1  Richard R. Rudnansky (SBN: 77981)
   rrudnansky@meyersnave.com
2  Julia L. Bond (SBN: 166587)
   jbond@meyersnave.com
3  Dawn A. McIntosh (SBN: 162713)
   dmcintosh@meyersnave.com
4  MEYERS, NAVE, RIBACK, SILVER & WILSON
   555 12th Street, Suite 1500
5  Oakland, California 94607
   Telephone: (510) 808-2000
6  Facsimile: (510) 444-1108

7  Attorneys for Defendants CITY OF COTATI and
   PLANNING COMMISSION OF THE CITY OF
8  COTATI

9                  **UNITED STATES DISTRICT COURT**

10                 **NORTHERN DISTRICT OF CALIFORNIA**

11

12  MICHAEL MEAD, an individual,              CASE NO. CV 08 3585 CW

13              Plaintiff,

14       v.                                   **DEFENDANTS CITY OF COTATI AND**
                                              **PLANNING COMMISSION OF THE**
15  CITY OF COTATI, a municipal corporation,  **CITY OF COTATI'S APPENDIX OF**
    PLANNING COMMISSION OF THE CITY           **FOREIGN AUTHORITIES IN SUPPORT**
16  OF COTATI, UNITED STATES FISH AND         **OF DEFENDANTS MOTION TO**
    WILDLIFE SERVICE, DONALD KOCH, in         **DISMISS**
17  his official capacity as Director of the
    California Department of Fish and Game,
18  Does 1-10, inclusive,
                                              Date:      October 9, 2008
19              Defendant.                    Time:      2:00 p.m.
                                              Crtrm.:    2
20
                                              Trial Date:        None Set
21

22

23

24

25

26

27

28
                                                              CV 08 3585 CW

1       Attached hereto are copies of the following Non-Federal authorities cited in Defendant's

2   Motion For Judgment On Partial Findings:

3   <u>Case Law</u>

4

5   *Abellerira v. District Court of Appeal,*
    17 Cal. 3d 280 (1941) ................................................................Tab 1

6

7   *Barratt American Incorporated v City of Rancho Cucamonga*
    37 Cal. 4th 685 (2005) ................................................................Tab 2

8   *Fogarty v. City of Chico,*
    148 Cal.App. 4th 537 (2007) ................................................................Tab 3

9

10  *Hensler v. City of Glendale,*
    8 Cal. 4th 1 (1994) ................................................................Tab 4

11  *Home Builders Association of Northern California v. City of Napa*
    90 Cal.App. 4th 188 (2001) ................................................................Tab 5

12

13  *McAllister v. County of Monterey,*
    147 Cal.App. 4th 253 (2007) ................................................................Tab 6

14  *Patrick Media Group v. California Coastal Commission,*
    9 Cal.App. 4th 592 (1992) ................................................................Tab 7

15

16  *Utility Cost Management v. Indian Wells Valley Water District,*
    26 Cal. 4th 1185 (2001) ................................................................Tab 8

17

18  *Travis v. County of Santa Cruz,*
    33 Cal.4th 757 (2004) ................................................................Tab 9

19  *Williams Communications, LLC v. City of Riverside,*
    114 Cal.App. 4th 642 (2003) ................................................................Tab 10

20

21  <u>Statutory Material</u>

22  **California Government Code**

23     Section 65009 ................................................................Tab 11

24     Section 65580 ................................................................Tab 12

25     Section 66000 ................................................................Tab 13

26     Section 66020 ................................................................Tab 14

27

28

City's Appendix of Foreign Authorities in Support of Motion to Dismiss

1  DATED: August 18, 2008              MEYERS, NAVE, RIBACK, SILVER & WILSON

2

3                                      By:    /s/ Dawn A. McIntosh

4                                          Dawn A. McIntosh
                                           Attorneys for Defendants CITY OF COTATI and
5                                          PLANNING COMMISSION OF THE CITY OF
                                           COTATI

6

7  1137121.1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

City's Appendix of Foreign Authorities in Support of Motion to Dismiss

# TAB 1

109 P.2d 942                                                                                           Page 1
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

▷

Abelleira v. District Court of Appeal, Third Dist.
Cal.

FRANK ABELLEIRA et al., Petitioners,
v.
THE DISTRICT COURT OF APPEAL OF THE
STATE OF CALIFORNIA, THIRD APPELLATE
DISTRICT et al., Respondents; MATSON NAVIG-
ATION COMPANY (a Corporation) et al., Inter-
veners.
**S. F. No. 16357.**

Supreme Court of California
February 7, 1941.

HEADNOTES

**(1) Prohibition § 17--Grounds for Relief Generally-
-Errors and Irregularities.**
The writ of prohibition never issues to restrain a
lower tribunal from committing mere error in de-
ciding a question properly before it.

**(2) Prohibition § 47--Jurisdiction and Procedure-
-Jurisdiction--Restraining District Court of Appeal.**
The Supreme Court has power by writ of prohibi-
tion to restrain a District Court of Appeal from pro-
ceeding in a matter over which it has no jurisdic-
tion.

**(3) Courts § 9--Jurisdiction--General Principles--In
General--Definition and Nature.**
The term "jurisdiction" has many different mean-
ings, depending upon the situation in respect of
which it is used. For the purpose of determining the
right to review by *certiorari,* restraint by prohibi-
tion, or dismissal of an action, the phrase "lack of
jurisdiction" may be applied to a case where,
though the court has jurisdiction over the subject
matter and the parties in the fundamental sense, it
has no "jurisdiction" or power to act except in a
particular manner, or to give certain kinds of relief,
or to act without the occurrence of certain proced-
ural prerequisites.

See 7 **Cal. Jur.** 584; 14 **Am. Jur.** 363.
**(4) Prohibition § 16 (1)--Grounds for Relief Gener-
ally--Want or Excess of Jurisdiction--In General.**
Speaking generally, any acts which exceed the
defined power of a court in any instance, whether
that power be defined by constitutional provision,
express statutory declaration, or rules developed by
the courts and followed under the doctrine of *stare
decisis,* are in excess of jurisdiction, in so far as
that term is used to indicate that those acts may be
restrained by prohibition or annulled on *certiorari.*

**(5)                    Unemployment                    Relief-
-Insurance--Procedure--Judicial    Remedies--    Ex-
haustion of Administrative Remedies.**
A District Court of Appeal is without jurisdiction to
issue a writ of mandate on application of employers
against the Employment Commission upon the
ground that the unemployment benefits awarded by
the adjustment unit were not authorized by the Un-
employment Insurance Act, where though the
award was affirmed by the referee, the employers
had not exhausted their right of appeal to the com-
mission (see Stats. 1935, chap. 352; Deering's Gen.
Laws, 1937, Act 8780d).

**(6)    Administrative    Law--Judicial    Remedies-
-Exhaustion of Administrative Remedies.**
Where an administrative remedy is provided by
statute, relief must be sought from the administrat-
ive body, and the remedy exhausted before the
courts will act. A court violating the rule acts in ex-
cess of jurisdiction.

**(7)    Prohibition    §    40--Judicial    Remedies-
-Exhaustion of Judicial Remedies-- Filing of Ap-
peal as not Constituting.**
The rule of exhaustion of remedies is not complied
with by the mere filing of an appeal; the remedies
are not exhausted until the appeal is fully prosec-
uted. Consequently the mere filing of an appeal
with the Employment Commission after procuring
the issuance of an alternative writ of mandate and a
temporary restraining order directing the withhold-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

ing of unemployment benefits is not a compliance with the rule requiring exhaustion of administrative remedies where because of the restraining order the commission is without power to act on the merits of the appeal.

**(8)** Unemployment Relief-
-Insurance--Procedure--Judicial Remedies-- Exhaustion of Administrative Remedies-
-Exceptions--Irreparable Injury.

Employers seeking a writ of mandate against the Employment Commission upon the ground that the unemployment benefits awarded are not authorized by the Unemployment Insurance Act are not excused from exhausting their administrative remedy of appeal to the commission where they are unable to show irreparable injury and where the effect would be to violate the provision in section 67 of the act that benefits shall be paid regardless of an appeal if the initial determination is affirmed by the referee.

**(9)** Unemployment Relief-
-Insurance--Procedure--Judicial Remedies-- Exhaustion of Administrative Remedies-
-Exceptions--Futility of Appeal.

Compliance with the rule requiring exhaustion of administrative remedies before resort to a *mandamus* proceeding to prevent unauthorized payment of unemployment benefits under the Unemployment Insurance Act cannot be evaded upon the claim that the commission has already decided cases on similar facts against the present position of the claimant and that, therefore, an appeal would be fruitless.

See 21 **Cal. Jur.** 594; 22 **R. C. L.** 19.

**(10)** Prohibition § 47--Jurisdiction and Procedure-
-Jurisdiction--Effect of Determination by Inferior Court.

A tribunal, judicial or administrative, has jurisdiction to determine its own jurisdiction in the sense that it may make the first preliminary determination thereof without interference. But when it acts to assume jurisdiction in accordance with that determination, its jurisdiction to act is subject to inquiry and restraint by a higher court.

See 14 **Am. Jur.** 368.

**(11)** Prohibition § 40--Application of Rules-
-Particular Civil Proceedings-- Contempt-
-Mandamus.

A writ of prohibition will issue where a District Court of Appeal has issued an alternative writ of mandate and a temporary restraining order against payment of unemployment benefits under the Unemployment Insurance Act prior to the exhaustion by the petitioning employers of their remedy under the statute of appeal to the Employment Commission. (See Stats. 1935, chap. 352; Deering's Gen. Laws, 1937, Act 8780d.)

### SUMMARY

PROCEEDING in prohibition to restrain the District Court of Appeal, Third Appellate District, and John F. Pullen, R. L. Thompson and Raglan Tuttle, justices thereof, from enforcing a writ of mandate and temporary restraining order. Writ granted.

### COUNSEL

Gladstein, Grossman, Margolis & Sawyer, Richard Gladstein, Ben Margolis and George Olshausen for Petitioners.

Robert W. Kenny, as *Amicus Curiae,* on behalf of Petitioners.

Earl Warren, Attorney-General, and John J. Dailey, Deputy Attorney- General, for Respondents.

Maurice P. McCaffrey, Glenn V. Walls, Webster V. Clark, Rogers & Clark, Milton Marks, J. M. Mannon, Jr., Edwin S. Pillsbury, George O. Bahrs, and McCutchen, Olney, Mannon & Greene, as *Amici Curiae,* on behalf of Respondents.

Brobeck, Phleger & Harrison, Gregory A. Harrison and Richard H. Ernst for Interveners. *283

### GIBSON, C. J.

Upon rehearing of this case, we adopt our prior opinion with certain minor modifications, as follows:

This is a petition for a writ of prohibition, to restrain the respondent District Court of Appeal from taking any steps toward the enforcement of a writ

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

of mandate and temporary restraining order heretofore issued by that court and directed against the California Employment Commission. For convenience, the term "petitioners" will be used to refer to those who seek the writ of prohibition in the present proceeding; the term "respondent" will refer to the District Court of Appeal; and the term "employers" will be used to refer to those employers who sought and obtained the writ of mandate and restraining order from the District Court of Appeal, as well as to other employers represented by counsel participating in the argument as *amici curiae*.

Petitioners are individual longshoremen ordinarily employed in the harbor of San Francisco and numbering about five thousand persons. As such workmen they are subject to the provisions of the California Unemployment Insurance Act. (Stats. 1935, chap. 352, as amended; Deering's General Laws, Act 8780d; Deering's 1939 Supplement, p. 1697.) Under the act a percentage of their earnings is deducted and paid into the unemployment fund, and this money, together with contributions from employers, is used to pay benefits to unemployed workers. The act is administered by a board known as the California Employment Commission, with powers usual to such commissions, including authority to adopt rules and regulations. (Sec. 90.) The procedure established by the act as it read at the time of this controversy is as follows: Application is made by an unemployed workman and notice thereof is sent to the employer. An initial determination is made by the adjustment unit, which is the lower tribunal. Notice of this determination and its reasons is sent to the applicant and the employers. If payment is ordered, any employer whose reserve account is affected by the payment may intervene and appeal, and payment will be stayed pending said appeal. (Sec. 67.) A referee is appointed by the commission to hear the appeal, which is conducted in the manner usual to such commission hearings, full opportunity being accorded to produce evidence and examine witnesses.*284 (Secs. 67-71.) The referee makes written findings and a

decision which, unless further appeal is taken, becomes final; but appeal lies to the commission. (Secs. 67, 68, 72.) This appeal is heard on the record and on any additional evidence produced; oral or written argument may be permitted; and the commission thereafter makes its findings of fact and decision. The commission may also transfer to itself proceedings on any claim pending before the referee, thus affording in some cases an opportunity to expedite a decision by the commission itself. (Sec. 72.) Section 67 contains a provision reading as follows: "If a referee affirms an initial determination allowing benefits, *such benefits shall be paid regardless of any appeal* which may thereafter be taken, but if such determination is finally reversed no employer's account shall be charged with benefits so paid as to each such determination so reversed." The importance of this provision will hereinafter appear.

During October and November, 1939, widespread unemployment occurred among petitioners. On or about November 10, 1939, they registered for work and made claim for unemployment benefits in accordance with the requirements of the statute. An initial determination was made by the adjustment unit that they were entitled to the benefits, and the employers, intervening, appealed from this determination. A hearing was had before a referee; considerable evidence was introduced and argument heard, following which written briefs were filed. On December 15, 1939, the referee made his decision affirming the initial determination.

On December 16, 1939, the employers applied to the District Court of Appeal, Third Appellate District, for a writ of mandate and other incidental relief, in a proceeding entitled *"Matson Navigation Company v. California Employment Commission"*. The employers objected to payment of the benefits on the ground that petitioners left work "because of a trade dispute", which, under section 56 of the act, disqualifies employees from receiving unemployment benefits. In their application for mandate the employers also alleged that they intend to and will

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

appeal to the commission; that they have not further exhausted their remedies before the commission because the proposed payment of benefits would violate the act; that in prior decisions the commission has indicated its position against the employers on the issue raised *285 and would decide against them; and that the unemployment fund would be seriously damaged by the allegedly unlawful payments contemplated in this case.

The District Court of Appeal issued an alternative writ of mandate and a temporary restraining order directed to the commission to withhold payment of unemployment benefits. The writ states that "any such payments which may be made ... are in violation of the provisions of the Unemployment Insurance Act", and orders the commission to refuse to pay as long as the asserted trade dispute is in progress, or to appear and show cause before the court why it has not done so. The restraining order was issued to enforce compliance with the mandate pending a final hearing on the alternative writ. The writ and restraining order having been issued *ex parte*, petitioners on December 18, 1939, made a motion to dissolve. The motion was argued, but the court submitted it without making any decision thereon at that time.

Subsequently, on December 22, 1939, the employers filed an appeal from the decision of the referee to the commission itself, which appeal is now pending.

On or about December 26, 1939, petitioners applied to this court for a writ of prohibition. On January 5, 1940, we issued an alternative writ. The matter was heard and is here on briefs of counsel, together with a number of additional briefs of *amici curiae* representing the commission, other employers and parties interested generally in the issues of the case. ·

The theory upon which the District Court of Appeal acted in issuing the writ of mandate clearly appears from the petition, the writ, and the briefs of counsel. The court, in ordering the commission to cease paying benefits, was undoubtedly of the belief that

the commission was acting beyond its statutory powers, and consequently was without jurisdiction to make the payments in question. This is expressly asserted by certain *amici curiae* appearing for the employers.

The theory upon which the writ of prohibition was sought is that the District Court of Appeal had no jurisdiction to issue the writ of mandate prior to completion of the administrative proceedings, and that petitioners had no plain, speedy or adequate remedy otherwise. (See Code Civ. Proc., sec. 1103, and authorities discussed *infra*.)*286

It must be understood at the outset that the merits of the controversy between the original parties, involving the interpretation of the "labor dispute" proviso in the Unemployment Insurance Act, are not before us. The important question is not *what* should be the decision on that point, but rather *how* the decision should be made. In the normal course the commission would make it, and thereafter judicial review, if appropriate, might be sought by either employers or employees. (See *Bodinson Mfg. Co. v. California Employment Commission,* Sac. No. 5407, this day decided, *post,* p. 321 [109 Pac. (2d) 935].) The employers, in departing from this normal procedure, and asking for a judicial review before completion of the administrative proceeding, rely upon assumptions of fact not supported by any record in this court. They seek to justify their action by charging that the determination in favor of petitioners is in violation of the law. But there has not, as yet, been any such final determination by the commission. That body has power to review the evidence previously presented before the referee, and also to take new evidence and make new findings, approving or disapproving those of the referee. It has not yet determined the facts upon which the right to benefits depends, and until it does so, it is improper for a reviewing court to consider the claims on their merits. The issue actually before us does not concern the rights of petitioners or their employers, nor the scope of the Unemployment Insurance Act. These matters were properly before

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

the court and were decided in the Bodinson Mfg. Co. case, *supra.* The question here is whether boards and commissions, charged with the administration of a statute, may carry on their administrative proceedings to completion before being subjected to judicial review. The importance of that issue can hardly be overestimated, since a curtailment of administrative jurisdiction usually means an enlargement of the duties of the courts in a field in which the courts traditionally are reluctant to enter.

### 1. *"Lack of jurisdiction" as a basis for writ of prohibition.*

The first inquiry in this case must, of course, be as to the nature and meaning of "jurisdiction"; and here three possible sources of confusion must be eliminated.

First is the argument of the employers that the District Court of Appeal has general original jurisdiction to issue writs *287 of mandate. This is not disputed, nor is the power of the court to review a final decision of the commission in issue. Whether the commission's decision as to the payment of benefits is subject to any judicial review, or whether it can be reviewed by mandate, are questions beyond the scope of this proceeding. They are considered and decided in the Bodinson Mfg. Co. case, *supra.* The writ herein was issued before any final decision of the commission was rendered, and the question before us now is whether the court could properly interfere with the uncompleted administrative proceeding.

(1) Second is the nature of a writ of prohibition, which never issues to restrain a lower tribunal from committing mere error in deciding a question properly before it. If the lower court has power to make a correct determination of a particular issue, it clearly has power to make an incorrect decision, subject only to appellate review and not to restraint by prohibition. Hence, in examining the authorities, we must conclude that in those situations in which a writ of prohibition was issued, the particular action

restrained was one beyond the jurisdiction of the court to take.

(2) Third is the question whether this court has power to restrain or otherwise control the action of the District Court of Appeal. There can no longer be any doubt on this point. The writ of prohibition is not confined in its operation to restraining trial courts from acting in original proceedings; it lies also to prevent a lower appellate court from reviewing on appeal a matter over which it has no jurisdiction. (*Shriver v. Superior Court,* 48 Cal. App. 576, 582 [192 Pac. 124]; *Commonwealth v. Yungblut,* 159 Ky. 87 [166 S. W. 808]; 50 C. J. 668, sec. 25.) This court has in fact issued prohibition directed against the District Court of Appeal in two comparatively recent cases. (*Fay v. District Court of Appeal,* 200 Cal. 522 [254 Pac. 896]; *People v. District Court of Appeal,* 193 Cal. 19 [222 Pac. 353]; see, also, *Stout v. Farwell,* 111 Cal. App. 31, 32 [295 Pac. 47].)

(3) We now proceed to a consideration of the meaning of the term "jurisdiction" in its relation to the granting of a writ of prohibition. The term, used continuously in a variety of situations, has so many different meanings that no single statement can be entirely satisfactory as a definition. At best it is possible to give the principal illustrations of the situations in which it may be applied, and then to consider *288 whether the present case falls within one of the classifications.

Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties. (See generally, 14 Am. Jur. 363, sec. 160.) Familiar to all lawyers are such examples as these: A state court has no jurisdiction to determine title to land located outside its territorial borders, for the subject matter is entirely beyond its authority or power. (See *Taylor v. Taylor,* 192 Cal. 71 [218 Pac. 756, 51 A. L. R. 1074].) A court has no jurisdiction to adjudicate upon the marital status of persons when neither is domiciled within the state. (See Restatement,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

Page 6

Conflict of Laws, sec. 111; *Ryder v. Ryder*, 2 Cal. App. (2d) 426 [37 Pac. (2d) 1069].) A court has no jurisdiction to render a personal judgment against one not personally served with process within its territorial borders, under the rule of *Pennoyer v. Neff*, 95 U. S. 714 [24 L. Ed. 565]. (See *Doherty & Co. v. Goodman*, 294 U. S. 623 [55 Sup. Ct. 553, 79 L. Ed. 1097], discussing modern exceptions to the rule.) A court has no jurisdiction to hear or determine a case where the type of proceeding or the amount in controversy is beyond the jurisdiction defined for that particular court by statute or constitutional provision. (See *Cambra v. Justice's Court*, 4 Cal. (2d) 445 [49 Pac. (2d) 1121].) Other examples of lack of jurisdiction in this fundamental sense will readily occur.

But in its ordinary usage the phrase "lack of jurisdiction" is not limited to these fundamental situations. For the purpose of determining the right to review by *certiorari*, restraint by prohibition, or dismissal of an action, a much broader meaning is recognized. Here it may be applied to a case where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no "jurisdiction" (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites. Thus, a probate court, with jurisdiction of an estate, and therefore over the appointment of an administrator, nevertheless acts in excess of jurisdiction if it fails to follow the statutory provisions governing such appointment. (*Texas Co. v. Bank of America*, 5 Cal. (2d) 35, 39 [53 Pac. (2d) 127].) The superior court may have jurisdiction over a cause of action *289 and the parties to a suit for libel, but in the case of non-residents, a bond for costs is required by statute, and unless such bond is filed, it is without jurisdiction to proceed, and will be restrained by writ of prohibition. (*Shell Oil Co. v. Superior Court*, 2 Cal. App. (2d) 348 [37 Pac. (2d) 1078]; see, also, *Carter v. Superior Court*, 176 Cal. 752, 757 [169 Pac. 667].) A court with jurisdiction over a cause may hear and determine it and give judgment, but it cannot award costs in a situation not provided by statute. (*Michel v. Williams*, 13 Cal. App. (2d) 198 [56 Pac. (2d) 546].) The superior court may have jurisdiction over a particular cause, but a disqualified judge may not sit and hear it if objection to his qualifications is raised, and prohibition will lie to prevent him from trying it. (*Hall v. Superior Court*, 198 Cal. 373, 387 [245 Pac. 814].) Where an injunction is sought against enforcement of a public statute, the court, despite its general equitable powers, has no jurisdiction to issue it. (*Loftis v. Superior Court*, 25 Cal. App. (2d) 346, 352 [77 Pac. (2d) 491]; *Reclamation Dist. v. Superior Court*, 171 Cal. 672 [154 Pac. 845].) A court may have jurisdiction to grant a new trial after motion based upon proper statutory grounds, but has no jurisdiction to make the order unless the moving party has given his notice of intention within the prescribed statutory time. (See *Peters v. Anderson*, 113 Cal. App. 158 [298 Pac. 76].) The court has power under section 473 of the Code of Civil Procedure to set aside its judgment or order on motion where it was entered against a party through inadvertence, excusable neglect, or mistake; but that power is wholly lost at the end of the six months' period prescribed by statute. (*Estate of Hunter*, 99 Cal. App. 191, 196 [278 Pac. 485].) An appellate court may have power to hear and determine a particular case on appeal, but is without jurisdiction to do so unless the procedural step of notice of appeal within the prescribed statutory time is taken. (*Aregood v. Traeger*, 94 Cal. App. 227 [270 Pac. 1002].) And if the notice is given before judgment is actually rendered, the premature appeal will be dismissed (*Aspegren & Co. v. Sherman, Swan & Co.*, 199 Cal. 532 [250 Pac. 400]), or a lower appellate court may be prevented from hearing it by writ of prohibition. (*Shriver v. Superior Court*, 48 Cal. App. 576, 582 [192 Pac. 124].) After reversal of a judgment with directions to the lower court, it has jurisdiction to enter judgment, *290 but is limited by the directions of the appellate court and is without jurisdiction to permit amended pleadings to raise new issues; hence prohibition will lie to prevent it from retrying the case. (*Lial v. Superior Court*, 133 Cal. App. 31 [23 Pac. (2d) 795].) The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942

17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

same is true where the superior court, in an appeal from a justice's court on questions of law alone, attempts to try the cause *de novo.*(*Sour v. Superior Court,* 1 Cal. (2d) 542 [36 Pac. (2d) 373].)

On a number of occasions the courts of this state have recognized the conflicting senses in which the term "jurisdiction" is used, and have emphasized the point that in applications for prohibition or *certiorari,* the broader meaning is involved. In our own recent decision, *Rodman v. Superior Court,* 13 Cal. (2d) 262 [89 Pac. (2d) 109], we said: "... some confusion exists with reference to what constitutes an excess, and what constitutes an error, in the exercise of jurisdiction. However, it seems well settled (and there appears to be no case holding to the contrary) that when a statute authorizes prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction, and *certiorari* will lie to correct such excess." In *Spreckels S. Co. v. Industrial Accident Com.,* 186 Cal. 256, 260 [199 Pac. 8, 9], where the commission made an award larger than the statute authorized and *certiorari* was sought, the court said: "The difficulty arises from the different shades of meaning which the word 'jurisdiction' has. As sometimes used, it means simply authority over the subject matter or question presented. In this sense the commission undoubtedly had jurisdiction in this case, and its award was not without jurisdiction on its part. But the word is frequently used as meaning authority to do the particular thing done, or, putting it conversely, a want of jurisdiction frequently means a want of authority to exercise in a particular manner a power which the board or tribunal has, the doing of something in excess of the authority possessed." (See, also, *Weintraub v. Superior Court,* 91 Cal. App. 763, 769 [267 Pac. 733]; *State v. Reynolds,* 209 Mo. 161 [107 S. W. 487, 491, 123 Am. St. Rep. 468, 14 Ann. Cas. 198, 15 L. R. A. (N. S.) 963], reviewing authorities on prohibition and quoting from *Appo v. People,* 20 N. Y. 531: "... The writ lies to prevent the exercise of any unauthorized power in a case or proceeding of which *291 the subordinate tribunal has jurisdic-

tion, no less than when the entire cause is without its jurisdiction.")

(4) The foregoing observations, while by no means a complete description of the term, nevertheless serve as a warning against a too restricted meaning. The concept of jurisdiction embraces a large number of ideas of similar character, some fundamental to the nature of any judicial system, some derived from the requirement of due process, some determined by the constitutional or statutory structure of a particular court, and some based upon mere procedural rules originally devised for convenience and efficiency, and by precedent made mandatory and jurisdictional. Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis,* are in excess of jurisdiction, in so far as that term is used to indicate that those acts may be restrained by prohibition or annulled on *certiorari.*And, as a practical matter, accuracy in definition is neither common nor necessary. Though confusion and uncertainty in statement are frequent, there is a surprising uniformity in the application of the doctrine by the courts, so that sound principles may be deduced from the established law by marshalling the cases and their holdings in this field.

### 2. *The requirement of exhaustion of administrative remedies.*

(5) Lack of jurisdiction in the District Court of Appeal to issue its writ of mandate is clearly established when the foregoing principles are considered in connection with a settled doctrine of administrative law. The Unemployment Insurance Act, summarized above, contains a complete administrative procedure, with provision for one original determination and two appeals, fulfilling every requisite of due process of law. Until that administrative procedure has been invoked and completed, there is nothing that the District Court of Appeal or any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

other court may review; it cannot interfere in the intermediate stages of the proceeding. The employers have no standing to ask for judicial relief because they have not yet exhausted the remedies given them by the statute. They still have their appeal to the commission, which appeal has not yet been decided adversely to them, and prior to the **\*292** prosecution of this appeal they have no right to demand an extraordinary writ from a court.

(6) This is the doctrine of "exhaustion of administrative remedies." In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act. The authorities to this effect are so numerous that only the more important ones need be cited here as illustrations. (See *Myers v. Bethlehem Shipbuilding Corp.,* 303 U. S. 41 [58 Sup. Ct. 459, 82 L. Ed. 638] [National Labor Relations Board]; *Prentis v. Atlantic Coast Line Co.,* 211 U. S. 210 [29 Sup. Ct. 67, 53 L. Ed. 150] [rate orders]; *Porter v. Investors Syndicate,* 286 U. S. 461, 468 [52 Sup. Ct. 617, 76 L. Ed. 1226] [investment commissioners and permit of investment company]; *United States v. Sing Tuck,* 194 U. S. 161 [24 Sup. Ct. 621, 48 L. Ed. 917] [immigration and the powers of the secretary of labor]; *Gorham Mfg. Co. v. State Tax Com.,* 266 U. S. 265 [45 Sup. Ct. 80, 69 L. Ed. 279] [tax board]; *Red River Broadcasting Co. v. Federal Communications Com.,* 98 Fed. (2d) 282, 284 [69 App. D. C. 1]; *Western Powder Mfg. Co. v. Interstate Coal Co.,* 5 Fed. Supp. 619, 621; *Hegeman Farms Corp. v. Baldwin,* 293 U. S. 163, 172 [55 Sup. Ct. 7, 79 L. Ed. 259] [liquor control board]; *United States Nav. Co. v. Cunard S. S. Co.*. 284 U. S. 474 [52 Sup. Ct. 247, 76 L. Ed. 408] [shipping board]; *De Pauw University v. Brunk,* 53 Fed. (2d) 647, 652; *Palermo L. & W. Co. v. Railroad Com.,* 227 Fed. (2d) 708; *Hammerstrom v. Toy Nat. Bank,* 81 Fed. (2d) 628 [tax board]; *American Bond etc. Co. v. United States,* 52 Fed. (2d) 318; *Monocacy Broadcasting Co. v. Prall,* 90 Fed. (2d) 421 [67 App. D. C. 176]; *Federal Trade Com. v. Claire Furnace Co.,* 274 U. S. 160, 174 [47 Sup. Ct. 553,

71 L. Ed. 978]; *St. Clair Borough v. Tamaqua etc. Ry. Co.,* 259 Pa. 462 [103 Atl. 287, 289, 5 A. L. R. 20]; *Corstvet v. Bank of Deerfield,* 220 Wis. 209 [263 N. W. 687, 697]; *Earl Carroll Realty Corp. v. New York Edison Co.,* 141 Misc. 266 [252 N. Y. Supp. 538, 543]; 48 Yale L. J. 981; 51 Harv. L. Rev. 1251; 35 Col. L. Rev. 230; 12 N. Y. Univ. L. Q. Rev. 393; 28 Mich. L. Rev. 637; 28 Cal. L. Rev. 129, 151, 154, 162.) The California cases have consistently applied this settled rule. (See *Teeter v. Los Angeles,* 209 Cal. 685 [290 Pac. 11]; *Collier & Wallis v. Astor,* 9 Cal. (2d) 202 [70 Pac. (2d) 171]; **\*293**San Joaquin etc. Co. v. Stanislaus,* 155 Cal. 21, 27 [99 Pac. 365]; *Dawson v. Los Angeles,* 15 Cal. (2d) 77 [98 Pac. (2d) 495].)

The rule itself is settled with scarcely any conflict. It is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis,* and binding upon all courts. We are here asked to sanction its violation, either on the ground that a valid exception to the rule is applicable, or that despite the uniformity with which the rule has been applied, it may be disregarded by lower tribunals without fear of prevention by the higher courts. This last point cannot be too strongly emphasized, for the rule will disappear unless this court is prepared to enforce it. To review such action of a lower court only on appeal or petition for hearing would permit interference with the administrative proceeding pending the appeal or hearing, with the effect of completely destroying the effectiveness of the administrative body. The writ of prohibition can alone operate surely and swiftly enough to prevent this unfortunate result; and only if we recognize that the rule is jurisdictional will it be uniformly enforced. Bearing in mind the analysis of jurisdiction which has heretofore been made, and examining the authorities dealing with the rule, we are necessarily led to the conclusion that exhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts.

In *Myers v. Bethlehem Shipbuilding Corp., supra,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

an application was made to the federal district court to enjoin the National Labor Relations Board from holding a hearing, but the employer applicant did not comply with the board's procedure. The United States Supreme Court annulled a preliminary injunction despite the employer's contention that the board had no authority over it because it was engaged in interstate commerce. The court declared that to uphold the employer's contention would be in effect "to substitute the district court for the board as the tribunal to hear and determine what Congress declared the board exclusively should hear and determine in the first instance". The court then went on to say: "The contention is at war with the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. That rule has been repeatedly acted on in cases *294 where, as here, the contention is made that the administrative body lacked power over the subject matter." The opinion of the court exhaustively cites the controlling authorities, and a footnote points out that "the rule is one of judicial administration-not merely a rule governing the exercise of discretion".

In *United States v. Sing Tuck, supra,* petitioner alleged that he was a citizen seeking to return to the United States. An immigration inspector decided against his claim of citizenship, and he failed to follow the statutory provision for appeal to the secretary of labor, seeking instead a writ of *habeas corpus.* The court denied relief, declaring (p. 167) that the act "points out a mode of procedure which must be followed before there can be a resort to the courts". The opinion then states that even though it be contended that the administrative officers are acting without jurisdiction, "it is one of the necessities of the administration of justice that even fundamental questions should be determined in an orderly way".

In *Gorham Mfg. Co. v. State Tax Com., supra,* it was held that a suit against the New York Tax Commission to enjoin collection of a tax alleged to

be invalid and levied under an unconstitutional statute was properly *dismissed* for failure of plaintiff to avail itself of the administrative remedy provided by the statute for revision and correction of the tax. The court said (p. 269): "A taxpayer who does not exhaust the remedies provided before an administrative board to secure the correct assessment of a tax, cannot thereafter be heard by a judicial tribunal to assert its invalidity."

In *Red River Broadcasting Co. v. Federal Communications Com., supra,* a broadcasting company appealed to the courts from a decision of the commission granting a permit for the construction of another station. The appeal was *dismissed* on the ground that appellant had failed to exhaust its administrative remedies and hence could not invoke the jurisdiction of the courts. The opinion, citing numerous cases, states (p. 284): "It is a well settled rule of judicial administration that no one is entitled to judicial relief until he has exhausted all prescribed applicable, administrative remedies. Generally, the rule is stated as being conclusive of the rights of one who prematurely asks judicial review, without intimation *295 or suggestion that any judicial discretion is involved in its application."

In *Porter v. Investors Syndicate, supra,* it was said that "the legislative process remains incomplete" until the administrative remedy is exhausted.

In *Western Powder Mfg. Co. v. Interstate Coal Co., supra,* the court declared that it "has no jurisdiction of such controversies until the administrative remedies have been exhausted".

This court recently gave the rule its full force in *Collier & Wallis v. Astor, supra.* In that case the Private Employment Agency Law required that certain controversies be submitted to the labor commissioner subject to later appeal to the superior court. Plaintiff sued on a contract coming within the scope of the statute, and defendant objected that no determination by the commissioner had been made prior to commencement of the action. We sustained the objection, saying (p. 206): "The pro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

vision of section 19 of the Private Employment Agency law providing for a reference to the labor commissioner of controversies arising under said act for hearing and determination by such official, being a valid legislative enactment, any action brought in the Superior Court without first making said reference and securing said determination, is prematurely brought and cannot be maintained."

(7) The mere filing of the appeal with the commission, after the mandate and stay order had issued, was not a fulfillment of the requirements of the rule. It was purely a formal step, not intended to have any substantial effect, for the commission was then under the restraint of the court's order, and unable to act upon the merits of the case. The courts have considered this type of evasion and have held that the rule of exhaustion of remedies is not complied with by the mere filing of an appeal; the remedies are not exhausted until the appeal is fully prosecuted. Consequently the filing of the appeal with the commission is no more a compliance with the rule than the participation in the original hearing before the Adjustment Unit, or the first appeal before the referee. (See *Southland Industries v. Federal Communications Com.,* 99 Fed. (2d) 117 [69 App. D. C. 82]; *Chicago etc. R. R. Co. v. Basham,* 249 U. S. 164, 167 [39 Sup. Ct. 213, 63 L. Ed. 534].) Thus, in *Southland Industries v. Federal Communications Com., supra,* where the petitioner applied to \*296 the court while his petition for rehearing before the commission was pending and undecided, the court said: "Upon the filing of its appeal in this court-its petition for rehearing being then undisposed of-appellant occupied the anomalous position of asking the Commission for administrative relief, and at the same time asking the court for judicial relief from the anticipated decision of the Commission. See *Vincent v. Vincent,* 3 Mackey, 320, 322,14 D. C. 320, 322; *Chicago Great Western R. Co. v. Basham,* 249 U. S. 164, 167, 39 Sup. Ct. 213, 63 L. Ed. 534; *Doyle v. District of Columbia,* 45 App. D. C. 90; *Burnet v. Lexington Ice & Coal Co.,* 4 Cir., 62 Fed. (2d) 906. 'Two courts cannot have jurisdiction in the same case at

the same time.' (*Lasier v. Lasier,* 47 App. D. C. 80, 83; see *Andrews v. Virginian Ry. Co.,* 248 U. S. 272, 39 Sup. Ct. 101, 63 L. Ed. 236.)As appellant elected to petition for a rehearing, the Commission retained jurisdiction; and as it failed to act on the petition its decision has never become a final one from which an appeal could be taken. (See *Voorhees* v. [*John T.*] *Noye Mfg. Co.,* 151 U. S. 135, 14 Sup. Ct. 295, 38 L. Ed. 101; *Kingman & Co. v. Western Mfg. Co.,* 170 U. S. 675, 18 Sup. Ct. 786, 42 L. Ed. 1192; *Northern Pac. R. Co. v. Holmes,* 155 U. S. 137, 138, 15 Sup. Ct. 28, 39 L. Ed. 99; *Harrison v. Magoon,* 205 U. S. 501, 27 Sup. Ct. 577, 51 L. Ed. 900.Consequently, this court is without jurisdiction."

### 3. *The employers' assertion of irreparable injury.*

(8) The employers seek to avoid the operation of the rule, however, by the contention that they would suffer irreparable injury if the administrative hearing were permitted to proceed and its orders made effective without judicial interference at this time. The cases they cite are those dealing with rate orders of regulatory commissions, where the administrative body imposes a confiscatory rate on a public utility. Continued operation of the business at the rate imposed pending the appeal may in some instances be so unprofitable as to amount to a destruction of the business, and therefore a taking of property without due process of law. The courts in these cases issue injunctions to stay the enforcement of the new rate until a final determination of its validity, in order to protect the constitutional rights of the petitioning utilities. In brief, these decisions establish the right to equitable relief to protect the property rights of a petitioner from irreparable \*297 injury immediately threatened by a void administrative act. The soundness of this proposition cannot be questioned, but it has no relevancy here.

What injury do the employers show? They say that they will suffer in the event unauthorized payments are made to unemployed workers, because their ac-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

counts will be charged with such payments, and their reserve under section 39 of the act will be thereby decreased, with the ultimate result that they may in 1941 pay contributions at an increased rate. In examining this contention, we must remember just what the employers are trying to do. They are attempting to prevent payment of public funds in which they have no direct interest, by a body specially charged with the duty of making such payment. We held, in the Bodinson Mfg. Co. case, *supra,* that they are aggrieved parties entitled to demand judicial review. But the question here is not whether they are aggrieved to the extent necessary to gain standing on appeal or review. The question is whether the payment of benefits at this time constitutes such an immediate and irreparable injury as to warrant the drastic step of interfering with an uncompleted administrative proceeding, in defiance of an established rule of jurisdiction. To this question there are several decisive answers.

In the first place, their whole contention is purely speculative. The maximum contribution which they can be required to pay under the statute is 2.07 per cent. This cannot be increased, and the extent of their possible injury would therefore be the loss of a hoped for lower rate under the so- called merit rating provision of the statute. This provision enables employers with a favorable employment experience to obtain a slightly lower rate of contribution, when their account on the commission books shows an excess of contributions over benefits paid. (See secs. 39, 40, 41.) But the narrow range in which the contribution rate fluctuates can be affected by a variety of circumstances and by numerous instances of unemployment. It cannot be determined at the present time whether this particular order of payment would, in the light of all the occurrences of the past year and any other period involved, actually result in a changed rate. (See 88 Univ. Pa. L. Rev. 137, 142.)

Second, it is provided in section 67 of the act that in the event that any payments of benefits are found to be erroneous, *298 the particular employer's ac-

count shall not be charged with them. This being so, it is not clear how his contributions can be increased by the payments, since the factor determining the rate is made inapplicable in such event.

The third answer is more fundamental; the mandate contravenes the express provision of section 67 that "if a referee affirms an initial determination allowing benefits, such benefits shall be paid regardless of any appeal which may thereafter be taken ..." This is one of the most significant statements in the act. In substance it provides that when the initial determination has been reviewed and approved by the intermediate appellate authority (the referee), no further delay in *payment* shall be permitted even though the issues may be still further considered in a subsequent appeal. It was designed to carry out the policy declared in section 1 of alleviating the evils of unemployment, as part of a national plan of social security in which federal and state legislation is coupled. (Sec. 2.) The very essence of the act is its provision for the prompt payment of benefits to those unemployed. (See 88 Univ. Pa. L. Rev. 137, 139.) Any substantial delay would defeat this purpose and would bring back the very evil sought to be avoided. The legislature, recognizing the importance on the one hand of avoiding improvident payments without due consideration of the right thereto, and the danger on the other hand of withholding the payments for long periods through the slow processes of appeal to the commission and perhaps eventually to the courts, took a middle course. It provided for a preliminary appeal or review of the first determination where payments were ordered. This appeal, ordinarily decided in a short period of time, carries with it a stay. But when this second decision has also been made in favor of the applicants, the benefits begin, with protection, as already noted, for the employer in the event of later reversal.

The proceeding instituted by the employers ignores this statutory objective, and attempts to do precisely what the statute forbids. Their position is that the challenge in a court of law of any of the numerous

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

factual and legal determinations which the referee must make in any decision to pay benefits is sufficient cause for the statute to cease operating. They believe that to continue payments where the propriety thereof has not yet been settled by the courts is an invasion of their *299 legal rights. But in truth there is nothing unusual in the provision, which is in force in some thirty-six of the states. The legislature has concluded on the basis of normal experience that the large majority of the administrative orders will be proper, and that to permit these justifiable and necessary payments to be postponed for long periods would defeat the objectives of the act. The courts have upheld similar provisions in workmen's compensation acts, where the statutes required payments of compensation after stay orders of limited duration, despite the pendency of proceedings on appeal or review. In *Employers' Mutual Ins. Co. v. Industrial Com.,* 65 Colo. 283 [176 Pac. 314], an employer's insurance company sought to enjoin enforcement of a commission award until the court could pass upon the legal questions. This was denied, and on appeal the court said (p. 316): "... the judgment of the commission in favor of a claimant is *prima facie* evidence of his right to recover. Procedure under the act is summary in character in order to furnish immediate aid to injured employees, and a careful reading of the statute as a whole leads to the conclusion that it was the intention of the legislature that payment of these weekly allowances should not be stayed. Indeed, to hold that such payments can be enjoined pending judicial review would in effect practically nullify one of the prime objects and purposes of the law." And in *Bannister v. Shepherd,* 191 S. C. 165 [4 S. E. (2d) 7], the South Carolina Industrial Commission made an award of compensation, from which the insurance carrier gave notice of appeal to the Supreme Court, meanwhile refusing to make the payments ordered. The statute provided that an appeal from an award of the commission should operate as a *supersedeas* for thirty days only, and thereafter the employer should be required to make payments until the issue was finally determined. The insurance carrier contended that if it were forced to pay

and ultimately obtained a reversal, there would be no way to recover the payments erroneously made, and therefore the statute violated its constitutional rights. The court called attention to the rule that there is no right to *supersedeas* pending an appeal except where expressly authorized by statute; pointed out that the legislative purpose was to prevent the long delays incident to an appeal by an insurance carrier seeking to escape payment; and observed further that the Workmen's Compensation Act "is a form of social legislation passed primarily for the benefit of the employee, *300 and to prevent the burden of injured employees becoming charges upon society". The opinion finally concludes: "The legislature has in clear and convincing language provided that an appeal shall only act as a *supersedeas* for a period of thirty days, whether or not this was a wise decision ... is not the province of this court to say."

The foregoing cases demonstrate the weakness of the argument that because a commission may make an occasional error in ordering some payment out of a public or semi-public fund, the courts must have the power to stay any and all payments during the lengthy period of judicial review. The legislature has concluded that it is wiser to have a system of unemployment compensation operating with a possible small percentage of error, than to have a system not operating at all. The legislative power to make such provision is unquestioned; the statutory language cannot be misunderstood; and for the courts that is the end of the matter.

To these arguments the employers answer that the statute does not in terms apply to the present case. Their theory is that the term "appeal" in section 67 must be given a restricted interpretation, to refer only to an appeal to the commission, and that it therefore does not purport to prohibit a stay pending a review by a court. Parenthetically it may be pointed out that the employers have already appealed to the commission, and while that appeal is pending the order to cease payments violates the statute. But this inconsistency need hardly be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942                                                                                      Page 13
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

stressed, for the entire argument begs the question. The issue is *whether there is a review proceeding properly pending in a court.* As we have already shown, the District Court of Appeal has no jurisdiction to take over the proceeding, unless some valid exception to the rule of exhaustion of remedies could be established; and the employers, by way of proving such an exception, assume the very point in issue, namely, the pendency of a valid proceeding before the District Court of Appeal to review the merits of the administrative determination. It is impossible to explain away section 67 by such reasoning as this.

(9) 4. *The assertion that appeal would be futile.*

One final argument of the employers to justify disregard of the administrative remedy may be noticed. They assert that the commission has already decided cases on similar facts against their present position, and therefore that an appeal in the instant case would be fruitless. This is, indeed, the slender *301 thread upon which their entire case hangs. But again their position is unsound in principle and unsupported by the better authorities, for it was early perceived that to countenance this view would break down the rule of exhaustion of remedies. In substance the contention is that if they learn upon hearsay or by analogy that the administrative board may take a certain action, the board may be ignored and its action treated as already taken. We should all be very much surprised, no doubt, to find such an assertion made in the judicial field. One might attempt, for example to bring an original suit in the Supreme Court on the theory that the local superior judge was possessed of a particular opinion opposed to the views of the plaintiff, but he would receive scant consideration. The whole argument rests upon an illogical and impractical basis, since it permits the party applying to the court to assert without any conclusive proof, and without any possibility of successful challenge, the outcome of an appeal which the administrative body has not even been permitted to decide. This argument, though successful in a few cases, has been rejected by the

weight of authority. In *Gilchrist v. Interborough Rapid Transit Co.,* 279 U. S. 159, 209 [49 Sup. Ct. 282, 73 L. Ed. 652], the court said that orderly action could not be defeated "by alleging an intent to deny the relief sought." And in *Red River Broadcasting Co. v. Federal Communications Com., supra,* the opinion states: "Appellant seeks further to excuse its failure, affirmatively to seek administrative relief, by contending that, even if it had attempted to do so, its request would have been denied; consequently, that its attempt would have been a futile and useless gesture. We cannot assume that consequence. If under such circumstances relief had been sought and denied, then there would have been basis for appeal. ... It cannot be heard to complain in this court that there was danger of refusal when it made no effort to do so." (See, also, *United States Nav. Co. v. Cunard S. S. Co.,* 284 U. S. 474, 488 [52 Sup. Ct. 247, 76 L. Ed. 408]; *United States v. Felt & Tarrant Mfg. Co.,* 283 U. S. 269, 272 [51 Sup. Ct. 376, 75 L. Ed. 1025].)

It should be observed also that this argument is completely answered by those cases which apply the rule of exhaustion of remedies to rehearings. Since the board has already made a decision, if the argument of futility of further application were sound, then surely this is the instance in which it would *302 be accepted. But it has been held that where the administrative procedure prescribes a rehearing, the rule of exhaustion of remedies will apply in order that the board may be given an opportunity to correct any errors that it may have made. (See *Palermo L. W. Co. v. Railroad Com., supra; Carlson v. Railroad Com.,* 216 Cal. 653, 655 [15 Pac. (2d) 859]; *Red River Broadcasting Co. v. Federal Communications Com., supra; McCardle v. Board of Commissioners,* 195 Ind. 281 [144 N. E. 877, 878].)

(10) 5. *Jurisdiction to determine jurisdiction.*

The final contention is advanced that though all of the above conclusions may be entirely correct, and that in consequence the District Court of Appeal has no jurisdiction to hear and determine the merits

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

of the case, nevertheless it has power *to hear and determine the question whether it has jurisdiction.* If by this statement it is meant that the court had jurisdiction to determine whether the employers had exhausted their remedies before the commission, the record itself is a conclusive answer. The employers have affirmatively alleged their failure to exhaust their remedies before the commission, and their entire argument is devoted to an attempt to excuse such failure. On this point there is no issue presented, but only an admitted fact. If, on the other hand, the statement means that the court had jurisdiction to determine whether it had jurisdiction of the merits of the cause, it is indeed a strange argument. Stated plainly, the proposition is that a court may temporarily interrupt any pending proceeding, administrative or judicial, and hold that proceeding in abeyance while it decides whether it had any power to interfere in the first place; *and during all this time it is immune from any restraint by a higher court.* If that is true as applied to this case, then there is no control over unauthorized, arbitrary assumptions of judicial power except the slow process of appeal or petition for hearing. We cannot, of course, lightly accept such a destructive doctrine, and it must be rejected unless compelled by the strongest logic and precedent. But upon careful study and examination of the authorities cited, we find neither.

The proposition, stated simply, is that a tribunal has jurisdiction to determine its own jurisdiction. This is a truism, and, subject to certain implicit limitations, is ordinarily a correct statement of law. It has its origin mainly in the cases holding that a court has inherent power to inquire *303 into jurisdiction of its own motion, regardless of whether the question is raised by the litigants. (See 15 C. J. 851, 852, secs. 170, 171; 14 Am. Jur. 368, sec. 168; *Morris v. Gilmer,* 129 U. S. 315, 325 [9 Sup. Ct. 289, 32 L. Ed. 690].) It rests also upon the theory that until the court determines that it has jurisdiction and does some act in consequence, there can be no injury to the party who denies its jurisdiction. (See *Noland v. Superior Court,* 26 Cal. App. (2d)

708 [80 Pac. (2d) 76].) It means only that the trial court or lower tribunal or body to which the question is submitted has such jurisdiction to make the first preliminary determination-not a final one; and no interference is permitted until it does decide the matter one way or the other. Until it acts to assume or refuse jurisdiction over the merits no one is entitled to complain.

But once the tribunal, judicial or administrative, has made this determination of the issue, and has acted to assume jurisdiction of the cause, the rule no longer has any meaning. *The jurisdiction to determine jurisdiction has been fully exercised* by a determination in favor of jurisdiction over the cause; the question is no longer of jurisdiction to *determine,* but of jurisdiction to *act.* And jurisdiction to act is always a subject of inquiry by a higher court. The cases cited by the employers declare well-established law and are in accord with this basic distinction. For example, in *Noland v. Superior Court, supra,* the superior court made an order to show cause in a custody proceeding. Petitioner appeared at the hearing and moved to dismiss the order for lack of jurisdiction. The motion was submitted, and while pending and undecided, petitioner sought a writ of prohibition from the District Court of Appeal. The writ was denied. *Chester v. Colby,* 52 Cal. 516, in which a demurrer raising the jurisdictional point was pending and undetermined, is to the same effect. In neither case had the lower court taken any action in the cause at the time prohibition was sought; it was simply considering whether or not it had jurisdiction to act.

The situation presented in the instant case is entirely different. If the District Court of Appeal, in response to the employers' application and petitioners' objection thereto, *had taken under consideration* the question *whether it had jurisdiction to issue the writ of mandate,* we would have no reason to interfere pending its determination thereof. But the District Court of Appeal did more than this; it acted. It did not *304 merely deliberate upon the question whether it should intervene in the adminis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

trative proceeding; it did intervene. The issuance of the writ of mandate with its stay was a positive assumption of jurisdiction, for it displaced the prior jurisdiction of the commission, and rendered that body powerless to proceed. To say that the District Court of Appeal, left alone, may ultimately reach the same conclusion as we do here, and therefore should not be restrained, is no longer an answer. The writ of prohibition is not refused nor held in abeyance because the lower tribunal may ultimately realize the error of its assumption of jurisdiction; it is granted at the time the act in excess of jurisdiction occurs. This very point was cogently stated by the court in *Kilburn v. Law,* 111 Cal. 237, 242 [43 Pac. 615]: "It is said that the objection that the complaint does not state a case of which the court has jurisdiction is in the nature of a demurrer, and that the superior court has jurisdiction to consider all such questions, and they cannot be made the ground for a writ of prohibition. *This point cuts too deep, and, if sustained so broadly, would deprive this court of all power to issue writs of prohibition in cases where a lower tribunal is exceeding its jurisdiction.*" And in *Brougham v. Oceanic Steam Nav. Co.,* 205 Fed. 857, 859, the court spoke in similar vein: "It is sometimes said that every court has jurisdiction to determine its own jurisdiction. This is partly true and partly untrue. A court must, as an incident to its general power to administer justice have authority to consider its own right to hear a cause. But the mere decision by a court that it has such right when it does not exist does not give it authority. A court by moving in a cause assumes authority, but the assumption does not confer it."

The controlling test of the correctness of the employers' theory must necessarily be found in its practical operation. We have already referred to the cases which correctly apply it during the court's deliberation, and up to the time it acts. If it goes further, as the employers contend, we should expect to find some suggestion to that effect in the authorities. But all the California cases dealing with this situation have reached exactly the opposite result. In each case a commission or administrative officer

assumed jurisdiction of a cause, and a superior court thereafter sought to take jurisdiction of the same cause. Under the theory urged here, if the court had jurisdiction to determine its jurisdiction, no higher court could stop this interference by prohibition, and the question *305 whether the interference was proper would have to await an appeal. But in every instance the appellate court issued a writ of prohibition to restrain the lower court from interfering with the administrative proceeding.

This, in *Goodyear etc. Co. v. Hanby,* 111 Cal. App. 382 [295 Pac. 562], an employee received an award from the Industrial Accident Commission and later sued in the superior court to enforce compliance therewith. It was held that the cause was within the jurisdiction of the commission, that therefore the court had no jurisdiction, and that a writ of prohibition should issue to prevent the trial. In *Vallejo Bus Co. v. Superior Court,* 19 Cal. App. (2d) 201 [65 Pac. (2d) 86], the Railroad Commission made an order permitting a utility to sell stock. The superior court gave a preliminary injunction. It was held that the court acted beyond its jurisdiction in thus interfering with the commission by such restraining order, and a writ of prohibition was issued to prevent the court from doing so. In *Lee v. Superior Court,* 191 Cal. 46 [214 Pac. 972], the Industrial Accident Commission, in a proceeding involving a nonresident minor, appointed a guardian *ad litem* to handle the award. The probate court sought to appoint a guardian of the estate. It was held that the commission's prior jurisdiction could not be usurped by the probate court, and that prohibition should issue to prevent its interference. Finally, in the recent decision in *Evans v. Superior Court,* 14 Cal. (2d) 563 [96 Pac. (2d) 107], the lower court sought to interfere by injunction with an administrative proceeding commenced by the Building and Loan Commissioner. This court issued a writ of prohibition to prevent such interference, saying (p. 415): "We believe that the trial court in the present case has acted and is acting in excess of its jurisdiction. ... We have heretofore held that the statute authorizes the commissioner to appoint necessary assistants and it

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

Page 16

appears that the proceedings of the trial court are preventing the exercise of the authority thus conferred upon him."

(11) It thus appears that under established principles of legal procedure the District Court of Appeal was without jurisdiction to issue its writ of mandate, and that petitioners are entitled to a peremptory writ of prohibition. The employers' application was founded upon an asserted right to judicial interference with an administrative proceeding before it became final, and hence impliedly claimed a right to interfere in the middle or the beginning, or even before any such *306 proceeding was commenced. This attitude challenges judicial practices of long standing. The courts have repeatedly recognized the necessity of placing the numerous and complex problems arising under statutes of the type involved herein in the hands of expert bodies, familiar with the subject matter through long experience. They have pointed out that to permit the initial consideration of these matters by the courts would not only preclude the efficient operation of the acts, but would overwhelm the courts with cases of a technical, specialized character, and seriously impair their capacity to handle their normal work. (See *Myers v. Bethlehem Shipbuilding Corp., supra;United States v. Sing Tuck, supra;United States Nav. Co. v. Cunard S. S. Co., supra;Federal Communications Com. v. Pottsville Broadcasting Co.,* 309 U. S. 134 [60 Sup. Ct. 437, 440, 443, 84 L. Ed. 656]; *Armstrong v. United States,* 16 Fed. (2d) 387, 389.)The observation of the United States Supreme Court in *Federal Communications Com. v. Pottsville Broadcasting Co., supra,* is a timely reminder: "It is always easy to conjure up extreme and even oppressive possibilities in the exercise of authority. But courts are not charged with general guardianship against all potential mischief in the complicated tasks of government." We can with safety and assurance follow the traditional policy of the courts in this respect, remaining ready to review any final improper action (see the Bodinson Mfg. Co. case, *supra.*), but permitting the administrative body initially to decide its myriad problems un-

hindered.

Let a peremptory writ of prohibition issue restraining the respondent District Court of Appeal from taking any steps toward the enforcement of its writ of mandate and temporary restraining order heretofore issued and directed against the California Employment Commission.

Edmonds, J., Traynor, J., Peters, J., *pro tem.,* and Carter, J., concurred.
SHENK, J.,
Dissenting.

I dissent.

The majority opinion and decision, when considered in connection with the decisions filed concurrently herewith in *Gantner & Matter Co. v. California Employment Com.* (Sac. No. 5406, commenced December 5, 1939) and in *Bodinson Manufacturing Co. v. California Employment Com.* (Sac. No. 5407, commenced December 5, 1939), demonstrates the incongruity *307 of the results which flow from the decisions in this group of cases.

In the Gantner & Mattern Company case, the District Court of Appeal regularly assumed jurisdiction to determine the right of the petitioner to the relief sought. That court issued an alternative writ of *mandamus* pursuant to its constitutional power (Const., art. VI, sec. 4b) and to sections 1084 to 1097 of the Code of Civil Procedure. No proceeding was commenced in this court or elsewhere to prohibit the District Court of Appeal from exercising its constitutional and statutory power in that proceeding. That court heard the matter on the merits on the petition and the return to the alternative writ and denied the peremptory writ, with opinion, and on the ground that the petitioner therein had not exhausted its statutory remedy. In due course the cause, transferred to this court for hearing and determination, has been decided by the majority on the same record presented to the District Court of Appeal and likewise on the merits and with the same result. For the purposes of this dissenting

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

opinion, it matters not whether the District Court of Appeal denied or granted the peremptory writ. The fact is that this court has recognized the power of the District Court of Appeal to render a decision in that proceeding on the merits, and to have that proceeding pursue its constitutional course to this court and, in turn, this court has disposed of the proceeding on its merits.

In the present proceeding in prohibition, it appears that on December 16, 1939, the Matson Navigation Company and others commenced a *mandamus* proceeding in the same District Court of Appeal, wherein that court likewise issued an alternative writ and was proceeding to hear and determine the matter on a return to that writ and on a set of facts raising the identical issues on the merits as were involved in the Gantner & Mattern Company case. Yet this court in the present proceeding halted the prompt determination of the Matson Navigation Company case and is now denying power in the District Court of Appeal to dispose of that case in like manner as this court has now disposed of the Gantner & Mattern Co. case.

Furthermore, in the Bodinson Mfg. Co. case, this day filed, this court by a ruling on the merits, and to the same effect as determined by the District Court of Appeal, has decided that the petitioner therein had exhausted the statutory remedies *308 and was entitled to an order of this court compelling the commission to deny the claims for benefits therein involved on the ground that the claimants were ineligible under the act to receive them.

Yet, in the present proceeding, this court has declared that the District Court of Appeal is without jurisdiction to decide whether the Matson Navigation Company had exhausted its statutory remedies and, if so, to decide whether the claimants for benefits in that proceeding were eligible to receive the same, or if not to deny the relief sought, as it had done in the Gantner & Mattern Co. case.

From the foregoing the conclusion is unavoidable that if the District Court of Appeal in the first instance and this court on transfer had jurisdiction to pass upon the merits of the Gantner & Mattern Co. case, as conclusively appears by the course taken in that case, then the District Court of Appeal had jurisdiction to decide, on identical issues, the Matson Navigation Co. case. On the other hand, if the District Court of Appeal had no jurisdiction in the Matson Navigation Co. case (as has been decided), then it would necessarily follow that this court has no such jurisdiction, the petitioners in the *mandamus* proceeding are without remedy in the courts, and the commission allowed to proceed without the restraint universally recognized to be necessary in the proper application of administrative law.

The sole question presented in the present proceeding in prohibition is whether the District Court of Appeal has the power to decide a certain controversy pending before it. That question here is not whether the employees affected are or are not entitled to unemployment benefits, but whether the petitioners in the *mandamus* proceeding pending before the District Court of Appeal have stated a case which that court has jurisdiction to entertain and determine. In my opinion, that court has that power and to deny it by the issuance of a peremptory writ of prohibition is to deny to parties interested the right to seek redress in our courts against threatened unlawful action on the part of a state administrative board.

The case presented to the District Court of Appeal is one calling for a judicial determination of the powers of the Board under the statute of its creation. Particularly in that proceeding the problem is whether on the admitted facts the legislative remedy of appeal to the commission from the decision of the referee is adequate and, if not, whether it is not *309 the legal duty of the California Employment Commission of its own motion, if need be, and contrary to its alleged intention, to set aside, pursuant to section 72 of the act, the decision of the referee affirming the initial determination allowing benefits, and in any event to disallow such benefits, and thus prevent the alleged illegal payments from

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

the unemployment fund.

In the *mandamus* proceeding, the District Court of Appeal was called upon to decide two principal questions:

First, whether under the undisputed facts found by or under the authority of the commission, the claimants for payments from the unemployment fund were eligible to receive the benefits. Section 56 (a) of the act provides:

"An individual is not eligible for benefits for unemployment, and no such benefits shall be payable to him under any of the following conditions: (a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

It is contended in the *mandamus* proceeding that the claimants, petitioners here, are not eligible for benefits under the foregoing section and under the facts found by, as distinguished from the conclusions of, the commission's referee. The question of the legal duty of the commission under the law and the facts was there squarely presented for that court's determination. The claimants have taken the position that the decisions of the commission allowing and directing the payment of benefits are beyond judicial review. Indeed, on oral argument counsel for the commission expressed this view. It cannot be true that this is the attitude of the members of the commission, who are public officers acting as trustees of a public fund which now contains an enormous amount of money collected from the employers and employees of the state for a specific purpose, namely, for the relief of employees who have been subjected to involuntary unemployment and who are eligible under the law to receive benefits. If the commission persists in payment to those who are ineligible to receive benefits, as is alleged in the pending *mandamus* proceeding, approximately a half million dollars will be unlawfully paid out of a fund whose beneficial and lawful adminis-

tration was mistakenly anticipated in the litigation which resulted in declaring the constitutionality of the act under which the *310 commission was created and is functioning. (*Gillum v. Johnson,* 7 Cal. (2d) 744 [62 Pac. (2d) 1037,63 Pac. (2d) 810, 108 A. L. R. 595].)

To hold that a commission set up by a statute of this state with the highly important and responsible duties of the Employment Commission is not amenable to judicial process in the pending *mandamus* proceeding would be to constitute the commission an autocratic body whose functioning is uncontrolled by any consideration except its own whim and caprice. Such of course is not the law of this state, nor of any other jurisdiction, state or federal. In this state the District Court of Appeal has constitutional and statutory authority to direct public officers to perform their duties under the law. (Const., art. VI, sec. 4b; secs. 1084-1097, Code Civ. Proc.) That power is coextensive with the same power reposed in this court except that the decision of that court is subject to review by this court by appropriate order of transfer. It is contended that not only under section 56 (a) of this act are the petitioners herein ineligible to receive the claimed benefits, but that section 67 also prescribes that benefits shall be paid only to claimants who are eligible to receive them. To deny to the District Court of Appeal the right and power to decide whether the petitioners herein are or are not eligible under the statute and the admitted facts would be deliberately to shut our eyes to an alleged arbitrary, flagrant and unlawful assumption of power by the Employment Commission.

In my opinion there is not the slightest doubt that a justiciable controversy within its jurisdiction has been presented to the District Court of Appeal and that the issues there tendered present for determination also the question whether the petitioners before that court had exhausted their statutory remedies before the commission. This is the second principal question on the merits involved in the pending *mandamus* proceeding.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The majority opinion holds that the District Court of Appeal is without jurisdiction because the *mandamus* proceeding was prematurely brought in that the petitioners therein had not exhausted their remedies before the commission. It is noted that the Adjustment Unit of the Division of Unemployment Compensation in the department of the commission granted the application of the employees, petitioners herein, for the payment of benefits. Certain of their employers appealed from the determination of the Adjustment Unit under *311 section 67 of the act. The commission designated a referee to hear the appeal pursuant to section 69. On that appeal the referee found the facts. The petitioners in the District Court of Appeal claim that those facts showed conclusively and as a matter of law that the claimants were ineligible to receive the benefits. But the referee concluded that the claimants were eligible to receive benefits and affirmed the initial determination of the Adjustment Unit. Section 72 of the act provides:

"Any party to a decision by a referee may appeal to the Commission from such decision. The Commission may on its own motion affirm, modify, or set aside any decision of a referee on the basis of the evidence previously submitted in such case, or direct the taking of additional evidence ..."

The majority say the District Court of Appeal has no jurisdiction in the *mandamus* proceeding because the petitioners had not taken and prosecuted to a final conclusion an appeal from the decision of the referee to the commission under section 72 of the act. Section 67 of the act provides for an appeal from an initial determination and then provides:

"If an appeal is duly filed benefits with respect to the period prior to the final decision on appeal shall be paid only after such decision, except as herein provided." Then follows the exception which is the crux of this phase of the present controversy. It reads: "If a referee affirms an initial determination allowing benefits, such benefits shall be paid regardless of any appeal which may thereafter be taken, but if such determination is finally reversed

no employer's account shall be charged with benefits so paid as to each such determination so reversed."

The main opinion decides as a matter of law that an employer must take and pursue to conclusion this last appeal to the commission before he may seek redress from the courts, notwithstanding the presence of an immediately enforceable order for alleged illegal expenditures from the unemployment trust fund. It is clear to me that a *bona fide* controversy is presented in the *mandamus* proceeding on the question whether the remedy provided by the statute for an appeal to the commission is an adequate statutory remedy as required by law, inasmuch as the benefits must be immediately paid notwithstanding the pendency of such appeal. It is of course well established that when the legislative department has set up an administrative board to ascertain the facts and to take *312 action thereon and has provided in the statute for hearings, rehearings, appeals and other proceedings before the board prior to its final decision, an interested party must exhaust his administrative remedies before he may resort to the courts for a redress of his grievances. But it is equally well settled that the statutory remedies before the board must be both appropriate and adequate. (See *Myers v. Bethlehem Shipbuilding Corporation,* 303 U. S. 41 [58 Sup. Ct. 459, 82 L. Ed. 638]; *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 U. S. 1 [57 Sup. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352.)To provide for an appeal to the commission from a decision of the referee would certainly appear to be appropriate. But whether the appeal to the commission provided for by this particular statute is adequate, under the circumstances presented to the District Court of Appeal, is a judicial question. The argument against the adequacy of the remedy provided by the final appeal to the commission is that since the benefits must be paid immediately upon affirmance by the referee and notwithstanding the pendency of such appeal to the commission from the order of affirmance, the subject matter of the court controversy, namely, the alleged

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

illegality of the payments by reason of powers usurped by the commission expressly prohibited by the act, has evaporated and the question has become moot; that is, unless the court may intervene to prevent the alleged illegal payments from the trust fund, the express mandate of the statute will be violated and the unlawful action of the board placed beyond judicial scrutiny and control; that power reposed in an administrative board does not constitute it an autocratic body to the extent that it may, uncontrolled and with impunity, exercise its power contrary to the provisions of the act which created it; that it is well settled that "whether the Commission applies the legislative standards validly set up, whether it acts within the authority conferred or goes beyond it, whether its proceedings satisfy the pertinent demands of due process, whether, in short, there is compliance with the legal requirements which fix the province of the Commission and govern its action, are appropriate questions for judicial decision." (*Federal Radio Com. v. Nelson Bros. etc. Co.,* 289 U. S. 266, 276 [53 Sup. Ct. 627, 77 L. Ed. 1166, 89 A. L. R. 406]; *Federal Communications Com. v. The Pottsville Broadcasting Co.,* 309 U. S. 134 [60 Sup. Ct. 437, 440, 84 L. Ed. 656]); that *prima facie* the petition for the writ of *mandamus* before the *313 District Court of Appeal presents a case of a threatened enforcement of an order on the part of the commission which will violate the express legislative mandate, which is a prerequisite to valid payments within the rule repeatedly announced by the Supreme Court of the United States; that the so-called remedy by appeal to the commission from the order of affirmance of the referee is just as inadequate and futile as would be a statutory right of appeal from a judgment for money where a stay pending appeal is expressly denied the appellant and with a further statutory mandate that notwithstanding the pendency of the appeal the money must be paid, and the judgment satisfied; that it is no valid answer to this argument that the statute provides that in the event the commission on appeal should reverse the order of the referee "No employer's account shall be charged with the benefits so paid", for the reason that the

employer as a contributor to the trust fund has an additional interest in preserving the integrity of that fund as against illegal expenditure and dissipation thereof contrary to the express provisions of the act.

The foregoing arguments urged on behalf of the respondents are addressed to the merits of the controversy pending before the District Court of Appeal and are mentioned solely for the purpose of indicating that there is clearly a question of law presented to that court in a matter in which it has jurisdiction of both the parties and the subject matter under the Constitution and laws of this state.

The majority say that the provision for payment of benefits pending appeal, when an initial determination for payment has been affirmed by the referee, was designed to carry out the policy declared in section 1 of alleviating the evils of unemployment, as part of a legislative plan of social security. This may be true where the payments are to persons eligible to receive the same under the act. But where the fact of ineligibility is concededly established and payments are threatened to be made to persons expressly excluded by the provisions of the act, do the majority still mean to say that such payments will carry out the legislative plan? The majority also say that to permit these "justifiable and necessary" payments to be postponed for long periods would defeat the objectives of the act. Would it defeat the objectives of the act to halt payments of benefits expressly forbidden by the act? On the contrary, would it not defeat the objectives of *314 the act to permit payments of benefits expressly so forbidden? The legislature did not leave any question for determination to the referee or the commission when the facts unquestionably disclose ineligibility on the part of claimants to receive payment of benefits. The provisions of the act direct the commission and leave it no alternative.

Finally, the writ of prohibition should not issue if there is a "plain, speedy, and adequate remedy in the ordinary course of law" (sec. 1103, Code Civ. Proc.). The petitioners herein would have had such a remedy by petition to this court for a hearing after

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

decision by the District Court of Appeal, if they had been dissatisfied with that decision. If the result in the *mandamus* proceeding had been the same in that court as in the Gantner & Mattern Co. case, as seems likely, it is fair to assume that the petitioners herein would not have been in a position to complain. In any event, if the *mandamus* proceeding had been allowed to take its usual course by decision in the District Court of Appeal and petition to this court, as the "plain, speedy, and adequate remedy" provided by the Constitution, the long drawn-out process of the present proceeding for over a year and the consequent uncertainty of jurisdiction of District Courts of Appeal resulting from the majority opinion would have been avoided.

Ward, J., *pro tem.,* concurred.

Cal.
Abelleira v. District Court of Appeal, Third Dist.
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 2

124 P.3d 719                                                                    Page 1
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

▷
Barratt American Inc. v. City of Rancho Cuca-
monga
Cal.,2005.

Supreme Court of California
BARRATT AMERICAN, INCORPORATED,
Plaintiff and Appellant,
v.
CITY OF RANCHO CUCAMONGA, Defendant
and Respondent.
**No. S117590.**

Dec. 22, 2005.

**Background:** Real estate developer filed petition
for writ of mandate and complaint against city,
challenging fees for building permits and plan re-
views. The Superior Court, San Bernardino County,
No. RCY063382,Joseph E. Johnston, J., sustained
city's demurrer without leave to amend. Developer
appealed. The Court of Appeal affirmed, and the
Supreme court granted developer's petition for re-
view, superseding the opinion of the Court of Ap-
peal.

**Holdings:** The Supreme Court, Chin, J., held that:
(1) fees developer paid were not "development
project fees" subject to Mitigation Fee Act's indi-
vidual refund remedy and limitations period;
(2) permit and plan review fees were not "special
taxes" subject to penalty or offset under Proposition
62;
(3) city was not required to conduct annual finan-
cial audit of revenues received from fees;
(4) city's resolution reenacting previously enacted
fees was subject to challenge; and
(5) mandamus was not available remedy for city's
alleged failure to comply with statutory duty to re-
view and adjust fees.

Judgment of the Court of Appeal affirmed in part
and reversed in part, and matter remanded.

Opinion, 135 Cal.Rptr.2d 85, superseded.

West Headnotes

**[1] Appeal and Error 30 ☞917(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k915 Pleading
                30k917 Demurrers
                    30k917(1) k. In General. Most
Cited Cases
When a case comes to the Supreme Court on a de-
murrer for failure to state a cause of action, the
Court accepts as true the facts alleged in the
plaintiff's complaint.

**[2] Zoning and Planning 414 ☞382.4**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(A) In General
            414k382.1 Maps, Plats, or Plans, Condi-
tions and Agreements
                414k382.4 k. Fees, Bonds, and in Lieu
Payments. Most Cited Cases

**Zoning and Planning 414 ☞584.1**

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(B) Proceedings
            414k584 Time for Proceedings
                414k584.1 k. In General. Most Cited
Cases
Building permit and plan review fees real estate de-
veloper paid to city were simply fees to defray ad-
ministrative and enforcement costs of local regulat-
ory program, and thus were not "development
project fees" subject to Mitigation Fee Act's indi-
vidual refund remedy and limitations period for al-
leged overcharges. West's Ann.Cal.Gov.Code §§
66000, 66014, 66016, 66020, 66021.
*See 12 Witkin, Summary of Cal. Law (10th ed.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719                                                                                                    Page 2
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

2005) Real Property, § 818; 9 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 25:200; Cal. Jur. 3d, Zoning and Other Land Controls, § 243 et seq.; Cal. Civil Practice (Thomson/West 2003) Real Property Litigation, § 14:79.

**[3] Statutes 361 ☞208**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic Aids to Construction
            361k208 k. Context and Related Clauses. Most Cited Cases
The Supreme Court must construe a statute in the context of the entire statutory scheme of which it is a part, in order to achieve harmony among the parts.

**[4] Taxation 371 ☞2002**

371 Taxation
    371I In General
        371k2002 k. Distinguishing "Tax" and "License" or "Fee". Most Cited Cases

**Zoning and Planning 414 ☞382.4**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(A) In General
            414k382.1 Maps, Plats, or Plans, Conditions and Agreements
            414k382.4 k. Fees, Bonds, and in Lieu Payments. Most Cited Cases
Even if excessive, city's building permit and plan review fees were not "special taxes" subject to penalty or offset remedies under Proposition 62; sole remedy for excessive fee was contained in Mitigation Fee Act. West's Ann.Cal.Gov.Code §§ 53728, 66016.

**[5] Taxation 371 ☞2001**

371 Taxation
    371I In General
        371k2001 k. Nature of Taxes. Most Cited Cases
In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted.

**[6] Municipal Corporations 268 ☞885**

268 Municipal Corporations
    268XIII Fiscal Matters
        268XIII(B) Administration in General, Appropriations, Warrants, and Payment
            268k885 k. Reports and Statements as to Finances. Most Cited Cases
City was not required, under government spending limitation provision of state Constitution, to conduct annual financial audit of revenues received from building permit and plan review fees imposed on developers to assess whether it had any surplus fees that would constitute proceeds of taxes. West's Ann.Cal. Const. Art. 13B, §§ 1.5, 8(b).

**[7] Zoning and Planning 414 ☞586**

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(B) Proceedings
            414k584 Time for Proceedings
            414k586 k. Commencement of Limitation Period. Most Cited Cases
Challenge to city's resolution reenacting previously enacted building permit and plan review fees was not barred by statute requiring such challenges to be brought within 120 days of enactment; even though fees remained essentially unchanged, legislation constituted modification or amendment of those fees, thereby triggering new limitations period. West's Ann.Cal.Gov.Code §§ 66016, 66022.

**[8] Mandamus 250 ☞3(4)**

250 Mandamus
    250I Nature and Grounds in General
        250k3 Existence and Adequacy of Other Remedy in General
            250k3(2) Remedy at Law
            250k3(4) k. Acts and Proceedings of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719                                                                                    Page 3
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

Public Officers and Boards and Municipalities in General. Most Cited Cases

Mandamus was not remedy available to real estate developer that alleged city had failed to comply with its statutory duty to review and adjust building permit fees, since Mitigation Fee Act provided adequate legal remedy. West's Ann.Cal.Gov.Code § 66016.

**[9] Mandamus 250 ⚍⚍⚍3(4)**

250 Mandamus
    250I Nature and Grounds in General
        250k3 Existence and Adequacy of Other Remedy in General
            250k3(2) Remedy at Law
                250k3(4) k. Acts and Proceedings of Public Officers and Boards and Municipalities in General. Most Cited Cases

Where the Legislature has provided for a validation action to review government actions, mandamus is unavailable to bypass the statutory remedy after the limitations period has expired.

***150 Law Offices of Walter P. McNeill, Walter P. McNeill, Redding; Law Offices of Richard D. Gann and Richard D. Gann, for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton and David P. Lanferman, San Francisco, for California Building Industry Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Jonathan M. Coupal and Timothy A. Bittle, Sacramento, for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Brent & Klein and Jason G. Brent, Tehachapi, for George C. Jenkins as Amicus Curiae on behalf of Plaintiff and Appellant.

James S. Burling and Meriem L. Hubbard, Sacramento, for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Richards, Watson & Gershon, James L. Markman, Brea, B. TildenKim Los Angeles, and Juliet E. Cox, for Defendant and Respondent.

Best, Best & Krieger, Jeffrey V. Dunn, Irvine, and Mark D. Servin, for League of California Cities and

California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

CHIN, J.

*691 **720 The Mitigation Fee Act (Gov.Code, §§ 66000-66025) FN1 (the Act) was passed by the Legislature " 'in response to concerns among developers that local agencies were ***151 imposing development fees for purposes unrelated to development projects.' " (Ehrlich v. City of Culver City (1996) 12 Cal.4th 854, 864, 50 Cal.Rptr.2d 242, 911 P.2d 429.) Although most of the Act is concerned with development fees, it also addresses fees or charges that do not necessarily relate to a development project. (Utility Cost Management v. Indian Wells Valley Water Dist. (2001) 26 Cal.4th 1185, 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2(Utility Cost Management ).) The various sections of the Act cover fees for development projects (§§ 66000-66011), water or sewer connections (§ 66013), and zoning and building permits (§ 66014). This case involves legal challenges to building inspection and permit fees and appropriate remedies when excessive fees are imposed.

> FN1. Except as otherwise noted, all further statutory references are to the Government Code.

Section 66014, subdivision (a), provides that local agency fees for *building inspections and permits* may not exceed the estimated reasonable cost of providing the service for which the fee is charged unless the excess amounts are submitted to and approved by a two-thirds vote of the electorate. Section 66016, subdivision (a), provides a *prospective fee reduction remedy* when fees or service charges exceed actual costs and create excess revenues. Both sections specify that any judicial challenge to a fee thereunder is subject to the requirements of **721section 66022, which states that the action or proceeding "shall be commenced within 120 days of the effective date of the ordinance, resolution, or motion."(§ 66022, subd. (a); see also §§ 66014, subd. (c), 66016, subd. (e).)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719

37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

Sections 66020 and 66021, which authorize a *refund* of any unlawful part of the fees imposed on a *development project*, are subject to a different statute of limitations period. Local agencies must give project applicants written notice of the fee amount, indicating that they have 90 days to protest it. (§ 66020, subd. (d)(1).) Any party who files a protest may then file an action attacking the imposition of the fees within 180 days after delivery of the local agency's notice. (§ 66020, subd. (d)(2).)

In this case, we determine: (1) whether a party who challenges a local agency's fees for building inspections and permits under section 66014 can state a claim for remedies under both section 66016 (prospective fee reduction) and section 66020 (refund); (2) whether the limitations period of section 66020 or section 66022 applies to a claim that the local agency's building permit fees are excessive; and (3) whether a local agency's reenactment of the same building permit and inspection fees is subject to challenge under *692 section 66022. In addition, we decide other issues: (4) whether local agencies that charge excessive building permit and plan review fees are subject to a penalty for collecting and retaining "special taxes" without voter approval within the meaning of section 53728; and (5) whether local agencies are constitutionally required to conduct annual financial audits to assess whether their fees create excess revenues. We conclude that building permit fees are not fees imposed on a development project. Therefore, the applicable remedy and limitations period for excessive building fees claims under section 66014 are found in sections 66016 and 66022, not in sections 66020 and 66021. Also, we conclude that a reenactment of the same building permit fee is a modification or amendment of an existing fee or service charge under section 66022, which triggers a new limitations period; that local agencies that charge excessive building permit fees are not subject to a section 53728 penalty; and that local agencies are not constitutionally required to conduct annual financial audits.

## I. FACTUAL AND PROCEDURAL HISTORY

[1] Because this case comes to us on a demurrer for failure to state a cause of action, we accept as true the facts alleged ***152 in plaintiff Barratt American, Inc. (Barratt)'s complaint. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.)

In July 1999, the City of Rancho Cucamonga (City) adopted resolution No. 99-146, setting forth a comprehensive fee schedule for various services the City provides. It included a fee schedule for building permits and plan reviews based on the "total valuation of work." The charges for building permit fees started at $25 for work valued up to $1,000 and ended at $555 for work valued up to $100,000. Each additional $1,000 in value incurred a fee of $2.50. Plan review fees were a percentage of the building permit fees. The City building official was authorized to determine the "total valuation of work." In December 2000, the City adopted resolution No. 00-268, which modified certain fees set in 1999. The 2000 resolution slightly increased, by 50 cents, the building permit fee from $555 for work valued at $100,000 to $555.50. The resolution explained that the new fee was a correction of a previous typographical error. In January 2002, the City adopted resolution No. 02-023, which modified certain fees set in 2000. However, the building permit fee was not changed, except to the extent it was reset at $555 for work valued at $100,000. The 2002 ordinance apparently reintroduced the typographical error that the 2000 ordinance had corrected.

In June 2000, Barratt, a real estate developer, began to construct a 123-unit residential subdivision in the City. In May 2002, Barratt sued the City, alleging that the City's building permit and plan review fees were excessive, *693 that the City's method of establishing those fees was arbitrary and unrelated to the actual cost of the service provided, that the fees were based improperly on the monetary value of the work, and that the building officials had unfettered authority**722 to determine the final valuation component of the fee. The complaint further al-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

leged that, beginning in June 2000, Barratt had paid more than $143,000 in building permit and plan review fees for at least 83 building permits for the construction of single-family homes in the 123-unit subdivision, that it intended to continue construction until it completed the project, and that the City collectively received more than $1 million per year (and more than $3 million total) in excess building permit and plan review fees. Barratt sought: (1) a refund of $143,000 for the allegedly excessive fees already paid (§ 66020) or in the alternative, a refund in excess of $110,000, after crediting the City with the reasonable value of services it rendered in issuing the building permits and reviewing Barratt's plans; (2) a writ of mandate compelling the City to apply the excess fee revenues to reduce future fees (§ 66016, subd. (a)) and to perform an annual audit to identify excess fee revenues (Cal. Const., art. XIII B, §§ 1.5, 8, subd. (b)); (3) a declaration that the fees imposed were invalid "special taxes," resulting in the reduction or forfeiture of property tax revenues (§§ 53722, 53728); and (4) the invalidation of resolution No. 02-023 (§§ 66016, subd. (e), 66022, subd. (b)). When it filed the action, Barratt was midway through the development and sales of the homes in the subdivision.

The City demurred to Barratt's complaint. The trial court sustained its demurrer without leave to amend, ruling that: (1) Barratt could not obtain a refund under section 66020 because building permit and plan review fees are not development fees within the meaning of that section; (2) a writ of mandamus to compel the City to comply with section 66016 and to perform an annual audit and fee adjustment was an inappropriate remedy because the timing of any fee review and adjustment is a matter of legislative discretion; and (3) declaratory relief under ***153 sections 53722 and 53728 was not an appropriate remedy. Instead, the court found that the appropriate remedy for excessively high building permit fees was to challenge the ordinance in a validation action and obtain a prospective fee reduction, as specified in section 66016. That remedy was unavailable to Barratt, however, because

the statute of limitations period had expired. In addition, the court determined that Barratt could not attack the validity of resolution No. 02-023 because the 2002 resolution only reenacted the fee previously set forth in the 2000 resolution and was not a new or increased fee under section 66016.

The Court of Appeal agreed with the trial court's reasoning and result and affirmed the judgment. We granted Barratt's petition for review.

## *694 II. DISCUSSION

Barratt contends that payers of excess building permit fees in violation of sections 66014 and 66016 have *several* remedies for those overcharges: (1) individual refunds (§§ 66020, 66021, subd. (a)); (2) application of excess fees to future costs (§ 66016, subd. (a)); and forfeiture of property tax revenues (§ 53728). Barratt also claims that to ensure that cities comply with sections 66014, subdivision (a), and 66016, subdivision (a), they must conduct annual audits. (Cal. Const., art. XIII B.) We discuss those claims below.

### Sections 66014, 66016, and 66022.

Section 66014, subdivision (a), permits local agencies to impose building inspection and permit fees "not [to] exceed the estimated reasonable cost of providing the service for which the fee is charged, unless a question regarding the amount of the fee charged in excess of the estimated reasonable cost of providing the services or materials is submitted to, and approved by, a popular vote of two-thirds of those electors voting on the issue."

Section 66016, subdivision (a), which also expressly applies to building inspection and permit fees, provides the remedy for over-collections: "Unless there has been voter approval, as prescribed by Section 66013 or 66014, no local agency shall levy a new fee or service charge or increase an existing fee or service charge to an amount which exceeds the estimated amount required to provide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719

Page 6

37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

the service for which the fee or service charge is levied. If, however, the fees or service charges create revenues in excess of actual cost, those revenues shall be used to reduce **723 the fee or service charge creating the excess."

Both sections 66014 and 66016 require that "[a]ny judicial action or proceeding to attack, review, set aside, void, or annul the ordinance, resolution, or motion" authorizing the charge of a fee subject to those sections "shall be brought pursuant to Section 66022."(§§ 66014, subd. (c), 66016, subd. (e).)

Section 66022, subdivision (a), provides: "Any judicial action or proceeding to attack, review, set aside, void, or annul an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee or service charge, adopted by a local agency, as defined in Section 66000, shall be commenced within 120 days of the effective date of the ordinance, resolution, or motion." Subdivision (c) of that same section states: "This section shall apply only to fees, capacity charges, and service charges described in and subject to Sections 66013 and 66014."

*695 *1. Individual Refund Remedy and Limitations Period Under Sections 66020 and 66021 Do Not Apply to the Building Permit Fees Barratt Paid.*

[2] Although Barratt agrees that the charges at issue are fees for "building ***154 inspections" and "building permits" that are subject to sections 66014 and 66016, it argues that it does not seek "to attack, review, set aside, void, or annul" the ordinances under section 66022. Instead, it claims that it is protesting the imposition of specific fees on a particular development project, which is governed by the separate protest and refund procedures and remedy and limitations scheme set forth in sections 66020 and 66021.

Section 66020 provides that "Any party may protest the imposition of any *fees,* dedications, reservations, or other exactions *imposed on a development*

*project, as defined in Section 66000,* by a local agency" by paying the fees and serving a written notice of protest. (§ 66020, subd. (a), italics added.) A local agency must provide a development project applicant written notice of the amount of the fees when imposing them and must indicate that the applicant has 90 days to protest the fees. (§ 66020, subd. (d)(1).) "Any party who files a protest pursuant to subdivision (a) may file an action to attack, review, set aside, void, or annul the imposition of the fees, dedications, reservations, or other exactions imposed on a development project by a local agency within 180 days after the delivery of the notice."(§ 66020, subd. (d)(2).)

Section 66021 provides that "Any party on whom a *fee,* tax, assessment, dedication, reservation, or other exaction has been imposed, the payment or performance of which is *required to obtain governmental approval of a development, as defined by Section 65927, or development project,* may protest the establishment or imposition of the fee, tax, assessment, dedication, reservation, or other exaction as provided in Section 66020."(§ 66021, subd. (a), italics added.)

Barratt argues that it complied with the statutory procedural requirements of sections 66020 and 66021 by paying the fees and submitting a letter of protest to the City, dated September 21, 2001. The City responds that those sections do not create a refund remedy for "excess" regulatory fees, such as building permit and plan review fees, because they are not fees imposed on a development project within the meaning of sections 66020 and 66021. Thus, those sections do not apply here. We agree that Barratt's refund claim fails because sections 66020 and 66021 do not apply to the building permit fees it paid.

*696 "[F]ees ... imposed on a development project," as used in section 66020, refers to "fees" and a "development project" as defined in section 66000. A "development project" is defined as "any project undertaken for the purpose of development ... includ[ing] a project involving the issuance of a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

permit for construction or reconstruction, but not a permit to operate."(§ 66000, subd. (a).) A "fee" is defined as "a monetary exaction other than a tax or special assessment ... that is charged by a local agency to the applicant *in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities related to the development project, but does not include ... fees for processing applications for governmental regulatory actions**724 or approvals....*" (§ 66000, subd. (b), italics added.) Thus, section 66020, by its own terms, applies only to "development fees" that alleviate the effects of development on the community and does *not* include fees for specific regulations or services.

On the other hand, Government Code section 66016 applies to a long list of local regulatory fees described in Government Code sections 51287, 56383, 57004, 65104, 65456, 65863.7, 65909.5, and 66451.2; to building, planning, and zoning fees described in section 66014; to public facility ***155 capacity and connection charges described in section 66013; and to building permit fees described in Health and Safety Code sections 17951, 19132.3, and 19852.[FN2]

> FN2. Section 66016, subdivision (d), states that: "This section shall apply only to fees and charges as described in Sections 51287, 56383, 57004, 65104, 65456, 65863.7, 65909.5, 66013, 66014, and 66451.2 of this code, Sections 17951, 19132.3, and 19852 of the Health and Safety Code, Section 41901 of the Public Resources Code, and Section 21671.5 of the Public Utilities Code."

Here, Barratt paid building permit and plan review fees to cover the costs of regulating construction quality and ensuring public safety. (See Health & Saf.Code, §§ 17951, subds. (c) and (e), 19132.3.) Although sections 66014 and 66016 govern these regulatory fees, they do not qualify as "development project" fees under section 66000. In addition, the building permit and plan review fees

were not made "in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities related to the development project ...." (§ 66000, subd. (b).) They were not "fees imposed on development projects in order to finance public improvements or programs that bear a 'reasonable relationship' to the development at issue." (*Utility Cost Management, supra,* 26 Cal.4th at p. 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2.) Instead, the building permit and plan review fees were simply fees to defray the administrative and enforcement costs of a local regulatory program. (See Gov.Code, §§ 66014, subd. (a), 66016, subd. (a); Health & Saf.Code, §§ 17951, subd. (c), 19132.3 [fees may not exceed the reasonable cost of providing the regulatory service for which the fee is charged].)

*697 Although the plain language of the statutes dictates the result here (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299), legislative history provides additional authority. The California Legislative Counsel has similarly concluded that section 66020 does not include fees associated with plan check or inspection fees. (Ops. Cal. Legis. Counsel, No. 1518 (Jan. 28, 1997) Development Fees, pp. 1, 6.) The Legislative Counsel reasoned that building permit fees are "separately authorized under the Health and Safety Code and do not relate to fees in the nature of monetary exactions imposed for the purpose of defraying all or a portion of the cost of public facilities related to a development project as contemplated in the Mitigation Fee Act."(*Id.* at p. 6.) Legislative Counsel opinions have great persuasive weight, "since they are prepared to assist the Legislature in its consideration of pending legislation." (*Cal. Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17, 270 Cal.Rptr. 796, 793 P.2d 2.) Accordingly, we conclude that the Legislature did not intend section 66020 to authorize a refund action for overcharges of building permit and plan review fees.

Barratt claims that section 66021 expands the scope

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

Page 8

of section 66020's protest procedures to cover building permit fees. He argues that a fee paid to obtain approval of a building permit for construction of residential housing qualifies as a fee "the payment or performance of which is required to obtain governmental approval of a development, as defined by Section 65927."(§ 66021, subd. (a).) Section 65927 defines "development" broadly to include "the placement or erection of any solid material or structure."

However, section 66021 operates not to extend section 66020's protest procedures to regulatory fees, but to extend them to taxes and assessments. (Compare § 66020, subd. (a) ["Any party may protest ***156 the imposition of any *fees, dedications, reservations, or other exactions....*"] with § 66021, subd. (a) ["Any party on whom a *fee, tax, assessment,* **725 *dedication, reservation, or other exaction* has been imposed ...."]; see also § 66000, subd. (b) [excluding taxes and assessments from the Act's definition of " fee"].) In addition, section 66021 limits its scope to those fees or taxes that are "required to obtain governmental approval of a development, as defined by Section 65927."(§ 66021, subd. (a).)

As the City notes, many cities require applicants to pay certain mitigation fees as a precondition to the issuance of a building permit. This building permit process might reasonably be characterized as being "required to obtain governmental approval of a development" (§ 66021, subd. (a)). (See, e.g., *Trend Homes, Inc. v. Central Unified Sch. Dist.* (1990) 220 Cal.App.3d 102, 108, 269 Cal.Rptr. 349 [noting that the City of Fresno required certain *698 homebuilders to pay school impact fees before becoming eligible for building permits].) However, Barratt challenges only the City's charges for ministerial, regulatory building plan review and construction inspection activities that implement state and local building safety standards. These fees-for regulatory services the Health and Safety Code requires-do not necessarily relate to a development project (e.g., fees imposed on a homeown-

er's addition of a laundry room). They fund a program that supervises *how, not whether,* Barratt may build. Thus, the building permit fees in this case were *not*"required to obtain governmental approval of a development."(§ 66021, subd. (a).)

Analogously, it has been held that water and sewer connection fees under section 66013-fees that are also included in section 66016-"are not 'fees ... imposed on a development project' for purposes of Section 66020" and thus, are not subject to review under the payment and protest provisions of section 66020. (*Cal. Psychiatric Transitions, Inc. v. Delhi County Water Dist.* (2003) 111 Cal.App.4th 1156, 1161, 4 Cal.Rptr.3d 503(*Cal. Psychiatric Transitions* ).) The Court of Appeal reasoned: "As the Supreme Court pointed out in *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2, the mere fact that fees are imposed in a particular instance in connection with development does not make them 'fees imposed on a development project for purposes of section 66020.' The court stated that 'development fees [are] fees imposed on development projects in order to finance public improvements or programs that bear a 'reasonable relationship' to the development at issue.' (*Utility Cost Management,* at p. 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2.) The fees and charges authorized by section 66013 may or may not involve development ... but the fees and charges are always tied directly to a benefit conferred on the property assessed (*id.* at p. 1189, 114 Cal.Rptr.2d 459, 36 P.3d 2). Accordingly, such charges are user fees (in the case of connection fees)...."

"By contrast, 'fees ... imposed on a development project,' as used in section 66020, refers to 'fees' as defined in section 66000, subdivision (b). That definition states that a fee is 'a monetary exaction *other than a tax or special assessment...* that is charged by a local agency to the applicant ... for the purpose of defraying all or a portion of the cost of public facilities related to the development project ....' (66000, subd. (b), italics added.) Thus, defini-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719                                                                                          Page 9
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

tionally, a fee subject to the payment/protest procedure of section 66020 [does not] include[ ] ... a connection fee (because it does not pay for public facilities, only for the private party's connection to the system)." ***157(Cal. Psychiatric Transitions, supra, 111 Cal.App.4th at p. 1161, 4 Cal.Rptr.3d 503.)

Similarly, in Capistrano Beach Water Dist. v. Taj Development Corp. (1999) 72 Cal.App.4th 524, 529-530, 85 Cal.Rptr.2d 382(Capistrano Water Dist.), the Court of Appeal held that sewer connection fees (§ 66013) paid by a developer to connect its hotel to a sanitation district's sewer system were *699 not "fees" for a "development project" under section 66000, subdivisions (a) and (b). Thus, fees imposed under section 66013 could not be refunded. The court noted that: (1) the district did not condition the approval of the hotel project on payment of the fee or impose the fee in connection with issuing or approving a permit for development and (2) sections 66013 and 66016 do not include a **726 refund remedy. (Capistrano Water Dist., supra, 72 Cal.App.4th at pp. 528-529, 85 Cal.Rptr.2d 382.)

In short, the fee does not become a "development fee" simply because it is made in connection with a development project. (Cal. Psychiatric Transitions, supra, 111 Cal.App.4th at p. 1161, 4 Cal.Rptr.3d 503; see also Utility Cost Management, supra, 26 Cal.4th at p. 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2.) Just as fees imposed under section 66013 cannot be refunded (Capistrano Water Dist., supra, 72 Cal.App.4th at pp. 527-530, 85 Cal.Rptr.2d 382), fees imposed under sections 66014 and 66016 cannot be refunded under sections 66020 and 66021.

[3] Moreover, we must construe a statute in the context of the entire statutory scheme of which it is a part, in order to achieve harmony among the parts. (DeVita v. County of Napa (1995) 9 Cal.4th 763, 779, 38 Cal.Rptr.2d 699, 889 P.2d 1019; People v. Woodhead (1987) 43 Cal.3d 1002, 1009-1010, 239 Cal.Rptr. 656, 741 P.2d 154.) Section 66016 applies specifically to building permit fees and states the remedy for any facial overcharges: "If however, the fees or service charges create revenues in excess of actual cost, those revenues shall be used to reduce the fee or service charge creating the excess."(§ 66016, subd. (a), italics added.) Surplus fees that have been refunded cannot simultaneously be "paid forward" to reduce fees. In other words, permitting both retrospective refund and prospective reduction remedies would allow two different dispersions of the same funds and would create incongruous results. Because section 66016 applies specifically to building permit fees, it prevails over the more general statutes that might otherwise seem to conflict with it. (See San Francisco Taxpayers Assn. v. Bd. of Supervisors (1992) 2 Cal.4th 571, 577-578, 7 Cal.Rptr.2d 245, 828 P.2d 147.) When read together, sections 66016, 66020, 66021, and 66022 do not authorize a refund remedy for excessive regulatory fees.

Barratt argues that depriving individual fee payers, such as itself, of a refund remedy is unfair because a prospective fee reduction remedy only benefits future fee payers collectively. By invoking the protest and refund procedure in section 66020, Barratt necessarily claims that such protests are timely up to 90 days after imposition of the fees. (§ 66020, subd. (d)(1).) However, such fee challenges would subject cities to suits for building permit fee refunds at any time well beyond the 120-day limitations period set forth in section 66022. This would undermine the purpose of that shortened limitations period, to give public agencies "certainty with respect to *700 the enforceability of their fee ordinances and resolutions." (Utility Cost Management, supra, 26 Cal.4th at p. 1197, 114 Cal.Rptr.2d 459, 36 P.3d 2.) We must apply the statutory scheme as written. Barratt's concerns are more appropriately ***158 brought to the attention of the Legislature.FN3

> FN3. Barratt argues that the lack of a refund remedy violates constitutional guarantees of due process. Because the Court of Appeal did not address the due process

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719

37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

Page 10

issue in its opinion and Barratt failed to file a petition for rehearing in that court to bring any deficiency to the court's attention, we do not address that claim. (Cal. Rules of Court, rule 28(c)(2).)

### 2. Penalty or Offset for Unauthorized Special Taxes Under Section 53728 Is an Inapplicable Remedy

[4][5] Barratt sought declaratory relief under section 53728, asking the trial court to impose a penalty on the City for collecting and retaining "special taxes" without voter approval. Section 53728-a part of Proposition 62 (§§ 53720-53730)-provides that property tax revenues allocated to the local government be reduced by one dollar for each dollar of revenue attributable to an unauthorized "special tax." [FN4] "Special taxes"**727 -those imposed for specific purposes (§ 53721)-must be approved by a two-thirds vote of the voters. (§ 53722.) "In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted. [Citations.]" *(Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874, 64 Cal.Rptr.2d 447, 937 P.2d 1350(*Sinclair Paint Co.*).)

> FN4. Section 53728 states: "If any local government or district imposes any tax without complying with the requirements of this Article, or in excess of its authority as clarified by Section 53727, whether or not any provision of Section 53727 is held not applicable to such jurisdiction, the amount of property tax revenue allocated to the jurisdiction pursuant to Chapter 6 of part 0.5 of Division 1 of the Revenue and Taxation Code (commencing with Section 95) shall be reduced by one dollar ($1.00) for each one dollar ($1.00) of revenue attributable to such tax for each year that the tax is collected. Nothing in this section shall impair the right of any citizen or taxpayer to maintain any action to invalidate any tax imposed in violation of this Article."

Barratt alleges that the surplus building permit and plan review fees are unauthorized "special taxes," which subject the City to a property tax allocation reduction. However, it provides no authority for the claim that excess regulatory fees constitute taxes. Simply because a fee exceeds the reasonable cost of providing the service or regulatory activity for which it is charged does not transform it into a tax. (See *Alamo Rent-A-Car, Inc. v. Board of Supervisors* (1990) 221 Cal.App.3d 198, 205-206, 272 Cal.Rptr. 19 ["reverse logic" does not compel the conclusion that an allegedly excessive fee was a tax].) The specific statute-section 66016-provides the exclusive remedy for overcharges. If actual revenues exceed actual costs, the City must make a prospective fee adjustment by using that surplus, in lieu of *701 a fee revenue, to cover future expenses. (§ 66016, subd. (a).) It cannot refund the excess or transfer it to the City's general fund to replace or augment tax revenue. (See Health & Saf.Code, §§ 17951, subd. (c) [local permit fees "shall not be levied for general revenue purposes"], 19132.3 [same].)

Accordingly, the dollar-for-dollar penalty or offset allowed by section 53728 does not apply to Barratt's claims. (See *Sinclair Paint Co., supra,* 15 Cal.4th at p. 876, 64 Cal.Rptr.2d 447, 937 P.2d 1350 ["special taxes" in article XIII A, section 4, of the California Constitution do not include regulatory fees that do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged *and* that are not levied for unrelated revenue purposes].)

***159 *3. Writ of Mandate to Compel an Annual Fee Revision Is Not an Available Remedy Under Article XIII B of the California Constitution.*

[6] Barratt petitioned for a writ of mandate, alleging that the City caused ongoing injury to Barratt, other builders, and consumers by failing to conduct an annual financial audit and adopt a subsequent fee reduction, in violation of article XIII B, section 1.5, of the California Constitution. It states:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

"The annual calculation of the appropriations limit *under this article* for each entity of local government shall be reviewed as part of an annual financial audit." (Cal. Const., art. XIII B, § 1.5, italics added.) However, article XIII B expressly governs government *spending,* not taxation and revenues. "While article XIII A was aimed at controlling ad valorem property taxes and imposition of new special taxes [citation], article XIII B is directed at controlling government spending." (*County of Placer v. Corin* (1980) 113 Cal.App.3d 443, 449, 170 Cal.Rptr. 232.)

Nevertheless, Barratt argues that the City must audit the revenues received from building permit and review fees to determine whether it has any surplus fees that would constitute "proceeds of taxes." Article XIII B of the California Constitution imposes total annual "appropriations subject to limitation" (*id.,* § 1), defining that term as "any authorization to expend during a fiscal year the *proceeds of taxes* levied by or for [the local government] entity." (Cal. Const., art. XIII B, § 8, subd. (b), italics added.) " 'Proceeds of taxes' shall include ... all tax revenues and the proceeds to an entity of government, from (1) regulatory licenses, user charges, and user fees to the extent that those proceeds exceed the costs reasonably borne by that entity in providing the regulation, product, or service, and (2) the investment of tax revenues." (*Id.,* § 8, subd. (c).)

**\*702** However, as the City correctly notes, an article XIII B annual financial audit must only *identify* "proceeds of taxes," including regulatory fees that "exceed the costs reasonably borne" in providing regulatory services. (Cal. Const., art. XIII B, § 8, subd. (c).) Neither section 1.5 nor section 8 of article XIII B states that those costs must be actual costs, rather than reasonable estimates, or that the fee-cost relationship must be determined over the course of a single year. In short, those sections do not impose **\*\*728** a duty on local government to conduct an annual audit of its " proceeds of taxes."

*4. Resolution No. 02-023 Is Subject to Challenge Under Section 66022.*

Resolution No. 02-023 establishes, as did the prior two resolutions, a "comprehensive fee schedule" for many municipal services. Most of the fees in resolution No. 02-023 remained the same as in resolution No. 00-268, except for the establishment of some new fees that are not at issue here. It is not contested that Barratt failed to meet section 66022's limitations period regarding the 1999 and 2000 ordinances, but complied with that period regarding the 2002 ordinance.

[7] Nevertheless, the City contends that, despite Barratt's timely challenge to the 2002 ordinance, resolution No. 02-023 is not subject to a validation action because it was not an ordinance or resolution "adopting a new fee or service charge, or modifying or amending an existing fee or service charge" within the meaning of section 66022. Section 66022, subdivision (a), authorizes "[a]ny judicial action or proceeding to attack, review, set aside, void, or annul an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee **\*\*\*160** or service charge." The City argues that the permit fees have not changed since June 2000 (when Barratt began construction), and that Barratt should have sued within 120 days of the City's initial July 1999 adoption of its permit fee schedule in resolution No. 99-146. Although Barratt sued within 120 days of the adoption of resolution No. 02-023 (in January 2002), that challenge to the validity of the ordinance was too late.

The Court of Appeal agreed with the City. It found that the 2002 ordinance only reenacted and continued the previous fee ordinance, the 50-cent difference was apparently a typographical error, and a reenactment is not a "new fee or service charge, or modif[ication] or amend[ment of] an existing fee or service charge."(§ 66022, subd. (a).)

Barratt does not contest that the 50-cent difference in the 2002 ordinance was merely a typographical

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

error. But it argues that, even though the building permit and plan review fees essentially remained the same, the legislative *703 action extending the allegedly excessive fees is nonetheless subject to attack under section 66022. As explained below, we agree with Barratt.

The 2002 reenactment of the previous building permit and plan review fees constituted a "modif[ication] or amend[ment of] an existing fee or service charge."(§ 66022, subd. (a).) Although the *amount* of the permit and plan review fees remained the same, resolution No. 02-023 changed the *duration* of the fee by extending its applicability, and by implication its validity. This change is significant when considered with a local agency's statutory duties. Local agencies may not impose fees that exceed the *estimated* reasonable costs of providing the services for which the fees are charged. (§§ 66014, subd. (a), 66016, subd. (a).) "If, however, the fees or service charges create revenues *in excess of actual cost,* those revenues *shall be used* to reduce the fee or service charge creating the excess."(§ 66016, subd. (a), italics added; see *Larson v. State Personnel Bd.* (1994) 28 Cal.App.4th 265, 276, 33 Cal.Rptr.2d 412 ["The ordinary meaning of 'shall' or 'must' is of mandatory effect...."].) However, the applicable statutes do *not* specify how often the local agencies must make the required accounting. As Barratt points out, if a fee was not challenged at its initial enactment, then the validity of all subsequent reenactments would be immune to judicial challenge or review. Thus, there would be no effective enforcement mechanism to ensure that local agencies are complying with their duty to reduce the fees if revenues exceed actual costs. Barratt further argues that this immunity from judicial review creates an incentive for local agencies to overvalue the estimated costs of services and then continually readopt that fee.

We find Barratt's arguments to be persuasive, especially in light of the facts in this case. In accordance with section 66016, subdivision (a), the City made public the data supporting its fee calculations be-

fore its scheduled public hearing. After a public hearing and adoption of resolution No. 02-023, the City published those fees in its "new **729 comprehensive fee schedule," [FN5] stating it "resolve[d] that the following fees are *established."* (Italics added.) When the City adopted that resolution, it implicitly represented that the building ***161 permit and plan review fees continued to be valid. This determination would have or should have required some type of accounting of operating expenses and revenues, resulting in either surplus revenues, a deficit, or no required change in the fees.

> FN5. Resolution No. 02-023 contained the following description: "A resolution of the City Council of the City of Rancho Cucamonga, California, establishing a new comprehensive fee schedule for permits and services provided by all city departments, the Rancho Cucamonga Fire Protection District and the Rancho Cucamonga Police Department, by modifying certain fees established in Resolution 00-286."

*704 Here, although the building permit fees remained the same, other fees included in the 2002 comprehensive fee resolution had changed. As Barratt argues, the City's reenactment of its building permit fees as part of a revised comprehensive fee resolution is analogous to legislation at the state level that amends a portion of a statute while leaving the unamended portion unchanged. Under the "reenactment rule" of statutory interpretation, the unamended portion of the statute is reenacted with the enactment of the amendment, so that the statute is deemed to have been acted on as a whole.[FN6] (See *Brown v. Superior Court* (1982) 33 Cal.3d 242, 251-252, 188 Cal.Rptr. 425, 655 P.2d 1260; *People v. Scott* (1987) 194 Cal.App.3d 550, 554-556, 239 Cal.Rptr. 588.) Thus, resolution No. 02-023 reflects the City's judgment that the fees charged do not exceed the estimated reasonable cost of providing the services for which the fee is charged, as those costs were estimated and projec-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

ted into the future from the date of enactment of resolution 02-023.

> FN6. Relying on a different rule of statutory interpretation, the City argues that the reenactment continues the effect of the unmodified portion of a statute unabated and without interruption. (*In re Johnny Dapper* (1969) 71 Cal.2d 184, 189, 77 Cal.Rptr. 897, 454 P.2d 905 [where a statute is repealed and at the same time reenacted without substantial change, there is no break in the continuous operation of the old statute, and no abatement of any legal consequences of acts done under the old statute]; *Orange County Water Dist. v. Farnsworth* (1956) 138 Cal.App.2d 518, 524-525, 292 P.2d 927; *Sobey v. Molony* (1940) 40 Cal.App.2d 381, 385, 104 P.2d 868.) Both rules seek to determine and effectuate legislative purpose and intent and can be reconciled as applied to this case. The reenactment continues the effect of the unmodified portion of the ordinance unabated to the extent that any payment obligations under resolution No. 00-268 continue and are not interrupted even though that resolution had been superseded by resolution No. 02-023.

We conclude that, contrary to the Court of Appeal's holding, Barratt could seek to invalidate the building permit and plan review fees in resolution No. 02-023, and that its challenge was timely as to applicable claims arising after January 16, 2002, the effective date of the resolution.

*5. Writ of Mandate Is Not an Available Remedy to Enforce a Local Agency's Duty Under Section 66016 in this Case Because Barratt Has or Had an Adequate Legal Remedy.*

[8] Barratt alleges that the City has a "continuing pattern" of refusing to perform its statutory duty to review and adjust building permit fees. Accordingly, Barratt sought a writ of mandate to compel the City to conduct a review and apply any surplus building permit and plan review fees to reduce prospective fees, in compliance with section 66016. The Court of Appeal held that a mandamus action under section 66016 was either untimely under section 66022 or inappropriate. The court concluded that the mandamus cause of action was essentially a facial challenge to the building permit fees, and that Barratt failed to seek a validation action in a timely manner. It further *705 concluded that courts cannot command any action under sections 66014 and 66016 because the fees are set and revised by the exercise of legislative discretion. We agree with the Court of Appeal that a writ of mandate is not an available remedy in this case, but for a different reason: Barratt has or had an adequate legal remedy.

***162 As discussed above, the reenactment of the building permit and plan review fees in resolution No. 02-023 constituted a modification or amendment of those fees, which were **730 subject to validation under section 66022. The same holds true for resolutions No. 99-146 and No. 00-268, because the City followed the same public hearing procedures and reestablished a comprehensive fee schedule as it did with resolution No. 02-023. In adopting those resolutions, the City implicitly represented it had complied with section 66016. That is, resolutions No. 99-146, No. 00-268, and No. 02-023 represented, as of their effective dates, reasonable estimates of costs and revenues, including proper adjustments for over- or under-recovery under previous fee structures. In other words, the City presumably performed the very same financial analysis under section 66016 that Barratt's mandamus cause of action demanded. Thus, Barratt's allegation in its mandamus action that the City had continually refused to perform its statutory duty to review and adjust building permit fees is inconsistent with its assertion in its validation action that the City conducted a review, but reenacted invalid new and amended permit fees.

[9] The fact that Barratt is time-barred from chal-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

lenging the facial validity of the fee schedules in resolutions No. 99-146 and No. 00-268 does not change the result. Where the Legislature has provided for a validation action to review government actions, mandamus is unavailable to bypass the statutory remedy after the limitations period has expired. (*Embarcadero Mun. Improvement Dist. v. County of Santa Barbara* (2001) 88 Cal.App.4th 781, 789-793, 107 Cal.Rptr.2d 6; *Hills for Everyone v. Local Agency Formation Com.* (1980) 105 Cal.App.3d 461, 467-468, 164 Cal.Rptr. 420.) As for resolution No. 02-023, because we find that Barratt may facially challenge the permit fees therein, a parallel mandate action would be unnecessary and inappropriate. (See Code Civ. Proc., § 1086 [writ of mandate must be issued where there is *not* a plain, speedy, and adequate remedy in the ordinary course of law.].) In light of this disposition, we need not determine whether the Court of Appeal correctly held that courts cannot enforce a local agency's section 66016 duty to review and adjust building permit fees by way of a writ of mandate.

### *706 III. DISPOSITION

We reverse the judgment of the Court of Appeal relating to the dismissal of the resolution No. 02-023 validation action (fifth cause of action) and affirm its judgment in all other respects. The matter is remanded to the Court of Appeal with directions to modify the judgment of the trial court and order reinstatement of the validation action challenging resolution No. 02-023, and to affirm the judgment as amended.

WE CONCUR: GEORGE, C.J., KENNARD, BAXTER, WERDEGAR, MORENO and COFFEE, JJ.FN*

> FN* Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Cal.,2005.

Barratt American Inc. v. City of Rancho Cucamonga

37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 3

148 Cal.App.4th 537                                                                  Page 1
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

**H**
Fogarty v. City of Chico
Cal.App. 3 Dist.,2007.

Court of Appeal, Third District, California.
Thomas V. FOGARTY et al., as Trustees, etc.,
Plaintiffs and Appellants,
v.
CITY OF CHICO, Defendant and Respondent.
**No. C052576.**

March 12, 2007.
Review Denied July 11, 2007.

**Background:** Trustees for developers who applied to develop a subdivision sued city to protest conditions imposed on development of developers' property. The Superior Court, Butte County, No. 136344,Barbara L. Roberts, J., sustained city's demurrer on the ground that the action was time-barred under the Subdivision Map Act. Trustees for developers appealed.

**Holding:** The Court of Appeal, Davis, J., held that applicable statute of limitations was codified in Subdivision Map Act rather than Mitigation Fee Act.

Affirmed.

West Headnotes

**[1] Zoning and Planning 414 ⚍584.1**

414 Zoning and Planning
   414X Judicial Review or Relief
     414X(B) Proceedings
       414k584 Time for Proceedings
         414k584.1 k. In General. Most Cited Cases
Developers' cause of action against city, to protest conditions imposed on development of developers' property, arose under Subdivision Map Act and was therefore time-barred under 90-day limitations period; although developers sought to rely on Mitiga-

tion Fee Act, which had a 180-day limitations period, the Fee Act applied to attacks on fees, reservations, or other exactions, and developers were simply protesting a restriction on the manner in which they could use their property. West's Ann.Cal.Gov.Code §§ 66020, 66499.37.
*See 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 86; 9 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 25:146 et seq.*
**[2] Dedication 119 ⚍1**

119 Dedication
   119I Nature and Requisites
     119k1 k. Nature and Essentials in General. Most Cited Cases
A "dedication" is the transfer of an interest in real property to a public entity for the public's use.

**[3] Municipal Corporations 268 ⚍223**

268 Municipal Corporations
   268VI Property
     268k223 k. Purposes for Which Property May Be Acquired or Held. Most Cited Cases
A "reservation" is an offer to transfer an interest in real property to a public agency for parks, recreational facilities, fire stations, libraries, or other public uses, which terminates automatically within two years after the completion and acceptance of all improvements, unless the agency enters into an agreement to acquire the interest and compensate the landowner at fair market value. West's Ann.Cal.Gov.Code §§ 66479-66481.

**[4] Statutes 361 ⚍194**

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
       361k187 Meaning of Language
         361k194 k. General and Specific Words and Provisions. Most Cited Cases
Under the principle of *ejusdem generis,* court should construe a statute's general terms following

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

148 Cal.App.4th 537                                                                                                    Page 2
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

specific terms as embracing only objects similar in nature to the specific terms.

**796 GCA Law Partners, Douglas B. Aikins, William D. Connell, Jeffrey K. Lee, Mountain View, for Plaintiffs and Appellants.

Allen Matkins Leck Gamble Mallory & Natsis, James L. Meeder, Michael Patrick Durkee, David H. Blackwell, San Francisco; David R. Frank, City Attorney, Lori J. Barker, Assistant City Attorney, for Defendant and Respondent.

DAVIS, J.

*539 Plaintiffs Thomas and Mary Fogarty (in their capacity as the trustees of two trusts) appeal from a judgment of dismissal after the trial court sustained the demurrer of defendant City of Chico (City) and several individual defendants. They limit the scope of their appeal to a single count in their pleading against only defendant City.[FN1] They contend the superior *540 court erred in its conclusion that this count is time-barred. We shall affirm. In so doing, we find that in this instance the applicable statute of limitations is codified in the Subdivision Map Act rather than the Mitigation Fee Act.

> FN1. The plaintiffs have dismissed the individual defendants from the appeal.

## BACKGROUND

Accepting the well-pleaded factual allegations of the amended petition filed in January 2006 (*Robison v. City of Manteca* (2000) 78 Cal.App.4th 452, 455, 92 Cal.Rptr.2d 748(*Robison* )), the plaintiff trusts are landowners that are seeking on behalf of themselves "and in the public interest" to enforce various provisions of law that "govern the exercise of discretion by [defendant City] ... over a real estate development owned and proposed by [the plaintiff trusts]."

More particularly, the plaintiffs had applied to develop a subdivision called Oak Valley. In approving the application, the City's planning agency authorized 80-160 residential units on a parcel known

as "Lot Q." The decision was appealed to the City Council. In May 2005, the City Council adopted a motion of intent to reduce the authorized number of units on Lot Q to 80, and to affirm the decision in all other respects. However, after a hearing on September 20, 2005, the City Council voted (4-3) to merge the boundaries of Lot Q with the adjacent parcel to its west (Lot P) and to preclude any residential use of Lot Q.[FN2]

> FN2. In its demurrer, defendant City requested the trial court to take judicial notice of the text of the resolution, which does not precisely reflect the petition's characterizations of it. For example, the petition neglects to mention that it allowed the plaintiffs to increase the number of units on Lot P by 160.

Lot Q is zoned RS-20, which limits its use to no more than two residential units per acre. At this density, it has a fair market value of $17 million. The plaintiffs did not at any point consent to a reduction in density below that authorized for RS-20 zoning.

In taking this action, members of the City Council cited two rationales at the hearing. They wished to mitigate the aesthetic impacts of the remainder of the Oak Valley development, and they wanted to preserve Lot Q as open space for the public's benefit.[FN3] Defendant City did not **797 comply with the requirements of Government Code section 66001 (hereafter, undesignated section *541 references will be to the Government Code).[FN4] Under the authority of section 66020 et seq., the plaintiff trusts filed a letter of protest on October 17, 2005, with defendant City.[FN5] They also delivered a courtesy copy of their petition on November 8. They filed their initial petition in this matter on December 19, 2005. However, they did not serve the petition on defendant City until December 27.[FN6]

> FN3. The resolution itself made findings that the configuration of the subdivision as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 4:08-cv-03585-CW    Document 13-2    Filed 08/18/2008    Page 41 of 110

148 Cal.App.4th 537                                                              Page 3
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

revised is "appropriate for development while providing permanent protection for those portions ... which are not appropriate for development[, g]iven the site's many physical and environmental constraints,""protect[s] the environment by maintaining the majority of the steeper slopes, oak woodlands, and special status plant species in permanent open space," and "preserv[es] unique natural and historic features present on the site.... Open space areas containing the oak woodlands and riparian/creek are visually linked to the developed portions of the plan...."

FN4. This is a provision of the Mitigation Fee Act (the Fee Act; see § 66000.5). It requires a local agency, in imposing a fee as a condition of approving a development project, to identify the purpose of the fee, the use to which it will be put, the reasonable relationship between the use and the project, and the reasonable relationship between the amount and the project. (§ 66001.)

FN5. Defendant City filed a stipulation in this court to augment the record with a copy of this letter. While the plaintiffs do not object to the augmentation, they object to any use of the letter to contradict the allegations of the petition. They are correct. As this letter was not incorporated in the petition by reference, this proposed augmentation cannot have any effect in the context of a demurrer on the amended petition's allegation regarding it, as we cannot take judicial notice of any of the contents of the letter. (*Bach v. McNelis* (1989) 207 Cal.App.3d 852, 864, 255 Cal.Rptr. 232.) We therefore deny the stipulation to augment the record with the letter and the motion to take judicial notice of portions of the City's municipal code, as they are not necessary to our resolution of the appeal.

FN6. In its demurrer, defendant City requested judicial notice of the return on the summons.

In its order sustaining the demurrer to the third count in the amended petition, the court stated "[the plaintiffs] failed to serve the petition and complaint on [defendant City] ... within 90 days of the accrual of ... [the] cause[ ] of action, as required by ...section 66499.37." It did not grant leave to amend, and directed the dismissal of the action in its entirety. The plaintiff trusts filed their notice of appeal in a timely manner in May 2006.

## DISCUSSION

[1] The briefing of the parties comes down to a straightforward issue. Section 66499.37, on which the trial court relied, is part of the Subdivision Map Act (the Map Act; see § 66410) and provides that "Any action ... to attack ... the decision of [a] ... legislative body concerning a subdivision ... or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained ... unless such action ... is commenced and *service of summons effected within 90 days after the date of such decision.*" [FN7] (Italics added.) On the other hand, section 66020, subd. (d)(2), on which the plaintiffs relied in their amended petition, is part of the Fee Act and provides that "Any party who files a protest ...*may file \*542 an action* to attack ... the imposition of the fees, dedications, reservations, or other exactions imposed on a development project by a local agency *within 180 days after the \*\*798 delivery of the notice* [from the local agency]." (Italics added.) We must determine which limitations period is controlling as part of our de novo review of the sufficiency of the petition. (*Robison, supra,* 78 Cal.App.4th at p. 456, 92 Cal.Rptr.2d 748.)

> FN7. A similar limitations provision applies to challenges to the facial validity of a land use regulation under the Planning and Zoning Law. (§§ 65000, 65009, subd.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(c)(1); *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22 & fn. 10, 24, 32 Cal.Rptr.2d 244, 876 P.2d 1043(*Hensler* ).) As we find that the Fee Act is inapplicable to the plaintiffs' petition, we do not need to consider defendant City's fallback argument based on the limitations period of the Planning and Zoning Law.

*Hensler* involved an ordinance enacted pursuant to the Map Act that prohibited the construction of residential units on ridge lines. (*Hensler, supra,* 8 Cal.4th at pp. 7-8, 32 Cal.Rptr.2d 244, 876 P.2d 1043.) The owner of a 300-acre tract of land filed an action for inverse condemnation, claiming that this ordinance precluded him from developing 40 percent of the tract. (*Ibid.*) Relying on the tenet that a legislative body must have the option of rescinding an enactment rather than pay compensation for a reduction in the value of affected land, *Hensler* concluded a cause of action for inverse condemnation necessarily includes a challenge to the validity of the enactment as applied to a particular piece of property and the need to exhaust the related administrative remedies. Otherwise, the landowner would have the power to compel the legislative body to exercise its power of eminent domain. (*Id.* at pp. 12, 13-14, 24-25, 32 Cal.Rptr.2d 244, 876 P.2d 1043.) As a result, the cause of action for inverse condemnation "aris[es] out of [the] application of a land-use regulation authorized" under the Map Act or is a facial challenge to the enactment under the Planning and Zoning Law, and is therefore subject to their long-expired limitations periods. (*Id.* at pp. 23-26, 32 Cal.Rptr.2d 244, 876 P.2d 1043, quoted material at p. 23, 32 Cal.Rptr.2d 244, 876 P.2d 1043.)

In *Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 42 Cal.Rptr.3d 96(*Branciforte Heights* ), a landowner sought to compel a city to accept a dedication of park land rather than the "in lieu" fees that the city chose to impose as a condition of its approval of a development project, alternatives available to a local gov-

ernment under a provision of the Map Act. (*Id.* at p. 919, 42 Cal.Rptr.3d 96.) As the land use regulation at issue imposed a fee as a condition of approval, the cause of action could be considered as arising both out of the general provision of the Map Act and the Fee Act. (*Id.* at p. 926, 42 Cal.Rptr.3d 96.) *Branciforte Heights* concluded that (as a matter of legislative intent) where a property owner invokes the protest procedure of the Fee Act, its longer limitations period applies; "[c]ontrariwise, where a party does not comply with the fee protest procedures, ... a traditional mandate action must be brought within the ... statute of limitations generally applicable to subdivision decisions." (*Id.* at p. 928, 42 Cal.Rptr.3d 96.) [FN8]

> FN8. The plaintiffs also cite *Ponderosa Homes, Inc. v. City of San Ramon* (1994) 23 Cal.App.4th 1761, 29 Cal.Rptr.2d 26 as standing for the proposition that the Fee Act's limitations period controls over the Map Act's where a challenge to a fee is involved. As the case does not at any point address this issue expressly (simply citing the Fee Act limitations period), it is not authority for that proposition. (*In re Randy J.* (1994) 22 Cal.App.4th 1497, 1505, 28 Cal.Rptr.2d 152.)

*543 It is undisputed that the plaintiff trusts purported to file a protest pursuant to the Fee Act. The question is whether the conditions imposed on the development of their land comes within this act.

[2][3] As noted above, the Fee Act applies to an attack on fees, dedications, reservations, or "other exactions." The plaintiffs do not contend that the conditions at issue come within any of the specifically named conditions in section 66020. Rather, they insist that the nebulous catchall that concludes this series of terms embraces their situation. As they concede **799 in their brief, " '[F]ees' and 'dedications' do denote a conveyance of an interest in money (fees) or an interest in real property (dedications), and 'reservations' have a specific Map Act definition of how they must be implemen-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

148 Cal.App.4th 537    Page 5
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

ted in order to qualify as legally valid...." Section 66000, subdivision (b) defines "fee" as a "monetary exaction" other than a "tax or special assessment." A dedication is the transfer of an interest in real property to a public entity for the public's use. (*Branciforte Heights, supra,* 138 Cal.App.4th at p. 927 & fn. 7, 42 Cal.Rptr.3d 96; *Rohn v. City of Visalia* (1989) 214 Cal.App.3d 1463, 1470, 263 Cal.Rptr. 319; see § 66475 et seq. [regulating various types of dedications].) A reservation is an offer to transfer an interest in real property to a public agency for "parks, recreational facilities, fire stations, libraries, or other public uses," which terminates automatically within two years after the completion and acceptance of all improvements unless the agency enters into an agreement to acquire the interest and compensate the landowner at fair market value.[FN9] (See §§ 66479-66481.)

> FN9. At the same time, they suggest that the conditions on Lot Q amount to a de facto reservation. However, as there is neither any offer nor any proposed transfer of an interest in their property, their suggestion fails.

Neither party cites to *Williams Communications v. City of Riverside* (2003) 114 Cal.App.4th 642, 8 Cal.Rptr.3d 96, which found that a per-foot assessment imposed in connection with a permit to lay cable in conduit under city streets was not a fee but was nonetheless an "exaction" within the meaning of section 66020. (*Id.* at pp. 645, 658, 8 Cal.Rptr.3d 96.) "The statutes do not define 'exaction' but the term is generally defined to include a '*compensation* arbitrarily or wrongfully demanded.' "(*Id.* at p. 658, 8 Cal.Rptr.3d 96, italics added.) This indicates that the usual and ordinary meaning of the word "exaction," the first step in the interpretation of a statute *544 (*Guillemin v. Stein* (2002) 104 Cal.App.4th 156, 164, 128 Cal.Rptr.2d 65(*Guillemin* )), does not include land use restrictions, which are not any form of payment.[FN10]

> FN10. The treatise that the plaintiffs cite, which calls for an expansive interpretation

of "exaction," does not include anything other than fees, interests in real property, and expenditures for onsite or offsite public improvements, facilities, equipment, or other "public amenities." (Abbott et al., Exactions and Impact Fees in California (2001 ed.) Defining the Terms, p. 15.) All of these involve some form of payment or transfer of an interest. This chapter does not mention land use regulations as a species of exaction.

[4] The interpretation that the plaintiffs champion violates the intrinsic interpretive principle of *ejusdem generis,* under which we should construe general terms following specific terms as embracing only objects similar in nature to the specific terms. (*Engelmann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 56, fn. 11, 3 Cal.Rptr.2d 264.) As the plaintiffs concede, the specific terms in section 66020 all involve divesting a developer of either money or a possessory interest in the subject property. The present land use conditions at issue do not result in either consequence; they are simply a restriction on the manner in which the plaintiffs may use their property.

It also violates the principle that we must construe related provisions in harmony. (*Guillemin, supra,* 104 Cal.App.4th at p. 164, 128 Cal.Rptr.2d 65.) If a plaintiff prevails under the Fee Act, "the court shall direct the local agency to *refund* the unlawful portion of the payment ... or *return* the unlawful portion of the exaction imposed."(§ 66020, subd. (e), italics added.) Neither of those verbs would apply in **800 their ordinary sense if exaction included land use restrictions, because they do not involve a transfer of anything to the local agency that must be refunded or returned.

Finally, we note that subdivision (c) of the statute, which involves the imposition of "a requirement for construction of [public] improvements or facilities," suggests the type of other condition at which the catchall provision is aimed. This again requires the expenditure of money but in a form different

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

148 Cal.App.4th 537                                                                                    Page 6
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

than a fee or any transfer of interest in real prop- erty.

The plaintiffs contend that "exaction" must be broad enough to include land use restrictions as a condition of approval in order to reach legislative usurpation of part of the unencumbered value of a property. Nothing, however, prevents a property owner from seeking redress for any reduction in value under the general Map Act rather than the more targeted Fee Act.

Consequently, the present cause of action does not arise under the Fee Act, and the plaintiffs' attempt to invoke its protest procedure and extended limita- tions period was ineffectual. Their petition was therefore untimely served on defendant City under the limitations period of the Map Act.

## *545 DISPOSITION

The stipulation to augment the record and the mo- tion for judicial notice are denied. The judgment is affirmed.

We concur: SCOTLAND, P.J., and RAYE, J.
Cal.App. 3 Dist.,2007.
Fogarty v. City of Chico
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

TAB 4

Westlaw.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 1

▷
Hensler v. City of Glendale
Cal. 1994.
R. R. HENSLER, Plaintiff and Appellant,
v.
CITY OF GLENDALE, Defendant and Respond-
ent.
**No. S032210.**

Supreme Court of California
Jul 25, 1994.

SUMMARY

The trial court sustained without leave to amend a
city's demurrer to an action for inverse condemna-
tion, and dismissed the action. Plaintiff alleged the
taking of his property resulted from the adoption
and application of an ordinance that restricted de-
velopment of property by prohibiting construction
along identified major ridge-line areas. The city's
demurrer was based on the 90-day limitations peri-
od of Gov. Code, § 66499.37, which applies to ac-
tions challenging decisions undertaken pursuant to
the Subdivision Map Act (Gov. Code, § 66410 et
seq.). (Superior Court of Los Angeles County, No.
NCC41335, Joseph R. Kalin, Judge.) The Court of
Appeal, Second Dist., Div. Four, No. B052246, af-
firmed.

The Supreme Court affirmed the judgment of the
Court of Appeal. The court held that the landowner
could not maintain an action in inverse condemna-
tion on the basis of a constitutional just compensa-
tion theory without first exhausting state adminis-
trative and judicial remedies. The complaint ac-
knowledged that some development had been per-
mitted on part of the property, and the ordinance
therefore did not deny the owner all economically
feasible use of the property. Thus, the compensable
taking of the property did not necessarily occur
when the ordinance was enacted. The owner could
not avoid pursuing administrative and judicial rem-
edies and thereby compel the city to purchase the
undeveloped portion of his property by electing to
seek only compensation in an inverse condemnation
action. The court further held that the action was
governed by the 90-day limitations period of Gov.
Code, § 66499.37, for applied challenges, or by the
120-day limitations period of Gov. Code, § 65009,
for facial challenges, and that the application of the
ordinance to the property was not a "continuous
wrong" for which a new cause of action arose each
day the city failed to compensate plaintiff. There
was no uncertainty regarding the commencement of
the period, and, whether the complaint was deemed
a facial challenge or an applied one, it was untimely
since it was brought five years after enactment of
the ordinance. It was immaterial that plaintiff did
not challenge the validity of the ordinance. Code
Civ. Proc., §§ 318 and 319, establishing five-year
periods of limitation for actions otherwise not
covered by statute, were thus not applicable. Gov.
Code, § 66499.37, is not limited to actions for spe-
cific relief, but includes actions for compensation
for a regulatory taking. Plaintiff could not avoid its
application by electing to forego raising his claim
in an administrative mandamus proceeding, and
could not transform the action into one seeking
only damages. (Opinion by Baxter, J., expressing
the unanimous view of the court.)

HEADNOTES

Classified to California Digest of Official Reports

**(1)**        Eminent        Domain        §
18--Compensation--Constitutional    and    Statutory
Provisions--What Constitutes Taking or Damage-
-Regulation.
Where the government authorizes a physical occu-
pation of property or actually takes title, the takings
clause (U.S. Const., 5th Amend.; Cal. Const., art. I,
§ 19) generally requires compensation. But when
the government merely regulates the use of prop-
erty, compensation is required only if considera-
tions such as the purpose of the regulation, or the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 2

extent to which it deprives the owner of the economic use of the property, suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. An individualized assessment of the impact of the regulation on a particular parcel of property and its relation to a legitimate state interest is necessary in determining whether a regulatory restriction on property use constitutes a compensable taking.

**(2a, 2b)** Eminent Domain § 133--Remedies of Owner--Inverse Condemnation-- Conditions Precedent--Regulation--Exhaustion of Administrative Remedies.

A landowner who alleged a taking of real property resulting from the adoption or application to his property of an ordinance enacted pursuant to the Subdivision Map Act (Gov. Code, § 66410 et seq.) could not maintain an action in inverse condemnation based on a constitutional just compensation theory without first exhausting state administrative and judicial remedies. The complaint acknowledged that some development had been permitted on part of the property; the ordinance therefore did not deny the owner all economically feasible use of the property. Thus, the compensable taking of property did not necessarily occur when the ordinance was enacted. The owner could not avoid pursuing administrative and judicial remedies and thereby compel the city to purchase the undeveloped portion of his property by electing to seek only compensation in an inverse condemnation action.

**(3)** Eminent Domain § 18--Compensation--Constitutional and Statutory Provisions--What Constitutes Taking or Damage--Land-use Restriction.

Not every land-use restriction which designates areas on which no development is permitted results in a compensable taking. The impact of a law or regulation as applied to a specific piece of property determines whether there has been a compensable taking, and compensation need not be paid unless the ordinance or regulation fails to serve an important governmental purpose or "goes too far" as applied to the specific property. The impact of a law or regulation on the owner's right to use or develop the property cannot be assessed until an administrative agency applies the ordinance or regulation to the property and a final administrative decision has been reached with regard to the availability of a variance or other means by which to exempt the property from the challenged restriction. A final administrative decision includes exhaustion of any available review mechanism. Utilization of available avenues of administrative relief is necessary because the court cannot determine whether a regulation has gone "too far" unless it knows how far the regulation goes.

**(4)** Eminent Domain § 131--Remedies of Owner--Inverse Condemnation-- Constitutional Basis.

U.S. Const., 5th Amend., conditions a state's right to take private property for public use on the payment of just compensation. It leaves to the state, however, the procedures by which compensation may be sought. If the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the government for a taking. California provides such a process by making available an action for inverse condemnation if, after exhausting administrative remedies to free the property from the limits placed on development and obtaining a judicial determination that just compensation is due, any restrictions for which compensation must otherwise be paid are not lifted. In that action the court determines whether the restriction on development "goes too far" and will be constitutionally impermissible unless just compensation is paid for the taking brought about by the restriction. When property is damaged, or a physical invasion has taken place, an inverse condemnation action may be brought immediately because an irrevocable taking has already occurred.

**(5)** Eminent Domain § 127--Remedies of Owner--Regulatory Taking-- Administrative and Judicial Remedies.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

When an alleged taking of property is a "regulatory taking," i.e., one that results from the application of zoning laws or regulations limiting development, the owner must afford the state the opportunity to rescind the ordinance or regulation or to exempt the property from the allegedly invalid development restriction once it has been judicially determined that the proposed application of the ordinance to the property will constitute a compensable taking. The owner may do so, where appropriate, by a facial challenge to the ordinance, but in most cases must seek a variance if that relief is available and then exhaust other administrative and judicial remedies, such as those provided in an action for declaratory relief or administrative mandamus. Both actions may be joined with an action in inverse condemnation. Damages for the "taking" may be sought in an administrative mandamus action (Code Civ. Proc., § 1095), or, if the plaintiff seeks a jury trial, in the joined inverse condemnation action. The owner may not, however, elect to sue in inverse condemnation and thereby transmute an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid. Compensation must be paid for a permanent taking only if there has been a judi-cial determination that application of the ordinance or regulation to the property is statutorily permissible and constitutes a compensable taking.

**(6)** Eminent Domain § 136--Remedies of Owner--Inverse Condemnation--Trial-- Right to Jury Trial--Damages.
A landowner is entitled to a jury trial in an inverse condemnation action pursuant to Cal. Const., art. I, § 19. However, the right is limited to the question of damages.

**(7)** Eminent Domain § 127--Remedies of Owner--Land-use Restriction--Judicial Determination of "Taking."
A property owner is entitled to a judicial determination of whether a land-use restriction constitutes a taking. Administrative adjudication in the course of exercising an administrative agency's regulatory power, if subject to judicial review, does not deny participants their right to a judicial determination of their rights. Moreover, an administrative agency is not competent to decide whether its own action constitutes a taking and, in many cases, administrative mandate proceedings are not an adequate forum in which to try a takings claim. If the administrative hearing is not one in which the landowner has a full and fair opportunity to present evidence relevant to the taking issue, one in which witnesses may be sworn and testimony presented by means of direct and cross-examination, the administrative record is not an adequate basis on which to determine if the challenged action constitutes a taking. A judicial determination is available in the mandate proceeding, however, if the administrative action is challenged on the basis that it is a compensable taking, the hearing did permit full litigation of the facts relevant to the takings issue, and any additional issues are litigated before the court. Because a taking of property is alleged, the court must accord the owner de novo review of the evidence before the agency in ruling on the taking claim and consider any additional evidence admitted at the hearing on the petition for a writ of mandate. If the owner believes the hearing before the administrative agency was not adequate, he or she is assured a full and fair hearing by exercising the right to join an inverse condemnation action with the mandate proceeding. The availability of these procedures satisfies the requirement that a state provide an adequate process for obtaining compensation when property is taken for public use.

**(8)** Eminent Domain § 133--Remedies of Owner--Inverse Condemnation-- Conditions Precedent--Waiver of Claim.
A landowner who believes that application of a state statute or local ordinance limiting development of the owner's property works a taking, may not bypass the remedies the state has made available to avoid the taking. If he or she does so, the government entity may deem the owner to have waived the taking claim.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 4

(9a, 9b, 9c) Eminent Domain § 135--Remedies of Owner--Inverse Condemnation--Limitation of Actions--Land-use Restriction Under Subdivision Map Act:Limitation of Actions § 18--Period of Limitation--Real Property--Land-use Restriction Under Subdivision Map Act.

A landowner's complaint, alleging the taking of real property resulting from the adoption, or application to plaintiff's property, of an ordinance enacted pursuant to the Subdivision Map Act (Gov. Code, § 66410 et seq.), was governed either by the 90-day limitations period of Gov. Code, § 66499.37, which applies to final adjudicative administrative decisions taken under the authority of the Subdivision Map Act, or by the 120-day limitations period established by Gov. Code, § 65009, for challenges to the facial validity of a land-use regulation. The application of the ordinance to the property was not a "continuous wrong " for which a new cause of action arose each day the city failed to compensate plaintiff. Whether the complaint was deemed a facial challenge or an applied one, it was untimely, since, in either case, the limitations period commenced running on the date the ordinance was enacted, and the action was brought five years after that date. It was immaterial that plaintiff did not challenge the validity of the ordinance. Code Civ. Proc., §§ 318, and 319, establishing five-year periods of limitation for actions otherwise not covered by statute, were thus not applicable. Gov. Code, § 66499.37, is not limited to actions for specific relief, but includes actions for compensation for a regulatory taking. Plaintiff could not avoid application of the provision by electing to forego raising his claim in an administrative mandamus proceeding, and could not transform the action into one seeking only damages.

[See 4 **Witkin**, Summary of Cal. Law (9th ed. 1987) Real Property, § 46.]

(10) Limitation of Actions § 17--Period of Limitation--Nature of Cause of Action.

To determine the statute of limitation which applies to a cause of action, it is necessary to identify the nature of the cause of action, i.e., the " gravamen " of the cause of action. The nature of the right sued on and not the form of action or the relief demanded determines the applicability of the statute of limitations.

(11) Zoning and Planning § 13--Content and Validity of Zoning Ordinances and Planning Enactments--Judicial Review--Administrative Mandamus--Purpose.

The purpose of statutes and rules which require that attacks on land-use decisions be brought by petitions for writs of administrative mandamus, and create relatively short limitations periods for those actions and actions challenging the validity of land-use statutes, regulations, or decisions, is to permit and promote sound fiscal planning by state and local government entities.

COUNSEL

Crosby, Heafey, Roach & May, Gideon Kanner, M. Reed Hunter and James C. Martin for Plaintiff and Appellant.

Ronald A. Zumbrun, James S. Burling, Alexander Dushku, Crahan, Javelera, Ver Halen & Aull, Marcus Crahan, Jr., Laskin & Graham and Richard Laskin as Amici Curiae on behalf of Plaintiff and Appellant.

Scott H. Howard, City Attorney, Freilich, Stone, Leitner & Carlisle, Freilich, Kaufman, Fox & Sohagi, Benjamin Kaufman and Robert F. Freilich for Defendant and Respondent.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, Richard M. Frank and J. Matthew Rodriquez, Deputy Attorneys General, Shute, Mihaly & Weinberger, Fran M. Layton and Susannah T. French as Amici Curiae on behalf of Defendant and Respondent.

BAXTER, J.

The parties in this case ask the court to determine the statute of limitations applicable to a complaint in inverse condemnation which alleges a taking of real property resulting from the adoption, or application *7 to the plaintiff's property, of an ordinance enacted pursuant to the Subdivision Map Act. (Gov. Code, § 66410 et seq.) We conclude that an action

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

in inverse condemnation, whether or not joined with an action in administrative mandamus (Code Civ. Proc., § 1094.5) challenging the ordinance or its application to the plaintiff's property, is governed by Government Code section 66499.37 [FN1] (hereafter section 66499.37) unless it alleges the existence of a final judgment establishing that there has been a compensable taking of the plaintiff's land.

> FN1 Section 66499.37 provides: "Any action or proceeding to attack, review, set aside, void or annul the decision of an advisory agency, appeal board or legislative body concerning a subdivision, or of any of the proceedings, acts or determinations taken, done or made prior to such decision, or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 90 days after the date of such decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of such decision or of such proceedings, acts or determinations. Any such proceeding shall take precedence over all matters of the calendar of the court except criminal, probate, eminent domain and forcible entry and unlawful detainer proceedings."

The legislative intent is clear. Section 66499.37 was enacted to ensure that any challenge to local legislative or administrative acts or decisions taken pursuant to ordinances enacted under the authority of the Subdivision Map Act will be brought promptly. A complaint in inverse condemnation, even one which does not expressly attack the validity of the ordinance or its application, and seeks only compensation for an alleged taking, must be deemed a challenge to the local action. This follows because the constitutional validity of the governmental action if uncompensated must be determined

in the course of ruling on the claim that compensation is owed. Moreover, the validity of the action must be determined to afford the local entity the opportunity to rescind its action rather than pay compensation for a taking. A landowner may not, by seeking only compensation, force a governmental agency to condemn the property.

Therefore, unless the complaint alleges that the existence of a taking has already been judicially established, the complaint necessarily states a cause of action which requires judicial review of a decision of the local legislative body concerning a subdivision or of the reasonableness, legality, or validity of any condition attached to a permit decision within the meaning of section 66499.37. An action which requires that review is governed by section 66499.37 regardless of the plaintiff's characterization of the cause of action.

Having reached that conclusion we shall affirm the judgment of the Court of Appeal.

### I. Events and Proceedings Below

The complaint alleges that plaintiff purchased a 300-acre tract of land zoned for single-family residential use in 1978. In 1981, defendant City of *8 Glendale (Glendale) adopted an ordinance which prohibited construction on major ridge lines within the city. [FN2] The ordinance was enacted pursuant to authority granted by the Subdivision Map Act. Plaintiff was advised by city representatives that development would not be permitted on ridge lines on his property. A plan for the construction of 588 residential units on the property was approved on April 1, 1986, but that approval rejected all proposed use of, and any encroachment within, on, or over, the major ridge lines within the tract. Claiming that the ordinance on which this action was based precluded development of 40 percent of the tract, plaintiff initiated this action in inverse condemnation in September 1989. Glendale demurred, asserting the 90-day limitations period of section 66499.37. It also argued that plaintiff's failure to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

challenge the conditions placed on development of his land barred the inverse condemnation action. The trial court sustained the demurrer and entered judgment dismissing the action. Plaintiff appealed. FN3

> FN2 It is undisputed that the ordinance was enacted pursuant to the authority granted by the Subdivision Map Act. Defendant has requested that this court take judicial notice both of this ordinance, No. 4533, and a predecessor ordinance enacted in 1971 which it amended, No. 3993. We grant that request and defendant's request that the court take judicial notice of certain other documents which defendant believes are relevant to the legislative history of section 66499.37 and subject to judicial notice under Evidence Code section 452. To the extent that the request seeks judicial notice of letters to the Governor from individual legislators and private persons reflecting their understanding of the purpose and effect of legislation creating special statutes of limitation for challenges to subdivision and zoning related decisions, the request is denied. (See *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157, fn. 6 [278 Cal.Rptr. 614, 805 P.2d 873].)

Section 28-2.1 of Ordinance No. 4533 provided in pertinent part:

"a. Intent and purpose. The city is experiencing unprecedented hillside subdivision development which without proper planning may destroy major ridge lines which are an exhaustible and precious scenic resource of the city and its citizens; it is necessary that subdivision developers include with their tentative tract maps, plans for the preservation of major ridge lines.

"b. Submission of plans. The tentative tract map and plans for any subdivision development which touches, crosses, includes or affects major ridge lines shall include

plans for the complete preservation of such major ridge line areas in their natural state.

"c. Major ridge lines defined.... No engineered slopes, housing construction, streets, utilities, or other man-made features shall be permitted within identified major ridge line areas."

> FN3 Defendant asserts that plaintiff sold the property that is the subject of this action in 1986, long before he filed this action, complains that he failed to exhaust available administrative remedies and was permitted dense cluster development on the property, and argues that plaintiff should not be permitted to take advantage of the permit and subsequently challenge its conditions. While some or all of these claims might have been asserted in a demurrer or in defense of the action, we need not address them here since the sole ground for the demurrer was the applicability of section 66499.37.
>
> For purposes of review of an order sustaining a demurrer to a complaint, we accept as true all material allegations of the complaint (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054]) and do not go beyond the face of the complaint and matters of which the trial court took judicial notice. (Evid. Code, § 459.) Defendant does not assert that the trial court was requested to and did take judicial notice of the events to which it alludes that are not alleged in the complaint.

The Court of Appeal affirmed the judgment of dismissal. The court held that the longer limitations period of Code of Civil Procedure section 338, *9 subdivision (j), and Code of Civil Procedure sections 318 and 319, which govern actions for damage to and taking of property, were not applicable to actions based on a decision made pursuant to an ordinance enacted under the authority of the Subdivision Map Act.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

## II. The Nature of Plaintiff's Action

Plaintiff argues that his action is one for a taking of his property, not a challenge to the city ordinance or to the actions taken on his application for a development permit. His position is, simply stated: The ridge-line acreage on which development is not permitted was taken by virtue of the enactment and/or application of the Glendale ordinance which forbids development on the land. Therefore, he is entitled to bring an action in inverse condemnation based on his inability to develop that portion of the property notwithstanding his failure to initiate a timely challenge to the permit condition or application of the ordinance to his property through a proceeding in mandamus.

The question is not answered that easily, however. Before considering which limitations period applies to this action, it is necessary to address plaintiff's argument that, as a matter of federal constitutional right, an action in inverse condemnation seeking damages for a permanent taking may be initiated in the first instance without a challenge to the application of the ordinance to the affected property.

### A. Fifth Amendment "Taking" Clause. [FN4]

Because plaintiff relies in part on authority applicable to a taking of property which occurs when a public agency causes a physical invasion of private property, it is important to note that a "regulatory" taking differs. (1) "Where the government authorizes a physical occupation of property *10 (or actually takes title), the Takings Clause generally requires compensation. [Citation.] But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." (Yee v. City of Escondido (1992) 503 U.S. 519 [118 L.Ed.2d 153, 162, 112 S.Ct. 1522, 1526].) An indi-

vidualized assessment of the impact of the regulation on a particular parcel of property and its relation to a legitimate state interest is necessary in determining whether a regulatory restriction on property use constitutes a compensable taking. (See, e.g., Dolan v. Tigard, Ore.(1994) _____ U.S. _____ [129 L.Ed.2d 304, 114 S.Ct. 2309].)

> FN4 Plaintiff relies on both article I, section 19 of the California Constitution and the takings clause of the Fifth Amendment to the United States Constitution. He relies primarily on federal authority, however. While article I, section 19, protects a somewhat broader range of property values than does the Fifth Amendment takings clause (Varjabedian v. City of Madera (1977) 20 Cal.3d 285, 298 [142 Cal.Rptr. 429, 572 P.2d 43]), that distinction is irrelevant to the issues in this case. Our conclusion that the prerequisites to an inverse condemnation action arising out of a regulatory taking do not deny landowners any rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution applies equally to rights claimed under article I, section 19.

(2a) Ignoring the distinction between a regulatory taking and takings by action which affects title or involves physical invasion, plaintiff contends that a landowner may not be required to exhaust state administrative and judicial remedies, and may sue directly on a constitutional just compensation cause of action. He relies for that assertion on both Williamson Planning Comm'n v. Hamilton Bank (1985) 473 U.S. 172 [87 L.Ed.2d 126, 105 S.Ct. 3108] and First Lutheran Church v. Los Angeles (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378). Neither case supports plaintiff's claim that a taking occurs at the time an ordinance which restricts development is enacted, Williamson Planning Comm'n v. Hamilton Bank, supra, 473 U.S. 172, held that the landowner's claim was not ripe for adjudication.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

The court held, as it had done in earlier cases, that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." (*Id.*, at p. 186 [87 L.Ed.2d at p. 139].) In that case the court noted that no variance had been sought from either the planning commission or the administrative appellate body, the board of zoning appeals. The court emphasized that until there has been a "final, definitive position regarding" how the regulations will be applied to the land, a court cannot determine whether a compensable taking has occurred. (*Id.*, at p. 191 [87 L.Ed.2d at p. 141].) As an alternative ground for concluding that the claim was not ripe, the court noted that the landowner had not utilized state procedures for seeking compensation. "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." (*Id.*, at p. 195 [87 L.Ed.2d at p. 144].)

Far from supporting plaintiffs' position therefore, the *Williamson* decision holds: (1) until a final administrative decision has been made, one which *11 affords the administrative agency and any reviewing body having similar authority the opportunity to amend the agency decision and/or grant a variance, whether a taking has occurred through application of a land-use regulation to specific property cannot be determined; and (2) a state may establish reasonable procedures by which taking claims are to be brought. Moreover, the responsible governmental entity has the option of exempting the property from the ordinance or regulation, or even repealing the ordinance as an alternative to paying compensation for a permanent taking if it is judicially determined, after administrative remedies have been exhausted, that application of the restrictions to the property will constitute a compensable taking.

*First Lutheran Church v. Los Angeles, supra,* 482

U.S. 304, offers no additional support for plaintiff's position. The question presented in that case was whether compensation must be paid for deprivation of use of property caused by an ordinance that is ultimately invalidated by the court. The Supreme Court held that a temporary taking must be compensated. In so doing, however, it cast no doubt on the right of a state to require that a landowner seeking compensation for permanent deprivation first seek a variance or invalidation of the ordinance or regulation as applied to the owner's property. The court held only that invalidation of an overly restrictive zoning ordinance is not a "sufficient remedy" (482 U.S. at p. 319 [96 L.Ed.2d at p. 267]) because it does not provide compensation for the temporary taking prior to its invalidation. [FN5] It did not question invalidation as an adequate alternative to forcing the state to pay compensation for a permanent taking, however. Instead the court reaffirmed: "Nothing we say today is intended to abrogate the principle that the decision to exercise the power of eminent domain is a legislative function .... *Once a court determines that a taking has occurred, the government retains the whole range of options already available-amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain.*" (*Id.*, at p. 321 [96 L.Ed.2d at pp. 267-268], italics added.)

> FN5 In holding that compensation must be paid for a temporary taking prior to the invalidation of the ordinance, the court was careful to point out that its holding did not address the problem of normal delays in the permit process. (482 U.S. at p. 321 [96 L.Ed.2d at pp. 267-268].)

The high court recently reaffirmed the continued availability of these options in *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. _____ [120 L.Ed.2d 798, 112 S.Ct. 2886]. There the court held that a regulation which denied a coastal owner the right to any construction on, or other beneficial use of, his property would constitute a compensable taking if, under state law, a right to develop the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

land existed prior to enactment of the challenged *12 regulation. Although the court remanded the matter to the state court to determine what rights had existed, the court also admonished: "*Of course, the State may elect to rescind its regulation and thereby avoid having to pay compensation for a permanent deprivation.*" (*Id.*, at p. _____, fn. 17 [120 L.Ed.2d at p. 822], italics added.)

Plaintiff seeks to deny the city these options. He claims that he need not seek a variance, exhaust administrative remedies, or give the city the opportunity to rescind the ordinance or exempt his property after obtaining a judicial determination that application of the ordinance to the property does effect a compensable taking. The authorities on which plaintiff relies do not support his thesis that the only precondition to a suit for compensation is administrative application of the ordinance restricting development of his property. He seeks to do what the high court says a landowner has no right to do—to force the city to exercise the power of eminent domain.

(3) Moreover, not every land-use restriction which designates areas on which no development is permitted results in a compensable taking. The governing constitutional authority recognizes that the impact of a law or regulation as applied to a specific piece of property determines whether there has been a compensable taking. Compensation need not be paid unless the ordinance or regulation fails to serve an important governmental purpose or "goes too far" as applied to the specific property that is the object of the litigation. (*Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321].) The impact of a law or regulation on the owner's right to use or develop the property cannot be assessed until an administrative agency applies the ordinance or regulation to the property and a final administrative decision has been reached with regard to the availability of a variance or other means by which to exempt the property from the challenged restriction. A final administrative decision includes exhaustion of any

available review mechanism. Utilization of available avenues of administrative relief is necessary because the court "cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." (*MacDonald, Sommer & Frates v. Yolo County* (1986) 477 U.S. 340, 348 [91 L.Ed.2d 285, 293-294, 106 S.Ct. 2561], see also *Hodel v. Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 297 [69 L.Ed.2d 1, 29, 101 S.Ct. 2352]; *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1032 [282 Cal.Rptr. 877]; *California Coastal Com. v. Superior Court* (1989) 210 Cal.App.3d 1488, 1500 [258 Cal.Rptr. 567].)

(2b) Plaintiff's complaint acknowledges that development has been permitted on part of his property, and thus concedes that the Glendale ordinance *13 did not deny him all economically feasible use of the property. We therefore reject both plaintiff's claim that a compensable taking of his property necessarily occurred when the Glendale ridge-line ordinance was enacted because development was limited to less than all of the property and his argument that he need not pursue administrative and judicial remedies as a prerequisite to a suit in inverse condemnation. He may not avoid these steps and compel the defendant to purchase the undeveloped portion of his property by electing to seek only compensation in an inverse condemnation action.

## B. *California Administrative and Judicial Remedies.*

(4) The Fifth Amendment to the United States Constitution conditions the state's right to take private property for public use on the payment of "just compensation." It leaves to the state, however, the procedures by which compensation may be sought. "If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner has no claim against the Government for a taking." (*Williamson Planning Comm'n v. Hamilton Bank, supra,* 473 U.S. 172, 194-195

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244
Page 10

[87 L.Ed.2d 126, 143-144]; see also *Preseault v. ICC* (1990) 494 U.S. 1, 11 [108 L.Ed.2d 1, 13-14, 110 S.Ct. 914].)

California provides such a process by making available an action for inverse condemnation if, after exhausting administrative remedies to free the property from the limits placed on development and obtaining a judicial determination that just compensation is due, any restrictions for which compensation must otherwise be paid are not lifted. In that action the court determines whether the restriction on development "goes too far" and will be constitutionally impermissible unless just compensation is paid for the taking brought about by the restriction.

When property is damaged, or a physical invasion has taken place, an inverse condemnation action may be brought immediately because an irrevocable taking has already occurred. (5) If the alleged taking is a "regulatory taking," i.e., one that results from the application of zoning laws or regulations which limit development of real property, however, the owner must afford the state the opportunity to rescind the ordinance or regulation or to exempt the property from the allegedly invalid development restriction once it has been judicially determined that the proposed application of the ordinance to the property will constitute a compensable taking. The owner may do so, where appropriate, by a facial challenge to the ordinance, but in most cases must seek a variance if that relief is available and then exhaust other administrative and judicial remedies. The facial challenge may be *14 through an action for declaratory relief (*Agins v. City of Tiburon* (1979) 24 Cal.3d 266, 273 [157 Cal.Rptr. 372, 598 P.2d 25]). The latter, an "as applied" challenge to the development restrictions imposed by the administrative agency, may be properly made in a petition for writ of "administrative" mandamus to review the final administrative decision (Code Civ. Proc., § 1094.5) and that action may be joined with one for inverse condemnation. A declaratory relief action also may be joined with an action in inverse condemnation. (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 251 [115 Cal.Rptr. 497, 524 P.2d 1281].) Damages for the "taking" may be sought in an administrative mandamus action (Code Civ. Proc., § 1095), or, if the plaintiff seeks a jury trial, in the joined inverse condemnation action. (*Patrick Media Group, Inc. v. California Coastal Com.* (1992) 9 Cal.App.4th 592, 614 [11 Cal.Rptr.2d 824]; *Rossco Holdings, Inc. v. State of California* (1989) 212 Cal.App.3d 642, 660 [260 Cal.Rptr. 736]; *California Coastal Com. v. Superior Court, supra,* 210 Cal.App.3d 1488, 1494.) [FN6]The owner "may not, however, elect to sue in inverse condemnation and thereby transmute an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid." (*Agins v. City of Tiburon, supra,* 24 Cal.3d 266, 273.) Compensation must be paid for a permanent taking only if there has been a final judicial determination that application of the ordinance or regulation to the property is statutorily permissible and constitutes a compensable taking. Even then the state or local entity has the option of rescinding its action in order to avoid paying compensation for a permanent taking.

> FN6 Plaintiff's belief to the contrary notwithstanding, this court did not hold in *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508 [125 Cal.Rptr. 365, 542 P.2d 237] that damages for a taking of property could not be sought in a mandamus action. We held that the plaintiff could not add a tort claim for damage predicated on acts for which the Government Code provides immunity, as for injury caused by adopting or failing to adopt an enactment. (See Gov. Code, § 818.2.) In that case we had explained that the plaintiff, who alleged that the value of his property had decreased as a result of the adoption of a zoning ordinance, had not stated a taking claim. (15 Cal.3d at p. 518.) We did not hold, nor could we, consistent with the takings clause of the Fifth Amendment to the United States Constitution and article 1,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

section 19 of the California Constitution, that the Legislature may immunize the state or a local agency from liability for a taking.

Plaintiff argues that it is unreasonable and constitutionally impermissible to require a landowner to pursue these remedies. He argues that it is unreasonable because the owner must bear the expense of, and suffer the delays attendant on, an administrative proceeding, judicial review in a mandamus proceeding, and an inverse condemnation proceeding. He argues it is constitutionally impermissible because the owner may not exercise the right to jury trial in a mandate proceeding.

We are not persuaded. As noted above, the inverse condemnation proceeding may be joined with the petition for writ of mandate. Thus, there is no *15 extended delay, and, as the court held in *First Lutheran Church v. Los Angeles, supra*, 482 U.S. 304, the landowner is entitled to damages for any loss of use of the property beyond that to be expected as part of the normal permit process. Moreover, the expense of a meritorious taking claim will not be borne by the owner. Not only are damages for a temporary taking available, but the owner's reasonable costs and attorney fees must be reimbursed by the local entity if the owner establishes that the restriction on land use is a compensable taking. (Code Civ. Proc., § 1036; *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 375-377 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 104 [160 Cal.Rptr. 733, 603 P.2d 1329]; *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 71 [37 Cal.Rptr. 74, 389 P.2d 538].)

In some cases, all of the evidence necessary to establish a taking claim may have been presented in the administrative proceeding. If it was not possible for the landowner to present that evidence, it may be introduced in the mandate proceeding. Subdivision (e) of Code of Civil Procedure section 1094.5 permits the introduction of additional evidence that is relevant to a challenge to the administrative action if the evidence "could not have been produced or ... was improperly excluded at the hearing before" the administrative agency. Thus, the trial court is able to resolve the taking claim in the mandate proceeding.

(6) A landowner is, as plaintiff argues, entitled to a jury trial in an inverse condemnation action. Article I, section 19 of the California Constitution provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Therefore, the right to jury trial applies in inverse condemnation actions, but that right is limited to the question of damages. (*Highland Realty Co. v. City of San Rafael* (1956) 46 Cal.2d 669, 683 [298 P.2d 15]; *People v. Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799]; *Contra Costa County Flood Control etc. Dist. v. Lone Tree Investments* (1992) 7 Cal.App.4th 930, 936 [9 Cal.Rptr.2d 326].)

(7) A property owner is, of course, entitled to a judicial determination of whether the agency action constitutes a taking. (*Healing v. California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1174 [27 Cal.Rptr.2d 758].) Administrative adjudication in the course of exercising an administrative agency's regulatory power, if subject to judicial review, does not deny participants their right to judicial determination of their rights. (*McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 374-375 [261 Cal.Rptr. 318, 777 P.2d 91].) We agree with the *Healing* court, however, that *16 an administrative agency is not competent to decide whether its own action constitutes a taking and, in many cases, administrative mandate proceedings are not an·adequate forum in which to try a takings claim.

If the administrative hearing is not one in which the landowner has a full and fair opportunity to present evidence relevant to the taking issue, one in which witnesses may be sworn, and testimony presented by means of direct and cross-examination, the administrative record is not an adequate basis on which to determine if the challenged action consti-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 12

tutes a taking. (*Healing v. California Coastal Com.*, *supra*, 22 Cal.App.4th 1158, 1170.) A judicial determination is available in the mandate proceeding, however, if the administrative action is challenged on the basis that it is a compensable taking, the hearing did permit full litigation of the facts relevant to the takings issue, and any additional issues are litigated before the court. Because a taking of property is alleged, the court must accord the owner de novo review of the evidence before the agency in ruling on the taking claim (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-44 [112 Cal.Rptr. 805, 520 P.2d 29]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 140 [93 Cal.Rptr. 234, 481 P.2d 242]) and consider any additional evidence admitted at the hearing on the petition for writ of mandate.

If the owner believes the hearing before the administrative agency was not adequate, the owner is assured a full and fair hearing by exercising his right to join an inverse condemnation action with the mandate proceeding. In the inverse condemnation proceeding the owner may both litigate the taking claim, and, if successful, assert the right to jury trial guaranteed by article I, section 19 of the California Constitution. The availability of these procedures satisfies the requirement that a state provide an adequate process for obtaining compensation when property is taken for public use.

Nor does the imposition on the property owner of the requirement that administrative remedies be exhausted as a prerequisite to an inverse condemnation action impermissibly deny the owner the right to compensation as a "preferred remedy." [FN7]The "preferred remedy" to which plaintiff claims a right is not one recognized as part of constitutional takings jurisprudence. *17 The decisions in which he finds this preference are simply applications of federal law. They hold that in situations in which Congress has not withdrawn from the Court of Claims the jurisdiction conferred by the Tucker Act (28 U.S.C. § 1491(a)(1)) over claims for damages founded on, inter alia, the United States Constitution, it

is improper to enjoin operation or enforcement of a federal statute on the ground that such enforcement might bring about a compensable taking. Those decisions say nothing about the power of a state to reserve the right to rescind a statute or ordinance, or to exempt property from its scope, if it is determined that enforcement of the statute will result in a compensable taking.

> FN7 Plaintiff's suggestion that *Preseault v. ICC*, *supra*, 494 U.S. 1, 12 [108 L.Ed.2d 1, 14] makes a suit in inverse condemnation the remedy of "first instance" lacks merit. *Preseault* dealt with a claim that title to property had been taken pursuant to federal action and construed federal statutory law which created a claims procedure which, the court held, had to be followed before an attack on the regulation which resulted in the alleged taking could be pursued. *Hurley v. Kincaid* (1932) 285 U.S. 95 [76 L.Ed. 637, 52 S.Ct. 267] also involved only federal law. The court held there that the plaintiff could not sue to enjoin operation of a federal flood control project which caused occasional flooding of plaintiff's land as Congress had provided a remedy by which compensation would be paid for such damage. *Ruckelshaus v. Monsanto Co.* (1983) 463 U.S. 1315 [77 L.Ed.2d 1417, 104 S.Ct. 3] is not an opinion of the court. It is an in-chambers opinion of Justice Blackmun denying a stay pending appeal from an injunction against enforcement of provisions of a federal pesticide regulation statute under which trade secrets might be disclosed. Not only is there no "holding" to the effect that inverse condemnation rather than specific relief is the proper remedy, there is no discussion of that topic. The court's actual holding in *Ruckleshaus v. Monsanto Co.* (1984) 467 U.S. 986 [81 L.Ed.2d 815, 104 S.Ct. 2862] offers no support for plaintiff's position. Again, the court applied federal

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

law, holding that because a federal claims procedure was available to provide just compensation if trade secrets had been disclosed, it was improper to enjoin actions the administrative agency took under the pesticide law. The case had nothing to do with regulatory taking of real property or state procedural prerequisites to inverse condemnation actions, and did not create a federal, constitutionally mandated, right to seek monetary compensation in lieu of other remedies.

In *United States v. Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121 [88 L.Ed.2d 419, 106 S.Ct. 455], for instance, the court held that it was improper to enjoin enforcement of a federal statute which required a permit for discharging fill into protected wetlands. The court reiterated the well-established proposition that if compensation is available when property is in fact taken, the governmental action is not unconstitutional. (474 U.S. at p. 128 [88 L.Ed.2d at p. 427].) However, the court pointed out, the permit requirement itself did not take any land, and, if a permit were to be denied with the result that no economically feasible use could be made of the property, federal law provided a means of obtaining compensation for any taking that might occur. For that reason it was premature to seek an injunction.

Far from supporting plaintiff, this case confirms that when restrictions on use of real property are the basis for a taking claim, the owner must pursue any available administrative permit process before seeking compensation or challenging the statute or regulation. The California permit process includes both administrative and judicial review of any conditions to which the landowner objects. Only when the review process has been completed is it possible to determine whether a taking has occurred. Nothing in the high court's holding that an injunction against enforcement of the law or regulation which requires a permit is premature, suggests that compensation must **\*18** be paid immediately upon either enactment of the statute or issuance of a permit with restrictions on development.

The other cases on which plaintiff relies also involve attempts to enjoin enforcement of a federal statute and are no more supportive. *Dames & Moore v. Regan* (1981) 453 U.S. 654 [69 L.Ed.2d 918, 101 S.Ct. 2972] held only that if a presidential order suspending claims against Iran were to effect a taking of the plaintiff's property, the "treaty exception" to the jurisdiction of the United States Court of Claims would not bar a claim for compensation.*Regional Rail Reorganization Act Cases* (1974) 419 U.S. 102 [42 L.Ed.2d 320, 95 S.Ct. 335] held that because the Regional Rail Reorganization Act of 1973 (45 U.S.C. § 701 et seq.) had not withdrawn jurisdiction from the United States Court of Claims, an adequate remedy existed for any taking that might result. The district court erred therefore in declaring the act unconstitutional and enjoining its enforcement. In *Dugan v. Rank* (1963) 372 U.S. 609 [10 L.Ed.2d 15, 83 S.Ct. 999], claimants to water rights attempted to enjoin storing and diversion of water as part of a federal Bureau of Reclamation project. The court held that their remedy, if valid rights were interfered with or partially taken, was a suit for damages. Finally, *U.S. v. Gerlach Live Stock Co.* (1950) 339 U.S. 725 [94 L.Ed. 1231, 70 S.Ct. 955, 20 A.L.R.2d 633] affirmed a United States Court of Claims judgment awarding compensation for a taking of riparian rights, noting that the absence of equitable remedies did not mean that no right was available. The rule on which plaintiff would rely, that the adequacy of a damage remedy is usually grounds for denying equitable remedies, was invoked by the court. It did so, however, with respect to the alternatives of specific performance, mandatory order, and injunctions. (*Id.*, at p. 752 [94 L.Ed.2d at pp. 1249-1250].) The court did not address the right of a state to enforce procedures by which the state or local governmental entity may determine whether its actions will effect a taking, and, if so, to opt to withdraw the objectionable restrictions on development.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The disparity in resources between the federal government and local governmental entities both explains and justifies the state procedure. The likelihood that the impact of a federal regulatory statute may effect a taking of property of such value as to threaten the federal treasury with insolvency is remote. Congress has determined that providing a damage remedy for those cases in which a taking occurs will not cause undue hardship. Few local governments could afford the financial impact of a decision that a *19 widely applicable zoning or regulatory ordinance brought about a taking of all affected property. [FN8]

> FN8 The prayer in plaintiff's complaint sought damages of $10 million for the alleged taking of his property alone.

The California procedural requirements to which plaintiff objects do no more than ensure to the state its right to a prepayment judicial determination that the ordinance or regulation is excessive and will constitute a taking, thus affording the state the option of abandoning the ordinance, regulation, or challenged action, or exempting parcels from its scope if the regulation on use is excessive. As we noted above, the United States Supreme Court has recognized repeatedly the right of the state to reserve the option of rescinding a statute that imposes excessive regulation, and has reaffirmed the principle that a landowner may not compel the state to initiate an eminent domain action. These requirements extend that principle to the inverse condemnation context.

Plaintiff's action is not a claim against the federal government. It is not governed by the federal authority on which plaintiff relies. (8) A California landowner, who believes that application of a state statute or local ordinance limiting development of the owner's property works a taking, may not bypass the remedies the state has made available to avoid the taking. If he does so, the state may deem the owner to have waived the "taking" claim. (*County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 510-511 [138 Cal.Rptr. 472, 564 P.2d 14];

*Rossco Holdings, Inc. v. State of California, supra,* 212 Cal.App.3d 642, 654.)

"If the conditions imposed by the city in the[] permit were invalid, Code of Civil Procedure section 1094.5 provided plaintiffs with the right and procedures to eliminate them. *By declining to avail themselves of those procedures, plaintiffs cannot convert that right into a cause of action in inverse condemnation.*" (*Pfeiffer v. City of La Mesa* (1977) 69 Cal.App.3d 74, 78 [137 Cal.Rptr. 804], italics added.) [FN9] As the *Pfeiffer* court observed, if a landowner could do so, "complete chaos would result in the administration of this important aspect of municipal affairs." (69 Cal.App.3d at p. 78.) *20

> FN9 Contrary to plaintiff's assertion, *Pfeiffer v. City of La Mesa, supra,* 69 Cal.App.3d 74, was not "nullified" by *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914 [218 Cal.Rptr. 839], which cited the case with approval, but distinguished it. The Legislature has now codified the rule that one who accepts the benefits of a permit may not later challenge conditions imposed on or in the permit.Government Code section 66020 creates a limited exception under which a residential housing developer may challenge a permit condition such as that in issue here while proceeding with development. That section, enacted in 1990, permits a protest if the developer provides evidence of arrangements made to ensure performance of the condition if it is upheld. The developer must also serve notice of the protest on the agency and the protest must be filed at the time the condition is approved or within 90 days after it is imposed and initiate a legal action to review or attack the condition within 180 days after the date of imposition.
> The Legislature otherwise indicated approval of and codified the *Pfeiffer* rule in subdivision (d) of Government Code sec-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

tion 66020, a provision which denies any further review rights if the procedures outlined in the statute are not followed: "Thereafter, notwithstanding any other law to the contrary, all persons are barred from any action or proceeding or any defense of invalidity or unreasonableness of the imposition."

In the face of case law which unanimously and repeatedly has rejected his arguments, plaintiff, and amicus curiae Pacific Legal Foundation, cite only *Golden Cheese Co. v. Voss (1991) 230 Cal.App.3d 727[281 Cal.Rptr. 602] (Golden Cheese II) as California authority for maintaining an inverse condemnation action without seeking exemption from a restrictive administrative regulation, and, if unsuccessful, seeking a judicial determination that application of the law or regulation will effect a constitutionally impermissible taking if compensation is not paid. The case does not support petitioner. The case did not involve land-use regulation and the administrative and judicial remedies which are available to, and must be exhausted by, landowners who claim that such regulation effects a taking.*

The court did state in *Golden Cheese II* that the plaintiff in that case could state an inverse condemnation cause of action without challenging the validity of the administrative order in issue there. However, plaintiff overlooks both the context of that statement and the fact that a complaint challenging the validity of the order had been filed with the inverse condemnation complaint.

*Golden Cheese II*, on which plaintiff relies, followed the decision of the Court of Appeal in *Golden Cheese Co. v. Voss (1991) 230 Cal.App.3d 547 [281 Cal.Rptr. 587] (Golden Cheese I)*, a companion case in which the trial court had upheld the validity of a milk marketing plan. The Court of Appeal had affirmed the judgment which denied a petition for writ of mandate. The challenged plan fixed the minimum price for milk used for cheese. The court held that the order was a valid exercise of the discretion given to the director by the Milk Stabilization Act (Food & Agr. Code, § 61801 et seq.). The new formula for pricing the milk, which the trial court and the Court of Appeal upheld, included a manufacturing cost allowance. The Director of the Department of Food and Agriculture found that Golden Cheese was one of the three highest-cost plants, and was not reasonably efficient. The formula adopted did not accommodate the costs of manufacturing in the Golden Cheese plant and, as a result, did not permit Golden Cheese to pass on all of the costs of milk. The Court of Appeal nonetheless upheld the formula.

*Golden Cheese II* was an appeal from a judgment for defendant entered after the trial court sustained without leave to amend a demurrer to an *21 inverse condemnation complaint. In the inverse condemnation action, the company claimed that the price fixing order and a conclusion of the Director of the Department of Food and Agriculture that operation of the Golden Cheese plant was contrary to the economic health of the dairy industry brought about a regulatory taking of its business. Golden Cheese based its taking argument on allegations that the director's actions did not allow it to recover its costs and destroyed any viable economic interest it had in its plant and property. The trial court sustained a demurrer without leave to amend on the ground that the plaintiff did not challenge the validity of the marketing order. The Court of Appeal concluded that this was error because the action challenged the marketing order as applied. Therefore, the court reasoned, Golden Cheese had stated or could state an "as applied" cause of action in inverse condemnation without alleging the invalidity of the director's order.

There is nothing remarkable in that conclusion. An otherwise valid statute or regulation may be invalid as applied to a particular property if compensation is not paid. The Court of Appeal noted that the validity of the order had been challenged in the companion case, and that the action did not involve regulation of real property. Nothing in the opinion

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

suggests that the demurrer to the Golden Cheese complaint asserted a procedural bar to the action based on failure to exhaust available administrative and judicial remedies. And, of course, the case did not involve any issue with respect to a statute of limitations.

Moreover, the actual holding in *Golden Cheese II* was that the holding in *Golden Cheese I* was res judicata on the question of whether the pricing formula was reasonable. Because it was, Golden Cheese had no reasonable investment-backed expectations to any particular milk price level, and there had been no taking of its property. *Golden Cheese II* thus offers no support for plaintiff's argument that he may bypass proper administrative and judicial remedies, and avoid an expressly applicable statute of limitations, when the alleged regulatory taking occurs through application of ordinances adopted pursuant to the Subdivision Map Act.

### C. *The Applicable Statute of Limitations.*

(9a) Relying on his theory that an inverse condemnation action may be pursued without seeking administrative relief from the land-use regulation which restricts development, followed by judicial review of the final administrative decision, plaintiff argues that the Court of Appeal erred in rejecting his claim that application of the Glendale ordinance to his property was a "continuous wrong" for which a new cause of action arises each day the city *22 fails to compensate him. He contends that this must be the rule or property owners cannot know the point in time at which the taking occurs and the statute of limitations commences running.

The Court of Appeal did not err in this respect. If the challenge is to the facial validity of a land-use regulation, the statute of limitations runs from the date the statute becomes effective. Government Code section 65009 establishes a 120-day period of limitation for such actions. [FN10] By contrast, if the challenge is to the application of the regulation to a specific piece of property, the statute of limitations

for initiating a judicial challenge to the administrative action runs from the date of the final adjudicatory administrative decision. [FN11] Government Code section 66499.37 establishes a 90-day period of limitation for these actions. Thus, there is no uncertainty regarding the commencement of the period. Whether the complaint is deemed a facial challenge or an applied challenge, it is untimely.

> FN10 Government Code section 65009, subdivision (c): "Except as provided in subdivision (d), no action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 120 days after the legislative body's decision:
> "(2) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a zoning ordinance."

> FN11 When that decision involves approval of a subdivision map, the "final administrative decision is the final administrative action approving or rejecting the tentative map, an adjudicatory decision," since approval of a final map which substantially complies with the previously approved tentative map is a mandatory ministerial act. (Gov. Code, § 66474.1; *Griffis v. County of Mono* (1985) 163 Cal.App.3d 414, 426-427 [209 Cal.Rptr. 519]; *Soderling v. City of Santa Monica* (1983) 142 Cal.App.3d 501, 506 [191 Cal.Rptr. 140].)

*Stone v. City of Los Angeles* (1975) 51 Cal.App.3d 987 [124 Cal.Rptr. 822], on which plaintiff relies for his argument that he has suffered a continuous wrong, does not support that claim. *Stone* was an action for loss of use of property caused by precondemnation delays after the defendant city had announced its intent to condemn the property. The Court of Appeal was not dealing with a taking which, allegedly, was complete at the time the action was filed.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 17

Plaintiff argues alternatively that Code of Civil Procedure sections 318, 319, or 338 apply. They do not. They are applicable only if no "different limitation is prescribed by statute." (Code Civ. Proc., § 312.)Government Code section 66499.37 is a "different limitation" which now governs actions in which such issues are raised.

(10) To determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, i.e., the "gravamen" of the cause of action. (*23*Leeper v. Beltrami* (1959) 53 Cal.2d 195, 214 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]; *San Filippo v. Griffiths* (1975) 51 Cal.App.3d 640, 645 [124 Cal.Rptr. 399].) "[T]he nature of the right sued upon and not the form of action nor the relief demanded determines the applicability of the statute of limitations under our code." (*Maguire v. Hibernia S.& L. Soc.* (1944) 23 Cal.2d 719, 733 [146 P.2d 673, 151 A.L.R. 1062].)

"The 'patent legislative objective' of [section 66499.37] is to ensure that judicial resolution of Subdivision Map Act disputes occurs 'as expeditiously as is consistent with the requirements of due process of law.' " (*Hunt v. County of Shasta* (1990) 225 Cal.App.3d 432, 442 [275 Cal.Rptr. 113].) (9b) As the Court of Appeal recognized here and in *Hunt*,section 66499.37 applies by its terms to *any* action involving a controversy over or arising out of the Subdivision Map Act. Therefore, if this is a claim arising out of application of a land-use regulation authorized by that act, section 66499.37 applies. Plaintiff seeks to avoid application of section 66499.37 by arguing he does not challenge the validity of the Glendale ordinance. He seeks only compensation for the taking he alleges was effected by the ordinance. He contends on that basis that the statutes of limitation found in the Code of Civil Procedure govern this action. We disagree.

Relying on *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 867 [218 Cal.Rptr. 293, 705 P.2d 866], plaintiff asserts that the five-year period of limitation established by

Code of Civil Procedure sections 318 and 319 applies to this action.

*Baker, supra,* 39 Cal.3d 862, did not involve a limitation on development, however. There the action was one for an alleged continuing nuisance caused by noise, smoke, and vibration from aircraft taking off and landing at defendants' nearby airport. The court deemed the gravamen of the cause of action to be one for an invasion of the plaintiffs property, and on that basis concluded that the five-year statute of limitations of Code of Civil Procedure sections 318 and 319 applied.

The court did not hold in *Baker* that all actions styled by the plaintiff as actions for inverse condemnation are subject to the five-year statute of limitations. In ruling that the five-year statute applied to that action it relied on *Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 374 [28 Cal.Rptr. 357]. In *Frustuck,* an inverse condemnation action was based on a physical invasion of the plaintiff's property by defendant city, whose agents enlarged a drainage ditch on the property and created a berm by piling up dirt, debris, rock and other material on the property. In concluding that the five-year statute applied, rather than the three-year statute for trespass, the Court of Appeal reasoned that the area in issue had been taken for public use. Unlike *24 the present action, both *Baker* and *Frustuck* were actions based on physical invasion of the property.

There is no basis for a conclusion that Code of Civil Procedure sections 318, 319, or 338 govern this action, therefore. The complaint does not allege facts to establish that title to the land was affected by enactment of the ordinance or that a physical invasion of the land took place.

Assuming, arguendo, that plaintiff's complaint alleges facts adequate to establish a taking of 40 percent of his property either by virtue of the enactment of the ridge line ordinance or by the restrictions administratively imposed on development under the authority of the ordinance, the complaint is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043

8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

untimely. [FN12] If this action were deemed a facial challenge to the Glendale ordinance predicated on a theory that the mere enactment of the Glendale ordinance worked a taking of plaintiff's property, it would be untimely even under *Frustuck* as the complaint was filed more than five years after the ordinance was enacted. Moreover, as the State of California points out in its amicus curiae brief, since *Frustuck* was decided the Legislature has adopted not only section 66499.37, but also section 65009, a 120-day statute of limitations specific to challenges to the facial validity of zoning ordinances. [FN13]

> FN12 The state, appearing as amicus curiae, argues that an ordinance or regulation which purports to deny affected property owners any economically feasible use of property without provision for compensation is invalid. The basis for this argument is that article I, section 19 of the California Constitution requires that compensation be paid for any taking. It follows, the state argues, that an owner may not compel the government to compensate the owner for action purportedly taken under an invalid statute. We agree that if an ordinance reflected legislative intent to take property in this manner and did not include a provision for compensation it would be invalid. It is unlikely that an ordinance which merely regulates the use of property would reflect such an intent, however. The state's argument does not acknowledge the possibility that a zoning or land-use ordinance or regulation which makes no provision for payment of compensation may be invalid as applied to one or more parcels within the overall area subject to the ordinance or regulation, but valid as to others.

> FN13 Section 66499.37 was amended in 1980 to reduce the limitations period from 180 days to 90 days. Elsewhere in that legislation the Legislature explained that

changes in the law were needed to expedite the permit process and thereby encourage the development of new housing. (Stats. 1980, ch. 1152, § 10 et seq., p. 3796; see now Gov. Code, § 65913.)

When the gravamen of the cause of action is a claim that a land-use ordinance or regulation enacted under the authority of the Subdivision Map Act, or administrative actions taken pursuant to such an ordinance or regulation, has had the effect of "taking" the plaintiff's property without compensation, the action necessarily challenges the validity either of the ordinance or regulation or of the acts taken by the local agency or appeal board pursuant to the ordinance or regulation. This follows because, as we have explained above, only if the ordinance or regulation would be invalid on its **\*25** face or as applied unless compensation is paid to an affected landowner is a claim in inverse condemnation meritorious. Therefore, the constitutional validity of the ordinance as it affects the plaintiff's property must be litigated in any inverse condemnation action which does not allege that a taking has already been judicially established.

Section 66499.37 mandates that: "*Any* action or proceeding *to attack, review, ... the decision of an advisory agency, appeal board or legislative body concerning a subdivision*, ... or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 90 days after the date of such decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of such decision or of such proceedings, acts or determinations." (Italics added.)

This section is not, as plaintiff argues, limited to actions for specific relief. It includes actions for compensation for a regulatory taking because the validity of the ordinance or its application to the plaintiff's property, if uncompensated, must be determined in the action-i.e., the court must determine

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

if there has been a taking. Before he or she is entitled to any relief, either compensation or exemption of the property from the development restriction, the plaintiff must establish that the ordinance, regulation, or administrative action is not lawful or constitutionally valid if no compensation is paid. The action therefore comes within the broad language of section 66499.37.

Had plaintiff exhausted his administrative remedies by first seeking a variance and pursuing an administrative appeal challenging the permit conditions, and made his claim that the administrative actions constituted a taking in a petition for writ of mandate seeking review of the agency action filed pursuant to Code of Civil Procedure section 1094.5, FN14 the application of section 66499.37 could not be questioned. His action would be one to attack a decision of an appeal board, or, if no administrative appeal is available under the Glendale ordinance, an action of the administrative agency, concerning a subdivision, and the act done prior to that decision. It would clearly be an action to determine the validity of the permit conditions. FN15 A plaintiff may not avoid the application of section 66499.37 by electing to *26 forego raising his claim in the administrative mandamus proceeding in which the owner must exhaust administrative remedies for an erroneous, excessive, or unreasonable restriction on development. If the taking claim is not asserted in that proceeding, the challenge to the validity of the administrative action must be resolved in the inverse condemnation action in order to determine if compensation is due, and to allow the administrative agency or local government the opportunity to rescind the land-use restriction or its application to the plaintiff's property. A court cannot determine that compensation is due on allegations like those of plaintiff's complaint without determining if the development restriction is a taking. It must, necessarily, rule on the validity of the ordinance, regulation, or administrative act under which development is restricted.

FN14 See *South Coast Regional Com. v.*

*Gordon* (1977) 18 Cal.3d 832 [135 Cal.Rptr. 781, 558 P.2d 867]; *State of California v. Superior Court, supra,* 12 Cal.3d 237;*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715] ("[T]he rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.").

FN15 Glendale might have demurred on the basis that plaintiff failed to state a cause of action, the omission being the absence of allegations that administrative remedies had been exhausted or to establish an exception to that requirement. (See *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 384 [216 Cal.Rptr. 733, 703 P.2d 73]; *County of Contra Costa v. State of California* (1986) 177 Cal.App.3d 62 [222 Cal.Rptr. 750].)

In sum, when there has been no prior determination that the plaintiff's property has been taken by virtue of governmental action authorized by the Subdivision Map Act, a court hearing an inverse condemnation action based on that action must determine whether, on its face or as applied, the ordinance or regulation would be invalid if the property owner is not compensated for the claimed taking.

The gravamen of plaintiff's cause of action is therefore a claim that the Glendale ordinance is invalid on its face or as applied because, through the authority of that ordinance and/or regulations enacted under it, the city has taken his property without compensation. Plaintiff cannot transform the action into one which does not challenge the validity of the ordinance, regulations, and administrative actions by acquiescing in the taking, assuming the validity of those actions, and seeking only damages. The election is not his, but the city's. Under a cause of action such as that stated by the complaint in this case, regardless of the title attached to the cause of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

action or the remedy sought, the plaintiff must prove that the ordinance and regulations as applied have worked a "taking" of the plaintiff's property and that the plaintiff has not been compensated.

Viewed from this perspective it is apparent that section 66499.37 governs the time within which this action should have been initiated. Both the statutory language and the legislative history of the section lead to a conclusion that this section, not Code of Civil Procedure section 318 or section 319, is applicable.

Every appellate decision which has considered the issue in a case involving a controversy related to a subdivision has held that section 66499.37 is *27 applicable no matter what the form of the action. (See *Presenting Jamul v. Board of Supervisors* (1991) 231 Cal.App.3d 665 [282 Cal.Rptr. 564] [declaratory relief action challenging denial of request to toll expiration date of tentative subdivision map]; *Hunt v. County of Shasta, supra,* 225 Cal.App.3d 432, 442 [action for declaratory relief that subdivision parcels complied with Subdivision Map Act and mandate to compel issuance of certificate of compliance]; *Griffis v. County of Mono, supra,* 163 Cal.App.3d 414 [action challenging approval of final subdivision map]; *Kirk v. County of San Luis Obispo* (1984) 156 Cal.App.3d 453 [202 Cal.Rptr. 606] [action to compel issuance of certificate of compliance with Subdivision Map Act]; *Soderling v. City of Santa Monica, supra,* 142 Cal.App.3d 501 [mandate to compel city to approve final subdivision maps]; *Resource Defense Fund v. County of Santa Cruz* (1982) 133 Cal.App.3d 800 [184 Cal.Rptr. 371] [action for mandamus and injunctive relief challenging county's approval of land division]; *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334 [176 Cal.Rptr. 620] [consolidated mandate and declaratory relief actions challenging approval of tentative maps for two subdivisions]; *Kriebel v. City Council* (1980) 112 Cal.App.3d 693 [169 Cal.Rptr. 342] [mandate challenging action approving neighboring residential development]; *Timberidge Enterprises, Inc. v. City of Santa Rosa*

(1978) 86 Cal.App.3d 873, 886 [150 Cal.Rptr. 606] [action to invalidate resolution permitting imposition of school impact fee condition on building permits and to recover fees].)

As the court held in *Timberidge Enterprises, Inc. v. City of Santa Rosa, supra,* 86 Cal.App.3d 873, 886, the "clear language" of section 66499.37 "manifests a legislative purpose that a *decision* such as that of the City, approving a subdivision map and attaching a *condition* thereto, shall be judicially attacked within [the limitation period of section 66499.37], or not at all." (Original italics.)

(11) The purpose of statutes and rules which require that attacks on land-use decisions be brought by petitions for administrative mandamus, and create relatively short limitation periods for those actions, and actions which challenge the validity of land use statutes, regulations, and/or decisions, is to permit and promote sound fiscal planning by state and local governmental entities. As the Court of Appeal explained in *Patrick Media Group, Inc. v. California Coastal Com., supra,* 9 Cal.App.4th 592, 612: "The requirement that challenges to administrative actions constituting takings be brought initially by administrative mandamus assures that the administrative agency will have the alternative of changing a decision for which compensation might be required. If no such early opportunity were given, and instead, persons were permitted to stand by in the face of administrative actions alleged to be injurious or confiscatory, and three or five years later, claim monetary compensation on the theory that the administrative action resulted *28 in a taking for public use, meaningful governmental fiscal planning would become impossible."

(9c) And, as the court observed in *California Coastal Com. v. Superior Court (Ham), supra,* 210 Cal.App.3d 1488, 1496, if an owner were permitted to bypass the administrative mandamus remedy and delay initiating an inverse condemnation action for almost five years "[i]n given cases and certainly in the aggregate, the financial burden on the state could be overwhelming." Although the 90-day lim-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

itation period is short, it is, as was the 60-day review period of Public Resources Code section 30801 at issue in *Ham*, the period "operates less as a limitations period and more as a time limit for seeking review of the ruling of another tribunal.... Where review is sought of a Commission decision, there is no question when the 60-day period begins to run. The property owner has no need to 'discover' anything.... [T]he Legislature had every reason to conclude that 60 days provides ample time for a property owner to decide whether to challenge an adverse Commission decision." (210 Cal.App.4th at pp. 1496-1497, fn. omitted.) The same may be said of section 66499.37 and actions seeking review of local agency decisions applying land-use regulations.

Section 66499.37 is not unique in establishing a requirement that challenges to the actions of an administrative agency be brought promptly. In addition to that section and Public Resources Code section 30801, the following statutes establish such requirements: Code of Civil Procedure section 1094.5 (administrative mandamus-90 days); Public Resources Code section 21167 (California Environmental Quality Act decisions-30-180 days); Government Code sections 65901, 65903, 65907 (variances, conditional use and permits, board of zoning adjustment-90 days).

Section 66499.37 governs this action.

### D. *Other Claims.*

Plaintiff argues for the first time in this court that it was error to sustain Glendale's demurrer without leave to amend because, had leave been granted, he could have added allegations that the tentative subdivision maps for the property were filed on October 1, 1986; he sold the property on December 21, 1986, and the final subdivision maps were approved on or about October 19, 1988, and April 27, 1989. This argument was not made in the Court of Appeal and is not among the issues presented in the petition for review. Moreover, we fail to see how such

amendment would have stated a cause of action. If there were a compensable taking of an interest plaintiff had in the land, it must necessarily have occurred before he sold the property. *29

Plaintiff's theory may be that a landowner may convert his rights to challenge an uncompensated regulatory taking into an inverse condemnation action by selling the property before seeking administrative relief, either without applying for a development permit or during the permit process. We disagree for the reasons stated above. A court cannot determine if application of a land-use restriction will constitute a taking until a final administrative decision has been made regarding the use of the property. A potential diminution of value as a result of rezoning or land-use restrictions is not necessarily a taking.

Plaintiff also claims that the right to sue in inverse condemnation for regulatory takings had been abolished in California as a result of this court's holding in *Agins v. City of Tiburon, supra*, 24 Cal.3d 266, and was not revived until the decision in *First Lutheran Church v. Los Angeles, supra*, 482 U.S. 304, "overruled" *Agins* in 1987. That assertion not only misstates the impact of *First Lutheran Church*, but assumes that plaintiff had a right to initiate an action in inverse condemnation without first challenging the development restrictions of which he complains. As we have shown above, that assumption is unwarranted. Nothing in *Agins* precluded an action challenging application of the Glendale ordinance to plaintiff's property, or seeking damages in an inverse condemnation action if the ordinance was found to be invalid absent compensation and the city nonetheless denied plaintiff the right to develop the ridge-line property. Plaintiff had a remedy by which he could have avoided the restrictions brought about by the Glendale ordinance or obtained compensation for their imposition *if their impact constituted a taking* unless compensation was paid. He elected to forego both a judicial determination that the restrictions would constitute a compensable taking, and the remedy the state provides.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

### III. Disposition

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., George, J., and Anderson, J., [FN*] concurred.

> [FN*] Presiding Justice, Court of Appeal, First Appellate District, Division Four, assigned by the Acting Chairperson of the Judicial Council.

Appellant's petition for a rehearing was denied September 22, 1994, and the opinion was modified to read as printed above.

Cal. 1994.
Hensler v. City of Glendale
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 5

Westlaw.

90 Cal.App.4th 188                                                                                    Page 1
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

**H**
HOME BUILDERS ASSOCIATION OF NORTH-
ERN CALIFORNIA, Plaintiff and Appellant, v.
CITY OF NAPA et al., Defendants and Respond-
ents; NAPA VALLEY COMMUNITY HOUSING
et al., Interveners and Respondents.
Cal.App.1.Dist.
HOME BUILDERS ASSOCIATION OF NORTH-
ERN CALIFORNIA, Plaintiff and Appellant,
v.
CITY OF NAPA et al., Defendants and Respond-
ents; NAPA VALLEY COMMUNITY HOUSING
et al., Interveners and Respondents.
**No. A090437.**

Court of Appeal, First District, Division 5, Califor-
nia.
June 6, 2001.

·

**[Opinion certified for partial publication. [FN*] ]**

FN* Pursuant to California Rules of Court,
rules 976(b) and 976.1, this opinion is cer-
tified for publication with the exception of
parts II.C and II.E.

### SUMMARY

A home builders association brought an action as-
serting a facial challenge to a city ordinance that
imposed on residential developers a requirement
that 10 percent of all newly constructed units be af-
fordable. The trial court sustained the city's demur-
rer and dismissed the complaint. (Superior Court of
Napa County, No. 26-07228, W. Scott Snowden,
Judge.)

The Court of Appeal affirmed. It held that the or-
dinance did not, on its face, violate the takings
clauses of the United States and California Consti-
tutions. Although the ordinance imposed significant
burdens on developers, it also provided significant
benefits for those who complied, and it allowed a
developer to appeal for a reduction, adjustment, or
complete waiver of the requirements. The court

held that, since the city had the ability to waive the
requirements, the ordinance could not, on its face,
result in a taking. Further, the waiver clause pre-
cluded a facial challenge even though it placed the
burden on the developer to prove that a waiver
would be appropriate. The court also held that the
ordinance met the test of substantially advancing a
legitimate state interest. Creating affordable hous-
ing for lowand moderateincome families is a legit-
imate state interest, and the ordinance would ad-
vance that interest. (Opinion by Jones, P. J., with
Stevens and Simons, JJ., concurring.)

### HEADNOTES

Classified to California Digest of Official Reports

**(1) Words, Phrases, and Maxims--Inclusionary
Zoning or Inclusionary Housing Ordinance.**
An inclusionary zoning or inclusionary housing or-
dinance is one that requires a residential developer
to set aside a specified percentage of new units for
lowor moderate-income housing.

**(2) Appellate Review § 128--Scope of Review-
-Function of Appellate Court-- Rulings on Demur-
rers.**
On appeal from a judgment of dismissal after an or-
der sustaining a demurrer, the appellate court re-
views the record de novo, to determine whether the
complaint states a cause of action as a matter of
law. All facts properly pleaded are deemed to be true.

**(3a,    3b,    3c)    Eminent    Domain    §
18--Compensation--Constitutional    and    Statutory
Provisions--What Constitutes Taking or Damage-
-Inclusionary Zoning.**
A city's inclusionary zoning ordinance, which im-
posed on residential developers a requirement that
10 percent of all newly constructed units be afford-
able, did not, on its face, violate the taking clauses
of the United States and California Constitutions.
Although the ordinance imposed significant bur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                    Page 2
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

dens on developers, it also provided significant benefits for those who complied, and it allowed a developer to appeal for a reduction, adjustment, or complete waiver of the requirements. It was not true that the ordinance required developers to sell or rent 10 percent of their units to low-income individuals, since they had the alternatives of donating land or paying an in-lieu fee. Also, since the city had the ability to waive the requirements, the ordinance could not, on its face, result in a taking. Further, the waiver clause precluded a facial challenge even though it placed the burden on the developer to prove that a waiver would be appropriate.

[See 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 938 et seq.; West's Key Number Digest, Eminent Domain k. 2(1.2).]

**(4)    Eminent    Domain    §** 18.2--Compensation--Constitutional and Statutory Provisions--Regulations--Facial Challenge.

A claim that a regulation is facially invalid because it effects an unconstitutional taking is only tenable if the terms of the regulation will not permit those who administer it to avoid an unconstitutional application to the complaining parties. This is because a facial challenge is predicated on the theory that the mere enactment of the ordinance worked a taking of the plaintiff's property.

**(5) Zoning and Planning § 9--Content and Validity of Zoning Ordinances and Planning Enactments--Inclusionary Zoning Ordinance.**

A city's inclusionary zoning ordinance, which imposed on residential developers a requirement that 10 percent of all newly constructed units be affordable, did not fail to substantially advance legitimate state interests, and thus the trial court, in an action by developers asserting a facial challenge to the ordinance, did not err in entering judgment for the city. Creating affordable housing for low and moderate-income families is a legitimate state interest, and the ordinance would advance that interest. Although a heightened standard of judicial scrutiny applies to specific land use bargains between property owners and regulatory bodies, that standard is inapplicable to development exactions that are generally applicable through legislative action.

COUNSEL

Paul Campos; Pacific Legal Foundation, James S. Burling and Mark T. Gallagher for Plaintiff and Appellant.

Harding Larmore Kutcher & Kozal, Christopher M. Harding and Kenneth L. Kutcher for California Housing Council and Apartment Association of Greater Los Angeles as Amici Curiae on behalf of Plaintiff and Appellant.

Hyde, Miller, Owen & Trost, Kirk E. Trost; and Thomas B. Brown, City Attorney, for Defendant and Respondent City of Napa.

Goldfarb & Lipman and Richard A. Judd for Napa Chamber of Commerce, Napa Valley Farm Bureau, Napa Valley Grape Growers' Association, 72 California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, and Tara L. Mueller, Deputy Attorney General, for the People of the State of California as Amicus Curiae on behalf of Defendant and Respondent.

California Affordable Housing Law Project of the Public Interest Law Project, Michael Rawson; Western Center on Law and Poverty, Dara L. *191 Schur; Howard, Rice, Nemerovski, Canady Falk & Rabkin and Steven L. Mayer for Interveners and Respondents Napa Valley Community Housing, Non-Profit Housing Association of Northern California, Housing California, Patricia Domingo, Heather Clayton, Donna Simon, Hilda Avia, Rainy Stegall and Hector Candelario.

Legal Aid of Napa and Richard A. Marcantonio for Interveners and Respondents Patricia Domingo, Heather Clayton, Donna Simon, Hilda Avia, Rainy Stegall and Hector Candelario.

**JONES, P. J.**

Home Builders Association of Northern California (HBA) appeals from a judgment entered after the trial court sustained a demurrer and dismissed its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                              Page 3
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

complaint asserting a facial challenge to an inclusionary zoning ordinance that was enacted by the City of Napa (City). HBA contends primarily that the trial court erroneously applied federal and California takings law. We disagree and will affirm the judgment.

### I. Factual and Procedural Background

City, like many other localities in California, has a shortage of affordable housing. This shortage has negative consequences for all of City's population, but causes particularly severe problems for those on the lower end of the economic spectrum. Manual laborers, some of whom work in the region's wine or leisure industries, are forced to live in crowded, substandard housing. There is a large and growing population of homeless, including many families and teenagers. Workers from low-income families increasingly are forced to live greater distances from their places of employment, which causes increased traffic congestion and pollution.

City formed the Napa Affordable Housing Task Force to address these problems. The task force was a broad based community group that included representatives from nonprofit agencies, environmental groups, religious institutions, local industries, for-profit developers, and the local chamber of commerce. The purpose of the task force was to "study the issues surrounding affordable housing in the City of Napa and ... make recommendations to the Housing Authority Commission."

The task force studied housing issues for several months. It formed subcommittees, conducted public hearings, and evaluated affordable housing **\*192** solutions that had been enacted by other communities. (1)**(See fn. 1)** Ultimately the task force recommended that City enact an inclusionary housing ordinance FN1 modeled after one that had been enacted by Napa County.

> FN1 An "inclusionary zoning" or "inclusionary housing" ordinance is one

that requires a residential developer to set aside a specified percentage of new units for lower moderateincome housing. (See Padilla, *Reflections on Inclusionary Housing and a Renewed Look at its Viability* (1995) 23 Hofstra L.Rev. 539, 540.)

City responded by enacting the inclusionary zoning ordinance FN2 that is at issue in the present appeal. The ordinance applies to all development in the city, including residential and nonresidential.

> FN2 In fact, City enacted two ordinances to address the inclusionary housing problem. We will refer to the ordinances collectively as the inclusionary zoning ordinance or simply, the ordinance.

The primary mandate imposed by the ordinance on residential developers is a requirement that 10 percent of all newly constructed units must be "affordable" as that term is defined. FN3 The ordinance offers developers two alternatives. First, developers of single-family units may, at their option, satisfy the so called inclusionary requirement through an "alternative equivalent proposal" such as a dedication of land, or the construction of affordable units on another site. Developers of multifamily units may also satisfy the 10 percent requirement through an "alternative equivalent proposal" if the city council, in its sole discretion, determines that the proposed alternative results in affordable housing opportunities equal to or greater than those created by the basic inclusionary requirement.

> FN3 The definition of "affordable" in the ordinance is complex. In general, the term refers to an amount that could be paid by persons who live in a household that earns significantly less than the area median income.

As a second alternative, a residential developer may choose to satisfy the inclusionary requirement by paying an in-lieu fee. Developers of single-family units may choose this option by right, while de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                                  Page 4
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

velopers of multi-family units are permitted this op-
tion if the city council, again in its sole discretion,
approves. All fees generated through this option are
deposited into a housing trust fund, and may only
be used to increase and improve the supply of af-
fordable housing in City.

Developments that include affordable housing are
eligible for a variety of benefits including expedited
processing, fee deferrals, loans or grants, and dens-
ity bonuses that allow more intensive development
than otherwise would be allowed. In addition, the
ordinance permits a developer to appeal for a re-
duction, adjustment, or *complete waiver* of obliga-
tions under the ordinance "based upon the absence
of any reasonable relationship or nexus between the
impact of the development and ... the inclusionary
requirement." *193

HBA is a nonprofit corporation and association of
builders, contractors, and related trades and profés-
sionals involved in the residential construction in-
dustry. In September 1999, HBA filed a complaint
against City seeking to have the inclusionary zon-
ing ordinance declared facially invalid. As is relev-
ant here, HBA alleged the ordinance violated (1)
the takings clauses of the federal and state Constitu-
tions, (2) the Mitigation Fee Act (Gov. Code, §
66000 et seq.), (3) the due process clause of the
federal Constitution, and (4) Proposition 218.

City demurred to the complaint, arguing it was en-
titled to prevail as a matter of law. City supported
its demurrer with nearly 700 pages of reports and
materials that it had relied upon when adopting the
ordinance.

In December 1999, the trial court allowed a group
of persons and entities to intervene in the action in
support of the ordinance. [FN4] The interveners
joined City's demurrer.

> FN4 The interveners were Napa Valley
> Community Housing, Non-Profit Housing
> Association of Northern California, Hous-
> ing California, Patricia Domingo, Heather

Clayton, Donna Simon, Hilda Avia, Rainy
Stegall, and Hector Candelario.

The trial court sustained the demurrer without leave
to amend, and entered judgment in favor of City
and the interveners. This appeal followed.

II. Discussion

A. *Introduction and Standard of Review*

HBA contends the trial court erred when it sus-
tained the demurrer to its complaint. In arguing
City's inclusionary zoning ordinance is facially in-
valid, HBA again asserts the ordinance violates (1)
the takings clauses of the federal and state Constitu-
tions, (2) the Mitigation Fee Act (Gov. Code, §
66000 et seq.), (3) the due process clause of the
federal Constitution, and (4) Proposition 218.

The standard of review we apply is familiar. (2) On
appeal from a judgment of dismissal after an order
sustaining a demurrer, the appellate court reviews
the record de novo, to determine whether the com-
plaint states a cause of action as a matter of law.
(*Moore v. Regents of University of California*
(1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793
P.2d 479, 16 A.L.R.5th 903].) All facts properly
pleaded are deemed to be true. (*Ibid.*)

With these principles in mind, we consider the ar-
guments that have been advanced concerning each
claim. *194

B. *Takings Issues*

1. *Is the Ordinance Facially Invalid?*

(3a) HBA contends that City's inclusionary zoning
ordinance is facially invalid because it violates the
taking clauses of the federal and state Constitutions.

A claimant who advances a facial challenge faces

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                         Page 5
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

an "uphill battle." (*Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 495 [107 S.Ct. 1232, 1247, 94 L.Ed.2d 472].) (4) " 'A claim that a regulation is *facially* invalid is only tenable if the terms of the regulation will not permit those who administer it to avoid an unconstitutional *application* to the complaining parties.' " (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 547 [45 Cal.Rptr.2d 117], quoting *Tahoe-Sierra Preservation Council v. State Water Resources Control Bd.* (1989) 210 Cal.App.3d 1421, 1442 [259 Cal.Rptr. 132].) This is because a facial challenge is predicated on the theory that "the mere enactment of the ... ordinance worked a taking of plaintiff's property ...." (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 24 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

(3b) Here, City's inclusionary zoning ordinance imposes significant burdens on those who wish to develop their property. However the ordinance also provides significant benefits to those who comply with its terms. Developments that include affordable housing are eligible for expedited processing, fee deferrals, loans or grants, and density bonuses. More critically, the ordinance permits a developer to appeal for a reduction, adjustment, or *complete waiver* of the ordinance's requirements. Since City has the ability to waive the requirements imposed by the ordinance, the ordinance cannot and does not, on its face, result in a taking.

HBA contends the ordinance's waiver clause does not preclude a facial challenge because that clause improperly places the burden on the developer to prove that a waiver would be appropriate when the City has not established a justification for the exactions mandated by the ordinance. According to HBA, allocating the burden in this way is inconsistent with *Dolan v. City of Tigard* (1994) 512 U.S. 374, 391, footnote 8 [114 S.Ct. 2309, 2320, 129 L.Ed.2d 304]. HBA misreads *Dolan*. Quite to the contrary, the Supreme Court stated in *Dolan,* that when evaluating the validity of generally applicable zoning regulations, it is appropriate to place the

burden on the party who is challenging the regulation. (*Ibid.*) As we will discuss below, City's inclusionary zoning ordinance is a generally applicable legislative enactment *195 rather than an individualized assessment imposed as a condition of development. Thus, the burden shifting standard described in *Dolan* does not apply.

### 2. *Does the Ordinance Substantially Advance a Legitimate Interest?*

The Fifth Amendment to the United States Constitution states that "private property [shall not] be taken for public use without just compensation." Article I, section 19 of the California Constitution contains similar language, stating that governmental entities must pay just compensation when they "take" private property for public use.

In *Agins v. Tiburon* (1980) 447 U.S. 255 [100 S.Ct. 2138, 65 L.Ed.2d 106], the Supreme Court provided a test to determine whether a taking has occurred. The court said, "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land ...." (*Id.* at p. 260 [100 S.Ct. at p. 2141].)

(5) Here, HBA contends that City's inclusionary zoning ordinance effects a taking under the first of these tests; i.e., that the ordinance is invalid because it fails to substantially advance legitimate state interests. We are unpersuaded.

First, we have no doubt that creating affordable housing for low and moderate income families is a legitimate state interest. Our Supreme Court has said that the "assistance of moderate-income households with their housing needs is recognized in this state as a legitimate governmental purpose." (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 970 [81 Cal.Rptr.2d 93, 968 P.2d 993].) This conclusion is consistent with repeated pronouncements from the state Legislature which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                                    Page 6
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

has declared that "the development of a sufficient supply of housing to meet the needs of *all Californians* is a matter of statewide concern," (Gov. Code, § 65913.9, italics added) and that local governments have "a responsibility to use the powers vested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of *all economic segments of the community.*" (Gov. Code, § 65580, subd. (d), italics added.) Indeed, Witkin lists 12 separate statutes that are "designed to stimulate the construction of low and moderate income housing by the private sector." (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 54, p. 275; *id.* (2000 supp.) § 54, p. 134.)

Second, it is beyond question that City's inclusionary zoning ordinance will "substantially advance" the important governmental interest of providing affordable housing for lowand moderate-income families. By requiring *196 developers in City to create a modest amount of affordable housing (or to comply with one of the alternatives) the ordinance will necessarily increase the supply of affordable housing. We conclude City's ordinance "substantially advance[s] legitimate state interests." (*Agins v. Tiburon, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141].)

HBA's principal constitutional claim is that City's ordinance is invalid under *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677], and *Dolan v. City of Tigard, supra,* 512 U.S. 374.

In *Nollan* the court discussed the "substantially advance" test in the context of a governmental requirement that appellant property owners dedicate a portion of their beachfront property to the public as a condition for obtaining a rebuilding permit. In the course of its discussion, the court said there must be an "essential nexus" between a condition imposed on the use of land, and the impacts caused by the proposed use. (*Nollan v. California Coastal Comm'n, supra,* 483 U.S. at p. 837 [107 S.Ct. at p. 3148].)

*Dolan* also involved dedications of property that were a condition for granting a development permit. There the court said that a "rough proportionality" standard "best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Dolan v. City of Tigard, supra,* 512 U.S. at p. 391 [114 S.Ct. at pp. 2319-2320].)

HBA contends City's ordinance is invalid under *Nollan* and *Dolan* because there is no "essential nexus" or "rough proportionality" between the exaction required by the ordinance, and the impacts caused by development of property.

We reject this argument because *Nollan* and *Dolan* are inapplicable under the facts of this case. "[T]he intermediate standard of judicial scrutiny formulated by the high court in *Nollan* and *Dolan* is intended to address ... land use 'bargains' between property owners and regulatory bodies-those in which the local government conditions permit approval for a given use on the owner's surrender of benefits which *purportedly* offset the impact of the proposed development. It is in this paradigmatic permit context-where the individual property owner-developer seeks to negotiate approval of a planned development-that the combined *Nollan* and *Dolan* test quintessentially applies." (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 868 [50 Cal.Rptr.2d 242, 911 P.2d 429].) "But a different standard of scrutiny *197 [applies] to development fees that are generally applicable through legislative action 'because the heightened risk of the "extortionate" use of the police power to exact unconstitutional conditions is not present.' " [FNS](*Santa Monica Beach, Ltd. v. Superior Court, supra,* 19 Cal.4th at p. 966, quoting *Ehrlich v. City of Culver City, supra,* 12 Cal.4th at p. 876.)"[I]ndividualized development fees warrant a type of review akin to the conditional conveyances at issue in *Nollan* and *Dolan,* whereas generally ap-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                    Page 7
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

plicable development fees warrant the more deferential review that the *Dolan* court recognized is generally accorded to legislative determinations." (*Santa Monica Beach, Ltd. v. Superior Court, supra,* 19 Cal.4th at pp. 966-967.) The justification for these varying levels of scrutiny is founded in the nature of the two types of exactions. "It is one thing for courts to make a government agency adhere to its own justification for requiring the dedication of a particular portion of property as a condition of development; such adherence safeguards against the possibility that the justification is merely a pretext for taking the property without paying compensation.... But it is another thing for courts to require that a complex, generally applicable piece of economic legislation that will have many effects on many different persons and entities accomplish precisely the goals stated in a legislative preamble in order to preserve its constitutionality." (*Santa Monica Beach, Ltd. v. Superior Court, supra,* 19 Cal.4th at p. 972.)

> FN5 While the court in *Santa Monica Beach,* discussed the scope of *Nollan* and *Dolan* in the context of "development fees," the court has made clear that the same analysis applies whether a governmental entity requires the conveyance of property, or the payment of a fee. (See *Ehrlich v. City of Culver City, supra,* 12 Cal.4th at p. 876.)

Here, we are not called upon to determine the validity of a particular land use bargain between a governmental agency and a person who wants to develop his or her land. Instead we are faced with a facial challenge to economic legislation that is generally applicable to *all* development in City. We conclude the heightened standard of review described in *Nollan* and *Dolan* is inapplicable under these facts.

### 3. *Other Takings Issues*

HBA advances two additional arguments on the takings issue.

First HBA contends that even if the heightened level of scrutiny set forth in *Nollan* and *Dolan* are inapplicable, City's inclusionary zoning ordinance is still invalid under California cases such as *Rohn v. City of Visalia* (1989) 214 Cal.App.3d 1463 [263 Cal.Rptr. 319],*Whaler's Village Club v. California Coastal Com.* (1985) 173 Cal.App.3d 240 [220 Cal.Rptr. 2], and *198Liberty v. California Coastal Com.* (1980) 113 Cal.App.3d 491 [170 Cal.Rptr. 247]. These decisions are inapposite. The issue in each was the validity of an ad hoc condition that was imposed on an individual developer. None of them involved a facial challenge to a generally applicable zoning ordinance that imposed obligations on all development in a given area. We conclude *Rohn, Whaler's Village,* and *Liberty* are not applicable under the facts of this case.

HBA also contends that the inclusionary zoning ordinance is invalid because the lack of housing for low and moderate income families in City is the product of City's own prior restrictive land use policies.

HBA has not cited any authority to support the proposition that a zoning ordinance which tries to solve problems caused by prior legislative decisions is invalid, and case law is directly to the contrary. For example, in *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 [98 S.Ct. 2646, 57 L.Ed.2d 631], the Supreme Court ruled that New York could enact a landmark preservation law that was designed to mitigate the effects of prior policies that permitted "large numbers of historic structures, landmarks, and areas" to be destroyed. (*Id.* at p. 108 [98 S.Ct. at p. 2651].) If New York can enact a landmark preservation law to remedy a shortage of historic buildings created by its prior policies, City can enact an inclusionary zoning ordinance even if its prior policies contributed to a scarcity of available land and a shortage of affordable housing.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                        Page 8
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)

C. *Mitigation Fee Act* [FN*]


FN* See footnote, *ante*, page 188.


. . . . . . . . . . .


D. *Due Process*


HBA contends the inclusionary zoning ordinance is facially invalid under the due process clause of the Federal Constitution because it "requires property owners who develop residential housing to sell or rent 10% of their units at prices or rents that are based entirely upon certain fixed percentages of the income levels of lower and very lowincome households." Imposing such a requirement violates the due process clause, HBA argues, because "the inclusionary zoning law provides no mechanism to make a fair return for property owners who are forced to sell or rent units at an amount unrelated to market prices."

We doubt seriously that HBA is entitled to a "fair return" under the due process clause. The "fair return" standard is commonly used to evaluate **\*199** restrictions placed on historically regulated industries such as railroads and public utilities. (See, e.g., *Power Comm'n v. Pipeline Co.* (1942) 315 U.S. 575 [62 S.Ct. 736, 86 L.Ed. 1037].) It has also been used to evaluate rent control ordinances. (See, e.g., *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 679 [209 Cal.Rptr. 682, 693 P.2d 261].) However HBA has not cited, and we are not aware of, any case that holds a housing developer is entitled to "fair return" on his or her investment.

(3c) However we need not base our decision on this ground. First, it is not literally correct to say that City's ordinance "requires property owners who develop residential housing to sell or rent 10% of their units [to low income individuals]." Under the ordinance, any person who does not want to sell or rent a portion of his or her housing units to low income individuals may choose one of the alternat-

ives, such as donating vacant land or paying an in-lieu fee. Thus HBA's argument is based on an incorrect premise.

Second, and more importantly, HBA's facial due process challenge must necessarily fail. As we have said, " 'A claim that a regulation is *facially* invalid is only tenable if the terms of the regulation will not permit those who administer it to avoid an unconstitutional *application* to the complaining parties....' " (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo, supra,*38 Cal.App.4th at p. 547, citation omitted.) When an ordinance contains provisions that allow for administrative relief, we must presume the implementing authorities will exercise their authority in conformity with the Constitution. (See *Fisher v. City of Berkeley, supra,*37 Cal.3d at p. 684.)

Here, as we have noted, City's ordinance includes a clause that allows city officials to reduce, modify or waive the requirements contained in the ordinance "based upon the absence of any reasonable relationship or nexus between the impact of the development and ... the inclusionary requirement." Since City has the authority to completely waive a developer's obligations, a facial challenge under the due process clause must necessarily fail.

HBA contends the waiver clause does not preclude a facial challenge because it does not state expressly that a waiver may be granted based on a lack of a "fair return." However the power of an agency to make adjustments to guarantee a fair return is "not limited to those literally granted by the ordinance ...." (*City of Berkeley v. City of Berkeley Rent Stabilization Bd.* (1994) 27 Cal.App.4th 951, 962 [33 Cal.Rptr.2d 317].) When this standard is not expressly stated, it is "present by implication." (*Ibid.*)**\*200**


E. *Proposition 218* [FN*]


FN* See footnote, *ante*, page 188.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                          Page 9
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

. . . . . . . . . . .

### III. Disposition

The judgment is affirmed.

Stevens, J., and Simons, J., concurred.
A petition for a rehearing was denied June 27,
2001, and on July 2, 2001, the opinion was modi-
fied to read as printed above. Appellant's petition
for review by the Supreme Court was denied
September 12, 2001. **\*201**

Cal.App.1.Dist.
Home Builders Ass'n of Northern California v. City
of Napa
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl.
L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001
Daily Journal D.A.R. 5713

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 6

Westlaw.

147 Cal.App.4th 253                                                                                                          Page 1
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

**C**

McAllister v. County of Monterey
Cal.App. 6 Dist.,2007.

Court of Appeal, Sixth District, California.
Hugh McALLISTER, Plaintiff and Appellant,
v.
COUNTY OF MONTEREY et al., Defendants and
Respondents;
Sheldon J. Laube et al., Real Parties in Interest and
Respondents.
**No. H028813.**

Jan. 31, 2007.

**Background:** While property owner's administrative appeal to Coastal Commission was pending, he sued county seeking writ of administrative mandate challenging county's approval of neighbors' coastal development project as null and void under county code provisions and in violation of California Environmental Quality Act (CEQA). Neighbor and county demurred based on plaintiff's asserted failure to exhaust his administrative remedies, and the trial court stayed proceedings and sustained the demurrers with leave to amend. After Coastal Commission issued a coastal development permit for the project, neighbors and county again demurred. The Superior Court, Monterey County, No. M68767,Robert O'Farrell, J., sustained defendants' demurrer without leave to amend and ordered the case dismissed. Plaintiff appealed.

**Holdings:** The Court of Appeal, McAdams, J., held that:
(1) trial court properly allowed defendants to file second demurrer;
(2) plaintiff's claim that county's action was null and void did not excuse his compliance with exhaustion requirement;
(3) county's approval of neighbor's project was not null and void under county code provisions; and
(4) county's CEQA determinations were superseded by Coastal Commission's environmental review,

and thus were not subject to judicial review.

Affirmed.

West Headnotes

**[1] Evidence 157 ⊜47**

157 Evidence
    157I Judicial Notice
        157k47 k. Administrative Rules and Regulations. Most Cited Cases

**Evidence 157 ⊜48**

157 Evidence
    157I Judicial Notice
        157k48 k. Official Proceedings and Acts. Most Cited Cases
On appeal from trial court's dismissal of property owner's action against county, seeking writ of mandate, injunctive relief, and declaratory judgment that county's approval of neighbors' coastal development project was null and void under county code provisions and violated California Environmental Quality Act (CEQA), Court of Appeal would take judicial notice of certain documents contained in clerk's transcript, those being county code provisions and Coastal Commission documents, and documents from related proceedings before Coastal Commission. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[2] Environmental Law 149E ⊜577**

149E Environmental Law
    149EXII Assessments and Impact Statements
        149Ek577 k. Duty of Government Bodies to Consider Environment in General. Most Cited Cases
The overriding purpose of the California Environmental Quality Act (CEQA) is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage. West's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                        Page 2
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

Ann.Cal.Pub.Res.Code § 21000 et seq.

**[3] Environmental Law 149E ☞581**

149E Environmental Law
  149EXII Assessments and Impact Statements
    149Ek580 Preliminary Assessment or Report
      149Ek581 k. In General. Most Cited Cases

**Environmental Law 149E ☞594**

149E Environmental Law
  149EXII Assessments and Impact Statements
    149Ek584 Necessity for Preparation of State-
ment, Consideration of Factors, or Other Compli-
ance with Requirements
      149Ek594 k. Negative Declaration; State-
ment of Reasons. Most Cited Cases
California Environmental Quality Act (CEQA) ex-
cuses the preparation of an environmental impact
report (EIR) and allows the use of a negative de-
claration when an initial study shows that there is
no substantial evidence that the project may have a
significant effect on the environment. West's
Ann.Cal.Pub.Res.Code §§ 21064, 21080(c); 14
CCR § 15070.

**[4] Environmental Law 149E ☞589**

149E Environmental Law
  149EXII Assessments and Impact Statements
    149Ek584 Necessity for Preparation of State-
ment, Consideration of Factors, or Other Compli-
ance with Requirements
      149Ek589 k. Significance in General.
Most Cited Cases

**Environmental Law 149E ☞615**

149E Environmental Law
  149EXII Assessments and Impact Statements
    149Ek612 Evidence
      149Ek615 k. Weight and Sufficiency.
Most Cited Cases
Since the preparation of an environmental impact
report (EIR) is the key to environmental protection

under California Environmental Quality Act
(CEQA), accomplishment of the high objectives of
that act requires the preparation of an EIR whenev-
er it can be fairly argued on the basis of substantial
evidence that the project may have significant en-
vironmental impact. West's Ann.Cal.Pub.Res.Code
§ 21000 et seq.

**[5] Environmental Law 149E ☞592**

149E Environmental Law
  149EXII Assessments and Impact Statements
    149Ek584 Necessity for Preparation of State-
ment, Consideration of Factors, or Other Compli-
ance with Requirements
      149Ek592 k. Categorical Exclusion; Ex-
emptions in General. Most Cited Cases
The Coastal Commission's permit appeal procedure
is treated as the functional equivalent of the envir-
onmental impact report (EIR) process mandated by
California Environmental Quality Act (CEQA).
West's Ann.Cal.Pub.Res.Code §§ 21000 et seq.,
30000 et seq.

**[6] Environmental Law 149E ☞132**

149E Environmental Law
  149EIV Water, Wetlands, and Waterfront Con-
servation
    149Ek129 Permissible Uses and Activities;
Permits and Licenses; Management
      149Ek132 k. Coastal Areas, Bays, and
Shorelines. Most Cited Cases
The Coastal Act contemplates local discretion and
autonomy in planning subject to review by the
Coastal Commission for conformity to statewide
standards. West's Ann.Cal.Pub.Res.Code § 30000 et
seq.

**[7] Environmental Law 149E ☞132**

149E Environmental Law
  149EIV Water, Wetlands, and Waterfront Con-
servation
    149Ek129 Permissible Uses and Activities;
Permits and Licenses; Management

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

149Ek132 k. Coastal Areas, Bays, and Shorelines. Most Cited Cases
Once the Coastal Commission has certified the local government's local coastal plan (LCP) as conforming to the policies of the Coastal Act, review authority for development within that portion of the coastal zone passes to the local government. West's Ann.Cal.Pub.Res.Code § 30000 et seq.

**[8] Administrative Law and Procedure 15A ⬤⟿ 229**

15A Administrative Law and Procedure
    15AIII Judicial Remedies Prior to or Pending Administrative Proceedings
        15Ak229 k. Exhaustion of Administrative Remedies. Most Cited Cases
Under the doctrine of administrative exhaustion, where an adequate administrative remedy is provided by statute, resort to that forum is a jurisdictional prerequisite to judicial consideration of the claim.

**[9] Environmental Law 149E ⬤⟿665**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek665 k. Exhaustion of Administrative Remedies. Most Cited Cases
The doctrine of exhaustion of administrative remedies applies to judicial review of Coastal Commission actions. West's Ann.Cal.Pub.Res.Code § 30000 et seq.

**[10] Administrative Law and Procedure 15A ⬤⟿229**

15A Administrative Law and Procedure
    15AIII Judicial Remedies Prior to or Pending Administrative Proceedings
        15Ak229 k. Exhaustion of Administrative Remedies. Most Cited Cases
Exceptions to the doctrine of exhaustion of administrative remedies apply when the administrative remedy is unavailable, when it is inadequate, or when it would be futile to pursue it; when the

agency indulges in unreasonable delay; when the subject matter lies outside the administrative agency's jurisdiction; when pursuit of an administrative remedy would result in irreparable harm; and, when important questions of constitutional law or public policy governing agency authority are tendered.

**[11] Administrative Law and Procedure 15A ⬤⟿229**

15A Administrative Law and Procedure
    15AIII Judicial Remedies Prior to or Pending Administrative Proceedings
        15Ak229 k. Exhaustion of Administrative Remedies. Most Cited Cases
Generally speaking, even where questions concerning the agency's jurisdiction are presented, the doctrine of exhaustion of administrative remedies requires judicial abstention until there has been a final decision in the administrative forum.

**[12] Appeal and Error 30 ⬤⟿863**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k862 Extent of Review Dependent on Nature of Decision Appealed from
                30k863 k. In General. Most Cited Cases
On appeal from the sustaining of a demurrer without leave to amend, the appellate court exercises its independent judgment about whether the complaint states a cause of action as a matter of law.

**[13] Appeal and Error 30 ⬤⟿78(3)**

30 Appeal and Error
    30III Decisions Reviewable
        30III(D) Finality of Determination
            30k75 Final Judgments or Decrees
                30k78 Nature and Scope of Decision
                    30k78(3) k. Rulings on Demurrer or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                          Page 4
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

Motion Relating to Pleadings. Most Cited Cases

**Appeal and Error 30 🔗102**

30 Appeal and Error
   30III Decisions Reviewable
     30III(E) Nature, Scope, and Effect of Decision
       30k102 k. On Demurrer. Most Cited Cases
Generally speaking, an order sustaining a demurrer is neither appealable per se nor as a final judgment, but an appellate court may deem an order sustaining a demurrer to incorporate a judgment of dismissal.

**[14] Appeal and Error 30 🔗105**

30 Appeal and Error
   30III Decisions Reviewable
     30III(E) Nature, Scope, and Effect of Decision
       30k105 k. Dismissal, Nonsuit, or Direction of Verdict. Most Cited Cases
An order dismissing a complaint with prejudice constitutes an appealable judgment. West's Ann.Cal.C.C.P. §§ 581d, 904.1(a)(1).

**[15] Declaratory Judgment 118A 🔗392.1**

118A Declaratory Judgment
   118AIII Proceedings
     118AIII(H) Appeal and Error
       118Ak392 Appeal and Error
         118Ak392.1 k. In General. Most Cited Cases

**Mandamus 250 🔗187.2**

250 Mandamus
   250III Jurisdiction, Proceedings, and Relief
     250k187 Appeal and Error
       250k187.2 k. Decisions Reviewable and Proper Mode of Review. Most Cited Cases
On appeal from trial court's order sustaining county's and neighbor's demurrer to property owner's action seeking writ of mandate, injunctive re-

lief, and declaratory judgment that county's approval of neighbors' coastal development project was null and void under county code provisions, and violated California Environmental Quality Act (CEQA), Court of Appeal would deem order sustaining demurrer to incorporate judgment of dismissal, rendering trial court's order appealable, where matter was fully briefed and no party had raised objection to consideration of the appeal on its merits. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[16] Mandamus 250 🔗163**

250 Mandamus
   250III Jurisdiction, Proceedings, and Relief
     250k163 k. Demurrer to Petition or Complaint, or to Alternative Writ. Most Cited Cases
Trial court properly allowed county and neighbor to file second demurrer to property owner's complaint seeking writ of administrative mandate challenging county's approval of neighbors' coastal development project, notwithstanding plaintiff's claim that demurrer was not timely; given judicial stay in response to defendants' first demurrer, based on plaintiff's failure to exhaust administrative remedies, and fact that plaintiff agreed to corresponding extension of time for filing answer, which could have been deemed extension for filing demurrer as well, treating second demurrer as timely was warranted and, in any event, plaintiff was not prejudiced, as allowing second demurrer did not affect his substantive rights. West's Ann.Cal.C.C.P. § 430.40.
*See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶¶ 7:34.1, 7:139 (CACIVP Ch. 7-A).*

**[17] Pleading 302 🔗199**

302 Pleading
   302V Demurrer or Exception
     302k199 k. Time for Filing or Serving Demurrer. Most Cited Cases
Statute setting 30-day time limit after service of the complaint or cross-complaint for filing a demurrer used word "may" rather than "must," and thus was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

permissive rather than mandatory. West's Ann.Cal.C.C.P. § 430.40.

**[18] Pleading 302** ⟨⟩352

302 Pleading
   302XVI Motions
      302k351 Striking Out Pleading or Defense
         302k352 k. In General. Most Cited Cases

**Pleading 302** ⟨⟩353

302 Pleading
   302XVI Motions
      302k351 Striking Out Pleading or Defense
         302k353 k. Authority and Discretion of Court. Most Cited Cases
There is no absolute right to have a pleading stricken for lack of timeliness in filing where no question of jurisdiction is involved, and where the late filing was a mere irregularity; the granting or denial of the motion is a matter which lies within the discretion of the court.

**[19] Pleading 302** ⟨⟩85(4)

302 Pleading
   302III Responses or Responsive Pleadings in General
      302III(A) Defenses in General
         302k85 Time to Plead in General
            302k85(4) k. Extension or Shortening of Time. Most Cited Cases

**Pleading 302** ⟨⟩199

302 Pleading
   302V Demurrer or Exception
      302k199 k. Time for Filing or Serving Demurrer. Most Cited Cases
The trial court may exercise its discretion to enlarge the time for answer or demurrer so long as its action does not affect the substantial rights of the parties. West's Ann.Cal.C.C.P. § 473(a)(1).

**[20] Mandamus 250** ⟨⟩163

250 Mandamus
   250III Jurisdiction, Proceedings, and Relief
      250k163 k. Demurrer to Petition or Complaint, or to Alternative Writ. Most Cited Cases
Trial court properly allowed county and neighbor to file second demurrer to property owner's complaint seeking writ of administrative mandate challenging county's approval of neighbors' coastal development project, following lifting of judicial stay which was imposed pending plaintiff's administrative appeal, despite fact that plaintiff had not filed amended pleading and, in any event, plaintiff was not prejudiced thereby, as allowing second demurrer did not affect his substantive rights. West's Ann.Cal.C.C.P. §§ 430.40(b), 475.

**[21] Environmental Law 149E** ⟨⟩665

149E Environmental Law
   149EXIII Judicial Review or Intervention
      149Ek665 k. Exhaustion of Administrative Remedies. Most Cited Cases
Property owner's claim that county's approval of neighbor's coastal development project was null and void under county code provisions did not excuse him from complying with requirement that he exhaust his administrative remedies by pursuing appeal to Coastal Commission to completion. West's Ann.Cal.Pub.Res.Code § 30603(a)(1).

**[22] Environmental Law 149E** ⟨⟩132

149E Environmental Law
   149EIV Water, Wetlands, and Waterfront Conservation
      149Ek129 Permissible Uses and Activities; Permits and Licenses; Management
         149Ek132 k. Coastal Areas, Bays, and Shorelines. Most Cited Cases
County's approval of coastal development project was not rendered null and void under county code provision voiding any permit that violated county's local coastal plan (LCP); although property owner's predecessor performed grading and construction work on property that violated predecessor's Coastal Commission permit, that decades-old viola-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion of prior permit, which was issued more than a decade before Coastal Commission's certification of county's LCP, did not violate county's LCP. West's Ann.Cal.Pub.Res.Code § 30000 et seq.

**[23] Mandamus 250 ⛂154(2)**

250 Mandamus
    250III Jurisdiction, Proceedings, and Relief
        250k154 Petition or Complaint, or Other Application
            250k154(2) k. Form, Requisites, and Sufficiency in General. Most Cited Cases
In order to state a cause of action warranting judicial interference with the official acts of agency defendants, plaintiffs must allege much more than mere conclusions of law; they must aver the specific facts from which the conclusions entitling them to relief would follow.

**[24] Environmental Law 149E ⛂648**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek636 Administrative Decisions or Actions Reviewable in General
            149Ek648 k. Assessments and Impact Statements. Most Cited Cases
County's determinations under California Environmental Quality Act (CEQA) relating to county's approval of coastal development project were superseded by Coastal Commission's environmental review that was conducted during administrative appeal of approval by neighbor who opposed project, and thus county's CEQA determinations were not subject to judicial review. West's Ann.Cal.Pub.Res.Code §§ 21000 et seq., 30000 et seq.
*See Cal. Civil Practice (Thomson/West 2006) Environmental Litigation, § 8:62 et seq.*
**[25] Pleading 302 ⛂236(1)**

302 Pleading
    302VI Amended and Supplemental Pleadings and Repleader
        302k233 Leave of Court to Amend

        302k236 Discretion of Court
            302k236(1) k. In General. Most Cited Cases
The trial court's discretion to allow amendments to the pleadings in the furtherance of justice should be exercised liberally in favor of amendments. West's Ann.Cal.C.C.P. § 473(a)(1).

**\*\*120** Fenton & Keller, John S. Bridges, Mark A. Cameron, David C. Sweigert, Monterey, Jennifer M. Pavlet, for Appellant.
Charles J. McKee, County Counsel, Frank G. Tiesen, Deputy County Counsel, for Respondent.
Lombardo & Gilles, Sheri L. Damon, Salinas, for Real Parties in Interest.

McADAMS, J.
**\*262** This appeal represents the latest round in the plaintiff's long battle against the approval of a coastal development permit on neighboring property. In administrative proceedings conducted by Monterey County officials and later by the California Coastal Commission, the real parties in interest won approval to construct a large single-family dwelling on the Big Sur Coast. In judicial proceedings below, the real parties in interest and the defendants successfully demurred to the plaintiff's complaint, which was then dismissed. On appeal, the plaintiff contends that the dismissal was improper procedurally, because the demurrer was unauthorized and untimely. He also argues that the dismissal was improper substantively because he has a valid cause of action against the County based on jurisdictional grounds and based on the County's violation of the California Environmental Quality Act (CEQA).

As we explain, we find no merit in the plaintiff's contentions. Procedurally, the trial court acted within its discretion in entertaining a second demurrer to the plaintiff's complaint after the conclusion of Coastal Commission proceedings. **\*263** Substantively, there is no merit in the plaintiff's jurisdictional claims that Monterey County's action was a legal nullity, since those allegations both conflict with judicially noticed documents and represent bare

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

legal conclusions. Nor can the plaintiff state a valid cause of action against the County under CEQA, because its determinations were superseded by the Coastal Commission's environmental review. Treating the trial court's order as a judgment of dismissal, we therefore affirm.

## BACKGROUND[FN1]

> FN1. Because this appeal followed a successful demurrer, the facts are drawn from the allegations of plaintiff's second amended complaint, the operative pleading. (See *Gu v. BMW of North America, LLC* (2005) 132 Cal.App.4th 195, 200, 33 Cal.Rptr.3d 617.) To the extent relevant, we also incorporate facts of which judicial notice has been taken. (Cf., *id.* at p. 203, fn. 2, 33 Cal.Rptr.3d 617.)

### The Parties

Appellant is Dr. Hugh McAllister (McAllister). McAllister chairs the World Wildlife Fund's Marine Leadership Committee. He also owns property along the Big Sur Coast within view of the challenged project.

Respondents are the County of Monterey and the Monterey County Board of Supervisors (collectively, the County). The County passed the resolution challenged here, which approved the coastal development proposed by the real parties in interest. The real parties in interest are Sheldon J. Laube and Dr. Nancy J. Engel (Laube & Engel or real parties).

### The Proposed Development

In 2001, Laube & Engel sought permission to develop their property, which is located on Kasler Point, north of Rocky Point, at 36240 Highway 1, Big Sur. The property then consisted of two contiguous **121 lots, each approximately two acres in size. Real parties' proposal was for a large single-family home with a subterranean garage complex, measuring just over 10,000 square feet in all.

Many years before, the prior owner of the property, Donald Sorenson, had taken steps to build a house there. In 1977, the California Coastal Commission granted Sorenson a development permit for a smaller home on the site, subject to certain conditions. One condition was that his *264 two lots would be consolidated into a single parcel prior to the commencement of any grading or construction. Despite this condition, Sorenson began grading and construction without merging the two lots. After putting in a driveway, foundation, water connections, a septic system, and certain other improvements, Sorenson abandoned the project.

### The County's Coastal Ordinances

Monterey County has a Local Coastal Plan (LCP), which is codified in Chapter 20.90 of the Monterey County Code (Chapter 20.90). The LCP includes the Big Sur Land Use Plan (LUP); it also includes a Coastal Implementation Plan (CIP).

One pertinent provision of Chapter 20.90-a linchpin of McAllister's opposition to the project-provides that any permit, "if issued in conflict with the provisions of this title, shall be null and void." (Monterey County Code, § 20.90.010.) Another relevant provision of Chapter 20.90 prohibits the approval of permits "where there is an outstanding violation of this Title or the remaining portions of the Monterey County Coastal Implementation Plan involving the property upon which there is a pending application for such permit, ... unless such permit ... is the, or part of the, administrative remedy for the violation." (Monterey County Code, § 20.90.120.) That provision continues: "After recordation of a Notice of Violation by the enforcing officer, all departments, commission, and public employees shall refuse to issue permits or licenses or entitlements involving the property except those necessary to abate the violation...."(*Ibid.*)Chapter 20.90 author-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253    Page 8
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

izes the County's director of planning and building inspection to establish violations of the title. (Monterey County Code, § 20.90.20.) It also provides an array of alternatives for correcting violations. (See *id.,* §§ 20.90.060, 20.90.070, 20.90.080, 20.90.090.) Among them are retroactive permits and restoration orders. (See *id.,* §§ 20.90.130, 20.90.140.)

## PROCEDURAL HISTORY

### Administrative Proceedings at the County

In early March 2001, Laube & Engel applied to the County for a development permit to construct a residence on their coastal property.

**\*265** Later that same month, real parties' application was reviewed for the first time by the Big Sur Land Use Advisory Committee (LUAC). LUAC approved the project, on condition that no outside flood lighting would be used and that the invasive ice plant on the property would be eradicated. Thereafter, based on McAllister's objections and pursuant to his requests, real parties relocated the proposed home. In March 2003, LUAC reviewed the proposal as modified. Despite McAllister's continued opposition, the committee voted unanimously to approve the modified project as proposed, with an additional requirement that stone be used as the building material for the walls in order to minimize view impacts.

In October 2003, after a number of continuances, the project proceeded to a hearing to the County's planning commission for a hearing. Over McAllister's opposition, the **\*\*122** planning commission voted unanimously to approve both the proposed home and the parcel merger and to certify a mitigated negative declaration under the California Environmental Quality Act.

In November 2003, McAllister filed an administrative appeal of the planning commission's decision, seeking review from the County's board of supervisors. In his appeal, McAllister asserted that the proposed project violated the 1977 coastal development permit obtained by real parties' predecessor, that it conflicted with numerous policies in the local coastal program, that the planning commission's approval was based on misleading information, and that the project violated CEQA.

In January 2004, the board of supervisors conducted a public hearing on McAllister's appeal. Speakers at the hearing included real parties' counsel; McAllister's counsel plus one witness; and the assigned land use planner for the County. The County's staff recommended denial of McAllister's appeal.

At the conclusion of the hearing, the board of supervisors unanimously adopted Resolution No. 04-028, thereby denying McAllister's appeal. The resolution contains a number of findings, including this: "The subject property is in compliance with all rules and regulations pertaining to the use of the property; no violations exist on the property...." In addition to denying McAllister's appeal, Resolution No. 04-028 explicitly affirmed the mitigated negative declaration prepared for the project and specifically upheld the planning commission's earlier decision to approve the application by Laube & Engel for a combined coastal development permit.

**\*266** The following month, McAllister appealed the County's decision to the Coastal Commission, "as a precautionary measure to protect [his] rights."

### Proceedings in the Trial Court

On February 18, 2004, simultaneously with his appeal to the Coastal Commission, McAllister filed this action. In his combined petition for writ of mandate and complaint for declaratory and injunctive relief, McAllister asserted three causes of action. The first cause of action alleged an administrative mandamus claim against the County. (Code Civ. Proc., § 1094.5.)That cause of action incorporated these assertions: that the County's approval

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

was null and void under its own code provisions and thus was made without jurisdiction; that the County failed to give McAllister a fair hearing; and that the County abused its discretion by not requiring an environmental impact report. McAllister's second cause of action, also against the County, sought a judicial declaration that the County's approval of the project was null and void. His third cause of action sought injunctive relief against the Coastal Commission, to prevent it from assuming jurisdiction over the project. In addition to the relief requested in the third cause of action of his complaint, McAllister also sought a temporary restraining order and preliminary injunction against the Coastal Commission, which the court denied.

In March 2004, Laube & Engel demurred to the complaint. As to the first cause of action, real parties asserted, McAllister failed to exhaust his administrative remedies. Laube & Engel challenged the other two causes of action on the ground that the relief sought was improper. In the event that it declined to sustain the demurrer and dismiss the action, real parties argued, the court should stay the litigation pending the outcome of the Coastal Commission appeal. The County joined real parties' demurrer. The Coastal Commission separately demurred to the third cause of action against it. McAllister opposed the demurrers.

**123 The court conducted a hearing on the demurrers in May 2004, taking them under submission. It issued a written ruling several days later, which included these provisions: (1) As to the first cause of action, the court stayed proceedings on McAllister's "claim under the California Environmental Quality Act ... pending the Commission's final decision." (2) With respect to the second cause of action, the court sustained the demurrers of the County and real parties, with leave to amend. (3) As to the third cause of action, the court sustained the Coastal Commission's demurrer, without leave to amend. Thereafter, in June 2004, the court issued a formal order concerning the demurrers, which reiterated the court's earlier rulings in all respects. In addition,

it ordered dismissal of the action with prejudice as against the Coastal Commission and the entry of a separate judgment in the Commission's favor.

*267 Coastal Commission Proceedings

In September 2004, the Coastal Commission took the first substantive step in the administrative appeal, by concluding that the project in fact raised a substantial issue on various grounds and that it would therefore assume jurisdiction. (See Pub. Res.Code, § 30625, subd. (b)(1).) [FN2]

> FN2. Further unspecified statutory references are to the Public Resources Code.

According to the Coastal Commission staff report, by then, "as a result of the appeal," Laube & Engel had modified the project. Under their revised plans as submitted, "the residence [was] relocated slightly north ..., the base elevation of the northern portion of the house [was] lowered so that it is not visible within the critical viewshed, and the size of the residence [was] reduced" slightly.

After a de novo hearing in December 2004, the Coastal Commission granted Laube & Engel a coastal development permit, with conditions, for the modified project.

Further Trial Court Proceedings

In January 2005, Laube & Engel filed a second demurrer to the complaint, entitled "Notice of Motion of Demurrer and Motion to Dismiss." In it, Laube & Engel argued that McAllister's complaint failed to state a cause of action against the County, in that the Coastal Commission was the agency taking the final administrative action. As before, the County joined real parties' demurrer. McAllister opposed the second demurrer on procedural and substantive grounds.

Following a hearing held in February 2005, the court sustained the second demurrer without leave

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                          Page 10
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

to amend. The court issued a formal order several days later, in which (1) it found that McAllister "failed to state a cause of action," (2) it sustained the demurrer to the first cause of action, and (3) it ordered "the case dismissed in its entirety."

## Appeal

[1] McAllister brought this timely appeal.[FN3]

> FN3. The record before us includes four volumes of clerk's transcript, three volumes of reporter's transcript, plus three volumes of administrative record, lodged with this court by McAllister. McAllister also requested this court to take judicial notice of certain documents contained in the clerk's transcript, being Monterey County Code provisions and Coastal Commission documents. We granted that request. In addition, Laube Engel filed a request for judicial notice of five documents. Two of those documents relate to proceedings in this matter at the Coastal Commission; the others reflect proceedings in a separate superior court case involving the same parties. We likewise granted that request.

### **124 *268 CONTENTIONS

On appeal, McAllister attacks the trial court's decision to sustain the second demurrer on three grounds. First, he asserts procedural deficiencies in the demurrer, including untimeliness. Second, McAllister argues, the demurrer lacks substantive merit, since his petition states a valid cause of action. Third, he contends, the trial court abused its discretion in sustaining the demurrer without leave to amend. Both the County and Laube & Engel refute those contentions.

### DISCUSSION

To establish the proper framework for our analysis

of McAllister's contentions, we begin by describing the relevant statutes. Next, we summarize pertinent procedural principles, specifically the doctrine of exhaustion and the standards that govern appellate review of demurrers. Finally, against that backdrop, we address the specific issues presented in this appeal.

### STATUTORY FRAMEWORK: GENERAL PRINCIPLES

Two statutes have particular relevance here, the California Environmental Quality Act and the California Coastal Act. Both are codified in the Public Resources Code.

### I. The California Environmental Quality Act (CEQA)

The California Environmental Quality Act appears at Division 13 of the Public Resources Code, beginning with section 21000. As an aid to carrying out the statute, the State Resources Agency has issued a set of regulations, called Guidelines for the California Environmental Quality Act (Guidelines).[FN4]

> FN4. The Guidelines are contained in the California Code of Regulations, Title 14, Division 6, Chapter 3, starting at section 15000. Further unspecified guideline references are to those regulations.

### A. Statutory Policy

[2] CEQA embodies our state's policy that "the long-term protection of the environment ... shall be the guiding criterion in public decisions."(§ 21001, subd. (d); see *269Davidon Homes v. City of San Jose (1997) 54 Cal.App.4th 106, 112, 62 Cal.Rptr.2d 612.) As this court has observed, "the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage." (Save Our Peninsula Committee v. Monterey County Bd. of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Supervisors* (2001) 87 Cal.App.4th 99, 117, 104 Cal.Rptr.2d 326.) Together, the statute and accompanying regulatory guidelines "have established a variety of environmental values. The "enjoyment of aesthetic, natural, [and] scenic ... qualities" is among them. (§ 21001, subd. (b).) So, too, is the protection of wildlife and other species. (*Id.*, subd. (c).)

## B. The CEQA Process

Consistent with California's strong environmental policy, whenever the approval of a project is at issue, the statute and regulations "have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 112, 62 Cal.Rptr.2d 612; see Guidelines, § 15002, subd. (k).)

## 1. Threshold Determination of CEQA's Applicability

"The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA **125 applies to a proposed activity. (Guidelines, §§ 15060, 15061.)" (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 112, 62 Cal.Rptr.2d 612.)

CEQA applies if the activity is a "project" under the statutory definition, unless the project is exempt. (See §§ 21065, 21080.) "If the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th p. 113, 62 Cal.Rptr.2d 612.) "Only those projects having no significant effect on the environment are categorically exempt from CEQA review." (*Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1107, 23 Cal.Rptr.3d 321.) "Single-family homes are categorically exempt from CEQA, except (1) when they 'may impact on an environmental resource of ... critical concern'; (2) 'when the cumulative impact of successive

projects of the same type in the same place, over time is significant'; or 'where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.'" (*Id.* at p. 1106, 23 Cal.Rptr.3d 321, quoting Guidelines, § 15300.2, subds. (a)-(c).)

If the project is not exempt-either because it does not fall within an exempt category or because an exception makes the exemption unavailable-then the agency must proceed to the second tier and conduct an initial study. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 792, 124 Cal.Rptr.2d 731; see Guidelines, § 15063.)

## 1. *270 Initial Study

The second tier of the process, the initial study, serves several purposes. One purpose is to inform the choice between a negative declaration and an environmental impact report (EIR). (Guidelines, § 15063, subd. (c)(1); *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1180, 31 Cal.Rptr.3d 901.) Another purpose of the initial study is to eliminate unnecessary environmental impact reports. (Guidelines, § 15063, subd. (c)(7).)

[3] "CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389-390, 83 Cal.Rptr.2d 836, citing Guidelines, § 15070; see also § 21064; § 21080, subd. (c).) In certain situations where a straightforward negative declaration is not appropriate, the agency may permit use of a mitigated negative declaration. (See § 21064.5; Guidelines, § 15064, subd. (f)(2); *San Bernardino,* at p. 390, 83 Cal.Rptr.2d 836.)

## 2. Environmental Impact Report

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

If the project does not qualify for a negative declaration, "the third step in the process is to prepare a full environmental impact report...."(*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 113, 62 Cal.Rptr.2d 612, citing §§ 21100, 21151, & Guidelines, §§ 15063, subd. (b)(1), 15080.)

[4] The California Supreme Court has "repeatedly recognized that the EIR is the 'heart of CEQA.' "(*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123, 26 Cal.Rptr.2d 231, 864 P.2d 502(*Laurel Heights II* ).) As the court observed more than three decades ago, "since the preparation of an EIR is the key to environmental**126 protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75, 118 Cal.Rptr. 34, 529 P.2d 66.) Other cases have since confirmed the statutory preference for resolving doubts in favor of an EIR. (See, e.g., *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 703, 7 Cal.Rptr.3d 868; *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 905, 60 Cal.Rptr.2d 821.)

**\*271** II. The California Coastal Act

The California Coastal Act of 1976 is codified at Public Resources Code, sections 30000 et seq. It replaced the California Coastal Zone Conservation Act, which had been enacted by initiative measure in 1972. (See § 30000, Historical and Statutory Notes, West's Annotated California Codes (1996), vol. 56B, p. 131.)

*A. Statutory Policy*

The Coastal Act "was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California."

*Yost v. Thomas* (1984) 36 Cal.3d 561, 565, 205 Cal.Rptr. 801, 685 P.2d 1152; see generally, 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 90, pp. 312-314; *id.*(2003 supp.) pp. 230-234; Robie et al., California Civil Practice-Environmental Litigation (2002) § 8:62, pp. 92-93; Curtin, California Land Use and Planning Law (2006) Ch. 9, pp. 232-236.)

In enacting the Coastal Act, the Legislature declared that "the basic goals of the state for the coastal zone are to: [¶] (a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources. [¶] (b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state. [¶] (c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners. [¶] (d) Assure priority for coastal-dependent and coastal-related development over other development on the coast. [¶] (e) Encourage state and local initiatives and cooperation in preparing programs to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone."(§ 30001.5.) Among other things, the "scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance."(§ 30251.)

*B. Operation*

[5] The Coastal Act "assigns chief responsibility for regulating the use and development of the 'coastal zone' to [the] California Coastal Commission." (4 Witkin, Summary of Cal. Law, *supra,* Real Property, § 90, p. 313, citation omitted.) The Commission's "regulatory functions are coordinated with those of other state agencies having overlapping responsibilities." **\*272** (*Ibid.*) With respect to environmental responsibilities, under CEQA and its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

accompanying Guidelines, Coastal Commission environmental review may substitute for an environmental impact report. (See § 21080.5, subds. (a), (e)(1); Guidelines, §§ 15002, subd. (*l* ); 15251, subds. (c), (f).) Thus, the Coastal Commission's "permit appeal procedure is treated as the functional equivalent of the EIR process."**127 (*Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569, 106 Cal.Rptr.2d 14.)

[6] As for local governments, the Coastal Act sets " 'minimum standards and policies' for localities to follow in developing land use plans" but leaves " 'wide discretion to ... local government ... to determine the contents' of such plans...."(*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775, 38 Cal.Rptr.2d 699, 889 P.2d 1019, quoting *Yost v. Thomas, supra,* 36 Cal.3d at pp. 572-573, 205 Cal.Rptr. 801, 685 P.2d 1152; see also §§ 30004, subd. (a); 30005, subds. (a), (b).) The Act thus contemplates "local discretion and autonomy in planning subject to review for conformity to statewide standards." (*Yost v. Thomas, supra,* 36 Cal.3d at p. 572, 205 Cal.Rptr. 801, 685 P.2d 1152.)

### 1. The Local Coastal Plan

A local coastal plan (LCP) consists of a local government's land use plans, zoning ordinances, zoning district maps, and other implementing actions that satisfy the Coastal Act. (§ 30108.6.)

The LCP is submitted to the Coastal Commission for certification. (§ 30510, subd. (a); see generally Robie et al., California Civil Practice-Environmental Litigation, *supra,* §§ 8:67-8:68, pp. 102-104.) In order to certify the LCP, the Commission must find that it satisfies the requirements and policies set forth in Chapter 3 of the Coastal Act. (§§ 30200, subd. (a); 30512, subd. (c); 30513; see *Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara* (2004) 121 Cal.App.4th 864, 871-872, 17 Cal.Rptr.3d 489; Robie, §§ 8:69-8:70, pp. 104-105.) Those "Chapter

3 policies" thus represent the standards for judging the adequacy of an LCP. (§ 30200, subd. (a); *Yost v. Thomas, supra,* 36 Cal.3d at p. 566, 205 Cal.Rptr. 801, 685 P.2d 1152; Robie, § 8:71, pp. 105-106.) These policies are designed to protect certain identified resources, including recreation, sensitive habitat, and scenic resources. (See §§ 30223 [upland recreation], 30240 [environmentally sensitive habitat area (ESHA) ], 30251 [visual and scenic resources].)

[7] Once the Coastal Commission has certified the local coastal plan "as conforming to the policies of the Coastal Act, review authority for development within that portion of the coastal zone passes to the local government." (*City of Half Moon Bay v. Superior Court* (2003) 106 Cal.App.4th 795, 804, 131 Cal.Rptr.2d 213.)

### *273 2. Coastal Development Permits

"Any person undertaking any development in the coastal zone, with certain limited exceptions, is required to obtain a coastal development permit. This is in addition to any other permit required from any state, regional or local agency." (Robie et al., California Civil Practice-Environmental Litigation, *supra,* § 8:73, p. 106; see § 30600, subd. (a).) Development is broadly defined for these purposes. (Robie, at pp. 106-107; see § 30106.) Thus, for example, a lot line adjustment may constitute a development requiring a coastal development permit [CDP].(*La Fe, Inc. v. County of Los Angeles* (1999) 73 Cal.App.4th 231, 239, 86 Cal.Rptr.2d 217.)

The Coastal Act's Chapter 3 policies constitute the general standards for judging the permissibility of specific developments within the coastal zone. (§ 30200, subd. (a).) Furthermore, permits "issued for development between the nearest public road and the sea ... must include a specific finding that the development is in conformity with the public access and public recreation policies of the Coastal Act."(Robie et al., California **128Civil Practice-Environmental Litigation, *supra,* § 8:74, p. 107; see

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

§ 30604, subd. (c).)

### 3. Coastal Commission Appeals

The Coastal Act provides for administrative appeals to the Coastal Commission in certain cases. (§ 30603.) "If ... the local government approves an application for a CDP [coastal development permit], its action may be appealed to the commission by the applicant, any aggrieved person, or any two members of the commission. [Citations.] The commission has limited jurisdiction to hear the appeal." (*City of Half Moon Bay v. Superior Court, supra,* 106 Cal.App.4th at p. 804, 131 Cal.Rptr.2d 213.) As relevant here, the governing statute provides: "(a) After certification of its local coastal program, an action taken by a local government on a coastal development permit application may be appealed to the commission for only the following types of developments: [¶] (1) Developments approved by the local government between the sea and the first public road paralleling the sea or within 300 feet of the inland extent of any beach or of the mean high tideline of the sea where there is no beach, whichever is the greater distance."(§ 30603, subd. (a)(1).) The grounds for such an appeal are "limited to an allegation that the development does not conform to the standards set forth in the certified local coastal program or the public access policies set forth in this division." (*Id.,* subd. (b)(1) [referring to Division 20, the Coastal Act]; see *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14; see generally, Robie et al., California Civil Practice-Environmental Litigation, *supra,* § 8:76, pp. 112-113.)

**\*274** "If an action is appealable, the commission must hear the appeal unless it determines no substantial issue exists with regard to the grounds for the appeal. (§ 30625, subd. (b)(2).)" (*City of Half Moon Bay v. Superior Court, supra,* 106 Cal.App.4th at p. 804, 131 Cal.Rptr.2d 213.) The hearing must be set within 49 days. (§ 30621.) "This short time limit is 'designed to avoid unne-

cessary bureaucratic delay.'" (*Encinitas Country Day School, Inc. v. California Coastal Com.* (2003) 108 Cal.App.4th 575, 584, 133 Cal.Rptr.2d 551.) The Coastal Commission thus "is required, at a minimum, to make the determination whether a substantial issue exists, i.e., whether the appeal raises a substantial issue meriting an appellate hearing, within the 49-day limitation period." (*Id.* at p. 585, 133 Cal.Rptr.2d 551.) "On appeal, the commission reviews the matter de novo, and may take additional evidence not received by the local government." (*City of Half Moon Bay,* at p. 804, 131 Cal.Rptr.2d 213.) Thus, "in effect, the Commission hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements." (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14.) The resulting decision " 'takes the place of and completely nullifies the former determination of the matter.' " (*Ibid.*)

### PROCEDURAL FRAMEWORK: GENERAL PRINCIPLES

In addition to the substantive statutes described above, this appeal also involves the application of other legal principles, which arise from procedural aspects of the case. One such principle is the doctrine of exhaustion of administrative remedies. Others relate to the procedural posture of this appeal, which follows the sustention of a demurrer.

### I. Exhaustion

[8][9] Under the doctrine of administrative exhaustion, the long-standing general**129 rule is this: "where an adequate administrative remedy is provided by statute, resort to that forum is a 'jurisdictional' prerequisite to judicial consideration of the claim." (*Styne v. Stevens* (2001) 26 Cal.4th 42, 56, 109 Cal.Rptr.2d 14, 26 P.3d 343; cf., *Farmers Ins. Exchange v. Superior Court*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                    Page 15
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

(1992) 2 Cal.4th 377, 386, 6 Cal.Rptr.2d 487, 826 P.2d 730 [discussing the closely related doctrine of primary jurisdiction]; see generally, 9 Witkin, Cal. Procedure (4th ed. 1997) Administrative Proceedings, §§ 108-109, pp. 1153-1155; Curtin, California Land Use and Planning Law, *supra,* Ch. 21, pp. 526-532.) Put another way: "In the context of administrative proceedings, a controversy is not ripe for adjudication until the administrative process is completed and the agency makes a final decision that results in a direct and immediate impact on the parties." **\*275**(*Santa Barbara County Flower and Nursery Growers Ass'n, Inc. v. County of Santa Barbara, supra,* 121 Cal.App.4th at p. 875, 17 Cal.Rptr.3d 489.) "The doctrine has been specifically applied to review of coastal commission actions." (*Walter H. Leimert Co. v. California Coastal Com.* (1983) 149 Cal.App.3d 222, 232, 196 Cal.Rptr. 739.)

### A. Underpinnings

"The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary)." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 391, 6 Cal.Rptr.2d 487, 826 P.2d 730.) "Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor 'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.'" (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501, 87 Cal.Rptr.2d 702, 981 P.2d 543.)

The doctrine "is not a matter of judicial discretion, but is a fundamental rule of procedure ... binding upon all courts." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293, 109 P.2d 942.)Un-

til an available "administrative procedure has been invoked and completed, there is nothing that the ... court may review; it cannot interfere in the intermediate stages of the proceeding." (*Id.* at p. 291, 109 P.2d 942.) For that reason, "the failure to exhaust administrative remedies prevents appellant from seeking relief through administrative mandamus (Code Civ. Proc., § 1094.5), which provides judicial review of *final* administrative proceedings." (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 619, 113 Cal.Rptr.2d 309.)

### B. Exceptions

[10] "There are exceptions to the exhaustion doctrine." (*Unnamed Physician v. Board of Trustees, supra,* 93 Cal.App.4th at p. 620, 113 Cal.Rptr.2d 309.) Exceptions are commonly recognized when the administrative remedy is unavailable, when it is inadequate, or when it would be futile to pursue it. (*Ibid.*) Other exceptions include "situations where the agency indulges in unreasonable delay ..., when the subject matter lies outside the administrative agency's jurisdiction, [or] when pursuit of an administrative remedy would result in irreparable harm...."(*Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222, 239 Cal.Rptr. 470; accord, **\*276**Public Employment Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816, 1827, 17 Cal.Rptr.2d 323.) "To this list must be **\*\*130** added exceptions where important questions of constitutional law or public policy governing agency authority are tendered." (*Public Employment Relations Bd.,* at p. 1827, 17 Cal.Rptr.2d 323.)

### C. Application to Questions of Law

Notwithstanding the foregoing exceptions, exhaustion is not excused merely "because the ultimate legal issues ... are better suited for determination by the courts." (*Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 169, 6 Cal.Rptr.2d 714.) For example, "constitutional challenges are frequently raised to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

the application of an administrative statutory scheme, yet the courts typically require such issues be presented to the administrative agency in the *first* instance." (*Ibid.*) As the California Supreme Court explained in another context, "the mere fact that the concept of vested rights is rooted in the Constitution does not deprive the [Coastal] Commission of the power to make the initial determination whether a developer qualifies for an exemption, so long as appropriate judicial review of the Commission's determination is provided." (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 250, 115 Cal.Rptr. 497, 524 P.2d 1281; accord, *South Coast Regional Com. v. Gordon* (1977) 18 Cal.3d 832, 834, 135 Cal.Rptr. 781, 558 P.2d 867; *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 63, 227 Cal.Rptr. 667, 720 P.2d 15.)

### D. Application to Questions of Agency Jurisdic- tion

[11] Generally speaking, even where questions concerning the agency's jurisdiction are presented, "the doctrine of exhaustion of administrative remedies requires judicial abstention until there has been a final decision in the administrative forum." (*Public Employment Relations Bd. v. Superior Court, supra,* 13 Cal.App.4th at p. 1828, 17 Cal.Rptr.2d 323.) "One of the principal policy concerns of the exhaustion doctrine is judicial efficiency [citation], which cannot be served if the issue of statutory jurisdiction must be fully plumbed in order to determine whether it should be left to the agency in the first instance." (*Id.* at pp. 1831-1832, 17 Cal.Rptr.2d 323.) As our state's high court put it long ago, "it lies within the power of the administrative agency to determine in the first instance, and before judicial relief may be obtained, whether a given controversy falls within the statutory grant of jurisdiction." (*United States v. Superior Court* (1941) 19 Cal.2d 189, 195, 120 P.2d 26.) However, as the court recognized in a later case, "these rules are inapplicable where ... the agency is given no jurisdiction to make a judicial determination of the

type involved." (*County of Alpine v. County of Tuolumne* (1958) 49 Cal.2d 787, 798, 322 P.2d 449.)

\*277 II. Demurrers: Appellate Review

On appeal, "the plaintiff bears the burden of demonstrating that the trial court erred" in sustaining the demurrer. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879, 6 Cal.Rptr.2d 151.) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58; accord, *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081, 6 Cal.Rptr.3d 457, 79 P.3d 569; \*\*131 see also, e.g., *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810, 27 Cal.Rptr.3d 661, 110 P.3d 914; *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1024, 282 Cal.Rptr. 877.)

[12] "As a general rule, if there is a reasonable possibility the defect in the complaint could be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459-460, 80 Cal.Rptr.2d 329; see also, e.g., *Fox v. Ethicon Endo-Surgery, Inc., supra,* 35 Cal.4th at p. 810, 27 Cal.Rptr.3d 661, 110 P.3d 914.) "Nevertheless, where the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result." (*City of Atascadero,* at pp. 459-460, 80 Cal.Rptr.2d 329.) In such cases, "we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." (*Montclair Parkowners Assn. v.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*City of Montclair* (1999) 76 Cal.App.4th 784, 790, 90 Cal.Rptr.2d 598.)

## ANALYSIS

Here, McAllister's appeal follows (1) an initial demurrer, interposed principally on the ground of failure to exhaust administrative remedies; (2) an administrative appeal to the Coastal Commission, which resulted in the approval of a modified project; and (3) a second demurrer, interposed principally on the ground of failure to state a cause of action, which the trial court sustained without leave to amend in February 2005.

On appeal, McAllister makes a three-pronged attack on the trial court's decision to sustain the second demurrer. First, he attacks the demurrer on procedural grounds, including untimeliness. Second, McAllister challenges the demurrer on substantive grounds, arguing that his petition states a valid cause of action on at least two theories. Third, McAllister contends that the trial court abused its discretion by not granting him leave to amend.

*278 Before analyzing those specific contentions, we first discuss two threshold appellate issues: appealability and the scope of our review.

## I. Threshold Issues

### A. Appealability

This appeal was taken from the trial court's February 2005 order sustaining the demurrer without leave to amend and ordering "the case dismissed in its entirety." The appellate record contains no judgment of dismissal, however.

[13][14] Generally speaking, an order sustaining a demurrer "is neither appealable per se nor as a final judgment." (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920, 167 Cal.Rptr. 831, 616 P.2d 813.) But "an appellate court may deem an order sustaining a demurrer to incorporate a

judgment of dismissal." (*Ibid.*) Furthermore, an "order dismissing a complaint with prejudice constitutes an appealable judgment.... (See Code Civ. Proc., §§ 581d, 904.1, subd. (a)(1).)" (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 867, fn. 3, 13 Cal.Rptr.3d 420.)

[15] In this case, the matter is fully briefed and no party has raised an objection to consideration of the appeal on its merits. To the contrary, the County points out that "all parties have treated the subject Order as the final act of the Trial Court and therefore appealable." Under these circumstances, it is appropriate**132 to treat the February 2005 order as an appealable judgment of dismissal. "In the interest of justice and to prevent further delay, we will deem the order sustaining defendant's demurrer to incorporate a judgment of dismissal and thus interpret plaintiffs' notice of appeal as applying to such dismissal." (*Bellah v. Greenson* (1978) 81 Cal.App.3d 614, 618, fn. 1, 146 Cal.Rptr. 535.)

### B. Scope of Review

This appeal involves only the first cause of action of McAllister's complaint, for administrative mandamus. Two of the claims asserted there are presented in this appeal: first, that the County's action was null and void, which divested it of jurisdiction, and second, that the County violated CEQA. In addition to those two claims, the first cause of action also alleges that the County denied McAllister a fair hearing, and that the County failed to comply with various substantive provisions of its local coastal plan. But those latter contentions are deemed abandoned for lack of appellate argument. (See, e.g., *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 237-238, 118 Cal.Rptr.2d 313.)

*279 We are not concerned here with the second cause of action of McAllister's complaint, which sought declaratory relief against the County, or with the third cause of action, which sought injunctive relief against the Coastal Commission. As

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                     Page 18
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

McAllister offers no argument concerning either cause of action, we treat both as abandoned. (*Schoendorf v. U.D. Registry, Inc., supra,* 97 Cal.App.4th at pp. 237-238, 118 Cal.Rptr.2d 313.) Moreover, as to the third cause of action, the trial court ordered judgment in the Commission's favor in June 2004. That action is not part of this appeal, which challenges only the court's later order of February 2005.

## II. Propriety of the Challenged Ruling

We turn now to McAllister's first avenue of attack on the challenged portion of trial court's order, which rests on his claim of procedural defects. As we explain, we find no merit in that claim.

### A. The trial court did not err in rejecting McAllister's procedural challenges to the second demurrer.

[16] McAllister argues that the demurrer was not timely and that it was not an authorized pleading. Like the trial court, we reject those procedural challenges.[FN5]

> FN5. As our analysis demonstrates, we do not adopt real parties' approach to this issue, which suggests viewing the second demurrer "as simply a reassertion of the original demurrer," or analogizing it to "other procedural avenues to test the sufficiency of the pleadings...."

### 1. Timeliness

The second demurrer was filed by Laube & Engel on January 18, 2005, and joined by the County the same day. By McAllister's reckoning, not only does that date fall some 11 months after service of the initial complaint, but it was 40 days after completion of the Coastal Commission proceedings, an event that operated to lift the May 2004 stay. Under either time frame, he claims, the second demurrer was filed too late. McAllister states that a demurrer

*must* be filed and served within 30 days after service of the complaint, citing several statutes, including Code of Civil Procedure section 430.40.

Despite McAllister's insistence to the contrary, we are not persuaded that the challenged demurrer was untimely.

[17] **\*280** At the outset, we disagree with McAllister's characterization of **\*\*133**section 430.40 of the Code of Civil Procedure as mandatory. That statute reads in relevant part: "A person against whom a complaint or cross-complaint has been filed *may,* within 30 days after service of the complaint or cross-complaint, demur to the complaint or cross-complaint." (Code Civ. Proc., § 430.40, italics added.) The cited provision thus uses the permissive expression "may," not the mandatory term " must." (Cf., *Garrison v. Rourke* (1948) 32 Cal.2d 430, 435-436, 196 P.2d 884, overruled on another ground in *Keane v. Smith* (1971) 4 Cal.3d 932, 939, 95 Cal.Rptr. 197, 485 P.2d 261 ["time limitation for the court's action in a matter subject to its determination is not mandatory (regardless of the mandatory nature of the language), unless a consequence or penalty is provided for failure to do the act within the time commanded"].)

Furthermore, the quoted provision nominally applies only to a first round of demurrers. As one commentator observes: "No statute or rule specifically provides a time limit for demurring to an *amended* complaint." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 7:139, p. 7-53.) In a similar vein, we are aware of no statute or rule that specifically governs situations such as that presented here, where no amended pleading is filed after dissolution of a stay.

Moreover, it is not clear precisely when the May 2004 stay was lifted, a point that was disputed below. The record contains no order explicitly lifting the stay or otherwise setting a specific time for further pleading. (Cf., Code Civ. Proc., § 472b ["When a demurrer to any pleading is sustained or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

overruled, and time to amend or answer is given, the time so given runs from the service of notice of the decision or order, unless the notice is waived in open court, and the waiver entered in the minutes"].)

The stay order itself contemplates an amendment of the complaint following completion of the Coastal Commission proceedings, followed by a response, at which point the stay would lift.[FN6] Of course, that did not happen here, since McAllister never amended his original complaint.

> FN6. With respect to the stay, the court's June 2004 formal order provides as follows: "The first cause of action is stayed in all respects from May 10, 2004, including but not limited to, the Real Parties in Interest's and Respondent's response to any amended petition and/or complaint which may be file by Petitioners, pending the Coastal Commission's final decision on the merits of the pending appeals to the Commission of the County's approval of Real Parties' project which is the subject of this litigation or, pending the Coastal Commission's determination that said appeals do not raise a substantial issue with respect to the grounds on which an appeal has been filed pursuant to ...section 30603."

**\*281** The May 2004 stay order further provides that the judicial proceedings would remain stayed "pending the Coastal Commission's final decision on the merits." But the order does not incorporate a mechanism for determining the date of that event's occurrence. And the record reflects a factual dispute on that point. According to McAllister's argument below, the stay lifted on December 9, 2004, when the Coastal Commission took action on the appeal. But Laube & Engel took a different view in the trial court. First, they raised questions about the finality of the administrative proceedings, noting that the Coastal Commission had not adopted its revised findings. Furthermore, they argued, their demurrer was filed within 30 days of notification to

the trial court of the Coastal Commission's action. Finally, real parties urged, they were entitled to further time to respond, since the administrative record was being augmented and thus was not complete. (See **\*\*134**Code Civ. Proc., § 1089.5.) To the extent that the trial court resolved these factual issues adversely to McAllister, we defer to its decision on that point. (See, e.g., *Jones v. Moers* (1928) 91 Cal.App. 65, 68, 266 P. 821.)

Finally, as McAllister acknowledges, the parties to an action may stipulate to an extension of time to respond. (Code Civ. Proc., § 1054, subd. (b).) In this case, by letter addressed to real parties' counsel, McAllister's attorneys confirmed their earlier offer "to extend the date within which the answers must be served and filed to January 10, 2005. [Deputy County Counsel] Mr. Iglesia thereafter requested an additional one-week extension, which we granted, and Mr. Iglesia has advised us that he will be filing the County's answer to the Petition by January 18, 2005. We are willing to provide your client with the same additional extension, if you so request." Notwithstanding McAllister's insistence that "answer" does not mean "demurrer," a contrary interpretation would not be unreasonable. (Cf., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 7:34.1, p. 7-16 ["word 'answer' in § 471.5 presumably means 'respond' and thus includes the possibility for another demurrer"].) That point represents a factual dispute concerning McAllister's "alleged promise to extend [defendant's] time to answer" and "the trial court necessarily passed upon this question adversely to [McAllister]. Under such circumstances the decision is controlling." (*Jones v. Moers, supra,* 91 Cal.App. at p. 68, 266 P. 821.)

For all these reasons, we conclude, the trial court was warranted in treating the second demurrer as timely.

[18] Even assuming for argument's sake that the demurrer was filed late, the trial court nevertheless had discretion to entertain it. "There is no absolute right to have a pleading stricken for lack of timeli-

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

ness in filing where no question of jurisdiction is involved, and where, as here, the late filing was a mere irregularity [citation]; the granting or denial of the motion is a matter *282 which lies within the discretion of the court." (*Tuck v. Thuesen* (1970) 10 Cal.App.3d 193, 196, 88 Cal.Rptr. 759, disapproved on another ground in *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 190, fn. 29, 98 Cal.Rptr. 837, 491 P.2d 421; cf., *Johnson v. Sun Realty Co.* (1934) 138 Cal.App. 296, 299, 32 P.2d 393 [court had discretion to hear a demurrer, notwithstanding violation of procedural rules].)

[19] As provided by statute: "The court may, in furtherance of justice, and on any terms as may be proper, ... enlarge the time for answer or demurrer." (Code Civ. Proc., § 473, subd. (a)(1).) The trial court may exercise this discretion so long as its action does "not affect the substantial rights of the parties." (*Harlan v. Department of Transportation* (2005) 132 Cal.App.4th 868, 873, 33 Cal.Rptr.3d 912 [affirming trial court's decision to permit plaintiff to file late amendment following demurrer]; see Code Civ. Proc., § 475.)

Here, we conclude, the trial court's decision to entertain the second demurrer did not affect McAllister's substantial rights. "Prior to the filing of respondent's demurrer to the amended complaint, appellant had not taken any steps to have judgment by default entered under Code of Civil Procedure section 432, nor did he endeavor to show that he was in any way prejudiced by the delay." (*Tuck v. Thuesen, supra,* 10 Cal.App.3d at p. 196, 88 Cal.Rptr. 759.) The same is true in this case. The trial court thus acted within its broad discretion in allowing respondents to file the second demurrer, notwithstanding McAllister's protestations that it was untimely.

**\*\*135** *2. Propriety*

[20] Apart from its timeliness, McAllister also challenges the validity of using a demurrer in these cir-

cumstances. As he puts it: "No legal authority allows Real Parties or the County to file the Second Demurrer in the absence of an amended pleading having first been filed by Dr. McAllister." Characterizing the demurrer as "procedurally improper" for that reason, McAllister argues that he was "clearly prejudiced by such error, which resulted in the dismissal of his Complaint in its entirety, thereby depriving him of an opportunity to seek judicial review of the County's violations of CEQA, including the failure to prepare an EIR for the Project, and judicial enforcement of Chapter 20.90 as to the County."

We reject McAllister's claim of error. While it is true that no statute specifically authorizes the procedure undertaken here, neither does any statute forbid it. "Courts, of course, also have 'inherent supervisory and administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority.' The inherent powers may be exercised *283 only if the procedure or practice of the court is not in conflict with a specified statutory procedure." (*Motion Picture & Television Fund Hospital v. Superior Court* (2001) 88 Cal.App.4th 488, 492, 105 Cal.Rptr.2d 872, additional internal quotation marks and citations omitted.)

Significantly, the pleading at issue here is a general demurrer, which attacks the fundamental validity of the cause of action-a challenge that may be raised at any time. "The objection that a complaint does not state facts sufficient to constitute a cause of action may be raised at any stage of the proceedings and, even for the first time upon appeal." (*Horacek v. Smith* (1948) 33 Cal.2d 186, 191, 199 P.2d 929; see Code Civ. Proc., § 430.40, subd. (b).) For these reasons, we are not persuaded that the procedure used in this case was improper.

Even assuming that the trial court erred in allowing the second demurrer in these circumstances, it nevertheless is bound to ignore any "defect[ ] in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                          Page 21
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

the parties." (Code Civ. Proc., § 475.) In our view, the trial court's decision to consider the second demurrer did not prejudice McAllister by affecting his substantial rights. McAllister's contention that the perceived irregularity caused the dismissal of his complaint and the attendant loss of his right to judicial review of his claims against the County misses the point. Those claims were not lost because of the procedures employed; rather, they were rejected because they lack substantive merit, a point we now address.

### B. McAllister did not state a cause of action based on voidness.

In McAllister's view, the trial court erred in dismissing his petition since it states a valid cause of action on two theories, the first being that the County's action was void *ab initio.* As we explain, we reject McAllister's voidness theory. Our analysis of this question proceeds in two separate steps: (1) a discussion of the exhaustion requirement in the context of this claim, and (2) an assessment of whether McAllister has stated a cause of action.

### 1. McAllister's claim that the County's action was null and void does not excuse the exhaustion requirement.

[21] We begin with an analysis of the administrative exhaustion doctrine as it relates to McAllister's voidness claim. We do so in light of the allegation in McAllister's complaint that he was "relieved of and exempt from any exhaustion of administrative**136 remedies by virtue of the lack of jurisdiction of the County to approve the Project based on ... Chapter 20.90 ... and the existing violation of the Project Site of Condition 3 of the 1977 Permit." As **284 noted above, exhaustion was primarily at issue in the first demurrer, which was interposed before the matter proceeded to the Coastal Commission. Nevertheless, the parties continued to dispute the exhaustion requirement in connection with the second demurrer. Real parties thus

argued: "The only final administrative decision on the issuance of a Coastal Development Permit ... is the one which the Coastal Commission made on December 9, 2004.... [¶] Accordingly, Petitioner failed to state facts sufficient to constitute a cause of action...." In response, McAllister reiterated that his "central argument is that the County's action in proceeding on the Project application was illegal under Chapter 20.90 and therefore not one that legally could be appealed to the Coastal Commission." Arguing against the "strict finality requirement" urged by real parties, McAllister contended "that the County remains an appropriate party" under "the exception to the exhaustion doctrine" that is applicable "where the action challenges the very jurisdiction of an administrative agency to consider the matter."

McAllister continues to press his exhaustion arguments on appeal. He contends: "Chapter 20.90 and its declaration that permits issued in conflict with the provisions of Title 20 of the LCP 'shall be null and void' changes the analysis ordinarily applicable in the context of a claim of failure to exhaust administrative remedies." He adds: "Central to Dr. McAllister's Complaint is the allegation that the County's action was a legal nullity and therefore there was no valid final County action from which an appeal to the Coastal Commission could be properly taken."

The County and real parties refute McAllister's contentions, though each takes a different analytic path.[FN7] As we now explain, our own assessment in this first step in the analysis leads us to the same conclusion: McAllister is mistaken, and exhaustion was required.

> FN7. While the County discusses the question in terms of exhaustion, Laube & Engel frame the issue as one of finality. As they see it, McAllister cannot challenge the County's action because that action was never final-a prerequisite for administrative mandamus-since an appeal was taken to the Coastal Commission. (See Code of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

Civ. Proc., § 1094.5.) "The purpose of section 1094.5 is to inquire into the validity of any *final* administrative order." (*State of California v. Superior Court, supra,* 12 Cal.3d at p. 245, 115 Cal.Rptr. 497, 524 P.2d 1281.) That does not occur "until the administrative process is completed and the agency makes a final decision that results in a direct and immediate impact on the parties." (*Santa Barbara County Flower and Nursery Growers Assn. v. County of Santa Barbara, supra,* 121 Cal.App.4th at p. 875, 17 Cal.Rptr.3d 489.)

### a. Exhaustion of all available remedies is generally required.

As discussed above, exhaustion of administrative remedies is generally required before resort to judicial remedies. (*Styne v. Stevens, supra,* 26 Cal.4th at p. 56, 109 Cal.Rptr.2d 14, 26 P.3d 343.) "The petitioner ... must obtain a final decision on the merits at the highest available administrative level before seeking judicial \*285 review. If an appeal can be taken to a higher administrative body ... that appeal must be pursued and the issues must be presented to the final decisionmaker before they can be presented in court." (Curtin, California Land Use and Planning Law, *supra,* Ch. 21, p. 528.) Where an administrative appeal is available but "no appeal is taken, there is a failure to exhaust administrative remedies, and mandamus will not lie." \*\*137(*Grant v. Superior Court* (1978) 80 Cal.App.3d 606, 609, 145 Cal.Rptr. 699.)

### b. Exhaustion is required even though voidness is asserted.

Even where an ordinance is challenged on the ground that it is void as applied to a particular property, the challenger generally must first exhaust all available administrative remedies before asserting his claim in court. Our high court endorsed that principle more than 60 years ago in the *Metcalf* case. (*Metcalf v. County of Los Angeles*

(1944) 24 Cal.2d 267, 270-273, 148 P.2d 645.) In *Metcalf,* the court squarely rejected an argument by the plaintiffs "that the doctrine of exhaustion of administrative remedies does not require them to follow the procedure prescribed by an ordinance which they allege is void as to their property." (*Id.* at p. 270, 148 P.2d 645; accord, *Pan Pacific Properties, Inc. v. County of Santa Cruz* (1978) 81 Cal.App.3d 244, 249, 146 Cal.Rptr. 428; see also, *United States v. Superior Court, supra,* 19 Cal.2d at pp. 194-195, 120 P.2d 26)

Applying *Metcalf* to the circumstances presented here, McAllister was required to apply for all available administrative relief-including appeal to the Coastal Commission-notwithstanding his claim that the County's action was a nullity.

We find no basis for a contrary result in the Supreme Court's later decision in *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d 787, 322 P.2d 449. In that case, the dispute concerned Alpine County's geographic boundaries, which were described in ambiguous statutory language. (*Id.* at p. 791, 322 P.2d 449.) The high court concluded that the courts-not the agency-had primary jurisdiction to interpret the legislative language. (*Id.* at pp. 792, 798, 322 P.2d 449.) As the court observed: "An administrative agency can act only as to those matters which are within the scope of the powers delegated to it." (*Id.* at p. 797, 322 P.2d 449.) Furthermore, the court stated, the rules requiring exhaustion "are inapplicable where, as here, the agency is given no jurisdiction to make a judicial determination of the type involved." (*Ibid.*)

The situation described in *Alpine* does not apply to our case. In this case, unlike that one, the agency had fundamental and primary jurisdiction over the parties' dispute. That conclusion proceeds manifestly from the relevant statutes, which recognize the Coastal Commission's authority to make determinations of the type involved here.

\*286 By statute, the Commission's jurisdiction extends to "any permit action, ... appeal, ... or any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                    Page 23
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

other quasi-judicial matter requiring commission action, for which an application has been submitted to the commission."(§ 30321; see *Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 190, 80 Cal.Rptr.2d 562.) With respect to appeals, under the Coastal Act, "an action taken by a local government on a coastal development permit application may be appealed to the commission for ... developments ... approved by the local government between the sea and the first public road paralleling the sea ...." (§ 30603, subd. (a)(1).) The Coastal Act thus incorporates a "chain of responsibility" for considering coastal developments such as that challenged here. (*REA Enterprises v. California Coastal Zone Com.* (1975) 52 Cal.App.3d 596, 605, 125 Cal.Rptr. 201 [construing the former administrative scheme, which gave regional commissions, rather than local governments, the authority "to adjudicate the propriety of granting or denying a permit" in the first instance, followed by an appeal to the state commission which "takes a new, unlimited look at the same request **138 for a permit by a de novo public hearing"]; see also, e.g., *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at pp. 569-570, 106 Cal.Rptr.2d 14.) For such projects, the County makes the initial decision on the coastal development permit, and the Coastal Commission hears any appeal.

The Coastal Commission's appellate jurisdiction is limited to determining whether the development conforms "to the standards set forth in the certified local coastal program or the public access policies set forth in this division."(§ 30603, subd. (b)(1); see *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14.) The County's local coastal program standards-previously certified by the Coastal Commission-include those set forth in Chapter 20.90. By logical inference, it is within the Coastal Commission's appellate jurisdiction to review the County's action vis-à-vis those standards-including an assessment of the underlying validity of the local government action. That very question was before the Coastal Commission here.[FN8] In undertaking

to answer it, the Coastal Commission was acting *287 "within the scope of the powers delegated to it." (*County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 797, 322 P.2d 449.)

> FN8. The Coastal Commission's August 2004 Appeal Staff Report-Substantial Issue Determination is part of the record, as the result of McAllister's request for judicial notice below and in this court. In a summary of the contentions raised in the Coastal Commission appeal, the report states: "The County's approval of this application presents a number of unresolved jurisdictional and procedural issues." As described in the report, they included: a) what effect the work done by Sorenson in violation of the 1977 permit would have on "the proper procedure that the Coastal Commission should follow in considering this item"; b) whether "the current plans approved by the County would ... be consistent with the CDP issued by the Coastal Commission and would violate the terms of approval that were adopted in 1977"; and c) whether "pending grading and construction violations [exist] that, under the County's LCP procedural rules, should have precluded action on the application."

> In its Recommended Findings and Declarations, the August 2004 Coastal Commission staff report continues: "With regards to the procedural issues, the Coastal Commission granted an earlier permit for a single family dwelling in 1977 to Sorenson (Permit # A-174-77).... ¶ During review of this current proposal, Commission staff recommended to the County staff that the applicants['] request for a new residence should be considered an amendment to the original 1977 Sorenson CCC permit, based on staff's belief that the original permittee had exercised the permit, as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

evidenced by partial development on site.... However, it has since been determined that Sorenson never combined the two lots as required by the Commission's permit, and so the work done was in violation of permit conditions.... Work done in violation of permit conditions is illegal and cannot be used to assert that the permit has been exercised. Since no extension of the 1977 permit occurred (or was requested) the Sorenson CDP appears to have expired in 1979. Eventually, the property was sold to Laube/Engel ... whose application for development in the same general building site is the subject of this appeal. ¶ ... Since Commission approval of the Sorenson project was granted for a period of two years, and permit conditions were never fully complied with during that time, the permit appears to have expired, and the development on the site is a violation. The County now has a certified LCP, and as such has been granted the authority to regulate development in the coastal zone, with the Commission retaining appeal jurisdiction in the Big Sur Coast. Thus the Commission finds that the County was correct to have processed a coastal development permit application for the project. As a result of carrying out their permit authority, the County has approved a project, which has been appealed to the Commission."

The recognition of this authority on the Coastal Commission's part is consistent with the policy reasons that underpin the exhaustion requirement. As has been **139 said, where litigants fail to proceed with available administrative remedies, they "have in effect deprived the [agency] of an opportunity to correct the alleged constitutional infirmity." (*Pan Pacific Properties, Inc. v. County of Santa Cruz, supra,* 81 Cal.App.3d at p. 249, 146 Cal.Rptr. 428; cf., *Sierra Club v. San Joaquin Loc-*

*al Agency Formation Com., supra,* 21 Cal.4th at p. 502, 87 Cal.Rptr.2d 702, 981 P.2d 543.) In this case, the agency charged with correcting the asserted defect (the Coastal Commission) is not the same one that took the challenged action (the County). But in our view, that circumstance is irrelevant, given the chain of responsibility established by the Coastal Act. Where the claimed deficiency can be corrected administratively-including via appeal to another agency-the beneficial purposes of the exhaustion doctrine are advanced. "The doctrine's purpose is fully served when parties raise all issues before the administrative body with *ultimate or final responsibility* to approve or disapprove the project...."(*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 594, 96 Cal.Rptr.2d 880, italics added.) In this case, that body is the Coastal Commission. (See *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14.)

To sum up, in cases where "the subject matter lies outside the administrative agency's jurisdiction," the exhaustion requirement is excused. (*Green v. City of Oceanside, supra,* 194 Cal.App.3d at p. 222, 239 Cal.Rptr. 470; *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 798, 322 P.2d 449.) This is not such a case, however. Here, by express legislative grant, the Coastal Commission had *288 fundamental subject matter jurisdiction to decide the administrative appeal of real parties' coastal development permit. (§ 30603, subd. (a)(1).) McAllister's claim that the County's action is null and void does not operate to excuse the exhaustion requirement in these circumstances. (*Metcalf v. County of Los Angeles, supra,* 24 Cal.2d at p. 271, 148 P.2d 645.)

*c. Cognizable jurisdictional claims will not escape review.*

Contrary to McAllister's dire assertions, the exhaustion requirement does not place reviewable administrative decisions *"forever beyond judicial scrutiny."* It is well established that an administrative

147 Cal.App.4th 253                                                                                    Page 25
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

agency "may constitutionally hold hearings, determine facts, apply the law, and impose certain types of monetary relief so long as (i) these activities are 'authorized by statute or legislation and are *reasonably necessary* to effectuate the administrative agency's *primary, legitimate regulatory purposes*, and (ii) the *'essential' judicial power* (i.e., the power to make enforceable, binding judgments) *remains ultimately in the courts, through review of agency determinations.'"* (*Bradshaw v. Park* (1994) 29 Cal.App.4th 1267, 34 Cal.Rptr.2d 872, quoting *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 372, 261 Cal.Rptr. 318, 777 P.2d 91; see also, e.g., *State of California v. Superior Court, supra,* 12 Cal.3d at p. 250, 115 Cal.Rptr. 497, 524 P.2d 1281; *Halaco Engineering Co. v. South Central Coast Regional Com., supra,* 42 Cal.3d at p. 63, 227 Cal.Rptr. 667, 720 P.2d 15.)

Judicial review thus remains obtainable-once available administrative remedies have been exhausted-for any claims that survive that process. (*Grant v. Superior Court, supra,* 80 Cal.App.3d at p. 609, 145 Cal.Rptr. 699; § 30801; cf., § 30802 [judicial review where there is no right of appeal to the Coastal Commission].) For example, as the Supreme Court observed in *Metcalf,* had the plaintiffs there exhausted the administrative process available**140 to them, "they would not have been barred from asserting in appropriate judicial proceedings that the zoning ordinance was unconstitutional as to their property." (*Metcalf v. County 'of Los Angeles, supra,* 24 Cal.2d at p. 272, 148 P.2d 645.) The same is true here. To the extent that McAllister's claims retained vitality following the Coastal Commission proceedings (a point we discuss below), they were subject to judicial review in his mandamus action in the superior court.

Having concluded that McAllister's voidness claim did not operate to excuse him from exhausting available administrative remedies, including an appeal to the Coastal Commission, we now proceed to the remaining step in our analysis of this theory of the complaint: an assessment of whether McAllister

has stated a cause of action on voidness grounds. The second demurrer not only challenged the allegations in McAllister's complaint that he was excused from exhausting administrative remedies, it also attacked the very existence of a cause of action based on voidness. In this second part of *289 the analysis, we therefore consider the sufficiency of McAllister's allegations that the County's action was void *ab initio* as a discrete issue, distinct from the question of finality.

*2. Liberally construed, McAllister's pleading does not state a claim that the County's action is void ab initio.*

[22] As McAllister puts it, if he "can allege *any* facts under which the provisions of Chapter 20.90 would prohibit County consideration and approval of the Project or under which those provisions would mandate a conclusion that the County's approval of the Project is 'null and void,' then the granting of the Second Demurrer without leave to amend must be reversed." That is an accurate recitation of the general *legal* principle concerning demurrers. McAllister's petition presents no *factual* basis for relief, however.

Under the governing legal principles, "we take as true the well-pleaded factual allegations of the complaint." (*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 193, 126 Cal.Rptr.2d 908, 57 P.3d 372.) We construe the "complaint liberally to attain substantial justice among the parties." (*Long Beach Equities, Inc. v. County of Ventura, supra,* 231 Cal.App.3d at p. 1024, 282 Cal.Rptr. 877.) Nevertheless, we "may not consider conclusions of fact or law, opinions, speculation or allegations which are contrary either to law or to judicially noticed facts." (*Ibid.*) We thus disregard any allegations of McAllister's complaint that conflict with judicially noticed documents as well as those that represent bare legal conclusions.

In a succinct summary of his position on this point,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                          Page 26
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

McAllister asserts that he "has stated a cause of action [a] that the County's consideration of the Project violated Chapter 20.90, [b] that its approval of the Project was 'null and void,' and [c] that therefore both the County and the Coastal Commission were without jurisdiction to take any action on the Project." Each of those three points follows in logical progression, with the last one depending on the first two. We examine each in turn.

### a. Violation of Chapter 20.90

McAllister starts with the assertion that the County's consideration of the project violated Chapter 20.90 of the Monterey County Code, which embodies part of the County's local coastal plan. That assertion relies on these two factual allegations: (1) that real parties' predecessor, Sorenson, did grading and construction work on the property that violated Condition 3 of the 1977 Coastal Commission permit since the two lots had not yet been merged; and (2) **141 that the "said grading and construction work was illegal and constituted a violation of permit conditions under Chapter 20.90...."

*290 We accept as true the first factual allegation summarized above-that Sorenson's grading and construction work was done in violation of his 1977 coastal development permit. Indeed, there appears to be no dispute as to that fact.

As to the second premise, however, we conclude that it conflicts with judicially noticed documents, which show that there was no record of any violation of Chapter 20.90, as distinguished from violations of the 1977 permit.

The documents before us include both a transcript of the January 2004 hearing by the County's board of supervisors and the resolution passed at the close of that hearing. As reflected in the transcript, the County's assigned planner said this: "As far as our County records, there is no recorded violation at the site. We did turn it over to the Coastal Commission

staff to investigate. We have heard nothing from them yet. But we hopefully, will treat that this project will correct any violation that there may be by making that site useable." Similarly, in a section devoted to findings supporting denial of the appeal, Resolution 04-428 notes McAllister's contention that "violations on the project site exist and must be fully investigated and remedied prior to project approval." The resolution includes this response to that contention: "Staff finds that no violation has been recorded for the property under County jurisdiction. Any violation associated with the property would be related to the original, abandoned, 1977 CC [Coastal Commission] permit. CC staff has been notified so as to recommend any remedial actions required at the site to correct a purported violation. At the receipt of this report, CC staff is expected to respond to the proposal during the appeal period."

In short, McAllister's assertion that there was an existing violation of Chapter 20.90 of the Monterey County Code conflicts with judicially noticed documents, which unequivocally refute the existence of any such local code violation. "The courts ... will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604, 176 Cal.Rptr. 824.) "Thus, a pleading valid on its face may nevertheless be subject to demurrer when matters judicially noticed by the court render the complaint meritless." (*Ibid.*) This is such a case.

In any event, even assuming that McAllister's pleading had cleared this first hurdle, the remaining allegations in support of his voidness claim cannot stand.

### *291 b. Approval as "null and void"

As the next link in the analytic chain, McAllister argues that the existing violation renders the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

County's action on the project null and void under Chapter 20.90.

Quite apart from its lack of a factual premise, this allegation must be disregarded as a bare legal conclusion. As the California Supreme Court has said in the context of complaints against administrative agencies: "Allegations that the acts of a commission or board were 'arbitrary, capricious, fraudulent, wrongful and unlawful,' like other adjectival descriptions of such proceedings, constitute mere conclusions of law which are not to be deemed admitted by a demurrer." (*Faulkner v. Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329, 253 P.2d 659.) McAllister's characterization of the County's action**142 as "legally null and void" suffers from the same defect.

Urging against that conclusion, McAllister cites the venerable case of *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 20 Cal.Rptr. 609, 370 P.2d 313. In that case, the California Supreme Court said this: "The sustaining of the demurrer to the second cause of action cannot be justified on the ground that the allegation that the housing accommodations were 'publicly assisted' was merely a conclusion of law. The distinction between conclusions of law and ultimate facts is not at all clear and involves at most a matter of degree." (*Id.* at p. 473, 20 Cal.Rptr. 609, 370 P.2d 313.) The court further explained: "In permitting allegations to be made in general terms the courts have said that the particularity of pleading required depends upon the extent to which the defendant in fairness needs detailed information that can be conveniently provided by the plaintiff, and that less particularity is required where the defendant may be assumed to possess knowledge of the facts at least equal, if not superior, to that possessed by the plaintiff. [Citations.] In accordance with these principles it may be alleged generally, *in the terms of the statute,* that housing accommodations are 'publicly assisted.' " (*Id.* at p. 474, 20 Cal.Rptr. 609, 370 P.2d 313, italics added.)

A critical distinction exists between that case and this one. The key term in the pleading at issue in

*Burks*-"publicly assisted" housing accommodation-came clothed in a detailed statutory definition. (*Burks v. Poppy Construction Co., supra,* 57 Cal.2d at p. 471, 20 Cal.Rptr. 609, 370 P.2d 313; see *id.* at p. 473, 20 Cal.Rptr. 609, 370 P.2d 313, citing Health & Saf.Code, former § 35710, subd. 3.) The same is not true here. The pivotal allegation here-that the action was "null and void"-does not enjoy an accepted meaning, under either statutory or decisional law, which would serve to give it a concrete factual dimension and thus to elevate it from the status of bare legal conclusion.

**\*292** Moreover, even as a conclusion of law, the claim is fallacious. As noted above, Chapter 20.90 provides that any permit, "if issued in conflict with the provisions of *this title,* shall be null and void." (Monterey County Code, § 20.90.010, italics added.) As the judicially noticed documents demonstrate, however, there is no violation of "this title" in this case, only a decades-old violation of a prior permit, which was issued more than a decade before the Coastal Commission's 1988 certification of the County's local coastal plan.

For all these reasons, we need not accept as true McAllister's contention that the County's action was a legal nullity.

### c. Lack of jurisdiction

The third and final link in McAllister's progression of arguments is his contention that both "the County and the Coastal Commission were without jurisdiction to take any action on the Project" since the County's approval was a legal nullity.

[23] Once again, this assertion is nothing more than an unvarnished legal conclusion. In order "to state a cause of action warranting judicial interference with the official acts of [agency] defendants, [plaintiffs] must allege much more than mere conclusions of law; they must aver the specific facts from which the conclusions entitling them to relief would follow." (*Faulkner v. Cal. Toll Bridge Au-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                    Page 28
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

*thority, supra,* 40 Cal.2d at p. 330, 253 P.2d 659.) Here no such facts have been stated that are supportable in light of the judicially noticed documents before us.

Moreover, as with his second argument, the conclusion of law that McAllister draws on this point is itself erroneous. As **143 legal authority for his claim that voidness necessarily divests jurisdiction, McAllister relies on the case of *City of Cupertino v. City of San Jose* (1960) 186 Cal.App.2d 29, 8 Cal.Rptr. 525. That case involved competing annexation proceedings. (*Id.* at p. 30, 8 Cal.Rptr. 525.) In such situations, the court explained, "it has been made clear that 'the first proceeding in point of time excludes the jurisdiction of the later one' [citation] and that the second proceeding is, in such situation 'an absolute nullity and [is] void' [citation]." (*Id.* at p. 32, 8 Cal.Rptr. 525.) "Since an annexation proceeding which is 'null and void' is so from the very beginning, and is generally ineffectual for all purposes, it does not bar a second proceeding by the same annexing city [citation]." (*Ibid.*)

Patently, the situation presented in *City of Cupertino* bears no relation to our case. In this case, unlike that one, no competing proceeding barred the County's jurisdiction. (Cf., *City of Cupertino v. City of San Jose, supra,* 186 Cal.App.2d at pp. 31-32, 8 Cal.Rptr. 525; *293Andrisani v. Saugus Colony Limited* (1992) 8 Cal.App.4th 517, 524, 10 Cal.Rptr.2d 444 ["trial court clearly had jurisdiction to vacate its void orders, made without jurisdiction, while the appeal was still pending"].) Nor was there a lack of fundamental jurisdiction to approve the project. (Cf., *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 798, 322 P.2d 449; *Buckley v. California Coastal Com., supra,* 68 Cal.App.4th at p. 190, 80 Cal.Rptr.2d 562.)

As stated above in connection with McAllister's second argument, we need not accept his characterization of the County's action as "null and void." But even if we were to concede that premise, it would not follow ipso facto that the County lacked

fundamental jurisdiction to act. One example of the impact of "voidness" on jurisdiction, offered by way of analogy, is when a trial judge has been disqualified. (Code Civ. Proc., §§ 170, 170.6.) In such cases, it has been argued, "the challenged judge is without jurisdiction to conduct any further proceedings in the cause, and his subsequent orders are null and void." (*Andrisani v. Saugus Colony Limited, supra,* 8 Cal.App.4th at p. 525, 10 Cal.Rptr.2d 444 [stating the party's contention].) "Although the cases frequently refer to the subsequent orders or judgment of a disqualified judge as absolutely void for lack of jurisdiction ..., it is clear that ... the actions of a disqualified judge are not void in any fundamental sense but at most voidable if properly raised by an interested party."(*In re Christian J.* (1984) 155 Cal.App.3d 276, 280, 202 Cal.Rptr. 54.) Thus, even a claim of underlying "voidness" does not inexorably rob an adjudicatory body of its jurisdiction.

To sum up, McAllister has not stated a cause of action with respect to his voidness claim. His allegation that the County's consideration of real parties' application violated Chapter 20.90 is directly contradicted by facts subject to judicial notice. (*Del E. Webb Corp. v. Structural Materials Co., supra,* 123 Cal.App.3d at p. 604, 176 Cal.Rptr. 824.) His other two assertions-that the County's action was null and void and that the County and the Coastal Commission therefore lacked fundamental jurisdiction to act-must be disregarded as baseless and erroneous legal conclusions. (*Long Beach Equities, Inc. v. County of Ventura, supra,* 231 Cal.App.3d at p. 1024, 282 Cal.Rptr. 877.)

### C. McAllister's pleading did not state a cause of action under CEQA.

[24] McAllister's remaining theory in support of the validity of his first cause of action relies on the California Environmental Quality Act. He asserts: "The County Defendants failed to comply with **144 CEQA" in various respects, including failure to prepare an EIR for the project, reliance on a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                             Page 29
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

flawed initial study, and adoption of inadequate mitigation measures.

As we now explain, in the procedural context of this case, those allegations do not support a claim against the County.

*294 *1. The County's CEQA determinations have been superseded by the Coastal Commission's review.*

With the Coastal Commission's decision to accept the administrative appeal, the County's CEQA determinations were converted into intermediate decisions, lacking in finality. "When, in the course of hearing that appeal, the Commission found a 'substantial issue,' it then heard the entire permit application de novo. The scope of that hearing decisively affects the status of the [County] and the Commission: 'A hearing *de novo* literally means a new hearing, or a hearing the second time. [Citation.] Such a hearing contemplates an entire trial of the controversial matter in the same manner in which the same was originally heard. It is in no sense a review of the hearing previously held, but is a complete trial of the controversy, the same as if no previous hearing had ever been held.... The decision therein ... takes the place of and completely nullifies the former determination of the matter.'" (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14, quoting *Collier & Wallis v. Astor* (1937) 9 Cal.2d 202, 205, 70 P.2d 171.) "Once the Commission conducted its de novo examination, there was no longer a decision by the [County] to review." (*Ibid.*)

The County's CEQA decisions thus have been superseded by the Coastal Commission's environmental review. "The Commission's findings that the [project] complied with CEQA superseded equivalent findings by the [County Board of Supervisors] [citation] in precisely the same manner that the Board's decision superseded that of the planning commission." (*Kaczorowski v. Mendocino County*

*Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 570, 106 Cal.Rptr.2d 14.) As a result, McAllister no longer has any CEQA claims against the County, which is "no longer plaintiff's adversarial opponent." (*Id.* at p. 570, 106 Cal.Rptr.2d 14.)

*2. The County's CEQA determinations are no longer subject to judicial review.*

As McAllister correctly observes, for purposes of environmental review of the project challenged here, the County is the lead agency under CEQA, while the Coastal Commission is a responsible agency. (See Guidelines, § 15050, subds. (b)(1), (c).) As he also points out, "CEQA mandates a lead agency to conduct a thorough review of the project in question even though additional review might later be undertaken by other agencies with jurisdiction over specific resources." (*Save San Francisco Bay Assn. v. San Francisco Bay Conservation etc. Com.* (1992) 10 Cal.App.4th 908, 921, 13 Cal.Rptr.2d 117(*Save San Francisco Bay* ).)

*295 From that premise, McAllister argues: "As a lead agency, the County's failure to comply with CEQA ... is subject to challenge under Code of Civil Procedure section 1094.5."

We cannot agree. True, the County was the lead agency here. As explained above, however, its CEQA determination was not final for purposes of administrative mandamus. That fact is one of several that distinguish our case from *Save San Francisco Bay.*(See *Save San Francisco Bay, supra,* 10 Cal.App.4th at p. 918, 13 Cal.Rptr.2d 117.) A second distinction, which **145 proceeds from the first, is that the agencies involved in *Save San Francisco Bay* undertook environmental review under different statutory schemes, each with a slightly different focus, rather than engaging in sequential review in a vertical process under CEQA. (*Id.* at pp. 917, 918, 13 Cal.Rptr.2d 117.)

As the *San Francisco Bay* court explained: "The administrative review of the aquarium project took

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                          Page 30
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

over four years and was conducted by many agencies, including the City's planning commission, planning department, port commission, art commission and board of supervisors, the Regional Water Quality Control Board, the Bay Area Quality Management District, the United States Army Corps of Engineers and BCDC [San Francisco Bay Conservation and Development Commission]. The project raised numerous complex issues and generated strong public interest. Nevertheless, approval was eventually forthcoming from every agency involved, each having a slightly different mission and each being subject to its own rules and regulations." (*Save San Francisco Bay, supra,* 10 Cal.App.4th at p. 917, 13 Cal.Rptr.2d 117.) "After the planning commission certified the final EIR and approved the project, BCDC formally accepted the project for review." (*Id.* at p. 918, 13 Cal.Rptr.2d 117, fn. omitted.) However, that agency's review was not pursuant to CEQA; rather, it was under an entirely different statutory scheme, the McAteer-Petris Act or MPA. (*Id.* at pp. 915, 918, 13 Cal.Rptr.2d 117; see Gov.Code, § 66600 et seq.) "Although it had participated in the preparation of the EIR, BCDC's central role in the review process was to review the project for conformity with the provisions of the MPA" and specific area plans. (*Save San Francisco Bay,* at p. 918, 13 Cal.Rptr.2d 117.) As the court pointed out, those two statutory schemes-CEQA and the MPA-"differ in many significant respects." (*Id.* at p. 923, 13 Cal.Rptr.2d 117.)

In this case, by contrast, the Coastal Commission did not undertake its environmental review pursuant to an entirely separate statutory scheme with a distinct focus. To the contrary, as CEQA and its accompanying Guidelines recognize, Coastal Commission review is a *substitute* for an environmental impact report. (See § 21080.5, subds. (a), (e)(1); Guidelines, §§ 15002, subd. (*l* ); 15251, *296 subds. (c), (f).) [FN9] Its review is "the functional equivalent of the EIR process." (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14.) In this

case, Coastal Commission**146 review was the final step in a sequential process of CEQA proceedings, which started with the County's planning commission. That final step is the only one appropriate for judicial review. (Code Civ. Proc., § 1094.5.)Under the circumstances presented here, the CEQA determination made by the County's board of supervisors is no more final than that made earlier by its planning commission. Both are merely intermediate determinations, and neither is a proper subject for judicial review.

> FN9. As the relevant portion of the statute provides, "when the regulatory program of a state agency requires a plan or other written documentation containing environmental information" that complies with the statute, "the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division if the Secretary of the Resources Agency has certified the regulatory program pursuant to this section."(§ 21080.5, subd. (a).) The Coastal Commission's regulatory program has been so certified. According to the Guidelines: "The following programs of state regulatory agencies have been certified by the Secretary for Resources as meeting the requirements of Section 21080.5: [¶] The regulatory program of the California Coastal Commission and the regional coastal commissions dealing with the consideration and granting of coastal development permits under the California Coastal Act of 1976, Division 20 (commencing with Section 30000) of the Public Resources Code."(Guidelines, § 15251, subd. (c).) Coastal Commission environmental review thus is among the programs that "have been certified by the Secretary of the Resources Agency as involving essentially the same consideration of environmental issues as is provided by use of EIRs and negative declarations. Certified programs

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                                    Page 31
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

are exempt from preparing EIRs and negative declarations but use other documents instead." (Guidelines, § 15002, subd. (*l* ).)

In short, nothing in *Save San Francisco Bay* or in the County's status as lead CEQA agency offers any basis for judicial review of the County's intermediate environmental decision.

### 3. Policy considerations do not dictate a different result.

Arguing against that conclusion based on policy considerations, McAllister contends that "the County's compliance with CEQA with respect to projects in the most sensitive coastal areas would be forever beyond judicial review."

We reject that argument. As provided by the Legislature, aggrieved parties may seek judicial review of a *final* environmental decision only. (Code Civ. Proc., § 1094.5.)In this case, that decision is entrusted to the Coastal Commission. (See §§ 21080.5, subd. (a), 30603.) We do not share McAllister's apparent apprehension over the Legislature's decision to give the Coastal Commission the final administrative say on sensitive coastal developments such as the one at issue here. In our view, that legislative choice is consistent with the Commission's statutory charge to protect the "quality of the coastal zone environment ...." (§ 30001.5, subd. (a).) Nor do *297 we agree with McAllister that shielding the local CEQA decision from judicial review when an appeal is taken to the Coastal Commission "would provide the County with a disincentive to rigorously comply with CEQA and would leave the County unaccountable to the public for its CEQA violations in this context." In the first place, as · a factual matter, nothing in the record before us suggests that the County fails to rigorously comply with its obligations under CEQA. Furthermore, a cursory examination of the administrative appeal process demonstrates the fallacy of that contention as a legal argument. The Coastal Commission does not have appellate jurisdiction unless someone

takes an appeal. (§ 30603.) Had no appeal been taken here, the County's CEQA determination would have been final and subject to immediate judicial review. In any given case, the County cannot know in advance whether its decision will be subject to a direct court challenge. For that reason alone, it has every incentive to comply with CEQA.

To sum up, McAllister's policy arguments are unpersuasive in the face of the legislative dictates that govern us here.

### D. The trial court did not err in failing to grant leave to amend.

[25] McAllister's final appellate contention is that the trial court abused its discretion in sustaining the demurrer without leave to amend. He argues that the trial court did not give him "a fair prior opportunity to correct any substantive defect in the complaint," and thus abused its discretion. (See *Larwin-Southern California, Inc. v. JGB Investment Co.* (1979) 101 Cal.App.3d 626, 635, 162 Cal.Rptr. 52.) He asserts: "If given a fair opportunity, Dr. McAllister would be able to amend the Complaint to allege, if necessary, more facts to support a violation of CEQA, Chapter 20.90 and his legal theory that the County's approval of the Project is null **147 and void based on the violations of the 1977 Permit."

### 1. Policy favoring amendments

"The trial court has discretion to allow amendments to the pleadings 'in the furtherance of justice.' (Code Civ. Proc., § 473, subd. (a)(1).) 'This discretion should be exercised liberally in favor of amendments....' "(*Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co.* (2006) 137 Cal.App.4th 905, 916, 41 Cal.Rptr.3d 39.) Furthermore, "a plaintiff need not request leave to amend in order to preserve on appeal the issue of whether the court abused its discretion in sustaining a demurrer without leave to amend (Code Civ. Proc., § 472c)...."(*Palm Springs Tennis Club v. Rangel*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

(1999) 73 Cal.App.4th 1, 7, 86 Cal.Rptr.2d 73.)

### *298 2. Plaintiff's burden

As the California Supreme Court explained long ago in the leading case of *Blank v. Kirwan,* when a demurrer "is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment.... The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318, 216 Cal.Rptr. 718, 703 P.2d 58, citations omitted.) In that case, the court found that the plaintiff failed to "carry his burden of proving a reasonable possibility that the defects can be cured by amendment." (*Id.* at p. 319, 216 Cal.Rptr. 718, 703 P.2d 58.)

In order to demonstrate a reasonable possibility of curing the defect in the complaint, the plaintiff must show how the complaint can be amended and how the amendment will change the pleading's legal effect. (*Palm Springs Tennis Club v. Rangel, supra,* 73 Cal.App.4th at pp. 7-8, 86 Cal.Rptr.2d 73.)

### 3. Application

McAllister failed to carry his burden here.

As to his voidness claim, McAllister does not indicate what specific facts he could assert that might breathe life into that claim. He "has never suggested what facts [he] is prepared to allege that would cure the defect in [his] complaint." (*Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co., supra,* 137 Cal.App.4th at p. 916, 41 Cal.Rptr.3d 39.) Furthermore, there is "nothing in the record that suggests" a reasonable possibility of cure, particularly given the judicially noticed documents in this record. (*Ibid.*) In this case, it is not enough to offer "essentially the same allegations but with greater specificity." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 319, 216 Cal.Rptr. 718, 703 P.2d 58.)

As to his CEQA claim, as explained above, McAllister cannot state a cause of action against the County. The proper defendant is the Coastal Commission. But due to the passage of time, it cannot now be joined as a party-defendant on McAllister's CEQA claim. (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 570, 106 Cal.Rptr.2d 14 [the plaintiff offered no "suggestion how the Commission could be joined 13 months after it had issued the permit to real parties"].)

Under these circumstances, the trial court did not abuse its discretion in sustaining the demurrer without leave to amend. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 319, 216 Cal.Rptr. 718, 703 P.2d 58; *Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co., supra,* 137 Cal.App.4th at p. 916, 41 Cal.Rptr.3d 39; *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 570, 106 Cal.Rptr.2d 14.)

### **148 *299 DISPOSITION

We treat the challenged order of February 22, 2005, as a judgment of dismissal, entered nunc pro tunc, which we affirm. McAllister shall bear the costs of appeal.

BAMATTRE-MANOUKIAN, Acting P.J., and DUFFY, J., concur.
Cal.App. 6 Dist.,2007.
McAllister v. County of Monterey
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1  Richard R. Rudnansky (SBN: 77981)
   rrudnansky@meyersnave.com
2  Julia L. Bond (SBN: 166587)
   jbond@meyersnave.com
3  Dawn A. McIntosh (SBN: 162713)
   dmcintosh@meyersnave.com
4  MEYERS, NAVE, RIBACK, SILVER & WILSON
   555 12th Street, Suite 1500
5  Oakland, California 94607
   Telephone: (510) 808-2000
6  Facsimile: (510) 444-1108

7  Attorneys for Defendants CITY OF COTATI and
   PLANNING COMMISSION OF THE CITY OF
8  COTATI

9

                    **UNITED STATES DISTRICT COURT**
10
        **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**
11

12
   | | |
   |---|---|
   | MICHAEL MEAD, an individual,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF COTATI, a municipal corporation, PLANNING COMMISSION OF THE CITY OF COTATI, UNITED STATES FISH AND WILDLIFE SERVICE, DONALD KOCH, in his official capacity as Director of the California Department of Fish and Game, Does 1-10, inclusive,<br><br>    Defendant. | CASE NO. CV 08 3585 CW<br><br><br>**DEFENDANTS CITY OF COTATI AND PLANNING COMMISSION OF THE CITY OF COTATI'S APPENDIX OF FOREIGN AUTHORITIES IN SUPPORT OF DEFENDANTS MOTION TO DISMISS**<br><br>Date:     October 9, 2008<br>Time:    2:00 p.m.<br>Crtrm.:  2<br><br>Trial Date:          None Set |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      Attached hereto are copies of the following Non-Federal authorities cited in Defendant's

2  Motion For Judgment On Partial Findings:

3

Case Law

4

5  *Abellerira v. District Court of Appeal,* 17 Cal. 3d 280 (1941) ............................................... Tab 1

6  *Barratt American Incorporated v City of Rancho Cucamonga*
7     37 Cal. 4th 685 (2005)  ........................................................................................ Tab 2

8  *Fogarty v. City of Chico,* 148 Cal.App. 4th 537 (2007) ........................................................ Tab 3

9  *Hensler v. City of Glendale,* 8 Cal. 4th  1 (1994) ................................................................ Tab 4

10  *Home Builders Association of Northern California v. City of Napa*
      90 Cal.App. 4th 188 (2001)  ................................................................................. Tab 5

11  *McAllister v. County of Monterey,* 147 Cal.App. 4th 253 (2007) ........................................... Tab 6

12  *Patrick Media Group v. California Coastal Commission,*
13     9 Cal.App. 4th 592 (1992) ................................................................................... Tab 7

14  *Utility Cost Management v. Indian Wells Valley Water District,*
       26 Cal. 4th 1185 (2001)  ..................................................................................... Tab 8
15

16  *Travis v. County of Santa Cruz,* 33 Cal.4th 757 (2004) ........................................................ Tab 9

    *Williams Communications, LLC v. City of Riverside,*
17     114 Cal.App. 4th 642 (2003)  ............................................................................... Tab 10

18

Statutory Material

19

20  **California Government Code**

21      Section 65009.................................................................................................... Tab 11

22      Section 65580.................................................................................................... Tab 12

23      Section 66000.................................................................................................... Tab 13

24      Section 66020.................................................................................................... Tab 14

25

26

27

28

1 | DATED: August 18, 2008                MEYERS, NAVE, RIBACK, SILVER & WILSON

2

3 | By:    /s/ Dawn A. McIntosh

4 | Dawn A. McIntosh
Attorneys for Defendants CITY OF COTATI and
PLANNING COMMISSION OF THE CITY OF

5 | COTATI

6

7 | 1137121.1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TAB 1

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

▷

Abelleira v. District Court of Appeal, Third Dist.
Cal.

FRANK ABELLEIRA et al., Petitioners,
v.
THE DISTRICT COURT OF APPEAL OF THE
STATE OF CALIFORNIA, THIRD APPELLATE
DISTRICT et al., Respondents; MATSON NAVIG-
ATION COMPANY (a Corporation) et al., Inter-
veners.
**S. F. No. 16357.**

Supreme Court of California
February 7, 1941.

HEADNOTES

**(1) Prohibition § 17--Grounds for Relief Generally-
-Errors and Irregularities.**
The writ of prohibition never issues to restrain a
lower tribunal from committing mere error in de-
ciding a question properly before it.

**(2) Prohibition § 47--Jurisdiction and Procedure-
-Jurisdiction--Restraining District Court of Appeal.**
The Supreme Court has power by writ of prohibi-
tion to restrain a District Court of Appeal from pro-
ceeding in a matter over which it has no jurisdic-
tion.

**(3) Courts § 9--Jurisdiction--General Principles--In
General--Definition and Nature.**
The term "jurisdiction" has many different mean-
ings, depending upon the situation in respect of
which it is used. For the purpose of determining the
right to review by *certiorari,* restraint by prohibi-
tion, or dismissal of an action, the phrase "lack of
jurisdiction" may be applied to a case where,
though the court has jurisdiction over the subject
matter and the parties in the fundamental sense, it
has no "jurisdiction" or power to act except in a
particular manner, or to give certain kinds of relief,
or to act without the occurrence of certain proced-
ural prerequisites.

See 7 **Cal. Jur.** 584; 14 **Am. Jur.** 363.
**(4) Prohibition § 16 (1)--Grounds for Relief Gener-
ally--Want or Excess of Jurisdiction--In General.**
Speaking generally, any acts which exceed the
defined power of a court in any instance, whether
that power be defined by constitutional provision,
express statutory declaration, or rules developed by
the courts and followed under the doctrine of *stare
decisis,* are in excess of jurisdiction, in so far as
that term is used to indicate that those acts may be
restrained by prohibition or annulled on *certiorari.*

**(5)        Unemployment        Relief-
-Insurance--Procedure--Judicial    Remedies--    Ex-
haustion of Administrative Remedies.**
A District Court of Appeal is without jurisdiction to
issue a writ of mandate on application of employers
against the Employment Commission upon the
ground that the unemployment benefits awarded by
the adjustment unit were not authorized by the Un-
employment Insurance Act, where though the
award was affirmed by the referee, the employers
had not exhausted their right of appeal to the com-
mission (see Stats. 1935, chap. 352; Deering's Gen.
Laws, 1937, Act 8780d).

**(6)    Administrative    Law--Judicial    Remedies-
-Exhaustion of Administrative Remedies.**
Where an administrative remedy is provided by
statute, relief must be sought from the administrat-
ive body, and the remedy exhausted before the
courts will act. A court violating the rule acts in ex-
cess of jurisdiction.

**(7)    Prohibition    §    40--Judicial    Remedies-
-Exhaustion of Judicial Remedies-- Filing of Ap-
peal as not Constituting.**
The rule of exhaustion of remedies is not complied
with by the mere filing of an appeal; the remedies
are not exhausted until the appeal is fully prosec-
uted. Consequently the mere filing of an appeal
with the Employment Commission after procuring
the issuance of an alternative writ of mandate and a
temporary restraining order directing the withhold-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942

17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

ing of unemployment benefits is not a compliance with the rule requiring exhaustion of administrative remedies where because of the restraining order the commission is without power to act on the merits of the appeal.

**(8)** Unemployment Relief- -Insurance--Procedure--Judicial Remedies-- Exhaustion of Administrative Remedies- -Exceptions--Irreparable Injury.

Employers seeking a writ of mandate against the Employment Commission upon the ground that the unemployment benefits awarded are not authorized by the Unemployment Insurance Act are not excused from exhausting their administrative remedy of appeal to the commission where they are unable to show irreparable injury and where the effect would be to violate the provision in section 67 of the act that benefits shall be paid regardless of an appeal if the initial determination is affirmed by the referee.

**(9)** Unemployment Relief- -Insurance--Procedure--Judicial Remedies-- Exhaustion of Administrative Remedies- -Exceptions--Futility of Appeal.

Compliance with the rule requiring exhaustion of administrative remedies before resort to a *mandamus* proceeding to prevent unauthorized payment of unemployment benefits under the Unemployment Insurance Act cannot be evaded upon the claim that the commission has already decided cases on similar facts against the present position of the claimant and that, therefore, an appeal would be fruitless.

See 21 **Cal. Jur.** 594; 22 **R. C. L.** 19.

**(10)** Prohibition § 47--Jurisdiction and Procedure- -Jurisdiction--Effect of Determination by Inferior Court.

A tribunal, judicial or administrative, has jurisdiction to determine its own jurisdiction in the sense that it may make the first preliminary determination thereof without interference. But when it acts to assume jurisdiction in accordance with that determination, its jurisdiction to act is subject to inquiry and restraint by a higher court.

See 14 **Am. Jur.** 368.

**(11)** Prohibition § 40--Application of Rules- -Particular Civil Proceedings-- Contempt- -Mandamus.

A writ of prohibition will issue where a District Court of Appeal has issued an alternative writ of mandate and a temporary restraining order against payment of unemployment benefits under the Unemployment Insurance Act prior to the exhaustion by the petitioning employers of their remedy under the statute of appeal to the Employment Commission. (See Stats. 1935, chap. 352; Deering's Gen. Laws, 1937, Act 8780d.)

## SUMMARY

PROCEEDING in prohibition to restrain the District Court of Appeal, Third Appellate District, and John F. Pullen, R. L. Thompson and Raglan Tuttle, justices thereof, from enforcing a writ of mandate and temporary restraining order. Writ granted.

## COUNSEL

Gladstein, Grossman, Margolis & Sawyer, Richard Gladstein, Ben Margolis and George Olshausen for Petitioners.

Robert W. Kenny, as *Amicus Curiae,* on behalf of Petitioners.

Earl Warren, Attorney-General, and John J. Dailey, Deputy Attorney- General, for Respondents.

Maurice P. McCaffrey, Glenn V. Walls, Webster V. Clark, Rogers & Clark, Milton Marks, J. M. Mannon, Jr., Edwin S. Pillsbury, George O. Bahrs, and McCutchen, Olney, Mannon & Greene, as *Amici Curiae,* on behalf of Respondents.

Brobeck, Phleger & Harrison, Gregory A. Harrison and Richard H. Ernst for Interveners. *283

GIBSON, C. J.

Upon rehearing of this case, we adopt our prior opinion with certain minor modifications, as follows:

This is a petition for a writ of prohibition, to restrain the respondent District Court of Appeal from taking any steps toward the enforcement of a writ

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

of mandate and temporary restraining order heretofore issued by that court and directed against the California Employment Commission. For convenience, the term "petitioners" will be used to refer to those who seek the writ of prohibition in the present proceeding; the term "respondent" will refer to the District Court of Appeal; and the term "employers" will be used to refer to those employers who sought and obtained the writ of mandate and restraining order from the District Court of Appeal, as well as to other employers represented by counsel participating in the argument as *amici curiae.*

Petitioners are individual longshoremen ordinarily employed in the harbor of San Francisco and numbering about five thousand persons. As such workmen they are subject to the provisions of the California Unemployment Insurance Act. (Stats. 1935, chap. 352, as amended; Deering's General Laws, Act 8780d; Deering's 1939 Supplement, p. 1697.) Under the act a percentage of their earnings is deducted and paid into the unemployment fund, and this money, together with contributions from employers, is used to pay benefits to unemployed workers. The act is administered by a board known as the California Employment Commission, with powers usual to such commissions, including authority to adopt rules and regulations. (Sec. 90.) The procedure established by the act as it read at the time of this controversy is as follows: Application is made by an unemployed workman and notice thereof is sent to the employer. An initial determination is made by the adjustment unit, which is the lower tribunal. Notice of this determination and its reasons is sent to the applicant and the employers. If payment is ordered, any employer whose reserve account is affected by the payment may intervene and appeal, and payment will be stayed pending said appeal. (Sec. 67.) A referee is appointed by the commission to hear the appeal, which is conducted in the manner usual to such commission hearings, full opportunity being accorded to produce evidence and examine witnesses.*284 (Secs. 67-71.) The referee makes written findings and a decision which, unless further appeal is taken, becomes final; but appeal lies to the commission. (Secs. 67, 68, 72.) This appeal is heard on the record and on any additional evidence produced; oral or written argument may be permitted; and the commission thereafter makes its findings of fact and decision. The commission may also transfer to itself proceedings on any claim pending before the referee, thus affording in some cases an opportunity to expedite a decision by the commission itself. (Sec. 72.) Section 67 contains a provision reading as follows: "If a referee affirms an initial determination allowing benefits, *such benefits shall be paid regardless of any appeal* which may thereafter be taken, but if such determination is finally reversed no employer's account shall be charged with benefits so paid as to each such determination so reversed." The importance of this provision will hereinafter appear.

During October and November, 1939, widespread unemployment occurred among petitioners. On or about November 10, 1939, they registered for work and made claim for unemployment benefits in accordance with the requirements of the statute. An initial determination was made by the adjustment unit that they were entitled to the benefits, and the employers, intervening, appealed from this determination. A hearing was had before a referee; considerable evidence was introduced and argument heard, following which written briefs were filed. On December 15, 1939, the referee made his decision affirming the initial determination.

On December 16, 1939, the employers applied to the District Court of Appeal, Third Appellate District, for a writ of mandate and other incidental relief, in a proceeding entitled *"Matson Navigation Company v. California Employment Commission".* The employers objected to payment of the benefits on the ground that petitioners left work "because of a trade dispute", which, under section 56 of the act, disqualifies employees from receiving unemployment benefits. In their application for mandate the employers also alleged that they intend to and will

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

appeal to the commission; that they have not further exhausted their remedies before the commission because the proposed payment of benefits would violate the act; that in prior decisions the commission has indicated its position against the employers on the issue raised *285 and would decide against them; and that the unemployment fund would be seriously damaged by the allegedly unlawful payments contemplated in this case.

The District Court of Appeal issued an alternative writ of mandate and a temporary restraining order directed to the commission to withhold payment of unemployment benefits. The writ states that "any such payments which may be made ... are in violation of the provisions of the Unemployment Insurance Act", and orders the commission to refuse to pay as long as the asserted trade dispute is in progress, or to appear and show cause before the court why it has not done so. The restraining order was issued to enforce compliance with the mandate pending a final hearing on the alternative writ. The writ and restraining order having been issued *ex parte*, petitioners on December 18, 1939, made a motion to dissolve. The motion was argued, but the court submitted it without making any decision thereon at that time.

Subsequently, on December 22, 1939, the employers filed an appeal from the decision of the referee to the commission itself, which appeal is now pending.

On or about December 26, 1939, petitioners applied to this court for a writ of prohibition. On January 5, 1940, we issued an alternative writ. The matter was heard and is here on briefs of counsel, together with a number of additional briefs of *amici curiae* representing the commission, other employers and parties interested generally in the issues of the case.

The theory upon which the District Court of Appeal acted in issuing the writ of mandate clearly appears from the petition, the writ, and the briefs of counsel. The court, in ordering the commission to cease paying benefits, was undoubtedly of the belief that

the commission was acting beyond its statutory powers, and consequently was without jurisdiction to make the payments in question. This is expressly asserted by certain *amici curiae* appearing for the employers.

The theory upon which the writ of prohibition was sought is that the District Court of Appeal had no jurisdiction to issue the writ of mandate prior to completion of the administrative proceedings, and that petitioners had no plain, speedy or adequate remedy otherwise. (See Code Civ. Proc., sec. 1103, and authorities discussed *infra.*)*286

It must be understood at the outset that the merits of the controversy between the original parties, involving the interpretation of the "labor dispute" proviso in the Unemployment Insurance Act, are not before us. The important question is not *what* should be the decision on that point, but rather *how* the decision should be made. In the normal course the commission would make it, and thereafter judicial review, if appropriate, might be sought by either employers or employees. (See *Bodinson Mfg. Co. v. California Employment Commission,* Sac. No. 5407, this day decided, *post,* p. 321 [109 Pac. (2d) 935].) The employers, in departing from this normal procedure, and asking for a judicial review before completion of the administrative proceeding, rely upon assumptions of fact not supported by any record in this court. They seek to justify their action by charging that the determination in favor of petitioners is in violation of the law. But there has not, as yet, been any such final determination by the commission. That body has power to review the evidence previously presented before the referee, and also to take new evidence and make new findings, approving or disapproving those of the referee. It has not yet determined the facts upon which the right to benefits depends, and until it does so, it is improper for a reviewing court to consider the claims on their merits. The issue actually before us does not concern the rights of petitioners or their employers, nor the scope of the Unemployment Insurance Act. These matters were properly before

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

the court and were decided in the Bodinson Mfg. Co. case, *supra.* The question here is whether boards and commissions, charged with the administration of a statute, may carry on their administrative proceedings to completion before being subjected to judicial review. The importance of that issue can hardly be overestimated, since a curtailment of administrative jurisdiction usually means an enlargement of the duties of the courts in a field in which the courts traditionally are reluctant to enter.

### 1. *"Lack of jurisdiction" as a basis for writ of prohibition.*

The first inquiry in this case must, of course, be as to the nature and meaning of "jurisdiction"; and here three possible sources of confusion must be eliminated.

First is the argument of the employers that the District Court of Appeal has general original jurisdiction to issue writs \*287 of mandate. This is not disputed, nor is the power of the court to review a final decision of the commission in issue. Whether the commission's decision as to the payment of benefits is subject to any judicial review, or whether it can be reviewed by mandate, are questions beyond the scope of this proceeding. They are considered and decided in the Bodinson Mfg. Co. case, *supra.* The writ herein was issued before any final decision of the commission was rendered, and the question before us now is whether the court could properly interfere with the uncompleted administrative proceeding.

(1) Second is the nature of a writ of prohibition, which never issues to restrain a lower tribunal from committing mere error in deciding a question properly before it. If the lower court has power to make a correct determination of a particular issue, it clearly has power to make an incorrect decision, subject only to appellate review and not to restraint by prohibition. Hence, in examining the authorities, we must conclude that in those situations in which a writ of prohibition was issued, the particular action

restrained was one beyond the jurisdiction of the court to take.

(2) Third is the question whether this court has power to restrain or otherwise control the action of the District Court of Appeal. There can no longer be any doubt on this point. The writ of prohibition is not confined in its operation to restraining trial courts from acting in original proceedings; it lies also to prevent a lower appellate court from reviewing on appeal a matter over which it has no jurisdiction. (*Shriver v. Superior Court,* 48 Cal. App. 576, 582 [192 Pac. 124]; *Commonwealth v. Yungblut,* 159 Ky. 87 [166 S. W. 808]; 50 C. J. 668, sec. 25.) This court has in fact issued prohibition directed against the District Court of Appeal in two comparatively recent cases. (*Fay v. District Court of Appeal,* 200 Cal. 522 [254 Pac. 896]; *People v. District Court of Appeal,* 193 Cal. 19 [222 Pac. 353]; see, also, *Stout v. Farwell,* 111 Cal. App. 31, 32 [295 Pac. 47].)

(3) We now proceed to a consideration of the meaning of the term "jurisdiction" in its relation to the granting of a writ of prohibition. The term, used continuously in a variety of situations, has so many different meanings that no single statement can be entirely satisfactory as a definition. At best it is possible to give the principal illustrations of the situations in which it may be applied, and then to consider \*288 whether the present case falls within one of the classifications.

Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties. (See generally, 14 Am. Jur. 363, sec. 160.) Familiar to all lawyers are such examples as these: A state court has no jurisdiction to determine title to land located outside its territorial borders, for the subject matter is entirely beyond its authority or power. (See *Taylor v. Taylor,* 192 Cal. 71 [218 Pac. 756, 51 A. L. R. 1074].) A court has no jurisdiction to adjudicate upon the marital status of persons when neither is domiciled within the state. (See Restatement,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

Page 6

Conflict of Laws, sec. 111; *Ryder v. Ryder,* 2 Cal. App. (2d) 426 [37 Pac. (2d) 1069].) A court has no jurisdiction to render a personal judgment against one not personally served with process within its territorial borders, under the rule of *Pennoyer v. Neff,* 95 U. S. 714 [24 L. Ed. 565]. (See *Doherty & Co. v. Goodman,* 294 U. S. 623 [55 Sup. Ct. 553, 79 L. Ed. 1097], discussing modern exceptions to the rule.) A court has no jurisdiction to hear or determine a case where the type of proceeding or the amount in controversy is beyond the jurisdiction defined for that particular court by statute or constitutional provision. (See *Cambra v. Justice's Court,* 4 Cal. (2d) 445 [49 Pac. (2d) 1121].) Other examples of lack of jurisdiction in this fundamental sense will readily occur.

But in its ordinary usage the phrase "lack of jurisdiction" is not limited to these fundamental situations. For the purpose of determining the right to review by *certiorari,* restraint by prohibition, or dismissal of an action, a much broader meaning is recognized. Here it may be applied to a case where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no "jurisdiction" (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites. Thus, a probate court, with jurisdiction of an estate, and therefore over the appointment of an administrator, nevertheless acts in excess of jurisdiction if it fails to follow the statutory provisions governing such appointment. (*Texas Co. v. Bank of America,* 5 Cal. (2d) 35, 39 [53 Pac. (2d) 127].) The superior court may have jurisdiction over a cause of action *289 and the parties to a suit for libel, but in the case of non-residents, a bond for costs is required by statute, and unless such bond is filed, it is without jurisdiction to proceed, and will be restrained by writ of prohibition. (*Shell Oil Co. v. Superior Court,* 2 Cal. App. (2d) 348 [37 Pac. (2d) 1078]; see, also, *Carter v. Superior Court,* 176 Cal. 752, 757 [169 Pac. 667].) A court with jurisdiction over a cause may hear and determine it and give judgment, but it cannot award costs in a situation not provided by statute. (*Michel v. Williams,* 13 Cal. App. (2d) 198 [56 Pac. (2d) 546].) The superior court may have jurisdiction over a particular cause, but a disqualified judge may not sit and hear it if objection to his qualifications is raised, and prohibition will lie to prevent him from trying it. (*Hall v. Superior Court,* 198 Cal. 373, 387 [245 Pac. 814].) Where an injunction is sought against enforcement of a public statute, the court, despite its general equitable powers, has no jurisdiction to issue it. (*Loftis v. Superior Court,* 25 Cal. App. (2d) 346, 352 [77 Pac. (2d) 491]; *Reclamation Dist. v. Superior Court,* 171 Cal. 672 [154 Pac. 845].) A court may have jurisdiction to grant a new trial after motion based upon proper statutory grounds, but has no jurisdiction to make the order unless the moving party has given his notice of intention within the prescribed statutory time. (See *Peters v. Anderson,* 113 Cal. App. 158 [298 Pac. 76].) The court has power under section 473 of the Code of Civil Procedure to set aside its judgment or order on motion where it was entered against a party through inadvertence, excusable neglect, or mistake; but that power is wholly lost at the end of the six months' period prescribed by statute. (*Estate of Hunter,* 99 Cal. App. 191, 196 [278 Pac. 485].) An appellate court may have power to hear and determine a particular case on appeal, but is without jurisdiction to do so unless the procedural step of notice of appeal within the prescribed statutory time is taken. (*Aregood v. Traeger,* 94 Cal. App. 227 [270 Pac. 1002].) And if the notice is given before judgment is actually rendered, the premature appeal will be dismissed (*Aspegren & Co. v. Sherman, Swan & Co.,* 199 Cal. 532 [250 Pac. 400]), or a lower appellate court may be prevented from hearing it by writ of prohibition. (*Shriver v. Superior Court,* 48 Cal. App. 576, 582 [192 Pac. 124].) After reversal of a judgment with directions to the lower court, it has jurisdiction to enter judgment, *290 but is limited by the directions of the appellate court and is without jurisdiction to permit amended pleadings to raise new issues; hence prohibition will lie to prevent it from retrying the case. (*Lial v. Superior Court,* 133 Cal. App. 31 [23 Pac. (2d) 795].) The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

same is true where the superior court, in an appeal from a justice's court on questions of law alone, attempts to try the cause *de novo.*(*Sour v. Superior Court,* 1 Cal. (2d) 542 [36 Pac. (2d) 373].)

On a number of occasions the courts of this state have recognized the conflicting senses in which the term "jurisdiction" is used, and have emphasized the point that in applications for prohibition or *certiorari,* the broader meaning is involved. In our own recent decision, *Rodman v. Superior Court,* 13 Cal. (2d) 262 [89 Pac. (2d) 109], we said: "... some confusion exists with reference to what constitutes an excess, and what constitutes an error, in the exercise of jurisdiction. However, it seems well settled (and there appears to be no case holding to the contrary) that when a statute authorizes prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction, and *certiorari* will lie to correct such excess." In *Spreckels S. Co. v. Industrial Accident Com.,* 186 Cal. 256, 260 [199 Pac. 8, 9], where the commission made an award larger than the statute authorized and *certiorari* was sought, the court said: "The difficulty arises from the different shades of meaning which the word 'jurisdiction' has. As sometimes used, it means simply authority over the subject matter or question presented. In this sense the commission undoubtedly had jurisdiction in this case, and its award was not without jurisdiction on its part. But the word is frequently used as meaning authority to do the particular thing done, or, putting it conversely, a want of jurisdiction frequently means a want of authority to exercise in a particular manner a power which the board or tribunal has, the doing of something in excess of the authority possessed." (See, also, *Weintraub v. Superior Court,* 91 Cal. App. 763, 769 [267 Pac. 733]; *State v. Reynolds,* 209 Mo. 161 [107 S. W. 487, 491, 123 Am. St. Rep. 468, 14 Ann. Cas. 198, 15 L. R. A. (N. S.) 963], reviewing authorities on prohibition and quoting from *Appo v. People,* 20 N. Y. 531: "... The writ lies to prevent the exercise of any unauthorized power in a case or proceeding of which *291 the subordinate tribunal has jurisdiction, no less than when the entire cause is without its jurisdiction.")

(4) The foregoing observations, while by no means a complete description of the term, nevertheless serve as a warning against a too restricted meaning. The concept of jurisdiction embraces a large number of ideas of similar character, some fundamental to the nature of any judicial system, some derived from the requirement of due process, some determined by the constitutional or statutory structure of a particular court, and some based upon mere procedural rules originally devised for convenience and efficiency, and by precedent made mandatory and jurisdictional. Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis,* are in excess of jurisdiction, in so far as that term is used to indicate that those acts may be restrained by prohibition or annulled on *certiorari.*And, as a practical matter, accuracy in definition is neither common nor necessary. Though confusion and uncertainty in statement are frequent, there is a surprising uniformity in the application of the doctrine by the courts, so that sound principles may be deduced from the established law by marshalling the cases and their holdings in this field.

## 2. *The requirement of exhaustion of administrative remedies.*

(5) Lack of jurisdiction in the District Court of Appeal to issue its writ of mandate is clearly established when the foregoing principles are considered in connection with a settled doctrine of administrative law. The Unemployment Insurance Act, summarized above, contains a complete administrative procedure, with provision for one original determination and two appeals, fulfilling every requisite of due process of law. Until that administrative procedure has been invoked and completed, there is nothing that the District Court of Appeal or any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

other court may review; it cannot interfere in the intermediate stages of the proceeding. The employers have no standing to ask for judicial relief because they have not yet exhausted the remedies given them by the statute. They still have their appeal to the commission, which appeal has not yet been decided adversely to them, and prior to the *292 prosecution of this appeal they have no right to demand an extraordinary writ from a court.

(6) This is the doctrine of "exhaustion of administrative remedies." In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act. The authorities to this effect are so numerous that only the more important ones need be cited here as illustrations. (See *Myers v. Bethlehem Shipbuilding Corp.,* 303 U. S. 41 [58 Sup. Ct. 459, 82 L. Ed. 638] [National Labor Relations Board]; *Prentis v. Atlantic Coast Line Co.,* 211 U. S. 210 [29 Sup. Ct. 67, 53 L. Ed. 150] [rate orders]; *Porter v. Investors Syndicate,* 286 U. S. 461, 468 [52 Sup. Ct. 617, 76 L. Ed. 1226] [investment commissioners and permit of investment company]; *United States v. Sing Tuck,* 194 U. S. 161 [24 Sup. Ct. 621, 48 L. Ed. 917] [immigration and the powers of the secretary of labor]; *Gorham Mfg. Co. v. State Tax Com.,* 266 U. S. 265 [45 Sup. Ct. 80, 69 L. Ed. 279] [tax board]; *Red River Broadcasting Co. v. Federal Communications Com.,* 98 Fed. (2d) 282, 284 [69 App. D. C. 1]; *Western Powder Mfg. Co. v. Interstate Coal Co.,* 5 Fed. Supp. 619, 621; *Hegeman Farms Corp. v. Baldwin,* 293 U. S. 163, 172 [55 Sup. Ct. 7, 79 L. Ed. 259] [liquor control board]; *United States Nav. Co. v. Cunard S. S. Co.,* 284 U. S. 474 [52 Sup. Ct. 247, 76 L. Ed. 408] [shipping board]; *De Pauw University v. Brunk,* 53 Fed. (2d) 647, 652; *Palermo L. & W. Co. v. Railroad Com.,* 227 Fed. (2d) 708; *Hammerstrom v. Toy Nat. Bank,* 81 Fed. (2d) 628 [tax board]; *American Bond etc. Co. v. United States,* 52 Fed. (2d) 318; *Monocacy Broadcasting Co. v. Prall,* 90 Fed. (2d) 421 [67 App. D. C. 176]; *Federal Trade Com. v. Claire Furnace Co.,* 274 U. S. 160, 174 [47 Sup. Ct. 553,

71 L. Ed. 978]; *St. Clair Borough v. Tamaqua etc. Ry. Co.,* 259 Pa. 462 [103 Atl. 287, 289, 5 A. L. R. 20]; *Corstvet v. Bank of Deerfield,* 220 Wis. 209 [263 N. W. 687, 697]; *Earl Carroll Realty Corp. v. New York Edison Co.,* 141 Misc. 266 [252 N. Y. Supp. 538, 543]; 48 Yale L. J. 981; 51 Harv. L. Rev. 1251; 35 Col. L. Rev. 230; 12 N. Y. Univ. L. Q. Rev. 393; 28 Mich. L. Rev. 637; 28 Cal. L. Rev. 129, 151, 154, 162.)The California cases have consistently applied this settled rule. (See *Teeter v. Los Angeles,* 209 Cal. 685 [290 Pac. 11]; *Collier & Wallis v. Astor,* 9 Cal. (2d) 202 [70 Pac. (2d) 171]; *293San Joaquin etc. Co. v. Stanislaus,* 155 Cal. 21, 27 [99 Pac. 365]; *Dawson v. Los Angeles,* 15 Cal. (2d) 77 [98 Pac. (2d) 495].)

The rule itself is settled with scarcely any conflict. It is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis,* and binding upon all courts. We are here asked to sanction its violation, either on the ground that a valid exception to the rule is applicable, or that despite the uniformity with which the rule has been applied, it may be disregarded by lower tribunals without fear of prevention by the higher courts. This last point cannot be too strongly emphasized, for the rule will disappear unless this court is prepared to enforce it. To review such action of a lower court only on appeal or petition for hearing would permit interference with the administrative proceeding pending the appeal or hearing, with the effect of completely destroying the effectiveness of the administrative body. The writ of prohibition can alone operate surely and swiftly enough to prevent this unfortunate result; and only if we recognize that the rule is jurisdictional will it be uniformly enforced. Bearing in mind the analysis of jurisdiction which has heretofore been made, and examining the authorities dealing with the rule, we are necessarily led to the conclusion that exhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts.

In *Myers v. Bethlehem Shipbuilding Corp., supra,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

an application was made to the federal district court to enjoin the National Labor Relations Board from holding a hearing, but the employer applicant did not comply with the board's procedure. The United States Supreme Court annulled a preliminary injunction despite the employer's contention that the board had no authority over it because it was engaged in interstate commerce. The court declared that to uphold the employer's contention would be in effect "to substitute the district court for the board as the tribunal to hear and determine what Congress declared the board exclusively should hear and determine in the first instance". The court then went on to say: "The contention is at war with the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. That rule has been repeatedly acted on in cases *294 where, as here, the contention is made that the administrative body lacked power over the subject matter." The opinion of the court exhaustively cites the controlling authorities, and a footnote points out that "the rule is one of judicial administration-not merely a rule governing the exercise of discretion".

In *United States v. Sing Tuck, supra,* petitioner alleged that he was a citizen seeking to return to the United States. An immigration inspector decided against his claim of citizenship, and he failed to follow the statutory provision for appeal to the secretary of labor, seeking instead a writ of *habeas corpus.* The court denied relief, declaring (p. 167) that the act "points out a mode of procedure which must be followed before there can be a resort to the courts". The opinion then states that even though it be contended that the administrative officers are acting without jurisdiction, "it is one of the necessities of the administration of justice that even fundamental questions should be determined in an orderly way".

In *Gorham Mfg. Co. v. State Tax Com., supra,* it was held that a suit against the New York Tax Commission to enjoin collection of a tax alleged to

be invalid and levied under an unconstitutional statute was properly *dismissed* for failure of plaintiff to avail itself of the administrative remedy provided by the statute for revision and correction of the tax. The court said (p. 269): "A taxpayer who does not exhaust the remedies provided before an administrative board to secure the correct assessment of a tax, cannot thereafter be heard by a judicial tribunal to assert its invalidity."

In *Red River Broadcasting Co. v. Federal Communications Com., supra,* a broadcasting company appealed to the courts from a decision of the commission granting a permit for the construction of another station. The appeal was *dismissed* on the ground that appellant had failed to exhaust its administrative remedies and hence could not invoke the jurisdiction of the courts. The opinion, citing numerous cases, states (p. 284): "It is a well settled rule of judicial administration that no one is entitled to judicial relief until he has exhausted all prescribed applicable, administrative remedies. Generally, the rule is stated as being conclusive of the rights of one who prematurely asks judicial review, without intimation *295 or suggestion that any judicial discretion is involved in its application."

In *Porter v. Investors Syndicate, supra,* it was said that "the legislative process remains incomplete" until the administrative remedy is exhausted.

In *Western Powder Mfg. Co. v. Interstate Coal Co., supra,* the court declared that it "has no jurisdiction of such controversies until the administrative remedies have been exhausted".

This court recently gave the rule its full force in *Collier & Wallis v. Astor, supra.* In that case the Private Employment Agency Law required that certain controversies be submitted to the labor commissioner subject to later appeal to the superior court. Plaintiff sued on a contract coming within the scope of the statute, and defendant objected that no determination by the commissioner had been made prior to commencement of the action. We sustained the objection, saying (p. 206): "The pro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

vision of section 19 of the Private Employment Agency law providing for a reference to the labor commissioner of controversies arising under said act for hearing and determination by such official, being a valid legislative enactment, any action brought in the Superior Court without first making said reference and securing said determination, is prematurely brought and cannot be maintained."

(7) The mere filing of the appeal with the commission, after the mandate and stay order had issued, was not a fulfillment of the requirements of the rule. It was purely a formal step, not intended to have any substantial effect, for the commission was then under the restraint of the court's order, and unable to act upon the merits of the case. The courts have considered this type of evasion and have held that the rule of exhaustion of remedies is not complied with by the mere filing of an appeal; the remedies are not exhausted until the appeal is fully prosecuted. Consequently the filing of the appeal with the commission is no more a compliance with the rule than the participation in the original hearing before the Adjustment Unit, or the first appeal before the referee. (See *Southland Industries v. Federal Communications Com.,* 99 Fed. (2d) 117 [69 App. D. C. 82]; *Chicago etc. R. R. Co. v. Basham,* 249 U. S. 164, 167 [39 Sup. Ct. 213, 63 L. Ed. 534].) Thus, in *Southland Industries v. Federal Communications Com., supra,* where the petitioner applied \*296 the court while his petition for rehearing before the commission was pending and undecided, the court said: "Upon the filing of its appeal in this court-its petition for rehearing being then undisposed of-appellant occupied the anomalous position of asking the Commission for administrative relief, and at the same time asking the court for judicial relief from the anticipated decision of the Commission. See *Vincent v. Vincent,* 3 Mackey, 320, 322,14 D. C. 320, 322; *Chicago Great Western R. Co. v. Basham,* 249 U. S. 164, 167, 39 Sup. Ct. 213, 63 L. Ed. 534; *Doyle v. District of Columbia,* 45 App. D. C. 90; *Burnet v. Lexington Ice & Coal Co.,* 4 Cir., 62 Fed. (2d) 906. 'Two courts cannot have jurisdiction in the same case at the same time.' (*Lasier v. Lasier,* 47 App. D. C. 80, 83; see *Andrews v. Virginian Ry. Co.,* 248 U. S. 272, 39 Sup. Ct. 101, 63 L. Ed. 236.)As appellant elected to petition for a rehearing, the Commission retained jurisdiction; and as it failed to act on the petition its decision has never become a final one from which an appeal could be taken. (See *Voorhees* v. [*John T.*] *Noye Mfg. Co.,* 151 U. S. 135, 14 Sup. Ct. 295, 38 L. Ed. 101; *Kingman & Co. v. Western Mfg. Co.,* 170 U. S. 675, 18 Sup. Ct. 786, 42 L. Ed. 1192; *Northern Pac. R. Co. v. Holmes,* 155 U. S. 137, 138, 15 Sup. Ct. 28, 39 L. Ed. 99; *Harrison v. Magoon,* 205 U. S. 501, 27 Sup. Ct. 577, 51 L. Ed. 900.Consequently, this court is without jurisdiction."

### 3. *The employers' assertion of irreparable injury.*

(8) The employers seek to avoid the operation of the rule, however, by the contention that they would suffer irreparable injury if the administrative hearing were permitted to proceed and its orders made effective without judicial interference at this time. The cases they cite are those dealing with rate orders of regulatory commissions, where the administrative body imposes a confiscatory rate on a public utility. Continued operation of the business at the rate imposed pending the appeal may in some instances be so unprofitable as to amount to a destruction of the business, and therefore a taking of property without due process of law. The courts in these cases issue injunctions to stay the enforcement of the new rate until a final determination of its validity, in order to protect the constitutional rights of the petitioning utilities. In brief, these decisions establish the right to equitable relief to protect the property rights of a petitioner from irreparable \*297 injury immediately threatened by a void administrative act. The soundness of this proposition cannot be questioned, but it has no relevancy here.

What injury do the employers show? They say that they will suffer in the event unauthorized payments are made to unemployed workers, because their ac-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942                                                                          Page 11
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

counts will be charged with such payments, and their reserve under section 39 of the act will be thereby decreased, with the ultimate result that they may in 1941 pay contributions at an increased rate. In examining this contention, we must remember just what the employers are trying to do. They are attempting to prevent payment of public funds in which they have no direct interest, by a body specially charged with the duty of making such payment. We held, in the Bodinson Mfg. Co. case, *supra,* that they are aggrieved parties entitled to demand judicial review. But the question here is not whether they are aggrieved to the extent necessary to gain standing on appeal or review. The question is whether the payment of benefits at this time constitutes such an immediate and irreparable injury as to warrant the drastic step of interfering with an uncompleted administrative proceeding, in defiance of an established rule of jurisdiction. To this question there are several decisive answers.

In the first place, their whole contention is purely speculative. The maximum contribution which they can be required to pay under the statute is 2.07 per cent. This cannot be increased, and the extent of their possible injury would therefore be the loss of a hoped for lower rate under the so- called merit rating provision of the statute. This provision enables employers with a favorable employment experience to obtain a slightly lower rate of contribution, when their account on the commission books shows an excess of contributions over benefits paid. (See secs. 39, 40, 41.) But the narrow range in which the contribution rate fluctuates can be affected by a variety of circumstances and by numerous instances of unemployment. It cannot be determined at the present time whether this particular order of payment would, in the light of all the occurrences of the past year and any other period involved, actually result in a changed rate. (See 88 Univ. Pa. L. Rev. 137, 142.)

Second, it is provided in section 67 of the act that in the event that any payments of benefits are found to be erroneous, *298 the particular employer's ac-

count shall not be charged with them. This being so, it is not clear how his contributions can be increased by the payments, since the factor determining the rate is made inapplicable in such event.

The third answer is more fundamental; the mandate contravenes the express provision of section 67 that "if a referee affirms an initial determination allowing benefits, such benefits shall be paid regardless of any appeal which may thereafter be taken ..." This is one of the most significant statements in the act. In substance it provides that when the initial determination has been reviewed and approved by the intermediate appellate authority (the referee), no further delay in *payment* shall be permitted even though the issues may be still further considered in a subsequent appeal. It was designed to carry out the policy declared in section 1 of alleviating the evils of unemployment, as part of a national plan of social security in which federal and state legislation is coupled. (Sec. 2.) The very essence of the act is its provision for the prompt payment of benefits to those unemployed. (See 88 Univ. Pa. L. Rev. 137, 139.) Any substantial delay would defeat this purpose and would bring back the very evil sought to be avoided. The legislature, recognizing the importance on the one hand of avoiding improvident payments without due consideration of the right thereto, and the danger on the other hand of withholding the payments for long periods through the slow processes of appeal to the commission and perhaps eventually to the courts, took a middle course. It provided for a preliminary appeal or review of the first determination where payments were ordered. This appeal, ordinarily decided in a short period of time, carries with it a stay. But when this second decision has also been made in favor of the applicants, the benefits begin, with protection, as already noted, for the employer in the event of later reversal.

The proceeding instituted by the employers ignores this statutory objective, and attempts to do precisely what the statute forbids. Their position is that the challenge in a court of law of any of the numerous

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

factual and legal determinations which the referee must make in any decision to pay benefits is sufficient cause for the statute to cease operating. They believe that to continue payments where the propriety thereof has not yet been settled by the courts is an invasion of their *299 legal rights. But in truth there is nothing unusual in the provision, which is in force in some thirty-six of the states. The legislature has concluded on the basis of normal experience that the large majority of the administrative orders will be proper, and that to permit these justifiable and necessary payments to be postponed for long periods would defeat the objectives of the act. The courts have upheld similar provisions in workmen's compensation acts, where the statutes required payments of compensation after stay orders of limited duration, despite the pendency of proceedings on appeal or review. In *Employers' Mutual Ins. Co. v. Industrial Com.,* 65 Colo. 283 [176 Pac. 314], an employer's insurance company sought to enjoin enforcement of a commission award until the court could pass upon the legal questions. This was denied, and on appeal the court said (p. 316): "... the judgment of the commission in favor of a claimant is *prima facie* evidence of his right to recover. Procedure under the act is summary in character in order to furnish immediate aid to injured employees, and a careful reading of the statute as a whole leads to the conclusion that it was the intention of the legislature that payment of these weekly allowances should not be stayed. Indeed, to hold that such payments can be enjoined pending judicial review would in effect practically nullify one of the prime objects and purposes of the law." And in *Bannister v. Shepherd,* 191 S. C. 165 [4 S. E. (2d) 7], the South Carolina Industrial Commission made an award of compensation, from which the insurance carrier gave notice of appeal to the Supreme Court, meanwhile refusing to make the payments ordered. The statute provided that an appeal from an award of the commission should operate as a *supersedeas* for thirty days only, and thereafter the employer should be required to make payments until the issue was finally determined. The insurance carrier contended that if it were forced to pay

and ultimately obtained a reversal, there would be no way to recover the payments erroneously made, and therefore the statute violated its constitutional rights. The court called attention to the rule that there is no right to *supersedeas* pending an appeal except where expressly authorized by statute; pointed out that the legislative purpose was to prevent the long delays incident to an appeal by an insurance carrier seeking to escape payment; and observed further that the Workmen's Compensation Act "is a form of social legislation passed primarily for the benefit of the employee, *300 and to prevent the burden of injured employees becoming charges upon society". The opinion finally concludes: "The legislature has in clear and convincing language provided that an appeal shall only act as a *supersedeas* for a period of thirty days, whether or not this was a wise decision ... is not the province of this court to say."

The foregoing cases demonstrate the weakness of the argument that because a commission may make an occasional error in ordering some payment out of a public or semi-public fund, the courts must have the power to stay any and all payments during the lengthy period of judicial review. The legislature has concluded that it is wiser to have a system of unemployment compensation operating with a possible small percentage of error, than to have a system not operating at all. The legislative power to make such provision is unquestioned; the statutory language cannot be misunderstood; and for the courts that is the end of the matter.

To these arguments the employers answer that the statute does not in terms apply to the present case. Their theory is that the term "appeal" in section 67 must be given a restricted interpretation, to refer only to an appeal to the commission, and that it therefore does not purport to prohibit a stay pending a review by a court. Parenthetically it may be pointed out that the employers have already appealed to the commission, and while that appeal is pending the order to cease payments violates the statute. But this inconsistency need hardly be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

Page 13

stressed, for the entire argument begs the question. The issue is *whether there is a review proceeding properly pending in a court.* As we have already shown, the District Court of Appeal has no jurisdiction to take over the proceeding, unless some valid exception to the rule of exhaustion of remedies could be established; and the employers, by way of proving such an exception, assume the very point in issue, namely, the pendency of a valid proceeding before the District Court of Appeal to review the merits of the administrative determination. It is impossible to explain away section 67 by such reasoning as this.

(9) 4. *The assertion that appeal would be futile.*

One final argument of the employers to justify disregard of the administrative remedy may be noticed. They assert that the commission has already decided cases on similar facts against their present position, and therefore that an appeal in the instant case would be fruitless. This is, indeed, the slender *301 thread upon which their entire case hangs. But again their position is unsound in principle and unsupported by the better authorities, for it was early perceived that to countenance this view would break down the rule of exhaustion of remedies. In substance the contention is that if they learn upon hearsay or by analogy that the administrative board may take a certain action, the board may be ignored and its action treated as already taken. We should all be very much surprised, no doubt, to find such an assertion made in the judicial field. One might attempt, for example to bring an original suit in the Supreme Court on the theory that the local superior judge was possessed of a particular opinion opposed to the views of the plaintiff, but he would receive scant consideration. The whole argument rests upon an illogical and impractical basis, since it permits the party applying to the court to assert without any conclusive proof, and without any possibility of successful challenge, the outcome of an appeal which the administrative body has not even been permitted to decide. This argument, though successful in a few cases, has been rejected by the

weight of authority. In *Gilchrist v. Interborough Rapid Transit Co.,* 279 U. S. 159, 209 [49 Sup. Ct. 282, 73 L. Ed. 652], the court said that orderly action could not be defeated "by alleging an intent to deny the relief sought." And in *Red River Broadcasting Co. v. Federal Communications Com., supra,* the opinion states: "Appellant seeks further to excuse its failure, affirmatively to seek administrative relief, by contending that, even if it had attempted to do so, its request would have been denied; consequently, that its attempt would have been a futile and useless gesture. We cannot assume that consequence. If under such circumstances relief had been sought and denied, then there would have been basis for appeal. ... It cannot be heard to complain in this court that there was danger of refusal when it made no effort to do so." (See, also, *United States Nav. Co. v. Cunard S. S. Co.,* 284 U. S. 474, 488 [52 Sup. Ct. 247, 76 L. Ed. 408]; *United States v. Felt & Tarrant Mfg. Co.,* 283 U. S. 269, 272 [51 Sup. Ct. 376, 75 L. Ed. 1025].)

It should be observed also that this argument is completely answered by those cases which apply the rule of exhaustion of remedies to rehearings. Since the board has already made a decision, if the argument of futility of further application were sound, then surely this is the instance in which it would *302 be accepted. But it has been held that where the administrative procedure prescribes a rehearing, the rule of exhaustion of remedies will apply in order that the board may be given an opportunity to correct any errors that it may have made. (See *Palermo L. W. Co. v. Railroad Com., supra;Carlson v. Railroad Com.,* 216 Cal. 653, 655 [15 Pac. (2d) 859]; *Red River Broadcasting Co. v. Federal Communications Com., supra; McCardle v. Board of Commissioners,* 195 Ind. 281 [144 N. E. 877, 878].)

(10) 5. *Jurisdiction to determine jurisdiction.*

The final contention is advanced that though all of the above conclusions may be entirely correct, and that in consequence the District Court of Appeal has no jurisdiction to hear and determine the merits

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

of the case, nevertheless it has power *to hear and determine the question whether it has jurisdiction.*If by this statement it is meant that the court had jurisdiction to determine whether the employers had exhausted their remedies before the commission, the record itself is a conclusive answer. The employers have affirmatively alleged their failure to exhaust their remedies before the commission, and their entire argument is devoted to an attempt to excuse such failure. On this point there is no issue presented, but only an admitted fact. If, on the other hand, the statement means that the court had jurisdiction to determine whether it had jurisdiction of the merits of the cause, it is indeed a strange argument. Stated plainly, the proposition is that a court may temporarily interrupt any pending proceeding, administrative or judicial, and hold that proceeding in abeyance while it decides whether it had any power to interfere in the first place; *and during all this time it is immune from any restraint by a higher court.*If that is true as applied to this case, then there is no control over unauthorized, arbitrary assumptions of judicial power except the slow process of appeal or petition for hearing. We cannot, of course, lightly accept such a destructive doctrine, and it must be rejected unless compelled by the strongest logic and precedent. But upon careful study and examination of the authorities cited, we find neither.

The proposition, stated simply, is that a tribunal has jurisdiction to determine its own jurisdiction. This is a truism, and, subject to certain implicit limitations, is ordinarily a correct statement of law. It has its origin mainly in the cases holding that a court has inherent power to inquire \*303 into jurisdiction of its own motion, regardless of whether the question is raised by the litigants. (See 15 C. J. 851, 852, secs. 170, 171; 14 Am. Jur. 368, sec. 168; *Morris v. Gilmer,* 129 U. S. 315, 325 [9 Sup. Ct. 289, 32 L. Ed. 690].) It rests also upon the theory that until the court determines that it has jurisdiction and does some act in consequence, there can be no injury to the party who denies its jurisdiction. (See *Noland v. Superior Court,* 26 Cal. App. (2d)

708 [80 Pac. (2d) 76].) It means only that the trial court or lower tribunal or body to which the question is submitted has such jurisdiction to make the first preliminary determination-not a final one; and no interference is permitted until it does decide the matter one way or the other. Until it acts to assume or refuse jurisdiction over the merits no one is entitled to complain.

But once the tribunal, judicial or administrative, has made this determination of the issue, and has acted to assume jurisdiction of the cause, the rule no longer has any meaning. *The jurisdiction to determine jurisdiction has been fully exercised* by a determination in favor of jurisdiction over the cause; the question is no longer of jurisdiction to *determine,* but of jurisdiction to *act.*And jurisdiction to act is always a subject of inquiry by a higher court. The cases cited by the employers declare well-established law and are in accord with this basic distinction. For example, in *Noland v. Superior Court, supra,* the superior court made an order to show cause in a custody proceeding. Petitioner appeared at the hearing and moved to dismiss the order for lack of jurisdiction. The motion was submitted, and while pending and undecided, petitioner sought a writ of prohibition from the District Court of Appeal. The writ was denied. *Chester v. Colby,* 52 Cal. 516, in which a demurrer raising the jurisdictional point was pending and undetermined, is to the same effect. In neither case had the lower court taken any action in the cause at the time prohibition was sought; it was simply considering whether or not it had jurisdiction to act.

The situation presented in the instant case is entirely different. If the District Court of Appeal, in response to the employers' application and petitioners' objection thereto, *had taken under consideration* the question *whether it had jurisdiction to issue the writ of mandate,* we would have no reason to interfere pending its determination thereof. But the District Court of Appeal did more than this; it acted. It did not \*304 merely deliberate upon the question whether it should intervene in the adminis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

trative proceeding; it did intervene. The issuance of the writ of mandate with its stay was a positive assumption of jurisdiction, for it displaced the prior jurisdiction of the commission, and rendered that body powerless to proceed. To say that the District Court of Appeal, left alone, may ultimately reach the same conclusion as we do here, and therefore should not be restrained, is no longer an answer. The writ of prohibition is not refused nor held in abeyance because the lower tribunal may ultimately realize the error of its assumption of jurisdiction; it is granted at the time the act in excess of jurisdiction occurs. This very point was cogently stated by the court in *Kilburn v. Law,* 111 Cal. 237, 242 [43 Pac. 615]: "It is said that the objection that the complaint does not state a case of which the court has jurisdiction is in the nature of a demurrer, and that the superior court has jurisdiction to consider all such questions, and they cannot be made the ground for a writ of prohibition. *This point cuts too deep, and, if sustained so broadly, would deprive this court of all power to issue writs of prohibition in cases where a lower tribunal is exceeding its jurisdiction.*" And in *Brougham v. Oceanic Steam Nav. Co.,* 205 Fed. 857, 859, the court spoke in similar vein: "It is sometimes said that every court has jurisdiction to determine its own jurisdiction. This is partly true and partly untrue. A court must, as an incident to its general power to administer justice have authority to consider its own right to hear a cause. But the mere decision by a court that it has such right when it does not exist does not give it authority. A court by moving in a cause assumes authority, but the assumption does not confer it."

The controlling test of the correctness of the employers' theory must necessarily be found in its practical operation. We have already referred to the cases which correctly apply it during the court's deliberation, and up to the time it acts. If it goes further, as the employers contend, we should expect to find some suggestion to that effect in the authorities. But all the California cases dealing with this situation have reached exactly the opposite result. In each case a commission or administrative officer

assumed jurisdiction of a cause, and a superior court thereafter sought to take jurisdiction of the same cause. Under the theory urged here, if the court had jurisdiction to determine its jurisdiction, no higher court could stop this interference by prohibition, and the question *305 whether the interference was proper would have to await an appeal. But in every instance the appellate court issued a writ of prohibition to restrain the lower court from interfering with the administrative proceeding.

This, in *Goodyear etc. Co. v. Hanby,* 111 Cal. App. 382 [295 Pac. 562], an employee received an award from the Industrial Accident Commission and later sued in the superior court to enforce compliance therewith. It was held that the cause was within the jurisdiction of the commission, that therefore the court had no jurisdiction, and that a writ of prohibition should issue to prevent the trial. In *Vallejo Bus Co. v. Superior Court,* 19 Cal. App. (2d) 201 [65 Pac. (2d) 86], the Railroad Commission made an order permitting a utility to sell stock. The superior court gave a preliminary injunction. It was held that the court acted beyond its jurisdiction in thus interfering with the commission by such restraining order, and a writ of prohibition was issued to prevent the court from doing so. In *Lee v. Superior Court,* 191 Cal. 46 [214 Pac. 972], the Industrial Accident Commission, in a proceeding involving a nonresident minor, appointed a guardian *ad litem* to handle the award. The probate court sought to appoint a guardian of the estate. It was held that the commission's prior jurisdiction could not be usurped by the probate court, and that prohibition should issue to prevent its interference. Finally, in the recent decision in *Evans v. Superior Court,* 14 Cal. (2d) 563 [96 Pac. (2d) 107], the lower court sought to interfere by injunction with an administrative proceeding commenced by the Building and Loan Commissioner. This court issued a writ of prohibition to prevent such interference, saying (p. 415): "We believe that the trial court in the present case has acted and is acting in excess of its jurisdiction. ... We have heretofore held that the statute authorizes the commissioner to appoint necessary assistants and it

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

appears that the proceedings of the trial court are preventing the exercise of the authority thus conferred upon him."

(11) It thus appears that under established principles of legal procedure the District Court of Appeal was without jurisdiction to issue its writ of mandate, and that petitioners are entitled to a peremptory writ of prohibition. The employers' application was founded upon an asserted right to judicial interference with an administrative proceeding before it became final, and hence impliedly claimed a right to interfere in the middle or the beginning, or even before any such *306 proceeding was commenced. This attitude challenges judicial practices of long standing. The courts have repeatedly recognized the necessity of placing the numerous and complex problems arising under statutes of the type involved herein in the hands of expert bodies, familiar with the subject matter through long experience. They have pointed out that to permit the initial consideration of these matters by the courts would not only preclude the efficient operation of the acts, but would overwhelm the courts with cases of a technical, specialized character, and seriously impair their capacity to handle their normal work. (See *Myers v. Bethlehem Shipbuilding Corp., supra;United States v. Sing Tuck, supra;United States Nav. Co. v. Cunard S. S. Co., supra;Federal Communications Com. v. Pottsville Broadcasting Co.,* 309 U. S. 134 [60 Sup. Ct. 437, 440, 443, 84 L. Ed. 656]; *Armstrong v. United States,* 16 Fed. (2d) 387, 389.)The observation of the United States Supreme Court in *Federal Communications Com. v. Pottsville Broadcasting Co., supra,* is a timely reminder: "It is always easy to conjure up extreme and even oppressive possibilities in the exercise of authority. But courts are not charged with general guardianship against all potential mischief in the complicated tasks of government." We can with safety and assurance follow the traditional policy of the courts in this respect, remaining ready to review any final improper action (see the Bodinson Mfg. Co. case, *supra.*), but permitting the administrative body initially to decide its myriad problems un-

hindered.

Let a peremptory writ of prohibition issue restraining the respondent District Court of Appeal from taking any steps toward the enforcement of its writ of mandate and temporary restraining order heretofore issued and directed against the California Employment Commission.

Edmonds, J., Traynor, J., Peters, J., *pro tem.,* and Carter, J., concurred.
SHENK, J.,
Dissenting.

I dissent.

The majority opinion and decision, when considered in connection with the decisions filed concurrently herewith in *Gantner & Matter Co. v. California Employment Com.* (Sac. No. 5406, commenced December 5, 1939) and in *Bodinson Manufacturing Co. v. California Employment Com.* (Sac. No. 5407, commenced December 5, 1939), demonstrates the incongruity *307 of the results which flow from the decisions in this group of cases.

In the Gantner & Mattern Company case, the District Court of Appeal regularly assumed jurisdiction to determine the right of the petitioner to the relief sought. That court issued an alternative writ of *mandamus* pursuant to its constitutional power (Const., art. VI, sec. 4b) and to sections 1084 to 1097 of the Code of Civil Procedure. No proceeding was commenced in this court or elsewhere to prohibit the District Court of Appeal from exercising its constitutional and statutory power in that proceeding. That court heard the matter on the merits on the petition and the return to the alternative writ and denied the peremptory writ, with opinion, and on the ground that the petitioner therein had not exhausted its statutory remedy. In due course the cause, transferred to this court for hearing and determination, has been decided by the majority on the same record presented to the District Court of Appeal and likewise on the merits and with the same result. For the purposes of this dissenting

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

opinion, it matters not whether the District Court of Appeal denied or granted the peremptory writ. The fact is that this court has recognized the power of the District Court of Appeal to render a decision in that proceeding on the merits, and to have that proceeding pursue its constitutional course to this court and, in turn, this court has disposed of the proceeding on its merits.

In the present proceeding in prohibition, it appears that on December 16, 1939, the Matson Navigation Company and others commenced a *mandamus* proceeding in the same District Court of Appeal, wherein that court likewise issued an alternative writ and was proceeding to hear and determine the matter on a return to that writ and on a set of facts raising the identical issues on the merits as were involved in the Gantner & Mattern Company case. Yet this court in the present proceeding halted the prompt determination of the Matson Navigation Company case and is now denying power in the District Court of Appeal to dispose of that case in like manner as this court has now disposed of the Gantner & Mattern Co. case.

Furthermore, in the Bodinson Mfg. Co. case, this day filed, this court by a ruling on the merits, and to the same effect as determined by the District Court of Appeal, has decided that the petitioner therein had exhausted the statutory remedies *308 and was entitled to an order of this court compelling the commission to deny the claims for benefits therein involved on the ground that the claimants were ineligible under the act to receive them.

Yet, in the present proceeding, this court has declared that the District Court of Appeal is without jurisdiction to decide whether the Matson Navigation Company had exhausted its statutory remedies and, if so, to decide whether the claimants for benefits in that proceeding were eligible to receive the same, or if not to deny the relief sought, as it had done in the Gantner & Mattern Co. case.

From the foregoing the conclusion is unavoidable that if the District Court of Appeal in the first in-

stance and this court on transfer had jurisdiction to pass upon the merits of the Gantner & Mattern Co. case, as conclusively appears by the course taken in that case, then the District Court of Appeal had jurisdiction to decide, on identical issues, the Matson Navigation Co. case. On the other hand, if the District Court of Appeal had no jurisdiction in the Matson Navigation Co. case (as has been decided), then it would necessarily follow that this court has no such jurisdiction, the petitioners in the *mandamus* proceeding are without remedy in the courts, and the commission allowed to proceed without the restraint universally recognized to be necessary in the proper application of administrative law.

The sole question presented in the present proceeding in prohibition is whether the District Court of Appeal has the power to decide a certain controversy pending before it. That question here is not whether the employees affected are or are not entitled to unemployment benefits, but whether the petitioners in the *mandamus* proceeding pending before the District Court of Appeal have stated a case which that court has jurisdiction to entertain and determine. In my opinion, that court has that power and to deny it by the issuance of a peremptory writ of prohibition is to deny to parties interested the right to seek redress in our courts against threatened unlawful action on the part of a state administrative board.

The case presented to the District Court of Appeal is one calling for a judicial determination of the powers of the Board under the statute of its creation. Particularly in that proceeding the problem is whether on the admitted facts the legislative remedy of appeal to the commission from the decision of the referee is adequate and, if not, whether it is not *309 the legal duty of the California Employment Commission of its own motion, if need be, and contrary to its alleged intention, to set aside, pursuant to section 72 of the act, the decision of the referee affirming the initial determination allowing benefits, and in any event to disallow such benefits, and thus prevent the alleged illegal payments from

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

the unemployment fund.

In the *mandamus* proceeding, the District Court of Appeal was called upon to decide two principal questions:

First, whether under the undisputed facts found by or under the authority of the commission, the claimants for payments from the unemployment fund were eligible to receive the benefits. Section 56 (a) of the act provides:

"An individual is not eligible for benefits for unemployment, and no such benefits shall be payable to him under any of the following conditions: (a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

It is contended in the *mandamus* proceeding that the claimants, petitioners here, are not eligible for benefits under the foregoing section and under the facts found by, as distinguished from the conclusions of, the commission's referee. The question of the legal duty of the commission under the law and the facts was there squarely presented for that court's determination. The claimants have taken the position that the decisions of the commission allowing and directing the payment of benefits are beyond judicial review. Indeed, on oral argument counsel for the commission expressed this view. It cannot be true that this is the attitude of the members of the commission, who are public officers acting as trustees of a public fund which now contains an enormous amount of money collected from the employers and employees of the state for a specific purpose, namely, for the relief of employees who have been subjected to involuntary unemployment and who are eligible under the law to receive benefits. If the commission persists in payment to those who are ineligible to receive benefits, as is alleged in the pending *mandamus* proceeding, approximately a half million dollars will be unlawfully paid out of a fund whose beneficial and lawful adminis-

tration was mistakenly anticipated in the litigation which resulted in declaring the constitutionality of the act under which the *310 commission was created and is functioning. (*Gillum v. Johnson,* 7 Cal. (2d) 744 [62 Pac. (2d) 1037,63 Pac. (2d) 810, 108 A. L. R. 595].)

To hold that a commission set up by a statute of this state with the highly important and responsible duties of the Employment Commission is not amenable to judicial process in the pending *mandamus* proceeding would be to constitute the commission an autocratic body whose functioning is uncontrolled by any consideration except its own whim and caprice. Such of course is not the law of this state, nor of any other jurisdiction, state or federal. In this state the District Court of Appeal has constitutional and statutory authority to direct public officers to perform their duties under the law. (Const., art. VI, sec. 4b; secs. 1084-1097, Code Civ. Proc.) That power is coextensive with the same power reposed in this court except that the decision of that court is subject to review by this court by appropriate order of transfer. It is contended that not only under section 56 (a) of this act are the petitioners herein ineligible to receive the claimed benefits, but that section 67 also prescribes that benefits shall be paid only to claimants who are eligible to receive them. To deny to the District Court of Appeal the right and power to decide whether the petitioners herein are or are not eligible under the statute and the admitted facts would be deliberately to shut our eyes to an alleged arbitrary, flagrant and unlawful assumption of power by the Employment Commission.

In my opinion there is not the slightest doubt that a justiciable controversy within its jurisdiction has been presented to the District Court of Appeal and that the issues there tendered present for determination also the question whether the petitioners before that court had exhausted their statutory remedies before the commission. This is the second principal question on the merits involved in the pending *mandamus* proceeding.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

Page 19

The majority opinion holds that the District Court of Appeal is without jurisdiction because the *mandamus* proceeding was prematurely brought in that the petitioners therein had not exhausted their remedies before the commission. It is noted that the Adjustment Unit of the Division of Unemployment Compensation in the department of the commission granted the application of the employees, petitioners herein, for the payment of benefits. Certain of their employers appealed from the determination of the Adjustment Unit under *311 section 67 of the act. The commission designated a referee to hear the appeal pursuant to section 69. On that appeal the referee found the facts. The petitioners in the District Court of Appeal claim that those facts showed conclusively and as a matter of law that the claimants were ineligible to receive the benefits. But the referee concluded that the claimants were eligible to receive benefits and affirmed the initial determination of the Adjustment Unit. Section 72 of the act provides:

"Any party to a decision by a referee may appeal to the Commission from such decision. The Commission may on its own motion affirm, modify, or set aside any decision of a referee on the basis of the evidence previously submitted in such case, or direct the taking of additional evidence ..."

The majority say the District Court of Appeal has no jurisdiction in the *mandamus* proceeding because the petitioners had not taken and prosecuted to a final conclusion an appeal from the decision of the referee to the commission under section 72 of the act. Section 67 of the act provides for an appeal from an initial determination and then provides:

"If an appeal is duly filed benefits with respect to the period prior to the final decision on appeal shall be paid only after such decision, except as herein provided." Then follows the exception which is the crux of this phase of the present controversy. It reads: "If a referee affirms an initial determination allowing benefits, such benefits shall be paid regardless of any appeal which may thereafter be taken, but if such determination is finally reversed

no employer's account shall be charged with benefits so paid as to each such determination so reversed."

The main opinion decides as a matter of law that an employer must take and pursue to conclusion this last appeal to the commission before he may seek redress from the courts, notwithstanding the presence of an immediately enforceable order for alleged illegal expenditures from the unemployment trust fund. It is clear to me that a *bona fide* controversy is presented in the *mandamus* proceeding on the question whether the remedy provided by the statute for an appeal to the commission is an adequate statutory remedy as required by law, inasmuch as the benefits must be immediately paid notwithstanding the pendency of such appeal. It is of course well established that when the legislative department has set up an administrative board to ascertain the facts and to take *312 action thereon and has provided in the statute for hearings, rehearings, appeals and other proceedings before the board prior to its final decision, an interested party must exhaust his administrative remedies before he may resort to the courts for a redress of his grievances. But it is equally well settled that the statutory remedies before the board must be both appropriate and adequate. (See *Myers v. Bethlehem Shipbuilding Corporation,* 303 U. S. 41 [58 Sup. Ct. 459, 82 L. Ed. 638]; *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 U. S. 1 [57 Sup. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352].)To provide for an appeal to the commission from a decision of the referee would certainly appear to be appropriate. But whether the appeal to the commission provided for by this particular statute is adequate, under the circumstances presented to the District Court of Appeal, is a judicial question. The argument against the adequacy of the remedy provided by the final appeal to the commission is that since the benefits must be paid immediately upon affirmance by the referee and notwithstanding the pendency of such appeal to the commission from the order of affirmance, the subject matter of the court controversy, namely, the alleged

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942
17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

illegality of the payments by reason of powers usurped by the commission expressly prohibited by the act, has evaporated and the question has become moot; that is, unless the court may intervene to prevent the alleged illegal payments from the trust fund, the express mandate of the statute will be violated and the unlawful action of the board placed beyond judicial scrutiny and control; that power reposed in an administrative board does not constitute it an autocratic body to the extent that it may, uncontrolled and with impunity, exercise its power contrary to the provisions of the act which created it; that it is well settled that "whether the Commission applies the legislative standards validly set up, whether it acts within the authority conferred or goes beyond it, whether its proceedings satisfy the pertinent demands of due process, whether, in short, there is compliance with the legal requirements which fix the province of the Commission and govern its action, are appropriate questions for judicial decision." (*Federal Radio Com. v. Nelson Bros. etc. Co.,* 289 U. S. 266, 276 [53 Sup. Ct. 627, 77 L. Ed. 1166, 89 A. L. R. 406]; *Federal Communications Com. v. The Pottsville Broadcasting Co.,* 309 U. S. 134 [60 Sup. Ct. 437, 440, 84 L. Ed. 656]); that *prima facie* the petition for the writ of *mandamus* before the *313 District Court of Appeal presents a case of a threatened enforcement of an order on the part of the commission which will violate the express legislative mandate, which is a prerequisite to valid payments within the rule repeatedly announced by the Supreme Court of the United States; that the so-called remedy by appeal to the commission from the order of affirmance of the referee is just as inadequate and futile as would be a statutory right of appeal from a judgment for money where a stay pending appeal is expressly denied the appellant and with a further statutory mandate that notwithstanding the pendency of the appeal the money must be paid, and the judgment satisfied; that it is no valid answer to this argument that the statute provides that in the event the commission on appeal should reverse the order of the referee "No employer's account shall be charged with the benefits so paid", for the reason that the employer as a contributor to the trust fund has an additional interest in preserving the integrity of that fund as against illegal expenditure and dissipation thereof contrary to the express provisions of the act.

The foregoing arguments urged on behalf of the respondents are addressed to the merits of the controversy pending before the District Court of Appeal and are mentioned solely for the purpose of indicating that there is clearly a question of law presented to that court in a matter in which it has jurisdiction of both the parties and the subject matter under the Constitution and laws of this state.

The majority say that the provision for payment of benefits pending appeal, when an initial determination for payment has been affirmed by the referee, was designed to carry out the policy declared in section 1 of alleviating the evils of unemployment, as part of a legislative plan of social security. This may be true where the payments are to persons eligible to receive the same under the act. But where the fact of ineligibility is concededly established and payments are threatened to be made to persons expressly excluded by the provisions of the act, do the majority still mean to say that such payments will carry out the legislative plan? The majority also say that to permit these "justifiable and necessary" payments to be postponed for long periods would defeat the objectives of the act. Would it defeat the objectives of the act to halt payments of benefits expressly forbidden by the act? On the contrary, would it not defeat the objectives of *314 the act to permit payments of benefits expressly so forbidden? The legislature did not leave any question for determination to the referee or the commission when the facts unquestionably disclose ineligibility on the part of claimants to receive payment of benefits. The provisions of the act direct the commission and leave it no alternative.

Finally, the writ of prohibition should not issue if there is a "plain, speedy, and adequate remedy in the ordinary course of law" (sec. 1103, Code Civ. Proc.). The petitioners herein would have had such a remedy by petition to this court for a hearing after

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

109 P.2d 942

17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

decision by the District Court of Appeal, if they had been dissatisfied with that decision. If the result in the *mandamus* proceeding had been the same in that court as in the Gantner & Mattern Co. case, as seems likely, it is fair to assume that the petitioners herein would not have been in a position to complain. In any event, if the *mandamus* proceeding had been allowed to take its usual course by decision in the District Court of Appeal and petition to this court, as the "plain, speedy, and adequate remedy" provided by the Constitution, the long drawn-out process of the present proceeding for over a year and the consequent uncertainty of jurisdiction of District Courts of Appeal resulting from the majority opinion would have been avoided.

Ward, J., *pro tem.,* concurred.

Cal.

Abelleira v. District Court of Appeal, Third Dist.

17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 2

Westlaw.

124 P.3d 719                                                                                                    Page 1
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

▷
Barratt American Inc. v. City of Rancho Cuca-
monga
Cal.,2005.

Supreme Court of California
BARRATT AMERICAN, INCORPORATED,
Plaintiff and Appellant,
v.
CITY OF RANCHO CUCAMONGA, Defendant
and Respondent.
**No. S117590.**

Dec. 22, 2005.

**Background:** Real estate developer filed petition
for writ of mandate and complaint against city,
challenging fees for building permits and plan re-
views. The Superior Court, San Bernardino County,
No. RCY063382,Joseph E. Johnston, J., sustained
city's demurrer without leave to amend. Developer
appealed. The Court of Appeal affirmed, and the
Supreme court granted developer's petition for re-
view, superseding the opinion of the Court of Ap-
peal.

**Holdings:** The Supreme Court, Chin, J., held that:
(1) fees developer paid were not "development
project fees" subject to Mitigation Fee Act's indi-
vidual refund remedy and limitations period;
(2) permit and plan review fees were not "special
taxes" subject to penalty or offset under Proposition
62;
(3) city was not required to conduct annual finan-
cial audit of revenues received from fees;
(4) city's resolution reenacting previously enacted
fees was subject to challenge; and
(5) mandamus was not available remedy for city's
alleged failure to comply with statutory duty to re-
view and adjust fees.

Judgment of the Court of Appeal affirmed in part
and reversed in part, and matter remanded.

Opinion, 135 Cal.Rptr.2d 85, superseded.

West Headnotes

**[1] Appeal and Error 30 €══917(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k915 Pleading
                30k917 Demurrers
                    30k917(1) k. In General. Most
Cited Cases
When a case comes to the Supreme Court on a de-
murrer for failure to state a cause of action, the
Court accepts as true the facts alleged in the
plaintiff's complaint.

**[2] Zoning and Planning 414 €══382.4**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(A) In General
            414k382.1 Maps, Plats, or Plans, Condi-
tions and Agreements
                414k382.4 k. Fees, Bonds, and in Lieu
Payments. Most Cited Cases

**Zoning and Planning 414 €══584.1**

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(B) Proceedings
            414k584 Time for Proceedings
                414k584.1 k. In General. Most Cited
Cases
Building permit and plan review fees real estate de-
veloper paid to city were simply fees to defray ad-
ministrative and enforcement costs of local regulat-
ory program, and thus were not "development
project fees" subject to Mitigation Fee Act's indi-
vidual refund remedy and limitations period for al-
leged overcharges. West's Ann.Cal.Gov.Code §§
66000, 66014, 66016, 66020, 66021.
*See 12 Witkin, Summary of Cal. Law (10th ed.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719                                                                 Page 2
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

2005) Real Property, § 818; 9 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 25:200; Cal. Jur. 3d, Zoning and Other Land Controls, § 243 et seq.; Cal. Civil Practice (Thomson/West 2003) Real Property Litigation, § 14:79.

**[3] Statutes 361 ☞208**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic Aids to Construction
                361k208 k. Context and Related Clauses. Most Cited Cases
The Supreme Court must construe a statute in the context of the entire statutory scheme of which it is a part, in order to achieve harmony among the parts.

**[4] Taxation 371 ☞2002**

371 Taxation
    371II In General
        371k2002 k. Distinguishing "Tax" and "License" or "Fee". Most Cited Cases

**Zoning and Planning 414 ☞382.4**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(A) In General
            414k382.1 Maps, Plats, or Plans, Conditions and Agreements
                414k382.4 k. Fees, Bonds, and in Lieu Payments. Most Cited Cases
Even if excessive, city's building permit and plan review fees were not "special taxes" subject to penalty or offset remedies under Proposition 62; sole remedy for excessive fee was contained in Mitigation Fee Act. West's Ann.Cal.Gov.Code §§ 53728, 66016.

**[5] Taxation 371 ☞2001**

371 Taxation
    371II In General
        371k2001 k. Nature of Taxes. Most Cited

Cases
In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted.

**[6] Municipal Corporations 268 ☞885**

268 Municipal Corporations
    268XIII Fiscal Matters
        268XIII(B) Administration in General, Appropriations, Warrants, and Payment
            268k885 k. Reports and Statements as to Finances. Most Cited Cases
City was not required, under government spending limitation provision of state Constitution, to conduct annual financial audit of revenues received from building permit and plan review fees imposed on developers to assess whether it had any surplus fees that would constitute proceeds of taxes. West's Ann.Cal. Const. Art. 13B, §§ 1.5, 8(b).

**[7] Zoning and Planning 414 ☞586**

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(B) Proceedings
            414k584 Time for Proceedings
                414k586 k. Commencement of Limitation Period. Most Cited Cases
Challenge to city's resolution reenacting previously enacted building permit and plan review fees was not barred by statute requiring such challenges to be brought within 120 days of enactment; even though fees remained essentially unchanged, legislation constituted modification or amendment of those fees, thereby triggering new limitations period. West's Ann.Cal.Gov.Code §§ 66016, 66022.

**[8] Mandamus 250 ☞3(4)**

250 Mandamus
    250I Nature and Grounds in General
        250k3 Existence and Adequacy of Other Remedy in General
            250k3(2) Remedy at Law
                250k3(4) k. Acts and Proceedings of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719                                                        Page 3

37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

Public Officers and Boards and Municipalities in General. Most Cited Cases

Mandamus was not remedy available to real estate developer that alleged city had failed to comply with its statutory duty to review and adjust building permit fees, since Mitigation Fee Act provided adequate legal remedy. West's Ann.Cal.Gov.Code § 66016.

**[9] Mandamus 250 ⟨⟩3(4)**

250 Mandamus
    250I Nature and Grounds in General
        250k3 Existence and Adequacy of Other Remedy in General
            250k3(2) Remedy at Law
                250k3(4) k. Acts and Proceedings of Public Officers and Boards and Municipalities in General. Most Cited Cases

Where the Legislature has provided for a validation action to review government actions, mandamus is unavailable to bypass the statutory remedy after the limitations period has expired.

***150 Law Offices of Walter P. McNeill, Walter P. McNeill, Redding; Law Offices of Richard D. Gann and Richard D. Gann, for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton and David P. Lanferman, San Francisco, for California Building Industry Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Jonathan M. Coupal and Timothy A. Bittle, Sacramento, for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Brent & Klein and Jason G. Brent, Tehachapi, for George C. Jenkins as Amicus Curiae on behalf of Plaintiff and Appellant.

James S. Burling and Meriem L. Hubbard, Sacramento, for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Richards, Watson & Gershon, James L. Markman, Brea, B. TildenKim Los Angeles, and Juliet E. Cox, for Defendant and Respondent.

Best, Best & Krieger, Jeffrey V. Dunn, Irvine, and Mark D. Servin, for League of California Cities and

California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

CHIN, J.

*691 **720 The Mitigation Fee Act (Gov.Code, §§ 66000-66025) [FN1] (the Act) was passed by the Legislature " 'in response to concerns among developers that local agencies were ***151 imposing development fees for purposes unrelated to development projects.' " (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 864, 50 Cal.Rptr.2d 242, 911 P.2d 429.) Although most of the Act is concerned with development fees, it also addresses fees or charges that do not necessarily relate to a development project. (*Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2(*Utility Cost Management* ).) The various sections of the Act cover fees for development projects (§§ 66000-66011), water or sewer connections (§ 66013), and zoning and building permits (§ 66014). This case involves legal challenges to building inspection and permit fees and appropriate remedies when excessive fees are imposed.

> FN1. Except as otherwise noted, all further statutory references are to the Government Code.

Section 66014, subdivision (a), provides that local agency fees for *building inspections and permits* may not exceed the estimated reasonable cost of providing the service for which the fee is charged unless the excess amounts are submitted to and approved by a two-thirds vote of the electorate. Section 66016, subdivision (a), provides a *prospective fee reduction remedy* when fees or service charges exceed actual costs and create excess revenues. Both sections specify that any judicial challenge to a fee thereunder is subject to the requirements of **721section 66022, which states that the action or proceeding "shall be commenced within 120 days of the effective date of the ordinance, resolution, or motion."(§ 66022, subd. (a); see also §§ 66014, subd. (c), 66016, subd. (e).)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

Sections 66020 and 66021, which authorize a *refund* of any unlawful part of the fees imposed on a *development project,* are subject to a different statute of limitations period. Local agencies must give project applicants written notice of the fee amount, indicating that they have 90 days to protest it. (§ 66020, subd. (d)(1).) Any party who files a protest may then file an action attacking the imposition of the fees within 180 days after delivery of the local agency's notice. (§ 66020, subd. (d)(2).)

In this case, we determine: (1) whether a party who challenges a local agency's fees for building inspections and permits under section 66014 can state a claim for remedies under both section 66016 (prospective fee reduction) and section 66020 (refund); (2) whether the limitations period of section 66020 or section 66022 applies to a claim that the local agency's building permit fees are excessive; and (3) whether a local agency's reenactment of the same building permit and inspection fees is subject to challenge under *692 section 66022. In addition, we decide other issues: (4) whether local agencies that charge excessive building permit and plan review fees are subject to a penalty for collecting and retaining "special taxes" without voter approval within the meaning of section 53728; and (5) whether local agencies are constitutionally required to conduct annual financial audits to assess whether their fees create excess revenues. We conclude that building permit fees are not fees imposed on a development project. Therefore, the applicable remedy and limitations period for excessive building fees claims under section 66014 are found in sections 66016 and 66022, not in sections 66020 and 66021. Also, we conclude that a reenactment of the same building permit fee is a modification or amendment of an existing fee or service charge under section 66022, which triggers a new limitations period; that local agencies that charge excessive building permit fees are not subject to a section 53728 penalty; and that local agencies are not constitutionally required to conduct annual financial audits.

## I. FACTUAL AND PROCEDURAL HISTORY

[1] Because this case comes to us on a demurrer for failure to state a cause of action, we accept as true the facts alleged ***152 in plaintiff Barratt American, Inc. (Barratt)'s complaint. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.)

In July 1999, the City of Rancho Cucamonga (City) adopted resolution No. 99-146, setting forth a comprehensive fee schedule for various services the City provides. It included a fee schedule for building permits and plan reviews based on the "total valuation of work." The charges for building permit fees started at $25 for work valued up to $1,000 and ended at $555 for work valued up to $100,000. Each additional $1,000 in value incurred a fee of $2.50. Plan review fees were a percentage of the building permit fees. The City building official was authorized to determine the "total valuation of work." In December 2000, the City adopted resolution No. 00-268, which modified certain fees set in 1999. The 2000 resolution slightly increased, by 50 cents, the building permit fee from $555 for work valued at $100,000 to $555.50. The resolution explained that the new fee was a correction of a previous typographical error. In January 2002, the City adopted resolution No. 02-023, which modified certain fees set in 2000. However, the building permit fee was not changed, except to the extent it was reset at $555 for work valued at $100,000. The 2002 ordinance apparently reintroduced the typographical error that the 2000 ordinance had corrected.

In June 2000, Barratt, a real estate developer, began to construct a 123-unit residential subdivision in the City. In May 2002, Barratt sued the City, alleging that the City's building permit and plan review fees were excessive, *693 that the City's method of establishing those fees was arbitrary and unrelated to the actual cost of the service provided, that the fees were based improperly on the monetary value of the work, and that the building officials had unfettered authority**722 to determine the final valuation component of the fee. The complaint further al-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

leged that, beginning in June 2000, Barratt had paid more than $143,000 in building permit and plan review fees for at least 83 building permits for the construction of single-family homes in the 123-unit subdivision, that it intended to continue construction until it completed the project, and that the City collectively received more than $1 million per year (and more than $3 million total) in excess building permit and plan review fees. Barratt sought: (1) a refund of $143,000 for the allegedly excessive fees already paid (§ 66020) or in the alternative, a refund in excess of $110,000, after crediting the City with the reasonable value of services it rendered in issuing the building permits and reviewing Barratt's plans; (2) a writ of mandate compelling the City to apply the excess fee revenues to reduce future fees (§ 66016, subd. (a)) and to perform an annual audit to identify excess fee revenues (Cal. Const., art. XIII B, §§ 1.5, 8, subd. (b)); (3) a declaration that the fees imposed were invalid "special taxes," resulting in the reduction or forfeiture of property tax revenues (§§ 53722, 53728); and (4) the invalidation of resolution No. 02-023 (§§ 66016, subd. (e), 66022, subd. (b)). When it filed the action, Barratt was midway through the development and sales of the homes in the subdivision.

The City demurred to Barratt's complaint. The trial court sustained its demurrer without leave to amend, ruling that: (1) Barratt could not obtain a refund under section 66020 because building permit and plan review fees are not development fees within the meaning of that section; (2) a writ of mandamus to compel the City to comply with section 66016 and to perform an annual audit and fee adjustment was an inappropriate remedy because the timing of any fee review and adjustment is a matter of legislative discretion; and (3) declaratory relief under ***153 sections 53722 and 53728 was not an appropriate remedy. Instead, the court found that the appropriate remedy for excessively high building permit fees was to challenge the ordinance in a validation action and obtain a prospective fee reduction, as specified in section 66016. That remedy was unavailable to Barratt, however, because

the statute of limitations period had expired. In addition, the court determined that Barratt could not attack the validity of resolution No. 02-023 because the 2002 resolution only reenacted the fee previously set forth in the 2000 resolution and was not a new or increased fee under section 66016.

The Court of Appeal agreed with the trial court's reasoning and result and affirmed the judgment. We granted Barratt's petition for review.

## *694 II. DISCUSSION

Barratt contends that payers of excess building permit fees in violation of sections 66014 and 66016 have *several* remedies for those overcharges: (1) individual refunds (§§ 66020, 66021, subd. (a)); (2) application of excess fees to future costs (§ 66016, subd. (a)); and forfeiture of property tax revenues (§ 53728). Barratt also claims that to ensure that cities comply with sections 66014, subdivision (a), and 66016, subdivision (a), they must conduct annual audits. (Cal. Const., art. XIII B.) We discuss those claims below.

### Sections 66014, 66016, and 66022.

Section 66014, subdivision (a), permits local agencies to impose building inspection and permit fees "not [to] exceed the estimated reasonable cost of providing the service for which the fee is charged, unless a question regarding the amount of the fee charged in excess of the estimated reasonable cost of providing the services or materials is submitted to, and approved by, a popular vote of two-thirds of those electors voting on the issue."

Section 66016, subdivision (a), which also expressly applies to building inspection and permit fees, provides the remedy for over-collections: "Unless there has been voter approval, as prescribed by Section 66013 or 66014, no local agency shall levy a new fee or service charge or increase an existing fee or service charge to an amount which exceeds the estimated amount required to provide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719

Page 6

37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

the service for which the fee or service charge is levied. If, however, the fees or service charges create revenues in excess of actual cost, those revenues shall be used to reduce **723 the fee or service charge creating the excess."

Both sections 66014 and 66016 require that "[a]ny judicial action or proceeding to attack, review, set aside, void, or annul the ordinance, resolution, or motion" authorizing the charge of a fee subject to those sections "shall be brought pursuant to Section 66022."(§§ 66014, subd. (c), 66016, subd. (e).)

Section 66022, subdivision (a), provides: "Any judicial action or proceeding to attack, review, set aside, void, or annul an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee or service charge, adopted by a local agency, as defined in Section 66000, shall be commenced within 120 days of the effective date of the ordinance, resolution, or motion." Subdivision (c) of that same section states: "This section shall apply only to fees, capacity charges, and service charges described in and subject to Sections 66013 and 66014."

*695 *1. Individual Refund Remedy and Limitations Period Under Sections 66020 and 66021 Do Not Apply to the Building Permit Fees Barratt Paid.*

[2] Although Barratt agrees that the charges at issue are fees for "building ***154 inspections" and "building permits" that are subject to sections 66014 and 66016, it argues that it does not seek "to attack, review, set aside, void, or annul" the ordinances under section 66022. Instead, it claims that it is protesting the imposition of specific fees on a particular development project, which is governed by the separate protest and refund procedures and remedy and limitations scheme set forth in sections 66020 and 66021.

Section 66020 provides that "Any party may protest the imposition of any *fees,* dedications, reservations, or other exactions *imposed on a development*

*project, as defined in Section 66000,* by a local agency" by paying the fees and serving a written notice of protest. (§ 66020, subd. (a), italics added.) A local agency must provide a development project applicant written notice of the amount of the fees when imposing them and must indicate that the applicant has 90 days to protest the fees. (§ 66020, subd. (d)(1).) "Any party who files a protest pursuant to subdivision (a) may file an action to attack, review, set aside, void, or annul the imposition of the fees, dedications, reservations, or other exactions imposed on a development project by a local agency within 180 days after the delivery of the notice."(§ 66020, subd. (d)(2).)

Section 66021 provides that "Any party on whom a *fee,* tax, assessment, dedication, reservation, or other exaction has been imposed, the payment or performance of which is *required to obtain governmental approval of a development, as defined by Section 65927, or development project,* may protest the establishment or imposition of the fee, tax, assessment, dedication, reservation, or other exaction as provided in Section 66020."(§ 66021, subd. (a), italics added.)

Barratt argues that it complied with the statutory procedural requirements of sections 66020 and 66021 by paying the fees and submitting a letter of protest to the City, dated September 21, 2001. The City responds that those sections do not create a refund remedy for "excess" regulatory fees, such as building permit and plan review fees, because they are not fees imposed on a development project within the meaning of sections 66020 and 66021. Thus, those sections do not apply here. We agree that Barratt's refund claim fails because sections 66020 and 66021 do not apply to the building permit fees it paid.

*696 "[F]ees ... imposed on a development project," as used in section 66020, refers to "fees" and a "development project" as defined in section 66000. A "development project" is defined as "any project undertaken for the purpose of development ... includ[ing] a project involving the issuance of a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

permit for construction or reconstruction, but not a permit to operate."(§ 66000, subd. (a).) A "fee" is defined as "a monetary exaction other than a tax or special assessment ... that is charged by a local agency to the applicant *in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities related to the development project, but does not include ... fees for processing applications for governmental regulatory actions**724 or approvals...*" (§ 66000, subd. (b), italics added.) Thus, section 66020, by its own terms, applies only to "development fees" that alleviate the effects of development on the community and does *not* include fees for specific regulations or services.

On the other hand, Government Code section 66016 applies to a long list of local regulatory fees described in Government Code sections 51287, 56383, 57004, 65104, 65456, 65863.7, 65909.5, and 66451.2; to building, planning, and zoning fees described in section 66014; to public facility ***155 capacity and connection charges described in section 66013; and to building permit fees described in Health and Safety Code sections 17951, 19132.3, and 19852.[FN2]

> FN2. Section 66016, subdivision (d), states that: "This section shall apply only to fees and charges as described in Sections 51287, 56383, 57004, 65104, 65456, 65863.7, 65909.5, 66013, 66014, and 66451.2 of this code, Sections 17951, 19132.3, and 19852 of the Health and Safety Code, Section 41901 of the Public Resources Code, and Section 21671.5 of the Public Utilities Code."

Here, Barratt paid building permit and plan review fees to cover the costs of regulating construction quality and ensuring public safety. (See Health & Saf.Code, §§ 17951, subds. (c) and (e), 19132.3.) Although sections 66014 and 66016 govern these regulatory fees, they do not qualify as "development project" fees under section 66000. In addition, the building permit and plan review fees

were not made "in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities related to the development project ...." (§ 66000, subd. (b).) They were not "fees imposed on development projects in order to finance public improvements or programs that bear a 'reasonable relationship' to the development at issue." (*Utility Cost Management, supra,* 26 Cal.4th at p. 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2.) Instead, the building permit and plan review fees were simply fees to defray the administrative and enforcement costs of a local regulatory program. (See Gov.Code, §§ 66014, subd. (a), 66016, subd. (a); Health & Saf.Code, §§ 17951, subd. (c), 19132.3 [fees may not exceed the reasonable cost of providing the regulatory service for which the fee is charged].)

*697 Although the plain language of the statutes dictates the result here (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299), legislative history provides additional authority. The California Legislative Counsel has similarly concluded that section 66020 does not include fees associated with plan check or inspection fees. (Ops. Cal. Legis. Counsel, No. 1518 (Jan. 28, 1997) Development Fees, pp. 1, 6.) The Legislative Counsel reasoned that building permit fees are "separately authorized under the Health and Safety Code and do not relate to fees in the nature of monetary exactions imposed for the purpose of defraying all or a portion of the cost of public facilities related to a development project as contemplated in the Mitigation Fee Act."(*Id.* at p. 6.) Legislative Counsel opinions have great persuasive weight, "since they are prepared to assist the Legislature in its consideration of pending legislation." (*Cal. Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17, 270 Cal.Rptr. 796, 793 P.2d 2.) Accordingly, we conclude that the Legislature did not intend section 66020 to authorize a refund action for overcharges of building permit and plan review fees.

Barratt claims that section 66021 expands the scope

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of section 66020's protest procedures to cover building permit fees. He argues that a fee paid to obtain approval of a building permit for construction of residential housing qualifies as a fee "the payment or performance of which is required to obtain governmental approval of a development, as defined by Section 65927."(§ 66021, subd. (a).) Section 65927 defines "development" broadly to include "the placement or erection of any solid material or structure."

However, section 66021 operates not to extend section 66020's protest procedures to regulatory fees, but to extend them to taxes and assessments. (Compare § 66020, subd. (a) ["Any party may protest ***156 the imposition of any *fees, dedications, reservations, or other exactions*...."] with § 66021, subd. (a) ["Any party on whom a *fee, tax, assessment,* **725 *dedication, reservation, or other exaction* has been imposed ...."]; see also § 66000, subd. (b) [excluding taxes and assessments from the Act's definition of " fee"].) In addition, section 66021 limits its scope to those fees or taxes that are "required to obtain governmental approval of a development, as defined by Section 65927."(§ 66021, subd. (a).)

As the City notes, many cities require applicants to pay certain mitigation fees as a precondition to the issuance of a building permit. This building permit process might reasonably be characterized as being "required to obtain governmental approval of a development" (§ 66021, subd. (a)). (See, e.g., *Trend Homes, Inc. v. Central Unified Sch. Dist.* (1990) 220 Cal.App.3d 102, 108, 269 Cal.Rptr. 349 [noting that the City of Fresno required certain *698 homebuilders to pay school impact fees before becoming eligible for building permits].) However, Barratt challenges only the City's charges for ministerial, regulatory building plan review and construction inspection activities that implement state and local building safety standards. These fees-for regulatory services the Health and Safety Code requires-do not necessarily relate to a development project (e.g., fees imposed on a homeown-

er's addition of a laundry room). They fund a program that supervises *how, not whether,* Barratt may build. Thus, the building permit fees in this case were *not* "required to obtain governmental approval of a development."(§ 66021, subd. (a).)

Analogously, it has been held that water and sewer connection fees under section 66013-fees that are also included in section 66016-"are not 'fees ... imposed on a development project' for purposes of Section 66020" and thus, are not subject to review under the payment and protest provisions of section 66020. (*Cal. Psychiatric Transitions, Inc. v. Delhi County Water Dist.* (2003) 111 Cal.App.4th 1156, 1161, 4 Cal.Rptr.3d 503(*Cal. Psychiatric Transitions* ).) The Court of Appeal reasoned: "As the Supreme Court pointed out in *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2, the mere fact that fees are imposed in a particular instance in connection with development does not make them 'fees imposed on a development project for purposes of section 66020.' The court stated that 'development fees [are] fees imposed on development projects in order to finance public improvements or programs that bear a 'reasonable relationship' to the development at issue.' (*Utility Cost Management,* at p. 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2.) The fees and charges authorized by section 66013 may or may not involve development ... but the fees and charges are always tied directly to a benefit conferred on the property assessed (*id.* at p. 1189, 114 Cal.Rptr.2d 459, 36 P.3d 2). Accordingly, such charges are user fees (in the case of connection fees)....

"By contrast, 'fees ... imposed on a development project,' as used in section 66020, refers to 'fees' as defined in section 66000, subdivision (b). That definition states that a fee is 'a monetary exaction *other than a tax or special assessment...* that is charged by a local agency to the applicant ... for the purpose of defraying all or a portion of the cost of public facilities related to the development project ....' (66000, subd. (b), italics added.) Thus, defini-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tionally, a fee subject to the payment/protest procedure of section 66020 [does not] include[ ] ... a connection fee (because it does not pay for public facilities, only for the private party's connection to the system)." ***157(*Cal. Psychiatric Transitions, supra,* 111 Cal.App.4th at p. 1161, 4 Cal.Rptr.3d 503.)

Similarly, in *Capistrano Beach Water Dist. v. Taj Development Corp.* (1999) 72 Cal.App.4th 524, 529-530, 85 Cal.Rptr.2d 382(*Capistrano Water Dist.*), the Court of Appeal held that sewer connection fees (§ 66013) paid by a developer to connect its hotel to a sanitation district's sewer system were *699 not "fees" for a "development project" under section 66000, subdivisions (a) and (b). Thus, fees imposed under section 66013 could not be refunded. The court noted that: (1) the district did not condition the approval of the hotel project on payment of the fee or impose the fee in connection with issuing or approving a permit for development and (2) sections 66013 and 66016 do not include a **726 refund remedy. (*Capistrano Water Dist., supra,* 72 Cal.App.4th at pp. 528-529, 85 Cal.Rptr.2d 382.)

In short, the fee does not become a "development fee" simply because it is made in connection with a development project. (*Cal. Psychiatric Transitions, supra,* 111 Cal.App.4th at p. 1161, 4 Cal.Rptr.3d 503; see also *Utility Cost Management, supra,* 26 Cal.4th at p. 1191, 114 Cal.Rptr.2d 459, 36 P.3d 2.) Just as fees imposed under section 66013 cannot be refunded (*Capistrano Water Dist., supra,* 72 Cal.App.4th at pp. 527-530, 85 Cal.Rptr.2d 382), fees imposed under sections 66014 and 66016 cannot be refunded under sections 66020 and 66021.

[3] Moreover, we must construe a statute in the context of the entire statutory scheme of which it is a part, in order to achieve harmony among the parts. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 779, 38 Cal.Rptr.2d 699, 889 P.2d 1019; *People v. Woodhead* (1987) 43 Cal.3d 1002, 1009-1010, 239 Cal.Rptr. 656, 741 P.2d 154.) Section 66016 applies specifically to building permit

fees and states the remedy for any facial overcharges: "If however, the fees or service charges create revenues in excess of actual cost, those revenues *shall be used* to reduce the fee or service charge creating the excess."(§ 66016, subd. (a), italics added.) Surplus fees that have been refunded cannot simultaneously be "paid forward" to reduce fees. In other words, permitting both retrospective refund and prospective reduction remedies would allow two different dispersions of the same funds and would create incongruous results. Because section 66016 applies specifically to building permit fees, it prevails over the more general statutes that might otherwise seem to conflict with it. (See *San Francisco Taxpayers Assn. v. Bd. of Supervisors* (1992) 2 Cal.4th 571, 577-578, 7 Cal.Rptr.2d 245, 828 P.2d 147.) When read together, sections 66016, 66020, 66021, and 66022 do not authorize a refund remedy for excessive regulatory fees.

Barratt argues that depriving individual fee payers, such as itself, of a refund remedy is unfair because a prospective fee reduction remedy only benefits future fee payers collectively. By invoking the protest and refund procedure in section 66020, Barratt necessarily claims that such protests are timely up to 90 days after imposition of the fees. (§ 66020, subd. (d)(1).) However, such fee challenges would subject cities to suits for building permit fee refunds at any time well beyond the 120-day limitations period set forth in section 66022. This would undermine the purpose of that shortened limitations period, to give public agencies "certainty with respect to *700 the enforceability of their fee ordinances and resolutions." (*Utility Cost Management, supra,* 26 Cal.4th at p. 1197, 114 Cal.Rptr.2d 459, 36 P.3d 2.) We must apply the statutory scheme as written. Barratt's concerns are more appropriately ***158 brought to the attention of the Legislature.FN3

> FN3. Barratt argues that the lack of a refund remedy violates constitutional guarantees of due process. Because the Court of Appeal did not address the due process

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

issue in its opinion and Barratt failed to file a petition for rehearing in that court to bring any deficiency to the court's attention, we do not address that claim. (Cal. Rules of Court, rule 28(c)(2).)

## 2. Penalty or Offset for Unauthorized Special Taxes Under Section 53728 Is an Inapplicable Remedy

[4][5] Barratt sought declaratory relief under section 53728, asking the trial court to impose a penalty on the City for collecting and retaining "special taxes" without voter approval. Section 53728-a part of Proposition 62 (§§ 53720-53730)-provides that property tax revenues allocated to the local government be reduced by one dollar for each dollar of revenue attributable to an unauthorized "special tax." [FN4] "Special taxes"**727 -those imposed for specific purposes (§ 53721)-must be approved by a two-thirds vote of the voters. (§ 53722.) "In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted. [Citations.]" (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874, 64 Cal.Rptr.2d 447, 937 P.2d 1350(*Sinclair Paint Co.*).)

> FN4. Section 53728 states: "If any local government or district imposes any tax without complying with the requirements of this Article, or in excess of its authority as clarified by Section 53727, whether or not any provision of Section 53727 is held not applicable to such jurisdiction, the amount of property tax revenue allocated to the jurisdiction pursuant to Chapter 6 of part 0.5 of Division 1 of the Revenue and Taxation Code (commencing with Section 95) shall be reduced by one dollar ($1.00) for each one dollar ($1.00) of revenue attributable to such tax for each year that the tax is collected. Nothing in this section shall impair the right of any citizen or taxpayer to maintain any action to invalidate any tax imposed in violation of this Article."

Barratt alleges that the surplus building permit and plan review fees are unauthorized "special taxes," which subject the City to a property tax allocation reduction. However, it provides no authority for the claim that excess regulatory fees constitute taxes. Simply because a fee exceeds the reasonable cost of providing the service or regulatory activity for which it is charged does not transform it into a tax. (See *Alamo Rent-A-Car, Inc. v. Board of Supervisors* (1990) 221 Cal.App.3d 198, 205-206, 272 Cal.Rptr. 19 ["reverse logic" does not compel the conclusion that an allegedly excessive fee was a tax].) The specific statute-section 66016-provides the exclusive remedy for overcharges. If actual revenues exceed actual costs, the City must make a prospective fee adjustment by using that surplus, in lieu of *701 a fee reduction, to cover future expenses. (§ 66016, subd. (a).) It cannot refund the excess or transfer it to the City's general fund to replace or augment tax revenue. (See Health & Saf.Code, §§ 17951, subd. (c) [local permit fees "shall not be levied for general revenue purposes"], 19132.3 [same].)

Accordingly, the dollar-for-dollar penalty or offset allowed by section 53728 does not apply to Barratt's claims. (See *Sinclair Paint Co., supra,* 15 Cal.4th at p. 876, 64 Cal.Rptr.2d 447, 937 P.2d 1350 ["special taxes" in article XIII A, section 4, of the California Constitution do not include regulatory fees that do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged *and* that are not levied for unrelated revenue purposes].)

***159 *3. Writ of Mandate to Compel an Annual Fee Revision Is Not an Available Remedy Under Article XIII B of the California Constitution.*

[6] Barratt petitioned for a writ of mandate, alleging that the City caused ongoing injury to Barratt, other builders, and consumers by failing to conduct an annual financial audit and adopt a subsequent fee reduction, in violation of article XIII B, section 1.5, of the California Constitution. It states:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

"The annual calculation of the appropriations limit *under this article* for each entity of local government shall be reviewed as part of an annual financial audit." (Cal. Const., art. XIII B, § 1.5, italics added.) However, article XIII B expressly governs government *spending,* not taxation and revenues. "While article XIII A was aimed at controlling ad valorem property taxes and imposition of new special taxes [citation], article XIII B is directed at controlling government spending." (*County of Placer v. Corin* (1980) 113 Cal.App.3d 443, 449, 170 Cal.Rptr. 232.)

Nevertheless, Barratt argues that the City must audit the revenues received from building permit and review fees to determine whether it has any surplus fees that would constitute "proceeds of taxes." Article XIII B of the California Constitution imposes total annual "appropriations subject to limitation" (*id.,* § 1), defining that term as "any authorization to expend during a fiscal year the *proceeds of taxes* levied by or for [the local government] entity." (Cal. Const., art. XIII B, § 8, subd. (b), italics added.) " 'Proceeds of taxes' shall include ... all tax revenues and the proceeds to an entity of government, from (1) regulatory licenses, user charges, and user fees to the extent that those proceeds exceed the costs reasonably borne by that entity in providing the regulation, product, or service, and (2) the investment of tax revenues." (*Id.,* § 8, subd. (c).)

*702 However, as the City correctly notes, an article XIII B annual financial audit must only *identify* "proceeds of taxes," including regulatory fees that "exceed the costs reasonably borne" in providing regulatory services. (Cal. Const., art. XIII B, § 8, subd. (c).) Neither section 1.5 nor section 8 of article XIII B states that those costs must be actual costs, rather than reasonable estimates, or that the fee-cost relationship must be determined over the course of a single year. In short, those sections do not impose **728 a duty on local government to conduct an annual audit of its " proceeds of taxes."

*4. Resolution No. 02-023 Is Subject to Challenge Under Section 66022.*

Resolution No. 02-023 establishes, as did the prior two resolutions, a "comprehensive fee schedule" for many municipal services. Most of the fees in resolution No. 02-023 remained the same as in resolution No. 00-268, except for the establishment of some new fees that are not at issue here. It is not contested that Barratt failed to meet section 66022's limitations period regarding the 1999 and 2000 ordinances, but complied with that period regarding the 2002 ordinance.

[7] Nevertheless, the City contends that, despite Barratt's timely challenge to the 2002 ordinance, resolution No. 02-023 is not subject to a validation action because it was not an ordinance or resolution "adopting a new fee or service charge, or modifying or amending an existing fee or service charge" within the meaning of section 66022. Section 66022, subdivision (a), authorizes "[a]ny judicial action or proceeding to attack, review, set aside, void, or annul an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee ***160 or service charge." The City argues that the permit fees have not changed since June 2000 (when Barratt began construction), and that Barratt should have sued within 120 days of the City's initial July 1999 adoption of its permit fee schedule in resolution No. 99-146. Although Barratt sued within 120 days of the adoption of resolution No. 02-023 (in January 2002), that challenge to the validity of the ordinance was too late.

The Court of Appeal agreed with the City. It found that the 2002 ordinance only reenacted and continued the previous fee ordinance, the 50-cent difference was apparently a typographical error, and a reenactment is not a "new fee or service charge, or modif[ication] or amend[ment of] an existing fee or service charge."(§ 66022, subd. (a).)

Barratt does not contest that the 50-cent difference in the 2002 ordinance was merely a typographical

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719                                                                        Page 12
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

error. But it argues that, even though the building permit and plan review fees essentially remained the same, the legislative *703 action extending the allegedly excessive fees is nonetheless subject to attack under section 66022. As explained below, we agree with Barratt.

The 2002 reenactment of the previous building permit and plan review fees constituted a "modif[ication] or amend[ment of] an existing fee or service charge."(§ 66022, subd. (a).) Although the *amount* of the permit and plan review fees remained the same, resolution No. 02-023 changed the *duration* of the fee by extending its applicability, and by implication its validity. This change is significant when considered with a local agency's statutory duties. Local agencies may not impose fees that exceed the *estimated* reasonable costs of providing the services for which the fees are charged. (§§ 66014, subd. (a), 66016, subd. (a).) "If, however, the fees or service charges create revenues *in excess of actual cost,* those revenues *shall be used* to reduce the fee or service charge creating the excess."(§ 66016, subd. (a), italics added; see *Larson v. State Personnel Bd.* (1994) 28 Cal.App.4th 265, 276, 33 Cal.Rptr.2d 412 ["The ordinary meaning of 'shall' or 'must' is of mandatory effect...."].) However, the applicable statutes do *not* specify how often the local agencies must make the required accounting. As Barratt points out, if a fee was not challenged at its initial enactment, then the validity of all subsequent reenactments would be immune to judicial challenge or review. Thus, there would be no effective enforcement mechanism to ensure that local agencies are complying with their duty to reduce the fees if revenues exceed actual costs. Barratt further argues that this immunity from judicial review creates an incentive for local agencies to overvalue the estimated costs of services and then continually readopt that fee.

We find Barratt's arguments to be persuasive, especially in light of the facts in this case. In accordance with section 66016, subdivision (a), the City made public the data supporting its fee calculations be-

fore its scheduled public hearing. After a public hearing and adoption of resolution No. 02-023, the City published those fees in its "new **729 comprehensive fee schedule," FN5 stating it "resolve[d] that the following fees are *established.*" (Italics added.) When the City adopted that resolution, it implicitly represented that the building ***161 permit and plan review fees continued to be valid. This determination would have or should have required some type of accounting of operating expenses and revenues, resulting in either surplus revenues, a deficit, or no required change in the fees.

> FN5. Resolution No. 02-023 contained the following description: "A resolution of the City Council of the City of Rancho Cucamonga, California, establishing a new comprehensive fee schedule for permits and services provided by all city departments, the Rancho Cucamonga Fire Protection District and the Rancho Cucamonga Police Department, by modifying certain fees established in Resolution 00-286."

*704 Here, although the building permit fees remained the same, other fees included in the 2002 comprehensive fee resolution had changed. As Barratt argues, the City's reenactment of its building permit fees as part of a revised comprehensive fee resolution is analogous to legislation at the state level that amends a portion of a statute while leaving the unamended portion unchanged. Under the "reenactment rule" of statutory interpretation, the unamended portion of the statute is reenacted with the enactment of the amendment, so that the statute is deemed to have been acted on as a whole.FN6 (See *Brown v. Superior Court* (1982) 33 Cal.3d 242, 251-252, 188 Cal.Rptr. 425, 655 P.2d 1260; *People v. Scott* (1987) 194 Cal.App.3d 550, 554-556, 239 Cal.Rptr. 588.) Thus, resolution No. 02-023 reflects the City's judgment that the fees charged do not exceed the estimated reasonable cost of providing the services for which the fee is charged, as those costs were estimated and projec-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 P.3d 719                                                                                                          Page 13
37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

ted into the future from the date of enactment of resolution 02-023.

> FN6. Relying on a different rule of statutory interpretation, the City argues that the reenactment continues the effect of the unmodified portion of a statute unabated and without interruption. (*In re Johnny Dapper* (1969) 71 Cal.2d 184, 189, 77 Cal.Rptr. 897, 454 P.2d 905 [where a statute is repealed and at the same time reenacted without substantial change, there is no break in the continuous operation of the old statute, and no abatement of any legal consequences of acts done under the old statute]; *Orange County Water Dist. v. Farnsworth* (1956) 138 Cal.App.2d 518, 524-525, 292 P.2d 927; *Sobey v. Molony* (1940) 40 Cal.App.2d 381, 385, 104 P.2d 868.) Both rules seek to determine and effectuate legislative purpose and intent and can be reconciled as applied to this case. The reenactment continues the effect of the unmodified portion of the ordinance unabated to the extent that any payment obligations under resolution No. 00-268 continue and are not interrupted even though that resolution had been superseded by resolution No. 02-023.

We conclude that, contrary to the Court of Appeal's holding, Barratt could seek to invalidate the building permit and plan review fees in resolution No. 02-023, and that its challenge was timely as to applicable claims arising after January 16, 2002, the effective date of the resolution.

*5. Writ of Mandate Is Not an Available Remedy to Enforce a Local Agency's Duty Under Section 66016 in this Case Because Barratt Has or Had an Adequate Legal Remedy.*

[8] Barratt alleges that the City has a "continuing pattern" of refusing to perform its statutory duty to review and adjust building permit fees. Accordingly, Barratt sought a writ of mandate to compel

the City to conduct a review and apply any surplus building permit and plan review fees to reduce prospective fees, in compliance with section 66016. The Court of Appeal held that a mandamus action under section 66016 was either untimely under section 66022 or inappropriate. The court concluded that the mandamus cause of action was essentially a facial challenge to the building permit fees, and that Barratt failed to seek a validation action in a timely manner. It further *705 concluded that courts cannot command any action under sections 66014 and 66016 because the fees are set and revised by the exercise of legislative discretion. We agree with the Court of Appeal that a writ of mandate is not an available remedy in this case, but for a different reason: Barratt has or had an adequate legal remedy.

***162 As discussed above, the reenactment of the building permit and plan review fees in resolution No. 02-023 constituted a modification or amendment of those fees, which were **730 subject to validation under section 66022. The same holds true for resolutions No. 99-146 and No. 00-268, because the City followed the same public hearing procedures and reestablished a comprehensive fee schedule as it did with resolution No. 02-023. In adopting those resolutions, the City implicitly represented it had complied with section 66016. That is, resolutions No. 99-146, No. 00-268, and No. 02-023 represented, as of their effective dates, reasonable estimates of costs and revenues, including proper adjustments for over- or under-recovery under previous fee structures. In other words, the City presumably performed the very same financial analysis under section 66016 that Barratt's mandamus cause of action demanded. Thus, Barratt's allegation in its mandamus action that the City had continually refused to perform its statutory duty to review and adjust building permit fees is inconsistent with its assertion in its validation action that the City conducted a review, but reenacted invalid new and amended permit fees.

[9] The fact that Barratt is time-barred from chal-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

lenging the facial validity of the fee schedules in resolutions No. 99-146 and No. 00-268 does not change the result. Where the Legislature has provided for a validation action to review government actions, mandamus is unavailable to bypass the statutory remedy after the limitations period has expired. (*Embarcadero Mun. Improvement Dist. v. County of Santa Barbara* (2001) 88 Cal.App.4th 781, 789-793, 107 Cal.Rptr.2d 6; *Hills for Everyone v. Local Agency Formation Com.* (1980) 105 Cal.App.3d 461, 467-468, 164 Cal.Rptr. 420.) As for resolution No. 02-023, because we find that Barratt may facially challenge the permit fees therein, a parallel mandate action would be unnecessary and inappropriate. (See Code Civ. Proc., § 1086 [writ of mandate must be issued where there is *not* a plain, speedy, and adequate remedy in the ordinary course of law.].) In light of this disposition, we need not determine whether the Court of Appeal correctly held that courts cannot enforce a local agency's section 66016 duty to review and adjust building permit fees by way of a writ of mandate.

### *706 III. DISPOSITION

We reverse the judgment of the Court of Appeal relating to the dismissal of the resolution No. 02-023 validation action (fifth cause of action) and affirm its judgment in all other respects. The matter is remanded to the Court of Appeal with directions to modify the judgment of the trial court and order reinstatement of the validation action challenging resolution No. 02-023, and to affirm the judgment as amended.

WE CONCUR: GEORGE, C.J., KENNARD, BAXTER, WERDEGAR, MORENO and COFFEE, JJ.FN*

> FN* Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Cal.,2005.

Barratt American Inc. v. City of Rancho Cucamonga

37 Cal.4th 685, 124 P.3d 719, 37 Cal.Rptr.3d 149, 2005 Daily Journal D.A.R. 14,715

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

TAB 3

**Westlaw.**

148 Cal.App.4th 537                                                                                     Page 1
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

**H**

Fogarty v. City of Chico
Cal.App. 3 Dist.,2007.

Court of Appeal, Third District, California.
Thomas V. FOGARTY et al., as Trustees, etc.,
Plaintiffs and Appellants,
v.
CITY OF CHICO, Defendant and Respondent.
**No. C052576.**

March 12, 2007.
Review Denied July 11, 2007.

**Background:** Trustees for developers who applied to develop a subdivision sued city to protest conditions imposed on development of developers' property. The Superior Court, Butte County, No. 136344,Barbara L. Roberts, J., sustained city's demurrer on the ground that the action was time-barred under the Subdivision Map Act. Trustees for developers appealed.

**Holding:** The Court of Appeal, Davis, J., held that applicable statute of limitations was codified in Subdivision Map Act rather than Mitigation Fee Act.

Affirmed.

West Headnotes

**[1] Zoning and Planning 414 ⟜584.1**

414 Zoning and Planning
   414X Judicial Review or Relief
     414X(B) Proceedings
       414k584 Time for Proceedings
         414k584.1 k. In General. Most Cited
Cases
Developers' cause of action against city, to protest conditions imposed on development of developers' property, arose under Subdivision Map Act and was therefore time-barred under 90-day limitations period; although developers sought to rely on Mitiga-

tion Fee Act, which had a 180-day limitations period, the Fee Act applied to attacks on fees, reservations, or other exactions, and developers were simply protesting a restriction on the manner in which they could use their property. West's Ann.Cal.Gov.Code §§ 66020, 66499.37.
*See 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 86; 9 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 25:146 et seq.*

**[2] Dedication 119 ⟜1**

119 Dedication
   119I Nature and Requisites
     119k1 k. Nature and Essentials in General.
Most Cited Cases
A "dedication" is the transfer of an interest in real property to a public entity for the public's use.

**[3] Municipal Corporations 268 ⟜223**

268 Municipal Corporations
   268VI Property
     268k223 k. Purposes for Which Property
May Be Acquired or Held. Most Cited Cases
A "reservation" is an offer to transfer an interest in real property to a public agency for parks, recreational facilities, fire stations, libraries, or other public uses, which terminates automatically within two years after the completion and acceptance of all improvements, unless the agency enters into an agreement to acquire the interest and compensate the landowner at fair market value. West's Ann.Cal.Gov.Code §§ 66479-66481.

**[4] Statutes 361 ⟜194**

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
       361k187 Meaning of Language
         361k194 k. General and Specific
Words and Provisions. Most Cited Cases
Under the principle of *ejusdem generis,* court should construe a statute's general terms following

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

148 Cal.App.4th 537                                                                                                                    Page 2
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

specific terms as embracing only objects similar in nature to the specific terms.

**796 GCA Law Partners, Douglas B. Aikins, William D. Connell, Jeffrey K. Lee, Mountain View, for Plaintiffs and Appellants.
Allen Matkins Leck Gamble Mallory & Natsis, James L. Meeder, Michael Patrick Durkee, David H. Blackwell, San Francisco; David R. Frank, City Attorney, Lori J. Barker, Assistant City Attorney, for Defendant and Respondent.

DAVIS, J.
*539 Plaintiffs Thomas and Mary Fogarty (in their capacity as the trustees of two trusts) appeal from a judgment of dismissal after the trial court sustained the demurrer of defendant City of Chico (City) and several individual defendants. They limit the scope of their appeal to a single count in their pleading against only defendant City.[FN1] They contend the superior *540 court erred in its conclusion that this count is time-barred. We shall affirm. In so doing, we find that in this instance the applicable statute of limitations is codified in the Subdivision Map Act rather than the Mitigation Fee Act.

> FN1. The plaintiffs have dismissed the individual defendants from the appeal.

## BACKGROUND

Accepting the well-pleaded factual allegations of the amended petition filed in January 2006 (*Robison v. City of Manteca* (2000) 78 Cal.App.4th 452, 455, 92 Cal.Rptr.2d 748(*Robison* )), the plaintiff trusts are landowners that are seeking on behalf of themselves "and in the public interest" to enforce various provisions of law that "govern the exercise of discretion by [defendant City] ... over a real estate development owned and proposed by [the plaintiff trusts]."

More particularly, the plaintiffs had applied to develop a subdivision called Oak Valley. In approving the application, the City's planning agency authorized 80-160 residential units on a parcel known

as "Lot Q." The decision was appealed to the City Council. In May 2005, the City Council adopted a motion of intent to reduce the authorized number of units on Lot Q to 80, and to affirm the decision in all other respects. However, after a hearing on September 20, 2005, the City Council voted (4-3) to merge the boundaries of Lot Q with the adjacent parcel to its west (Lot P) and to preclude any residential use of Lot Q.[FN2]

> FN2. In its demurrer, defendant City requested the trial court to take judicial notice of the text of the resolution, which does not precisely reflect the petition's characterizations of it. For example, the petition neglects to mention that it allowed the plaintiffs to increase the number of units on Lot P by 160.

Lot Q is zoned RS-20, which limits its use to no more than two residential units per acre. At this density, it has a fair market value of $17 million. The plaintiffs did not at any point consent to a reduction in density below that authorized for RS-20 zoning.

In taking this action, members of the City Council cited two rationales at the hearing. They wished to mitigate the aesthetic impacts of the remainder of the Oak Valley development, and they wanted to preserve Lot Q as open space for the public's benefit.[FN3] Defendant City did not **797 comply with the requirements of Government Code section 66001 (hereafter, undesignated section *541 references will be to the Government Code).[FN4] Under the authority of section 66020 et seq., the plaintiff trusts filed a letter of protest on October 17, 2005, with defendant City.[FN5] They also delivered a courtesy copy of their petition on November 8. They filed their initial petition in this matter on December 19, 2005. However, they did not serve the petition on defendant City until December 27.[FN6]

> FN3. The resolution itself made findings that the configuration of the subdivision as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

148 Cal.App.4th 537                                                                                              Page 3
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

revised is "appropriate for development while providing permanent protection for those portions ... which are not appropriate for development[, g]iven the site's many physical and environmental constraints,""protect[s] the environment by maintaining the majority of the steeper slopes, oak woodlands, and special status plant species in permanent open space," and "preserv[es] unique natural and historic features present on the site.... Open space areas containing the oak woodlands and riparian/creek are visually linked to the developed portions of the plan...."

FN4. This is a provision of the Mitigation Fee Act (the Fee Act; see § 66000.5). It requires a local agency, in imposing a fee as a condition of approving a development project, to identify the purpose of the fee, the use to which it will be put, the reasonable relationship between the use and the project, and the reasonable relationship between the amount and the project. (§ 66001.)

FN5. Defendant City filed a stipulation in this court to augment the record with a copy of this letter. While the plaintiffs do not object to the augmentation, they object to any use of the letter to contradict the allegations of the petition. They are correct. As this letter was not incorporated in the petition by reference, this proposed augmentation cannot have any effect in the context of a demurrer on the amended petition's allegation regarding it, as we cannot take judicial notice of any of the contents of the letter. (*Bach v. McNelis* (1989) 207 Cal.App.3d 852, 864, 255 Cal.Rptr. 232.) We therefore deny the stipulation to augment the record with the letter and the motion to take judicial notice of portions of the City's municipal code, as they are not necessary to our resolution of the appeal.

FN6. In its demurrer, defendant City requested judicial notice of the return on the summons.

In its order sustaining the demurrer to the third count in the amended petition, the court stated "[the plaintiffs] failed to serve the petition and complaint on [defendant City] ... within 90 days of the accrual of ... [the] cause[ ] of action, as required by ...section 66499.37." It did not grant leave to amend, and directed the dismissal of the action in its entirety. The plaintiff trusts filed their notice of appeal in a timely manner in May 2006.

## DISCUSSION

[1] The briefing of the parties comes down to a straightforward issue. Section 66499.37, on which the trial court relied, is part of the Subdivision Map Act (the Map Act; see § 66410) and provides that "Any action ... to attack ... the decision of [a] ... legislative body concerning a subdivision ... or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained ... unless such action ... is commenced and *service of summons effected within 90 days after the date of such decision.*" [FN7] (Italics added.) On the other hand, section 66020, subd. (d)(2), on which the plaintiffs relied in their amended petition, is part of the Fee Act and provides that "Any party who files a protest ...*may file *542 an action* to attack ... the imposition of the fees, dedications, reservations, or other exactions imposed on a development project by a local agency *within 180 days after the **798 delivery of the notice* [from the local agency]." (Italics added.) We must determine which limitations period is controlling as part of our de novo review of the sufficiency of the petition. (*Robison, supra,* 78 Cal.App.4th at p. 456, 92 Cal.Rptr.2d 748.)

FN7. A similar limitations provision applies to challenges to the facial validity of a land use regulation under the Planning and Zoning Law. (§§ 65000, 65009, subd.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

148 Cal.App.4th 537                                                                    Page 4
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

(c)(1); *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22 & fn. 10, 24, 32 Cal.Rptr.2d 244, 876 P.2d 1043(*Hensler* ).) As we find that the Fee Act is inapplicable to the plaintiffs' petition, we do not need to consider defendant City's fallback argument based on the limitations period of the Planning and Zoning Law.

*Hensler* involved an ordinance enacted pursuant to the Map Act that prohibited the construction of residential units on ridge lines. (*Hensler, supra,* 8 Cal.4th at pp. 7-8, 32 Cal.Rptr.2d 244, 876 P.2d 1043.) The owner of a 300-acre tract of land filed an action for inverse condemnation, claiming that this ordinance precluded him from developing 40 percent of the tract. (*Ibid.*) Relying on the tenet that a legislative body must have the option of rescinding an enactment rather than pay compensation for a reduction in the value of affected land, *Hensler* concluded a cause of action for inverse condemnation necessarily includes a challenge to the validity of the enactment as applied to a particular piece of property and the need to exhaust the related administrative remedies. Otherwise, the landowner would have the power to compel the legislative body to exercise its power of eminent domain. (*Id.* at pp. 12, 13-14, 24-25, 32 Cal.Rptr.2d 244, 876 P.2d 1043.) As a result, the cause of action for inverse condemnation "aris[es] out of [the] application of a land-use regulation authorized" under the Map Act or is a facial challenge to the enactment under the Planning and Zoning Law, and is therefore subject to their long-expired limitations periods. (*Id.* at pp. 23-26, 32 Cal.Rptr.2d 244, 876 P.2d 1043, quoted material at p. 23, 32 Cal.Rptr.2d 244, 876 P.2d 1043.)

In *Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 42 Cal.Rptr.3d 96(*Branciforte Heights* ), a landowner sought to compel a city to accept a dedication of park land rather than the "in lieu" fees that the city chose to impose as a condition of its approval of a development project, alternatives available to a local gov-ernment under a provision of the Map Act. (*Id.* at p. 919, 42 Cal.Rptr.3d 96.) As the land use regulation at issue imposed a fee as a condition of approval, the cause of action could be considered as arising both out of the general provision of the Map Act and the Fee Act. (*Id.* at p. 926, 42 Cal.Rptr.3d 96.) *Branciforte Heights* concluded that (as a matter of legislative intent) where a property owner invokes the protest procedure of the Fee Act, its longer limitations period applies; "[c]ontrariwise, where a party does not comply with the fee protest procedures, ... a traditional mandate action must be brought within the ... statute of limitations generally applicable to subdivision decisions." (*Id.* at p. 928, 42 Cal.Rptr.3d 96.) [FN8]

> FN8. The plaintiffs also cite *Ponderosa Homes, Inc. v. City of San Ramon* (1994) 23 Cal.App.4th 1761, 29 Cal.Rptr.2d 26 as standing for the proposition that the Fee Act's limitations period controls over the Map Act's where a challenge to a fee is involved. As the case does not at any point address this issue expressly (simply citing the Fee Act limitations period), it is not authority for that proposition. (*In re Randy J.* (1994) 22 Cal.App.4th 1497, 1505, 28 Cal.Rptr.2d 152.)

**\*543** It is undisputed that the plaintiff trusts purported to file a protest pursuant to the Fee Act. The question is whether the conditions imposed on the development of their land comes within this act.

[2][3] As noted above, the Fee Act applies to an attack on fees, dedications, reservations, or "other exactions." The plaintiffs do not contend that the conditions at issue come within any of the specifically named conditions in section 66020. Rather, they insist that the nebulous catchall that concludes this series of terms embraces their situation. As they concede **\*\*799** in their brief, " '[F]ees' and 'dedications' do denote a conveyance of an interest in money (fees) or an interest in real property (dedications), and 'reservations' have a specific Map Act definition of how they must be implemen-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

148 Cal.App.4th 537                                                                                                                 Page 5
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

ted in order to qualify as legally valid...." Section 66000, subdivision (b) defines "fee" as a "monetary exaction" other than a "tax or special assessment." A dedication is the transfer of an interest in real property to a public entity for the public's use. (*Branciforte Heights, supra,* 138 Cal.App.4th at p. 927 & fn. 7, 42 Cal.Rptr.3d 96; *Rohn v. City of Visalia* (1989) 214 Cal.App.3d 1463, 1470, 263 Cal.Rptr. 319; see § 66475 et seq. [regulating various types of dedications].) A reservation is an offer to transfer an interest in real property to a public agency for "parks, recreational facilities, fire stations, libraries, or other public uses," which terminates automatically within two years after the completion and acceptance of all improvements unless the agency enters into an agreement to acquire the interest and compensate the landowner at fair market value.[FN9] (See §§ 66479-66481.)

> FN9. At the same time, they suggest that the conditions on Lot Q amount to a de facto reservation. However, as there is neither any offer nor any proposed transfer of an interest in their property, their suggestion fails.

Neither party cites to *Williams Communications v. City of Riverside* (2003) 114 Cal.App.4th 642, 8 Cal.Rptr.3d 96, which found that a per-foot assessment imposed in connection with a permit to lay cable in conduit under city streets was not a fee but was nonetheless an "exaction" within the meaning of section 66020. (*Id.* at pp. 645, 658, 8 Cal.Rptr.3d 96.) "The statutes do not define 'exaction' but the term is generally defined to include a '*compensation* arbitrarily or wrongfully demanded.' "(*Id.* at p. 658, 8 Cal.Rptr.3d 96, italics added.) This indicates that the usual and ordinary meaning of the word "exaction," the first step in the interpretation of a statute *544 (*Guillemin v. Stein* (2002) 104 Cal.App.4th 156, 164, 128 Cal.Rptr.2d 65(*Guillemin* )), does not include land use restrictions, which are not any form of payment.[FN10]

> FN10. The treatise that the plaintiffs cite, which calls for an expansive interpretation

of "exaction," does not include anything other than fees, interests in real property, and expenditures for onsite or offsite public improvements, facilities, equipment, or other "public amenities." (Abbott et al., Exactions and Impact Fees in California (2001 ed.) Defining the Terms, p. 15.) All of these involve some form of payment or transfer of an interest. This chapter does not mention land use regulations as a species of exaction.

[4] The interpretation that the plaintiffs champion violates the intrinsic interpretive principle of *ejusdem generis,* under which we should construe general terms following specific terms as embracing only objects similar in nature to the specific terms. (*Engelmann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 56, fn. 11, 3 Cal.Rptr.2d 264.) As the plaintiffs concede, the specific terms in section 66020 all involve divesting a developer of either money or a possessory interest in the subject property. The present land use conditions at issue do not result in either consequence; they are simply a restriction on the manner in which the plaintiffs may use their property.

It also violates the principle that we must construe related provisions in harmony. (*Guillemin, supra,* 104 Cal.App.4th at p. 164, 128 Cal.Rptr.2d 65.) If a plaintiff prevails under the Fee Act, "the court shall direct the local agency to *refund* the unlawful portion of the payment ... or *return* the unlawful portion of the exaction imposed."(§ 66020, subd. (e), italics added.) Neither of those verbs would apply in **800 their ordinary sense if exaction included land use restrictions, because they do not involve a transfer of anything to the local agency that must be refunded or returned.

Finally, we note that subdivision (c) of the statute, which involves the imposition of "a requirement for construction of [public] improvements or facilities," suggests the type of other condition at which the catchall provision is aimed. This again requires the expenditure of money but in a form different

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

148 Cal.App.4th 537                                                                                                    Page 6
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

than a fee or any transfer of interest in real prop- erty.

The plaintiffs contend that "exaction" must be broad enough to include land use restrictions as a condition of approval in order to reach legislative usurpation of part of the unencumbered value of a property. Nothing, however, prevents a property owner from seeking redress for any reduction in value under the general Map Act rather than the more targeted Fee Act.

Consequently, the present cause of action does not arise under the Fee Act, and the plaintiffs' attempt to invoke its protest procedure and extended limita- tions period was ineffectual. Their petition was therefore untimely served on defendant City under the limitations period of the Map Act.

### *545 DISPOSITION

The stipulation to augment the record and the mo- tion for judicial notice are denied. The judgment is affirmed.

We concur: SCOTLAND, P.J., and RAYE, J.
Cal.App. 3 Dist.,2007.
Fogarty v. City of Chico
148 Cal.App.4th 537, 55 Cal.Rptr.3d 795, 07 Cal. Daily Op. Serv. 2660, 2007 Daily Journal D.A.R. 3375

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 4

Westlaw.

876 P.2d 1043                                                    Page 1
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

▷
Hensler v. City of Glendale
Cal. 1994.
R. R. HENSLER, Plaintiff and Appellant,
v.
CITY OF GLENDALE, Defendant and Respond-
ent.
**No. S032210.**

Supreme Court of California
Jul 25, 1994.

SUMMARY

The trial court sustained without leave to amend a
city's demurrer to an action for inverse condemna-
tion, and dismissed the action. Plaintiff alleged the
taking of his property resulted from the adoption
and application of an ordinance that restricted de-
velopment of property by prohibiting construction
along identified major ridge-line areas. The city's
demurrer was based on the 90-day limitations peri-
od of Gov. Code, § 66499.37, which applies to ac-
tions challenging decisions undertaken pursuant to
the Subdivision Map Act (Gov. Code, § 66410 et
seq.). (Superior Court of Los Angeles County, No.
NCC41335, Joseph R. Kalin, Judge.) The Court of
Appeal, Second Dist., Div. Four, No. B052246, af-
firmed.

The Supreme Court affirmed the judgment of the
Court of Appeal. The court held that the landowner
could not maintain an action in inverse condemna-
tion on the basis of a constitutional just compensa-
tion theory without first exhausting state adminis-
trative and judicial remedies. The complaint ac-
knowledged that some development had been per-
mitted on part of the property, and the ordinance
therefore did not deny the owner all economically
feasible use of the property. Thus, the compensable
taking of the property did not necessarily occur
when the ordinance was enacted. The owner could
not avoid pursuing administrative and judicial rem-
edies and thereby compel the city to purchase the
undeveloped portion of his property by electing to
seek only compensation in an inverse condemnation
action. The court further held that the action was
governed by the 90-day limitations period of Gov.
Code, § 66499.37, for applied challenges, or by the
120-day limitations period of Gov. Code, § 65009,
for facial challenges, and that the application of the
ordinance to the property was not a "continuous
wrong" for which a new cause of action arose each
day the city failed to compensate plaintiff. There
was no uncertainty regarding the commencement of
the period, and, whether the complaint was deemed
a facial challenge or an applied one, it was untimely
since it was brought five years after enactment of
the ordinance. It was immaterial that plaintiff did
not challenge the validity of the ordinance. Code
Civ. Proc., §§ 318 and 319, establishing five-year
periods of limitation for actions otherwise not
covered by statute, were thus not applicable. Gov.
Code, § 66499.37, is not limited to actions for spe-
cific relief, but includes actions for compensation
for a regulatory taking. Plaintiff could not avoid its
application by electing to forego raising his claim
in an administrative mandamus proceeding, and
could not transform the action into one seeking
only damages. (Opinion by Baxter, J., expressing
the unanimous view of the court.)

HEADNOTES

Classified to California Digest of Official Reports

**(1)** Eminent Domain §
18--Compensation--Constitutional and Statutory
Provisions--What Constitutes Taking or Damage-
-Regulation.
Where the government authorizes a physical occu-
pation of property or actually takes title, the takings
clause (U.S. Const., 5th Amend.; Cal. Const., art. I,
§ 19) generally requires compensation. But when
the government merely regulates the use of prop-
erty, compensation is required only if considera-
tions such as the purpose of the regulation, or the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 2

extent to which it deprives the owner of the economic use of the property, suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. An individualized assessment of the impact of the regulation on a particular parcel of property and its relation to a legitimate state interest is necessary in determining whether a regulatory restriction on property use constitutes a compensable taking.

**(2a, 2b)** Eminent Domain § 133--Remedies of Owner--Inverse Condemnation-- Conditions Precedent--Regulation--Exhaustion of Administrative Remedies.

A landowner who alleged a taking of real property resulting from the adoption or application to his property of an ordinance enacted pursuant to the Subdivision Map Act (Gov. Code, § 66410 et seq.) could not maintain an action in inverse condemnation based on a constitutional just compensation theory without first exhausting state administrative and judicial remedies. The complaint acknowledged that some development had been permitted on part of the property; the ordinance therefore did not deny the owner all economically feasible use of the property. Thus, the compensable taking of property did not necessarily occur when the ordinance was enacted. The owner could not avoid pursuing administrative and judicial remedies and thereby compel the city to purchase the undeveloped portion of his property by electing to seek only compensation in an inverse condemnation action.

**(3)** Eminent Domain § 18--Compensation--Constitutional and Statutory Provisions--What Constitutes Taking or Damage--Land-use Restriction.

Not every land-use restriction which designates areas on which no development is permitted results in a compensable taking. The impact of a law or regulation as applied to a specific piece of property determines whether there has been a compensable taking, and compensation need not be paid unless the ordinance or regulation fails to serve an important governmental purpose or "goes too far" as applied to the specific property. The impact of a law or regulation on the owner's right to use or develop the property cannot be assessed until an administrative agency applies the ordinance or regulation to the property and a final administrative decision has been reached with regard to the availability of a variance or other means by which to exempt the property from the challenged restriction. A final administrative decision includes exhaustion of any available review mechanism. Utilization of available avenues of administrative relief is necessary because the court cannot determine whether a regulation has gone "too far" unless it knows how far the regulation goes.

**(4)** Eminent Domain § 131--Remedies of Owner--Inverse Condemnation-- Constitutional Basis.

U.S. Const., 5th Amend., conditions a state's right to take private property for public use on the payment of just compensation. It leaves to the state, however, the procedures by which compensation may be sought. If the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the government for a taking. California provides such a process by making available an action for inverse condemnation if, after exhausting administrative remedies to free the property from the limits placed on development and obtaining a judicial determination that just compensation is due, any restrictions for which compensation must otherwise be paid are not lifted. In that action the court determines whether the restriction on development "goes too far" and will be constitutionally impermissible unless just compensation is paid for the taking brought about by the restriction. When property is damaged, or a physical invasion has taken place, an inverse condemnation action may be brought immediately because an irrevocable taking has already occurred.

**(5)** Eminent Domain § 127--Remedies of Owner--Regulatory Taking-- Administrative and Judicial Remedies.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
Page 3
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

When an alleged taking of property is a "regulatory taking," i.e., one that results from the application of zoning laws or regulations limiting development, the owner must afford the state the opportunity to rescind the ordinance or regulation or to exempt the property from the allegedly invalid development restriction once it has been judicially determined that the proposed application of the ordinance to the property will constitute a compensable taking. The owner may do so, where appropriate, by a facial challenge to the ordinance, but in most cases must seek a variance if that relief is available and then exhaust other administrative and judicial remedies, such as those provided in an action for declaratory relief or administrative mandamus. Both actions may be joined with an action in inverse condemnation. Damages for the "taking" may be sought in an administrative mandamus action (Code Civ. Proc., § 1095), or, if the plaintiff seeks a jury trial, in the joined inverse condemnation action. The owner may not, however, elect to sue in inverse condemnation and thereby transmute an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid. Compensation must be paid for a permanent taking only if there has been a judi-cial determination that application of the ordinance or regulation to the property is statutorily permissible and constitutes a compensable taking.

**(6)** Eminent Domain § 136--Remedies of Owner--Inverse Condemnation--Trial-- Right to Jury Trial--Damages.
A landowner is entitled to a jury trial in an inverse condemnation action pursuant to Cal. Const., art. I, § 19. However, the right is limited to the question of damages.

**(7)** Eminent Domain § 127--Remedies of Owner--Land-use Restriction--Judicial Determination of "Taking."
A property owner is entitled to a judicial determination of whether a land-use restriction constitutes a taking. Administrative adjudication in the course of exercising an administrative agency's regulatory

power, if subject to judicial review, does not deny participants their right to a judicial determination of their rights. Moreover, an administrative agency is not competent to decide whether its own action constitutes a taking and, in many cases, administrative mandate proceedings are not an adequate forum in which to try a takings claim. If the administrative hearing is not one in which the landowner has a full and fair opportunity to present evidence relevant to the taking issue, one in which witnesses may be sworn and testimony presented by means of direct and cross-examination, the administrative record is not an adequate basis on which to determine if the challenged action constitutes a taking. A judicial determination is available in the mandate proceeding, however, if the administrative action is challenged on the basis that it is a compensable taking, the hearing did permit full litigation of the facts relevant to the takings issue, and any additional issues are litigated before the court. Because a taking of property is alleged, the court must accord the owner de novo review of the evidence before the agency in ruling on the taking claim and consider any additional evidence admitted at the hearing on the petition for a writ of mandate. If the owner believes the hearing before the administrative agency was not adequate, he or she is assured a full and fair hearing by exercising the right to join an inverse condemnation action with the mandate proceeding. The availability of these procedures satisfies the requirement that a state provide an adequate process for obtaining compensation when property is taken for public use.

**(8)** Eminent Domain § 133--Remedies of Owner--Inverse Condemnation-- Conditions Precedent--Waiver of Claim.
A landowner who believes that application of a state statute or local ordinance limiting development of the owner's property works a taking, may not bypass the remedies the state has made available to avoid the taking. If he or she does so, the government entity may deem the owner to have waived the taking claim.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

**(9a, 9b, 9c)** Eminent Domain § 135--Remedies of Owner--Inverse Condemnation--Limitation of Actions--Land-use Restriction Under Subdivision Map Act:Limitation of Actions § 18--Period of Limitation--Real Property--Land-use Restriction Under Subdivision Map Act.

A landowner's complaint, alleging the taking of real property resulting from the adoption, or application to plaintiff's property, of an ordinance enacted pursuant to the Subdivision Map Act (Gov. Code, § 66410 et seq.), was governed either by the 90-day limitations period of Gov. Code, § 66499.37, which applies to final adjudicative administrative decisions taken under the authority of the Subdivision Map Act, or by the 120-day limitations period established by Gov. Code, § 65009, for challenges to the facial validity of a land-use regulation. The application of the ordinance to the property was not a "continuous wrong " for which a new cause of action arose each day the city failed to compensate plaintiff. Whether the complaint was deemed a facial challenge or an applied one, it was untimely, since, in either case, the limitations period commenced running on the date the ordinance was enacted, and the action was brought five years after that date. It was immaterial that plaintiff did not challenge the validity of the ordinance. Code Civ. Proc., §§ 318, and 319, establishing five-year periods of limitation for actions otherwise not covered by statute, were thus not applicable. Gov. Code, § 66499.37, is not limited to actions for specific relief, but includes actions for compensation for a regulatory taking. Plaintiff could not avoid application of the provision by electing to forego raising his claim in an administrative mandamus proceeding, and could not transform the action into one seeking only damages.

[See 4 **Witkin**, Summary of Cal. Law (9th ed. 1987) Real Property, § 46.]

**(10)** Limitation of Actions § 17--Period of Limitation--Nature of Cause of Action.

To determine the statute of limitation which applies to a cause of action, it is necessary to identify the nature of the cause of action, i.e., the " gravamen " of the cause of action. The nature of the right sued on and not the form of action or the relief demanded determines the applicability of the statute of limitations.

**(11)** Zoning and Planning § 13--Content and Validity of Zoning Ordinances and Planning Enactments--Judicial Review--Administrative Mandamus--Purpose.

The purpose of statutes and rules which require that attacks on land-use decisions be brought by petitions for writs of administrative mandamus, and create relatively short limitations periods for those actions and actions challenging the validity of land-use statutes, regulations, or decisions, is to permit and promote sound fiscal planning by state and local government entities.

COUNSEL

Crosby, Heafey, Roach & May, Gideon Kanner, M. Reed Hunter and James C. Martin for Plaintiff and Appellant.

Ronald A. Zumbrun, James S. Burling, Alexander Dushku, Crahan, Javelera, Ver Halen & Aull, Marcus Crahan, Jr., Laskin & Graham and Richard Laskin as Amici Curiae on behalf of Plaintiff and Appellant.

Scott H. Howard, City Attorney, Freilich, Stone, Leitner & Carlisle, Freilich, Kaufman, Fox & Sohagi, Benjamin Kaufman and Robert F. Freilich for Defendant and Respondent.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, Richard M. Frank and J. Matthew Rodriquez, Deputy Attorneys General, Shute, Mihaly & Weinberger, Fran M. Layton and Susannah T. French as Amici Curiae on behalf of Defendant and Respondent.

**BAXTER, J.**

The parties in this case ask the court to determine the statute of limitations applicable to a complaint in inverse condemnation which alleges a taking of real property resulting from the adoption, or application *7 to the plaintiff's property, of an ordinance enacted pursuant to the Subdivision Map Act. (Gov. Code, § 66410 et seq.) We conclude that an action

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043                                                                                                    Page 5
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

in inverse condemnation, whether or not joined with an action in administrative mandamus (Code Civ. Proc., § 1094.5) challenging the ordinance or its application to the plaintiff's property, is governed by Government Code section 66499.37 [FN1] (hereafter section 66499.37) unless it alleges the existence of a final judgment establishing that there has been a compensable taking of the plaintiff's land.

> FN1 Section 66499.37 provides: "Any action or proceeding to attack, review, set aside, void or annul the decision of an advisory agency, appeal board or legislative body concerning a subdivision, or of any of the proceedings, acts or determinations taken, done or made prior to such decision, or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 90 days after the date of such decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of such decision or of such proceedings, acts or determinations. Any such proceeding shall take precedence over all matters of the calendar of the court except criminal, probate, eminent domain and forcible entry and unlawful detainer proceedings."

The legislative intent is clear. Section 66499.37 was enacted to ensure that any challenge to local legislative or administrative acts or decisions taken pursuant to ordinances enacted under the authority of the Subdivision Map Act will be brought promptly. A complaint in inverse condemnation, even one which does not expressly attack the validity of the ordinance or its application, and seeks only compensation for an alleged taking, must be deemed a challenge to the local action. This follows because the constitutional validity of the governmental action if uncompensated must be determined

in the course of ruling on the claim that compensation is owed. Moreover, the validity of the action must be determined to afford the local entity the opportunity to rescind its action rather than pay compensation for a taking. A landowner may not, by seeking only compensation, force a governmental agency to condemn the property.

Therefore, unless the complaint alleges that the existence of a taking has already been judicially established, the complaint necessarily states a cause of action which requires judicial review of a decision of the local legislative body concerning a subdivision or of the reasonableness, legality, or validity of any condition attached to a permit decision within the meaning of section 66499.37. An action which requires that review is governed by section 66499.37 regardless of the plaintiff's characterization of the cause of action.

Having reached that conclusion we shall affirm the judgment of the Court of Appeal.

## I. Events and Proceedings Below

The complaint alleges that plaintiff purchased a 300-acre tract of land zoned for single-family residential use in 1978. In 1981, defendant City of *8 Glendale (Glendale) adopted an ordinance which prohibited construction on major ridge lines within the city. [FN2] The ordinance was enacted pursuant to authority granted by the Subdivision Map Act. Plaintiff was advised by city representatives that development would not be permitted on ridge lines on his property. A plan for the construction of 588 residential units on the property was approved on April 1, 1986, but that approval rejected all proposed use of, and any encroachment within, on, or over, the major ridge lines within the tract. Claiming that the ordinance on which this action was based precluded development of 40 percent of the tract, plaintiff initiated this action in inverse condemnation in September 1989. Glendale demurred, asserting the 90-day limitations period of section 66499.37. It also argued that plaintiff's failure to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 6

challenge the conditions placed on development of his land barred the inverse condemnation action. The trial court sustained the demurrer and entered judgment dismissing the action. Plaintiff appealed. FN3

> FN2 It is undisputed that the ordinance was enacted pursuant to the authority granted by the Subdivision Map Act. Defendant has requested that this court take judicial notice both of this ordinance, No. 4533, and a predecessor ordinance enacted in 1971 which it amended, No. 3993. We grant that request and defendant's request that the court take judicial notice of certain other documents which defendant believes are relevant to the legislative history of section 66499.37 and subject to judicial notice under Evidence Code section 452. To the extent that the request seeks judicial notice of letters to the Governor from individual legislators and private persons reflecting their understanding of the purpose and effect of legislation creating special statutes of limitation for challenges to subdivision and zoning related decisions, the request is denied. (See *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157, fn. 6 [278 Cal.Rptr. 614, 805 P.2d 873].)
> Section 28-2.1 of Ordinance No. 4533 provided in pertinent part:
> "a. Intent and purpose. The city is experiencing unprecedented hillside subdivision development which without proper planning may destroy major ridge lines which are an exhaustible and precious scenic resource of the city and its citizens; it is necessary that subdivision developers include with their tentative tract maps, plans for the preservation of major ridge lines.
> "b. Submission of plans. The tentative tract map and plans for any subdivision development which touches, crosses, includes or affects major ridge lines shall include

> plans for the complete preservation of such major ridge line areas in their natural state.
> "c. Major ridge lines defined.... No engineered slopes, housing construction, streets, utilities, or other man-made features shall be permitted within identified major ridge line areas."

> FN3 Defendant asserts that plaintiff sold the property that is the subject of this action in 1986, long before he filed this action, complains that he failed to exhaust available administrative remedies and was permitted dense cluster development on the property, and argues that plaintiff should not be permitted to take advantage of the permit and subsequently challenge its conditions. While some or all of these claims might have been asserted in a demurrer or in defense of the action, we need not address them here since the sole ground for the demurrer was the applicability of section 66499.37.
> For purposes of review of an order sustaining a demurrer to a complaint, we accept as true all material allegations of the complaint (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054]) and do not go beyond the face of the complaint and matters of which the trial court took judicial notice. (Evid. Code, § 459.) Defendant does not assert that the trial court was requested to and did take judicial notice of the events to which it alludes that are not alleged in the complaint.

The Court of Appeal affirmed the judgment of dismissal. The court held that the longer limitations period of Code of Civil Procedure section 338, **\*9** subdivision (j), and Code of Civil Procedure sections 318 and 319, which govern actions for damage to and taking of property, were not applicable to actions based on a decision made pursuant to an ordinance enacted under the authority of the Subdivision Map Act.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

## II. The Nature of Plaintiff's Action

Plaintiff argues that his action is one for a taking of his property, not a challenge to the city ordinance or to the actions taken on his application for a development permit. His position is, simply stated: The ridge-line acreage on which development is not permitted was taken by virtue of the enactment and/or application of the Glendale ordinance which forbids development on the land. Therefore, he is entitled to bring an action in inverse condemnation based on his inability to develop that portion of the property notwithstanding his failure to initiate a timely challenge to the permit condition or application of the ordinance to his property through a proceeding in mandamus.

The question is not answered that easily, however. Before considering which limitations period applies to this action, it is necessary to address plaintiff's argument that, as a matter of federal constitutional right, an action in inverse condemnation seeking damages for a permanent taking may be initiated in the first instance without a challenge to the application of the ordinance to the affected property.

### A. *Fifth Amendment "Taking" Clause.* [FN4]

Because plaintiff relies in part on authority applicable to a taking of property which occurs when a public agency causes a physical invasion of private property, it is important to note that a "regulatory" taking differs. (1) "Where the government authorizes a physical occupation of property *10 (or actually takes title), the Takings Clause generally requires compensation. [Citation.] But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." (*Yee v. City of Escondido* (1992) 503 U.S. 519 [118 L.Ed.2d 153, 162, 112 S.Ct. 1522, 1526].) An indi-

vidualized assessment of the impact of the regulation on a particular parcel of property and its relation to a legitimate state interest is necessary in determining whether a regulatory restriction on property use constitutes a compensable taking. (See, e.g., *Dolan v. Tigard, Ore.*(1994) _____ U.S. _____ [129 L.Ed.2d 304, 114 S.Ct. 2309].)

> FN4 Plaintiff relies on both article I, section 19 of the California Constitution and the takings clause of the Fifth Amendment to the United States Constitution. He relies primarily on federal authority, however. While article I, section 19, protects a somewhat broader range of property values than does the Fifth Amendment takings clause (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 298 [142 Cal.Rptr. 429, 572 P.2d 43]), that distinction is irrelevant to the issues in this case. Our conclusion that the prerequisites to an inverse condemnation action arising out of a regulatory taking do not deny landowners any rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution applies equally to rights claimed under article I, section 19.

(2a) Ignoring the distinction between a regulatory taking and takings by action which affects title or involves physical invasion, plaintiff contends that a landowner may not be required to exhaust state administrative and judicial remedies, and may sue directly on a constitutional just compensation cause of action. He relies for that assertion on both *Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172 [87 L.Ed.2d 126, 105 S.Ct. 3108] and *First Lutheran Church v. Los Angeles* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378]. Neither case supports plaintiff's broad proposition. Rather than a claim that a taking occurs at the time an ordinance which restricts development is enacted, *Williamson Planning Comm'n v. Hamilton Bank, supra,* 473 U.S. 172, held that the landowner's claim was not ripe for adjudication.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 8

The court held, as it had done in earlier cases, that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." (*Id.*, at p. 186 [87 L.Ed.2d at p. 139].) In that case the court noted that no variance had been sought from either the planning commission or the administrative appellate body, the board of zoning appeals. The court emphasized that until there has been a "final, definitive position regarding" how the regulations will be applied to the land, a court cannot determine whether a compensable taking has occurred. (*Id.*, at p. 191 [87 L.Ed.2d at p. 141].) As an alternative ground for concluding that the claim was not ripe, the court noted that the landowner had not utilized state procedures for seeking compensation. "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." (*Id.*, at p. 195 [87 L.Ed.2d at p. 144].)

Far from supporting plaintiffs' position therefore, the *Williamson* decision holds: (1) until a final administrative decision has been made, one which *11 affords the administrative agency and any reviewing body having similar authority the opportunity to amend the agency decision and/or grant a variance, whether a taking has occurred through application of a land-use regulation to specific property cannot be determined; and (2) a state may establish reasonable procedures by which taking claims are to be brought. Moreover, the responsible governmental entity has the option of exempting the property from the ordinance or regulation, or even repealing the ordinance as an alternative to paying compensation for a permanent taking if it is judicially determined, after administrative remedies have been exhausted, that application of the restrictions to the property will constitute a compensable taking.

*First Lutheran Church v. Los Angeles, supra,* 482

U.S. 304, offers no additional support for plaintiffs' position. The question presented in that case was whether compensation must be paid for deprivation of use of property caused by an ordinance that is ultimately invalidated by the court. The Supreme Court held that a temporary taking must be compensated. In so doing, however, it cast no doubt on the right of a state to require that a landowner seeking compensation for permanent deprivation first seek a variance or invalidation of the ordinance or regulation as applied to the owner's property. The court held only that invalidation of an overly restrictive zoning ordinance is not a "sufficient remedy" (482 U.S. at p. 319 [96 L.Ed.2d at p. 267]) because it does not provide compensation for the temporary taking prior to invalidation. [FN5] It did not question invalidation as an adequate alternative to forcing the state to pay compensation for a permanent taking, however. Instead the court reaffirmed: "Nothing we say today is intended to abrogate the principle that the decision to exercise the power of eminent domain is a legislative function .... *Once a court determines that a taking has occurred, the government retains the whole range of options already available-amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain.*" (*Id.*, at p. 321 [96 L.Ed.2d at pp. 267-268], italics added.)

> FN5 In holding that compensation must be paid for a temporary taking prior to the invalidation of the ordinance, the court was careful to point out that its holding did not address the problem of normal delays in the permit process. (482 U.S. at p. 321 [96 L.Ed.2d at pp. 267-268].)

The high court recently reaffirmed the continued availability of these options in *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. ___ [120 L.Ed.2d 798, 112 S.Ct. 2886]. There the court held that a regulation which denied a coastal owner the right to any construction on, or other beneficial use of, his property would constitute a compensable taking if, under state law, a right to develop the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

land existed prior to enactment of the challenged *12 regulation. Although the court remanded the matter to the state court to determine what rights had existed, the court also admonished: "*Of course, the State may elect to rescind its regulation and thereby avoid having to pay compensation for a permanent deprivation.*" (*Id.*, at p. _____, fn. 17 [120 L.Ed.2d at p. 822], italics added.)

Plaintiff seeks to deny the city these options. He claims that he need not seek a variance, exhaust administrative remedies, or give the city the opportunity to rescind the ordinance or exempt his property after obtaining a judicial determination that application of the ordinance to the property does effect a compensable taking. The authorities on which plaintiff relies do not support his thesis that the only precondition to a suit for compensation is administrative application of the ordinance restricting development of his property. He seeks to do what the high court says a landowner has no right to do-to force the city to exercise the power of eminent domain.

(3) Moreover, not every land-use restriction which designates areas on which no development is permitted results in a compensable taking. The governing constitutional authority recognizes that the impact of a law or regulation as applied to a specific piece of property determines whether there has been a compensable taking. Compensation need not be paid unless the ordinance or regulation fails to serve an important governmental purpose or "goes too far" as applied to the specific property that is the object of the litigation. (*Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321].) The impact of a law or regulation on the owner's right to use or develop the property cannot be assessed until an administrative agency applies the ordinance or regulation to the property and a final administrative decision has been reached with regard to the availability of a variance or other means by which to exempt the property from the challenged restriction. A final administrative decision includes exhaustion of any

available review mechanism. Utilization of available avenues of administrative relief is necessary because the court "cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." (*MacDonald, Sommer & Frates v. Yolo County* (1986) 477 U.S. 340, 348 [91 L.Ed.2d 285, 293-294, 106 S.Ct. 2561], see also *Hodel v. Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 297 [69 L.Ed.2d 1, 29, 101 S.Ct. 2352]; *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1032 [282 Cal.Rptr. 877]; *California Coastal Com. v. Superior Court* (1989) 210 Cal.App.3d 1488, 1500 [258 Cal.Rptr. 567].)

(2b) Plaintiff's complaint acknowledges that development has been permitted on part of his property, and thus concedes that the Glendale ordinance *13 did not deny him all economically feasible use of the property. We therefore reject both plaintiff's claim that a compensable taking of his property necessarily occurred when the Glendale ridge-line ordinance was enacted because development was limited to less than all of the property and his argument that he need not pursue administrative and judicial remedies as a prerequisite to a suit in inverse condemnation. He may not avoid these steps and compel the defendant to purchase the undeveloped portion of his property by electing to seek only compensation in an inverse condemnation action.

### B. *California Administrative and Judicial Remedies.*

(4) The Fifth Amendment to the United States Constitution conditions the state's right to take private property for public use on the payment of "just compensation." It leaves to the state, however, the procedures by which compensation may be sought. "If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner has no claim against the Government for a taking." (*Williamson Planning Comm'n v. Hamilton Bank, supra*, 473 U.S. 172, 194-195

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 10

[87 L.Ed.2d 126, 143-144]; see also *Preseault v. ICC* (1990) 494 U.S. 1, 11 [108 L.Ed.2d 1, 13-14, 110 S.Ct. 914].)

California provides such a process by making available an action for inverse condemnation if, after exhausting administrative remedies to free the property from the limits placed on development and obtaining a judicial determination that just compensation is due, any restrictions for which compensation must otherwise be paid are not lifted. In that action the court determines whether the restriction on development "goes too far" and will be constitutionally impermissible unless just compensation is paid for the taking brought about by the restriction.

When property is damaged, or a physical invasion has taken place, an inverse condemnation action may be brought immediately because an irrevocable taking has already occurred. (5) If the alleged taking is a "regulatory taking," i.e., one that results from the application of zoning laws or regulations which limit development of real property, however, the owner must afford the state the opportunity to rescind the ordinance or regulation or to exempt the property from the allegedly invalid development restriction once it has been judicially determined that the proposed application of the ordinance to the property will constitute a compensable taking. The owner may do so, where appropriate, by a facial challenge to the ordinance, but in most cases must seek a variance if that relief is available and then exhaust other administrative and judicial remedies. The facial challenge may be **\*14** through an action for declaratory relief (*Agins v. City of Tiburon* (1979) 24 Cal.3d 266, 273 [157 Cal.Rptr. 372, 598 P.2d 25]). The latter, an "as applied" challenge to the development restrictions imposed by the administrative agency, may be properly made in a petition for writ of "administrative" mandamus to review the final administrative decision (Code Civ. Proc., § 1094.5) and that action may be joined with one for inverse condemnation. A declaratory relief action also may be joined with an action in inverse condemnation. (*State of California v. Superior Court*

(1974) 12 Cal.3d 237, 251 [115 Cal.Rptr. 497, 524 P.2d 1281].) Damages for the "taking" may be sought in an administrative mandamus action (Code Civ. Proc., § 1095), or, if the plaintiff seeks a jury trial, in the joined inverse condemnation action. (*Patrick Media Group, Inc. v. California Coastal Com.* (1992) 9 Cal.App.4th 592, 614 [11 Cal.Rptr.2d 824]; *Rossco Holdings, Inc. v. State of California* (1989) 212 Cal.App.3d 642, 660 [260 Cal.Rptr. 736]; *California Coastal Com. v. Superior Court, supra,* 210 Cal.App.3d 1488, 1494.) [FN6]The owner "may not, however, elect to sue in inverse condemnation and thereby transmute an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid." (*Agins v. City of Tiburon, supra,* 24 Cal.3d 266, 273.) Compensation must be paid for a permanent taking only if there has been a final judicial determination that application of the ordinance or regulation to the property is statutorily permissible and constitutes a compensable taking. Even then the state or local entity has the option of rescinding its action in order to avoid paying compensation for a permanent taking.

> FN6 Plaintiff's belief to the contrary notwithstanding, this court did not hold in *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508 [125 Cal.Rptr. 365, 542 P.2d 237] that damages for a taking of property could not be sought in a mandamus action. We held that the plaintiff could not add a tort claim for damage predicated on acts for which the Government Code provides immunity, as for injury caused by adopting or failing to adopt an enactment. (See Gov. Code, § 818.2.) In that case we had explained that the plaintiff, who alleged that the value of his property had decreased as a result of the adoption of a zoning ordinance, had not stated a taking claim. (15 Cal.3d at p. 518.) We did not hold, nor could we, consistent with the takings clause of the Fifth Amendment to the United States Constitution and article 1,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

section 19 of the California Constitution, that the Legislature may immunize the state or a local agency from liability for a taking.

Plaintiff argues that it is unreasonable and constitutionally impermissible to require a landowner to pursue these remedies. He argues that it is unreasonable because the owner must bear the expense of, and suffer the delays attendant on, an administrative proceeding, judicial review in a mandamus proceeding, and an inverse condemnation proceeding. He argues it is constitutionally impermissible because the owner may not exercise the right to jury trial in a mandate proceeding.

We are not persuaded. As noted above, the inverse condemnation proceeding may be joined with the petition for writ of mandate. Thus, there is no **\*15** extended delay, and, as the court held in *First Lutheran Church v. Los Angeles, supra*, 482 U.S. 304, the landowner is entitled to damages for any loss of use of the property beyond that to be expected as part of the normal permit process. Moreover, the expense of a meritorious taking claim will not be borne by the owner. Not only are damages for a temporary taking available, but the owner's reasonable costs and attorney fees must be reimbursed by the local entity if the owner establishes that the restriction on land use is a compensable taking. (Code Civ. Proc., § 1036; *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 375-377 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 104 [160 Cal.Rptr. 733, 603 P.2d 1329]; *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 71 [37 Cal.Rptr. 74, 389 P.2d 538].)

In some cases, all of the evidence necessary to establish a taking claim may have been presented in the administrative proceeding. If it was not possible for the landowner to present that evidence, it may be introduced in the mandate proceeding. Subdivision (e) of Code of Civil Procedure section 1094.5 permits the introduction of additional evidence that is relevant to a challenge to the administrative ac-

tion if the evidence "could not have been produced or ... was improperly excluded at the hearing before" the administrative agency. Thus, the trial court is able to resolve the taking claim in the mandate proceeding.

(6) A landowner is, as plaintiff argues, entitled to a jury trial in an inverse condemnation action. Article I, section 19 of the California Constitution provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Therefore, the right to jury trial applies in inverse condemnation actions, but that right is limited to the question of damages. (*Highland Realty Co. v. City of San Rafael* (1956) 46 Cal.2d 669, 683 [298 P.2d 15]; *People v. Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799]; *Contra Costa County Flood Control etc. Dist. v. Lone Tree Investments* (1992) 7 Cal.App.4th 930, 936 [9 Cal.Rptr.2d 326].)

(7) A property owner is, of course, entitled to a judicial determination of whether the agency action constitutes a taking. (*Healing v. California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1174 [27 Cal.Rptr.2d 758].) Administrative adjudication in the course of exercising an administrative agency's regulatory power, if subject to judicial review, does not deny participants their right to judicial determination of their rights. (*McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 374-375 [261 Cal.Rptr. 318, 777 P.2d 91].) We agree with the *Healing* court, however, that **\*16** an administrative agency is not competent to decide whether its own action constitutes a taking and, in many cases, administrative mandate proceedings are not an adequate forum in which to try a takings claim.

If the administrative hearing is not one in which the landowner has a full and fair opportunity to present evidence relevant to the taking issue, one in which witnesses may be sworn, and testimony presented by means of direct and cross-examination, the administrative record is not an adequate basis on which to determine if the challenged action consti-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

tutes a taking. (*Healing v. California Coastal Com.*, *supra*, 22 Cal.App.4th 1158, 1170.) A judicial determination is available in the mandate proceeding, however, if the administrative action is challenged on the basis that it is a compensable taking, the hearing did permit full litigation of the facts relevant to the takings issue, and any additional issues are litigated before the court. Because a taking of property is alleged, the court must accord the owner de novo review of the evidence before the agency in ruling on the taking claim (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-44 [112 Cal.Rptr. 805, 520 P.2d 29]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 140 [93 Cal.Rptr. 234, 481 P.2d 242]) and consider any additional evidence admitted at the hearing on the petition for writ of mandate.

If the owner believes the hearing before the administrative agency was not adequate, the owner is assured a full and fair hearing by exercising his right to join an inverse condemnation action with the mandate proceeding. In the inverse condemnation proceeding the owner may both litigate the taking claim, and, if successful, assert the right to jury trial guaranteed by article I, section 19 of the California Constitution. The availability of these procedures satisfies the requirement that a state provide an adequate process for obtaining compensation when property is taken for public use.

Nor does the imposition on the property owner of the requirement that administrative remedies be exhausted as a prerequisite to an inverse condemnation action impermissibly deny the owner the right to compensation as a "preferred remedy." [FN7] The "preferred remedy" to which plaintiff claims a right is not one recognized as part of constitutional takings jurisprudence. *17 The decisions in which he finds this preference are simply applications of federal law. They hold that in situations in which Congress has not withdrawn from the Court of Claims the jurisdiction conferred by the Tucker Act (28 U.S.C. § 1491(a)(1)) over claims for damages founded on, inter alia, the United States Constitution, it

is improper to enjoin operation or enforcement of a federal statute on the ground that such enforcement might bring about a compensable taking. Those decisions say nothing about the power of a state to reserve the right to rescind a statute or ordinance, or to exempt property from its scope, if it is determined that enforcement of the statute will result in a compensable taking.

> FN7 Plaintiff's suggestion that *Preseault v. ICC*, *supra*, 494 U.S. 1, 12 [108 L.Ed.2d 1, 14] makes a suit in inverse condemnation the remedy of "first instance" lacks merit. *Preseault* dealt with a claim that title to property had been taken pursuant to federal action and construed federal statutory law which created a claims procedure which, the court held, had to be followed before an attack on the regulation which resulted in the alleged taking could be pursued. *Hurley v. Kincaid* (1932) 285 U.S. 95 [76 L.Ed. 637, 52 S.Ct. 267] also involved only federal law. The court held there that the plaintiff could not sue to enjoin operation of a federal flood control project which caused occasional flooding of plaintiff's land as Congress had provided a remedy by which compensation would be paid for such damage. *Ruckelshaus v. Monsanto Co.* (1983) 463 U.S. 1315 [77 L.Ed.2d 1417, 104 S.Ct. 3] is not an opinion of the court. It is an in-chambers opinion of Justice Blackmun denying a stay pending appeal from an injunction against enforcement of provisions of a federal pesticide regulation statute under which trade secrets might be disclosed. Not only is there no "holding" to the effect that inverse condemnation rather than specific relief is the proper remedy, there is no discussion of that topic. The court's actual holding in *Ruckleshaus v. Monsanto Co.* (1984) 467 U.S. 986 [81 L.Ed.2d 815, 104 S.Ct. 2862] offers no support for plaintiff's position. Again, the court applied federal

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

law, holding that because a federal claims procedure was available to provide just compensation if trade secrets had been disclosed, it was improper to enjoin actions the administrative agency took under the pesticide law. The case had nothing to do with regulatory taking of real property or state procedural prerequisites to inverse condemnation actions, and did not create a federal, constitutionally mandated, right to seek monetary compensation in lieu of other remedies.

In *United States v. Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121 [88 L.Ed.2d 419, 106 S.Ct. 455], for instance, the court held that it was improper to enjoin enforcement of a federal statute which required a permit for discharging fill into protected wetlands. The court reiterated the well-established proposition that if compensation is available when property is in fact taken, the governmental action is not unconstitutional. (474 U.S. at p. 128 [88 L.Ed.2d at p. 427].) However, the court pointed out, the permit requirement itself did not take any land, and, if a permit were to be denied with the result that no economically feasible use could be made of the property, federal law provided a means of obtaining compensation for any taking that might occur. For that reason it was premature to seek an injunction.

Far from supporting plaintiff, this case confirms that when restrictions on use of real property are the basis for a taking claim, the owner must pursue any available administrative permit process before seeking compensation or challenging the statute or regulation. The California permit process includes both administrative and judicial review of any conditions to which the landowner objects. Only when the review process has been completed is it possible to determine whether a taking has occurred. Nothing in the high court's holding that an injunction against enforcement of the law or regulation which requires a permit is premature, suggests that compensation must **\*18** be paid immediately upon either enactment of the statute or issuance of a permit with restrictions on development.

The other cases on which plaintiff relies also involve attempts to enjoin enforcement of a federal statute and are no more supportive. *Dames & Moore v. Regan* (1981) 453 U.S. 654 [69 L.Ed.2d 918, 101 S.Ct. 2972] held only that if a presidential order suspending claims against Iran were to effect a taking of the plaintiff's property, the "treaty exception" to the jurisdiction of the United States Court of Claims would not bar a claim for compensation. *Regional Rail Reorganization Act Cases* (1974) 419 U.S. 102 [42 L.Ed.2d 320, 95 S.Ct. 335] held that because the Regional Rail Reorganization Act of 1973 (45 U.S.C. § 701 et seq.) had not withdrawn jurisdiction from the United States Court of Claims, an adequate remedy existed for any taking that might result. The district court erred therefore in declaring the act unconstitutional and enjoining its enforcement. In *Dugan v. Rank* (1963) 372 U.S. 609 [10 L.Ed.2d 15, 83 S.Ct. 999], claimants to water rights attempted to enjoin storing and diversion of water as part of a federal Bureau of Reclamation project. The court held that their remedy, if valid rights were interfered with or partially taken, was a suit for damages. Finally, *U.S. v. Gerlach Live Stock Co.* (1950) 339 U.S. 725 [94 L.Ed. 1231, 70 S.Ct. 955, 20 A.L.R.2d 633] affirmed a United States Court of Claims judgment awarding compensation for a taking of riparian rights, noting that the absence of equitable remedies did not mean that no right was available. The rule on which plaintiff would rely, that the adequacy of a damage remedy is usually grounds for denying equitable remedies, was invoked by the court. It did so, however, with respect to the alternatives of specific performance, mandatory order, and injunctions. (*Id.*, at p. 752 [94 L.Ed.2d at pp. 1249-1250].) The court did not address the right of a state to enforce procedures by which the state or local governmental entity may determine whether its actions will effect a taking, and, if so, to opt to withdraw the objectionable restrictions on development.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The disparity in resources between the federal government and local governmental entities both explains and justifies the state procedure. The likelihood that the impact of a federal regulatory statute may effect a taking of property of such value as to threaten the federal treasury with insolvency is remote. Congress has determined that providing a damage remedy for those cases in which a taking occurs will not cause undue hardship. Few local governments could afford the financial impact of a decision that a *19 widely applicable zoning or regulatory ordinance brought about a taking of all affected property. [FN8]

> FN8 The prayer in plaintiff's complaint sought damages of $10 million for the alleged taking of his property alone.

The California procedural requirements to which plaintiff objects do no more than ensure to the state its right to a prepayment judicial determination that the ordinance or regulation is excessive and will constitute a taking, thus affording the state the option of abandoning the ordinance, regulation, or challenged action, or exempting parcels from its scope if the regulation on use is excessive. As we noted above, the United States Supreme Court has recognized repeatedly the right of the state to reserve the option of rescinding a statute that imposes excessive regulation, and has reaffirmed the principle that a landowner may not compel the state to initiate an eminent domain action. These requirements extend that principle to the inverse condemnation context.

Plaintiff's action is not a claim against the federal government. It is not governed by the federal authority on which plaintiff relies. (8) A California landowner, who believes that application of a state statute or local ordinance limiting development of the owner's property works a taking, may not bypass the remedies the state has made available to avoid the taking. If he does so, the state may deem the owner to have waived the "taking" claim. (*County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 510-511 [138 Cal.Rptr. 472, 564 P.2d 14];

*Rossco Holdings, Inc. v. State of California, supra,* 212 Cal.App.3d 642, 654.)

"If the conditions imposed by the city in the[] permit were invalid, Code of Civil Procedure section 1094.5 provided plaintiffs with the right and procedures to eliminate them. *By declining to avail themselves of those procedures, plaintiffs cannot convert that right into a cause of action in inverse condemnation.*" (*Pfeiffer v. City of La Mesa* (1977) 69 Cal.App.3d 74, 78 [137 Cal.Rptr. 804], italics added.) [FN9]As the *Pfeiffer* court observed, if a landowner could do so, "complete chaos would result in the administration of this important aspect of municipal affairs." (69 Cal.App.3d at p. 78.) *20

> FN9 Contrary to plaintiff's assertion, *Pfeiffer v. City of La Mesa, supra,* 69 Cal.App.3d 74, was not "nullified" by *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914 [218 Cal.Rptr. 839], which cited the case with approval, but distinguished it. The Legislature has now codified the rule that one who accepts the benefits of a permit may not later challenge conditions imposed on or in the permit.Government Code section 66020 creates a limited exception under which a residential housing developer may challenge a permit condition such as that in issue here while proceeding with development. That section, enacted in 1990, permits a protest if the developer provides evidence of arrangements made to ensure performance of the condition if it is upheld. The developer must also serve notice of the protest on the agency and the protest must be filed at the time the condition is approved or within 90 days after it is imposed and initiate a legal action to review or attack the condition within 180 days after the date of imposition.
> The Legislature otherwise indicated approval of and codified the *Pfeiffer* rule in subdivision (d) of Government Code sec-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

tion 66020, a provision which denies any further review rights if the procedures outlined in the statute are not followed: "Thereafter, notwithstanding any other law to the contrary, all persons are barred from any action or proceeding or any defense of invalidity or unreasonableness of the imposition."

In the face of case law which unanimously and repeatedly has rejected his arguments, plaintiff, and amicus curiae Pacific Legal Foundation, cite only *Golden Cheese Co. v. Voss (1991) 230 Cal.App.3d 727[281 Cal.Rptr. 6022] (Golden Cheese II) as California authority for maintaining an inverse condemnation action without seeking exemption from a restrictive administrative regulation, and, if unsuccessful, seeking a judicial determination that application of the law or regulation will effect a constitutionally impermissible taking if compensation is not paid.* The case does not support petitioner. The case did not involve land-use regulation and the administrative and judicial remedies which are available to, and must be exhausted by, landowners who claim that such regulation effects a taking.

The court did state in *Golden Cheese II* that the plaintiff in that case could state an inverse condemnation cause of action without challenging the validity of the administrative order in issue there. However, plaintiff overlooks both the context of that statement and the fact that a complaint challenging the validity of the order had been filed with the inverse condemnation complaint.

*Golden Cheese II*, on which plaintiff relies, followed the decision of the Court of Appeal in *Golden Cheese Co. v. Voss* (1991) 230 Cal.App.3d 547 [281 Cal.Rptr. 587] (*Golden Cheese I*), a companion case in which the trial court had upheld the validity of a milk marketing plan. The Court of Appeal had affirmed the judgment which denied a petition for writ of mandate. The challenged plan fixed the minimum price for milk used for cheese. The court held that the order was a valid exercise of the discretion given to the director by the Milk Stabilization Act (Food & Agr. Code, § 61801 et seq.). The new formula for pricing the milk, which the trial court and the Court of Appeal upheld, included a manufacturing cost allowance. The Director of the Department of Food and Agriculture found that Golden Cheese was one of the three highest-cost plants, and was not reasonably efficient. The formula adopted did not accommodate the costs of manufacturing in the Golden Cheese plant and, as a result, did not permit Golden Cheese to pass on all of the costs of milk. The Court of Appeal nonetheless upheld the formula.

*Golden Cheese II* was an appeal from a judgment for defendant entered after the trial court sustained without leave to amend a demurrer to an *21 inverse condemnation complaint. In the inverse condemnation action, the company claimed that the price fixing order and a conclusion of the Director of the Department of Food and Agriculture that operation of the Golden Cheese plant was contrary to the economic health of the dairy industry brought about a regulatory taking of its business. Golden Cheese based its taking argument on allegations that the director's actions did not allow it to recover its costs and destroyed any viable economic interest it had in its plant and property. The trial court sustained a demurrer without leave to amend on the ground that the plaintiff did not challenge the validity of the marketing order. The Court of Appeal concluded that this was error because the action challenged the marketing order as applied. Therefore, the court reasoned, Golden Cheese had stated or could state an "as applied" cause of action in inverse condemnation without alleging the invalidity of the director's order.

There is nothing remarkable in that conclusion. An otherwise valid statute or regulation may be invalid as applied to a particular property if compensation is not paid. The Court of Appeal noted that the validity of the order had been challenged in the companion case, and that the action did not involve regulation of real property. Nothing in the opinion

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

suggests that the demurrer to the Golden Cheese complaint asserted a procedural bar to the action based on failure to exhaust available administrative and judicial remedies. And, of course, the case did not involve any issue with respect to a statute of limitations.

Moreover, the actual holding in *Golden Cheese II* was that the holding in *Golden Cheese I* was res judicata on the question of whether the pricing formula was reasonable. Because it was, Golden Cheese had no reasonable investment-backed expectations to any particular milk price level, and there had been no taking of its property. *Golden Cheese II* thus offers no support for plaintiff's argument that he may bypass proper administrative and judicial remedies, and avoid an expressly applicable statute of limitations, when the alleged regulatory taking occurs through application of ordinances adopted pursuant to the Subdivision Map Act.

### C. *The Applicable Statute of Limitations.*

(9a) Relying on his theory that an inverse condemnation action may be pursued without seeking administrative relief from the land-use regulation which restricts development, followed by judicial review of the final administrative decision, plaintiff argues that the Court of Appeal erred in rejecting his claim that application of the Glendale ordinance to his property was a "continuous wrong" for which a new cause of action arises each day the city *22 fails to compensate him. He contends that this must be the rule or property owners cannot know the point in time at which the taking occurs and the statute of limitations commences running.

The Court of Appeal did not err in this respect. If the challenge is to the facial validity of a land-use regulation, the statute of limitations runs from the date the statute becomes effective. Government Code section 65009 establishes a 120-day period of limitation for such actions. [FN10] By contrast, if the challenge is to the application of the regulation to a specific piece of property, the statute of limitations

for initiating a judicial challenge to the administrative action runs from the date of the final adjudicatory administrative decision. [FN11] Government Code section 66499.37 establishes a 90-day period of limitation for these actions. Thus, there is no uncertainty regarding the commencement of the period. Whether the complaint is deemed a facial challenge or an applied challenge, it is untimely.

> FN10 Government Code section 65009, subdivision (c): "Except as provided in subdivision (d), no action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 120 days after the legislative body's decision:
> "(2) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a zoning ordinance."

> FN11 When that decision involves approval of a subdivision map, the "final administrative decision is the final administrative action approving or rejecting the tentative map, an adjudicatory decision," since approval of a final map which substantially complies with the previously approved tentative map is a mandatory ministerial act. (Gov. Code, § 66474.1; *Griffis v. County of Mono* (1985) 163 Cal.App.3d 414, 426-427 [209 Cal.Rptr. 519]; *Soderling v. City of Santa Monica* (1983) 142 Cal.App.3d 501, 506 [191 Cal.Rptr. 140].)

*Stone v. City of Los Angeles* (1975) 51 Cal.App.3d 987 [124 Cal.Rptr. 822], on which plaintiff relies for his argument that he has suffered a continuous wrong, does not support that claim. *Stone* was an action for loss of use of property caused by precondemnation delays after the defendant city had announced its intent to condemn the property. The Court of Appeal was not dealing with a taking which, allegedly, was complete at the time the action was filed.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiff argues alternatively that Code of Civil Procedure sections 318, 319, or 338 apply. They do not. They are applicable only if no "different limitation is prescribed by statute." (Code Civ. Proc., § 312.)Government Code section 66499.37 is a "different limitation" which now governs actions in which such issues are raised.

(10) To determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, i.e., the "gravamen" of the cause of action. (*23*Leeper v. Beltrami* (1959) 53 Cal.2d 195, 214 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]; *San Filippo v. Griffiths* (1975) 51 Cal.App.3d 640, 645 [124 Cal.Rptr. 399].) "[T]he nature of the right sued upon and not the form of action nor the relief demanded determines the applicability of the statute of limitations under our code." (*Maguire v. Hibernia S.& L. Soc.* (1944) 23 Cal.2d 719, 733 [146 P.2d 673, 151 A.L.R. 1062].)

"The 'patent legislative objective' of [section 66499.37] is to ensure that judicial resolution of Subdivision Map Act disputes occurs 'as expeditiously as is consistent with the requirements of due process of law.' " (*Hunt v. County of Shasta* (1990) 225 Cal.App.3d 432, 442 [275 Cal.Rptr. 113].) (9b) As the Court of Appeal recognized here and in *Hunt,*section 66499.37 applies by its terms to *any* action involving a controversy over or arising out of the Subdivision Map Act. Therefore, if this is a claim arising out of application of a land-use regulation authorized by that act, section 66499.37 applies. Plaintiff seeks to avoid application of section 66499.37 by arguing he does not challenge the validity of the Glendale ordinance. He seeks only compensation for the taking he alleges was effected by the ordinance. He contends on that basis that the statutes of limitation found in the Code of Civil Procedure govern this action. We disagree.

Relying on *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 867 [218 Cal.Rptr. 293, 705 P.2d 866], plaintiff asserts that the five-year period of limitation established by

Code of Civil Procedure sections 318 and 319 applies to this action.

*Baker, supra,* 39 Cal.3d 862, did not involve a limitation on development, however. There the action was one for an alleged continuing nuisance caused by noise, smoke, and vibration from aircraft taking off and landing at defendants' nearby airport. The court deemed the gravamen of the cause of action to be one for an invasion of the plaintiffs property, and on that basis concluded that the five-year statute of limitations of Code of Civil Procedure sections 318 and 319 applied.

The court did not hold in *Baker* that all actions styled by the plaintiff as actions for inverse condemnation are subject to the five-year statute of limitations. In ruling that the five-year statute applied to that action it relied on *Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 374 [28 Cal.Rptr. 357]. In *Frustuck,* an inverse condemnation action was based on a physical invasion of the plaintiff's property by defendant city, whose agents enlarged a drainage ditch on the property and created a berm by piling up dirt, debris, rock and other material on the property. In concluding that the five-year statute applied, rather than the three-year statute for trespass, the Court of Appeal reasoned that the area in issue had been taken for public use. Unlike *24 the present action, both *Baker* and *Frustuck* were actions based on physical invasion of the property.

There is no basis for a conclusion that Code of Civil Procedure sections 318, 319, or 338 govern this action, therefore. The complaint does not allege facts to establish that title to the land was affected by enactment of the ordinance or that a physical invasion of the land took place.

Assuming, arguendo, that plaintiff's complaint alleges facts adequate to establish a taking of 40 percent of his property either by virtue of the enactment of the ridge line ordinance or by the restrictions administratively imposed on development under the authority of the ordinance, the complaint is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

untimely. [FN12] If this action were deemed a facial challenge to the Glendale ordinance predicated on a theory that the mere enactment of the Glendale ordinance worked a taking of plaintiff's property, it would be untimely even under *Frustuck* as the complaint was filed more than five years after the ordinance was enacted. Moreover, as the State of California points out in its amicus curiae brief, since *Frustuck* was decided the Legislature has adopted not only section 66499.37, but also section 65009, a 120-day statute of limitations specific to challenges to the facial validity of zoning ordinances. [FN13]

> FN12 The state, appearing as amicus curiae, argues that an ordinance or regulation which purports to deny affected property owners any economically feasible use of property without provision for compensation is invalid. The basis for this argument is that article I, section 19 of the California Constitution requires that compensation be paid for any taking. It follows, the state argues, that an owner may not compel the government to compensate the owner for action purportedly taken under an invalid statute. We agree that if an ordinance reflected legislative intent to take property in this manner and did not include a provision for compensation it would be invalid. It is unlikely that an ordinance which merely regulates the use of property would reflect such an intent, however. The state's argument does not acknowledge the possibility that a zoning or land-use ordinance or regulation which makes no provision for payment of compensation may be invalid as applied to one or more parcels within the overall area subject to the ordinance or regulation, but valid as to others.

> FN13 Section 66499.37 was amended in 1980 to reduce the limitations period from 180 days to 90 days. Elsewhere in that legislation the Legislature explained that

changes in the law were needed to expedite the permit process and thereby encourage the development of new housing. (Stats. 1980, ch. 1152, § 10 et seq., p. 3796; see now Gov. Code, § 65913.)

When the gravamen of the cause of action is a claim that a land-use ordinance or regulation enacted under the authority of the Subdivision Map Act, or administrative actions taken pursuant to such an ordinance or regulation, has had the effect of "taking" the plaintiff's property without compensation, the action necessarily challenges the validity either of the ordinance or regulation or of the acts taken by the local agency or appeal board pursuant to the ordinance or regulation. This follows because, as we have explained above, only if the ordinance or regulation would be invalid on its **\*25** face or as applied unless compensation is paid to an affected landowner is a claim in inverse condemnation meritorious. Therefore, the constitutional validity of the ordinance as it affects the plaintiff's property must be litigated in any inverse condemnation action which does not allege that a taking has already been judicially established.

Section 66499.37 mandates that: "*Any* action or proceeding *to attack, review, ... the decision of an advisory agency, appeal board or legislative body concerning a subdivision, ...* or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 90 days after the date of such decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of such decision or of such proceedings, acts or determinations." (Italics added.)

This section is not, as plaintiff argues, limited to actions for specific relief. It includes actions for compensation for a regulatory taking because the validity of the ordinance or its application to the plaintiff's property, if uncompensated, must be determined in the action-i.e., the court must determine

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

if there has been a taking. Before he or she is entitled to any relief, either compensation or exemption of the property from the development restriction, the plaintiff must establish that the ordinance, regulation, or administrative action is not lawful or constitutionally valid if no compensation is paid. The action therefore comes within the broad language of section 66499.37.

Had plaintiff exhausted his administrative remedies by first seeking a variance and pursuing an administrative appeal challenging the permit conditions, and made his claim that the administrative actions constituted a taking in a petition for writ of mandate seeking review of the agency action filed pursuant to Code of Civil Procedure section 1094.5, FN14 the application of section 66499.37 could not be questioned. His action would be one to attack a decision of an appeal board, or, if no administrative appeal is available under the Glendale ordinance, an action of the administrative agency, concerning a subdivision, and the act done prior to that decision. It would clearly be an action to determine the validity of the permit conditions. FN15 A plaintiff may not avoid the application of section 66499.37 by electing to *26 forego raising his claim in the administrative mandamus proceeding in which the owner must exhaust administrative remedies for an erroneous, excessive, or unreasonable restriction on development. If the taking claim is not asserted in that proceeding, the challenge to the validity of the administrative action must be resolved in the inverse condemnation action in order to determine if compensation is due, and to allow the administrative agency or local government the opportunity to rescind the land-use restriction or its application to the plaintiff's property. A court cannot determine that compensation is due on allegations like those of plaintiff's complaint without determining if the development restriction is a taking. It must, necessarily, rule on the validity of the ordinance, regulation, or administrative act under which development is restricted.

FN14 See *South Coast Regional Com. v.*

*Gordon* (1977) 18 Cal.3d 832 [135 Cal.Rptr. 781, 558 P.2d 867]; *State of California v. Superior Court, supra,* 12 Cal.3d 237;*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715] ("[T]he rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.").

FN15 Glendale might have demurred on the basis that plaintiff failed to state a cause of action, the omission being the absence of allegations that administrative remedies had been exhausted or to establish an exception to that requirement. (See *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 384 [216 Cal.Rptr. 733, 703 P.2d 73]; *County of Contra Costa v. State of California* (1986) 177 Cal.App.3d 62 [222 Cal.Rptr. 750].)

In sum, when there has been no prior determination that the plaintiff's property has been taken by virtue of governmental action authorized by the Subdivision Map Act, a court hearing an inverse condemnation action based on that action must determine whether, on its face or as applied, the ordinance or regulation would be invalid if the property owner is not compensated for the claimed taking.

The gravamen of plaintiff's cause of action is therefore a claim that the Glendale ordinance is invalid on its face or as applied because, through the authority of that ordinance and/or regulations enacted under it, the city has taken his property without compensation. Plaintiff cannot transform the action into one which does not challenge the validity of the ordinance, regulations, and administrative actions by acquiescing in the taking, assuming the validity of those actions, and seeking only damages. The election is not his, but the city's. Under a cause of action such as that stated by the complaint in this case, regardless of the title attached to the cause of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

action or the remedy sought, the plaintiff must prove that the ordinance and regulations as applied have worked a "taking" of the plaintiff's property and that the plaintiff has not been compensated.

Viewed from this perspective it is apparent that section 66499.37 governs the time within which this action should have been initiated. Both the statutory language and the legislative history of the section lead to a conclusion that this section, not Code of Civil Procedure section 318 or section 319, is applicable.

Every appellate decision which has considered the issue in a case involving a controversy related to a subdivision has held that section 66499.37 is *27 applicable no matter what the form of the action. (See *Presenting Jamul v. Board of Supervisors* (1991) 231 Cal.App.3d 665 [282 Cal.Rptr. 564] [declaratory relief action challenging denial of request to toll expiration date of tentative subdivision map]; *Hunt v. County of Shasta, supra,* 225 Cal.App.3d 432, 442 [action for declaratory relief that subdivision parcels complied with Subdivision Map Act and mandate to compel issuance of certificate of compliance]; *Griffis v. County of Mono, supra,* 163 Cal.App.3d 414 [action challenging approval of final subdivision map]; *Kirk v. County of San Luis Obispo* (1984) 156 Cal.App.3d 453 [202 Cal.Rptr. 606] [action to compel issuance of certificate of compliance with Subdivision Map Act]; *Soderling v. City of Santa Monica, supra,* 142 Cal.App.3d 501 [mandate to compel city to approve final subdivision maps]; *Resource Defense Fund v. County of Santa Cruz* (1982) 133 Cal.App.3d 800 [184 Cal.Rptr. 371] [action for mandamus and injunctive relief challenging county's approval of land division]; *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334 [176 Cal.Rptr. 620] [consolidated mandate and declaratory relief actions challenging approval of tentative maps for two subdivisions]; *Kriebel v. City Council* (1980) 112 Cal.App.3d 693 [169 Cal.Rptr. 342] [mandate challenging action approving neighboring residential development]; *Timberidge Enterprises, Inc. v. City of Santa Rosa*

(1978) 86 Cal.App.3d 873, 886 [150 Cal.Rptr. 606] [action to invalidate resolution permitting imposition of school impact fee condition on building permits and to recover fees].)

As the court held in *Timberidge Enterprises, Inc. v. City of Santa Rosa, supra,* 86 Cal.App.3d 873, 886, the "clear language" of section 66499.37 "manifests a legislative purpose that a *decision* such as that of the City, approving a subdivision map and attaching a *condition* thereto, shall be judicially attacked within [the limitation period of section 66499.37], or not at all." (Original italics.)

(11) The purpose of statutes and rules which require that attacks on land-use decisions be brought by petitions for administrative mandamus, and create relatively short limitation periods for those actions, and actions which challenge the validity of land use statutes, regulations, and/or decisions, is to permit and promote sound fiscal planning by state and local governmental entities. As the Court of Appeal explained in *Patrick Media Group, Inc. v. California Coastal Com., supra,* 9 Cal.App.4th 592, 612: "The requirement that challenges to administrative actions constituting takings be brought initially by administrative mandamus assures that the administrative agency will have the alternative of changing a decision for which compensation might be required. If no such early opportunity were given, and instead, persons were permitted to stand by in the face of administrative actions alleged to be injurious or confiscatory, and three or five years later, claim monetary compensation on the theory that the administrative action resulted *28 in a taking for public use, meaningful governmental fiscal planning would become impossible."

(9c) And, as the court observed in *California Coastal Com. v. Superior Court (Ham), supra,* 210 Cal.App.3d 1488, 1496, if an owner were permitted to bypass the administrative mandamus remedy and delay initiating an inverse condemnation action for almost five years "[i]n given cases and certainly in the aggregate, the financial burden on the state could be overwhelming." Although the 90-day lim-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043
8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

itation period is short, it is, as was the 60-day review period of Public Resources Code section 30801 at issue in *Ham*, the period "operates less as a limitations period and more as a time limit for seeking review of the ruling of another tribunal.... Where review is sought of a Commission decision, there is no question when the 60-day period begins to run. The property owner has no need to 'discover' anything.... [T]he Legislature had every reason to conclude that 60 days provides ample time for a property owner to decide whether to challenge an adverse Commission decision." (210 Cal.App.4th at pp. 1496-1497, fn. omitted.) The same may be said of section 66499.37 and actions seeking review of local agency decisions applying land-use regulations.

Section 66499.37 is not unique in establishing a requirement that challenges to the actions of an administrative agency be brought promptly. In addition to that section and Public Resources Code section 30801, the following statutes establish such requirements: Code of Civil Procedure section 1094.5 (administrative mandamus-90 days); Public Resources Code section 21167 (California Environmental Quality Act decisions-30-180 days); Government Code sections 65901, 65903, 65907 (variances, conditional use and permits, board of zoning adjustment-90 days).

Section 66499.37 governs this action.

### D. *Other Claims.*

Plaintiff argues for the first time in this court that it was error to sustain Glendale's demurrer without leave to amend because, had leave been granted, he could have added allegations that the tentative subdivision maps for the property were filed on October 1, 1986; he sold the property on December 21, 1986, and the final subdivision maps were approved on or about October 19, 1988, and April 27, 1989. This argument was not made in the Court of Appeal and is not among the issues presented in the petition for review. Moreover, we fail to see how such

amendment would have stated a cause of action. If there were a compensable taking of an interest plaintiff had in the land, it must necessarily have occurred before he sold the property. *29

Plaintiff's theory may be that a landowner may convert his rights to challenge an uncompensated regulatory taking into an inverse condemnation action by selling the property before seeking administrative relief, either without applying for a development permit or during the permit process. We disagree for the reasons stated above. A court cannot determine if application of a land-use restriction will constitute a taking until a final administrative decision has been made regarding the use of the property. A potential diminution of value as a result of rezoning or land-use restrictions is not necessarily a taking.

Plaintiff also claims that the right to sue in inverse condemnation for regulatory takings had been abolished in California as a result of this court's holding in *Agins v. City of Tiburon, supra,* 24 Cal.3d 266, and was not revived until the decision in *First Lutheran Church v. Los Angeles, supra,* 482 U.S. 304, "overruled" *Agins* in 1987. That assertion not only misstates the impact of *First Lutheran Church,* but assumes that plaintiff had a right to initiate an action in inverse condemnation without first challenging the development restrictions of which he complains. As we have shown above, that assumption is unwarranted. Nothing in *Agins* precluded an action challenging application of the Glendale ordinance to plaintiff's property, or seeking damages in an inverse condemnation action if the ordinance was found to be invalid absent compensation and the city nonetheless denied plaintiff the right to develop the ridge-line property. Plaintiff had a remedy by which he could have avoided the restrictions brought about by the Glendale ordinance or obtained compensation for their imposition *if their impact constituted a taking* unless compensation was paid. He elected to forego both a judicial determination that the restrictions would constitute a compensable taking, and the remedy the state provides.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

876 P.2d 1043

8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

Page 22

### III. Disposition

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., George, J., and Anderson, J., [FN*] concurred.

> FN* Presiding Justice, Court of Appeal, First Appellate District, Division Four, assigned by the Acting Chairperson of the Judicial Council.

Appellant's petition for a rehearing was denied September 22, 1994, and the opinion was modified to read as printed above.

Cal. 1994.

Hensler v. City of Glendale

8 Cal.4th 1, 876 P.2d 1043, 32 Cal.Rptr.2d 244

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 5

Westlaw.

90 Cal.App.4th 188                                                                                                Page 1
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

**H**
HOME BUILDERS ASSOCIATION OF NORTH-
ERN CALIFORNIA, Plaintiff and Appellant, v.
CITY OF NAPA et al., Defendants and Respond-
ents; NAPA VALLEY COMMUNITY HOUSING
et al., Interveners and Respondents.
Cal.App.1.Dist.
HOME BUILDERS ASSOCIATION OF NORTH-
ERN CALIFORNIA, Plaintiff and Appellant,
v.
CITY OF NAPA et al., Defendants and Respond-
ents; NAPA VALLEY COMMUNITY HOUSING
et al., Interveners and Respondents.
**No. A090437.**

Court of Appeal, First District, Division 5, Califor-
nia.
June 6, 2001.

·

**[Opinion certified for partial publication. FN* ]**

FN* Pursuant to California Rules of Court,
rules 976(b) and 976.1, this opinion is cer-
tified for publication with the exception of
parts II.C and II.E.

SUMMARY

A home builders association brought an action as-
serting a facial challenge to a city ordinance that
imposed on residential developers a requirement
that 10 percent of all newly constructed units be af-
fordable. The trial court sustained the city's demur-
rer and dismissed the complaint. (Superior Court of
Napa County, No. 26-07228, W. Scott Snowden,
Judge.)

The Court of Appeal affirmed. It held that the or-
dinance did not, on its face, violate the takings
clauses of the United States and California Consti-
tutions. Although the ordinance imposed significant
burdens on developers, it also provided significant
benefits for those who complied, and it allowed a
developer to appeal for a reduction, adjustment, or
complete waiver of the requirements. The court

held that, since the city had the ability to waive the
requirements, the ordinance could not, on its face,
result in a taking. Further, the waiver clause pre-
cluded a facial challenge even though it placed the
burden on the developer to prove that a waiver
would be appropriate. The court also held that the
ordinance met the test of substantially advancing a
legitimate state interest. Creating affordable hous-
ing for lowand moderateincome families is a legit-
imate state interest, and the ordinance would ad-
vance that interest. (Opinion by Jones, P. J., with
Stevens and Simons, JJ., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1)** Words, Phrases, and Maxims--Inclusionary
Zoning or Inclusionary Housing Ordinance.
An inclusionary zoning or inclusionary housing or-
dinance is one that requires a residential developer
to set aside a specified percentage of new units for
lowor moderate-income housing.

**(2)** Appellate Review § 128--Scope of Review-
-Function of Appellate Court-- Rulings on Demur-
rers.
On appeal from a judgment of dismissal after an or-
der sustaining a demurrer, the appellate court re-
views the record de novo, to determine whether the
complaint states a cause of action as a matter of
law. All facts properly pleaded are deemed to be true.

**(3a,    3b,    3c)**    Eminent    Domain    §
18--Compensation--Constitutional    and    Statutory
Provisions--What Constitutes Taking or Damage-
-Inclusionary Zoning.
A city's inclusionary zoning ordinance, which im-
posed on residential developers a requirement that
10 percent of all newly constructed units be afford-
able, did not, on its face, violate the taking clauses
of the United States and California Constitutions.
Although the ordinance imposed significant bur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                    Page 2
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

dens on developers, it also provided significant benefits for those who complied, and it allowed a developer to appeal for a reduction, adjustment, or complete waiver of the requirements. It was not true that the ordinance required developers to sell or rent 10 percent of their units to low-income individuals, since they had the alternatives of donating land or paying an in-lieu fee. Also, since the city had the ability to waive the requirements, the ordinance could not, on its face, result in a taking. Further, the waiver clause precluded a facial challenge even though it placed the burden on the developer to prove that a waiver would be appropriate.

[See 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 938 et seq.; West's Key Number Digest, Eminent Domain k. 2(1.2).]

**(4)    Eminent    Domain    §**
**18.2--Compensation--Constitutional and Statutory Provisions--Regulations--Facial Challenge.**
A claim that a regulation is facially invalid because it effects an unconstitutional taking is only tenable if the terms of the regulation will not permit those who administer it to avoid an unconstitutional application to the complaining parties. This is because a facial challenge is predicated on the theory that the mere enactment of the ordinance worked a taking of the plaintiff's property.

**(5) Zoning and Planning § 9--Content and Validity of Zoning Ordinances and Planning Enactments--Inclusionary Zoning Ordinance.**
A city's inclusionary zoning ordinance, which imposed on residential developers a requirement that 10 percent of all newly constructed units be affordable, did not fail to substantially advance legitimate state interests, and thus the trial court, in an action by developers asserting a facial challenge to the ordinance, did not err in entering judgment for the city. Creating affordable housing for low and moderate-income families is a legitimate state interest, and the ordinance would advance that interest. Although a heightened standard of judicial scrutiny applies to specific land use bargains between property owners and regulatory bodies, that standard is inapplicable to development exactions that are generally applicable through legislative action.

COUNSEL
Paul Campos; Pacific Legal Foundation, James S. Burling and Mark T. Gallagher for Plaintiff and Appellant.
Harding Larmore Kutcher & Kozal, Christopher M. Harding and Kenneth L. Kutcher for California Housing Council and Apartment Association of Greater Los Angeles as Amici Curiae on behalf of Plaintiff and Appellant.
Hyde, Miller, Owen & Trost, Kirk E. Trost; and Thomas B. Brown, City Attorney, for Defendant and Respondent City of Napa.
Goldfarb & Lipman and Richard A. Judd for Napa Chamber of Commerce, Napa Valley Farm Bureau, Napa Valley Grape Growers' Association, 72 California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.
Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, and Tara L. Mueller, Deputy Attorney General, for the People of the State of California as Amicus Curiae on behalf of Defendant and Respondent.
California Affordable Housing Law Project of the Public Interest Law Project, Michael Rawson; Western Center on Law and Poverty, Dara L. *191 Schur; Howard, Rice, Nemerovski, Canady Falk & Rabkin and Steven L. Mayer for Interveners and Respondents Napa Valley Community Housing, Non-Profit Housing Association of Northern California, Housing California, Patricia Domingo, Heather Clayton, Donna Simon, Hilda Avia, Rainy Stegall and Hector Candelario.
Legal Aid of Napa and Richard A. Marcantonio for Interveners and Respondents Patricia Domingo, Heather Clayton, Donna Simon, Hilda Avia, Rainy Stegall and Hector Candelario.

**JONES, P. J.**
Home Builders Association of Northern California (HBA) appeals from a judgment entered after the trial court sustained a demurrer and dismissed its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                              Page 3
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

complaint asserting a facial challenge to an inclusionary zoning ordinance that was enacted by the City of Napa (City). HBA contends primarily that the trial court erroneously applied federal and California takings law. We disagree and will affirm the judgment.

### I. Factual and Procedural Background

City, like many other localities in California, has a shortage of affordable housing. This shortage has negative consequences for all of City's population, but causes particularly severe problems for those on the lower end of the economic spectrum. Manual laborers, some of whom work in the region's wine or leisure industries, are forced to live in crowded, substandard housing. There is a large and growing population of homeless, including many families and teenagers. Workers from low-income families increasingly are forced to live greater distances from their places of employment, which causes increased traffic congestion and pollution.

City formed the Napa Affordable Housing Task Force to address these problems. The task force was a broad based community group that included representatives from nonprofit agencies, environmental groups, religious institutions, local industries, for-profit developers, and the local chamber of commerce. The purpose of the task force was to "study the issues surrounding affordable housing in the City of Napa and ... make recommendations to the Housing Authority Commission."

The task force studied housing issues for several months. It formed subcommittees, conducted public hearings, and evaluated affordable housing *192 solutions that had been enacted by other communities. (1)(See fn. 1) Ultimately the task force recommended that City enact an inclusionary housing ordinance [FN1] modeled after one that had been enacted by Napa County.

> FN1    An "inclusionary zoning" or "inclusionary housing" ordinance is one

that requires a residential developer to set aside a specified percentage of new units for lower moderateincome housing. (See Padilla, *Reflections on Inclusionary Housing and a Renewed Look at its Viability* (1995) 23 Hofstra L.Rev. 539, 540.)

City responded by enacting the inclusionary zoning ordinance [FN2] that is at issue in the present appeal. The ordinance applies to all development in the city, including residential and nonresidential.

> FN2 In fact, City enacted two ordinances to address the inclusionary housing problem. We will refer to the ordinances collectively as the inclusionary zoning ordinance or simply, the ordinance.

The primary mandate imposed by the ordinance on residential developers is a requirement that 10 percent of all newly constructed units must be "affordable" as that term is defined. [FN3] The ordinance offers developers two alternatives. First, developers of single-family units may, at their option, satisfy the so called inclusionary requirement through an "alternative equivalent proposal" such as a dedication of land, or the construction of affordable units on another site. Developers of multi-family units may also satisfy the 10 percent requirement through an "alternative equivalent proposal" if the city council, in its sole discretion, determines that the proposed alternative results in affordable housing opportunities equal to or greater than those created by the basic inclusionary requirement.

> FN3 The definition of "affordable" in the ordinance is complex. In general, the term refers to an amount that could be paid by persons who live in a household that earns significantly less than the area median income.

As a second alternative, a residential developer may choose to satisfy the inclusionary requirement by paying an in-lieu fee. Developers of single-family units may choose this option by right, while de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                                              Page 4
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

velopers of multi-family units are permitted this option if the city council, again in its sole discretion, approves. All fees generated through this option are deposited into a housing trust fund, and may only be used to increase and improve the supply of affordable housing in City.

Developments that include affordable housing are eligible for a variety of benefits including expedited processing, fee deferrals, loans or grants, and density bonuses that allow more intensive development than otherwise would be allowed. In addition, the ordinance permits a developer to appeal for a reduction, adjustment, or *complete waiver* of obligations under the ordinance "based upon the absence of any reasonable relationship or nexus between the impact of the development and ... the inclusionary requirement." *193

HBA is a nonprofit corporation and association of builders, contractors, and related trades and professionals involved in the residential construction industry. In September 1999, HBA filed a complaint against City seeking to have the inclusionary zoning ordinance declared facially invalid. As is relevant here, HBA alleged the ordinance violated (1) the takings clauses of the federal and state Constitutions, (2) the Mitigation Fee Act (Gov. Code, § 66000 et seq.), (3) the due process clause of the federal Constitution, and (4) Proposition 218.

City demurred to the complaint, arguing it was entitled to prevail as a matter of law. City supported its demurrer with nearly 700 pages of reports and materials that it had relied upon when adopting the ordinance.

In December 1999, the trial court allowed a group of persons and entities to intervene in the action in support of the ordinance. [FN4] The interveners joined City's demurrer.

> FN4  The interveners were Napa Valley Community Housing, Non-Profit Housing Association of Northern California, Housing California, Patricia Domingo, Heather

Clayton, Donna Simon, Hilda Avia, Rainy Stegall, and Hector Candelario.

The trial court sustained the demurrer without leave to amend, and entered judgment in favor of City and the interveners. This appeal followed.

## II. Discussion

### A. *Introduction and Standard of Review*

HBA contends the trial court erred when it sustained the demurrer to its complaint. In arguing City's inclusionary zoning ordinance is facially invalid, HBA again asserts the ordinance violates (1) the takings clauses of the federal and state Constitutions, (2) the Mitigation Fee Act (Gov. Code, § 66000 et seq.), (3) the due process clause of the federal Constitution, and (4) Proposition 218.

The standard of review we apply is familiar. (2) On appeal from a judgment of dismissal after an order sustaining a demurrer, the appellate court reviews the record de novo, to determine whether the complaint states a cause of action as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903].) All facts properly pleaded are deemed to be true. (*Ibid.*)

With these principles in mind, we consider the arguments that have been advanced concerning each claim. *194

### B. *Takings Issues*

#### 1. *Is the Ordinance Facially Invalid?*

(3a) HBA contends that City's inclusionary zoning ordinance is facially invalid because it violates the taking clauses of the federal and state Constitutions.

A claimant who advances a facial challenge faces

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                          Page 5
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

an "uphill battle." (*Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 495 [107 S.Ct. 1232, 1247, 94 L.Ed.2d 472].) (4) " 'A claim that a regulation is *facially* invalid is only tenable if the terms of the regulation will not permit those who administer it to avoid an unconstitutional *application* to the complaining parties.' " (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 547 [45 Cal.Rptr.2d 117], quoting *Tahoe-Sierra Preservation Council v. State Water Resources Control Bd.* (1989) 210 Cal.App.3d 1421, 1442 [259 Cal.Rptr. 132].) This is because a facial challenge is predicated on the theory that "the mere enactment of the ... ordinance worked a taking of plaintiff's property ...." (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 24 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

(3b) Here, City's inclusionary zoning ordinance imposes significant burdens on those who wish to develop their property. However the ordinance also provides significant benefits to those who comply with its terms. Developments that include affordable housing are eligible for expedited processing, fee deferrals, loans or grants, and density bonuses. More critically, the ordinance permits a developer to appeal for a reduction, adjustment, or *complete waiver* of the ordinance's requirements. Since City has the ability to waive the requirements imposed by the ordinance, the ordinance cannot and does not, on its face, result in a taking.

HBA contends the ordinance's waiver clause does not preclude a facial challenge because that clause improperly places the burden on the developer to prove that a waiver would be appropriate when the City has not established a justification for the exactions mandated by the ordinance. According to HBA, allocating the burden in this way is inconsistent with *Dolan v. City of Tigard* (1994) 512 U.S. 374, 391, footnote 8 [114 S.Ct. 2309, 2320, 129 L.Ed.2d 304]. HBA misreads *Dolan*.Quite to the contrary, the Supreme Court stated in *Dolan,* that when evaluating the validity of generally applicable zoning regulations, it is appropriate to place the

burden on the party who is challenging the regulation. (*Ibid.*) As we will discuss below, City's inclusionary zoning ordinance is a generally applicable legislative enactment **\*195** rather than an individualized assessment imposed as a condition of development. Thus, the burden shifting standard described in *Dolan* does not apply.

### 2. Does the Ordinance Substantially Advance a Legitimate Interest?

The Fifth Amendment to the United States Constitution states that "private property [shall not] be taken for public use without just compensation." Article I, section 19 of the California Constitution contains similar language, stating that governmental entities must pay just compensation when they "take" private property for public use.

In *Agins v. Tiburon* (1980) 447 U.S. 255 [100 S.Ct. 2138, 65 L.Ed.2d 106], the Supreme Court provided a test to determine whether a taking has occurred. The court said, "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land ...." (*Id.* at p. 260 [100 S.Ct. at p. 2141].)

(5) Here, HBA contends that City's inclusionary zoning ordinance effects a taking under the first of these tests; i.e., that the ordinance is invalid because it fails to substantially advance legitimate state interests. We are unpersuaded.

First, we have no doubt that creating affordable housing for low and moderate income families is a legitimate state interest. Our Supreme Court has said that the "assistance of moderate-income households with their housing needs is recognized in this state as a legitimate governmental purpose." (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 970 [81 Cal.Rptr.2d 93, 968 P.2d 993].) This conclusion is consistent with repeated pronouncements from the state Legislature which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188 Page 6
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

has declared that "the development of a sufficient supply of housing to meet the needs of *all Californians* is a matter of statewide concern," (Gov. Code, § 65913.9, italics added) and that local governments have "a responsibility to use the powers vested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of *all economic segments of the community.*" (Gov. Code, § 65580, subd. (d), italics added.) Indeed, Witkin lists 12 separate statutes that are "designed to stimulate the construction of low and moderate income housing by the private sector." (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 54, p. 275; *id.* (2000 supp.) § 54, p. 134.)

Second, it is beyond question that City's inclusionary zoning ordinance will "substantially advance" the important governmental interest of providing affordable housing for lowand moderate-income families. By requiring *196 developers in City to create a modest amount of affordable housing (or to comply with one of the alternatives) the ordinance will necessarily increase the supply of affordable housing. We conclude City's ordinance "substantially advance[s] legitimate state interests." (*Agins v. Tiburon, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141].)

HBA's principal constitutional claim is that City's ordinance is invalid under *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677], and *Dolan v. City of Tigard, supra,* 512 U.S. 374.

In *Nollan* the court discussed the "substantially advance" test in the context of a governmental requirement that appellant property owners dedicate a portion of their beachfront property to the public as a condition for obtaining a rebuilding permit. In the course of its discussion, the court said there must be an "essential nexus" between a condition imposed on the use of land, and the impacts caused by the proposed use. (*Nollan v. California Coastal Comm'n, supra,* 483 U.S. at p. 837 [107 S.Ct. at p. 3148].)

*Dolan* also involved dedications of property that were a condition for granting a development permit. There the court said that a "rough proportionality" standard "best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Dolan v. City of Tigard, supra,* 512 U.S. at p. 391 [114 S.Ct. at pp. 2319-2320].)

HBA contends City's ordinance is invalid under *Nollan* and *Dolan* because there is no "essential nexus" or "rough proportionality" between the exaction required by the ordinance, and the impacts caused by development of property.

We reject this argument because *Nollan* and *Dolan* are inapplicable under the facts of this case. "[T]he intermediate standard of judicial scrutiny formulated by the high court in *Nollan* and *Dolan* is intended to address ... land use 'bargains' between property owners and regulatory bodies-those in which the local government conditions permit approval for a given use on the owner's surrender of benefits which *purportedly* offset the impact of the proposed development. It is in this paradigmatic permit context-where the individual property owner-developer seeks to negotiate approval of a planned development-that the combined *Nollan* and *Dolan* test quintessentially applies." (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 868 [50 Cal.Rptr.2d 242, 911 P.2d 429].) "But a different standard of scrutiny *197 [applies] to development fees that are generally applicable through legislative action 'because the heightened risk of the "extortionate" use of the police power to exact unconstitutional conditions is not present.' " [FNS](*Santa Monica Beach, Ltd. v. Superior Court, supra,* 19 Cal.4th at p. 966, quoting *Ehrlich v. City of Culver City, supra,* 12 Cal.4th at p. 876.)"[I]ndividualized development fees warrant a type of review akin to the conditional conveyances at issue in *Nollan* and *Dolan,* whereas generally ap-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                                      Page 7
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

plicable development fees warrant the more defer-
ential review that the *Dolan* court recognized is
generally accorded to legislative determinations."
(*Santa Monica Beach, Ltd. v. Superior Court,
supra,* 19 Cal.4th at pp. 966-967.)The justification
for these varying levels of scrutiny is founded in
the nature of the two types of exactions. "It is one
thing for courts to make a government agency ad-
here to its own justification for requiring the dedic-
ation of a particular portion of property as a condi-
tion of development; such adherence safeguards
against the possibility that the justification is
merely a pretext for taking the property without
paying compensation.... But it is another thing for
courts to require that a complex, generally applic-
able piece of economic legislation that will have
many effects on many different persons and entities
accomplish precisely the goals stated in a legislat-
ive preamble in order to preserve its constitutional-
ity." (*Santa Monica Beach, Ltd. v. Superior Court,
supra,* 19 Cal.4th at p. 972.)

> FN5 While the court in *Santa Monica
> Beach,* discussed the scope of *Nollan* and
> *Dolan* in the context of "development
> fees," the court has made clear that the
> same analysis applies whether a govern-
> mental entity requires the conveyance of
> property, or the payment of a fee. (See
> *Ehrlich v. City of Culver City, supra,* 12
> Cal.4th at p. 876.)

Here, we are not called upon to determine the valid-
ity of a particular land use bargain between a gov-
ernmental agency and a person who wants to devel-
op his or her land. Instead we are faced with a fa-
cial challenge to economic legislation that is gener-
ally applicable to *all* development in City. We con-
clude the heightened standard of review described
in *Nollan* and *Dolan* is inapplicable under these facts.

### 3. *Other Takings Issues*

HBA advances two additional arguments on the

takings issue.

First HBA contends that even if the heightened
level of scrutiny set forth in *Nollan* and *Dolan* are
inapplicable, City's inclusionary zoning ordinance
is still invalid under California cases such as *Rohn
v. City of Visalia* (1989) 214 Cal.App.3d 1463 [263
Cal.Rptr. 319],*Whaler's Village Club v. California
Coastal Com.* (1985) 173 Cal.App.3d 240 [220
Cal.Rptr. 2], and *198Liberty v. California Coastal
Com.* (1980) 113 Cal.App.3d 491 [170 Cal.Rptr.
247]. These decisions are inapposite. The issue in
each was the validity of an ad hoc condition that
was imposed on an individual developer. None of
them involved a facial challenge to a generally ap-
plicable zoning ordinance that imposed obligations
on all development in a given area. We conclude
*Rohn, Whaler's Village,* and *Liberty* are not applic-
able under the facts of this case.

HBA also contends that the inclusionary zoning or-
dinance is invalid because the lack of housing for
low and moderate income families in City is the
product of City's own prior restrictive land use
policies.

HBA has not cited any authority to support the pro-
position that a zoning ordinance which tries to
solve problems caused by prior legislative decisions
is invalid, and case law is directly to the contrary.
For example, in *Penn Central Transp. Co. v. New
York City* (1978) 438 U.S. 104 [98 S.Ct. 2646, 57
L.Ed.2d 631], the Supreme Court ruled that New
York could enact a landmark preservation law that
was designed to mitigate the effects of prior
policies that permitted "large numbers of historic
structures, landmarks, and areas" to be destroyed.
(*Id.* at p. 108 [98 S.Ct. at p. 2651].) If New York
can enact a landmark preservation law to remedy a
shortage of historic buildings created by its prior
policies, City can enact an inclusionary zoning or-
dinance even if its prior policies contributed to a
scarcity of available land and a shortage of afford-
able housing.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                    Page 8
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)

C. *Mitigation Fee Act* FN*

FN* See footnote, *ante*, page 188.

. . . . . . . . . . .

D. *Due Process*

HBA contends the inclusionary zoning ordinance is facially invalid under the due process clause of the Federal Constitution because it "requires property owners who develop residential housing to sell or rent 10% of their units at prices or rents that are based entirely upon certain fixed percentages of the income levels of lower and very lowincome households." Imposing such a requirement violates the due process clause, HBA argues, because "the inclusionary zoning law provides no mechanism to make a fair return for property owners who are forced to sell or rent units at an amount unrelated to market prices."

We doubt seriously that HBA is entitled to a "fair return" under the due process clause. The "fair return" standard is commonly used to evaluate **\*199** restrictions placed on historically regulated industries such as railroads and public utilities. (See, e.g., *Power Comm'n v. Pipeline Co.* (1942) 315 U.S. 575 [62 S.Ct. 736, 86 L.Ed. 1037].) It has also been used to evaluate rent control ordinances. (See, e.g., *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 679 [209 Cal.Rptr. 682, 693 P.2d 261].) However HBA has not cited, and we are not aware of, any case that holds a housing developer is entitled to "fair return" on his or her investment.

(3c) However we need not base our decision on this ground. First, it is not literally correct to say that City's ordinance "requires property owners who develop residential housing to sell or rent 10% of their units [to low income individuals]." Under the ordinance, any person who does not want to sell or rent a portion of his or her housing units to low income individuals may choose one of the alternat-

ives, such as donating vacant land or paying an inlieu fee. Thus HBA's argument is based on an incorrect premise.

Second, and more importantly, HBA's facial due process challenge must necessarily fail. As we have said, " 'A claim that a regulation is *facially* invalid is only tenable if the terms of the regulation will not permit those who administer it to avoid an unconstitutional *application* to the complaining parties....' " (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo, supra,* 38 Cal.App.4th at p. 547, citation omitted.) When an ordinance contains provisions that allow for administrative relief, we must presume the implementing authorities will exercise their authority in conformity with the Constitution. (See *Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 684.)

Here, as we have noted, City's ordinance includes a clause that allows city officials to reduce, modify or waive the requirements contained in the ordinance "based upon the absence of any reasonable relationship or nexus between the impact of the development and ... the inclusionary requirement." Since City has the authority to completely waive a developer's obligations, a facial challenge under the due process clause must necessarily fail.

HBA contends the waiver clause does not preclude a facial challenge because it does not state expressly that a waiver may be granted based on a lack of a "fair return." However the power of an agency to make adjustments to guarantee a fair return is "not limited to those literally granted by the ordinance ...." (*City of Berkeley v. City of Berkeley Rent Stabilization Bd.* (1994) 27 Cal.App.4th 951, 962 [33 Cal.Rptr.2d 317].) When this standard is not expressly stated, it is "present by implication." (*Ibid.*)**\*200**

E. *Proposition 218* FN*

FN* See footnote, *ante*, page 188.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

90 Cal.App.4th 188                                                                                                    Page 9
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl. L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001 Daily Journal
D.A.R. 5713
**Previously published at: 89 Cal.App.4th 897 (Cal. Rules of Court, Rules 976, 977, 979)**

. . . . . . . . . . .

### III. Disposition

The judgment is affirmed.

Stevens, J., and Simons, J., concurred.
A petition for a rehearing was denied June 27,
2001, and on July 2, 2001, the opinion was modi-
fied to read as printed above. Appellant's petition
for review by the Supreme Court was denied
September 12, 2001. \*201

Cal.App.1.Dist.
Home Builders Ass'n of Northern California v. City
of Napa
90 Cal.App.4th 188, 108 Cal.Rptr.2d 60, 31 Envtl.
L. Rep. 20,800, 01 Cal. Daily Op. Serv. 4655, 2001
Daily Journal D.A.R. 5713

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 6

Westlaw.

147 Cal.App.4th 253                                                                                                    Page 1
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

**c**

McAllister v. County of Monterey
Cal.App. 6 Dist.,2007.

Court of Appeal, Sixth District, California.
Hugh McALLISTER, Plaintiff and Appellant,
v.
COUNTY OF MONTEREY et al., Defendants and
Respondents;
Sheldon J. Laube et al., Real Parties in Interest and
Respondents.
**No. H028813.**

Jan. 31, 2007.

**Background:** While property owner's administrat-
ive appeal to Coastal Commission was pending, he
sued county seeking writ of administrative mandate
challenging county's approval of neighbors' coastal
development project as null and void under county
code provisions and in violation of California En-
vironmental Quality Act (CEQA). Neighbor and
county demurred based on plaintiff's asserted fail-
ure to exhaust his administrative remedies, and the
trial court stayed proceedings and sustained the de-
murrers with leave to amend. After Coastal Com-
mission issued a coastal development permit for the
project, neighbors and county again demurred. The
Superior Court, Monterey County, No.
M68767,Robert O'Farrell, J., sustained defendants'
demurrer without leave to amend and ordered the
case dismissed. Plaintiff appealed.

**Holdings:** The Court of Appeal, McAdams, J.,
held that:
(1) trial court properly allowed defendants to file
second demurrer;
(2) plaintiff's claim that county's action was null
and void did not excuse his compliance with ex-
haustion requirement;
(3) county's approval of neighbor's project was not
null and void under county code provisions; and
(4) county's CEQA determinations were superseded
by Coastal Commission's environmental review,

and thus were not subject to judicial review.

Affirmed.

West Headnotes

**[1] Evidence 157 47**

157 Evidence
    157I Judicial Notice
        157k47 k. Administrative Rules and Regula-
tions. Most Cited Cases

**Evidence 157 48**

157 Evidence
    157I Judicial Notice
        157k48 k. Official Proceedings and Acts.
Most Cited Cases
On appeal from trial court's dismissal of property
owner's action against county, seeking writ of man-
date, injunctive relief, and declaratory judgment
that county's approval of neighbors' coastal devel-
opment project was null and void under county
code provisions and violated California Environ-
mental Quality Act (CEQA), Court of Appeal
would take judicial notice of certain documents
contained in clerk's transcript, those being county
code provisions and Coastal Commission docu-
ments, and documents from related proceedings be-
fore         Coastal         Commission.         West's
Ann.Cal.Pub.Res.Code § 21000 et seq.

**[2] Environmental Law 149E 577**

149E Environmental Law
    149EXII Assessments and Impact Statements
        149Ek577 k. Duty of Government Bodies to
Consider Environment in General. Most Cited Cases
The overriding purpose of the California Environ-
mental Quality Act (CEQA) is to ensure that agen-
cies regulating activities that may affect the quality
of the environment give primary consideration to
preventing         environmental         damage.         West's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Ann.Cal.Pub.Res.Code § 21000 et seq.

**[3] Environmental Law 149E ☞581**

149E Environmental Law
   149EXII Assessments and Impact Statements
      149Ek580 Preliminary Assessment or Report
         149Ek581 k. In General. Most Cited Cases

**Environmental Law 149E ☞594**

149E Environmental Law
   149EXII Assessments and Impact Statements
      149Ek584 Necessity for Preparation of Statement, Consideration of Factors, or Other Compliance with Requirements
         149Ek594 k. Negative Declaration; Statement of Reasons. Most Cited Cases
California Environmental Quality Act (CEQA) excuses the preparation of an environmental impact report (EIR) and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment. West's Ann.Cal.Pub.Res.Code §§ 21064, 21080(c); 14 CCR § 15070.

**[4] Environmental Law 149E ☞589**

149E Environmental Law
   149EXII Assessments and Impact Statements
      149Ek584 Necessity for Preparation of Statement, Consideration of Factors, or Other Compliance with Requirements
         149Ek589 k. Significance in General. Most Cited Cases

**Environmental Law 149E ☞615**

149E Environmental Law
   149EXII Assessments and Impact Statements
      149Ek612 Evidence
         149Ek615 k. Weight and Sufficiency. Most Cited Cases
Since the preparation of an environmental impact report (EIR) is the key to environmental protection

under California Environmental Quality Act (CEQA), accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[5] Environmental Law 149E ☞592**

149E Environmental Law
   149EXII Assessments and Impact Statements
      149Ek584 Necessity for Preparation of Statement, Consideration of Factors, or Other Compliance with Requirements
         149Ek592 k. Categorical Exclusion; Exemptions in General. Most Cited Cases
The Coastal Commission's permit appeal procedure is treated as the functional equivalent of the environmental impact report (EIR) process mandated by California Environmental Quality Act (CEQA). West's Ann.Cal.Pub.Res.Code §§ 21000 et seq., 30000 et seq.

**[6] Environmental Law 149E ☞132**

149E Environmental Law
   149EIV Water, Wetlands, and Waterfront Conservation
      149Ek129 Permissible Uses and Activities; Permits and Licenses; Management
         149Ek132 k. Coastal Areas, Bays, and Shorelines. Most Cited Cases
The Coastal Act contemplates local discretion and autonomy in planning subject to review by the Coastal Commission for conformity to statewide standards. West's Ann.Cal.Pub.Res.Code § 30000 et seq.

**[7] Environmental Law 149E ☞132**

149E Environmental Law
   149EIV Water, Wetlands, and Waterfront Conservation
      149Ek129 Permissible Uses and Activities; Permits and Licenses; Management

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                      Page 3
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

149Ek132 k. Coastal Areas, Bays, and Shorelines. Most Cited Cases

Once the Coastal Commission has certified the local government's local coastal plan (LCP) as conforming to the policies of the Coastal Act, review authority for development within that portion of the coastal zone passes to the local government. West's Ann.Cal.Pub.Res.Code § 30000 et seq.

[8] Administrative Law and Procedure 15A ◆ 229

15A Administrative Law and Procedure
    15AIII Judicial Remedies Prior to or Pending Administrative Proceedings
        15Ak229 k. Exhaustion of Administrative Remedies. Most Cited Cases

Under the doctrine of administrative exhaustion, where an adequate administrative remedy is provided by statute, resort to that forum is a jurisdictional prerequisite to judicial consideration of the claim.

[9] Environmental Law 149E ◆ 665

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek665 k. Exhaustion of Administrative Remedies. Most Cited Cases

The doctrine of exhaustion of administrative remedies applies to judicial review of Coastal Commission actions. West's Ann.Cal.Pub.Res.Code § 30000 et seq.

[10] Administrative Law and Procedure 15A ◆ 229

15A Administrative Law and Procedure
    15AIII Judicial Remedies Prior to or Pending Administrative Proceedings
        15Ak229 k. Exhaustion of Administrative Remedies. Most Cited Cases

Exceptions to the doctrine of exhaustion of administrative remedies apply when the administrative remedy is unavailable, when it is inadequate, or when it would be futile to pursue it; when the

agency indulges in unreasonable delay; when the subject matter lies outside the administrative agency's jurisdiction; when pursuit of an administrative remedy would result in irreparable harm; and, when important questions of constitutional law or public policy governing agency authority are tendered.

[11] Administrative Law and Procedure 15A ◆ 229

15A Administrative Law and Procedure
    15AIII Judicial Remedies Prior to or Pending Administrative Proceedings
        15Ak229 k. Exhaustion of Administrative Remedies. Most Cited Cases

Generally speaking, even where questions concerning the agency's jurisdiction are presented, the doctrine of exhaustion of administrative remedies requires judicial abstention until there has been a final decision in the administrative forum.

[12] Appeal and Error 30 ◆ 863

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k862 Extent of Review Dependent on Nature of Decision Appealed from
                30k863 k. In General. Most Cited Cases

On appeal from the sustaining of a demurrer without leave to amend, the appellate court exercises its independent judgment about whether the complaint states a cause of action as a matter of law.

[13] Appeal and Error 30 ◆ 78(3)

30 Appeal and Error
    30III Decisions Reviewable
        30III(D) Finality of Determination
            30k75 Final Judgments or Decrees
                30k78 Nature and Scope of Decision
                    30k78(3) k. Rulings on Demurrer or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                              Page 4
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

Motion Relating to Pleadings. Most Cited Cases

**Appeal and Error 30 ☞102**

30 Appeal and Error
    30III Decisions Reviewable
        30III(E) Nature, Scope, and Effect of Decision
            30k102 k. On Demurrer. Most Cited Cases
Generally speaking, an order sustaining a demurrer is neither appealable per se nor as a final judgment, but an appellate court may deem an order sustaining a demurrer to incorporate a judgment of dismissal.

**[14] Appeal and Error 30 ☞105**

30 Appeal and Error
    30III Decisions Reviewable
        30III(E) Nature, Scope, and Effect of Decision
            30k105 k. Dismissal, Nonsuit, or Direction of Verdict. Most Cited Cases
An order dismissing a complaint with prejudice constitutes an appealable judgment. West's Ann.Cal.C.C.P. §§ 581d, 904.1(a)(1).

**[15] Declaratory Judgment 118A ☞392.1**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(H) Appeal and Error
            118Ak392 Appeal and Error
                118Ak392.1 k. In General. Most Cited Cases

**Mandamus 250 ☞187.2**

250 Mandamus
    250III Jurisdiction, Proceedings, and Relief
        250k187 Appeal and Error
            250k187.2 k. Decisions Reviewable and Proper Mode of Review. Most Cited Cases
On appeal from trial court's order sustaining county's and neighbor's demurrer to property owner's action seeking writ of mandate, injunctive re-

lief, and declaratory judgment that county's approval of neighbors' coastal development project was null and void under county code provisions, and violated California Environmental Quality Act (CEQA), Court of Appeal would deem order sustaining demurrer to incorporate judgment of dismissal, rendering trial court's order appealable, where matter was fully briefed and no party had raised objection to consideration of the appeal on its merits. West's Ann.Cal.Pub.Res.Code § 21000 et seq.

**[16] Mandamus 250 ☞163**

250 Mandamus
    250III Jurisdiction, Proceedings, and Relief
        250k163 k. Demurrer to Petition or Complaint, or to Alternative Writ. Most Cited Cases
Trial court properly allowed county and neighbor to file second demurrer to property owner's complaint seeking writ of administrative mandate challenging county's approval of neighbors' coastal development project, notwithstanding plaintiff's claim that demurrer was not timely; given judicial stay in response to defendants' first demurrer, based on plaintiff's failure to exhaust administrative remedies, and fact that plaintiff agreed to corresponding extension of time for filing answer, which could have been deemed extension for filing demurrer as well, treating second demurrer as timely was warranted and, in any event, plaintiff was not prejudiced, as allowing second demurrer did not affect his substantive rights. West's Ann.Cal.C.C.P. § 430.40.
*See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶¶ 7:34.1, 7:139 (CACIVP Ch. 7-A).*

**[17] Pleading 302 ☞199**

302 Pleading
    302V Demurrer or Exception
        302k199 k. Time for Filing or Serving Demurrer. Most Cited Cases
Statute setting 30-day time limit after service of the complaint or cross-complaint for filing a demurrer used word "may" rather than "must," and thus was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

permissive rather than mandatory. West's Ann.Cal.C.C.P. § 430.40.

**[18] Pleading 302** ☜352

302 Pleading
    302XVI Motions
        302k351 Striking Out Pleading or Defense
            302k352 k. In General. Most Cited Cases

**Pleading 302** ☜353

302 Pleading
    302XVI Motions
        302k351 Striking Out Pleading or Defense
            302k353 k. Authority and Discretion of Court. Most Cited Cases
There is no absolute right to have a pleading stricken for lack of timeliness in filing where no question of jurisdiction is involved, and where the late filing was a mere irregularity; the granting or denial of the motion is a matter which lies within the discretion of the court.

**[19] Pleading 302** ☜85(4)

302 Pleading
    302III Responses or Responsive Pleadings in General
        302III(A) Defenses in General
            302k85 Time to Plead in General
                302k85(4) k. Extension or Shortening of Time. Most Cited Cases

**Pleading 302** ☜199

302 Pleading
    302V Demurrer or Exception
        302k199 k. Time for Filing or Serving Demurrer. Most Cited Cases
The trial court may exercise its discretion to enlarge the time for answer or demurrer so long as its action does not affect the substantial rights of the parties. West's Ann.Cal.C.C.P. § 473(a)(1).

**[20] Mandamus 250** ☜163

**250 Mandamus**
    250III Jurisdiction, Proceedings, and Relief
        250k163 k. Demurrer to Petition or Complaint, or to Alternative Writ. Most Cited Cases
Trial court properly allowed county and neighbor to file second demurrer to property owner's complaint seeking writ of administrative mandate challenging county's approval of neighbors' coastal development project, following lifting of judicial stay which was imposed pending plaintiff's administrative appeal, despite fact that plaintiff had not filed amended pleading and, in any event, plaintiff was not prejudiced thereby, as allowing second demurrer did not affect his substantive rights. West's Ann.Cal.C.C.P. §§ 430.40(b), 475.

**[21] Environmental Law 149E** ☜665

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek665 k. Exhaustion of Administrative Remedies. Most Cited Cases
Property owner's claim that county's approval of neighbor's coastal development project was null and void under county code provisions did not excuse him from complying with requirement that he exhaust his administrative remedies by pursuing appeal to Coastal Commission to completion. West's Ann.Cal.Pub.Res.Code § 30603(a)(1).

**[22] Environmental Law 149E** ☜132

149E Environmental Law
    149EIV Water, Wetlands, and Waterfront Conservation
        149Ek129 Permissible Uses and Activities; Permits and Licenses; Management
            149Ek132 k. Coastal Areas, Bays, and Shorelines. Most Cited Cases
County's approval of coastal development project was not rendered null and void under county code provision voiding any permit that violated county's local coastal plan (LCP); although property owner's predecessor performed grading and construction work on property that violated predecessor's Coastal Commission permit, that decades-old viola-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

tion of prior permit, which was issued more than a decade before Coastal Commission's certification of county's LCP, did not violate county's LCP. West's Ann.Cal.Pub.Res.Code § 30000 et seq.

**[23] Mandamus 250 ⚖➞154(2)**

250 Mandamus
   250III Jurisdiction, Proceedings, and Relief
      250k154 Petition or Complaint, or Other Application
         250k154(2) k. Form, Requisites, and Sufficiency in General. Most Cited Cases
In order to state a cause of action warranting judicial interference with the official acts of agency defendants, plaintiffs must allege much more than mere conclusions of law; they must aver the specific facts from which the conclusions entitling them to relief would follow.

**[24] Environmental Law 149E ⚖➞648**

149E Environmental Law
   149EXIII Judicial Review or Intervention
      149Ek636 Administrative Decisions or Actions Reviewable in General
         149Ek648 k. Assessments and Impact Statements. Most Cited Cases
County's determinations under California Environmental Quality Act (CEQA) relating to county's approval of coastal development project were superseded by Coastal Commission's environmental review that was conducted during administrative appeal of approval by neighbor who opposed project, and thus county's CEQA determinations were not subject to judicial review. West's Ann.Cal.Pub.Res.Code §§ 21000 et seq., 30000 et seq.
*See Cal. Civil Practice (Thomson/West 2006) Environmental Litigation, § 8:62 et seq.*
**[25] Pleading 302 ⚖➞236(1)**

302 Pleading
   302VI Amended and Supplemental Pleadings and Repleader
      302k233 Leave of Court to Amend

         302k236 Discretion of Court
            302k236(1) k. In General. Most Cited Cases
The trial court's discretion to allow amendments to the pleadings in the furtherance of justice should be exercised liberally in favor of amendments. West's Ann.Cal.C.C.P. § 473(a)(1).

**120 Fenton & Keller, John S. Bridges, Mark A. Cameron, David C. Sweigert, Monterey, Jennifer M. Pavlet, for Appellant.
Charles J. McKee, County Counsel, Frank G. Tiesen, Deputy County Counsel, for Respondent.
Lombardo & Gilles, Sheri L. Damon, Salinas, for Real Parties in Interest.

McADAMS, J.
*262 This appeal represents the latest round in the plaintiff's long battle against the approval of a coastal development permit on neighboring property. In administrative proceedings conducted by Monterey County officials and later by the California Coastal Commission, the real parties in interest won approval to construct a large single-family dwelling on the Big Sur Coast. In judicial proceedings below, the real parties in interest and the defendants successfully demurred to the plaintiff's complaint, which was then dismissed. On appeal, the plaintiff contends that the dismissal was improper procedurally, because the demurrer was unauthorized and untimely. He also argues that the dismissal was improper substantively because he has a valid cause of action against the County based on jurisdictional grounds and based on the County's violation of the California Environmental Quality Act (CEQA).

As we explain, we find no merit in the plaintiff's contentions. Procedurally, the trial court acted within its discretion in entertaining a second demurrer to the plaintiff's complaint after the conclusion of Coastal Commission proceedings. *263 Substantively, there is no merit in the plaintiff's jurisdictional claims that Monterey County's action was a legal nullity, since those allegations both conflict with judicially noticed documents and represent bare

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

legal conclusions. Nor can the plaintiff state a valid cause of action against the County under CEQA, because its determinations were superseded by the Coastal Commission's environmental review. Treating the trial court's order as a judgment of dismissal, we therefore affirm.

### BACKGROUND[FN1]

> FN1. Because this appeal followed a successful demurrer, the facts are drawn from the allegations of plaintiff's second amended complaint, the operative pleading. (See *Gu v. BMW of North America, LLC* (2005) 132 Cal.App.4th 195, 200, 33 Cal.Rptr.3d 617.) To the extent relevant, we also incorporate facts of which judicial notice has been taken. (Cf., *id.* at p. 203, fn. 2, 33 Cal.Rptr.3d 617.)

### The Parties

Appellant is Dr. Hugh McAllister (McAllister). McAllister chairs the World Wildlife Fund's Marine Leadership Committee. He also owns property along the Big Sur Coast within view of the challenged project.

Respondents are the County of Monterey and the Monterey County Board of Supervisors (collectively, the County). The County passed the resolution challenged here, which approved the coastal development proposed by the real parties in interest. The real parties in interest are Sheldon J. Laube and Dr. Nancy J. Engel (Laube & Engel or real parties).

### The Proposed Development

In 2001, Laube & Engel sought permission to develop their property, which is located on Kasler Point, north of Rocky Point, at 36240 Highway 1, Big Sur. The property then consisted of two contiguous **121 lots, each approximately two acres in

size. Real parties' proposal was for a large single-family home with a subterranean garage complex, measuring just over 10,000 square feet in all.

Many years before, the prior owner of the property, Donald Sorenson, had taken steps to build a house there. In 1977, the California Coastal Commission granted Sorenson a development permit for a smaller home on the site, subject to certain conditions. One condition was that his *264 two lots would be consolidated into a single parcel prior to the commencement of any grading or construction. Despite this condition, Sorenson began grading and construction without merging the two lots. After putting in a driveway, foundation, water connections, a septic system, and certain other improvements, Sorenson abandoned the project.

### The County's Coastal Ordinances

Monterey County has a Local Coastal Plan (LCP), which is codified in Chapter 20.90 of the Monterey County Code (Chapter 20.90). The LCP includes the Big Sur Land Use Plan (LUP); it also includes a Coastal Implementation Plan (CIP).

One pertinent provision of Chapter 20.90-a linchpin of McAllister's opposition to the project-provides that any permit, "if issued in conflict with the provisions of this title, shall be null and void." (Monterey County Code, § 20.90.010.) Another relevant provision of Chapter 20.90 prohibits the approval of permits "where there is an outstanding violation of this Title or the remaining portions of the Monterey County Coastal Implementation Plan involving the property upon which there is a pending application for such permit, ... unless such permit ... is the, or part of the, administrative remedy for the violation." (Monterey County Code, § 20.90.120.) That provision continues: "After recordation of a Notice of Violation by the enforcing officer, all departments, commission, and public employees shall refuse to issue permits or licenses or entitlements involving the property except those necessary to abate the violation...."(*Ibid.*)Chapter 20.90 author-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

izes the County's director of planning and building inspection to establish violations of the title. (Monterey County Code, § 20.90.20.) It also provides an array of alternatives for correcting violations. (See *id.,* §§ 20.90.060, 20.90.070, 20.90.080, 20.90.090.) Among them are retroactive permits and restoration orders. (See *id.,* §§ 20.90.130, 20.90.140.)

### PROCEDURAL HISTORY

### Administrative Proceedings at the County

In early March 2001, Laube & Engel applied to the County for a development permit to construct a residence on their coastal property.

*265 Later that same month, real parties' application was reviewed for the first time by the Big Sur Land Use Advisory Committee (LUAC). LUAC approved the project, on condition that no outside flood lighting would be used and that the invasive ice plant on the property would be eradicated. Thereafter, based on McAllister's objections and pursuant to his requests, real parties relocated the proposed home. In March 2003, LUAC reviewed the proposal as modified. Despite McAllister's continued opposition, the committee voted unanimously to approve the modified project as proposed, with an additional requirement that stone be used as the building material for the walls in order to minimize view impacts.

In October 2003, after a number of continuances, the project proceeded to a hearing before the County's planning commission for a hearing. Over McAllister's opposition, the **122 planning commission voted unanimously to approve both the proposed home and the parcel merger and to certify a mitigated negative declaration under the California Environmental Quality Act.

In November 2003, McAllister filed an administrative appeal of the planning commission's decision, seeking review from the County's board of supervisors. In his appeal, McAllister asserted that the proposed project violated the 1977 coastal development permit obtained by real parties' predecessor, that it conflicted with numerous policies in the local coastal program, that the planning commission's approval was based on misleading information, and that the project violated CEQA.

In January 2004, the board of supervisors conducted a public hearing on McAllister's appeal. Speakers at the hearing included real parties' counsel; McAllister's counsel plus one witness; and the assigned land use planner for the County. The County's staff recommended denial of McAllister's appeal.

At the conclusion of the hearing, the board of supervisors unanimously adopted Resolution No. 04-028, thereby denying McAllister's appeal. The resolution contains a number of findings, including this: "The subject property is in compliance with all rules and regulations pertaining to the use of the property; no violations exist on the property...." In addition to denying McAllister's appeal, Resolution No. 04-028 explicitly affirmed the mitigated negative declaration prepared for the project and specifically upheld the planning commission's earlier decision to approve the application by Laube & Engel for a combined coastal development permit.

*266 The following month, McAllister appealed the County's decision to the Coastal Commission, "as a precautionary measure to protect [his] rights."

### Proceedings in the Trial Court

On February 18, 2004, simultaneously with his appeal to the Coastal Commission, McAllister filed this action. In his combined petition for writ of mandate and complaint for declaratory and injunctive relief, McAllister asserted three causes of action. The first cause of action alleged an administrative mandamus claim against the County. (Code Civ. Proc., § 1094.5.)That cause of action incorporated these assertions: that the County's approval

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

was null and void under its own code provisions and thus was made without jurisdiction; that the County failed to give McAllister a fair hearing; and that the County abused its discretion by not requiring an environmental impact report. McAllister's second cause of action, also against the County, sought a judicial declaration that the County's approval of the project was null and void. His third cause of action sought injunctive relief against the Coastal Commission, to prevent it from assuming jurisdiction over the project. In addition to the relief requested in the third cause of action of his complaint, McAllister also sought a temporary restraining order and preliminary injunction against the Coastal Commission, which the court denied.

In March 2004, Laube & Engel demurred to the complaint. As to the first cause of action, real parties asserted, McAllister failed to exhaust his administrative remedies. Laube & Engel challenged the other two causes of action on the ground that the relief sought was improper. In the event that it declined to sustain the demurrer and dismiss the action, real parties argued, the court should stay the litigation pending the outcome of the Coastal Commission appeal. The County joined real parties' demurrer. The Coastal Commission separately demurred to the third cause of action against it. McAllister opposed the demurrers.

**123 The court conducted a hearing on the demurrers in May 2004, taking them under submission. It issued a written ruling several days later, which included these provisions: (1) As to the first cause of action, the court stayed proceedings on McAllister's "claim under the California Environmental Quality Act ... pending the Commission's final decision." (2) With respect to the second cause of action, the court sustained the demurrers of the County and real parties, with leave to amend. (3) As to the third cause of action, the court sustained the Coastal Commission's demurrer, without leave to amend. Thereafter, in June 2004, the court issued a formal order concerning the demurrers, which reiterated the court's earlier rulings in all respects. In addition,

it ordered dismissal of the action with prejudice as against the Coastal Commission and the entry of a separate judgment in the Commission's favor.

**\*267** Coastal Commission Proceedings

In September 2004, the Coastal Commission took the first substantive step in the administrative appeal, by concluding that the project in fact raised a substantial issue on various grounds and that it would therefore assume jurisdiction. (See Pub. Res.Code, § 30625, subd. (b)(1).)[FN2]

> FN2. Further unspecified statutory references are to the Public Resources Code.

According to the Coastal Commission staff report, by then, "as a result of the appeal," Laube & Engel had modified the project. Under their revised plans as submitted, "the residence [was] relocated slightly north ..., the base elevation of the northern portion of the house [was] lowered so that it is not visible within the critical viewshed, and the size of the residence [was] reduced" slightly.

After a de novo hearing in December 2004, the Coastal Commission granted Laube & Engel a coastal development permit, with conditions, for the modified project.

**Further Trial Court Proceedings**

In January 2005, Laube & Engel filed a second demurrer to the complaint, entitled "Notice of Motion of Demurrer and Motion to Dismiss." In it, Laube & Engel argued that McAllister's complaint failed to state a cause of action against the County, in that the Coastal Commission was the agency taking the final administrative action. As before, the County joined real parties' demurrer. McAllister opposed the second demurrer on procedural and substantive grounds.

Following a hearing held in February 2005, the court sustained the second demurrer without leave

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                    Page 10
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

to amend. The court issued a formal order several days later, in which (1) it found that McAllister "failed to state a cause of action," (2) it sustained the demurrer to the first cause of action, and (3) it ordered "the case dismissed in its entirety."

## Appeal

[1] McAllister brought this timely appeal.[FN3]

> FN3. The record before us includes four volumes of clerk's transcript, three volumes of reporter's transcript, plus three volumes of administrative record, lodged with this court by McAllister. McAllister also requested this court to take judicial notice of certain documents contained in the clerk's transcript, being Monterey County Code provisions and Coastal Commission documents. We granted that request. In addition, Laube Engel filed a request for judicial notice of five documents. Two of those documents relate to proceedings in this matter at the Coastal Commission; the others reflect proceedings in a separate superior court case involving the same parties. We likewise granted that request.

### **124 *268 CONTENTIONS

On appeal, McAllister attacks the trial court's decision to sustain the second demurrer on three grounds. First, he asserts procedural deficiencies in the demurrer, including untimeliness. Second, McAllister argues, the demurrer lacks substantive merit, since his petition states a valid cause of action. Third, he contends, the trial court abused its discretion in sustaining the demurrer without leave to amend. Both the County and Laube & Engel refute those contentions.

## DISCUSSION

To establish the proper framework for our analysis

of McAllister's contentions, we begin by describing the relevant statutes. Next, we summarize pertinent procedural principles, specifically the doctrine of exhaustion and the standards that govern appellate review of demurrers. Finally, against that backdrop, we address the specific issues presented in this appeal.

### STATUTORY FRAMEWORK: GENERAL PRINCIPLES

Two statutes have particular relevance here, the California Environmental Quality Act and the California Coastal Act. Both are codified in the Public Resources Code.

### I. The California Environmental Quality Act (CEQA)

The California Environmental Quality Act appears at Division 13 of the Public Resources Code, beginning with section 21000. As an aid to carrying out the statute, the State Resources Agency has issued a set of regulations, called Guidelines for the California Environmental Quality Act (Guidelines).[FN4]

> FN4. The Guidelines are contained in the California Code of Regulations, Title 14, Division 6, Chapter 3, starting at section 15000. Further unspecified guideline references are to those regulations.

### A. Statutory Policy

[2] CEQA embodies our state's policy that "the long-term protection of the environment ... shall be the guiding criterion in public decisions."(§ 21001, subd. (d); see *269*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112, 62 Cal.Rptr.2d 612.) As this court has observed, "the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage." (*Save Our Peninsula Committee v. Monterey County Bd. of*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Supervisors* (2001) 87 Cal.App.4th 99, 117, 104 Cal.Rptr.2d 326.) Together, the statute and accompanying regulatory guidelines "have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 112, 62 Cal.Rptr.2d 612; see Guidelines, § 15002, subd. (k).)

### *1. Threshold Determination of CEQA's Applicability*

"The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA **125 applies to a proposed activity. (Guidelines, §§ 15060, 15061.)" (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 112, 62 Cal.Rptr.2d 612.)

CEQA applies if the activity is a "project" under the statutory definition, unless the project is exempt. (See §§ 21065, 21080.) "If the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th p. 113, 62 Cal.Rptr.2d 612.) "Only those projects having no significant effect on the environment are categorically exempt from CEQA review." (*Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1107, 23 Cal.Rptr.3d 321.) "Single-family homes are categorically exempt from CEQA, except (1) when they 'may impact on an environmental resource of ... critical concern'; (2) 'when the cumulative impact of successive

projects of the same type in the same place, over time is significant'; or 'where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.'" (*Id.* at p. 1106, 23 Cal.Rptr.3d 321, quoting Guidelines, § 15300.2, subds. (a)-(c).)

If the project is not exempt-either because it does not fall within an exempt category or because an exception makes the exemption unavailable-then the agency must proceed to the second tier and conduct an initial study. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 792, 124 Cal.Rptr.2d 731; see Guidelines, § 15063.)

### *1. *270 Initial Study*

The second tier of the process, the initial study, serves several purposes. One purpose is to inform the choice between a negative declaration and an environmental impact report (EIR). (Guidelines, § 15063, subd. (c)(1); *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1180, 31 Cal.Rptr.3d 901.) Another purpose of the initial study is to eliminate unnecessary environmental impact reports. (Guidelines, § 15063, subd. (c)(7).)

[3] "CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389-390, 83 Cal.Rptr.2d 836, citing Guidelines, § 15070; see also § 21064; § 21080, subd. (c).) In certain situations where a straightforward negative declaration is not appropriate, the agency may permit use of a mitigated negative declaration. (See § 21064.5; Guidelines, § 15064, subd. (f)(2); *San Bernardino,* at p. 390, 83 Cal.Rptr.2d 836.)

### *2. Environmental Impact Report*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

If the project does not qualify for a negative declaration, "the third step in the process is to prepare a full environmental impact report...."(*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 113, 62 Cal.Rptr.2d 612, citing §§ 21100, 21151, & Guidelines, §§ 15063, subd. (b)(1), 15080.)

[4] The California Supreme Court has "repeatedly recognized that the EIR is the 'heart of CEQA.' "(*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123, 26 Cal.Rptr.2d 231, 864 P.2d 502(*Laurel Heights II* ).) As the court observed more than three decades ago, "since the preparation of an EIR is the key to environmental**126 protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75, 118 Cal.Rptr. 34, 529 P.2d 66.) Other cases have since confirmed the statutory preference for resolving doubts in favor of an EIR. (See, e.g., *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 703, 7 Cal.Rptr.3d 868; *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 905, 60 Cal.Rptr.2d 821.)

**\*271 II. The California Coastal Act**

The California Coastal Act of 1976 is codified at Public Resources Code, sections 30000 et seq. It replaced the California Coastal Zone Conservation Act, which had been enacted by initiative measure in 1972. (See § 30000, Historical and Statutory Notes, West's Annotated California Codes (1996), vol. 56B, p. 131.)

**A. Statutory Policy**

The Coastal Act "was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California."

*Yost v. Thomas* (1984) 36 Cal.3d 561, 565, 205 Cal.Rptr. 801, 685 P.2d 1152; see generally, 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 90, pp. 312-314; *id.*(2003 supp.) pp. 230-234; Robie et al., California Civil Practice-Environmental Litigation (2002) § 8:62, pp. 92-93; Curtin, California Land Use and Planning Law (2006) Ch. 9, pp. 232-236.)

In enacting the Coastal Act, the Legislature declared that "the basic goals of the state for the coastal zone are to: [¶] (a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources. [¶] (b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state. [¶] (c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners. [¶] (d) Assure priority for coastal-dependent and coastal-related development over other development on the coast. [¶] (e) Encourage state and local initiatives and cooperation in preparing programs to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone."(§ 30001.5.) Among other things, the "scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance."(§ 30251.)

**B. Operation**

[5] The Coastal Act "assigns chief responsibility for regulating the use and development of the 'coastal zone' to [the] California Coastal Commission." (4 Witkin, Summary of Cal. Law, *supra,* Real Property, § 90, p. 313, citation omitted.) The Commission's "regulatory functions are coordinated with those of other state agencies having overlapping responsibilities." **\*272** (*Ibid.*) With respect to environmental responsibilities, under CEQA and its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

accompanying Guidelines, Coastal Commission environmental review may substitute for an environmental impact report. (See § 21080.5, subds. (a), (e)(1); Guidelines, §§ 15002, subd. (*l*); 15251, subds. (c), (f).) Thus, the Coastal Commission's "permit appeal procedure is treated as the functional equivalent of the EIR process."**127 (*Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569, 106 Cal.Rptr.2d 14.)

[6] As for local governments, the Coastal Act sets " 'minimum standards and policies' for localities to follow in developing land use plans" but leaves " 'wide discretion to ... local government ... to determine the contents' of such plans...."(*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775, 38 Cal.Rptr.2d 699, 889 P.2d 1019, quoting *Yost v. Thomas, supra,* 36 Cal.3d at pp. 572-573, 205 Cal.Rptr. 801, 685 P.2d 1152; see also §§ 30004, subd. (a); 30005, subds. (a), (b).) The Act thus contemplates "local discretion and autonomy in planning subject to review for conformity to statewide standards." (*Yost v. Thomas, supra,* 36 Cal.3d at p. 572, 205 Cal.Rptr. 801, 685 P.2d 1152.)

### 1. The Local Coastal Plan

A local coastal plan (LCP) consists of a local government's land use plans, zoning ordinances, zoning district maps, and other implementing actions that satisfy the Coastal Act. (§ 30108.6.)

The LCP is submitted to the Coastal Commission for certification. (§ 30510, subd. (a); see generally Robie et al., California Civil Practice-Environmental Litigation, *supra,* §§ 8:67-8:68, pp. 102-104.) In order to certify the LCP, the Commission must find that it satisfies the requirements and policies set forth in Chapter 3 of the Coastal Act. (§§ 30200, subd. (a); 30512, subd. (c); 30513; see *Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara* (2004) 121 Cal.App.4th 864, 871-872, 17 Cal.Rptr.3d 489; Robie, §§ 8:69-8:70, pp. 104-105.) Those "Chapter

3 policies" thus represent the standards for judging the adequacy of an LCP. (§ 30200, subd. (a); *Yost v. Thomas, supra,* 36 Cal.3d at p. 566, 205 Cal.Rptr. 801, 685 P.2d 1152; Robie, § 8:71, pp. 105-106.) These policies are designed to protect certain identified resources, including recreation, sensitive habitat, and scenic resources. (See §§ 30223 [upland recreation], 30240 [environmentally sensitive habitat area (ESHA) ], 30251 [visual and scenic resources].)

[7] Once the Coastal Commission has certified the local coastal plan "as conforming to the policies of the Coastal Act, review authority for development within that portion of the coastal zone passes to the local government." (*City of Half Moon Bay v. Superior Court* (2003) 106 Cal.App.4th 795, 804, 131 Cal.Rptr.2d 213.)

### *273 2. Coastal Development Permits

"Any person undertaking any development in the coastal zone, with certain limited exceptions, is required to obtain a coastal development permit. This is in addition to any other permit required from any state, regional or local agency." (Robie et al., California Civil Practice-Environmental Litigation, *supra,* § 8:73, p. 106; see § 30600, subd. (a).) Development is broadly defined for these purposes. (Robie, at pp. 106-107; see § 30106.) Thus, for example, a lot line adjustment may constitute a development requiring a coastal development permit [CDP].(*La Fe, Inc. v. County of Los Angeles* (1999) 73 Cal.App.4th 231, 239, 86 Cal.Rptr.2d 217.)

The Coastal Act's Chapter 3 policies constitute the general standards for judging the permissibility of specific developments within the coastal zone. (§ 30200, subd. (a).) Furthermore, permits "issued for development between the nearest public road and the sea ... must include a specific finding that the development is in conformity with the public access and public recreation policies of the Coastal Act."(Robie et al., California **128Civil Practice-Environmental Litigation, *supra,* § 8:74, p. 107; see

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

§ 30604, subd. (c).)

### 3. Coastal Commission Appeals

The Coastal Act provides for administrative appeals to the Coastal Commission in certain cases. (§ 30603.) "If ... the local government approves an application for a CDP [coastal development permit], its action may be appealed to the commission by the applicant, any aggrieved person, or any two members of the commission. [Citations.] The commission has limited jurisdiction to hear the appeal." (*City of Half Moon Bay v. Superior Court, supra,* 106 Cal.App.4th at p. 804, 131 Cal.Rptr.2d 213.) As relevant here, the governing statute provides: "(a) After certification of its local coastal program, an action taken by a local government on a coastal development permit application may be appealed to the commission for only the following types of developments: [¶] (1) Developments approved by the local government between the sea and the first public road paralleling the sea or within 300 feet of the inland extent of any beach or of the mean high tideline of the sea where there is no beach, whichever is the greater distance."(§ 30603, subd. (a)(1).) The grounds for such an appeal are "limited to an allegation that the development does not conform to the standards set forth in the certified local coastal program or the public access policies set forth in this division." (*Id.,* subd. (b)(1) [referring to Division 20, the Coastal Act]; see *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14; see generally, Robie et al., California Civil Practice-Environmental Litigation, *supra,* § 8:76, pp. 112-113.)

**\*274** "If an action is appealable, the commission must hear the appeal unless it determines no substantial issue exists with regard to the grounds for the appeal. (§ 30625, subd. (b)(2).)" (*City of Half Moon Bay v. Superior Court, supra,* 106 Cal.App.4th at p. 804, 131 Cal.Rptr.2d 213.) The hearing must be set within 49 days. (§ 30621.) "This short time limit is 'designed to avoid unnecessary bureaucratic delay.'" (*Encinitas Country Day School, Inc. v. California Coastal Com.* (2003) 108 Cal.App.4th 575, 584, 133 Cal.Rptr.2d 551.) The Coastal Commission thus "is required, at a minimum, to make the determination whether a substantial issue exists, i.e., whether the appeal raises a substantial issue meriting an appellate hearing, within the 49-day limitation period." (*Id.* at p. 585, 133 Cal.Rptr.2d 551.) "On appeal, the commission reviews the matter de novo, and may take additional evidence not received by the local government." (*City of Half Moon Bay,* at p. 804, 131 Cal.Rptr.2d 213.) Thus, "in effect, the Commission hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements." (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14.) The resulting decision " 'takes the place of and completely nullifies the former determination of the matter.' " (*Ibid.*)

### PROCEDURAL FRAMEWORK: GENERAL PRINCIPLES

In addition to the substantive statutes described above, this appeal also involves the application of other legal principles, which arise from procedural aspects of the case. One such principle is the doctrine of exhaustion of administrative remedies. Others relate to the procedural posture of this appeal, which follows the sustention of a demurrer.

### I. Exhaustion

[8][9] Under the doctrine of administrative exhaustion, the long-standing general**\*\*129** rule is this: "where an adequate administrative remedy is provided by statute, resort to that forum is a 'jurisdictional' prerequisite to judicial consideration of the claim." (*Styne v. Stevens* (2001) 26 Cal.4th 42, 56, 109 Cal.Rptr.2d 14, 26 P.3d 343; cf., *Farmers Ins. Exchange v. Superior Court*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                          Page 15
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

(1992) 2 Cal.4th 377, 386, 6 Cal.Rptr.2d 487, 826 P.2d 730 [discussing the closely related doctrine of primary jurisdiction]; see generally, 9 Witkin, Cal. Procedure (4th ed. 1997) Administrative Proceedings, §§ 108-109, pp. 1153-1155; Curtin, California Land Use and Planning Law, *supra,* Ch. 21, pp. 526-532.) Put another way: "In the context of administrative proceedings, a controversy is not ripe for adjudication until the administrative process is completed and the agency makes a final decision that results in a direct and immediate impact on the parties." **\*275**(*Santa Barbara County Flower and Nursery Growers Ass'n, Inc. v. County of Santa Barbara, supra,* 121 Cal.App.4th at p. 875, 17 Cal.Rptr.3d 489.) "The doctrine has been specifically applied to review of coastal commission actions." (*Walter H. Leimert Co. v. California Coastal Com.* (1983) 149 Cal.App.3d 222, 232, 196 Cal.Rptr. 739.)

### A. Underpinnings

"The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary)." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 391, 6 Cal.Rptr.2d 487, 826 P.2d 730.) "Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor 'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.'" (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501, 87 Cal.Rptr.2d 702, 981 P.2d 543.)

The doctrine "is not a matter of judicial discretion, but is a fundamental rule of procedure ... binding upon all courts." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293, 109 P.2d 942.)Un-

til an available "administrative procedure has been invoked and completed, there is nothing that the ... court may review; it cannot interfere in the intermediate stages of the proceeding." (*Id.* at p. 291, 109 P.2d 942.) For that reason, "the failure to exhaust administrative remedies prevents appellant from seeking relief through administrative mandamus (Code Civ. Proc., § 1094.5), which provides judicial review of *final* administrative proceedings." (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 619, 113 Cal.Rptr.2d 309.)

### B. Exceptions

[10] "There are exceptions to the exhaustion doctrine." (*Unnamed Physician v. Board of Trustees, supra,* 93 Cal.App.4th at p. 620, 113 Cal.Rptr.2d 309.) Exceptions are commonly recognized when the administrative remedy is unavailable, when it is inadequate, or when it would be futile to pursue it. (*Ibid.*) Other exceptions include "situations where the agency indulges in unreasonable delay ..., when the subject matter lies outside the administrative agency's jurisdiction, [or] when pursuit of an administrative remedy would result in irreparable harm...."(*Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222, 239 Cal.Rptr. 470; accord, **\*276**Public Employment Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816, 1827, 17 Cal.Rptr.2d 323.) "To this list must be **\*\*130** added exceptions where important questions of constitutional law or public policy governing agency authority are tendered." (*Public Employment Relations Bd.,* at p. 1827, 17 Cal.Rptr.2d 323.)

### C. Application to Questions of Law

Notwithstanding the foregoing exceptions, exhaustion is not excused merely "because the ultimate legal issues ... are better suited for determination by the courts." (*Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 169, 6 Cal.Rptr.2d 714.) For example, "constitutional challenges are frequently raised to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

the application of an administrative statutory scheme, yet the courts typically require such issues be presented to the administrative agency in the *first* instance." (*Ibid.*) As the California Supreme Court explained in another context, "the mere fact that the concept of vested rights is rooted in the Constitution does not deprive the [Coastal] Commission of the power to make the initial determination whether a developer qualifies for an exemption, so long as appropriate judicial review of the Commission's determination is provided." (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 250, 115 Cal.Rptr. 497, 524 P.2d 1281; accord, *South Coast Regional Com. v. Gordon* (1977) 18 Cal.3d 832, 834, 135 Cal.Rptr. 781, 558 P.2d 867; *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 63, 227 Cal.Rptr. 667, 720 P.2d 15.)

### D. Application to Questions of Agency Jurisdiction

[11] Generally speaking, even where questions concerning the agency's jurisdiction are presented, "the doctrine of exhaustion of administrative remedies requires judicial abstention until there has been a final decision in the administrative forum." (*Public Employment Relations Bd. v. Superior Court, supra,* 13 Cal.App.4th at p. 1828, 17 Cal.Rptr.2d 323.) "One of the principal policy concerns of the exhaustion doctrine is judicial efficiency [citation], which cannot be served if the issue of statutory jurisdiction must be fully plumbed in order to determine whether it should be left to the agency in the first instance." (*Id.* at pp. 1831-1832, 17 Cal.Rptr.2d 323.) As our state's high court put it long ago, "it lies within the power of the administrative agency to determine in the first instance, and before judicial relief may be obtained, whether a given controversy falls within the statutory grant of jurisdiction." (*United States v. Superior Court* (1941) 19 Cal.2d 189, 195, 120 P.2d 26.) However, as the court recognized in a later case, "these rules are inapplicable where ... the agency is given no jurisdiction to make a judicial determination of the

type involved." (*County of Alpine v. County of Tuolumne* (1958) 49 Cal.2d 787, 798, 322 P.2d 449.)

*277 II. Demurrers: Appellate Review

On appeal, "the plaintiff bears the burden of demonstrating that the trial court erred" in sustaining the demurrer. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879, 6 Cal.Rptr.2d 151.) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58; accord, *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081, 6 Cal.Rptr.3d 457, 79 P.3d 569; **131 see also, e.g., *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810, 27 Cal.Rptr.3d 661, 110 P.3d 914; *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1024, 282 Cal.Rptr. 877.)

[12] "As a general rule, if there is a reasonable possibility the defect in the complaint could be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459-460, 80 Cal.Rptr.2d 329; see also, e.g., *Fox v. Ethicon Endo-Surgery, Inc., supra,* 35 Cal.4th at p. 810, 27 Cal.Rptr.3d 661, 110 P.3d 914.) "Nevertheless, where the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result." (*City of Atascadero,* at pp. 459-460, 80 Cal.Rptr.2d 329.) In such cases, "we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." (*Montclair Parkowners Assn. v.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*City of Montclair* (1999) 76 Cal.App.4th 784, 790, 90 Cal.Rptr.2d 598.)

## ANALYSIS

Here, McAllister's appeal follows (1) an initial demurrer, interposed principally on the ground of failure to exhaust administrative remedies; (2) an administrative appeal to the Coastal Commission, which resulted in the approval of a modified project; and (3) a second demurrer, interposed principally on the ground of failure to state a cause of action, which the trial court sustained without leave to amend in February 2005.

On appeal, McAllister makes a three-pronged attack on the trial court's decision to sustain the second demurrer. First, he attacks the demurrer on procedural grounds, including untimeliness. Second, McAllister challenges the demurrer on substantive grounds, arguing that his petition states a valid cause of action on at least two theories. Third, McAllister contends that the trial court abused its discretion by not granting him leave to amend.

*278 Before analyzing those specific contentions, we first discuss two threshold appellate issues: appealability and the scope of our review.

## I. Threshold Issues

### A. Appealability

This appeal was taken from the trial court's February 2005 order sustaining the demurrer without leave to amend and ordering "the case dismissed in its entirety." The appellate record contains no judgment of dismissal, however.

[13][14] Generally speaking, an order sustaining a demurrer "is neither appealable per se nor as a final judgment." (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920, 167 Cal.Rptr. 831, 616 P.2d 813.) But "an appellate court may deem an order sustaining a demurrer to incorporate a judgment of dismissal." (*Ibid.*) Furthermore, an "order dismissing a complaint with prejudice constitutes an appealable judgment.... (See Code Civ. Proc., §§ 581d, 904.1, subd. (a)(1).)" (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 867, fn. 3, 13 Cal.Rptr.3d 420.)

[15] In this case, the matter is fully briefed and no party has raised an objection to consideration of the appeal on its merits. To the contrary, the County points out that "all parties have treated the subject Order as the final act of the Trial Court and therefore appealable." Under these circumstances, it is appropriate**132 to treat the February 2005 order as an appealable judgment of dismissal. "In the interest of justice and to prevent further delay, we will deem the order sustaining defendant's demurrer to incorporate a judgment of dismissal and thus interpret plaintiffs' notice of appeal as applying to such dismissal." (*Bellah v. Greenson* (1978) 81 Cal.App.3d 614, 618, fn. 1, 146 Cal.Rptr. 535.)

### B. Scope of Review

This appeal involves only the first cause of action of McAllister's complaint, for administrative mandamus. Two of the claims asserted there are presented in this appeal: first, that the County's action was null and void, which divested it of jurisdiction, and second, that the County violated CEQA. In addition to those two claims, the first cause of action also alleges that the County denied McAllister a fair hearing, and that the County failed to comply with various substantive provisions of its local coastal plan. But those latter contentions are deemed abandoned for lack of appellate argument. (See, e.g., *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 237-238, 118 Cal.Rptr.2d 313.)

*279 We are not concerned here with the second cause of action of McAllister's complaint, which sought declaratory relief against the County, or with the third cause of action, which sought injunctive relief against the Coastal Commission. As

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

McAllister offers no argument concerning either cause of action, we treat both as abandoned. (*Schoendorf v. U.D. Registry, Inc., supra,* 97 Cal.App.4th at pp. 237-238, 118 Cal.Rptr.2d 313.) Moreover, as to the third cause of action, the trial court ordered judgment in the Commission's favor in June 2004. That action is not part of this appeal, which challenges only the court's later order of February 2005.

## II. Propriety of the Challenged Ruling

We turn now to McAllister's first avenue of attack on the challenged portion of trial court's order, which rests on his claim of procedural defects. As we explain, we find no merit in that claim.

### A. The trial court did not err in rejecting McAllister's procedural challenges to the second demurrer.

[16] McAllister argues that the demurrer was not timely and that it was not an authorized pleading. Like the trial court, we reject those procedural challenges.[FN5]

> FN5. As our analysis demonstrates, we do not adopt real parties' approach to this issue, which suggests viewing the second demurrer "as simply a reassertion of the original demurrer," or analogizing it to "other procedural avenues to test the sufficiency of the pleadings...."

#### 1. Timeliness

The second demurrer was filed by Laube & Engel on January 18, 2005, and joined by the County the same day. By McAllister's reckoning, not only does that date fall some 11 months after service of the initial complaint, but it was 40 days after completion of the Coastal Commission proceedings, an event that operated to lift the May 2004 stay. Under either time frame, he claims, the second demurrer was filed too late. McAllister states that a demurrer

*must* be filed and served within 30 days after service of the complaint, citing several statutes, including Code of Civil Procedure section 430.40.

Despite McAllister's insistence to the contrary, we are not persuaded that the challenged demurrer was untimely.

[17] **\*280** At the outset, we disagree with McAllister's characterization of **\*\*133**section 430.40 of the Code of Civil Procedure as mandatory. That statute reads in relevant part: "A person against whom a complaint or cross-complaint has been filed *may,* within 30 days after service of the complaint or cross-complaint, demur to the complaint or cross-complaint." (Code Civ. Proc., § 430.40, italics added.) The cited provision thus uses the permissive expression "may," not the mandatory term " must." (Cf., *Garrison v. Rourke* (1948) 32 Cal.2d 430, 435-436, 196 P.2d 884, overruled on another ground in *Keane v. Smith* (1971) 4 Cal.3d 932, 939, 95 Cal.Rptr. 197, 485 P.2d 261 ["time limitation for the court's action in a matter subject to its determination is not mandatory (regardless of the mandatory nature of the language), unless a consequence or penalty is provided for failure to do the act within the time commanded"].)

Furthermore, the quoted provision nominally applies only to a first round of demurrers. As one commentator observes: "No statute or rule specifically provides a time limit for demurring to an *amended* complaint." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 7:139, p. 7-53.) In a similar vein, we are aware of no statute or rule that specifically governs situations such as that presented here, where no amended pleading is filed after dissolution of a stay.

Moreover, it is not clear precisely when the May 2004 stay was lifted, a point that was disputed below. The record contains no order explicitly lifting the stay or otherwise setting a specific time for further pleading. (Cf., Code Civ. Proc., § 472b ["When a demurrer to any pleading is sustained or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

overruled, and time to amend or answer is given, the time so given runs from the service of notice of the decision or order, unless the notice is waived in open court, and the waiver entered in the minutes"].)

The stay order itself contemplates an amendment of the complaint following completion of the Coastal Commission proceedings, followed by a response, at which point the stay would lift.[FN6] Of course, that did not happen here, since McAllister never amended his original complaint.

> FN6. With respect to the stay, the court's June 2004 formal order provides as follows: "The first cause of action is stayed in all respects from May 10, 2004, including but not limited to, the Real Parties in Interest's and Respondent's response to any amended petition and/or complaint which may be filed by Petitioners, pending the Coastal Commission's final decision on the merits of the pending appeals to the Commission of the County's approval of Real Parties' project which is the subject of this litigation or, pending the Coastal Commission's determination that said appeals do not raise a substantial issue with respect to the grounds on which an appeal has been filed pursuant to ...section 30603."

*281 The May 2004 stay order further provides that the judicial proceedings would remain stayed "pending the Coastal Commission's final decision on the merits." But the order does not incorporate a mechanism for determining the date of that event's occurrence. And the record reflects a factual dispute on that point. According to McAllister's argument below, the stay lifted on December 9, 2004, when the Coastal Commission took action on the appeal. But Laube & Engel took a different view in the trial court. First, they raised questions about the finality of the administrative proceedings, noting that the Coastal Commission had not adopted its revised findings. Furthermore, they argued, their demurrer was filed within 30 days of notification to

the trial court of the Coastal Commission's action. Finally, real parties urged, they were entitled to further time to respond, since the administrative record was being augmented and thus was not complete. (See **134Code Civ. Proc., § 1089.5.) To the extent that the trial court resolved these factual issues adversely to McAllister, we defer to its decision on that point. (See, e.g., *Jones v. Moers* (1928) 91 Cal.App. 65, 68, 266 P. 821.)

Finally, as McAllister acknowledges, the parties to an action may stipulate to an extension of time to respond. (Code Civ. Proc., § 1054, subd. (b).) In this case, by letter addressed to real parties' counsel, McAllister's attorneys confirmed their earlier offer "to extend the date within which the answers must be served and filed to January 10, 2005. [Deputy County Counsel] Mr. Iglesia thereafter requested an additional one-week extension, which we granted, and Mr. Iglesia has advised us that he will be filing the County's answer to the Petition by January 18, 2005. We are willing to provide your client with the same additional extension, if you so request." Notwithstanding McAllister's insistence that "answer" does not mean "demurrer," a contrary interpretation would not be unreasonable. (Cf., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 7:34.1, p. 7-16 ["word 'answer' in § 471.5 presumably means 'respond' and thus includes the possibility for another demurrer"].) That point represents a factual dispute concerning McAllister's "alleged promise to extend [defendant's] time to answer" and "the trial court necessarily passed upon this question adversely to [McAllister]. Under such circumstances the decision is controlling." (*Jones v. Moers, supra,* 91 Cal.App. at p. 68, 266 P. 821.)

For all these reasons, we conclude, the trial court was warranted in treating the second demurrer as timely.

[18] Even assuming for argument's sake that the demurrer was filed late, the trial court nevertheless had discretion to entertain it. "There is no absolute right to have a pleading stricken for lack of timeli-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ness in filing where no question of jurisdiction is involved, and where, as here, the late filing was a mere irregularity [citation]; the granting or denial of the motion is a matter *282 which lies within the discretion of the court." (*Tuck v. Thuesen* (1970) 10 Cal.App.3d 193, 196, 88 Cal.Rptr. 759, disapproved on another ground in *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 190, fn. 29, 98 Cal.Rptr. 837, 491 P.2d 421; cf., *Johnson v. Sun Realty Co.* (1934) 138 Cal.App. 296, 299, 32 P.2d 393 [court had discretion to hear a demurrer, notwithstanding violation of procedural rules].)

[19] As provided by statute: "The court may, in furtherance of justice, and on any terms as may be proper, ... enlarge the time for answer or demurrer." (Code Civ. Proc., § 473, subd. (a)(1).) The trial court may exercise this discretion so long as its action does "not affect the substantial rights of the parties." (*Harlan v. Department of Transportation* (2005) 132 Cal.App.4th 868, 873, 33 Cal.Rptr.3d 912 [affirming trial court's decision to permit plaintiff to file late amendment following demurrer]; see Code Civ. Proc., § 475.)

Here, we conclude, the trial court's decision to entertain the second demurrer did not affect McAllister's substantial rights. "Prior to the filing of respondent's demurrer to the amended complaint, appellant had not taken any steps to have judgment by default entered under Code of Civil Procedure section 432, nor did he endeavor to show that he was in any way prejudiced by the delay." (*Tuck v. Thuesen, supra,* 10 Cal.App.3d at p. 196, 88 Cal.Rptr. 759.) The same is true in this case. The trial court thus acted within its broad discretion in allowing respondents to file the second demurrer, notwithstanding McAllister's protestations that it was untimely.

**135 *2. Propriety*

[20] Apart from its timeliness, McAllister also challenges the validity of using a demurrer in these cir-

cumstances. As he puts it: "No legal authority allows Real Parties or the County to file the Second Demurrer in the absence of an amended pleading having first been filed by Dr. McAllister." Characterizing the demurrer as "procedurally improper" for that reason, McAllister argues that he was "clearly prejudiced by such error, which resulted in the dismissal of his Complaint in its entirety, thereby depriving him of an opportunity to seek judicial review of the County's violations of CEQA, including the failure to prepare an EIR for the Project, and judicial enforcement of Chapter 20.90 as to the County."

We reject McAllister's claim of error. While it is true that no statute specifically authorizes the procedure undertaken here, neither does any statute forbid it. "Courts, of course, also have 'inherent supervisory and administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority.' The inherent powers may be exercised *283 only if the procedure or practice of the court is not in conflict with a specified statutory procedure." (*Motion Picture & Television Fund Hospital v. Superior Court* (2001) 88 Cal.App.4th 488, 492, 105 Cal.Rptr.2d 872, additional internal quotation marks and citations omitted.)

Significantly, the pleading at issue here is a general demurrer, which attacks the fundamental validity of the cause of action-a challenge that may be raised at any time. "The objection that a complaint does not state facts sufficient to constitute a cause of action may be raised at any stage of the proceedings and, even for the first time upon appeal." (*Horacek v. Smith* (1948) 33 Cal.2d 186, 191, 199 P.2d 929; see Code Civ. Proc., § 430.40, subd. (b).) For these reasons, we are not persuaded that the procedure used in this case was improper.

Even assuming that the trial court erred in allowing the second demurrer in these circumstances, it nevertheless is bound to ignore any "defect[ ] in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                                   Page 21
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

the parties." (Code Civ. Proc., § 475.) In our view, the trial court's decision to consider the second demurrer did not prejudice McAllister by affecting his substantial rights. McAllister's contention that the perceived irregularity caused the dismissal of his complaint and the attendant loss of his right to judicial review of his claims against the County misses the point. Those claims were not lost because of the procedures employed; rather, they were rejected because they lack substantive merit, a point we now address.

### B. McAllister did not state a cause of action based on voidness.

In McAllister's view, the trial court erred in dismissing his petition since it states a valid cause of action on two theories, the first being that the County's action was void *ab initio.* As we explain, we reject McAllister's voidness theory. Our analysis of this question proceeds in two separate steps: (1) a discussion of the administrative requirement in the context of this claim, and (2) an assessment of whether McAllister has stated a cause of action.

### 1. McAllister's claim that the County's action was null and void does not excuse the exhaustion requirement.

[21] We begin with an analysis of the administrative exhaustion doctrine as it relates to McAllister's voidness claim. We do so in light of the allegation in McAllister's complaint that he was "relieved of and exempt from any exhaustion of administrative**136 remedies by virtue of the lack of jurisdiction of the County to approve the Project based on ... Chapter 20.90 ... and the existing violation of the Project Site of Condition 3 of the 1977 Permit." As **284 noted above, exhaustion was primarily at issue in the first demurrer, which was interposed before the matter proceeded to the Coastal Commission. Nevertheless, the parties continued to dispute the exhaustion requirement in connection with the second demurrer. Real parties thus

argued: "The only final administrative decision on the issuance of a Coastal Development Permit ... is the one which the Coastal Commission made on December 9, 2004.... [¶] Accordingly, Petitioner failed to state facts sufficient to constitute a cause of action...." In response, McAllister reiterated that his "central argument is that the County's action in proceeding on the Project application was illegal under Chapter 20.90 and therefore not one that legally could be appealed to the Coastal Commission." Arguing against the "strict finality requirement" urged by real parties, McAllister contended "that the County remains an appropriate party" under "the exception to the exhaustion doctrine" that is applicable "where the action challenges the very jurisdiction of an administrative agency to consider the matter."

McAllister continues to press his exhaustion arguments on appeal. He contends: "Chapter 20.90 and its declaration that permits issued in conflict with the provisions of Title 20 of the LCP 'shall be null and void' changes the analysis ordinarily applicable in the context of a claim of failure to exhaust administrative remedies." He adds: "Central to Dr. McAllister's Complaint is the allegation that the County's action was a legal nullity and therefore there was no valid final County action from which an appeal to the Coastal Commission could be properly taken."

The County and real parties refute McAllister's contentions, though each takes a different analytic path.[FN7] As we now explain, our own assessment in this first step in the analysis leads us to the same conclusion: McAllister is mistaken, and exhaustion was required.

> FN7. While the County discusses the question in terms of exhaustion, Laube & Engel frame the issue as one of finality. As they see it, McAllister cannot challenge the County's action because that action was never final-a prerequisite for administrative mandamus-since an appeal was taken to the Coastal Commission. (See Code of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253

Page 22

147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

Civ. Proc., § 1094.5.) "The purpose of section 1094.5 is to inquire into the validity of any *final* administrative order." (*State of California v. Superior Court, supra,* 12 Cal.3d at p. 245, 115 Cal.Rptr. 497, 524 P.2d 1281.) That does not occur "until the administrative process is completed and the agency makes a final decision that results in a direct and immediate impact on the parties." (*Santa Barbara County Flower and Nursery Growers Assn. v. County of Santa Barbara, supra,* 121 Cal.App.4th at p. 875, 17 Cal.Rptr.3d 489.)

*a. Exhaustion of all available remedies is generally required.*

As discussed above, exhaustion of administrative remedies is generally required before resort to judicial remedies. (*Styne v. Stevens, supra,* 26 Cal.4th at p. 56, 109 Cal.Rptr.2d 14, 26 P.3d 343.) "The petitioner ... must obtain a final decision on the merits at the highest available administrative level before seeking judicial \*285 review. If an appeal can be taken to a higher administrative body ... that appeal must be pursued and the issues must be presented to the final decisionmaker before they can be presented in court." (Curtin, California Land Use and Planning Law, *supra,* Ch. 21, p. 528.) Where an administrative appeal is available but "no appeal is taken, there is a failure to exhaust administrative remedies, and mandamus will not lie." \*\*137(*Grant v. Superior Court* (1978) 80 Cal.App.3d 606, 609, 145 Cal.Rptr. 699.)

*b. Exhaustion is required even though voidness is asserted.*

Even where an ordinance is challenged on the ground that it is void as applied to a particular property, the challenger generally must first exhaust all available administrative remedies before asserting his claim in court. Our high court endorsed that principle more than 60 years ago in the *Metcalf* case. (*Metcalf v. County of Los Angeles*

(1944) 24 Cal.2d 267, 270-273, 148 P.2d 645.) In *Metcalf,* the court squarely rejected an argument by the plaintiffs "that the doctrine of exhaustion of administrative remedies does not require them to follow the procedure prescribed by an ordinance which they allege is void as to their property." (*Id.* at p. 270, 148 P.2d 645; accord, *Pan Pacific Properties, Inc. v. County of Santa Cruz* (1978) 81 Cal.App.3d 244, 249, 146 Cal.Rptr. 428; see also, *United States v. Superior Court, supra,* 19 Cal.2d at pp. 194-195, 120 P.2d 26)

Applying *Metcalf* to the circumstances presented here, McAllister was required to apply for all available administrative relief-including appeal to the Coastal Commission-notwithstanding his claim that the County's action was a nullity.

We find no basis for a contrary result in the Supreme Court's later decision in *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d 787, 322 P.2d 449. In that case, the dispute concerned Alpine County's geographic boundaries, which were described in ambiguous statutory language. (*Id.* at p. 791, 322 P.2d 449.) The high court concluded that the courts-not the agency-had primary jurisdiction to interpret the legislative language. (*Id.* at pp. 792, 798, 322 P.2d 449.) As the court observed: "An administrative agency can act only as to those matters which are within the scope of the powers delegated to it." (*Id.* at p. 797, 322 P.2d 449.) Furthermore, the court stated, the rules requiring exhaustion "are inapplicable where, as here, the agency is given no jurisdiction to make a judicial determination of the type involved." (*Ibid.*)

The situation described in *Alpine* does not apply to our case. In this case, unlike that one, the agency had fundamental and primary jurisdiction over the parties' dispute. That conclusion proceeds manifestly from the relevant statutes, which recognize the Coastal Commission's authority to make determinations of the type involved here.

\*286 By statute, the Commission's jurisdiction extends to "any permit action, ... appeal, ... or any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                    Page 23
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

other quasi-judicial matter requiring commission action, for which an application has been submitted to the commission."(§ 30321; see *Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 190, 80 Cal.Rptr.2d 562.) With respect to appeals, under the Coastal Act, "an action taken by a local government on a coastal development permit application may be appealed to the commission for ... developments ... approved by the local government between the sea and the first public road paralleling the sea ...." (§ 30603, subd. (a)(1).) The Coastal Act thus incorporates a "chain of responsibility" for considering coastal developments such as that challenged here. (*REA Enterprises v. California Coastal Zone Com.* (1975) 52 Cal.App.3d 596, 605, 125 Cal.Rptr. 201 [construing the former administrative scheme, which gave regional commissions, rather than local governments, the authority "to adjudicate the propriety of granting or denying a permit" in the first instance, followed by an appeal to the state commission which "takes a new, unlimited look at the same request **138 for a permit by a de novo public hearing"]; see also, e.g., *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at pp. 569-570, 106 Cal.Rptr.2d 14.) For such projects, the County makes the initial decision on the coastal development permit, and the Coastal Commission hears any appeal.

The Coastal Commission's appellate jurisdiction is limited to determining whether the development conforms "to the standards set forth in the certified local coastal program or the public access policies set forth in this division."(§ 30603, subd. (b)(1); see *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14.) The County's local coastal program standards-previously certified by the Coastal Commission-include those set forth in Chapter 20.90. By logical inference, it is within the Coastal Commission's appellate jurisdiction to review the County's action vis-à-vis those standards-including an assessment of the underlying validity of the local government action. That very question was before the Coastal Commission here.[FN8] In undertaking

to answer it, the Coastal Commission was acting *287 "within the scope of the powers delegated to it." (*County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 797, 322 P.2d 449.)

> FN8. The Coastal Commission's August 2004 Appeal Staff Report-Substantial Issue Determination is part of the record, as the result of McAllister's request for judicial notice below and in this court. In a summary of the contentions raised in the Coastal Commission appeal, the report states: "The County's approval of this application presents a number of unresolved jurisdictional and procedural issues." As described in the report, they included: a) what effect the work done by Sorenson in violation of the 1977 permit would have on "the proper procedure that the Coastal Commission should follow in considering this item"; b) whether "the current plans approved by the County would ... be consistent with the CDP issued by the Coastal Commission and would violate the terms of approval that were adopted in 1977"; and c) whether "pending grading and construction violations [exist] that, under the County's LCP procedural rules, should have precluded action on the application."

> In its Recommended Findings and Declarations, the August 2004 Coastal Commission staff report continues: "With regards to the procedural issues, the Coastal Commission granted an earlier permit for a single family dwelling in 1977 to Sorenson (Permit # A-174-77).... ¶ During review of this current proposal, Commission staff recommended to the County staff that the applicants['] request for a new residence should be considered an amendment to the original 1977 Sorenson CCC permit, based on staff's belief that the original permittee had exercised the permit, as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

evidenced by partial development on site.... However, it has since been determined that Sorenson never combined the two lots as required by the Commission's permit, and so the work done was in violation of permit conditions.... Work done in violation of permit conditions is illegal and cannot be used to assert that the permit has been exercised. Since no extension of the 1977 permit occurred (or was requested) the Sorenson CDP appears to have expired in 1979. Eventually, the property was sold to Laube/Engel ... whose application for development in the same general building site is the subject of this appeal. ¶ ... Since Commission approval of the Sorenson project was granted for a period of two years, and permit conditions were never fully complied with during that time, the permit appears to have expired, and the development on the site is a violation. The County now has a certified LCP, and as such has been granted the authority to regulate development in the coastal zone, with the Commission retaining appeal jurisdiction in the Big Sur Coast. Thus the Commission finds that the County was correct to have processed a coastal development permit application for the project. As a result of carrying out their permit authority, the County has approved a project, which has been appealed to the Commission."

The recognition of this authority on the Coastal Commission's part is consistent with the policy reasons that underpin the exhaustion requirement. As has been **139 said, where litigants fail to proceed with available administrative remedies, they "have in effect deprived the [agency] of an opportunity to correct the alleged constitutional infirmity." (*Pan Pacific Properties, Inc. v. County of Santa Cruz, supra,* 81 Cal.App.3d at p. 249, 146 Cal.Rptr. 428; cf., *Sierra Club v. San Joaquin Loc-*

*al Agency Formation Com., supra,* 21 Cal.4th at p. 502, 87 Cal.Rptr.2d 702, 981 P.2d 543.) In this case, the agency charged with correcting the asserted defect (the Coastal Commission) is not the same one that took the challenged action (the County). But in our view, that circumstance is irrelevant, given the chain of responsibility established by the Coastal Act. Where the claimed deficiency can be corrected administratively-including via appeal to another agency-the beneficial purposes of the exhaustion doctrine are advanced. "The doctrine's purpose is fully served when parties raise all issues before the administrative body with *ultimate or final responsibility* to approve or disapprove the project...."(*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 594, 96 Cal.Rptr.2d 880, italics added.) In this case, that body is the Coastal Commission. (See *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14.)

To sum up, in cases where "the subject matter lies outside the administrative agency's jurisdiction," the exhaustion requirement is excused. (*Green v. City of Oceanside, supra,* 194 Cal.App.3d at p. 222, 239 Cal.Rptr. 470; *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 798, 322 P.2d 449.) This is not such a case, however. Here, by express legislative grant, the Coastal Commission had *288 fundamental subject matter jurisdiction to decide the administrative appeal of real parties' coastal development permit. (§ 30603, subd. (a)(1).) McAllister's claim that the County's action is null and void does not operate to excuse the exhaustion requirement in these circumstances. (*Metcalf v. County of Los Angeles, supra,* 24 Cal.2d at p. 271, 148 P.2d 645.)

*c. Cognizable jurisdictional claims will not escape review.*

Contrary to McAllister's dire assertions, the exhaustion requirement does not place reviewable administrative decisions *"forever beyond judicial scrutiny."* It is well established that an administrative

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

agency "may constitutionally hold hearings, determine facts, apply the law, and impose certain types of monetary relief so long as (i) these activities are 'authorized by statute or legislation and are *reasonably necessary* to effectuate the administrative agency's *primary, legitimate regulatory purposes,* and (ii) the *'essential' judicial power* (i.e., the power to make enforceable, binding judgments) *remains ultimately in the courts, through review of agency determinations.'"* (*Bradshaw v. Park* (1994) 29 Cal.App.4th 1267, 34 Cal.Rptr.2d 872, quoting *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 372, 261 Cal.Rptr. 318, 777 P.2d 91; see also, e.g., *State of California v. Superior Court, supra,* 12 Cal.3d at p. 250, 115 Cal.Rptr. 497, 524 P.2d 1281; *Halaco Engineering Co. v. South Central Coast Regional Com., supra,* 42 Cal.3d at p. 63, 227 Cal.Rptr. 667, 720 P.2d 15.)

Judicial review thus remains obtainable-once available administrative remedies have been exhausted-for any claims that survive that process. (*Grant v. Superior Court, supra,* 80 Cal.App.3d at p. 609, 145 Cal.Rptr. 699; § 30801; cf., § 30802 [judicial review where there is no right of appeal to the Coastal Commission].) For example, as the Supreme Court observed in *Metcalf,* had the plaintiffs there exhausted the administrative process available**140 to them, "they would not have been barred from asserting in appropriate judicial proceedings that the zoning ordinance was unconstitutional as to their property." (*Metcalf v. County 'of Los Angeles, supra,* 24 Cal.2d at p. 272, 148 P.2d 645.) The same is true here. To the extent that McAllister's claims retained vitality following the Coastal Commission proceedings (a point we discuss below), they were subject to judicial review in his mandamus action in the superior court.

Having concluded that McAllister's voidness claim did not operate to excuse him from exhausting available administrative remedies, including an appeal to the Coastal Commission, we now proceed to the remaining step in our analysis of this theory of the complaint: an assessment of whether McAllister

has stated a cause of action on voidness grounds. The second demurrer not only challenged the allegations in McAllister's complaint that he was excused from exhausting administrative remedies, it also attacked the very existence of a cause of action based on voidness. In this second part of *289 the analysis, we therefore consider the sufficiency of McAllister's allegations that the County's action was void *ab initio* as a discrete issue, distinct from the question of finality.

*2. Liberally construed, McAllister's pleading does not state a claim that the County's action is void ab initio.*

[22] As McAllister puts it, if he "can allege *any* facts under which the provisions of Chapter 20.90 would prohibit County consideration and approval of the Project or under which those provisions would mandate a conclusion that the County's approval of the Project is 'null and void,' then the granting of the Second Demurrer without leave to amend must be reversed." That is an accurate recitation of the general *legal* principle concerning demurrers. McAllister's petition presents no *factual* basis for relief, however.

Under the governing legal principles, "we take as true the well-pleaded factual allegations of the complaint." (*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 193, 126 Cal.Rptr.2d 908, 57 P.3d 372.) We construe the "complaint liberally to attain substantial justice among the parties." (*Long Beach Equities, Inc. v. County of Ventura, supra,* 231 Cal.App.3d at p. 1024, 282 Cal.Rptr. 877.) Nevertheless, we "may not consider conclusions of fact or law, opinions, speculation or allegations which are contrary either to law or to judicially noticed facts." (*Ibid.*) We thus disregard any allegations of McAllister's complaint that conflict with judicially noticed documents as well as those that represent bare legal conclusions.

In a succinct summary of his position on this point,

McAllister asserts that he "has stated a cause of action [a] that the County's consideration of the Project violated Chapter 20.90, [b] that its approval of the Project was 'null and void,' and [c] that therefore both the County and the Coastal Commission were without jurisdiction to take any action on the Project." Each of those three points follows in logical progression, with the last one depending on the first two. We examine each in turn.

### a. Violation of Chapter 20.90

McAllister starts with the assertion that the County's consideration of the project violated Chapter 20.90 of the Monterey County Code, which embodies part of the County's local coastal plan. That assertion relies on these two factual allegations: (1) that real parties' predecessor, Sorenson, did grading and construction work on the property that violated Condition 3 of the 1977 Coastal Commission permit since the two lots had not yet been merged; and (2) **141 that the "said grading and construction work was illegal and constituted a violation of permit conditions under Chapter 20.90...."

*290 We accept as true the first factual allegation summarized above-that Sorenson's grading and construction work was done in violation of his 1977 coastal development permit. Indeed, there appears to be no dispute as to that fact.

As to the second premise, however, we conclude that it conflicts with judicially noticed documents, which show that there was no record of any violation of Chapter 20.90, as distinguished from violations of the 1977 permit.

The documents before us include both a transcript of the January 2004 hearing by the County's board of supervisors and the resolution passed at the close of that hearing. As reflected in the transcript, the County's assigned planner said this: "As far as our County records, there is no recorded violation at the site. We did turn it over to the Coastal Commission

staff to investigate. We have heard nothing from them yet. But we hopefully, will treat that this project will correct any violation that there may be by making that site useable." Similarly, in a section devoted to findings supporting denial of the appeal, Resolution 04-428 notes McAllister's contention that "violations on the project site exist and must be fully investigated and remedied prior to project approval." The resolution includes this response to that contention: "Staff finds that no violation has been recorded for the property under County jurisdiction. Any violation associated with the property would be related to the original, abandoned, 1977 CC [Coastal Commission] permit. CC staff has been notified so as to recommend any remedial actions required at the site to correct a purported violation. At the receipt of this report, CC staff is expected to respond to the proposal during the appeal period."

In short, McAllister's assertion that there was an existing violation of Chapter 20.90 of the Monterey County Code conflicts with judicially noticed documents, which unequivocally refute the existence of any such local code violation. "The courts ... will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604, 176 Cal.Rptr. 824.) "Thus, a pleading valid on its face may nevertheless be subject to demurrer when matters judicially noticed by the court render the complaint meritless." (*Ibid.*) This is such a case.

In any event, even assuming that McAllister's pleading had cleared this first hurdle, the remaining allegations in support of his voidness claim cannot stand.

### *291 b. Approval as "null and void"

As the next link in the analytic chain, McAllister argues that the existing violation renders the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                    Page 27
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

County's action on the project null and void under Chapter 20.90.

Quite apart from its lack of a factual premise, this allegation must be disregarded as a bare legal conclusion. As the California Supreme Court has said in the context of complaints against administrative agencies: "Allegations that the acts of a commission or board were 'arbitrary, capricious, fraudulent, wrongful and unlawful,' like other adjectival descriptions of such proceedings, constitute mere conclusions of law which are not to be deemed admitted by a demurrer." (*Faulkner v. Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329, 253 P.2d 659.) McAllister's characterization of the County's action**142 as "legally null and void" suffers from the same defect.

Urging against that conclusion, McAllister cites the venerable case of *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 20 Cal.Rptr. 609, 370 P.2d 313. In that case, the California Supreme Court said this: "The sustaining of the demurrer to the second cause of action cannot be justified on the ground that the allegation that the housing accommodations were 'publicly assisted' was merely a conclusion of law. The distinction between conclusions of law and ultimate facts is not at all clear and involves at most a matter of degree." (*Id.* at p. 473, 20 Cal.Rptr. 609, 370 P.2d 313.) The court further explained: "In permitting allegations to be made in general terms the courts have said that the particularity of pleading required depends upon the extent to which the defendant in fairness needs detailed information that can be conveniently provided by the plaintiff, and that less particularity is required where the defendant may be assumed to possess knowledge of the facts at least equal, if not superior, to that possessed by the plaintiff. [Citations.] In accordance with these principles it may be alleged generally, *in the terms of the statute,* that housing accommodations are 'publicly assisted.' " (*Id.* at p. 474, 20 Cal.Rptr. 609, 370 P.2d 313, italics added.)

A critical distinction exists between that case and this one. The key term in the pleading at issue in

*Burks*-"publicly assisted" housing accommodation-came clothed in a detailed statutory definition. (*Burks v. Poppy Construction Co., supra,* 57 Cal.2d at p. 471, 20 Cal.Rptr. 609, 370 P.2d 313; see *id.* at p. 473, 20 Cal.Rptr. 609, 370 P.2d 313, citing Health & Saf.Code, former § 35710, subd. 3.) The same is not true here. The pivotal allegation here-that the action was "null and void"-does not enjoy an accepted meaning, under either statutory or decisional law, which would serve to give it a concrete factual dimension and thus to elevate it from the status of bare legal conclusion.

**\*292** Moreover, even as a conclusion of law, the claim is fallacious. As noted above, Chapter 20.90 provides that any permit, "if issued in conflict with the provisions of *this title,* shall be null and void." (Monterey County Code, § 20.90.010, italics added.) As the judicially noticed documents demonstrate, however, there is no violation of "this title" in this case, only a decades-old violation of a prior permit, which was issued more than a decade before the Coastal Commission's 1988 certification of the County's local coastal plan.

For all these reasons, we need not accept as true McAllister's contention that the County's action was a legal nullity.

*c. Lack of jurisdiction*

The third and final link in McAllister's progression of arguments is his contention that both "the County and the Coastal Commission were without jurisdiction to take any action on the Project" since the County's approval was a legal nullity.

[23] Once again, this assertion is nothing more than an unvarnished legal conclusion. In order "to state a cause of action warranting judicial interference with the official acts of [agency] defendants, [plaintiffs] must allege much more than mere conclusions of law; they must aver the specific facts from which the conclusions entitling them to relief would follow." (*Faulkner v. Cal. Toll Bridge Au-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                    Page 28
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

*thority, supra,* 40 Cal.2d at p. 330, 253 P.2d 659.) Here no such facts have been stated that are supportable in light of the judicially noticed documents before us.

Moreover, as with his second argument, the conclusion of law that McAllister draws on this point is itself erroneous. As **143 legal authority for his claim that voidness necessarily divests jurisdiction, McAllister relies on the case of *City of Cupertino v. City of San Jose* (1960) 186 Cal.App.2d 29, 8 Cal.Rptr. 525. That case involved competing annexation proceedings. (*Id.* at p. 30, 8 Cal.Rptr. 525.) In such situations, the court explained, "it has been made clear that 'the first proceeding in point of time excludes the jurisdiction of the later one' [citation] and that the second proceeding is, in such situation 'an absolute nullity and [is] void' [citation]." (*Id.* at p. 32, 8 Cal.Rptr. 525.) "Since an annexation proceeding which is 'null and void' is so from the very beginning, and is generally ineffectual for all purposes, it does not bar a second proceeding by the same annexing city [citation]." (*Ibid.*)

Patently, the situation presented in *City of Cupertino* bears no relation to our case. In this case, unlike that one, no competing proceeding barred the County's jurisdiction. (Cf., *City of Cupertino v. City of San Jose, supra,* 186 Cal.App.2d at pp. 31-32, 8 Cal.Rptr. 525; *293Andrisani v. Saugus Colony Limited* (1992) 8 Cal.App.4th 517, 524, 10 Cal.Rptr.2d 444 ["trial court clearly had jurisdiction to vacate its void orders, made without jurisdiction, while the appeal was still pending"].) Nor was there a lack of fundamental jurisdiction to approve the project. (Cf., *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 798, 322 P.2d 449; *Buckley v. California Coastal Com., supra,* 68 Cal.App.4th at p. 190, 80 Cal.Rptr.2d 562.)

As stated above in connection with McAllister's second argument, we need not accept his characterization of the County's action as "null and void." But even if we were to concede that premise, it would not follow ipso facto that the County lacked

fundamental jurisdiction to act. One example of the impact of "voidness" on jurisdiction, offered by way of analogy, is when a trial judge has been disqualified. (Code Civ. Proc., §§ 170, 170.6.) In such cases, it has been argued, "the challenged judge is without jurisdiction to conduct any further proceedings in the cause, and his subsequent orders are null and void." (*Andrisani v. Saugus Colony Limited, supra,* 8 Cal.App.4th at p. 525, 10 Cal.Rptr.2d 444 [stating the party's contention].) "Although the cases frequently refer to the subsequent orders or judgment of a disqualified judge as absolutely void for lack of jurisdiction ..., it is clear that ... the actions of a disqualified judge are not void in any fundamental sense but at most voidable if properly raised by an interested party."(*In re Christian J.* (1984) 155 Cal.App.3d 276, 280, 202 Cal.Rptr. 54.) Thus, even a claim of underlying "voidness" does not inexorably rob an adjudicatory body of its jurisdiction.

To sum up, McAllister has not stated a cause of action with respect to his voidness claim. His allegation that the County's consideration of real parties' application violated Chapter 20.90 is directly contradicted by facts subject to judicial notice. (*Del E. Webb Corp. v. Structural Materials Co., supra,* 123 Cal.App.3d at p. 604, 176 Cal.Rptr. 824.) His other two assertions-that the County's action was null and void and that the County and the Coastal Commission therefore lacked fundamental jurisdiction to act-must be disregarded as baseless and erroneous legal conclusions. (*Long Beach Equities, Inc. v. County of Ventura, supra,* 231 Cal.App.3d at p. 1024, 282 Cal.Rptr. 877.)

### C. McAllister's pleading did not state a cause of action under CEQA.

[24] McAllister's remaining theory in support of the validity of his first cause of action relies on the California Environmental Quality Act. He asserts: "The County Defendants failed to comply with **144 CEQA" in various respects, including failure to prepare an EIR for the project, reliance on a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                    Page 29
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

flawed initial study, and adoption of inadequate mitigation measures.

As we now explain, in the procedural context of this case, those allegations do not support a claim against the County.

*294 1. The County's CEQA determinations have been superseded by the Coastal Commission's review.

With the Coastal Commission's decision to accept the administrative appeal, the County's CEQA determinations were converted into intermediate decisions, lacking in finality. "When, in the course of hearing that appeal, the Commission found a 'substantial issue,' it then heard the entire permit application de novo. The scope of that hearing decisively affects the status of the [County] and the Commission: 'A hearing *de novo* literally means a new hearing, or a hearing the second time. [Citation.] Such a hearing contemplates an entire trial of the controversial matter in the same manner in which the same was originally heard. It is in no sense a review of the hearing previously held, but is a complete trial of the controversy, the same as if no previous hearing had ever been held.... The decision therein ... takes the place of and completely nullifies the former determination of the matter.'" (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14, quoting *Collier & Wallis v. Astor* (1937) 9 Cal.2d 202, 205, 70 P.2d 171.) "Once the Commission conducted its de novo examination, there was no longer a decision by the [County] to review." (*Ibid.*)

The County's CEQA decisions thus have been superseded by the Coastal Commission's environmental review. "The Commission's findings that the [project] complied with CEQA superseded equivalent findings by the [County Board of Supervisors] [citation] in precisely the same manner that the Board's decision superseded that of the planning commission." (*Kaczorowski v. Mendocino County*

*Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 570, 106 Cal.Rptr.2d 14.) As a result, McAllister no longer has any CEQA claims against the County, which is "no longer plaintiff's adversarial opponent." (*Id.* at p. 570, 106 Cal.Rptr.2d 14.)

2. *The County's CEQA determinations are no longer subject to judicial review.*

As McAllister correctly observes, for purposes of environmental review of the project challenged here, the County is the lead agency under CEQA, while the Coastal Commission is a responsible agency. (See Guidelines, § 15050, subds. (b)(1), (c).) As he also points out, "CEQA mandates a lead agency to conduct a thorough review of the project in question even though additional review might later be undertaken by other agencies with jurisdiction over specific resources." (*Save San Francisco Bay Assn. v. San Francisco Bay Conservation etc. Com.* (1992) 10 Cal.App.4th 908, 921, 13 Cal.Rptr.2d 117(*Save San Francisco Bay* ).)

*295 From that premise, McAllister argues: "As a lead agency, the County's failure to comply with CEQA ... is subject to challenge under Code of Civil Procedure section 1094.5."

We cannot agree. True, the County was the lead agency here. As explained above, however, its CEQA determination was not final for purposes of administrative mandamus. That fact is one of several that distinguish our case from *Save San Francisco Bay.*(See *Save San Francisco Bay, supra,* 10 Cal.App.4th at p. 918, 13 Cal.Rptr.2d 117.) A second distinction, which **145 proceeds from the first, is that the agencies involved in *Save San Francisco Bay* undertook environmental review under different statutory schemes, each with a slightly different focus, rather than engaging in sequential review in a vertical process under CEQA. (*Id.* at pp. 917, 918, 13 Cal.Rptr.2d 117.)

As the *San Francisco Bay* court explained: "The administrative review of the aquarium project took

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                                              Page 30
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

over four years and was conducted by many agencies, including the City's planning commission, planning department, port commission, art commission and board of supervisors, the Regional Water Quality Control Board, the Bay Area Quality Management District, the United States Army Corps of Engineers and BCDC [San Francisco Bay Conservation and Development Commission]. The project raised numerous complex issues and generated strong public interest. Nevertheless, approval was eventually forthcoming from every agency involved, each having a slightly different mission and each being subject to its own rules and regulations." (*Save San Francisco Bay, supra,* 10 Cal.App.4th at p. 917, 13 Cal.Rptr.2d 117.) "After the planning commission certified the final EIR and approved the project, BCDC formally accepted the project for review." (*Id.* at p. 918, 13 Cal.Rptr.2d 117, fn. omitted.) However, that agency's review was not pursuant to CEQA; rather, it was under an entirely different statutory scheme, the McAteer-Petris Act or MPA. (*Id.* at pp. 915, 918, 13 Cal.Rptr.2d 117; see Gov.Code, § 66600 et seq.) "Although it had participated in the preparation of the EIR, BCDC's central role in the review process was to review the project for conformity with the provisions of the MPA" and specific area plans. (*Save San Francisco Bay,* at p. 918, 13 Cal.Rptr.2d 117.) As the court pointed out, those two statutory schemes-CEQA and the MPA-"differ in many significant respects." (*Id.* at p. 923, 13 Cal.Rptr.2d 117.)

In this case, by contrast, the Coastal Commission did not undertake its environmental review pursuant to an entirely separate statutory scheme with a distinct focus. To the contrary, as CEQA and its accompanying Guidelines recognize, Coastal Commission review is a *substitute* for an environmental impact report. (See § 21080.5, subds. (a), (e)(1); Guidelines, §§ 15002, subd. (*l* ); 15251, *296 subds. (c), (f).) [FN9] Its review is "the functional equivalent of the EIR process." (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, 106 Cal.Rptr.2d 14.) In this

case, Coastal Commission**146 review was the final step in a sequential process of CEQA proceedings, which started with the County's planning commission. That final step is the only one appropriate for judicial review. (Code Civ. Proc., § 1094.5.)Under the circumstances presented here, the CEQA determination made by the County's board of supervisors is no more final than that made earlier by its planning commission. Both are merely intermediate determinations, and neither is a proper subject for judicial review.

> FN9. As the relevant portion of the statute provides, "when the regulatory program of a state agency requires a plan or other written documentation containing environmental information" that complies with the statute, "the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division if the Secretary of the Resources Agency has certified the regulatory program pursuant to this section."(§ 21080.5, subd. (a).) The Coastal Commission's regulatory program has been so certified. According to the Guidelines: "The following programs of state regulatory agencies have been certified by the Secretary for Resources as meeting the requirements of Section 21080.5: [¶] The regulatory program of the California Coastal Commission and the regional coastal commissions dealing with the consideration and granting of coastal development permits under the California Coastal Act of 1976, Division 20 (commencing with Section 30000) of the Public Resources Code."(Guidelines, § 15251, subd. (c).) Coastal Commission environmental review thus is among the programs that "have been certified by the Secretary of the Resources Agency as involving essentially the same consideration of environmental issues as is provided by use of EIRs and negative declarations. Certified programs

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253                                                                    Page 31
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

are exempt from preparing EIRs and negative declarations but use other documents instead." (Guidelines, § 15002, subd. (*l* ).)

In short, nothing in *Save San Francisco Bay* or in the County's status as lead CEQA agency offers any basis for judicial review of the County's intermediate environmental decision.

*3. Policy considerations do not dictate a different result.*

Arguing against that conclusion based on policy considerations, McAllister contends that "the County's compliance with CEQA with respect to projects in the most sensitive coastal areas would be forever beyond judicial review."

We reject that argument. As provided by the Legislature, aggrieved parties may seek judicial review of a *final* environmental decision only. (Code Civ. Proc., § 1094.5.)In this case, that decision is entrusted to the Coastal Commission. (See §§ 21080.5, subd. (a), 30603.) We do not share McAllister's apparent apprehension over the Legislature's decision to give the Coastal Commission the final administrative say on sensitive coastal developments such as the one at issue here. In our view, that legislative choice is consistent with the Commission's statutory charge to protect the "quality of the coastal zone environment ...." (§ 30001.5, subd. (a).) Nor do *297 we agree with McAllister that shielding the local CEQA decision from judicial review when an appeal is taken to the Coastal Commission "would provide the County with a disincentive to rigorously comply with CEQA and would leave the County unaccountable to the public for its CEQA violations in this context." In the first place, as·a factual matter, nothing in the record before us suggests that the County fails to rigorously comply with its obligations under CEQA. Furthermore, a cursory examination of the administrative appeal process demonstrates the fallacy of that contention as a legal argument. The Coastal Commission does not have appellate jurisdiction unless someone

takes an appeal. (§ 30603.) Had no appeal been taken here, the County's CEQA determination would have been final and subject to immediate judicial review. In any given case, the County cannot know in advance whether its decision will be subject to a direct court challenge. For that reason alone, it has every incentive to comply with CEQA.

To sum up, McAllister's policy arguments are unpersuasive in the face of the legislative dictates that govern us here.

*D. The trial court did not err in failing to grant leave to amend.*

[25] McAllister's final appellate contention is that the trial court abused its discretion in sustaining the demurrer without leave to amend. He argues that the trial court did not give him "a fair prior opportunity to correct any substantive defect in the complaint," and thus abused its discretion. (See *Larwin-Southern California, Inc. v. JGB Investment Co.* (1979) 101 Cal.App.3d 626, 635, 162 Cal.Rptr. 52.) He asserts: "If given a fair opportunity, Dr. McAllister would be able to amend the Complaint to allege, if necessary, more facts to support a violation of CEQA, Chapter 20.90 and his legal theory that the County's approval of the Project is null **147 and void based on the violations of the 1977 Permit."

*1. Policy favoring amendments*

"The trial court has discretion to allow amendments to the pleadings 'in the furtherance of justice.' (Code Civ. Proc., § 473, subd. (a)(1).) 'This discretion should be exercised liberally in favor of amendments....' "(*Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co.* (2006) 137 Cal.App.4th 905, 916, 41 Cal.Rptr.3d 39.) Furthermore, "a plaintiff need not request leave to amend in order to preserve on appeal the issue of whether the court abused its discretion in sustaining a demurrer without leave to amend (Code Civ. Proc., § 472c)...."(*Palm Springs Tennis Club v. Rangel*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

147 Cal.App.4th 253
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

(1999) 73 Cal.App.4th 1, 7, 86 Cal.Rptr.2d 73.)

*298 2. *Plaintiff's burden*

As the California Supreme Court explained long ago in the leading case of *Blank v. Kirwan,* when a demurrer "is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment.... The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318, 216 Cal.Rptr. 718, 703 P.2d 58, citations omitted.) In that case, the court found that the plaintiff failed to "carry his burden of proving a reasonable possibility that the defects can be cured by amendment." (*Id.* at p. 319, 216 Cal.Rptr. 718, 703 P.2d 58.)

In order to demonstrate a reasonable possibility of curing the defect in the complaint, the plaintiff must show how the complaint can be amended and how the amendment will change the pleading's legal effect. (*Palm Springs Tennis Club v. Rangel, supra,* 73 Cal.App.4th at pp. 7-8, 86 Cal.Rptr.2d 73.)

3. *Application*

McAllister failed to carry his burden here.

As to his voidness claim, McAllister does not indicate what specific facts he could assert that might breathe life into that claim. He "has never suggested what facts [he] is prepared to allege that would cure the defect in [his] complaint." (*Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co., supra,* 137 Cal.App.4th at p. 916, 41 Cal.Rptr.3d 39.) Furthermore, there is "nothing in the record that suggests" a reasonable possibility of cure, particularly given the judicially noticed documents in this record. (*Ibid.*) In this case, it is not enough to offer "essentially the same allegations but with greater specificity." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 319, 216 Cal.Rptr. 718, 703 P.2d 58.)

As to his CEQA claim, as explained above, McAllister cannot state a cause of action against the County. The proper defendant is the Coastal Commission. But due to the passage of time, it cannot now be joined as a party-defendant on McAllister's CEQA claim. (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 570, 106 Cal.Rptr.2d 14 [the plaintiff offered no "suggestion how the Commission could be joined 13 months after it had issued the permit to real parties"].)

Under these circumstances, the trial court did not abuse its discretion in sustaining the demurrer without leave to amend. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 319, 216 Cal.Rptr. 718, 703 P.2d 58; *Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co., supra,* 137 Cal.App.4th at p. 916, 41 Cal.Rptr.3d 39; *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 570, 106 Cal.Rptr.2d 14.)

**148 *299 DISPOSITION

We treat the challenged order of February 22, 2005, as a judgment of dismissal, entered nunc pro tunc, which we affirm. McAllister shall bear the costs of appeal.

BAMATTRE-MANOUKIAN, Acting P.J., and DUFFY, J., concur.
Cal.App. 6 Dist.,2007.
McAllister v. County of Monterey
147 Cal.App.4th 253, 54 Cal.Rptr.3d 116, 07 Cal. Daily Op. Serv. 1181

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.