1 | Richard R. Rudnansky (SBN: 77981)
rrudnansky@meyersnave.com
2 | Julia L. Bond (SBN: 166587)
jbond@meyersnave.com
3 | Dawn A. McIntosh (SBN: 162713)
dmcintosh@meyersnave.com
4 | MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12th Street, Suite 1500
5 | Oakland, California  94607
Telephone: (510) 808-2000
6 | Facsimile: (510) 444-1108

7 | Attorneys for Defendants CITY OF COTATI and
PLANNING COMMISSION OF THE CITY OF
8 | COTATI

9

## UNITED STATES DISTRICT COURT

10

### NORTHERN DISTRICT OF CALIFORNIA

11

12 | MICHAEL MEAD, an individual,                     CASE NO. CV 08 3585 CW

13 |                    Plaintiff,                  **REQUEST FOR JUDICIAL NOTICE IN
                                                  SUPPORT OF DEFENDANTS MOTION
                     v.                            TO DISMISS; EXHIBITS A-G IN
14 |                                                SUPPORT THEREOF**

15 | CITY OF COTATI, a municipal corporation,
PLANNING COMMISSION OF THE CITY        Date:      October 9, 2008
16 | OF COTATI, UNITED STATES FISH AND      Time:      2:00 p.m.
WILDLIFE SERVICE, DONALD KOCH, in      Crtrm.:    2
his official capacity as Director of the
17 | California Department of Fish and Game,       Trial Date:          None Set
Does 1-10, inclusive,
18 |
                    Defendant.
19

20

21

22

23

24

25

26

27

28

RFJN RE CITY'S MOTION TO DIMISS; EXHIBITS A-G

1   TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        Defendants City of Cotati and Planning Commission of the City of Cotati (collectively "the

3   City defendants") hereby request that this Court take judicial notice of the City's Exhibits A, B, C,

4   D, E, F and G attached hereto pursuant to Federal Rules of Evidence, Rule 201. This request for

5   judicial notice and exhibits are submitted in support of the City's Notice of Motion and Motion to

6   Dismiss filed concurrently.

7        The Court may properly consider matters that are not reasonably subject to dispute and are

8   capable of immediate and accurate determination by resort to sources whose accuracy cannot

9   reasonably be questioned. Federal Rules of Evidence, Rule 201(b); *O'Toole v. Northrop Grumman*

10   *Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *United States v. Mariscal,* 285 F.3d 1127 (9th Cir.

11   2002). The Court shall take judicial notice if requested by a party. Federal Rules of Evidence, Rule

12   201(d).

13        The City defendants respectfully request that this Court take judicial notice of the following:

14      Exhibit A     U.S. Fish & Wildlife Service, Sacramento Fish & Wildlife Office, Species

15                     Account, California Tiger Salamander from the Fish & Wildlife Service

16                     website at:

17                     http://www.fws.gov/sacramento/es/animal_spp_acct/california_tiger_salam

18                     ander.pdf

19      Exhibit B     Excerpts from the Santa Rosa Plain Conservation Strategy, Final, December

20                     1, 2005 website at:

21                     http://www.fws.gov/sacramento/es/documents/Santa_Rosa_Final_Conserva

22                     tion_Strategy/Title_Page.pdf;

23                     www.fws.gov/sacramento/es/documents/Santa_Rosa_Final_Conservation_

24                     Strategy/team_members.pdf;

25                     http://www.fws.gov/sacramento/es/documents/Santa_Rosa_Final_Conserva

26                     tion_Strategy/Executive_Summary.pdf; and

27                     www.fws.gov/sacramento/es/maps/Santa_Rosa_Plain_final_strategy_maps/

28                     Fig1_StudyAreaOverview.pdf

| 1 | Exhibit C | Programmatic Biological Opinion for the project area the U.S. Department |
|---|---|---|
| 2 | | of Interior, Fish and Wildlife Service, Sacramento Fish and Wildlife Office, |
| 3 | | November 9, 2007, from the website at: |
| 4 | | http://www.fws.gov/sacramento/es/consultations/COE_Santa_Rosa_CTS_a |
| 5 | | nd_plant_programmatic.pdf |
| 6 | Exhibit D | Letter from the U.S. Department of Interior, Fish and Wildlife Service, to |
| 7 | | Derek Marshall, BioConsultant LLC (Mead project) |
| 8 | Exhibit E | Letter from the U.S. Department of Interior, Fish and Wildlife Service, to |
| 9 | | Wendy Mountain |
| 10 | Exhibit F | Ordinance No. 766 adopted by the City of Cotati on June 8, 2005 |
| 11 | Exhibit G | Cotati Municipal Code Section 17.84.030 |

12    Pursuant to the Federal Rules of Evidence, Rule 201, a Court may take judicial notice of

13  undisputed matters of public record, including records and reports of administrative bodies; or

14  legislative history of laws, rules or ordinances. *See Lee v. City of Los Angeles,* 250 F.3d 668, 689

15  (9th Cir. 2001) citing *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir.

16  1986).  A court may also take judicial notice of letters issued by state and federal regulatory

17  agencies.  *Louis v. McCormick & Schmick Restaurant Corp.,* 460 F.Supp.2d 1153, 1156, fn.4 (C.D.

18  Cal. 2006); *Lundquist v. Continental Casualty Co.,* 394 F.Supp.2d 1230, 1243 (C.D. Cal. 2005);

19  *Kitty Hawk Air Cargo, Inc. v. Chao,* 418 F.3d 453, 457 (5th Cir. 2005) [official agency action may

20  be judicially noticed].  In addition, "[i]t is not uncommon for courts to take judicial notice of factual

21  information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218,

22  1225, citations omitted; *Caldwell v. Caldwell*, 420 F.Supp.2d 1102, 1105 n. 3 (N.D. Cal. 2006).

23    Exhibits A-G are all official records of state and federal agencies.  As such they are

24  properly within the scope of judicially noticeable materials pursuant to the Federal Rules of

25  Evidence, Rule 201(b).

26

27

28

1    DATED: August 18, 2008              MEYERS, NAVE, RIBACK, SILVER & WILSON

2

3                                         By:      /s/ Dawn A. McIntosh
                                                  Dawn A. McIntosh
4                                                 Attorneys for Defendants CITY OF COTATI and
                                                  PLANNING COMMISSION OF THE CITY OF
5                                                 COTATI
     1134643.1
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RFJN RE CITY'S MOTION TO DISMISS; EXHIBITS A-G

# EXHIBIT A



# U.S. Fish & Wildlife Service
# Sacramento Fish & Wildlife Office
## Species Account
### CALIFORNIA TIGER SALAMANDER
*Ambystoma californiense*



## CLASSIFICATION: Endangered



Sonoma population – Endangered Federal Register 68:13497 (PDF), March 19, 2003

Main (Central Valley) population - Federal Register 69:47211 (PDF), August 4, 2004)

On 8/4/04, we listed the CA tiger salamander as threatened throughout its range. In doing so, we changed the status of the Santa Barbara and Sonoma county populations from endangered to threatened. Federal Register 69:47212 (PDF), August 4, 2004.

On 8/19/05 U.S. District Judge William Alsup vacated the Service's downlisting of the Sonoma and Santa Barbara populations from endangered to threatened. **The Sonoma and Santa Barbara populations are once again listed as endangered.**

## CRITICAL HABITAT: Designated
In Federal Register Notice 70:49379 (PDF), August 23, 2005, we designated 199,109 acres of critical habitat in 19 counties for the central population. See index to unit maps.

In Federal Register Notice 70: 74137 (PDF), we concluded that the designation of critical habitat for the Sonoma County distinct population segment of the California tiger salamander would have negative impacts on the finalization and implementation of the Santa Rosa Plain Conservation Strategy. Avoiding these negative impacts is a benefit of excluding these lands from the final critical habitat designation.

## RECOVERY PLAN: Under development
See the Santa Rosa Conservation Strategy for recovery planning for the Sonoma population.

## DESCRIPTION
The California tiger salamander (*Ambystoma californiense*) is an amphibian in the family Ambystomatidae. It is a large, stocky, terrestrial salamander with a broad, rounded snout. Adult males are about 20 centimeters (8 inches) long, females a little less than 18 centimeters (7 inches).

Coloration consists of white or pale yellow spots or bars on a black background on the back and sides. The belly varies from almost uniform white or pale yellow to a variegated pattern of white or pale yellow and black. The salamander's small eyes protrude from their heads. They have black irises.

Males can be distinguished from females, especially during the breeding season, by their swollen *cloacae*, a common chamber into which the intestinal, urinary, and reproductive canals discharge. They also have more developed tail fins and, as mentioned above, larger overall size.

The species is restricted to grasslands and low (typically below 2000 feet/610 meters) foothill regions where lowland aquatic sites are available for breeding. They prefer natural ephemeral pools or ponds that mimic them (stock ponds that are allowed to go dry).

Larvae require significantly more time to transform into juvenile adults than other amphibians such as the western spadefoot toad (*Scaphiopus hammondii*) and Pacific tree frog (*Pseudacris regilla*).

Compared to the western toad (*Bufo boreas*) or western spadefoot toad, California tiger salamanders are poor burrowers. They require refuges provided by ground squirrels and other burrowing mammals in which to enter a dormant state called *estivation* during the dry months.

## DISTRIBUTION

This species is restricted to California and does not overlap with any other species of tiger salamander. California tiger salamanders are restricted to vernal pools and seasonal ponds, including many constructed stock ponds, in grassland and oak savannah plant communities, predominantly from sea level to 2,000 feet, in central California.

In the Coastal region, populations are scattered from Sonoma County in the northern San Francisco Bay Area to Santa Barbara County (up to elevations of 3,500 feet/1067 meters), and in the Central Valley and Sierra Nevada foothills from Yolo to Kern counties (up to 2,000 feet/610 meters).

The Sonoma population appears to have been geographically isolated from the remainder of the California tiger salamander population by distance, mountains and major waterway barriers for more than 700,000 years.

## THREATS

The primary cause of the decline of California tiger salamander populations is the loss and fragmentation of habitat from human activities and the encroachment of nonnative predators. Federal, State and local laws have not prevented past and ongoing losses of habitat. All of the estimated seven genetic populations of this species have been significantly reduced because of urban and agricultural development, land conversion, and other human-caused factors.

A typical salamander breeding population in a pond can drop to less than twenty breeding adults and/or recruiting juveniles in some years, making these local populations prone to extinction. California tiger salamanders therefore require large contiguous areas of vernal pools (vernal pool complexes or comparable aquatic breeding habitat) containing multiple breeding ponds to ensure recolonization of individual ponds.

A strong negative association between bullfrogs and California tiger salamanders has been documented. Although bullfrogs are unable to establish permanent breeding populations in vernal pools, dispersing immature frogs from permanent water bodies within two miles take up residence and prey on adult or larval salamanders in these areas during the rainy season. Louisiana swamp crayfish, mosquito fish, green sunfish and other introduced fishes also prey on adult or larval salamanders.

A deformity-causing infection, possibly caused by a parasite in the presence of other factors, has affected pond-breeding amphibians at known California tiger salamander breeding sites. This same infection has become widespread among amphibian populations in Minnesota and poses the threat of becoming widespread here.

Reduction of ground squirrel populations to low levels through widespread rodent control programs may reduce availability of burrows and adversely affect the California tiger salamander. Poison typically used on ground squirrels is likely to have a disproportionately adverse effect on California tiger salamanders, which are smaller than the target species and have permeable skins. Use of pesticides, such as methoprene, in mosquito abatement may have an indirect adverse effect on the California tiger salamander by reducing the availability of prey.

Various nonnative subspecies of the tiger salamander within the Ambystoma tigrinum complex have been imported into California for use as fish bait. The introduced salamanders may out-compete the California tiger salamanders, or interbreed with them to create hybrids that may be less adapted to the California climate or are not reproductively viable past the first or second generations.

Automobiles and off-road vehicles kill a significant number of migrating California tiger salamanders, and contaminated runoff from roads, highways and agriculture may adversely affect them.

## REFERENCES FOR ADDITIONAL INFORMATION

Anderson, J.D., D.D. Hassinger and G.H. Dalrymple. 1971. Natural Mortality of Eggs and Larvae of *Ambystoma t. tigrinum*. Ecology 52(6):1108-1112.

Anderson, P.R. 1968. The reproductive and developmental history of the California Tiger Salamander. Masters thesis, Dept. Of Biology, Fresno State College, Fresno, California.

Barry, S.J., and HOB. Shaffer. 1994. The status of the California tiger salamander (*Ambystoma californiense*) at Lagunita: a 50 year update. Journal of Herpetology 28:246-255.

Cook, D.G., P.C. Trenham and P.T. Northern. 2006. Demography and breeding phenology of the California tiger salamander (*Ambystoma californiense*) in an urban landscape. Northwestern Naturalist, 87:215-224.

Feaver, Paul E. 1971. Breeding pool selection and larval mortality of three California amphibians: *Ambystoma tigrinum californiense* Gray, *Hyla regilla* Baird and Girard and *Scaphiopus hammondi hammondi* Girard. Master's thesis, Dept. Of Biology, Fresno State College, Fresno, California.

Fisher, R., and H. Bradley Shaffer. 1996. The decline of amphibians in California's Great Central Valley. Conservation Biology, 10:1387-1397.

Holland, R.F. and S. Jain. 1977. Vernal pools. Pages 515-533. In: M.E. Barbour and J. Major, eds. Supplement to terrestrial vegetation of California (new expanded edition). California Native Plant Society Special Publication 9.

Holland, D.C., M.P. Hayes and E. McMillan. 1990. Late summer movement and mass mortality in the California tiger salamander (*Ambystoma californiense*). The Southwestern Naturalist 35(2):217-220.

Hurt, R. 2000. The elusive California tiger salamander. Tidelines. U.S. Fish & Wildlife Service. Don Edwards San Francisco Bay National Wildlife Refuge. Newark, California.

Morey, S.R., and D.A. Guinn. 1992. Activity patterns, food habits, and changing abundance in a community of vernal pool amphibians. In: D.F. Williams, S. Byrne, and T.A. Rado (editors), Endangered and sensitive species of the San Joaquin Valley, California: Their biology, management, and conservation. The California Energy Commission, Sacramento, California, and the Western Section of the Wildlife Society. 149-158.

Photo Credit: Cathy Johnson, U.S. Fish & Wildlife Service

Sacramento Fish and Wildlife Office
2800 Cottage Way, Room W-2605
Sacramento, California 95825
Phone (916) 414-6600
FAX (916) 414-6713

Last updated February 21, 2008

# EXHIBIT B

# SANTA ROSA PLAIN
# CONSERVATION STRATEGY

## FINAL



Sonoma sunshine

Many-flowered navarretia

California tiger salamander

Burke's goldfields

Sebastopol meadowfoam

December 1, 2005

# EXECUTIVE SUMMARY

The purpose of the Santa Rosa Plain Conservation Strategy (Conservation Strategy) is to create a long-term conservation program sufficient to mitigate potential adverse effects on listed species due to future development on the Santa Rosa Plain (Plain). The program will contribute to the recovery of the Sonoma County distinct population segment of the California tiger salamander (CTS), Burke's goldfield, Sonoma sunshine, Sebastopol meadowfoam and the many-flowered navarretia (listed plants), and to the conservation of their sensitive habitat. The Conservation Strategy accomplishes the above in a manner that protects stakeholders' (both public and private) land use interests, and supports issuance of an authorization for incidental take of CTS and listed plants that may occur in the course of carrying out project activities on the Plain.

The listing of CTS caused uncertainty for local jurisdictions, landowners and developers about how the listing would affect their activities. Private and local public interests met with US Fish and Wildlife Service (FWS) to discuss possible cooperative approaches to protecting the species, while allowing planned land uses to occur within the range of CTS. These discussions led to the formation of the Santa Rosa Plain Conservation Strategy Team (Team), consisting of representatives of the appropriate government agencies and interested parties.

The original goals of the Team were to:
- Develop a habitat conservation strategy that contributes to the recovery of CTS and listed plant species
- Identify proposed areas for conservation
- Develop an implementation framework for the conservation strategy which identifies short- and long-term actions and milestones as needed
- Establish development process predictability

Before developing a Draft Conservation Strategy, the Team held a public meeting to answer questions about the Team process and to ask for input into what should be included in the Conservation Strategy. The Team submitted an administrative draft of the Conservation Strategy to five independent scientists for peer review prior to preparation of the Draft Conservation Strategy that was made available to the public. Prior to finalizing the document, the Team received public comments. These comments were considered, and numerous modifications were made to the document in response to that input.

## Biological Goals and Objectives, and Assumptions

The Conservation Strategy is based on biological goals and objectives to achieve conservation of CTS and the listed plants. The goals and objectives are based on available information on the distribution, ecology and genetics of CTS and listed plants. They are also based on existing and planned land use patterns and assumptions about expected development in a ten-year time frame, the effect of that development on the species, how the preserves would offset those impacts, and

the compatibility of existing land uses with CTS and listed species conservation. In addition, there are various other biological factors that were used in developing the conservation areas.

## Conservation Areas

The Conservation Strategy identifies eight conservation areas for CTS and listed plants, one CTS and listed plant preserve system, and one listed plant conservation area. The designation of these areas is based on current available information on the occurrence and habitat needs of the listed species. The conservation areas were designated to conserve the species throughout their distribution range. These conservation areas identify lands where mitigation for project-related impacts to listed species will be directed. Designation of an individual property as being within a conservation area does not change that property's land use designation or zoning, or otherwise restrict the use of that property.

### Preserve Establishment

Preserves may be established within the conservation areas by acquiring land in fee title or through conservation easements, and may include wetland restoration/creation and habitat enhancement. Some mitigation may occur outside of conservation areas if the land is contiguous to a conservation area and meets the other provisions of the preserve selection criteria.

### Translocation

Translocation of listed species is allowed through collection and relocation to suitable habitat within the Plain. The Conservation Strategy outlines the conditions under which this can take place and when it may be required.

### Habitat Improvement

Three types of habitat improvement may occur as a part of the Conservation Strategy. They include wetland creation, wetland restoration, and enhancement of wetland and upland habitat. Criteria for lands proposed for habitat improvement are detailed in the Conservation Strategy.

### Preserve Management

Preserve management plans will be required and must detail activities that are necessary to maintain and enhance the wildlife, plant communities and wetland habitats, including management of water, vegetation and predators. Annual work plans will be required and will be submitted to the appropriate authorities. Criteria used for designing management plans are detailed in the Conservation Strategy, along with the funding mechanisms to assure that the preserves can be adequately managed. The preserves also must be monitored to ensure their success; the criteria for this monitoring must be included in the management plan.

An Adaptive Management Team (AMT) will ensure that preserve management is occurring consistent with the Conservation Strategy. Composition of the AMT and its role in long-term preserve management is detailed in the Conservation Strategy.

## Mitigation

The goal of mitigation is to reduce, or compensate for, the negative impact an action may have on a listed species or sensitive habitat. The Conservation Strategy addresses the mitigation requirements for CTS, the listed plant species and seasonal wetlands, including vernal pools. Both interim and long-term mitigation ratios for CTS, wetlands and listed plants are detailed. Once the Conservation Strategy is implemented, projects within 1.3 miles of a breeding site, as shown on Figure 3, will be required to provide two acres of conservation to each one acre of impact as CTS mitigation. In the interim period, until the Conservation Strategy is implemented, CTS mitigation will range from one acre to three acres of conservation for each one acre of impact. Mitigation for impacts to wetlands will be determined through State and Federal permitting processes. Mitigation for listed plants will be applied pursuant to the programmatic biological opinion.

The Conservation Strategy provides projects outside of 1.3 miles from a known breeding site, but with potential for presence of CTS, as shown on Figure 3, the option to mitigate by contributing to a species fund. The species fund will provide conservation benefits to the CTS. This will preclude the need to conduct two years of protocol level surveys in areas not known to be occupied, but within the potential range of the CTS.

## Implementation

In January 2005, a group referred to as the Implementation Committee was formed to develop a plan to implement the Conservation Strategy. This group is currently comprised of representatives of local jurisdictions, FWS, CA Department of Fish and Game (DFG), and the agricultural, environmental and private landowner communities. The Implementation Committee is preparing a plan that, when adopted by the various agencies, will provide the basis for implementation of the Conservation Strategy.

## Potential Funding

There are a variety of potential funding sources to assist in implementation of the Conservation Strategy. Direct mitigation is the most likely and certain source. Other potential sources include land acquisition grants, Habitat Conservation Plan (HCP) land acquisition grants, private foundation grants, State revolving funds, Sonoma County Agriculture and Open Space Protection District funds, Legislative and Congressional appropriations, and private stewardship programs.

## Glossary/Acronyms & Abbreviations

In Section 11, a glossary is provided to define terms used in the Conservation Strategy that may not be common to all readers; a list of acronyms and abbreviations is available for quick

reference in Section 12. Also, a list of references used by members of the Team in developing the Conservation Strategy is provided in Section 13.

# CONSERVATION STRATEGY TEAM MEMBERS

Cay Goude, US Fish and Wildlife Service
Carl Wilcox, CA Department of Fish and Game
Jane Hicks, US Army Corps of Engineers
Mike Monroe, US Environmental Protection Agency
Andrew Jensen, North Coast Regional Water Quality Control Board
Colleen Ferguson, County of Sonoma and Cities of Cotati, Rohnert Park, Santa Rosa & Windsor
Dan Schurman, Laguna de Santa Rosa Foundation
Keith Kaulum, Environmental Community
Carolyn Wasem, Private Landowner Community
Joannie Dranginis, Environmental Community Alternate

## *FACILITATOR*

Ed Brauner, Brauner Consulting & Mediation

## *GIS RESOURCE TO TEAM*

Tracy Love, CA Department of Fish and Game

## *COVER PHOTOGRAPHY*

California tiger salamander courtesy of Chuck Brown
Sonoma sunshine by J. E. and Bonnie McClellan (c) California Academy of Sciences
Many-flowered navarretia (c) 1998 Dean Wm. Taylor
Other photos supplied by the US Fish & Wildlife Service



# EXHIBIT C



**United States Department of the Interior**
FISH AND WILDLIFE SERVICE
Sacramento Fish and Wildlife Office
2800 Cottage Way, Room W-2605
Sacramento, California 95825-1846

In Reply Refer To:
81420-2008-F-0261

NOV 19 2007

Ms. Jane Hicks
Regulatory Branch Chief
San Francisco District
U.S. Army Corps of Engineers
1455 Market Street
San Francisco, California 94103-1398

Subject:     Programmatic Biological Opinion (Programmatic) for U.S. Army Corps of
Engineers (Corps) Permitted Projects that May Affect California Tiger
Salamander and Three Endangered Plant Species on the Santa Rosa Plain,
California (Corps File Number 223420N)

Dear Ms. Hicks:

This is in response to your November 1, 2007, request to re-initiate formal consultation with the
U.S. Fish and Wildlife Service (Service) for permits, enforcement actions and mitigation banks
that are under the Corps jurisdiction. This document represents the Service's biological opinion
on the effects of the action on the endangered Sonoma County Distinct Population Segment of
the California tiger salamander (*Ambystoma californiense*), Burke's goldfields (*Lasthenia
burkei*), Sonoma sunshine (*Blemnosperma bakeri)* and Sebastopol meadowfoam (*Limnanthes
vinculans*) in accordance with section 7 of the Endangered Species Act of 1973, as amended (16
U.S.C. 1531 *et seq.*) (Act).

This biological opinion is based on information provided by the following facts, communications
and documents:

1. The November 1, 2007letter from the Corps re-initiating formal consultation;

2. The December 1, 2005 Santa Rosa Plain Conservation Strategy;

3. The May 16, 2006 Interim Mitigation Guidelines authored by the Service and CDFG
(http://www.fws.gov/sacramento/es/santa_rosa_conservation.html);

4. References cited in this Biological Opinion; and

5. Other information available to the Service.



Ms. Jane Hicks                                                                                      2

## Consultation History/Background

The Santa Rosa Plain is located in central Sonoma County and is characterized by vernal pools, seasonal wetlands, and associated grassland habitat, which support – among other flora and fauna  – the endangered California tiger salamander and four endangered plant species:  Burke's goldfields, Sonoma sunshine, Sebastopol meadowfoam, and many-flowered navarretia (*Navarretia leucocephala* ssp. *plieantha*) (listed plants).  These listed plants grow only in vernal pools; the California tiger salamander uses seasonal wetlands and vernal pools for breeding and metamorphosis, and the surrounding uplands for dispersal, feeding, growth, maturation and maintenance of the juvenile and adult population (upland habitat).  The distribution of Burke's goldfields, Sonoma sunshine, and Sebastopol meadowfoam is confined almost entirely to the Santa Rosa Plain.  Many-flowered navarretia occurs mostly outside the Santa Rosa Plain, but its only Sonoma County population is present on the Santa Rosa Plain.

Urbanization and agricultural development on the Santa Rosa Plain has encroached into areas inhabited by the California tiger salamander and the listed plants discussed above.  The loss of seasonal wetlands caused by development on the Santa Rosa Plain has led to declines in the populations of the listed plants and the California tiger salamander.  Voters in the cities of Cotati, Rohnert Park, Santa Rosa, and Sebastopol, and the Town of Windsor have established urban growth boundaries (UGBs) for their communities.  This is intended to accomplish the goal of city-centered growth, resulting in rural and agricultural land uses being maintained between the urbanized areas.  Therefore, it can be reasonably expected that rural land uses will continue into the foreseeable future.  There are also acreages of publicly owned property and preserves located in the Santa Rosa Plain, which will further contribute to conservation.  Some of the areas within these UGBs, however, include lands inhabited by California tiger salamander and the listed plant species.  Some agricultural practices have also disturbed and modified seasonal wetlands, California tiger salamander and listed plant habitat on the Santa Rosa Plain.  Some agricultural practices, such as irrigated or grazed pasture, retain some California tiger salamander habitat value compared to more intensive development.

Burke's goldfields, Sonoma sunshine, and Sebastopol meadowfoam were federally listed as endangered on December 2, 1991.  The many-flowered navarretia was listed on June 18, 1997.  These plants are also listed as endangered by the State of California.  A Programmatic Biological Opinion covering the four listed plants was issued on July 17, 1998.  On July 22, 2002, the Service listed the Sonoma County distinct population segment of the California tiger salamander as endangered under an emergency basis.  The final rule was issued on March 19, 2003.  The Service listed the species as threatened throughout its range on August 4, 2004, including the former Sonoma County distinct population segment (Federal Register 69:47211-47248).  The listing of the California tiger salamander has caused a level of uncertainty for local jurisdictions, landowners, and developers about how the listing would affect their activities.  Private and local public interests met with the Service to discuss possible cooperative approaches to protecting the species, while allowing planned land uses to occur within the range of the animal.  The result of these discussions was the formation of the Santa Rosa Plain Conservation Strategy Team (Team).  The Team included the following members: Service, CDFG, Corps, Environmental Protection Agency, North Coast Regional Water Quality Control Board, local governments, the Laguna de Santa Rosa Foundation, the environmental community, and the private landowner community.  It was agreed that the Team would develop a conservation strategy for the Santa

Rosa Plain that conserves and enhances the habitat for the California tiger salamander and the listed plants, while considering the need for development pursuant to the general plans of the local jurisdictions. The Team held its first meeting on March 30, 2004, and continued to meet through August 2005, to prepare a Draft Santa Rosa Plain Conservation Strategy. The Team held a public meeting on September 12, 2005, and received numerous comments on the draft through September 16, 2005. In addition, the Draft Santa Rosa Plain Conservation Strategy was peer reviewed. The Team reviewed and considered all comments received, made modifications to the Draft Santa Rosa Plain Conservation Strategy where appropriate, and produced the Final Santa Rosa Plain Conservation Strategy (Conservation Strategy).

The Sonoma County distinct population segment for the California tiger salamander was reinstated and re-designated as endangered by court order on August 19, 2005. On December 14, 2005, the Service made a final determination to not designate critical habitat for the Sonoma County distinct population segment of the California tiger salamander. The Service analyzed whether the benefits of designating critical habitat were outweighed by the benefits of not designating critical habitat. It was determined that the interim conservation strategies and measures being implemented by those local governing agencies with land use authority over the area outweighed the benefits of listing critical habitat at this time. The California tiger salamander is not listed under the California Endangered Species Act at this time. It is currently a state species of special concern.

Conservation Areas

The Conservation Strategy identifies areas within the Santa Rosa Plain that should be conserved to benefit both the California tiger salamander and listed plants. Designation of an individual property as being within a conservation area does not change that property's land use designation or zoning, or otherwise restrict the use of that property. In addition, a property in a conservation area is not automatically suitable for listed species conservation.

The purpose of the conservation areas is to insure that preservation occurs throughout the distribution of the species. The designation of conservation areas is based upon the following factors: 1) known distribution of the California tiger salamander; 2) the presence of suitable California tiger salamander habitat; 3) presence of large blocks of natural or restorable land; 4) proximity to existing Preserves; and 5) known location of the listed plants. The designation of conservation areas also generally attempted to avoid future development areas established by UGBs and city general plans. Areas which are in the Laguna de Santa Rosa floodplain, areas above approximately 300 feet in elevation and characterized by oak woodland, or are adjacent to or surrounded by significant urban areas, generally have been excluded from the boundaries of the conservation areas, however these areas may still require mitigation if endangered species are adversely affected. The Southwest Santa Rosa Preserve System is within the urban growth boundary of the City of Santa Rosa.

The conservation area boundaries identify areas where mitigation for project-related impacts to the listed species should be directed. The listed plants also occur in the identified conservation areas, with the exception of the southwest Cotati and southeast Cotati Conservation Areas. However, the many-flowered navarettia is only known from one site in the Santa Rosa Plain.

Ms. Jane Hicks                                                                                                      4

Figures 1 through 3 in the Conservation Strategy identify areas important for protection of the California tiger salamander and listed plants on the Santa Rosa Plain as well as other pertinent information. Figures 4 through 13 in the Conservation Strategy describe each conservation area in detail (Service web page: http://www.fws.gov/sacramento/es/santa_rosa_conservation.html). Some lands within the conservation areas are excluded based on existing development and on their small size or on other factors that would make them unsuitable for conservation of listed species. Complete descriptions of the conservation areas are in the Conservation Strategy.

**Introduction**

The Conservation Strategy is the biological framework upon which this Programmatic is based. However, because the local agencies with interested stakeholders are currently developing mechanisms to implement the Conservation Strategy, this Programmatic will be based on the interim mitigation ratios described in the Conservation Strategy and described later in this opinion. This Programmatic will replace the July 17, 1998 programmatic biological opinion (Service, 1998) prepared for the listed plants. This Programmatic may be amended or a new one may be written after an Implementation Plan for the Conservation Strategy is completed by the local jurisdictions.

This Programmatic is issued to the Corps for permits, enforcement actions or mitigation banks (Project(s)) that are under their jurisdiction. Projects that are appended to this Programmatic will be provided individual take authorization. This Programmatic will not cover the many-flowered navarretia because of its limited distribution. Also, projects that will impact occupied sites supporting Burke's goldfields and Sonoma sunshine, where surveys have documented 2,000 plants or greater in any year in the past 10 years may not be appended to this Programmatic, but will be evaluated on a case by case basis. The number for 2,000 plants was derived from comments provided by numerous technical experts and the Service's review of projects impacting plant populations. This Programmatic will expedite the process for project approval provided all information listed in the next section is provided by the project applicants. This Programmatic provides the framework for mitigation, conservation, translocation, and appropriate minimization measures. The Service and CDFG will track Project impacts, mitigation and other pertinent information.

Procedures for Appending Projects to the Programmatic Biological Opinion

The following information is required from the applicant and will be used by the Corps along with the California tiger salamander and Plant Designation Map (Enclosure 1) and Plant Mitigation Location Map (Enclosure 2) to evaluate whether a Project can be appended to this Programmatic:

1) Corps Permit Application including Assessors Parcel Number(s), UTM coordinates, and street address of the Project;

2) Corps-verified jurisdictional determination;

3) Biological Assessment including Service survey protocols (Survey protocols:

http://www.fws.gov/sacramento/es/santa_rosa_conservation.html) results, if needed, and proposed mitigation consistent with the ratios in this Programmatic;

4) Listed plant occurrence information on the Project and mitigation sites from the CDFG California Natural Diversity Database (http://www.dfg.ca.gov/biogeodata/cnddb/) and the 1994 report, *Seasonal Wetland Baseline Report for the Santa Rosa Plain, Sonoma County* (http://www.fws.gov/sacramento/es/Santa_Rosa_strategy_COE_programmatic_BO.htm) (Patterson *et al.* , 1994); and

5) Mitigation proposal including acres and location, credit sale receipt and any other pertinent information. If the proposed mitigation is a new Preserve, then the Preserve Establishment and Evaluation Criteria (Enclosure 3) will be used by the Applicants to provide the preliminary determination for Preserve selection.

The Corps will make one of the following determinations of effect for a project by reviewing Enclosure 1, Enclosure 2 and other information provided by the applicant and will take the identified action:

- No effect. No consultation with the Service is required for areas on Enclosure 1 identified as "No Effect".

- May affect listed plants, but would not likely affect California tiger salamander. Consult with the Service for concurrence for areas on Enclosure 1 identified as "May affect listed plants, but would not likely affect California tiger salamander". The Corps will forward to the Service all biological and other pertinent information and a letter requesting that the proposed Project to be appended to this Programmatic.

- May affect listed plants and would likely affect California tiger salamander. Consult with the Service for concurrence for areas on Enclosure 1 and Enclosure 2 identified as "May affect listed plants and would likely affect California tiger salamander". The Corps will forward to the Service all biological and other pertinent information and a letter requesting that the proposed Project to be appended to this Programmatic.
- May affect California tiger salamander, but no effect to listed plants. Consult with the Service for concurrence for areas on Enclosure 1 and identified as "May affect California tiger salamander, but no effect to listed plants". The Corps will forward to the Service all biological and other pertinent information and a letter requesting that the proposed project to be appended to this Programmatic.

The Service will review the proposed Project to evaluate whether it is appropriate to append the Project to this Programmatic based on the level of impacts, avoidance, minimization and mitigation measures. The Service may determine some projects require separate Section 7 consultation and will not be appended to this Programmatic. If the Service does not concur the project is appropriate to be appended to this Programmatic, the Service will notify the Corps in writing. Applicants who have had consultation initiated by the Corps prior to the date of this Programmatic may continue with that consultation or may request their Project be appended to this Programmatic.

Ms. Jane Hicks                                                                                      6

## BIOLOGICAL OPINION

### Description of the Proposed Action

The proposed action is appending Projects to this Programmatic that are consistent with the Conservation Strategy and that the Service has determined to be appropriate for being appended to this Programmatic. For the purpose of this Programmatic, the action area is shown in Enclosure 1 as the "Santa Rosa Plain Conservation Strategy Study Area" (Study Area).

As stated above, Project sites where surveys have documented 2,000 plants or greater of Burke's goldfield or Sonoma sunshine in any year in the past 10 years may not be appended to this Programmatic. These sites may require an individual formal consultation. Certain linear projects as defined in the Conservation Strategy may be covered under this Programmatic if they follow the ratios described in this Programmatic. In addition, Projects in the Southwest Santa Rosa Preserve System (Conservation Strategy Team, 2005) will be evaluated individually and may not adhere to the ratios if the individual Project mitigation includes preserving corridors as described and shown on Figure 3 and Figure 12 in the Conservation Strategy. The corridors may not need to be exactly as depicted on Figure 3 and 12, but must provide similar or greater function as the Conservation Strategy intended.

<u>Preserves</u>

A "Preserve" includes mitigation and conservation banks and other mitigation and conservation sites. Parcels proposed for preservation under this Programmatic provide habitat for the California tiger salamander and/or listed plants. The Service and CDFG will evaluate the Applicant's proposed Preserve to determine its suitability. Preserve establishment guidance and evaluation criteria is provided in Enclosure 3. Other required mitigation components include management plans, long-term endowments, and other necessary requirements, all of which must be complete and approved by the Service and CDFG. Preserve enhancement or management associated with permits and enforcement actions that are appended to this Programmatic will be provided individual take authorization. It is anticipated that ground work associated with enhancing a Preserve will generally have a net benefit to the California tiger salamander and/or listed plants and would not need to adhere to the mitigation ratios.

To meet the biological goals and objectives as described in the Conservation Strategy, the following measures will be applied:

1) Preserves must ultimately have the listed species present and within a reasonable timeframe.

2) There will be at least one California tiger salamander breeding pool for every 20 acres of Preserves unless otherwise determined by the Service and CDFG;

3) Each Preserve will have at least one created or existing California tiger salamander breeding site, as defined in the Conservation Strategy, or the presence of listed plants;

Ms. Jane Hicks                                                                                          7

4) Generally, seasonal wetlands will not exceed 30-35% of a Preserve;

5) Generally, pool size of individual pools will be under 0.25 acres and

6) Site specific design plans will be reviewed and approved by the Service and CDFG.

Mitigation

Mitigation ratios for the California tiger salamander were determined by considering the likely impacts to the species and its habitat. Adult California tiger salamanders have been observed up to 1.3 miles from breeding sites (S. Sweet, 1998). The graduated ratios were developed using an estimate of the amount of habitat needed to meet the required conservation goal based on the expected impacts of development projected to occur on the Santa Rosa Plain from 2005 through 2015. The graduated ratios were based on the proximity to known California tiger salamander breeding habitat and adult occurrences. These ratios will be used until the Conservation Strategy is implemented by the local jurisdictions. The expected impact areas and conservation areas were mapped by using existing land use plans, aerial photography, expert knowledge of the areas, and data on California tiger salamander and listed plants from the California Natural Diversity Database (CNDDB) and local experts.

Mitigation requirements will apply to the entire Project area, however, the mitigation requirement for Projects on parcels with existing hardscape will be removed from the calculation. Hardscape may include parking lots, compacted gravel surfaces, buildings, or other structures. In some cases, hardscape may provide some recognizable benefit to the species. Where the hardscape currently functions as a movement corridor between existing and/or proposed preserve habitat, measures must be included in the design of future development to maintain this function. For each Project, the Service and CDFG will determine if hardscape provides benefit to the species and if any mitigation is required.

Mitigation ratios and the Conservation Strategy are dependent on current information on both California tiger salamander distribution and development that is currently proposed. Reinitiation of this Programmatic may be required if the land use changes or if new information is discovered regarding the distribution of tiger salamander or listed plants within the Study Area. If new breeding sites or occurrences are found in the Study Area, then Enclosure 1 would be revised accordingly. Enclosure 1 will be updated at least annually by the Service and CDFG and will be provided to the Corps and posted on the Service's web page.

Mitigation for California tiger salamander or listed plants must be achieved at a Preserve which could include purchasing appropriate credits at a Service-approved bank or another type of Preserve as described above.

California tiger salamander Mitigation Ratios

The following ratios for required area of mitigation to area of impact will be used for this Programmatic:

Ms. Jane Hicks                                                                                          8

Mitigation of 3:1 – For projects that are within 500 feet of a known breeding site.

Mitigation of 2:1 – For projects that are greater than 500 feet and within 2,200 feet of a known breeding site, and for projects beyond 2,200 feet from a known breeding site, but within 500 feet of an adult occurrence.

Mitigation of 1:1 – For projects that are greater than 2,200 feet and within 1.3 miles of a known breeding site.

Mitigation of 0.2:1 – For projects that are greater than 1.3 miles from a known breeding site and greater than 500 feet from an adult occurrence, but excluding the "No Effect" areas shown on Enclosure 1.

<u>California Tiger Salamander Minimization Measures</u>

Projects and other activities will incorporate measures to minimize their potential direct and indirect effects on the California tiger salamander. Minimization measures may vary based on environmental factors and site location as determined by the Service and CDFG. No mitigation or conservation bank may receive translocated California tiger salamanders until all the bank's credits have been sold (See Enclosure 4 for translocation guidance). The following activities will require measures to minimize take for California tiger salamander:

(1) An activity that impacts a California tiger salamander breeding site:

Prior to construction, salamanders will be collected and translocated (See Enclosure 4) to an appropriate breeding site as identified by the Service and CDFG.

(2) An activity that impacts California tiger salamander upland habitat:

Prior to construction, fencing will be installed to exclude California tiger salamander from entering the project site. Fences with ramps may be required to allow any California tiger salamander onsite to move into an adjacent habitat offsite. In these instances translocation may occur and would be determined on a case-by-case basis.

(3) An activity where wetlands are being established for listed plants, California tiger salamander breeding or for wetland mitigation that has an effect on California tiger salamander:

Prior to construction, fencing will be installed to exclude California tiger salamanders from entering the site.

The following minimization measures will be implemented unless otherwise waived by the Service in writing:

a.) A Service approved biological monitor will be on site each day during wetland restoration and construction, and during initial site grading of development sites where

Ms. Jane Hicks                                                                                    9

California tiger salamanders have been found.

b.) The biological monitor will conduct a training session for all construction workers before work is started on the project.

c.) Before the start of work each day, the biological monitor will check for animals under any equipment such as vehicles and stored pipes. The biological monitor will check all excavated steep-walled holes or trenches greater than one foot deep for any California tiger salamander. California tiger salamanders will be removed by the biological monitor and translocated as described in Enclosure 4 or as directed by the Service.

d.) An erosion and sediment control plan will be implemented to prevent impacts of wetland restoration and construction on habitat outside the work areas.

e.) Access routes, number and size of staging areas, and work areas, will be limited to the minimum necessary to achieve the project goals. Routes and boundaries of the roadwork will be clearly marked prior to initiating construction/grading.

f.) All foods and food-related trash items will be enclosed in sealed trash containers at the end of each day, and removed from the site every three days.

g.) No pets will be allowed on the project site.

h.) No more than a maximum speed limit of 15 mph will be permitted.

i.) All equipment will be maintained such that there will be no leaks of automotive fluids such as gasoline, oils, or solvents.

j.) Hazardous materials such as fuels, oils, solvents, etc., will be stored in sealable containers in a designated location that is at least 200 feet from aquatic habitats. All fueling and maintenance of vehicles and other equipment and staging areas will occur at least 200 feet from any aquatic habitat.

k.) Grading and clearing will be conducted between April 15 and October 15, of any given year, depending on the level of rainfall and/or site conditions.

l.) Project areas temporarily disturbed by construction activities will be re-vegetated with locally-occurring native plants.

Plant Mitigation and Establishment

Seasonal wetlands within the range of the listed plants on the Santa Rosa Plain are considered suitable habitat for the listed plants (See Enclosure 5). If surveys conducted following Service protocols (http://www.fws.gov/sacramento/es/santa_rosa_conservation.html) document listed plants on a site, or if the site had listed plants in the past, then the site is considered occupied.

If surveys have been conducted according to Service protocols and no listed plants have been found, the seasonal wetlands on-site will be treated as suitable habitat. This Programmatic addresses effects and mitigation for this habitat type where the listed plants have not yet been observed because a persistent seed bank may be present even if the plants have not been detected.

Plant establishment is defined as the introduction of listed plant seeds, inoculum or seed bank to a Preserve resulting in the persistence of the species on the site and having met the success criteria. Success criteria for plant establishment is available on the Service's web page at http://www.fws.gov/sacramento/es/santa_rosa_conservation.html. Establishing plant populations may require translocation of seed, inoculum or other plant material, or a change of land management. Guidelines for plant translocation are described in Enclosure 4.

Plant Mitigation Ratios

Mitigation for adverse effects to occupied or suitable habitat for listed plants is calculated by the impacted acres of seasonal wetlands. The following table provides the mitigation ratios for the listed plants.

### Table 1: Mitigation Ratios for the Listed Plants

| Impact to: | Occupied Habitat Compensation | Suitable Habitat Compensation |
|---|---|---|
| Burke's goldfields<br><br>OR<br><br>Sonoma sunshine | 3:1 occupied or established habitat (any combination) with success criteria met prior to groundbreaking at project site | 1:1 occupied or established habitat (any combination) with success criteria met prior to groundbreaking at project site<br><br>AND<br><br>0.5:1 established habitat with success criteria met prior to groundbreaking at project site |
| Sebastopol meadowfoam | 2:1 occupied or established habitat (any combination) with success criteria met prior to groundbreaking at project site | 1:1 occupied or established habitat (any combination) with success criteria met prior to groundbreaking at project site<br><br>AND<br><br>0.5:1 established habitat with success criteria met prior to groundbreaking at project site |

The distribution of the three listed plants does not completely overlap. Sebastopol meadowfoam is generally found south of Santa Rosa Creek. Therefore, Sebastopol meadowfoam cannot be established north of Santa Rosa Creek. Burke's goldfields and Sonoma sunshine cannot be established south of the Laguna de Santa Rosa (Enclosure 2).

Preserves for listed plants may be located north of Highway 116 and within the Santa Rosa Plain study area to the north near Windsor (North Area and South Area) as depicted in Enclosure 2.

For impact sites with suitable habitat north of Santa Rosa Creek, the Preserve must support Burke's goldfields and/or Sonoma sunshine and must be in the North Area or South Area.

For impact sites with suitable habitat south of Santa Rosa Creek, the Preserve must support Sebastopol meadowfoam, Burke's goldfields, and/or Sonoma sunshine and must be in the North Area or South Area.

For impacts to occupied habitat supporting Burke's goldfields, Sonoma sunshine and/or Sebastopol meadowfoam, the wetlands at a Preserve must support the impacted species and must be in the North Area or South Area.

<u>Minimization and Mitigation Measures For Plants Required Prior to Ground Disturbance</u>

Ground disturbance at a project site may begin when the following criteria are deemed completed by the Service and CDFG:

1) Seed/soil collection and salvage at the project site has been completed at sites that have been determined by the Service and CDFG as being occupied by one or more of the listed plants (Enclosure 4);

2) The applicant has completed one of the following: a) purchased appropriate plant credits at a Service and CDFG approved bank; or b) conserved occupied and established plant habitat at a location and number of acres approved by the Service and CDFG. The conserved land must also have a Service and CDFG – approved management plan and non-wasting endowment fund. Mitigation sites proposed under option b will be evaluated on a case by case basis.

A single project that needs to preserve habitat for both listed plants and the California tiger salamander may mitigate at a single location, if a preserve meets the mitigation requirements for all the impacted listed species.

**Action Area**

The action area is shown on Enclosure 1 as the Santa Rosa Plain Conservation Strategy Study Area. The action area for this Programmatic includes the geographic range of the Sonoma County Distinct population of California tiger salamander and the listed plants.

**Status of the Species**

Descriptions of the Status of the Species below include *Listing History, Historical and Current Distribution, Description, Habitat and Life History, Reasons for Decline and Threats to Survival,* and *Recovery Actions.*

California Tiger Salamander

*Listing History.* The Sonoma County Distinct Population Segment of the California tiger salamander was emergency listed as endangered on July 22, 2002 (67 FR 47726). The salamander was listed as endangered on March 19, 2003 (68 FR 13497). The California tiger salamander was listed as threatened on August 4, 2004 (69 FR 47212). This latter listing changed the status of the Santa Barbara and Sonoma county populations from endangered to threatened. On August 10, 2004, the Service proposed 47 critical habitat units in 20 counties. No critical habitat was proposed for Sonoma County. On October 13, 2004, a complaint was filed in the U.S. District Court for the Northern District of California (Center for Biological Diversity and Environmental Defense Council v. U.S. Fish and Wildlife Service *et al.*). On February 3, 2005, the District Court required the Service to submit for publication in the Federal Register, a final determination on the proposed critical habitat designation on or before December 1, 2005. On August 2, 2005, the Service noticed in the **Federal Register** a proposed critical habitat designation (70 FR 44301). On August 19, 2005, a court order was filed on the above complaint, which upheld the section 4(d) rule exempting grazing from Section 9 prohibitions, but vacated the downlisting of the Santa Barbara and Sonoma populations and reinstated their endangered distinct population segment status. On December 14, 2005, (70 FR 74138), we made a final determination to designate and exclude approximately 17,418 acres (7,049 hectares) of critical habitat for the Sonoma population. All of critical habitat was excluded based on interim conservation strategies and measures being implemented by those local governing agencies with land use authority over the area and also as a result of economic exclusions authorized under section 4(b)(2) of the Act. Therefore, no critical habitat was designated for the Sonoma County Distinct Population Segment of the California tiger salamander in Sonoma County, California.

*Historical and Current Distribution.* Historically, the California tiger salamander inhabited low elevation grassland and oak savanna plant communities of the Central Valley, and adjacent foothills, and the inner coast ranges in California (Jennings and Hayes 1994; Storer 1925; Shaffer *et al.* 1993). The species has been recorded from near sea level to approximately 3,900 feet (1188.7 meters) in the coast ranges and to approximately 1,600 feet (487.7 meters) in the Sierra Nevada foothills (Shaffer et al. 2004). Along the coast ranges, the species occurred from the Santa Rosa area of Sonoma County, south to the vicinity of Buellton in Santa Barbara County. The historic distribution in the Central Valley and surrounding foothills included northern Yolo County southward to northwestern Kern County and northern Tulare County.

The Sonoma County Distinct Population Segment of the California tiger salamander is discrete in relation to the remainder of the species. The population is geographically isolated and separate from other California tiger salamanders. The Sonoma County population is widely separated geographically from the closest populations, which are located in Contra Costa, Yolo, and Solano counties. These populations are separated from the Sonoma County population by the Coast Range, Napa River, and the Carquinez Straits, at a minimum distance of approximately 45 miles (72 kilometers). There are no known records of the California tiger salamander in the intervening areas (D. Warenycia, California Department of Fish and Game, personal communication with the Service, 2002). We have no evidence of natural interchange of individuals between the Sonoma County population and other California tiger salamander

populations.

Sonoma County Distinct Population Segment of the California tiger salamander inhabits low-elevation (below 500 feet [152 meters]) vernal pools and seasonal ponds, associated grassland, and oak savannah plant communities. The historic range of the Sonoma County population also may have included the Petaluma River watershed, as there is one historic record of a specimen from the vicinity of Petaluma from the mid-1800s (Borland 1856, as cited in Storer 1925).

*Description.* The California tiger salamander is a large, stocky, terrestrial salamander with a broad, rounded snout. Adults may reach a total length of 8.2 inches (Petranka 1998). Tiger salamanders exhibit sexual dimorphism; males tend to be larger than females. The coloration of the California tiger salamander is white or yellowish markings against black. As adults, California tiger salamanders tend to have the creamy yellow to white spotting on the sides with much less on the dorsal surface of the animal, whereas other tiger salamander species have brighter yellow spotting that is heaviest on the dorsal surface. The larvae have yellowish gray bodies, broad fat heads, large feathery external gills, and broad dorsal fins extending well up their back and range in length from approximately 0.45 to 0.56 inches (1.14 to 1.42 centimeters) (Petranka 1998).

*Habitat and Life History.* The California tiger salamander has an obligate biphasic life cycle (Shaffer *et al.* 2004). Although the larvae salamanders develop in the vernal pools and ponds in which they were born, they are otherwise terrestrial salamanders and spend most of their postmetamorphic lives in widely dispersed underground retreats (Shaffer *et al.* 2004; Trenham *et al.* 2001). Subadult and adult California tiger salamanders spend the dry summer and fall months of the year in the burrows of small mammals, such as California ground squirrels (*Spermophilus beecheyi*) and Botta's pocket gopher (*Thomomys bottae*) (Storer 1925; Loredo and Van Vuren 1996; Petranka 1998; Trenham 1998a). Because they spend most of their lives underground, California tiger salamanders are rarely encountered, even in areas where they are abundant.

California tiger salamanders may also use landscape features such as leaf litter or desiccation cracks in the soil for upland refugia. Burrows often harbor camel crickets and other invertebrates that provide likely prey for California tiger salamanders. Underground refugia also provides protection from the sun and wind associated with the dry California climate that can cause excessive drying of amphibian skin. Although California tiger salamanders are members of a family of "burrowing" salamanders, they are not known to create their own burrows. This may be due to the hardness of soils in the California ecosystems in which they are found. Tiger salamanders typically use the burrows of ground squirrels and gophers (Loredo *et al.* 1996; Trenham 1998a). However, Dave Cook (Sonoma County Water Agency, personal communication with the Service, 2001) found that pocket gopher burrows are most often used by California tiger salamanders in Sonoma County. California tiger salamanders depend on persistent small mammal activity to create, maintain, and sustain sufficient underground refugia. Burrows are short lived without continued small mammal activity and typically collapse within approximately 18 months (Loredo *et al.* 1996).

Upland burrows inhabited by California tiger salamanders have often been referred to as

"estivation" sites. However, "estivation" implies a state of inactivity, while most evidence suggests that California tiger salamanders remain active in their underground dwellings. A recent study has found that California tiger salamanders move, feed, and remain active in their burrows (Van Hattem 2004). Because California tiger salamanders arrive at breeding ponds in good condition and are heavier when entering the pond than when leaving, researchers have long inferred that California tiger salamanders are feeding while underground. Recent direct observations have confirmed this (Trenham 2001; van Hattem 2004). Thus, "upland habitat" is a more accurate description of the terrestrial areas used by California tiger salamanders.

Once fall or winter rains begin, the salamanders emerge from the upland sites on rainy nights to feed and to migrate to the breeding ponds (Stebbins 1985, 1989; Shaffer *et al.* 1993). Adult salamanders mate in the breeding ponds, after which the females lay their eggs in the water (Twitty 1941; Shaffer *et al.* 1993; Petranka 1998). Historically, the California tiger salamander utilized vernal pools, but the animals also currently breed in livestock stockponds. Females attach their eggs singly, or in rare circumstances, in groups of two to four, to twigs, grass stems, vegetation, or debris (Storer 1925; Twitty 1941). In ponds with no or limited vegetation, they may be attached to objects, such as rocks and boards on the bottom (Jennings and Hayes 1994). After breeding, adults leave the pool and return to the small mammal burrows (Loredo *et al.* 1996; Trenham 1998a), although they may continue to come out nightly for approximately the next two weeks to feed (Shaffer *et al.* 1993). In drought years, the seasonal pools may not form and the adults can not breed (Barry and Shaffer 1994).

California tiger salamander larvae typically hatch within 10 to 24 days after eggs are laid (Storer 1925). The peak emergence of these metamorphs is typically between mid-June to mid-July (Loredo and Van Vuren 1996; Trenham *et al.* 2000) but in some areas as early as late February or early March. The larvae are totally aquatic. The larvae feed on zooplankton, small crustaceans, and aquatic insects for about six weeks after hatching, after which they switch to larger prey (J. Anderson 1968). Larger larvae have been known to consume the tadpoles of Pacific treefrogs (*Pseudacris regilla*), Western spadefoot toads (*Spea hammondii*), and California red-legged frogs (*Rana aurora draytonii*)(J. Anderson 1968; P. Anderson 1968). California tiger salamander larvae are among the top aquatic predators in seasonal pool ecosystems. When not feeding, they often rest on the bottom in shallow water but are also found throughout the water column in deeper water. Young salamanders are wary and typically escape into vegetation at the bottom of the pool when approached by potential predators (Storer 1925).

The larval stage of the California tiger salamander usually last three to six months, as most seasonal ponds and pools dry up during the summer (Petranka 1998). Amphibian larvae must grow to a critical minimum body size before they can metamorphose (change into a different physical form) to the terrestrial stage (Wilbur and Collins 1973). Individuals collected near Stockton in the Central Valley during April varied from 1.88 to 2.32 inches in length (Storer 1925). Feaver (1971) found that larvae metamorphosed and left the breeding pools 60 to 94 days after the eggs had been laid, with larvae developing faster in smaller, more rapidly drying pools. The longer the ponding duration, the larger the larvae and metamorphosed juveniles are able to grow, and the more likely they are to survive and reproduce (Pechmann *et al.* 1989; Semlitsch *et al.* 1988; Morey 1998; Trenham 1998b). The larvae will perish if a site dries before metamorphosis is complete (P. Anderson 1968; Feaver 1971). Pechmann *et al.* (1989) found a

strong positive correlation with ponding duration and total number of metamorphosing juveniles in five salamander species. In Madera County, Feaver (1971) found that only 11 of 30 pools sampled supported larval California tiger salamanders, and 5 of these dried before metamorphosis could occur. Therefore, out of the original 30 pools, only six (20 percent) provided suitable conditions for successful reproduction that year. Size at metamorphosis is positively correlated with stored body fat and survival of juvenile amphibians, and negatively correlated with age at first reproduction (Semlitsch *et al.* 1988; Scott 1994; Morey 1998). In the late spring or early summer, before the ponds dry completely, metamorphosed juveniles leave them and enter upland habitat. This emigration occurs in both wet and dry conditions (Loredo and Van Vuren 1996; Loredo *et al.* 1996). Unlike during their winter migration, the wet conditions that California tiger salamanders prefer do not generally occur during the months when their breeding ponds begin to dry. As a result, juveniles may be forced to leave their ponds on rainless nights. Under these conditions, they may move only short distances to find temporary upland sites for the dry summer months, waiting until the next winter's rains to move further into suitable upland refugia. Once juvenile California tiger salamanders leave their birth ponds for upland refugia, they typically do not return to ponds to breed for an average of 4 to 5 years. However, they remain active in the uplands, coming to the surface during rainfall events to disperse or forage (Trenham and Shaffer, 2005).

Lifetime reproductive success for California and other tiger salamanders is low. Trenham *et al.* (2000) found the average female bred 1.4 times and produced 8.5 young that survived to metamorphosis per reproductive effort. This resulted in roughly 11 metamorphic offspring over the lifetime of a female. Two reasons for the low reproductive success are the preliminary data suggests that most individuals of the California tiger salamanders require two years to become sexually mature, but some individuals may be slower to mature (Shaffer *et al.* 1993); and some animals do not breed until they are four to six years old. While individuals may survive for more than ten years, many breed only once, and in some populations, less than 5 percent of marked juveniles survive to become breeding adults (Trenham 1998b). With such low recruitment, isolated populations are susceptible to unusual, randomly occurring natural events as well as from human caused factors that reduce breeding success and individual survival. Factors that repeatedly lower breeding success in isolated pools can quickly extirpate a population. Dispersal and migration movements made by California tiger salamanders can be grouped into two main categories: (1) breeding migration; and (2) interpond dispersal. Breeding migration is the movement of salamanders to and from a pond from the surrounding upland habitat. After metamorphosis, juveniles move away from breeding ponds into the surrounding uplands, where they live continuously for several years. At a study in Monterey County, it was found that upon reaching sexual maturity, most individuals returned to their natal/ birth pond to breed, while 20 percent dispersed to other ponds (Trenham *et al.* 2001). Following breeding, adult California tiger salamanders return to upland habitats, where they may live for one or more years before breeding again (Trenham *et al.* 2000).

California tiger salamanders are known to travel large distances from breeding ponds or pools into upland habitats. Maximum distances moved are generally difficult to establish for any species, but California tiger salamanders in Santa Barbara County have been recorded to disperse 1.3 miles from breeding ponds (Sweet, *in litt.* 1998). California tiger salamanders are known to travel between breeding ponds; one study found that 20 to 25 percent of the individuals captured

at one pond were recaptured later at ponds approximately 1,900 and 2,200 feet away (Trenham *et al.* 2001). In addition to traveling long distances during migration to or dispersal from ponds, California tiger salamanders may reside in burrows that are far from ponds.

Although the observations above show that California tiger salamanders can travel far, typically they stay closer to breeding ponds. Evidence suggests that juvenile California tiger salamanders disperse further into upland habitats than adult California tiger salamanders. A trapping study conducted in Solano County during winter of 2002/2003 found that juveniles used upland habitats further from breeding ponds than adults (Trenham and Shaffer, 2005). More juvenile salamanders were captured at distances of 328, 656, and 1,312 feet from a breeding pond than at 164 feet. Large numbers, approximately 20 percent of total captures, were found 1,312 feet from a breeding pond. Fitting a distribution curve to the data revealed that 95 percent of juvenile salamanders could be found within 2,099 feet of the pond, with the remaining 5 percent being found at even greater distances. Results from the 2003-04 trapping efforts detected juvenile California tiger salamanders at even further distances, with a large proportion of the total salamanders caught at 2,297 feet from the breeding pond (Trenham and Shaffer, 2005). During post-breeding emigration, radio-equipped adult California tiger salamanders were tracked to burrows 62 to 813 feet from their breeding ponds (Trenham 2001). These reduced movements may be due to adult California tiger salamanders having depleted physical reserves post-breeding, or also due to the drier weather conditions that can occur during the period when adults leave the ponds.

In addition, rather than staying in a single burrow, most individuals used several successive burrows at increasing distances from the pond. Although the studies discussed above provide an approximation of the distances that California tiger salamanders regularly move from their breeding ponds, upland habitat features will drive the details of movements in a particular landscape. Trenham (2001) found that radio-tracked adults favored grasslands with scattered large oaks, over more densely wooded areas. Based on radio-tracked adults, there is no indication that certain habitat types are favored as corridors for terrestrial movements (Trenham 2001). In addition, at two ponds completely encircled by drift fences and pitfall traps, captures of arriving adults and dispersing new metamorphs were distributed roughly evenly around the ponds. Thus, it appears that dispersal into the terrestrial habitat occurs randomly with respect to direction and habitat types.

Several species have either been documented to prey or likely prey upon the California tiger salamanders including coyotes (*Canis latrans*), raccoons (*Procyon lotor*), opossums (*Didelphis virginiana*), egrets (*Egretta species*), great blue herons (*Ardea herodias*), crows (*Corvus brachyrhynchos*), ravens (*Corvus corax*), bullfrogs (*Rana catesbeiana*), mosquito fish (*Gambusia affinis*), and crayfish (*Procrambus* species).

*Reasons for Decline and Threats to Survival.* The California tiger salamanders are imperiled throughout its range by a variety of human activities (Service 2004). Current factors associated with declining populations of the salamander include continued degradation and loss of habitat due to agriculture and urbanization, hybridization with non-native eastern tiger salamanders (*Ambystoma tigrinum*) (Fitzpatrick and Shaffer 2004; Riley *et al.* 2003), and introduced predators. Hybridization with non-native eastern tiger salamanders has not yet been identified

within the Sonoma County population. Fragmentation of existing habitat and agricultural activities that degrade and/or eliminate breeding pools may represent the most significant current threats to California tiger salamanders, although populations are likely threatened by more than one factor. Isolation and fragmentation of habitats within many watersheds have precluded dispersal between sub-populations and jeopardized the viability of metapopulations (broadly defined as multiple subpopulations that occasionally exchange individuals through dispersal, and are capable of colonizing or "rescuing" extinct habitat patches). Other threats are predation and competition from introduced exotic species; disease; various chemical contaminants; road-crossing mortality; and certain unrestrictive mosquito and rodent control operations.

<u>Burke's Goldfields</u>

*Listing History.* Burke's goldfields was federally listed as endangered on December 2, 1991 (56 **FR** 61173). No critical habitat has been designated for this species.

*Description.* Burke's goldfields is an annual herb in the aster family (Asteraceae). Plants are typically less than 11.8 inches (30 centimeters) in height (Hickman 1993) and usually branched (California Native Plant Society (CNPS) 1977). Leaves are opposite, less than two inches (5 centimeters) in length, and pinnately lobed. Yellow, daisy-like inflorescences with separate involucre bracts (leaf-like structures beneath the flower head) appear from approximately April through June (Skinner and Pavlik 1994). Fruits are achenes (dry, one-seeded fruits) less than 0.06 inch (1.5 millimeters) in length. The fruits of Burke's goldfields can be distinguished from those of other goldfields by the presence of one long awn (bristle and numerous short scales) (Hickman 1993). Individual Burke's goldfields plants may exhibit some geographic variation in morphology (McCarten 1985 as cited in CH2M Hill 1995, Patterson et al. 1994). Patterson *et al.* (1994) report robust specimens from the southern Santa Rosa Plain near the Laguna de Santa Rosa and variation in the number of awns from a Lake County population. Burke's goldfields can be distinguished from smooth goldfields (*Lasthenia glaberrima*) because smooth goldfields have partly fused involucre bracts and a pappus (ring of scale-like or hair-like projections at the crown of an achene) of numerous narrowed scales. The linear leaves without lobes distinguish common goldfields (*Lasthenia californica*) from Burke's goldfields (Hickman 1993).

*Historical and Current Distribution.* Burke's goldfields is endemic to the central California Coastal Range region and has been reported historically from Mendocino, Lake, and Sonoma counties (CNPS 1977, Patterson et al. 1994). The type locality of Burke's goldfields is the only known occurrence from Mendocino County and is possibly extirpated. Two California Natural Diversity Database (CNDDB) occurrences are recorded from Lake County, at Manning Flat and at a winery on Highway 29. Both Lake County occurrences are presumed extant. The remaining occurrences are from Sonoma County (CNDDB 1998). Within Sonoma County, one occurrence is known from north of Healdsburg (Patterson et al. 1994). On the Santa Rosa Plain, Burke's goldfields is distributed primarily in the northwestern and central areas with two additional occurrences south of Highway 12 near the Laguna de Santa Rosa (CH2M Hill 1995). The core of the current range of Burke's goldfields is in the Santa Rosa Plain.

*Habitat.* Burke's goldfields grow in vernal pools and swales below 500 meters (m) (Hickman 1993). At the Manning Flat occurrence in Lake County, Burke's goldfields is found in a series

of claypan vernal pools on volcanic ash soils (56 FR 61173, CNDDB 1998). At this location, the species is associated with common goldfields and few-flowered navarretia (*Navarretia leucocephala pauciflora*) (CNDDB 1998). In Sonoma County, the vernal pools containing Burke's goldfields are on nearly level to slightly sloping loams, clay loams, and clays. A clay layer or hardpan approximately two to three feet (0.6 to 0.9 meters) below the surface restricts downward movement of water (56 FR 61173). Huichica loam is the predominant soil series on which Burke's goldfields is found on the northern part of the Santa Rosa Plain (Patterson et al. 1994, CNDDB 1998). Huichica loam is a fine textured clay loam over buried dense clay and cemented layers (Patterson et al. 1994). More southerly Burke's goldfields sites likely occur on Wright loam or Clear Lake clay (Patterson et al. 1994, CNDDB 1998). Wright loam is a fine silty loam over buried dense clay and marine sediments. Clear Lake clay is hard dense clay from the surface to many feet thick (Patterson et al. 1994). Burke's goldfields sometimes occurs along with Sonoma sunshine and Sebastopol meadowfoam (*Limnanthes vinculans*). These three federally listed species are all associated with other plants that commonly grow in vernal pools on the Santa Rosa Plain, including Douglas' pogogyne (*Pogogyne douglasii spp. parviflora*), Lobb's aquatic buttercup (*Ranunculus lobbii*), smooth goldfields, California semaphore grass (*Pleuropogon californicus*), maroonspot downingia (*Downingia concolor*), and button-celery (*Eryngium sp.*) (CNDDB 1998).

*Life History.* The flowers of Burke's goldfields are self-incompatible (Ornduff 1966, Crawford and Ornduff 1989) and insect-pollinated. Seed banks are of particular importance to annual plant species which are subject to uncertain or variable environmental conditions (Cohen 1966, 1967; Parker et al. 1989; Templeton and Levin 1979). Burke's goldfields fit this criterion; it is an annual species living in California's highly variable Mediterranean climate.

No information exists with respect to the seed life of Burke's goldfields. Circumstantial evidence suggests that Burke's goldfields successfully germinated from seed in soil collected from a previously developed portion of the Westwind Business Park (Building F) when the soil was translocated and deposited in created seasonal wetlands (C. Wilcox, CDFG, 2000 in litt.). As annual species, it is expected that Burke's goldfields and Sonoma sunshine will respond to environmental stochastic events, such as changes in vegetative composition, climate, and disturbance, by partial germination of its seed bank. Baskin and Baskin (1998) indicate that species (annuals) adapted to "risky environments" produce persistent seed banks to offset years of low reproductive success and to ensure the species can persist at a site without immigration. These characteristics can be attributed to Burke's goldfields. Considering the adaptations of these plants to a variable Mediterranean climate it is likely the seed of Burke's goldfields can persist as dormant embryos for an undetermined number of years. Therefore, it is likely that populations of these species may persist undetected for a period of years until conditions are favorable to allow germination. Although formal studies of seed viability have not been conducted for these species, it is reasonable to expect their seed banks may persist for extended periods without germination. Furthermore, it is not unlikely that the individual fruits of Burke's goldfields may be predisposed to variable germination requirements as a strategy for survival.

For species that develop long-lived seed banks, a census of plants growing above ground may not accurately reflect the total number of plants at the site (Rice 1989, Given 1994). Population sizes of California's vernal pool/swale annual plant species, including Burke's goldfields, may

fluctuate substantially between very high numbers in some years to very small numbers, or even absence in other years because of varying environmental conditions. Therefore, total extirpation cannot be assumed when above-ground plants of these species are not observed at a site. Furthermore, declines in population size over a few years may not necessarily indicate that habitat is unsuitable (Given 1994), merely that environmental conditions within a vernal pool or swale have not favored seed germination.

*Reasons for Decline and Threats to Survival.* Burke's goldfields is threatened with habitat loss, fragmentation, and degradation throughout all or part of its range by factors including urbanization, agricultural land use changes, alterations in hydrology, and erosion (CNPS 1977, 56 FR 61173, Patterson et al. 1994, CH2M Hill 1995, CNDDB 1998). The only known Mendocino County occurrence is presumably extirpated (CH2M Hill 1995). The Manning Flat occurrence, located on private land in Lake County, is the largest known occurrence of the species and is threatened by extensive gully erosion that is destroying the habitat (CH2M Hill 1995, CNDDB 1998). The second Lake County occurrence is on property owned by a winery. Recent reports suggest that some damage to this population has resulted from vineyard operations (R. Chan, University of California, Berkeley, 1998 in litt.). However, in the past the winery owners appeared willing to coordinate with the Service and the U.S. Army Corps of Engineers (Corps) to avoid and/or minimize further damage to the site (N. Haley, Corps, 1998 pers. comm.). On the Santa Rosa Plain, many Burke's goldfields locations have been extirpated due to urbanization and conversion of land to row crops. Formerly well-represented in the vicinity of Windsor, Burke's goldfields has now been nearly extirpated from the area (Patterson *et al.* 1994, CH2M Hill 1995).

Of the 48 known records of Burke's goldfields, 26 are presumed to remain extant, with a majority found on the Santa Rosa Plain. Four populations occur outside of the Santa Rosa Plain, of which only two populations, one in northern Healdsburg and one at the Ployes winery, are extant.

Sonoma Sunshine

*Listing History.* Sonoma sunshine was federally listed as endangered on December 2, 1991 (56 FR 61173). No critical habitat has been designated for this species.

*Description.* Sonoma sunshine is an annual plant in the aster family. Plants are less than 11.8 inches (30 centimeters) tall with alternate, linear leaves (CNPS 1977, Hickman 1993). The lower leaves are entire, and the upper leaves have one to three lobes that are 0.4 to 1.2 inches (1 to 3 centimeters) deep (Hickman 1993). The daisy-like flower heads of Sonoma sunshine are yellow. The ray flowers have dark red stigmas. The disk flowers have white stigmas and white pollen but are otherwise yellow. Achenes are 0.1 to 0.15 inches (3 to 4 millimeters) long with small rounded or conic proturbences (papillate) and 4 to 6 strongly angled edges (CNPS 1977, Hickman 1993). Sonoma sunshine could be confused with common stickseed (*Blennosperma nanum*); however, Sonoma sunshine has longer and fewer lobes on the leaves and is more robust (CNPS 1977).

*Historical and Current Distribution.* Sonoma sunshine occurs only in Sonoma County. In the

Cotati Valley, the species ranges from near the community of Fulton in the north to Scenic Avenue between Santa Rosa and Cotati in the south. Additionally, the species extends or extended from near Glen Ellen to near the junction of State Routes 116 and 121 in the Sonoma Valley. During 2001, two new natural populations were identified north and south of the City of Santa Rosa, increasing the number of previously identified CNDDB occurrences from 26 to 28. Of the 28 occurrences, 21 are presumed to be extant with a majority occurring on the Santa Rosa Plain and one occurring in Glen Ellen. In addition, Sonoma sunshine has been introduced to at least one site on Alton Lane during mitigation activities. Seven populations within or near the City of Santa Rosa have been extirpated.

*Habitat.* Sonoma sunshine grows in vernal pools and wet grasslands below 100 m (330 ft) (Hickman 1993). In the Sonoma and Cotati valleys, Sonoma sunshine occurs in vernal pools on nearly level to slightly sloping loams, clay loams, and clays, as described for Burke's goldfields (56 **FR** 61173). The two concentrations of Sonoma sunshine on the Santa Rosa Plain occur on different soil types (Patterson et al. 1994). Sonoma sunshine likely grows on Huichica loam north of Highway 12 and on Wright loam and Clear Lake clay south of Highway 12 (Patterson et al. 1994, CNDDB 1998). These soil series are briefly described in the discussion of Burke's goldfields habitat above.

*Life History.* Sonoma sunshine flowers from March to April. The flowers of Sonoma sunshine are self-incompatible, meaning that they can set seed only when fertilized by pollen from a different plant. The extent to which pollination of the species covered in this Programmatic depends on host-specific or more generalist pollinators is currently unknown.

Seed banks are thought to be of particular importance in annual species subject to uncertain or variable environmental conditions (Cohen 1966, 1967; Parker *et al.* 1989; Templeton and Levin 1979). The Sonoma sunshine also fit these criteria; they are annual species (Hickman 1993) living in an uncertain vernal pool environment (Holland and Jain 1977). In the absence of data to suggest otherwise, the presence of substantial seed banks for these species is a reasonable assumption.

*Reasons for Decline and Threats to Survival.* Sonoma sunshine is threatened with habitat loss, fragmentation, and degradation throughout all or part of its range by factors including urbanization, agricultural land use changes, and alterations in hydrology (Patterson et al. 1994, CH2M Hill 1995, CNDDB 1998). In the Sonoma Valley, two of five known occurrences have been extirpated. One was extirpated by habitat destruction in 1986, and the area is now a vineyard. At the second site, most habitat was destroyed by grading for home sites in 1980; the remainder was converted to vineyard or overtaken by weeds (CNDDB 1998). Of the presumed extant Sonoma Valley occurrences, one locality has been largely developed. A small area was retained by CDFG when the development took place, but Sonoma sunshine has not been recorded from this area since the subdivision was developed (Service files). A second Sonoma Valley locale is currently pasture. A portion of the occurrence may have been disced, and the landowners of a second portion want to convert the locale to vineyard (C. Wilcox, 1998, pers. comm., Service files). The third Sonoma Valley occurrence is in Sonoma Valley Regional Park, which is not managed for conservation (CNDDB 1998). On the Santa Rosa Plain, one locale has probably been extirpated by completion of a subdivision and one locale by major land alterations

on the locale (CNDDB 1998). Of the presumed extant locales, some support severely degraded habitat, are threatened by development, or have not supported confirmed populations of Sonoma sunshine in recent years (CH2M Hill 1995, CNDDB 1998).

### Sebastopol Meadowfoam

*Listing History.* Sebastopol meadowfoam was federally listed as endangered on December 2, 1991 (56 FR 61173). No critical habitat has been designated for this species.

*Description.* Sebastopol meadowfoam is an annual herb with weak, somewhat fleshy, decumbent stems up to 11.8 inches (30 centimeters) long. The seedlings are unusual among *Limnanthes* species in that they have entire leaves. Leaves of mature plants are up to 3.9 inches (10 centimeters) long and have 3 to 5 leaflets that are narrow and unlobed with rounded tips. The leaves are borne on long petioles; petiole length, like stem length, appears to be promoted by submergence. Sebastopol meadowfoam has fragrant, white flowers that are borne in the leaf axils during April and May. The flowers are bell-shaped or dish-shaped, with petals 0.47 to 0.71 inch (12 to 18 millimeters) long. The sepals are shorter than the petals. The petals turn outward as the nutlets mature. The nutlets are dark brown, 0.12 to 0.16 inch (3 to 4 millimeters) long, and covered with knobby pinkish tubercles (Patterson et al. 1994).

*Historical and Current Distribution.* Historically, Sebastopol meadowfoam was known from 40 occurrences in Sonoma County and one occurrence (occurrence #39) in Napa County, at the Napa River Ecological Reserve. In Sonoma County, all but two occurrences were found in the central and southern portions of the Santa Rosa Plain. Occurrence #20 occurred at Atascadero Creek Marsh west of Sebastopol, and the second (#40) occurred in the vicinity of Knights Valley northeast of Windsor (CNDDB 2001).

The current condition of numerous Sebastopol meadowfoam occurrences is unclear, because many have not been visited in over 5 years. The southern cluster of occurrences extends 3 miles (5 kilometers) from Stoney Point Road west to the Laguna de Santa Rosa, and is bounded by Occidental Road to the north and Cotati to the south. The central cluster stretches 1.5 miles (2.41 kilometers) on either side of Fulton Road extending northwards from Occidental Road to River Road. Patterson et al. (1994) estimated that the Santa Rosa Plain occurrences represent only 10 hydrologically separate populations of Sebastopol meadowfoam. At least one occurrence (#21) has been extirpated from the Santa Rosa Plain (CNDDB 2002). Recent field surveys found that all three occurrences outside of the Santa Rosa Plain have probably been extirpated (CNDDB 2002).

*Life History.* The seeds of Sebastopol meadowfoam germinate after the first significant rains in fall, although late initiation of rains may delay seed germination. Sebastopol meadowfoam plants grow slowly underwater during the winter, and growth rates increase as the pools dry. Repeated drying and filling of pools in the spring favors development of large plants with many branches and long stems. Sebastopol meadowfoam begins flowering as the pools dry, typically in March or April. The largest plants can produce 20 or more flowers. Flowering may continue as late as mid-June, although in most years the plants have set seed and died back by then (Patterson et al. 1994). Each plant can produce up to 100 nutlets (Patterson et al. 1994).

Nutlets of Sebastopol meadowfoam likely remain dormant in the soil, as they do for other species of *Limnanthes* (Patterson et al. 1994). One case presents strong circumstantial evidence for persistent, long-lived seed banks in this species. In the late 1980's and early 1990's, a site in Cotati remote from other Sebastopol meadowfoam colonies was surveyed for several years by independent qualified botanists. None of these botanists identified flowering populations of Sebastopol meadowfoam on the project site. Conditions of the pools on the site were highly degraded by wallowing hogs (*Sus scrofa*) and subsequent eutrophication of the pools. Following several years of negative surveys 12 plants of Sebastopol meadowfoam emerged simultaneously in one pool in the first year following removal of hogs. The population expanded rapidly to 60 plants the next year and was larger in subsequent years (Geoff Monk, personal communication), all limited to one pool. Long-distance dispersal is an improbable explanation for the simultaneous emergence of multiple plants at one location, so seed banks are implicated in this case as well. This example also indicates that lack of Sebastopol meadowfoam during periods of adverse conditions (drought, heavy disturbance, etc.) does not necessarily mean the population is extirpated.

This species grows in Northern Basalt Flow and Northern Hardpan vernal pools (Sawyer and Keeler-Wolf 1995), wet swales and meadows, on the banks of streams, and in artificial habitats such as ditches (Wainwright 1984; CNDDB 2002). The surrounding plant communities range from oak savanna, grassland, and marsh in Sonoma County to riparian woodland in Napa County (CNDDB 2002). Sebastopol meadowfoam grows in both shallow and deep areas, but is most frequent in pools 10 to 20 inches (25 to 51 centimeters) deep (Patterson et al. 1994). The species is most abundant in the margin habitat at the edge of vernal pools or swales (Pavlik et al. 2000, 2001). Most confirmed occurrences of Sebastopol meadowfoam on the Santa Rosa Plain grow on Wright loam or Clear Lake clay soils (Patterson et al. 1994, CNDDB 2002). A few occurrences are on other soil types, including Pajaro clay loam, Cotati fine sandy loam, Haire clay loam (Patterson et al. 1994) and Blucher fine sandy loam (Wainwright 1984).

*Reasons for Decline and Threats to Survival.* Like Burke's goldfields and Sonoma sunshine, Sebastopol meadowfoam has been and continues to be threatened by habitat loss, habitat degradation, and small population size. Causes of habitat loss include agricultural conversion, urbanization, and road maintenance. Habitat degradation is caused by excessive grazing by livestock, alterations in hydrology, and competition from non-native species (in some cases, exacerbated by removal of grazing), off-highway vehicle use, and dumping (56 **FR** 61173, Patterson et al. 1994, CH2M Hill 1995, CNDDB 2002).

Recovery Actions

As discussed in the Background section of this Programmatic, the Conservation Strategy was developed by the Team. The purpose of the Conservation Strategy is threefold: (1) to establish a long-term conservation program sufficient to compensate potential adverse effects of future development on the Santa Rosa Plain, and to conserve and contribute to the recovery of the California tiger salamander and a select group of listed plants (Sonoma sunshine, Burke's goldfields, Sebastopol meadowfoam, and many-flowered navarretia) and the conservation of their sensitive habitat; (2) to accomplish the preceding in a fashion that protects stakeholders' (both public and private) land use interests, and (3) to support issuance of an authorization for

incidental take of California tiger salamanders that may occur in the course of carrying out a broad range of activities on the Santa Rosa Plain. The Conservation Strategy will not preserve the species unless implemented by the appropriate agencies. The Conservation Strategy provides the biological basis for a permitting process for projects that are in the potential range of listed species on the Santa Rosa Plain. This is intended to provide consistency, timeliness and certainty for permitted activities. The Conservation Strategy study area is comprised of the potential California tiger salamander range and the listed plant range within the Santa Rosa Plain. The Conservation Strategy establishes interim and long-term mitigation requirements and designates conservation areas where mitigation will occur. It describes how preserves will be established and managed. It also includes guidelines for translocation, management plans, adaptive management and funding. Finally, the document describes the implementation planning process.

The County of Sonoma, the Cities of Santa Rosa, Cotati, Rohnert Park, the Town of Windsor, Service, and CDFG have commenced a process to develop a plan for implementing the Conservation Strategy. An implementation committee has been formed that is comprised of elected and staff representatives of the local jurisdictions and representatives of the agricultural, development, and environmental communities. Staff representatives from the Service and CDFG provide technical assistance to the implementation committee. The implementation plan is expected to provide a mechanism for applying the Conservation Strategy to cover public and private projects, agricultural activities, and residential and commercial development.

The Service and CDFG are implementing interim mitigation guidelines (Service and CDFG, 2006 *in litt.*) for Federal and non-federal actions. This Programmatic has integrated many of the guidelines in the Conservation Strategy and interim mitigation guidelines in the Description of the Proposed Action.

The Service will also prepare a recovery plan for the Sonoma County Distinct Population Segment of the California tiger salamander and listed plants as required by the Act. The Conservation Strategy will be the foundation of the recovery plan; however, it does not preclude the obligation of the Service to develop a recovery plan.

**Environmental Baseline**

Prior to human settlement, it is believed the Santa Rosa Plain supported a vast network of seasonally wet swales and scattered pools within a matrix of grassland and oak savanna. The low-gradient terrain with underlying dense clay soil horizons and high clay soil surfaces, ample winter precipitation, and dry summer climate on the Santa Rosa Plain predisposed this area to the development of seasonal wetlands. The natural landscape historically consisted of numerous shallow depressions that would pond water during the rainy season (vernal pools), often connected by narrow swales. Much of the vernal pool ecosystem has since been lost or degraded through agricultural activities and development projects (Patterson *et al.*1994, CH2M Hill 1995). The Santa Rosa Plain is believed to have historically supported approximately 7,000 acres of seasonal wetlands, an estimated 84 percent of which had been lost due to land conversion as of 1994. The approximately 1,000 acres of seasonal wetlands that remained on the Santa Rosa Plain in 1994 were composed of both vernal pools (ponded) and swales (non-ponded) in roughly

equal proportions, and the swales had largely been invaded by exotic species, therefore it is believed the actual amount of vernal pool acreage had been reduced to less than a few hundred acres (Patterson *et al.*, 1994). Because the vernal pool ecosystem was once extensive over the Santa Rosa Plain, it is not difficult to find parcels on which vernal pools have been "smeared" into the landscape, resulting in degraded seasonal wetlands that may still retain the necessary qualities for supporting one or more of the listed plant species but may require considerable restoration to ensure long-term species viability (Patterson *et al.*1994, CH2M Hill 1995).

The loss of seasonal wetland habitat on the Santa Rosa Plain has largely resulted from urban and agricultural conversion (Patterson *et al.* 1994, CH2M Hill 1995, CNDDB 1998). Of 28,000 acres of the Santa Rosa Plain studied by Waaland *et al.* (1990 as cited in Patterson *et al.* 1994), 12,000 acres had been converted to urban, cropland, orchard or vineyard uses. The conversion most severely affected oak woodland/savanna-vernal pool habitat.

In addition, seasonal wetlands on the Santa Rosa Plain have been heavily impacted through stream channelization, filling and draining of wetlands, livestock grazing, and irrigation (Patterson *et al.* 1994, CH2M Hill 1995, Keeler-Wolf *et al.* 1997, CNDDB 1998). Each of these impacts is discussed briefly below.

Stream channelization for flood control, such as of Roseland and Colgan Creeks, has involved excavation through vernal pool terrain causing interruption of hydrological connections and filling of wetlands with dredge spoils. Pools have also been filled and drained for mosquito abatement and to create dry ground for livestock. Air photo analyses and reconnaissance surveys have revealed incidences of unauthorized low level backyard filling throughout the action area (Patterson *et al.* 1994).

Livestock grazing is another factor with historic and ongoing effects on the listed plant species of the Santa Rosa Plain. While light grazing may benefit habitat by reducing thatch and minimizing competitive grasses (this has been demonstrated to be an effective strategy for Burke's goldfields), heavier grazing can result in injurious trampling, direct plant consumption, local soil compaction, and detrimental effects resulting from the excessive contribution of manure (Patterson *et al.* 1994, 56 FR 61173).

Wastewater irrigation is a recently established factor affecting vernal pools on the Santa Rosa Plain. This practice began in the 1970s and has continued which has resulted in changing seasonal wetland plant composition. While the native seasonal wetland species are adapted to a summer-dry Mediterranean climate, summer irrigation results in perennial wetland conditions that are intolerable by native seasonal wetland species (Patterson *et al.* 1994). A 1996 draft Environmental Impact Report (EIR) addressed a proposed long-term wastewater project that would dispose of wastewater from the Laguna Wastewater Treatment Plant by irrigating fields on the Santa Rosa Plain. The draft EIR stated that wastewater irrigation would avoid impacts to sensitive biological resources (City of Santa Rosa and U.S. Army Corps of Engineers 1996). However, in February of 1998, the site supporting many-flowered navarretia had a sign stating wastewater was being used for irrigation on-site (Ellen Berryman, 1998 pers. obs.). Patterson *et al.* (1994) state, "the ongoing need to expand effluent irrigation acreage to keep pace with population growth will continue to jeopardize the existence of oak woodlands and vernal pools

on the Santa Rosa Plain unless other, less sensitive lands are found for irrigation or other means of disposal are found". The City has recently developed an EIR to look at additional wastewater storage and irrigation in the Santa Rosa Plain. The City of Santa Rosa is pursuing agreements with other wastewater facilities (Sonoma County Water Agency and Town of Windsor) to share irrigation and storage. The City of Santa Rosa is permitted to apply wastewater biosolids to lands within the Santa Rosa Plains. The RWQCB recently issued a renewed permit to Santa Rosa for wastewater discharges. The permit requires the City of Santa Rosa to study wastewater land application rates to ensure they are not over-irrigating. The permit recognized specific pollutants (including toxic pollutants) in the treated wastewater. The permit sets time schedules for these pollutants to be addressed prior to discharge to surface waters. Technically, the RWQCB regulations (Water Quality Control Plan for the North Coast Region) prohibit wastewater discharge to surface waters during the summer. The regulations however do not contemplate that wastewater would be used to irrigate vernal pools and other types of seasonal wetlands (J. Short, 2007 pers. comm.).

Burke's goldfields

*1991 to 1998.* Patterson *et al.* (1994) evaluated known Burke's goldfields sites on the Santa Rosa Plain, categorizing them as (1) in public ownership, (2) presumed extant and privately owned, and (3) extirpated or largely destroyed. Their data indicate that 33 percent of the acreage of known Santa Rosa Plain Burke's goldfields sites has been severely degraded or extirpated. As of 1998, the Service was aware of at least a dozen specific instances where ditching, draining, discing or overgrazing occurred on parcels containing Burke's goldfields. In many cases, the number of plants at those sites declined after the disturbance took place. In addition, the Service was aware of at least four instances of unauthorized discing that triggered Corps enforcement actions for sites where Burke's goldfields grew. Because of typically small parcel size, development projects that have proceeded since listing, such as Cobblestone and TMD Brown, have mitigated Burke's goldfields losses entirely off site. The few sites where plants were avoided in the course of development have failed to sustain viable populations (Service files).

The most severely impacted portion of the range of Burke's goldfields has been the northwestern portion of the Plain. The majority of the known sites severely degraded or extirpated are in the Windsor area (Patterson *et al.*1994, CH2M Hill 1995). Two of the largest known populations in the county occurred in this area and were considered extirpated by Patterson *et al.* (1994). The extirpations were thought to have resulted from urban and commercial development or agricultural land use changes. For example, one CNDDB occurrence in the area contained 11 colonies in 1984; by 1993, only two were extant (CNDDB 1998). A second occurrence had more than 20 vernal pools in 1985, but by 1994, only one colony of Burke's goldfields was present (CNDDB 1998). This property once contained 50,000 plants, but after repeated discing only about 100 plants remain (B. Guggolz, CNPS, 1998 pers. comm.). Only a few stable Burke's goldfields sites still exist in the Windsor area, and these are threatened by development (Patterson *et al.* 1994). The City of Windsor has already developed, or designated development, on every Burke's goldfields site within their general planning area (B. Guggolz, 1998 pers. comm.). Only a few stable Burke's goldfields sites still exist in the Windsor area, and these are threatened by development (Patterson *et al.* 1994). The City of Windsor has already developed,

or designated development, on every Burke's goldfields site within their general planning area (B. Guggolz, 1998 pers. comm.).

Since the time Burke's goldfields was listed in 1991, the species has continued to experience dramatic loss. The Service used data from 1994 (Patterson *et al.* 1994) to examine how numbers of Burke's goldfields plants changed at particular sites between the time of listing and the most recent surveys that had been conducted after listing. A site, as defined by Patterson *et al.* (1994), may be all or part of a CNDDB occurrence. After listing, the number of sites with many individuals decreased, and the number with very few individuals increased. Fifteen of the 28 sites for which we have both pre- and post-listing surveys decreased in size after the species was listed. The percentage of sites with fewer than 10 individuals increased by 30 percent, and the percentage of sites with 10,000 to 100,000 individuals decreased by 7 percent. As of 1994, no sites were recorded with more than 100,000 plants. Data from Patterson *et al.* (1994) also indicate that between the time of listing and 1994, 12 different sites were extirpated or largely destroyed. The data indicate large populations of Burke's goldfields are diminishing and nearly half of the sites may have populations either extirpated or are highly vulnerable to extirpation due to small population numbers (less than 10 individuals) (calculated from Patterson *et al.* 1994; CH2M Hill 1995).

Only about 15 percent of the acreage of Burke's goldfields sites on the Santa Rosa Plain had some preservation designation as of 1994 (calculated from data in Patterson *et al.* 1994). However, the species has not been observed since 1987 at Todd Road Preserve, the largest of the preservation sites (Patterson *et al.* 1994, CH2M Hill 1995). Excluding this site, the preserved acreage of Burke's goldfields sites is only 8 percent of acreage known in 1994 (calculated from data in Patterson *et al.* 1994). Since 1994, one preservation bank with Burke's goldfields has been established, but only a small portion of the site supports Burke's goldfields (Exhibit A, MOA for Wright Preservation Bank, 1997).

*1998 to present.* The 1998 programmatic consultation for the listed plants was designed to allow up to 50 acres of low-quality seasonal wetlands to be filled and no more than 30 acres could be occupied (or presumed to be occupied) by the listed plant species. Of the 30 impacted acres which are occupied or presumed occupied, no more than 6 acres would be on sites for which there are known records of the listed plants. Impacts to no more than 6 additional acres on sites for which there are known records of listed plants may be authorized under the 1998 programmatic consultation at the Service's discretion, based upon the Service's evaluation of the significance of impacts to the first 6 acres of known listed species habitat and / or upon substantial progress toward a comprehensive conservation program. Between the period of the 1998 programmatic consultation and the date of this Programmatic, less than 30 acres of low-quality seasonal wetlands were authorized to be filled under the 1998 programmatic. At this time, it is unknown how many of the 30 impacted wetland acres were occupied with one or more of the listed plants. The low-quality seasonal wetlands were to be mitigated for with preservation and creation of listed plant habitat as outlined in the 1998 programmatic.

Sonoma sunshine

*1991 to 1998.* Patterson *et al.* (1994) estimated less than 12 biologically separate populations

remain. Of the sites they examined, 17 percent (nearly one-third) had been extirpated, and 17 percent (nearly one-sixth) had not been confirmed recently. An additional 17 percent (one-sixth) were believed to be extant but threatened by development as of 1994 (Patterson *et al*. 1994). A site, as defined by Patterson *et al*. (1994), may be all or part of a CNDDB occurrence. At one CNDDB occurrence, 12 Sonoma sunshine colonies were observed in 1989. By 1993, only six remained (CNDDB 1998). The Service is aware of at least five specific Sonoma sunshine sites that have been developed or isolated by surrounding development or vineyards on the Santa Rosa Plain since the time of listing, including Cobblestone and TMD Brown. Other sites have been used as wastewater irrigated pastures, damaged by ORV use, heavily grazed, or been subject to land conversion activities (CNDDB 1998, Service files). In addition, Sonoma sunshine is known from at least one of the Burke's goldfield sites mentioned above that were disced without authorization and that triggered Corps enforcement actions (Service files).

The Service used data from 1994 (Patterson *et al*. 1994) to examine how numbers of Sonoma sunshine plants at particular sites changed between the time of listing and the most current surveys that had been performed after listing. After listing, the number of sites with many individuals decreased, and the number with less than 10 individuals increased. The percentage of sites with fewer than 10 individuals increased by 15 percent between the time of listing and 1994.

Approximately 8 percent of the acreage of Sonoma sunshine sites known from the Santa Rosa Plain had some protection as of 1994 (calculated from data in Patterson *et al*. 1994). Of the 120 acres designated as preserve (excludes areas under conservation easement), the amount of habitat containing the species is estimated to be only 2 acres (Guggolz 1995 as cited in CH2M Hill 1995). Since 1994, one preservation bank with Sonoma sunshine has been established, but only 15 individual plants have been observed in recent surveys at the site (M. Waaland, 1998 pers. comm.).

*1998 to present.* The 1998 programmatic consultation was designed to allow up to 50 acres of low-quality seasonal wetlands to be filled and no more than 30 acres could be occupied (or presumed to be occupied) by the listed plant species. Of the 30 impacted acres which are occupied or presumed occupied, no more than 6 acres would be on sites for which there are known records of the listed plants. Impacts to no more than 6 additional acres on sites for which there are known records of listed plants may be authorized under the 1998 programmatic consultation at the Service's discretion, based upon the Service's evaluation of the significance of impacts to the first 6 acres of known listed species habitat and / or upon substantial progress toward a comprehensive conservation program. Between the period of the 1998 programmatic consultation and the date of this Programmatic, less than 30 acres of low-quality seasonal wetlands were authorized to be filled under the 1998 programmatic. At this time, it is unknown how many of the 30 impacted wetland acres were occupied with one or more of the listed plants. The low-quality seasonal wetlands were to be mitigated for with preservation and creation of listed plant habitat as outlined in the 1998 programmatic.

Sebastopol Meadowfoam

*1991 to 1998.* Patterson *et al*. (1994) estimated only 10 hydrologically separate populations of

Sebastopol meadowfoam exist. Of the sites they examined, nearly 10 percent were considered erroneous, 18 percent were extirpated, 18 percent were extant but threatened by development, and 36 percent were extant but may not be large enough to qualify as high-quality preserve lands (Patterson *et al.* 1994). A site, as defined by Patterson *et al.* (1994), may be all or part of a CNDDB occurrence. According to Service records, significant Sebastopol meadowfoam sites are within southwest Santa Rosa. Other sites have been extensively fragmented by development, leaving parts of larger vernal pool complexes interspersed with homes. Repeated discing and land conversion activities have damaged some sites as well (Service files).

Excluding easements, eight Sebastopol meadowfoam sites comprising approximately 170 acres were preserved as of 1994 (Patterson *et al.* 1994). However, only a small portion of this acreage is considered actual Sebastopol meadowfoam habitat (CH2M Hill 1995). These eight sites comprised approximately 11 percent of the acreage of Sebatopol meadowfoam sites known from the Santa Rosa Plain in 1994 (calculated from data in Patterson *et al.* 1994). Since 1994, two preservation banks with Sebastopol meadowfoam have been established (MOA for Wright Preservation Bank 1997, MOA for Southwest Santa Rosa Vernal Pool Preservation Bank 1997).

*1998 to present.* The 1998 programmatic consultation was designed to allow up to 50 acres of low-quality seasonal wetlands to be filled and no more than 30 acres could be occupied (or presumed to be occupied) by the listed plant species. Of the 30 impacted acres which are occupied or presumed occupied, no more than 6 acres would be on sites for which there are known records of the listed plants. Impacts to no more than 6 additional acres on sites for which there are known records of listed plants may be authorized under the 1998 programmatic consultation at the Service's discretion, based upon the Service's evaluation of the significance of impacts to the first 6 acres of known listed species habitat and / or upon substantial progress toward a comprehensive conservation program. Between the period of the 1998 programmatic consultation and the date of this Programmatic, less than 30 acres of low-quality seasonal wetlands were authorized to be filled under the 1998 programmatic. At this time, it is unknown how many of the 30 impacted wetland acres were occupied with one or more of the listed plants. The low-quality seasonal wetlands were to be mitigated for with preservation and creation of listed plant habitat as outlined in the 1998 programmatic.

## California Tiger Salamander

*2001 to present.* Between 2001 and 2002, five breeding sites for Sonoma County Distinct Population Segment of the California tiger salamander were destroyed. Loss of real and potential salamander breeding sites, upland refugia, dispersal, and foraging habitat continues to occur in the Santa Rosa Plain. To date (prior to this biological opinion), there have been 21 biological opinions (*i.e.,* section 7 formal consultations) authorizing incidental take to all individuals inhabiting 493.222 acres of California tiger salamander habitat since the emergency listing on July 22, 2002. Three of these 21 biological opinions address adverse and beneficial effects associated with the construction of seasonal wetlands and creation of California tiger salamander breeding habitat and establishment of Burke's goldfields, Sebastopol meadowfoam and Sonoma sunshine populations. These three sites are known as the Hazel Mitigation Bank, Wright Preservation Bank and the Slippery Rock Conservation Bank. The temporary ground disturbance associated with these Banks includes approximately 149.06 acres; therefore there has

been 344.222 acres of permanent California tiger salamander habitat loss permitted by the Service through section 7 consultations. The other 18 biological opinions have integrated in their project proposals to conserve a total of 471.865 acres of California tiger salamander habitat at Service approved locations within Sonoma County via the purchase of mitigation or conservation credits, recording conservation easements, or offering fee title to the CDFG or another Service approved entity.

As of October 15, 2007, there are approximately 730 acres of *existing* Preserves that support occupied California tiger salamander habitat within conservation areas. Some of these existing preserves also support the listed plants. There are also approximately 165 acres (187 hectares) of *pending* Preserves within conservation areas that are anticipated to be protected in perpetuity.

**Effects of the Proposed Action**

The following effects analysis is based on the effects of Projects to the California tiger salamander, Sebastopol meadowfoam, Sonoma sunshine and Burke's goldfields. This may encompass all types of projects in which the Corps issues permits, conducts enforcement actions and/or development of mitigation banks. These effects are expected to be in the form of direct and indirect effects as a result of urbanization and agricultural development related Project(s) and to a lesser degree restoration and enhancement of habitat. Project(s) appended to this Programmatic must adhere to the mitigation and minimization measures described in the *Description of the Proposed Action*. Implementation of the mitigation and minimization measures may have some adverse effects but will likely have greater beneficial effects as a result of creation, restoration and enhancement of habitat for these species.

CaliforniaTiger Salamander

The effects analysis for the California tiger salamander is primarily based on the location of the Project(s) impacts relative to a known individual salamander observation and/or breeding site(s). Those effects based on distance are differentiated and classified in Table 2 below and assumes the permanent or temporary loss of habitat. The interim mitigation guidelines do not differentiate between temporary and permanent effects. The interim mitigation guidelines are described on page 46 of the Conservation Strategy (Conservation Strategy Team, 2005), in a letter from the Service and CDFG to the Santa Rosa Plain Conservation Strategy Implementation Committee (Service and CDFG, 2006 *in litt.)* and in the *Description of the Proposed Action* of this Programmatic.

The majority of anticipated effects to the California tiger salamander will likely be within the urban growth boundaries of the Cities of Santa Rosa, Cotati and Rohnert Park (shaded red in Figure 3 of the Conservation Strategy). These estimated acres are based on a ten year timeframe from December 2005 to December 2015. Some smaller amount of California tiger salamander impacts may occur outside of the urban growth boundaries within the Study Area (Figure 3 of the Conservation Strategy) in the form of agricultural, rural residential and ministerial projects as defined by Sonoma County. In addition, the Town of Windsor supports approximately 137 acres of potential California tiger salamander that may be adversely affected and may require approximately 27.4 acres of mitigation (i.e. 137 acres x 0.2 = 27.4).

**Table 2. Predicted Tiger Salamander Habitat Loss Within City Urban Growth Boundaries**

| | Santa Rosa (acres) | Cotati (acres) | Rhonert Park (acres) | Estimated Mitigation (acres) |
|---|---|---|---|---|
| 0 - 500 feet of a California tiger salamander breeding occurrence | 190.4 | 21 | 0 | 634.2 |
| 501 - 2200 feet of a California tiger salamander breeding site | 761.4 | 132.2 | 13.9 | 1815 |
| 2201 feet - 1.3 miles of a known California tiger salamander breeding site | 411.7 | 6.7 | 166.6 | 585 |
| 500 feet of a California tiger salamander non-breeding occurrence | 177 | 43.3 | 22.3 | 485.2 |
| Total | 1540.5 | 203.2 | 202.8 | 3519.4 |

Anticipated permanent acreage loss of California tiger salamander habitat within city UBG's within a 10 year timeframe was compared with the acreage needed to conserve habitat and maintain viable populations within identified conservation areas. This comparison was used to calculate the ratio of mitigation for project impacts in order to meet conservation goals in the conservation areas. Additional analysis of the Conservation Strategy took into account several assumptions which in part, support justification for the interim mitigation ratios. These assumptions are summarized in the following paragraphs.

Development of the Conservation Strategy was based on the following assumptions about expected development in a ten-year time frame: 1) the effect of that development on the species, 2) how the Preserves would offset those effects and 3) the compatibility of existing land uses with California tiger salamander and listed species conservation. In addition, there are other factors that were used in developing the conservation areas:

- Existing agricultural and rural land uses outside the UGBs will not change appreciably

- Urban development within the UGBs may occur based on general plans of the municipalities

- Limited urban development may occur outside of the UGBs based on the Sonoma County General Plan

- Voter-approved UGBs will remain in place for at least 10 years and will likely continue into the foreseeable future

- Based on aerial photography and site visits, potential habitat for the California tiger salamander exists in locations where surveys have not been conducted

- Urban development will eliminate some California tiger salamander habitat

- Small Preserves in an urban environment are difficult to manage, and will not likely sustain viable California tiger salamander populations

The analysis performed in the Conservation Strategy was used to develop appropriate mitigation ratios and is anticipated to aid in conserving appropriate levels of habitat to support viable populations of California tiger salamanders in perpetuity. The mitigation and minimization measures as described in this Programmatic is expected to contribute to recovery of the California tiger salamander by preserving occupied, restored and created habitat. Adaptive management and monitoring which will be supported with endowment funds is expected to assist in the maintenance of viable populations.

## Sebastopol Meadowfoam, Sonoma Sunshine and Burke's Goldfields

As described in the Status of the Species and Environmental Baseline, above, habitat for the listed plant species has been severely impacted on the Santa Rosa Plain as a result of urban and agricultural development. These species, which are naturally rare, narrow endemics, have become extremely vulnerable due to decreases in population size, habitat fragmentation, and chronic habitat degradation. The long-term survival and recovery of these species requires the establishment of a viable regional preserve system that includes restoration of degraded habitat to enhance overall population size and viability.

Projects such as 404 permitting authorized under this Programmatic is expected to result in direct and indirect impacts to seasonal wetlands which may be occupied (or assumed occupied) by the listed plants. These impacts will further reduce the size and numbers of the listed plant populations, and could reduce the extent of the range for each of the listed plant species on the Santa Rosa Plain. Projects authorized under this consultation are also likely to result in fragmentation and edge effects to existing habitat. The loss of seasonal wetlands where the listed plants have not been found is expected to reduce opportunities for habitat restoration and enhancement of listed plant populations, thereby potentially affecting the species long-term survival and recovery.

Restoration projects as result of Corps enforcement actions or mitigation banks authorized under this Programmatic are expected to benefit the listed plants by restoring their destroyed or altered habitat by establishing endangered plant populations. Impacts to seasonal wetlands, both in habitat currently suitable for the listed plant species and in restorable habitat, will be limited and mitigated to allow for the species long-term survival and recovery.

Impacts to seasonal wetlands allowed under this Programmatic could result in loss of habitat where the plant species have not been detected for a number of years, but where viable seed banks persist on-site. However, any habitat with historic records of the species will be mitigated for in the same manner as habitat known to be currently occupied. This mitigation is expected to reduce the level of impacts to important suitable and restorable sites with historic records of listed plants by preserving currently occupied or established sites.

Impacts to occupied Burke's goldfields and Sonoma sunshine habitat will be mitigated through 3:1 of occupied or established habitat (any combination) with success criteria met prior to groundbreaking. Impacts to suitable Burke's goldfields and Sonoma sunshine habitat will be mitigated with 1:1 occupied or established habitat (any combination) with success criteria met AND 0.5:1 of established habitat prior to groundbreaking. The mitigation land will be preserved

and managed in perpetuity.

Impacts to <u>occupied</u> Sebastopol meadowfoam habitat will be mitigated with 2:1 occupied or established habitat (any combination) with success criteria met prior to groundbreaking. Impacts to <u>suitable</u> Sebastopol meadowfaom habitat will be mitigated with 1:1 occupied or established habitat (any combination) with success criteria met AND 0.5:1 of established habitat prior to groundbreaking. The mitigation land will be preserved and managed in perpetuity.

Mitigation for impacts to occupied and suitable habitat will be in the form of preserving occupied sites or established sites with the same impacted species. The location of the mitigation may be anywhere within the North Area or South Area as depicted in Enclosure 2 as long as the site supports the target endangered plant(s). Sites with suitable habitat are sites that have not been observed to flower during botanical surveys but may have viable seeds in the soil and have additional biological, hydrological and topographic attributes as described in Enclosure 5, *Description of Suitable Habitat*. Mitigation of impacts to suitable habitat must support one of the target species based on the location of the impacts. The species that must be mitigated for will be determined by the location of the project impacts to the suitable habitat. As described in the *Environmental Baseline*, the majority of Burke's goldfields and Sonoma sunshine populations are north of Santa Rosa Creek and the majority of Sebastopol meadowfoam populations are south of Santa Rosa Creek. Therefore, impacts to suitable habitat north of Santa Rosa Creek (i.e. North Area) will mitigate with occupied or established Burke's goldfields or Sonoma sunshine. Impacts to suitable habitat south of Santa Rosa Creek (i.e. South Area) will mitigate with Burke's goldfields, Sonoma sunshine or Sebastopol meadowfoam. Mitigation of occupied and suitable habitat will minimize the effects to the listed plants by ensuring sites will actually support the species. Adaptive management plans and endowment funding will also increase the probability of the plant populations to be viable in the long term and will be protected in perpetuity.

Projects that will impact occupied sites supporting Burke's goldfields and Sonoma sunshine, where surveys have documented 2,000 plants or greater in any year in the past 10 years may not be appended to this Programmatic, but will be evaluated on a case by case basis. The number for 2,000 plants was derived from comments provided by numerous technical experts and the Service's review of projects impacting plant populations.

The most common method of project proponents mitigating for their impacts will be by purchasing mitigation credits at Service and CDFG – approved Preserves. These Preserves often have extant natural populations of the plants and/or established or restored populations and are located within their historical range.

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Cumulative effects to the California tiger salamander include continuing and future conversion of suitable California tiger salamander breeding, foraging, sheltering, and dispersal habitat resulting from urban development. Additional urbanization can result in road widening and increased traffic on roads that bisect breeding and upland sites, thereby increasing road-kill while reducing in size and further fragmenting remaining habitats.

California tiger salamanders probably are exposed to a variety of pesticides and other chemicals throughout their range. California tiger salamanders also could die from starvation by the loss of their prey base. Hydrocarbon and other contamination from oil production and road runoff; the application of numerous chemicals for roadside maintenance; urban/suburban landscape maintenance; and rodent and vector control programs may all have negative effects on California tiger salamander populations. In addition, California tiger salamanders may be harmed through collection by local residents.

A commonly used method to control mosquitoes, used in Sonoma County (Marin/Sonoma Mosquito and Vector Control District, internet website 2002), is the application of methoprene, which increases the level of juvenile hormone in insect larvae and disrupts the molting process. Lawrenz (1984) found that methoprene (Altosid SR 10) retarded the development of selected crustacea that had the same molting hormones (i.e., juvenile hormone) as insects, and anticipated that the same hormone may control metamorphosis in other arthropods. Because the success of many aquatic vertebrates relies on an abundance of invertebrates in temporary wetlands, any delay in insect growth could reduce the numbers and density of prey available (Lawrenz 1984).

Threats to Burke's goldfields, Sonoma sunshine, and Sebastopol meadowfoam such as unauthorized fill of wetlands, urbanization, increases in non-native species, and expanded irrigation of pastures with recycled wastewater discharge, are likely to continue with concomitant adverse effects on these species resulting in additional habitat loss and degradation; increasingly isolated populations (exacerbating the disruption of gene flow patterns); and further reductions in the reproduction, numbers, and distribution of these species which will decrease their ability to respond to stochastic events.

Some activities that do not require a 404 permit could occur that may negatively impact the listed plant species, including excessive grazing and wastewater irrigation. On-going grazing on the Santa Rosa Plain appears to be occurring at a low enough level that it may actually benefit the species by controlling competitive, non-native plant species, but grazing could increase to a detrimental level in the future. The cessation of grazing might also have a negative effect on the species, since non-native competitors have invaded the species' habitat and grazing may currently play an essential role in controlling these competitors.

As stated in the Conservation Strategy, urban and rural growth on the Santa Rosa Plain has taken place for over one hundred years, and for the past twenty years urban growth has encroached into areas inhabited by the California tiger salamander and the listed plants. The loss of seasonal wetlands caused by development on the Santa Rosa Plain has led to declines in the populations of California tiger salamander and the listed plants. Voters in the cities of Cotati, Rohnert Park, Santa Rosa, and Sebastopol, and the Town of Windsor have established urban growth boundaries for their communities. This is intended to accomplish the goal of city-centered growth, resulting

in rural and agricultural land uses being maintained between the urbanized areas. Therefore, it can be reasonably expected that rural land uses will continue into the foreseeable future. There are also areas of publicly owned property and preserves located in the Santa Rosa Plain, which will further protect against development. Some of the areas within these urban growth boundaries, however, include lands inhabited by California tiger salamanders and the listed plant species. Agricultural practices have also disturbed seasonal wetlands, California tiger salamanders and listed plant habitat on the Santa Rosa Plain. Some agricultural practices, such as irrigated or grazed pasture, have protected habitat from intensive development.

The Conservation Strategy was designed to plan for future cumulative effects from federal and non-federal actions to the California tiger salamander and listed plant habitat within the Santa Rosa Plain. The Conservation Strategy and the interim guidelines are intended to benefit the California tiger salamander and the listed plants by providing a consistent approach for mitigation vital to habitat preservation and the long-term conservation of the species. They are also intended to provide more certainty and efficiency in the project review process. The Conservation Strategy and the interim guidelines provide guidance to focus mitigation efforts on preventing further habitat fragmentation and to establish, to the maximum extent possible, a viable preserve system that will contribute to the long-term conservation and recovery of these listed species.

The County of Sonoma, the Cities of Santa Rosa, Cotati, Rohnert Park, the Town of Windsor, Service, and CDFG have commenced a process to develop a plan for implementing the Conservation Strategy. An implementation committee has been formed that is comprised of elected and staff representatives of the local jurisdictions, staff representatives of Service and CDFG, and representatives of the agricultural, development, and environmental communities. The implementation plan is expected to provide a mechanism for applying the Conservation Strategy to cover public and private projects, agricultural activities, and residential and commercial development. Eventual implementation of the Conservation Strategy by the local cities and Sonoma County is expected to reduce potential increases of these cumulative effects.

**Conclusion**

After reviewing the current status of the species, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's biological opinion that projects which meet the qualifications for this Programmatic are not likely to jeopardize the continued existence of the California tiger salamander, Burke's goldfields, Sonoma sunshine or Sebastopol meadowfoam. This determination is based on the *Description of the Proposed Action*, Enclosures 3, 4 and 5 which provides numerous conservation measures that would be implemented to minimize adverse effects of Projects on the California tiger salamander and the three listed plants. Critical habitat has not been designated for these species, therefore, none will be affected.

**CONSERVATION RECOMMENDATIONS**

Section 7 (a) (1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and

threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. The recommendations provided here relate only to the proposed action and do not necessarily represent complete fulfillment of the agency's 7(a)(1) responsibilities for these species.

1.  As the Santa Rosa Plain Recovery Plan is developed, the Corps should assist the Service in the implementation of the interim mitigation guidelines for projects on the Santa Rosa Plain.

2.  The Corps should work with the Service to encourage the local jurisdictions of the Santa Rosa Plain to develop an implementation plan for the Conservation Strategy.

3.  The Corps should work with the Service to identify grant opportunities to support restoration efforts, research, surveys and public outreach opportunities that aid in the recovery of the four species discussed in this Programmatic.

## REINITIATION – CLOSING STATEMENT

This concludes formal consultation on the actions described in this opinion. As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (2) the agency action is subsequently modified in a manner that causes an effect to listed species or critical habitat that was not considered in this opinion; or (3) a new species is listed or critical habitat is designated that may be affected by the action. If the Corps discovers that the conditions of the permit have not been followed, the Corps should review its responsibilities under section 7 of the Act and reinitiate formal consultation with the Service. We appreciate the cooperation and active participation of the Corps throughout this consultation process.

If you have any questions regarding this biological opinion, please contact Vincent Griego, Ryan Olah or Cay Goude of my staff at the letterhead address or (916) 414-6625.

Sincerely,

Susan K. Moore

Susan K. Moore
Field Supervisor

Ms. Jane Hicks                                                                    36

cc: Chuck Regalia, City of Santa Rosa, California
    David Woltering, City of Cotati, California
    Rob Bendorff, City of Rohnert Part, California
    Pete Chamberlin, Town of Windsor, California
    Pete Parkinson, Sonoma County, California
    Scott Wilson, CDFG, Yountville, California
    Liam Davis, CDFG, Yountville, California
    Stephen Bargsten, RWQCB, Santa Rosa, California
    Michael Monroe, EPA, San Francisco, California

## LITERATURE CITED

Anderson, J. D. 1968. Comparison of the food habits of *Ambystoma macrodactylum sigillatum*, *Ambystoma macrodactylum croceum*, and *Ambystoma tigrinum californiense*. Herpetologica 24(4): 273-284.

Anderson, P. R. 1968. The reproductive and developmental history of the California tiger salamander. Masters thesis, Department of Biology, Fresno State College, Fresno, California. 82 pages.

Barry, S. J. and H. B. Shaffer. 1994. The status of the California tiger salamander (*Ambystoma californiense*) at Lagunita: 50-year update. Journal of Herpetology 28(2): 159-164.

California Native Plant Society (CNPS). 1977. California Native Plant Status Report: *Lasthenia burkei*. Sacramento, California

California Natural Diversity Data Base (CNDDB). 1998. Natural Heritage Division. California Department of Fish and Game, Sacramento, California.

_____ 2001. Natural Heritage Division. California Department of Fish and Game, Sacramento, California.

_____ 2002. Natural Heritage Division. California Department of Fish and Game, Sacramento, California.

CH2M Hill. 1995. Phase 1 Final Report, Santa Rosa Plain Vernal Pool Ecosystem Preservation Plan. Prepared for Sonoma County Vernal Pool Task Force.

City of Santa Rosa and U.S. Army Corps of Engineers. 1996. Environmental Impact Report/Environmental Impact Statement for Santa Rosa Subregional Long-term Wastewater Project.

Cohen, D. 1966. Optimizing reproduction in a randomly varying environment. Journal of Theoretical Biology 12: 119-129.

Cohen, D. 1967. Optimizing reproduction in a randomly varying environment when a correlation may exist between the conditions at the time a choice has to be made and the subsequent outcome. Journal of Theoretical Biology 16:1-14.

Conservation Strategy Team. 2005. Santa Rosa Plain Conservation Strategy. Final. December 1, 2005. Available at the Sacramento Fish and Wildlife Service website: http://www.fws.gov/sacramento/es/santa_rosa_conservation.html

Crawford, D.J. and R. Ornduff. 1989. Enzyme electrophoresis and evolutionary relationships among three species of *Lasthenia* (Asteraceae: Heliantheae). American Journal of Botany 76: 289-296.

Feaver, P. E. 1971. Breeding pool selection and larval mortality of three California amphibians: *Ambystoma tigrinum californiense* Gray, *Hyla regilla* Baird and Girard and *Scaphiopus hammondi* Girard. Master's thesis, Department of Biology, Fresno State College, Fresno, California. 58 pages.

Fitzpatrick, B. M. an H. B. Shaffer. 2004. Environmental-dependent admixture dynamics in a tiger salamander hybrid zone. Evolution 58(6): 1282-1293.

Given, D.R. 1994. Principles and Practice of Plant Conservation. Timber Press, Portland, Oregon.

Hickman, J.C. 1993. The Jepson Manual: Higher Plants of California. University of California Press, Berkeley, California.

Holland, R. and S. Jain. 1977. Vernal pools. *In* M.G. Barbour and J. Major, eds. Terrestrial Vegetation of California. Pp. 515-533. John Wiley and Sons.

Jennings, M.R. and M.P. Hayes. 1994. Amphibian and reptile species of special concern in California. Final report to California Dept. of Fish and Game. Sacramento, California.

Keeler-Wolf, T., D.R. Elam, and S.A. Flint. 1997. Draft California Vernal Pool Assessment Preliminary Report. California Department of Fish and Game. State of California.

Lawrenz, R.W. 1984. The response of invertebrates in temporary vernal wetlands to Altosid® SR-10 as used in mosquito abatement programs. Journal of the Minnesota Academy of Science 50:31-34.

Loredo, I. and D. Van Vuren. 1996. Reproductive ecology of a population of the California tiger salamander. Copeia 1996(4):895-901.

Loredo, I., D. Van Vuren and M. L. Morrison. 1996. Habitat use and migration behavior of the California tiger salamander. Journal of Herpetology 30(2): 282-285.

McCarten, N.F. 1985. A survey of *Navarretia pauciflora* and *Navarretia plieantha* (Polemoniaceae): Two rare endemic plant species from the vernal pools of the California North Coast Ranges. Unpublished report. Endangered Plant Program. California Department of Fish and Game. Sacramento, California.

Morey, S. R. 1998. Pool duration influences age and body mass at metamorphosis in the western spadefoot toad: implications for vernal pool conservation. Pages 86-91 *in* Witham, C.W., E.T. Bauder, D. Belk, W.R. Ferren Jr., and R. Ornduff (eds). Ecology, Conservation, and Management of Vernal Pool Ecosystems - Proceedings from a 1996 Conference. California Native Plant Society. Sacramento, California. 1998.

Ornduff, Robert. 1966. A biosystematic survey of the Goldfield genus *Lasthenia* (Compositae:

Helenieae). University of California publications in botany. 40: 1-40.

Parker, V.T., Simpson, and M.A. Leck. 1989. Pattern and process in the dynamics of seed banks. Pages 367-384 *in* M.A. Leck, V.T. Parker and R.L. Simpson (eds.). Ecology of Soil Seed Banks. Academic Press, New York, New York.

Patterson, C.A., B. Guggolz, and M. Waaland. 1994. Seasonal Wetland Baseline Report for the Santa Rosa Plain, Sonoma County.

Pavlik, B. M., A. Fine, J. Archbold, and T. O'Hanley. 2000. Development of the Santa Rosa Vernal Reserve System, Installation of a Long-Term Restoration Experiment and Description of Baseline Vegetation. Department of Biology, Mills College, Oakland California, 94613. 102 pp.

Pavlik, B.M., J. Randall, A. Smith, and N. Metz. 2001. Development of the Santa Rosa Vernal Reserve System, First-Year Response of Margin and Upland Habitats to Mowing and Phytomass Removal. Department of Biology, Mills College, Oakland California, 94613. 172 pp.

Pechmann, J. H. K., D. E. Scott, J. W. Gibbons, and R. D. Semlitsch. 1989. Influence of wetland hydroperiod on diversity and abundance of metamorphosing juvenile amphibians. Wetlands Ecology and Management 1(1):3-11.

Petranka, J.W. 1998. Salamanders of the United States and Canada. Smithsonian Institution Press. Selected pages maintained in file. Washington, D.C.

Rice, K.J. 1989. Impacts of seed banks on grassland community structure and population dynamics. Pages 211-230 *in* M.A. Leck, V.T. Parker and R.L. Simpson (eds.). Ecology of Soil Seed Banks. Academic Press, New York, New York.

Riley, S.P.D., H.B. Shaffer, S.R. Voss, and B.M. Fitzpatrick. 2003. Hybridization between a rare, native tiger salamander (*Ambystoma californiense*) and its introduced congener. Biological Applications 13(5): 1263-1275.

Sawyer, J.O., and T. Keeler-Wolf. 1995. A manual of California vegetation. California Native Plant Society, Sacramento, California. 471 pp.

Semlitsch, R. D., D. E. Scott, and J. H. K. Pechmann. 1988. Time and size at metamorphosis related to adult fitness in *Ambystoma talpoideum*. Ecology 69: 184-192.

Scott, D. E. 1994. The effect of larval density on adult demographic traits in *Ambystoma opacum*. Ecology 75:1383-1396.

Shaffer, H.B., R.N. Fisher, and S.E. Stanley. 1993. Status report: The California tiger salamander (*Ambystoma californiense*). Final report for the California Department of Fish and Game. 33 pages.

Ms. Jane Hicks                                                                                          40

Shaffer, H.B., G. B. Pauly, J.C. Oliver, and P.C. Trenham. 2004. The molecular phylogenitics of endangerment: cryptic variation and historic phylogeography of the California tiger salamander, *Ambystoma califoriniense*. Molecular Ecology 13: 3033-3049.

Skinner, M.W. and B.M. Pavlik. 1994. California Native Plant Society inventory of rare and endangered plants of California. 5th edition. Special Publication No. 1. California Native Plant Society. Sacramento, California.

Stebbins, R. C. 1985. A field guide to western reptiles and amphibians. Houghton Mifflin Co. Boston, Massachusetts.

Storer, T.I. 1925. A synopsis of the amphibia of California. University of California Publications in Zoology 27.

Templeton, A.R. and D.A. Levin. 1979. Evolutionary consequences of seed pools. American Naturalist 114: 232-249.

Trenham, P. 1998a. Radiotracking information. University of California, Davis, California.

_____1998b. Demography, migration, and metapopulation structure of pond breeding salamanders. Ph.D. dissertation. University of California, Davis, California.

Trenham, P.C., H.B. Shaffer, W.D. Koenig and M.R. Stromberg. 2000. Life history and demographic variation in the California tiger salamander (*Ambystoma californiense*). Copeia 2000(2): 365-377.

Trenham, P. 2001. Terrestrial habitat use by adult California tiger salamanders. Journal of Herpetology 35(2): 343-346.

Trenham, P. C., W. D. Koenig, and H. B. Shaffer. 2001. Spatially autocorrelated demography and interpond dispersal in the salamander *Ambystoma californiense*. Ecology 82: 3519-3530.

Trenham, P.C. and H.B. Shaffer. 2005. Amphibians upland habitat use and its consequences for population viability. Ecological Applications, 15(4): 1158-1168.

Twitty, V. C. 1941. Data on the life history of *Ambystoma tigrinum californiense* Gray. Copeia 1941 (1):1-4.

U.S. Fish and Wildlife Service. 1991. Determination of endangered status for three plants: *Blemnosperma bakeri* (Sonoma sunshine or Baker's stickyseed), *Lasthenia burkei* (Burke's goldfields), and *Limnanthes vinculans* (Sebastopol meadowfoam). 56 **Federal Register** 61173. 10pp.

   1998. Programmatic Formal Consultation for U.S. Army Corps of Engineers 404 Permitted Projects that May Affect Four Endangered Plant Species on the Santa Rosa

Plain, California (File Number 22342N). 36pp.

_____ 2002. Endangered and Threatened Wildlife and Plants; Listing the Sonoma County Distinct Population Segment of the California Tiger Salamander as Endangered. **Federal Register** 67: 47726-47740.

_____ 2003. Endangered and Threatened Wildlife and Plants; Determination of Endangered Status for the Sonoma County Distinct Population Segment of the California Tiger Salamander; Final Rule. **Federal Register** 68: 13497.

_____ 2004. Endangered and threatened wildlife and plants; determination of threatened status for the California tiger salamander; and special rule exemption for existing routine ranching activities; final rule. **Federal Register** 69: 47212-47248.

_____ 2005a. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the California Tiger Salamander in Sonoma County. **Federal Register** 70: 44301-44322.

_____ 2005b. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Sonoma County Distinct Population Segment of the California Tiger Salamander; Final Rule. **Federal Register** 70: 74137-74163.

Van Hattem, M. G. 2004. Underground ecology and natural history of the California tiger salamander. Master of Science thesis. San Jose State University, San Jose, California.

Wilbur, H. M. and J. P. Collins. 1973. Ecological aspects of amphibian metamorphosis. Science (n.s.) 182(4119): 1305-1314.

## IN LITT. CITATIONS

Chan, R. 1998. University of California, Berkeley, CA.

Haley, N. 1998. U.S. Army Corps of Engineers. Sacramento, California

Wilcox, C. 2000. California Department of Fish and Game. Yountville, California

Sam Sweet, University of California, Santa Barbara, 31 August 1998. Vineyard development posing an imminent threat to *Ambystoma californiense*. Letter.

_____ 1998. Letter to Dwight Harvey, U.S. Fish and Wildlife Service. With enclosed report, "Vineyard development posing an imminent threat to *Ambystoma californiense* in Santa Barbara County, California."

U.S. Fish and Wildlife Service and California Department of Fish and Game. 2006. Letter from Susan K. Moore of the Sacramento Fish and Wildlife Office and Robert W. Floerke of

the Central Coast Region Office of the California Department of Fish and Game to Mike
Reilly and Jake Mackenzie, Co-Chairmen of the Santa Rosa Plain Conservation Strategy
Implementation Committee

Wright Preservation Bank. 1997. Memorandum of Agreement.

## PERSONAL COMMUNICATIONS

Cook, D. 2001 Sonoma County Water Agency. Santa Rosa, California

Galacatos, K. 2007. U.S. Army Corp of Engineers, San Francisco, California.

Guggolz, B. Milo Baker Chapter, California Native Plant Society, Cloverdale, California.

Short, J. 2007. State of California Regional Water Quality Control Board, California

Warenycia, D. 2002. California Department of Fish and Game.

Wilcox, C. 1998. California Department of Fish and Game, Yountville, California





## Enclosure 3 - Preserve Establishment and Evaluation Criteria

Preserves shall meet the following minimum requirements:

- The site must be preserved in perpetuity for the benefit of the affected species through dedication of fee title or a conservation easement to an appropriate resource management agency or organization.

- The site must have a habitat enhancement plan, if California tiger salamander and/or listed plant habitat is to be created, restored or established on the site.

- The site must have a management and monitoring plan including management actions necessary to manage, enhance, and protect the resources protected and created on the site, and monitoring actions to determine the success of created or restored wetlands and the status of the protected resources and effectiveness of specified management actions.

- The site must have a Service and CDFG – approved funding mechanism to assure long-term management and monitoring.

### Preserve Evaluation Criteria

This Preserve Evaluation Criteria is used to determine if parcels proposed as Preserves provide suitable habitat for the California tiger salamander and/or listed plants. This describes the process for evaluating, and approving individual properties or parcels for preservation.

The preserve evaluation criteria will be used by the Service and CDFG in guiding both mitigation and mitigation bank development. These criteria are to aid and help expedite the selection of preserves.

To be considered acceptable as a preserve, a proposed property or properties must meet all the following criteria:

### For California tiger salamander:

(1) Be within the boundary of one of the Conservation Areas designated by the Conservation Strategy, unless otherwise approved by the Service and CDFG.

(2) Contain known, occupied California tiger salamander breeding, upland, or dispersal habitat; or represent potential California tiger salamander habitat. With respect to potential California tiger salamander habitat, the site must exhibit, in the judgment of the Service and CDFG, reasonable potential for habitat restoration or enhancement. Preserves must ultimately have the listed species present within a reasonable time frame.

(3) Be free of excessive land surface features such as roads, parking lots, other hardened surfaces, buildings or other structures, or extensive hardscape that cause a significant portion of the site to be unsuitable as California tiger salamander habitat. Generally, for purposes of this criterion, no more than 15% of the land surface of any potential preserve site may include or be covered by such features unless it is to be restored as part of the preservation action.

(4) Not isolated from other nearby California tiger salamander habitats (preserve or non-preserve) by incompatible land uses (e.g., hardscape) or other significant barriers to California tiger salamander movement and dispersal, such as Highway 101.

(5) Not inhabited by fish and bullfrogs or other non-native predatory species, unless, in the judgment of the Service and CDFG, such species can be effectively removed or eradicated.

(6) Not within the Laguna de Santa Rosa 100-year floodplain.

(7) Exhibit no history or evidence of the presence (storage or use) of hazardous materials on the surface of the site unless proof of removal or remediation can be provided.

For Burke's Goldfields, Sonoma sunshine, and Sebastopol meadowfoam

(1) Preservation of the listed plant species in appropriate locations within the Plain, as previously described in *Plant Mitigation and Establishment* section of the *Description of the Proposed Action*.

(2) Contain known population(s) of listed plants or represent potential plant habitat. With respect to potential plant habitat, the site must exhibit, in the judgment of the Service and CDFG, reasonable potential for habitat restoration, and establishment of listed plant population(s).

(3) Be free of excessive land surface features such as roads, parking lots, other hardened surfaces, buildings or other structures, or extensive hardscape that cause a significant portion of the site to be unsuitable as plant habitat. Generally, for purposes of this criterion, no more than 15% of the land surface of any potential preserve site may include or be covered by such features unless it is to be restored as part of the preservation action.

(4) If establishing populations of Sebastopol meadowfoam, the location is to be located south of Santa Rosa Creek. If establishing populations of Sonoma sunshine and/or Burke's goldfields, the location is to be north of the Laguna de Santa Rosa (See Enclosure 2).

(5) Plant preserves should be a minimum of ten acres. Smaller plant preserves may be established to protect extant populations of Sonoma sunshine and Burke's goldfield, where the site characteristics would assure long-term viability or there is an opportunity to protect important population of these two species.

(6) From a management perspective, preserves should include the entire watershed of the pool(s) and swale(s) being protected, and the ratio of perimeter to area should be minimized.

(7) In general, establishment of plant population(s) should not occur in areas where preservation of any natural population(s) occur unless it can be demonstrated that no adverse effects would occur to the natural population(s) as a result of establishing plant populations.

## Enclosure 4 - Translocation

Listed plants and California tiger salamander adult, larvae and juveniles present within an area planned for development will be translocated by appropriate means as approved by the Service and CDFG. In all cases where translocation occurs, authorization must be given by the Service and CDFG.

Translocation would be undertaken for the following reasons:

1) Where salvage of species is required as a permit condition by the Service and CDFG when the removal of occupied habitat will occur (performance criteria and monitoring is required for the salvage and translocation) and/or;
2) To establish or enhance a new population or an existing population where all the conditions are present (including a management and monitoring program) to achieve success of the population. Such collections would be accomplished in a manner as to not to adversely impact an existing population.

### California tiger salamander Translocation

The following guidelines apply to required California tiger salamander translocations.

- No mitigation or conservation bank may receive translocated California tiger salamanders until all the bank's credits have been sold and California tiger salamander credits will not be provided as a result of California tiger salamander translocation.

- California tiger salamanders will be translocated to receptor sites that are within the same conservation area as the donor site or, where this is not possible, to the nearest conservation area.

- California tiger salamanders will be translocated only to sites with suitable Califoria tiger salamander breeding habitat.

- California tiger salamander larvae will not be translocated where resulting larval densities would exceed one per square meter.

- The costs of translocation will be the responsibility of the project proponent.

- Translocation will occur only to conservation areas and will not create any new mitigation obligations beyond what already exists.

### Plant Translocation

Prior to collection of seeds, approval of the Service and CDFG to address site-specific conditions is required.

Collection at an impact site with occupied habitat

Collection of seeds shall occur from all occupied sites prior to development of the Project. Collection methodology must be approved by the Service and CDFG. The seeds must be translocated to a Service and CDFG--approved Preserve with successful establishment according to Service and CDFG – approved performance, management and monitoring criteria. If a suitable Preserve is not available to accept translocated seeds within one year, the seeds must be deposited at a Service and CDFG – approved seed storage facility for future translocation to a Preserve.

If a project proponent is attempting to establish plants at a mitigation site but is unsuccessful, then remediation would be necessary or an alternative site must be selected and must have successful establishment. If additional seeds are needed to reach performance criteria, they may salvaged from a Service and CDFG – approved site and/or be obtained from a Service and CDFG – approved seed storage facility with prior written authorization from the Service.

Collection at an impact site with suitable habitat

Collection of seeds may be warranted depending on site conditions including the native plant components.

Collection at a Preserve

Collection is limited to a portion of the population that would not affect population viability. Generally not more than 5% of the plant population at a preserve could be collected. Seed and soil removal shall occur only when pools are dry.

The following guidelines apply to plant translocation:

1. The establishment location will be as close to the collection site as possible.
2. The establishment location must have suitable or occupied habitat.
3. Collect seeds after seeds have set or collect the seed bank after seeds have set and when there is no standing water.
4. Establishment will occur when seasonal wetlands are dry and before the rainy season begins.
5. Material will be used within 1 year. Seeds must be stored inside in a dry and cool place.
6. If seeds cannot be used within 1 year, the seeds must be submitted to a Service and CDFG – approved storage facility.

**Enclosure 5 – Description of Suitable Habitat for Sebastopol Meadowfoam, Sonoma Sunshine and Burke's Goldfields**

Suitable habitat for the listed plant species can be characterized as having the following topographic, hydrologic, and geographic conditions.

Topographic and Hydrologic Conditions

A) One or more of the following topographic or hydrologic conditions must exist for the site to be considered suitable habitat:

 1. The wetland contains surface (standing or flowing) water during the rainy season in a normal rainfall year for 7 or more consecutive days.

 2. The wetland has an outlet barrier (is a pool) or occurs in depressional terrain (i.e. is a swale or drainage feature).

B) The following conditions indicate that a site is not suitable habitat:

 1. The wetland occurs on sloping ground (not the slopes of a swale or pond) and is not a swale or swale-related drainage feature, such that no ponding or flooding occurs.

 2. The wetland is irrigated, and contains standing water of natural or artificial origin, and the soils are saturated, for more than 60 days between June 1 and October 1.

Geographic Conditions

The site is located within the North Area or South Area as depicted in Enclosure 2.

# EXHIBIT D




# United States Department of the Interior

**FISH AND WILDLIFE SERVICE**
Sacramento Fish and Wildlife Office
2800 Cottage Way, Room W-2605
Sacramento, California 95825-1846

IN REPLY REFER TO:
1-1-04-TA-2053

Mr. Derek Marshall
BioConsultant LLC
122 Calistoga Rd. #360
Santa Rosa, CA 95409

Subject:    California Tiger Salamander Site Assessment for the Mead Project at Lund
Hill Drive, Cotati, Sonoma County, California

Dear Mr. Marshall:

This letter is in response to your April 19, 2004, request to the U.S. Fish and Wildlife Service
(Service) for a "no effect" determination for the Mead project located at Lund Hill Drive in
Cotati, Sonoma County, California. At issue are the potential effects to the endangered Sonoma
County distinct population segment of the California tiger salamander (*Ambystoma californiense*)
(tiger salamander). Your letter was received in our office on May 27, 2004, and we received
additional information on the location of the project on July 13, 2005. This response is provided
in accordance with the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*).

Section 9 of the Act and its implementing regulations prohibit the "take" of any federally listed
animal species by any person subject to the jurisdiction of the United States without a special
exemption. Take is defined by the Act as "...to harass, harm, pursue, hunt, shoot, wound, kill,
trap, capture, or collect, or attempt to engage in any such conduct" of any listed wildlife species.
"Harm" in this definition includes significant habitat modification or degradation where it
actually kills or injures wildlife, by significantly impairing essential behavior patterns, including
breeding, feeding, or sheltering (50 CFR 17.3). "Harass" means an intentional or negligent act or
omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to
disrupt normal behavioral patterns which include, but are not limited to breeding, feeding, or
sheltering.

Take incidental to an otherwise lawful activity may be authorized by one of two procedures.
If a Federal agency is involved with the permitting, funding, or carrying out of this project,
and a listed species is going to be adversely affected, then initiation of consultation between
that agency and the Service pursuant to section 7 of the Act is required. Such consultation
would result in a biological opinion addressing anticipated effects of the project to the listed
species and may exempt a limited level of incidental take from section 9 of the Act. If the
project may result in the take of listed species and no Federal agency is involved, then an



Mr. Derek Marshall                                                                                        2

"incidental take" permit pursuant to section 10(a)(1)(B) of the Act should be obtained. The Service may issue such a permit upon completion by the permit applicant of a satisfactory habitat conservation plan for the listed species that would be affected by the project.

Your letter states that the property at Lund Hill Drive in Cotati is unsuitable for the tiger salamander since the property contains no breeding habitat and degraded ruderal/grassland habitat. The Service does not agree with your determination. Protocol surveys for the tiger salamander were not conducted, and therefore, the Service cannot rule out that tiger salamanders are not present on this property because of the presence of suitable habitat at the site, and the location is within 1.3 miles of a known breeding pond. Tiger salamanders could use the property as upland dispersal habitat or inhabit the location. You may have biologists possessing a valid section 10(a)(1)(A) permit survey the project site to determine if the animal is present on site. The Service has developed survey guidance that reliably determines the presence or absence of tiger salamanders. The most recent survey guidance can be obtained by contacting this office. If the tiger salamander occurs on the project site, we recommend that you contact us concerning authorization for incidental take under the Act. In lieu of having surveys performed, you may follow the mitigation guidelines described in the Service and California Department of Fish and Game's joint letter for the tiger salamander on the Santa Rosa Plain. A copy of this letter is attached.

If you have questions regarding this response on the Mead project located at Lund Hill Drive in Cotati, please contact Ryan Olah at (916) 414-6625.

                                        Sincerely,




                                        Chris Nagano
                                        Deputy Assistant Field Supervisor
                                        Endangered Species Program

Cc: Carl Wilcox, California Department of Fish and Game, Yountville, California
Enclosure

# EXHIBIT E

 **United States Department of the Interior** 
FISH AND WILDLIFE SERVICE
Sacramento Fish and Wildlife Office
2800 Cottage Way, Room W-2605
Sacramento, California 95825-1846

IN REPLY REFER TO:
1-1-05-TA-2034

Ms. Wendy Mountain
P.O. Box 1028
1355 Lawndale Road
Kenwood California 95452

Dear Ms. Mountain:

This letter is in response to your August 30, 2005, requesting information on the property owned by Michael Mead located at Lund Hill Drive in Cotati, Sonoma County, California. The Service issued a letter on the Mead project on August 31, 2005, which states that Mr. Mead could either conduct protocol surveys for tiger salamanders or follow the mitigation guidelines described in the Service and California Department of Fish and Game's joint letter for the tiger salamander. A copy of this letter is attached. Furthermore, Service staff visited the project site on September 13, and confirmed that the project site could be potential habitat since tiger salamanders could disperse to the project site or could be currently be present on the site.

If you have questions regarding our response to the Mead Project in Cotati, please contact our office or call (916) 414-6600.

Sincerely,

Chris Nagano
Deputy Assistant Field Supervisor

Enclosure



# EXHIBIT F

**ORDINANCE NO. 766**

**AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF COTATI
REPEALING COTATI MUNICIPAL CODE TITLE 17, THE ORDINANCES CODIFIED
THEREIN, INCLUDING BUT NOT LIMITED TO ORDINANCE 149 AND 303 AND THE
ZONING MAP, ADOPTING A NEW COMPREHENSIVE LAND USE CODE AND NEW
ZONING MAP, REPEALING CHAPTERS 11.12 AND 14.30 OF THE
MUNICIPAL CODE AND REZONING CERTAIN PROPERTIES**

**THE CITY COUNCIL OF THE CITY OF COTATI DOES ORDAIN AS FOLLOWS:**

<u>SECTION 1</u>   FINDINGS   The City Council of the City of Cotati hereby finds that.

A     The City finds that the repeal of Cotati Municipal Code Title 17, the ordinances codified therein, including but not limited to Ordinance No 149, Ordinance No. 303 and the Zoning Map, adoption of a new comprehensive Land Use Code and new Zoning Map; repeal of Chapters 11 12 and 14 30 of the Municipal Code, and rezoning of certain properties are consistent with the General Plan and the goals, objectives, policies and programs adopted therein   The Land Use Code and Zoning Map implement the Cotati General Plan by classifying all land and regulating the uses of land and structures within the City of Cotati   The standards and procedures set forth in the Land Use Code implement many of the policies and programs identified in the General Plan and further the City's goals and objectives as set forth in the General Plan   Several provisions contained in the Land Use Code were identified as mitigation measures in the General Plan EIR; these mitigation measures will be implemented through the adoption of the Land Use Code   The Land Use Code creates zoning districts that are consistent with the General Plan Land Use Element   The Zoning Map reclassifies all properties within the City to zoning districts consistent with the adopted General Plan Land Use Map   The repealed chapters of the Municipal Code are amended and included in the new Land Use Code, these chapters remain consistent with the General Plan.   The new comprehensive Land Use Code; Zoning Map, repeal of Cotati Municipal Code Title 17, the ordinances codified therein, including but not limited to Ordinance No. 149, Ordinance No. 303 and the Zoning Map, repeal of Chapters 11.12 and 14 30 of the Municipal Code, and rezoning of certain properties are adopted to protect and promote the public health, safety, and general welfare of residents, and to preserve and enhance the environmental setting, unique characteristics and aesthetic quality of the city

       1     The City finds that the new comprehensive Land Use Code, Zoning Map, repeal of Cotati Municipal Code Title 17, the ordinances codified therein, including but not limited to Ordinance No 149, Ordinance No. 303 and the Zoning Map, repeal of Chapters 11 12 and 14 30 of the Municipal Code; and rezoning of certain properties are consistent with the General Plan policies and programs and further the following goals and objectives to

           a     Provide standards and guidelines for the continuing orderly growth and development of the City that will assist in protecting the small town character and community identity of Cotati;

           b     Conserve and protect the City's natural beauty and setting, including scenic vistas, cultural and historic resources, hills and oak trees, and agrarian heritage,

           c     Ensure that proposed development and new land uses conserve energy and natural resources,

d.   Create a comprehensive and stable pattern of land uses upon which to plan transportation, water supply, sewerage, energy, and other public facilities and utilities;

e    Ensure that proposed development is of human scale, primarily pedestrian-oriented, and designed to create attractive streetscapes and pedestrian spaces;

f.   Minimize vehicle traffic by providing for a mixture of land uses, pedestrian-oriented development, compact community form, safe and effective traffic circulation, and adequate on- and off-street parking facilities;

g    Provide neighborhoods with a variety of housing types to serve the needs of a diverse population; and

h    Ensure compatibility between different types of development and land uses.

2    The General Plan land use designation "Open Space" is intended to preserve natural and scenic resources and a distinct community identity. The Land Use Code establishes an "Open Space – Conservation" (OSC) zoning district that implements and is consistent with the Open Space land use designation of the General Plan. Development in the OSC district is limited to structures that support the open space features being conserved and caretaker quarters

3    The General Plan land use designation "Parks" is designed to identify land already utilized or intended for community recreational uses  Appropriate uses include recreational facilities and areas of important aesthetic, historical, or public health and safety significance. The Land Use Code establishes an "Open Space – Recreation" (OSR) zoning district that implements and is consistent with the Parks land use designation of the General Plan. Development in the OSR district is limited to parks and other recreational and cultural facilities

4    The General Plan land use designation "Rural Residential" is intended to provide for a limited variety of agricultural uses with associated limited neighborhood retail development and no more than one residential unit per acre. The Land Use Code includes a "Rural Residential" (RR) zoning district that implements and is consistent with the Rural Residential land use designation of the General Plan  The RR zoning designation is applied to areas appropriate for agricultural uses such as orchards and vineyards, grazing, and low density residential uses, where proposed development and agricultural uses maintain existing natural vegetation and topography to the maximum extent feasible.

5    The General Plan land use designation "Low Density Residential" permits up to two units per acre of single family residential attached or detached homes  The Land Use Code includes a "Residential Very Low Density" (RVL) zoning district that implements and is consistent with the Low Density Residential land use designation of the General Plan. The RVL zoning designation is applied to areas appropriate for low-density single-family homes and some non-residential land uses such as parks and playgrounds.

6    The General Plan land use designation "Low-Medium Density Residential" permits up to six units per acre of single family attached and detached units, duplexes, planned unit development, and associated neighborhood retail  The Land Use Code includes a

"Neighborhood, Low Density" (NL) zoning district that implements and is consistent with the Low-Medium Density Residential land use designation of the General Plan. The NL zoning designation is applied to areas developed with and appropriate for neighborhoods of detached and attached single-family homes, duplex, limited neighborhood retail, and related, compatible uses.

7  The General Plan land use designation "Medium Density Residential" permits up to ten units per acre of single family attached and detached units, duplexes, planned unit developments, and associated neighborhood retail. The Land Use Code includes a "Neighborhood, Medium Density" (NM) zoning district that implements and is consistent with the Medium Density Residential land use designation of the General Plan. The NM zoning designation is applied to areas appropriate for a variety of housing types, including small-lot single-family housing, various types of multifamily housing (e.g duplexes, townhouses, and apartments), limited neighborhood retail, and related, compatible uses.

8  The General Plan land use designation "High Density Residential" permits up to fifteen units per acre of single family attached and detached units, duplexes, multiple-family units, planned unit developments and associated neighborhood retail. The Land Use Code includes a "Neighborhood, Urban" (NU) zoning district that implements and is consistent with the High Density Residential land use designation of the General Plan. The NU zoning designation is applied to areas appropriate for a variety of higher-density housing types, including all types of multi-family housing, neighborhood-serving commercial uses, and related compatible uses.

9.  The General Plan land use designation "General Commercial" provides for the basic business and service needs of the local community. Both General Plan land use designations "General Commercial" and "Office" permit professional services, retail, and residential land uses that are easily integrated into adjacent residential districts.

a   The Land Use Code establishes a "Commercial, East Cotati Corridor" (CE) zoning district that implements and is consistent with the General Commercial and Office land use designations of the General Plan. The CE zoning district is a mixed-use classification that is applied to specific parcels on both sides of East Cotati Avenue, from Arthur Street east to the city limits. The CE zoning designation is applied to parcels that are appropriate for a wide range of retail and service uses that primarily serve local residents and businesses, including offices, shops, personal and business services, and small-scale restaurants, where structures fronting East Cotati Avenue are a minimum of two stories. Residential uses may be accommodated as part of mixed-use projects in the CE district, at a maximum density of fifteen dwelling units per acre.

b   The Land Use Code establishes a "Commercial, Gravenstein Corridor" (CG) zoning district that implements and is consistent with the General Commercial land use designation of the General Plan. The CG zoning district is a mixed-use classification that is applied to specific parcels on both sides of Gravenstein Highway, from Highway 101 west to the city limits. The CG zoning designation is applied to parcels that are appropriate for a wide range of retail and service uses that serve both the local and regional markets, including retail uses and restaurants, with additional uses such as personal and business services, and offices limited to the second floor along the Gravenstein frontage, where structures fronting Gravenstein are a minimum of

two stories   Residential uses may be accommodated as part of mixed-use projects in the CG district, at a maximum density of fifteen dwelling units per acre.

c   The Land Use Code includes a "Downtown Commercial" (CD) zoning district that implements and is consistent with the General Commercial land use designation of the General Plan and the La Plaza Specific Plan. The purpose of the CD zoning district is to define and enhance the Old Redwood Highway corridor and includes portions of the La Plaza downtown historic core. The CD zoning district is applied to the downtown area of Cotati that encompasses the historic plaza area, and extends south along Old Redwood Highway to Page Street and north along Old Redwood Highway to Highway 101, including properties along Commerce Avenue. The CD zoning designation is applied to parcels that are appropriate for a wide variety of land uses, with retail and other pedestrian-oriented uses on the ground floors of street-fronting structures, and residential units or offices allowed on second or third floors, at a maximum of fifteen dwelling units per acre.

10.   The Land Use Code establishes a "Rural Commercial" (CR) zoning overlay district that implements and is consistent with the Rural and Low Density land use designations of the General Plan   The CR overlay zone is intended for parcels that can serve as rural community gateways, where limited commercial development with high design quality may appropriately accommodate both community-serving and/or tourist-serving uses.

11   The General Plan land use designation "Commercial/Industrial" accommodates light industrial and retail uses   The Land Use Code includes a "Commercial/Industrial" (CI) zoning district that implements and is consistent with the Commercial/Industrial land use designation of the General Plan   The CI zoning district is applied to areas appropriate for a mixture of retail, service, large-scale office, and light industry uses

12.   The General Plan land use designation "General Industrial" accommodates manufacturing and warehousing uses   The Land Use Code includes a "General Industrial" (IG) zoning district that implements and is consistent with the General Industrial land use designation of the General Plan   The IG zoning district is applied to areas appropriate for manufacturing, warehousing, and assembly

13.   Within the City of Cotati, there are groups of separately owned parcels that are capable of developing with appropriate public services, infrastructure, retail and services   The City finds that the planning of proposed development on each parcel must be coordinated with the proposed and/or anticipated development of adjacent parcels   Coordinated development planning for these groups of parcels is intended to ensure safe and convenient pedestrian and vehicle circulation, preservation of natural resources, and the implementation of other purposes of the General Plan and the Land Use Code   Therefore, the Land Use Code establishes a "Coordinated Planning" (CP) overlay zone to limit development otherwise allowed by the primary zoning district of affected parcels until a Master Plan has been prepared for development on all contiguous parcels within the overlay

14   Three mobile home parks currently are located in the City of Cotati   In accordance with California State law, the Land Use Code establishes a "Mobile Home Park" zoning overlay district (MHP) for these existing parks. The allowable density of development is determined by the primary zoning district of the affected site

15. The General Plan land use designation "Public Facilities" applies to land areas reserved for schools, government administration and operation facilities, and other facilities not of specific open space or recreation value. The Land Use Code includes a "Public Facilities" (PF) zoning district that implements and is consistent with the Public Facilities land use designation of the General Plan. The PF zoning district is applied to areas appropriate for public facilities, utilities, and public gathering facilities, including public schools, libraries, and government offices

16. Two major purposes of the Santero Way Specific Plan are to 1) encourage a mix of land uses that will result in a vital neighborhood that is complementary to the existing character of Cotati; and 2) plan development along Santero Way that will support all modes of transportation  The Santero Way Specific Plan implements a number of General Plan policies and objectives as summarized in the Specific Plan. The General Plan designates all properties within the Santero Way Specific Plan area as "General Commercial", a land use designation that provides for the basic business and service needs of the local community, as well as office and multi-family residential land uses that are easily integrated into adjacent districts  The Land Use Code, Chapter 17 29, establishes a new zoning designation, entitled "Specific Plan, Santero Way" (SPSW) as required by the Santero Way Specific Plan for implementation. The SPSW zoning district is applied to the area covered by the Santero Way Specific Plan, which provides detailed and comprehensive guidance and standards for development

17. The City of Cotati General Plan accommodates population growth in a manner that seeks to avoid exacerbating the problems of increased traffic, air pollution and wasteful energy consumption that could occur with projected growth if not accompanied by affordable housing  The Growth Management Chapter of the Land Use Code (17 52) implements the General Plan by providing growth management procedures to phase the construction of new dwellings within the City so that new development does not exceed the resource, infrastructure, and public service capacities of the City, and so that the rate of proposed development is compatible with the character of the City  This Chapter clarifies the City's procedure for obtaining Growth Management allocations

18. The City of Cotati contains a range of topographic features including hills, knolls and ridgelines that provide a scenic backdrop for the community: support a variety of flora and fauna, form natural drainage systems and a variety of wetland resources, and help form the visual character of Cotati  Failure to ensure protection of these resources would degrade the quality of life within the community and would deteriorate the natural setting of Cotati and its unique character.  Development within hillside, ridgelines or slope areas can lead to slope failure, increased erosion and sedimentation of streams, wetlands and other water resources, create unsightly views or block community vistas; and can fragment habitat areas or block migration corridors reducing their habitat values and diversity of wildlife  The City finds that standards for protection of the hillside and ridgeline areas are needed to protect the natural and scenic resources and minimize hazards associated with unstable slopes and the potential for damage to water resources caused by erosion and sedimentation.  The City finds that the Hillside and Ridgeline Development standards set forth in Land Use Code Chapter 17.53 provide for the implementation of the scenic resource and environmental protection policies of the General Plan by encouraging the retention of natural topographic features and vegetation, appropriate grading practices on hillside areas, and appropriate architectural design on structures to be located on hillsides

19. The City recognizes that the trees of Cotati, particularly native oaks and other tree species common to oak woodlands, are significant community resources that define the character of the city  Additionally, the City recognizes the importance of trees and woodland areas for environmental benefits such as the provision of wildlife habitat and the provision of shade that can assist in energy conservation. The City finds that preserving and enhancing tree and woodland resources provides a substantial benefit to the community and surrounding environs  The City also finds that development within sensitive woodland areas can lead to fragmentation of wildlife habitat, increased erosion and sedimentation, and reduce the habitat value and diversity of wildlife. Additionally, the City finds that standards for the protection and enhancement of tree and woodland resources are needed to protect wildlife habitat, natural and scenic resources, and maintain a diversity of plant and animal communities

The Tree Preservation and Protection provisions of the Land Use Code (Chapter 17 54) are intended to protect, preserve and maintain native trees and their habitat value, trees of historic or cultural significance, groves and stands of mature trees, and mature trees in general that are associated with proposals for development. The Tree Preservation and Protection Chapter implements General Plan policies such as policy 9.5.2 (use of drought-tolerant and native plants in landscaping), policy 13.4 1 (requiring tree removal permits), and policy 13.4.5 (protecting native trees)

20. The City recognizes that as the population grows, the local demand for energy will increase, potentially adding to global greenhouse gas production and contributing to other effects that are detrimental to the environment  The General Plan contains numerous objectives to limit the growth of demand for energy, including the achievement of a high level of energy efficiency in all new buildings and in modifications of existing ones (objective 9 1), designing land use features to maximize energy conservation (objective 9.2); and reducing the consumption of natural resources (objective 9 5)

The Resource Conservation Chapter of the Land Use Code (17 51) implements these General Plan objectives by providing standards to assist new development in achieving the conservation of energy and other resources within the community  This Chapter sets a Citywide Energy Conservation Standard (section 17.51 030) that requires all new structures to be designed and constructed to achieve a minimum of 15 percent greater energy efficiency than required by the California Code of Regulations, Title 24  The two other major green building strategies are Construction Project Materials Recycling (section 17 51.050) and Solar Access and View Preservation (section 17.51 060) and the implementation of a Sustainable Building Program

21. The City of Cotati contains an integrated aquatic system of streams, creeks, wetlands, vernal pools, and other bodies of water. The riparian habitat associated with these waterways provides critical habitat for a diversity of wildlife including birds, amphibians, and reptile species as well as various aquatic species  Waterways connect habitat areas within the watershed and serve as important migration corridors for many wildlife species  The City finds that development within or near waterways has the potential to reduce the habitat value of riparian areas and adversely impact the aquatic habitats, thereby diminishing the diversity of plant and wildlife species  Additionally, the City finds that development near waterways can increase erosion and contribute sediment and pollutants in urban runoff that adversely offset water quality  Development near waterways may also lead to bank instability and/or impair stream flows and reduce floodway and flood plain storage and/or capacity  Standards for the protection and

enhancement of riparian and waterway areas are needed to protect wildlife habitat, natural and scenic resources, and maintain a high diversity of plant and animal communities  The Watercourse and Riparian Resource Protection section (Chapter 17.50) provides standards for the protection of watercourse and riparian resources within the city, including provisions for adequate buffer areas between watercourses and adjacent development, to retain the watercourses as valuable natural, scenic, and recreational amenities as appropriate. The Watercourse and Riparian Resource Protection Chapter implements General Plan policies such as policy 15.2.3 (limiting channelization of creeks)

22      Wetlands and their associated upland areas provide very productive ecosystems which offer food, cover, nesting and roosting habitat for a variety of wildlife, generate organic matter to fuel aquatic food chains and function as natural flood control and pollution control systems.  Invertebrates that colonize wetland areas are an important food source for waterfowl and a variety of shorebirds and wading birds  The loss of wetland habitat has led to a significant decline in wildlife species diversity and abundance and an increase in pollutants and sediment loading to the local watershed.  Additionally, wetlands and associated upland areas can provide passive recreational opportunities and open space values for the community.  These areas can be easily damaged by pollution, construction activity and the intrusion of nonnative species and therefore careful control of development and use is necessary

The Wetland Protection and Restoration section (chapter 17 58) provides procedures and standards for identifying and protecting wetland resources, and permitting wetland restoration, enhancement, and mitigation projects  The Wetland Protection and Restoration Chapter is consistent with the General Plan and complies with the requirements of the U.S. Army Corps of Engineers, U.S. Fish and Wildlife Service, California Department of Fish and Game, and CEQA

23      The Adult-Oriented Businesses Regulations in the Land Use Code are intended to prevent community-wide adverse economic impacts, increased crime, decreased property values, and the deterioration of neighborhoods which can be brought about by the concentration of Adult-Oriented Businesses in close proximity to each other or proximity to other incompatible uses such as schools for minors, religious facilities, and residentially zoned districts or uses.  It has been demonstrated in various communities that the concentration of Adult-Oriented Businesses causes an increase in the number of transients in the area, and an increase in crime, and in addition to the effects described above can cause other businesses and residents to move elsewhere   It is, therefore, the purpose of Chapter 17.90 to establish reasonable and uniform regulations to prevent the concentration of Adult-Oriented Businesses or their close proximity to incompatible uses, while permitting the location of Adult-Oriented Businesses in certain areas

a      The City Council, in adopting the provisions of this Land Use Code regarding Adult-Oriented Businesses, takes legislative notice of the existence and content of the following studies concerning the adverse secondary side effects of Adult-Oriented Businesses in other cities  Garden Grove, California (1991), Tucson, Arizona (1990), Seattle, Washington (1989), Austin, Texas (1986), Oklahoma City, Oklahoma (1986); Indianapolis, Indiana (1984); Houston, Texas (1983), Beaumont, Texas (1982), Minneapolis, Minnesota (1980), Phoenix, Arizona (1979); Whittier, California (1978), Amarillo, Texas (1977), Cleveland, Ohio (1977), Los Angeles, California (1977)   The City Council finds that these

studies are relevant to the problems addressed by the City in enacting this ordinance to regulate the adverse secondary side effects of Adult-Oriented Businesses, and more specifically finds that these studies provide convincing evidence that

(1)    Adult-Oriented Businesses are linked to increases in the crime rates in those areas in which they are located and in surrounding areas

(2)    Both the proximity of Adult-Oriented Businesses to sensitive land uses and the concentration of Adult-Oriented Businesses tend to result in the blighting and deterioration of the areas in which they are located

(3)    The proximity and concentration of Adult-Oriented Businesses adjacent to residential, recreational, religious, educational and other Adult-Oriented Business uses can cause other businesses and residences to move elsewhere

(4)    There is substantial evidence that an increase in crime tends to accompany, concentrate around, and be aggravated by Adult-Oriented Businesses, including but not limited to an increase in the crimes of narcotics distribution and use, prostitution, pandering, and violence against persons and property   The studies from other cities establish convincing evidence that Adult-Oriented Businesses which are not regulated as to permissible locations often have a deleterious effect on nearby businesses in residential areas, causing, among other adverse secondary effects, an increase in crime and a decrease in property values

b.    Based on the foregoing, the City Council finds and determines that special regulation of Adult-Oriented Businesses is necessary to ensure that their adverse secondary side effects will not contribute to an increase in crime rates or to the blighting or deterioration of the areas in which they are located or surrounding areas   The need for such special regulations is based upon the recognition that Adult-Oriented Businesses have serious objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances or located in direct proximity to sensitive uses such as parks, schools, and churches, thereby having a deleterious effect upon the adjacent areas   It is the purpose and intent of these special regulations to prevent the concentration of Adult-Oriented Businesses and thereby prevent such adverse secondary side effects

c.    The locational requirements established by this ordinance do not unreasonably restrict the establishment or operation of constitutionally protected Adult-Oriented Businesses in the City of Cotati, and a sufficient reasonable number of appropriate locations for Adult Oriented Businesses are provided by this ordinance

d.    In developing this ordinance, the City Council has been mindful of legal principles relating to regulation of Adult-Oriented Businesses and does not intend to suppress or infringe upon any expressive activities protected by the First Amendments of the United States and California Constitutions, but instead desires to enact reasonable time, place, and manner regulations that address the

adverse secondary effects of Adult Oriented Businesses  The City Council has considered decisions of the United States Supreme Court regarding local regulation of Adult-Oriented Businesses, including but not limited to: Young v American Mini Theaters, Inc , 427 U S  50 (1976) (Reh. denied 429 U.S  873), Renton v. Playtime Theaters, 475 U S  41 (1986) (Reh. denied 475 U S  1132), FW/PBS, Inc. v  Dallas, 493 U S  215 (1990), Barnes v. Glenn Theater, 501 U S  560 (1991), United States Court of Appeals 9th Circuit decisions, including but not limited to, Topanga Press, et al. v. City of Los Angeles, 989 F 2d 1524 (1993); several California cases including but not limited to  City of National City v  Wiener, 3 Cal  4th 832 (1993), People v. Superior Court (Lucero) 49 Cal.3d 14 (1989); and City of Vallejo v  Adult Books, et al , 167 Cal. App.3d 1169 (1985); and other federal cases including Lakeland Lounge v  City of Jacksonville (5th Cir  1992) 973 F 2d 1255, Hang On, Inc. v. Arlington (5th Cir. 1995) 65 F 3d 1248, Mitchell v  Commission on Adult Entertainment (3rd Cir. 1993) 10 F.3d 123, International Eateries v  Froward County (11th Cir  1991) 941 F 2d 1157, and Star Satellite v  City of Biloxi (5th Cir. 1986) 779 F 2d 1074.

e.    The City Council of the City of Cotati also finds that locational criteria alone do not adequately protect the health, safety, and general welfare of the citizens of the City of Cotati, and thus certain requirements with respect to the ownership and operation of Adult-Oriented Businesses are in the public interest  In addition to the findings and studies conducted in other cities regarding increases in crime rates, decreases in property values and the blighting of areas in which such businesses are located, the City Council also takes legislative notice of the facts recited in the case of Key, Inc. v. Catsup County, 793 F 2d 1053 (1986), regarding how live adult entertainment results in secondary effects such as prostitution, drug dealing, and other law enforcement problems

f.    The City Council finds the following, in part based upon its understanding of the documents and judicial decisions in the public record·

(1)    Evidence indicates that some dancers, models and entertainers, and other persons who publicly perform specified sexual activities or publicly display specified anatomical parts in Adult-Oriented Businesses (collectively referred to as "performers") have been found to engage in sexual activities with patrons of Adult-Oriented Businesses on the site of the Adult-Oriented Business,

(2)    Evidence has demonstrated that performers employed by Adult-Oriented Businesses have been found to offer and provide private shows to patrons who, for a price, are permitted to observe and participate with the performers in live sex shows,

(3)    Evidence indicates that performers at Adult-Oriented Businesses have been found to engage in acts of prostitution with patrons of the establishment,

(4)    Evidence indicates that fully enclosed booths, individual viewing areas, and other small rooms whose interiors cannot be seen from public areas of the establishment regularly have been found to be used as a location for engaging in unlawful sexual activity,

(5)     As a result of the above, and the increase in incidents of AIDS and Hepatitis B, which are both sexually transmitted diseases, the City has a substantial interest in adopting regulations which will reduce, to the greatest extent possible, the possibility for the occurrence of prostitution and casual sex acts at Adult-Oriented Businesses

g.     Zoning, licensing and other police power regulations are legitimate, reasonable means of accountability to help protect the quality of life in the community of Cotati and to help assure that all operators of Adult-Oriented Businesses comply with reasonable regulations and are located in places that minimize the adverse secondary effects which naturally accompany the operation of such businesses.

h     The City Council of the City of Cotati recognizes the possible harmful effects on children and minors exposed to the effects of such Adult-Oriented Businesses and the deterioration of respect for family values, and the need and desire of children and minors to stay away from and avoid such businesses, which causes children to be fearful and cautious when walking through or visiting the immediate neighborhood of such businesses; and the City Council desires to minimize and control the adverse secondary side effects associated with the operation of Adult-Oriented Businesses and thereby protect the health, safety, and welfare of the citizens of communicable and sexually transmitted diseases.

i.     It is not the intent of the City Council of the City of Cotati in enacting this ordinance, or any provision thereof, to condone or legitimize the distribution of obscene material, and the City of Cotati recognizes that state law prohibits the distribution of the obscene materials and expects and encourages law enforcement officials to enforce state obscenity statutes against such illegal activities in the City of Cotati

j.     Nothing in this ordinance is intended to authorize, legalize, or permit the establishment, operation, or maintenance of any business, building, or use which violates any City ordinance or any statute of the State of California regarding public nuisances, unlawful or indecent exposure, sexual conduct, lewdness, obscene or harmful matter or the exhibition or public display thereof

k.     The City of Cotati finds the following in part, based upon its understanding of the documents and judicial decisions in the public record

(1)     Evidence indicates that some dancers, models, entertainers, and other persons who publicly perform Specified Sexual Activities or publicly display Specified Anatomical Parts in Adult-Oriented Businesses (as those terms are defined herein) (collectively referred to as "Performers") have been found to engage in sexual activities with patrons of Adult-Oriented Businesses on the site of the Adult-Oriented Business;

(2)     Evidence has demonstrated that Performers employed by Adult-Oriented Businesses have been found to offer and provide private shows to patrons who, for a price, are permitted to observe and participate with the Performers in live sex shows.

(3)    Evidence indicates that Performers at Adult-Oriented Businesses have been found to engage in acts of prostitution with patrons of the establishment, and

l    In prohibiting public nudity in Adult-Oriented Businesses, the City Council does not intend to proscribe the communication of erotic messages or any other communicative element or activity, but rather only to prohibit public nudity due to the secondary impacts associated with such public nudity; and

m    The City Council also finds, as a wholly independent basis, that it has a substantial public interest in preserving societal order and morality, and that such interest is furthered by a prohibition on public nudity; and

n    While the City Council desires to protect the rights conferred by the United States Constitution to Adult-Oriented Businesses, it does so in a manner that ensures the continued and orderly development of property within the City and diminishes, to the greatest extent feasible, those undesirable secondary effects which the aforementioned studies have shown to be associated with the development and operation of Adult-Oriented Businesses; and

o.    In enacting a nudity limitation, the City declares that the limitation is a regulatory licensing provision and not a criminal offense. The City has not provided a criminal penalty for a violation of the nudity limitation. The City adopts such a limitation only as a condition of issuance and maintenance of an Adult-Oriented Business permit issued pursuant to the Land Use Code, and

p.    The City Council finds that preventing the exchange of money between entertainers and patrons also reduces the likelihood of drug and sex transactions occurring in Adult-Oriented Businesses, and

q    Requiring separations between entertainers and patrons reduces the likelihood that such persons will negotiate narcotics sales and/or transact sexual favors within the Adult-Oriented Business.

r    Enclosed or concealed booths and dimly-lit areas within Adult-Oriented Businesses greatly increase the potential for misuse of the premises, including unlawful conduct of a type that facilitates transmission of disease. Requirements that all indoor areas be open to view by management at all times, and that adequate lighting be provided are necessary in order to reduce the opportunity for, and therefore the incidence of illegal conduct within Adult-Oriented Businesses, and to facilitate the inspection of the interior of the premises thereof by law enforcement personnel

24    The City finds that certain land uses have characteristics that may be incompatible in certain neighborhoods or circumstances. The Standards for Specific Land Uses section of the Land Use Code (Chapter 17.42) provides site planning, development and/or operating standards for certain land uses that are allowed by Article 2 (Community and Project Design) within individual or multiple zoning districts, and for activities that require special standards to mitigate their potential adverse impacts and to ensure compatibility

25.    The City finds that the operational characteristics of development and land uses can lead to a nuisance or impact on adjoining areas and land uses  The Cotati General Plan contains Objectives, Policies and Programs aimed at reducing the impacts of development and land uses on adjoining areas and land uses  The City also finds that the Performance Standards Chapter section of the Land Use Code (section 17.30.070) provides performance standards that are designed to minimize various potential operational impacts of development and new land uses within the City, and promote compatibility with adjoining areas and land uses

26    The citizens of the City of Cotati face a serious housing problem that threatens their economic security. Lack of access to affordable housing has a direct impact upon the health, safety, and welfare of the residents of the City. The City will not be able to contribute to the attainment of State housing goals or to retain a healthy environment without additional affordable housing. The housing problem has an impact upon a broad range of income groups, including many who are not impoverished by standards other than those applicable to California's and the City's housing markets, and no single housing program will be sufficient to meet the need. Federal and state funds for the construction of new affordable housing are insufficient to fully address the problem of affordable housing within the City. Nor has the private housing market provided adequate housing opportunities affordable to Moderate-, Low-, and Very Low-Income Households

The California Legislature has required each local government agency to develop a comprehensive, long-term general plan establishing policies for future development. As specified in the Government Code (at Sections 65300, 65302(c), and 65583(c)), the plan must  (i) "encourage the development of a variety of types of housing for all income levels, including multifamily rental housing," (ii) "[a]ssist in the development of adequate housing to meet the needs of low- and moderate-income households;" (iii) "conserve and improve the condition of the existing affordable housing stock, which may include addressing ways to mitigate the loss of dwelling units demolished by public or private action "  The City's certified Housing Element was adopted in 2002 to advance the City's housing goals and to comply with State law.

a.    The Affordable Housing Requirements Chapter of the Land Use Code (17.31) encourages the development and availability of housing affordable to a broad range of households with varying income levels within the City as mandated by Government Code Sections 65580 et seq , offsets the demand on housing created by new development, mitigates environmental and other impacts that accompany new development; and implements the Housing Element policies of the General Plan

b.    The Density Bonus Chapter of the Land Use Code (17 32) offers incentives for the development of affordable housing. This Chapter implements the requirements of Government Code Sections 65302, 65915, et seq., and the Housing Element of the General Plan

27    The State of California Department of Finance projects an increase in the percentage of elderly persons (aged 55 or older) in the future of the City of Cotati  The City recognizes that as the population ages, the demand for care facilities and ancillary services will increase  The City finds that development of residential care facilities for the elderly provides valuable services to seniors, including  housing, health care (short-term care for

minor illnesses), food, counseling, transportation, recreation, and other social services. The City also finds that the growing need for residential care facilities for the elderly cannot be met solely through government programs or non-profit agencies, but must be augmented by private development and operation of senior care facilities. Additionally, the City finds that standards for the development of residential care facilities for the elderly are needed to encourage development of residential care facilities, as well as ensure that such facilities are harmonious with surrounding land uses

The Land Use Code allows Residential Care Facilities for the Elderly (RCFEs) with a Use Permit in areas zoned NM (Neighborhood – Medium Density) and NU (Neighborhood – Urban). These provisions are intended to enhance the public welfare and help accommodate persons with special housing needs as recognized in the General Plan

28.    The City finds that development can have adverse visual impacts, increasing heat and glare, increasing pollutants in storm water runoff and increasing the demand for energy Landscaping is an important element in the built environment that serves to merge the hardscape surfaces into the natural environment with a sense of harmonious integration. By establishing landscaping standards, the City can ensure that appropriate vegetation is utilized which draws upon appropriate species and provides for a means of minimizing the visual impact of the built environment. The landscaping standards provide for shade within parking areas, thereby reducing the heat gain of paved surfaces. Ensuring an adequate vegetation cover within development areas provides for absorption of harmful carbon dioxide gases as well as rainfall to reduce runoff

The Landscaping Standards in the Land Use Code (Chapter 17 34) establish landscape standards to mitigate the effects of urbanization on the environment and to provide for an aesthetically pleasing urban setting. It is the intent of this Chapter to establish a measure of consistency in landscaping for new projects as well as to provide a mechanism to require updating and upgrading of existing landscaping in existing developments when improvements are proposed. It is also the intent of this Chapter to encourage optimum use of drought-tolerant plant materials in conjunction with water conserving automatic irrigation systems. This chapter implements numerous policies of the General Plan that have environmental and design significance to the community

29    The City finds that, without local regulation, the occurrence of improper signs by placement, type, size, number, and lack of maintenance within the City can lead to unattractive, disorderly, and unsafe conditions. The City finds that competition among signs within commercial districts can discourage potential patrons and undermine the economic vitality of the area. The Signs Chapter of the Land Use Code is established to:

a    Avoid traffic safety hazards to motorists and pedestrians caused by visual distractions and obstructions.

b    Promote the aesthetic and environmental values of the community by providing for signs that do not impair the attractiveness of the City as a place to live, work, and shop.

c    Provide for signs as an effective channel of communication, while ensuring that signs are aesthetically proportioned in relation to adjacent structures and the structures to which they are attached, and

      d      Safeguard and protect the public health, safety and general welfare

30      The City finds that the raising and maintenance of animals may have adverse impacts on surrounding properties by dust, noise, visual blight, odor, fumes, bright lights, or insect infestations. The Animal Keeping section of the Land Use Code (17 42 040) provides reasonable standards for the keeping of animals in specified zoning districts (Open Space – Conservation, Rural Residential, and Residential, Very Low Density) to ensure compatibility of land use between private properties  Minor Use Permit approval is required for those identified circumstances where proposed animal keeping has been determined to have the greatest potential to create negative impacts to surrounding properties, e g  kennels, horses, cows, and other large animals  The Use Permit process will enable the City to establish appropriate conditions that will ensure compatibility.

31      The Child Day Care Facilities section of the Land Use Code (17 42 060) provides location and operational standards for child day care facilities, in compliance with state law and in a manner that recognizes the needs of child care operators and minimizes effects on adjoining properties  These standards are intended to avoid or minimize adverse effects (e g., noise and parking) on the residents in the surrounding neighborhood

32.      The City of Cotati recognizes that live/work projects provide business and housing opportunities on one site, potentially reducing the demand for travel. The Live/Work section of the Land Use Code (17 42 090) provides standards for the development of new live/work units and for the reuse of existing commercial and industrial structures to accommodate live/work opportunities, where allowed  The City of Cotati finds the Live/Work section incorporates standards designed to minimize impacts (e g., noise, parking, hazardous materials) of commercial activities on residential uses.

33.      The City of Cotati recognizes that mixed-use projects provide opportunities for development of office, commercial, and residential land uses on a single site, reducing the demand for travel. The Mixed Use Projects section of the Land Use Code (17.42 100) provides standards for the design of mixed use projects; these projects will allow a combination of office, commercial, and residential land uses on a single site that are compatible with the development pattern and character of the surrounding neighborhood and existing adjacent land uses  The City of Cotati finds that the Mixed Use Projects section establishes standards that will help reduce potential impacts to residential units (e g., lighting, noise, hours of operation. and setbacks associated with commercial activities) in the neighborhood

34.      The City finds that it is necessary to provide a clear and consistent procedure for the processing of all land use applications required by the Land Use Code. It is the intent of the Permit Application Filing and Processing Chapter (17 60) to provide standardized procedures and requirements for the proper preparation, filing, and processing of applications for the land use permits required by Land Use Code and in compliance with the applicable provisions of the Permit Streamlining Act and the California Environmental Quality Act. This Chapter identifies the review authority, review process, application content and who is eligible to file applications

35      The City of Cotati recognizes that some activities and uses have unique aspects that require additional review to ensure that the activity will not impact the surrounding

neighborhood and environment  It is the intent of the Use Permit and Minor Use Permit section (17 62 050) of the Land Use Code to provide a process for reviewing proposed uses and activities that may be appropriate in the applicable zoning district, but whose effects on site and surroundings and, therefore, the appropriateness of the use or activity to the site or surrounding cannot be determined before a proposal is submitted for a specific site  The procedures of this section provide for the review of the configuration, design, location, and potential impacts such as hours of operation, litter, adequate parking, and noise of the proposed use, to evaluate the compatibility of the proposed use with surrounding uses and the suitability of the use to the site  As stated in the Land Use Code, public hearings for Use Permits are conducted by the Planning Commission and public hearings for Minor Use Permits are conducted by the Planning Director.

36.    The City of Cotati recognizes that there are properties within the City that have special circumstances such as location, shape, size, surroundings, topography, environmental constraints or other resources that application of the strict provisions of the Land Use Code would deny a property owner privileges that are enjoyed by other property owners It is the intent of the Variance and Minor Variances section (17 62 060) of the Land Use Code to provide a process for City consideration of requests to waive or modify certain standards of the Land Use Code only when, because of special circumstances applicable to the property, including location, shape, size, surrounding, topography, or other conditions, the strict application of the Land Use Code denies the property owner privileges enjoyed by other property owners in the vicinity and in the same zoning districts  As stated in the Land Use Code, public hearings for Variances are conducted by the Planning Commission.  Public hearings for Minor Variances may be held by the Planning Director or forwarded for review by the Planning Commission.

37,    The City finds that it is necessary to provide the public with logical procedures for permit implementation, time limits, and extensions for the implementation or "exercising" of the permits required by the Land Use Code, including time limits, and procedures for extensions of time for previously granted permits  These requirements are intended to streamline the permitting process, guarantee faithful performance and proper completion of any work, and promote orderly development of property

38.    The Development Agreements Chapter of the Land Use Code (17 66) establishes procedures and requirements for the review and approval of development agreements, consistent with Government Code Sections 65864, et seq , and to promote conservation of resources, reduce the cost of housing and other development to the consumer and to provide a commitment to comprehensive planning

39    The Administrative Responsibility Chapter of the Land Use Code (17 80) describes the authority and responsibilities of the City staff and official bodies in the administration of the Land Use Code

40.    The City finds that new land use regulations can create conflicts with existing land uses, structures and parcels that may not conform to the new standards and that a fair standard and practice are needed to address these concerns and provide equal protection to all residents and property owners  The Nonconforming Uses, Structures, and Parcels Chapter of the Land Use Code (17 82) provides regulations for legal nonconforming land uses, structures, and parcels that were legal before the adoption and amendment of the Land Use Code, but which would be prohibited, regulated, or restricted differently under the current terms of the new Land Use Code or an amendment that changed applicable

requirements. It is the intent of this Chapter to discourage the long-term continuance of nonconformities, providing for their eventual elimination, while allowing them to exist under limited conditions.

41    The City finds that the citizens of Cotati have a right to due process under the law and have a right to appeal an action taken by a lower decision-making body. The Appeals Chapter of the Land Use Code (17.84) establishes procedures for the appeal and review of determinations made by the Planning Director, Design Review Committee, or Planning Commission. These provisions provide for a public re-evaluation of the merits of an action on a permit or administrative decision and to facilitate public participation and protection of private property rights.

42    The City finds that the citizens of Cotati contribute valuable insights and information and raise issues that are important in the decision-making process. The City also finds that adequate opportunity for public input is vital to protecting the public interest. The Public Hearings Chapter of the Land Use Code (17 88) establishes procedures for public hearings as required by the Land Use Code. This Chapter is intended to provide for proper public noticing to ensure public participation in the planning process

43.    The City recognizes that land uses are subject to change over time and that new demands for land use are constantly arising. Therefore, the City finds that it is necessary to clarify the meaning of terms and provide more comprehensive definitions in the Land Use Code The Definitions Chapter (17.90) provides definitions of terms and phrases used in the Land Use Code that are technical or specialized, or that may not reflect common usage

44,    The City recognizes that its transportation system affects citizens' ability and inclination to choose transportation modes other than the automobile. There are numerous goals, objectives, and policies in the General Plan that emphasize pedestrian- and transit-orientation for new development. To implement the General Plan, the City finds it necessary to adopt street standards to ensure that streets are developed at an appropriate scale for the built environment and to balance the needs of pedestrians and drivers. The Street and Streetscape Standards Chapter of the Land Use Code (17.26) provides standards for the design of public streets and the character of the streetscape between buildings along public streets.

45    The Subdivision Ordinance Applicability and Administration Chapter of the Land Use Code (17 70) supplements, implements, and works with the Subdivision Map Act (Map Act), Sections 66410 et seq. of the California Government Code. This Chapter, in conjunction with the Map Act, guides the preparation of subdivision applications, and the review, approval, and improvement of proposed subdivisions.

B    The City Council has adopted Resolution No. 04-78, approving a Negative Declaration for the 2004 Land Use Code, Zoning Map, and General Plan Amendments including Land Use Map and Text. The Negative Declaration concludes that all potential impacts have been avoided and mitigated pursuant to the 1998 General Plan EIR

SECTION 2    The Cotati Municipal Code is hereby amended as follows:

A.    Cotati Municipal Code Title 17, the ordinances codified therein, including but not limited to Ordinance No. 149, Ordinance No. 303 and the Zoning Map are hereby repealed

B       Chapter 11 12 of the Cotati Municipal Code, Tree Removal, is hereby repealed

C.      Chapter 14 30 of the Cotati Municipal Code, Construction Hours Limited, is hereby repealed

D.      The City of Cotati Land Use Code is hereby adopted as set forth in Exhibit A: Land Use Code September 2004, which is attached to this Ordinance and is hereby incorporated into this Ordinance by reference as though it were fully set forth here

E       The City of Cotati Zoning Map is hereby adopted as set forth in Exhibit B: Cotati Zoning Map September 2004, which is attached to this Ordinance and is hereby incorporated into this Ordinance by reference as though it were fully set forth here

F       Certain parcels within the City of Cotati are hereby rezoned for the reasons set forth in Section 1, above, as set forth in Exhibit C: Rezoned Parcels, which is attached to this Ordinance and is hereby incorporated into this Ordinance by reference as though it were fully set forth here  All other parcels not specifically listed in Exhibit C are subject to a general rezone as shown on Exhibit D, these general rezones are subject to a name change of their current zoning district, with negligible or no change in land use limitations

SECTION 3.          The City Council finds that the repeal of Cotati Municipal Code Title 17, the ordinances codified therein, including but not limited to Ordinance No 149, Ordinance No 303 and the Zoning Map; adoption of a new comprehensive Land Use Code and new Zoning Map, repeal of Chapters 11.12 and 14.30 of the Municipal Code; and rezoning of certain properties as listed in Section 2, above, are consistent with the General Plan

SECTION 4          Severability If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held invalid or unconstitutional in any court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision and such holding shall not affect the validity of the remaining portions of this ordinance

SECTION 5.          Judicial Review  The time within which judicial review must be sought is governed by California Code of Civil Procedure Section 1094 6

SECTION 6.          Effective Date  This ordinance shall become effective 30 days after the date of adoption

SECTION 7.          Posting. The City Clerk shall cause this ordinance to be published and/or posted within fifteen days after its adoption

**********

**IT IS HEREBY CERTIFIED** that the foregoing ordinance was duly introduced at a regular meeting of the City Council of the City of Cotati on the 10th day of May, 2005, and legally adopted on the 8th day of June, 2005, by the following vote, to wit

| | |
|---|---|
| MOORE | <u>Yes</u> |
| ORCHARD | <u>Yes</u> |
| FOX | <u>Yes</u> |
| GILARDI | <u>Yes</u> |
| MINNIS | <u>No</u> |

APPROVED: _____
                              Mayor

ATTEST: _____
                Deputy City Clerk

APPROVED AS TO FORM: _____
                Acct.   City Attorney

**EXHIBIT C**
**Rezoned Parcels**

| A. P. Number | Location | Zone Change |
|---|---|---|
| 046-076-004 | 7812 Derby Lane | AC to CG |
| 046-076-005 | 7840 Derby Lane | AC to CG |
| 144-100-003 | 8150 Highway 116 | AC to CG |
| 144-100-004 | 8184 Highway 116 | AC to CG |
| 144-030-001 | 7899 Derby Lane | AC to CG |
| 144-030-002 | 7899 Derby Lane | AC to CG |
| 144-040-005 | 8017 Highway 116 | AC to CG |
| 144-040-006 | 8079 Highway 116 | AC to CG |
| 144-040-007 | 8049 Highway 116 | AC to CG |
| 144-040-008 | 8055 Highway 116 | AC to CG |
| 144-040-011 | 7515 Alder Avenue | AC to CG |
| 144-040-021 | 8145 Highway 116 | AC to CG |
| 144-040-023 | 8023 Highway 116 | AC to CG |
| 144-050-005 | 8356 Highway 116 (Kana Cotati) | CH to CG |
| 144-050-007 | DR (South Sonoma) | CH to CG |
| 144-060-005 | 8555 Redwood Drive | CH to CG |
| 144-060-006 | 7950 Redwood Drive | CH to CG |
| 144-060-009 | 8505 Highway 116 | CH to CG |
| 144-060-010 | 8501 Gravenstein Highway | CH to CG |
| 144-130-023 | 8500 Gravenstein Highway | CH to CG |
| 144-130-024 | 8492 Gravenstein Highway | CH to CG |
| 144-130-025 | 8492 Gravenstein Highway | CH to CG |
| 144-130-026 | 8526 Highway 116 | CH to CG |
| 144-060-001 | 7501 Old Redwood Highway (State of California) | CH to CD |
| 144-060-002 | 7581 Old Redwood Highway | CH to CD |
| 144-060-003 | 7621 Old Redwood Highway | CH to CD |
| 144-060-011 | 7665 Old Redwood Highway | CH to CD |
| 144-060-014 | 7675 Old Redwood Highway | CH to CD |
| 144-070-008 | 7500 Commerce Boulevard | C1 to CD |
| 144-070-018 | 7500 Commerce Boulevard | C1 to CD |
| 144-070-021 | 7384 Commerce Boulevard | C1 to CD |
| 144-070-022 | 7520 Commerce Boulevard | C1 to CD |
| 144-070-027 | 11 Wilford Lane | C1 to CD |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 144-070-029 | 7560 Commerce Boulevard | C1 to CD |
| 144-070-030 | 7360 Commerce Boulevard | C1 to CD |
| 144-070-026 | 7582 Commerce Boulevard (front portion) | C1 to CD |
| 144-080-001 | 7600 Commerce Boulevard (front portion) | C1 to CD |
| 144-080-019 | 7662 Old Redwood Highway | C1 to CD |
| 144-261-001 | 8011 Old Redwood Highway | C1 to CD |
| 144-261-004 | 8049 Old Redwood Highway | C1 to CD |
| 144-261-005 | 8055 Old Redwood Highway | C1 to CD |
| 144-261-008 | 8099 La Plaza | C1 to CD |
| 144-261-011 | 65 West Cotati Avenue | C1 to CD |
| 144-262-004 | 70 West Cotati Avenue | C1 to CD |
| 144-262-006 | 60 West Cotati Avenue | C1 to CD |
| 144-262-014 | 55 West Sierra Avenue | C1 to CD |
| 144-262-015 | 8197 La Plaza | C1 to CD |
| 144-262-018 | 8109 La Plaza | C1 to CD |
| 144-262-019 | 8125 La Plaza | C1 to CD |
| 144-262-020 | 8189 La Plaza | C1 to CD |
| 144-263-001 | 8195 La Plaza | C1 to CD |
| 144-263-002 | 8201 Old Redwood Highway | C1 to CD |
| 144-263-003 | 8225 Old Redwood Highway | C1 to CD |
| 144-263-004 | 1818 La Plaza | C1 to CD |
| 144-263-005 | 45 Henry Street | C1 to CD |
| 144-263-009 | 60 West Sierra Avenue | C1 to CD |
| 144-263-011 | 1820 La Plaza | C1 to CD |
| 144-263-012 | 48 West Sierra Avenue | C1 to CD |
| 144-263-013 | 36 West Sierra Avenue | C1 to CD |
| 144-272-009 | 8000 Old Redwood Highway | C1 to CD |
| 144-272-010 | 8741 Old Redwood Highway | C1 to CD |
| 144-272-011 | 8050 Old Redwood Highway | C1 to CD |
| 144-272-012 | 85 La Plaza | C1 to CD |
| 144-272-003 | 73 East Sierra Avenue | C1 to CD |
| 144-273-007 | 84 East Sierra Avenue | C1 to CD |
| 144-273-008 | 8140 La Plaza | C1 to CD |
| 144-273-009 | 8150 La Plaza | C1 to CD |
| 144-273-010 | 127 East Cotati Avenue | C1 to CD |
| 144-274-002 | 8170 La Plaza | C1 to CD |
| 144-274-004 | 8172 La Plaza | C1 to CD |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 144-274-006 | 8200 La Plaza | C1 to CD |
| 144-274-008 | 8110 Old Redwood Highway | C1 to CD |
| 144-274-009 | 29 Charles Street | C1 to CD |
| 144-274-010 | 8230 Old Redwood Highway | C1 to CD |
| 144-274-011 | 8240 Old Redwood Highway | C1 to CD |
| 144-274-012 | 8244 Old Redwood Highway | C1 to CD |
| 144-274-014 | 128 East Cotati Avenue | C1 to CD |
| 144-274-015 | 120 East Cotati Avenue | C1 to CD |
| 046-286-011 | DR (South Sonoma) | C1 to CG |
| 046-286-013 | 170 Helman Lane (South Sonoma) | C1 to CG |
| 046-286-015 | Highway 116 (South Sonoma) | C1 to CG |
| 144-100-001 | 8028 Highway 116 | C1 to CG |
| 144-050-004 | 8214 Highway 116 | C1 to CG |
| 144-050-009 | None (South Sonoma) | C1 to CG |
| 144-090-003 | 7946 Highway 116 | C1 to CG |
| 144-110-001 | 8260 Highway 116 | C1 to CG |
| 144-090-002 | 7960 Highway 116 | AR to CG |
| 144-100-002 | 8112 Highway 116 (front portion) | AR to CG |
| 144-301-008 | 955 East Cotati Avenue | M1 to CE |
| 144-301-010 | 905 East Cotati Avenue | R2 to CE |
| 144-292-024 | 680 East Cotati Avenue | R2 to CE |
| 144-770-001 | 6305 Santero Way | R3:PUD to SPSW |
| 144-770-002 | 6307 Santero Way | R3:PUD to SPSW |
| 144-770-003 | 6309 Santero Way | R3 PUD to SPSW |
| 144-770-004 | 6311 Santero Way | R3.PUD to SPSW |
| 144-770-005 | 6313 Santero Way | R3·PUD to SPSW |
| 144-770-006 | 6327 Santero Way | R3:PUD to SPSW |
| 144-770-007 | 6325 Santero Way | R3:PUD to SPSW |
| 144-770-008 | 6323 Santero Way | R3.PUD to SPSW |
| 144-770-009 | 6321 Santero Way | R3 PUD to SPSW |
| 144-770-010 | 6319 Santero Way | R3 PUD to SPSW |
| 144-770-011 | 6575 Santero Way | R3 PUD to SPSW |
| 144-770-012 | 6577 Santero Way | R3.PUD to SPSW |
| 144-770-013 | 6579 Santero Way | R3·PUD to SPSW |
| 144-770-014 | 6581 Santero Way | R3 PUD to SPSW |
| 144-770-015 | 6583 Santero Way | R3 PUD to SPSW |
| 144-770-016 | 6597 Santero Way | R3 PUD to SPSW |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 144-770-017 | 6595 Santero Way | R3.PUD to SPSW |
| 144-770-018 | 6593 Santero Way | R3 PUD to SPSW |
| 144-770-019 | 6591 Santero Way | R3.PUD to SPSW |
| 144-770-020 | 6589 Santero Way | R3 PUD to SPSW |
| 144-770-021 | 6747 Santero Way | R3:PUD to SPSW |
| 144-770-022 | 6749 Santero Way | R3 PUD to SPSW |
| 144-770-023 | 6751 Santero Way | R3:PUD to SPSW |
| 144-770-024 | 6753 Santero Way | R3·PUD to SPSW |
| 144-770-025 | 6755 Santero Way | R3 PUD to SPSW |
| 144-770-026 | 6769 Santero Way | R3 PUD to SPSW |
| 144-770-027 | 6767 Santero Way | R3 PUD to SPSW |
| 144-770-028 | 6765 Santero Way | R3 PUD to SPSW |
| 144-770-029 | 6763 Santero Way | R3:PUD to SPSW |
| 144-770-030 | 6761 Santero Way | R3:PUD to SPSW |
| 144-770-031 | 6919 Santero Way | R3:PUD to SPSW |
| 144-770-032 | 6921 Santero Way | R3 PUD to SPSW |
| 144-770-033 | 6923 Santero Way | R3·PUD to SPSW |
| 144-770-034 | 6925 Santero Way | R3 PUD to SPSW |
| 144-770-035 | 6927 Santero Way | R3:PUD to SPSW |
| 144-770-036 | 6941 Santero Way | R3 PUD to SPSW |
| 144-770-037 | 6939 Santero Way | R3 PUD to SPSW |
| 144-770-038 | 6937 Santero Way | R3 PUD to SPSW |
| 144-770-039 | 6935 Santero Way | R3:PUD to SPSW |
| 144-770-040 | 6933 Santero Way | R3 PUD to SPSW |
| 144-770-041 | 7004 Santero Way | R3 PUD to SPSW |
| 144-770-042 | 7006 Santero Way | R3:PUD to SPSW |
| 144-770-043 | 7008 Santero Way | R3:PUD to SPSW |
| 144-770-044 | 7010 Santero Way | R3 PUD to SPSW |
| 144-770-045 | 7012 Santero Way | R3·PUD to SPSW |
| 144-770-046 | 6698 Santero Way | R3:PUD to SPSW |
| 144-770-047 | 6696 Santero Way | R3 PUD to SPSW |
| 144-770-048 | 6694 Santero Way | R3 PUD to SPSW |
| 144-770-049 | 6692 Santero Way | R3 PUD to SPSW |
| 144-770-050 | 6690 Santero Way | R3:PUD to SPSW |
| 144-770-051 | 6301 Santero Way | R3 PUD to SPSW |
| 144-770-052 | 6303 Santero Way | R3 PUD to SPSW |
| 144-770-053 | 6315 Santero Way | R3:PUD to SPSW |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 144-770-054 | 6317 Santero Way | R3-PUD to SPSW |
| 144-770-055 | 6571 Santero Way | R3-PUD to SPSW |
| 144-770-056 | 6573 Santero Way | R3-PUD to SPSW |
| 144-770-057 | 6585 Santero Way | R3:PUD to SPSW |
| 144-770-058 | 6587 Santero Way | R3-PUD to SPSW |
| 144-770-059 | 6743 Santero Way | R3.PUD to SPSW |
| 144-770-060 | 6745 Santero Way | R3-PUD to SPSW |
| 144-770-061 | 6757 Santero Way | R3 PUD to SPSW |
| 144-770-062 | 6759 Santero Way | R3 PUD to SPSW |
| 144-770-063 | 6915 Santero Way | R3-PUD to SPSW |
| 144-770-064 | 6917 Santero Way | R3 PUD to SPSW |
| 144-770-065 | 6929 Santero Way | R3 PUD to SPSW |
| 144-770-066 | 6931 Santero Way | R3-PUD to SPSW |
| 144-770-067 | 7002 Santero Way | R3 PUD to SPSW |
| 144-770-068 | 7000 Santero Way | R3 PUD to SPSW |
| 144-770-069 | 6688 Santero Way | R3 PUD to SPSW |
| 144-770-070 | 6686 Santero Way | R3 PUD to SPSW |
| 144-770-071 | Santero Way (Public Park) | R3.PUD to SPSW |
| 144-770-072 | Santero Way (Common Parcel B) | R3:PUD to SPSW |
| 144-770-073 | Santero Way (Common Parcel C) | R3:PUD to SPSW |
| 144-770-074 | Santero Way (Common Parcel D) | R3 PUD to SPSW |
| 144-302-049 | 924 East Cotati Avenue | R2 to SPSW |
| 144-302-041 | Industrial Avenue | M1 to SPSW |
| 144-302-043 | Industrial Avenue | M1 to SPSW |
| 144-302-047 | 930 East Cotati Avenue | M1 to SPSW |
| 144-302-048 | Industrial Avenue | M1 to SPSW |
| 144-320-008 | 982 East Cotati Avenue | M1 to SPSW |
| 144-320-015 | Industrial Avenue | M1 to SPSW |
| 144-320-016 | Industrial Avenue | M1 to SPSW |
| 144-320-018 | None | M1 to SPSW |
| 144-320-019 | 970 East Cotati Avenue | M1 to SPSW |
| 144-320-020 | None | M1 to SPSW |
| 144-480-012 | Industrial Avenue | M1 to SPSW |
| 144-480-016 | Industrial Avenue | M1 to SPSW |
| 144-480-017 | Industrial Avenue | M1 to SPSW |
| 144-480-019 | Industrial Avenue | M1 to SPSW |
| 144-480-021 | Industrial Avenue | M1 to SPSW |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 144-480-008 | 8354 Industrial Avenue | M2 to SPSW |
| 144-480-014 | 8360 Industrial Avenue | M2 to SPSW |
| 144-480-015 | 8364 Industrial Avenue | M2 to SPSW |
| 144-282-020 | 8301 La Salle Avenue | R3 to NM |
| 144-282-021 | 8303 La Salle Avenue | R3 to NM |
| 144-282-022 | 8305 La Salle Avenue | R3 to NM |
| 144-282-023 | 8307 La Salle Avenue | R3 to NM |
| 144-282-024 | 8309 La Salle Avenue | R3 to NM |
| 144-282-025 | 8312 La Salle Avenue | R3 to NM |
| 144-282-026 | 8314 La Salle Avenue | R3 to NM |
| 144-282-027 | 8317 La Salle Avenue | R3 to NM |
| 144-282-028 | La Salle Avenue | R3 to NM |
| 144-200-013 | 21 William Street | R1 to CD |
| 144-261-002 | 50 William Street | R1 to CD |
| 144-261-003 | 54 William Street | R1 to CD |
| 144-261-006 | 58 William Street | R1 to CD |
| 144-261-007 | 70 William Street | R1 to CD |
| 144-261-009 | 79 West Cotati Avenue | R1 to CD |
| 144-261-010 | 81 West Cotati Avenue | R1 to CD |
| 144-262-012 | 61 West Sierra Avenue | R1 to CD |
| 144-262-013 | 71 West Sierra Avenue | R1 to CD |
| 144-263-006 | 65 Henry Street | R1 to CD |
| 144-263-007 | 77 Henry Street | R1 to CD |
| 144-263-008 | 75 Henry Street | R1 to CD |
| 144-263-010 | 78 West Sierra Avenue | R1 to CD |
| 144-274-003 | 65 Charles Street | R2 to CD |
| 144-274-005 | 45 Charles Street | R2 to CD |
| 144-274-007 | 35 Charles Street | R2 to CD |
| 144-200-006 | 21 William Street | O to CD |
| 144-273-006 | 8197 Arthur Street | O to CD |
| 046-073-002 | 595 Helman Lane (Mosquito Abatement) | M1 to CI |
| 046-073-006 | 597 Helman Lane | M1 to CI |
| 046-111-013 | 425 Helman Lane | M1 to CI |
| 046-111-020 | 395 Helman Lane | M1 to CI |
| 046-111-021 | 363 Helman Lane | M1 to CI |
| 046-111-022 | 351 Alder Avenue | M1 to CI |
| 046-111-026 | 361 Blodgett Street | M1 to CI |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 046-111-027 | 353 Blodgett Street | M1 to C1 |
| 046-111-036 | 358 Blodgett Street | M1 to C1 |
| 046-111-040 | 335 Blodgett Street | M1 to C1 |
| 046-111-041 | 335 Blodgett Street | M1 to C1 |
| 046-111-042 | 321 Blodgett Street | M1 to C1 |
| 046-111-043 | 300 Alder Avenue | M1 to C1 |
| 046-111-044 | 292 Alder Avenue | M1 to C1 |
| 046-111-045 | 364 Blodgett Street | M1 to C1 |
| 046-111-046 | 365 Blodgett Street | M1 to C1 |
| 046-111-047 | 369 Blodgett Street | M1 to C1 |
| 046-111-048 | 373 Blodgett Street | M1 to C1 |
| 046-111-049 | 374 Blodgett Street | M1 to C1 |
| 046-111-050 | 368 Blodgett Street | M1 to C1 |
| 046-111-051 | None | M1 to C1 |
| 046-111-052 | 279 Helman Lane | M1 to C1 |
| 046-281-003 | 159 Helman Lane | M1 to C1 |
| 046-281-008 | 187 Helman Lane | M1 to C1 |
| 046-281-009 | 221 Helman Lane | M1 to C1 |
| 144-020-004 | 141 Helman Lane | M1 to C1 |
| 144-020-005 | 7911 Redwood Drive | M1 to C1 |
| 144-391-011 | 300 Valparaiso Avenue | RR to RVL |
| 144-391-001 | 390 West Sierra Avenue | RR to NL |
| 144-391-007 | 8540 Cypress Avenue | RR to NL |
| 144-391-008 | 8558 Cypress Avenue | RR to NL |
| 144-391-012 | 8564 Cypress Avenue | RR to NL |
| 144-391-017 | 8516 Cypress Avenue | RR to NL |
| 144-391-018 | 8526 Cypress Avenue | RR to NL |
| 144-391-021 | 8596 Cypress Avenue | RR to NL |
| 144-391-022 | 8592 Cypress Avenue | RR to NL |
| 144-391-023 | 8594 Cypress Avenue | RR to NL |
| 144-391-024 | 8576 Cypress Avenue | RR to NL |
| 144-391-027 | 8568 Cypress Avenue | RR to NL |
| 144-391-028 | 8570 Cypress Avenue | RR to NL |
| 144-161-006 | 201 Maple Avenue | RR to NL |
| 144-161-007 | 219 Maple Avenue | RR to NL |
| 144-161-008 | 235 Maple Avenue | RR to NL |
| 144-161-009 | 253 Maple Avenue | RR to NL |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 144-161-010 | 451 West Cotati Avenue | RR to NL |
| 144-161-011 | 485 West Cotati Avenue | RR to NL |
| 144-161-012 | 256 West Cotati Oaks Court | RR to NL |
| 144-161-013 | 240 West Cotati Oaks Court | RR to NL |
| 144-161-014 | 224 West Cotati Oaks Court | RR to NL |
| 144-161-015 | 206 West Cotati Oaks Court | RR to NL |
| 144-161-016 | 190 West Cotati Oaks Court | RR to NL |
| 144-161-017 | 176 West Cotati Oaks Court | RR to NL |
| 144-161-020 | 120 West Cotati Oaks Court | RR to NL |
| 144-161-021 | 135 West Cotati Oaks Court | RR to NL |
| 144-161-022 | 151 West Cotati Oaks Court | RR to NL |
| 144-161-023 | 167 West Cotati Oaks Court | RR to NL |
| 144-161-024 | 183 West Cotati Oaks Court | RR to NL |
| 144-161-025 | 215 West Cotati Oaks Court | RR to NL |
| 144-161-032 | 144 West Cotati Oaks Court | RR to NL |
| 144-161-033 | 160 West Cotati Oaks Court | RR to NL |
| 144-450-004 | 200 Valparaiso Avenue | R2 to NL |
| 144-450-023 | 180 Valparaiso Avenue | R2 to NU |
| 144-450-025 | 152 Valparaiso Avenue | R2 to NU |
| 144-450-026 | 160 Valparaiso Avenue | R2 to NU |
| 144-450-027 | 168 Valparaiso Avenue | R2 to NU |
| 144-450-028 | 172 Valparaiso Avenue | R2 to NU |
| 144-450-029 | 8720 Lund Hill Lane | R2 to NU |
| 144-450-030 | 8722 Lund Hill Lane | R2 to NU |
| 144-450-031 | 8724 Lund Hill Lane | R2 to NU |
| 144-450-032 | 8734 Lund Hill Lane | R2 to NU |
| 144-450-033 | 8754 Lund Hill Lane | R2 to NU |
| 144-450-034 | 8770 Lund Hill Lane | R2 to NU |
| 144-450-035 | Lund Hill Lane | R2 to NU |
| 144-380-002 | 492 West Sierra Avenue (Sierra MHP) | RR to NM/MHP |
| 144-340-014 | 425 West Sierra Avenue | R2 to NM/MHP |
| 144-352-008 | 11 Ramble Creek Drive | R2 to NM/MHP |
| 144-391-001 | 390 West Sierra Avenue | RR to NM |
| 144-391-002 | 330 West Sierra Avenue | RR to NM |
| 144-391-003 | 320 West Sierra Avenue | RR to NM |
| 144-391-004 | 310 West Sierra Avenue | RR to NM |
| 144-391-005 | 302 West Sierra Avenue | RR to NM |
| 144-352-004 | 191 Valparaiso Avenue | R1 to NM |
| 144-352-005 | 199 Valparaiso Avenue | R1 to NM |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 144-352-006 | 195 Valparaiso Avenue | R1 to NM |
| 144-410-032 | 8505 Park Avenue (Veterans' Building) | R1 to PF |
| 144-410-033 | 8421 Park Avenue (Veterans' Park) | R1 to OSR |
| 144-410-034 | 8561 Park Avenue (Veterans' Park) | R1 to OSR |
| 046-111-018 | 1 Trebino Court (Corp Yard) | M1/PF to PF |
| 144-250-010 | 320 School Street (Civic Center Park) | R1/PF to PF |
| 144-250-013 | 351 West Sierra Avenue (Civic Center Park) | R1/PF to PF |
| 144-250-017 | 203 W. Sierra Avenue (Police Station, Civic Center) | R1/PF to PF |
| 144-250-018 | 201 West Sierra Avenue (City Hall) | R1/PF to PF |
| 046-103-038 | 1073 Madrone Avenue | |
| | a) Thomas Page School | AR/PF to PF |
| | b) Easterly edge of school property | AR to OSR |
| 046-103-048 | 1075 Madrone Avenue | |
| | a) Thomas Page School | AR/PF to PF |
| | b) Easterly edge of school property | AR to OSR |
| 144-170-003 | 147 St. Joseph Way (Caltrans Lot) | CD/PF to PF |
| 144-070-032 | 162 Wilford Lane (Draper Park) | R3/PUD to OSR |
| 144-180-054 | Faletti Park | R2/P to OSR |
| 144-180-055 | Faletti Park | R2/P to OSR |
| 046-200-010 | Putnam Park | R1/P to OSR |
| 144-410-031 | 55 Myrtle Avenue (Putnam Park) | R1/P to OSR |
| 144-493-001 | Kotate Park | R1/P to OSR |
| Former public street | Delano Park | R1/P to OSR |
| 144-450-002 | 100 Valparaiso Avenue | AR to NL |
| 144-470-007 | 65 Lasker Lane | AR to NL |
| 144-170-009 | 150 St. Joseph Way | |
| | a) closest to Old Redwood Highway | R1 to CD |
| | b) central portion | R1 to NU |
| | c) southern edge | R1 to NL |
| 144-264-001 | 8220 La Plaza (La Plaza Park) | C1 to OSR |
| 144-265-001 | 8110 La Plaza (La Plaza Park) | C1 to OSR |
| 144-266-001 | 8100 La Plaza (La Plaza Park) | C1 to OSR |
| 144-275-001 | 1 East Cotati Avenue (Fire Station) | C1 to PF |
| 144-276-001 | 8139 La Plaza (La Plaza Park) | C1 to OSR |
| 144-277-001 | 8167 La Plaza (La Plaza Park) | C1 to OSR |
| 144-271-006 | 8198 Arthur Street | O to NL |

| A. P. Number | Location | Zone Change |
|---|---|---|
| 144-040-013 | 7455 Alder Avenue | RR To CG |
| 144-040-017 | 7457 Alder Avenue | RR To CG |
| *144-330-003* | *605 West Sierra Avenue (Crisp)* | *ARI 5 - CD* |

**EXHIBIT D**

**Cotati Land Use Code – New Zoning Districts**

| Zoning District Symbol | Name of Proposed Zoning District | General Plan Designation Implemented by Zoning District | Existing Equivalent Zoning District |
|---|---|---|---|
| OSC | Open Space - Conservation | Open Space (add to GP) | |
| OSR | Open Space - Recreation | Parks | |
| RR | Rural Residential | Rural | AR - Agricultural<br>RR - Rural |
| RVL | Residential Very Low Density | Low Density Residential | RR - Rural |
| NL | Neighborhood, Low Density | Low-Medium Density Residential | R1 - Single Family Residential |
| NM | Neighborhood, Medium Density | Medium Density Residential | R2 - Two-Family Residential |
| NU | Neighborhood, Urban | High Density Residential | R3 - Multi-Family Residential |
| CE | Commercial, East Cotati Corridor | Office, General Commercial Residential | C1 - General Commercial<br>O - Office |
| CG | Commercial, Gravenstein Corridor | Highway Commercial, General Commercial | C1 - General Commercial<br>CH - Highway Commercial<br>AC - Ag Commercial |
| CD | Downtown Commercial | General Commercial (La Plaza Specific Plan), Residential | CD - Downtown Commercial |
| CI | Commercial/Industrial District | Commercial/Industrial | M1 - Light Industrial |
| IG | General Industrial District | General Industrial | M1 - Light Industrial |
| PF | Public Facility District | Public Facilities | Public Facilities |
| SPSW | Specific Plan, Santero Way | Commercial | M1 – Light Industrial<br>M2 – Heavy Industrial |

# EXHIBIT G

Title 17 LAND USE

## Chapter 17.84 APPEALS

17.84.010 Purpose.

17.84.020 Appeal subjects and jurisdiction.

17.84.030 Filing of appeals.

17.84.040 Processing of appeals.

17.84.050 Directed referral.

## 17.84.010 Purpose.

This chapter establishes procedures for the appeal and review of determinations and decisions of the director, design review committee, or commission. (Ord. 766 §2 Exh. A (part), 2004).

## 17.84.020 Appeal subjects and jurisdiction.

A. Director Decision. A determination or decision by the director or department staff may be appealed to the commission.
B. Director Decision on Design Review. A decision of the director in relation to the design review process may be appealed to the design review committee. See Section 17.62.040 (Design review) of this title.
C. Design Review Committee Decision. A decision of the design review committee may be appealed to the commission. See Section 17.62.040 (Design review) of this title.
D. Commission Decision. A decision by the commission may be appealed to the council. (Ord. 766 §2 Exh. A (part), 2004).

## 17.84.030 Filing of appeals.

A. Eligibility. An appeal may be filed by:
1. Any person affected by an administrative determination or action by the director, as described in Section 17.84.020(A) of this chapter;
2. In the case of a planning permit and/or hearing decision described in Section 17.84.020 of this chapter, by anyone who, in person or through a representative, presented testimony at a public hearing in connection with the decision being appealed, or who otherwise informed the city in writing of the nature of their concerns before the hearing or determination.
B. Timing and Form of Appeal. Appeals shall be filed with the director, on a city application form, within ten calendar days after the date of the decision or action being appealed. The appeal shall include the required filing fee. The written appeal shall specifically state the pertinent facts of the case and the basis for the appeal.
C. Scope of Planning Permit Appeals. An appeal of a decision by the director, design review committee, or commission on a planning permit shall be limited to issues raised at the public hearing, or in writing before the hearing, or information that was not known at the time of the decision that is being appealed.
D. Action Being Appealed Suspended. Pending a decision on an appeal in compliance with this land use code, all rights emanating from the permit, license, or other entitlement that is the subject of the appeal, and all relevant time periods, shall be suspended.
E. Multiple Actions. In the event an appeal is filed regarding a decision on one of multiple permits

or city approvals concurrently granted for a single project (for example, the approval of a use permit is appealed on a project for which a negative declaration was approved at the same time), all concurrently granted city permits and approvals for the project shall be automatically appealed, and shall be considered and acted upon in compliance with this chapter. (Ord. 766 §2 Exh. A (part), 2004).

## 17.84.040 Processing of appeals.

A. Scheduling of Hearing. After an appeal has been received in compliance with Section 17.84.030 of this chapter, the director shall schedule the matter for a commission agenda, or the city clerk shall schedule the matter for a council agenda, as applicable to the appeal.

B. Report. After the appeal hearing has been scheduled, the director shall prepare a report on the matter, and forward the report to the appropriate appeal body.

C. Joining an Appeal. Only persons who file an appeal within the ten-day appeal period in compliance with Section 17.84.030 of this chapter shall be considered appellants of the matter under appeal.

1. Any person who wishes to join an appeal shall follow the same procedures for an appellant in compliance with Section 17.84.030 of this chapter.

2. No person shall be allowed to join an appeal after the end of the ten-day appeal period.

D. Withdrawal of Appeal. Once filed, an appellant may withdraw an appeal only within the ten-day appeal period established by Section 17.84.030(B) of this chapter.

E. Findings and Decision.

1. General Procedure. The appeal body shall conduct a public hearing in compliance with Chapter 17.88 (Public Hearings).

a. Scope of Review. When reviewing an appeal the review authority may consider any issue associated with the project for which a decision is being appealed, in addition to the specific grounds for the appeal. The review authority shall also consider any environmental determination applicable to the entitlement or decision being appealed.

b. New Evidence. If new or different evidence is presented during the appeal hearing, the commission or council, may refer the matter back to the director, design review committee, or commission, as applicable, for a report on the new or different evidence prior to a final decision on the appeal.

c. Decision. After a public hearing, the appeal body may:

i. Approve, modify, or disapprove the action appealed from, either in whole or in part, based on the record on appeal and the evidence received at the hearing on appeal; and

ii. Adopt additional conditions of approval deemed reasonable and necessary; or

iii. Disapprove the planning permit approved by the previous review authority, even if the appeal only requested modification or elimination of one or more conditions of approval.

2. Appeals to the Council. A decision by the commission may be appealed to the council as provided by Section 17.84.030 (Filing of appeals) of this chapter.

a. Authority of Council. The council shall have the authority to approve, modify, or disapprove the action appealed from, either in whole or in part, based on the record on appeal and the evidence received at the hearing on the appeal. The lack of an affirmative majority vote on the appeal, or a tie vote, shall constitute denial of the project appealed.

b. Referral. The council may refer any appeal to the commission for a report and recommendation, or for further proceedings. In this event, if the commission changes its decision, and the appeal is thereafter returned to the council, the appeal shall be deemed to be from the decision of the commission as modified.

c. Finality of Decision. The findings, decision, and action of the council on an appeal shall be final.

3. Simultaneous Appeal and Directed Referral. When an action is both appealed and a directed referral is called (Section 17.84.050), both the appeal and the directed referral shall be heard by the council.

F. Effective Date of Appeal Decision. A decision by the commission on an appeal is effective on the eleventh day after the decision, when no appeal to the decision has been filed with the council. A decision by the council is effective as of the date of the decision. (Ord. 766 §2 Exh. A (part), 2004).

## 17.84.050 Directed referral.

A. Purpose. This section provides a process for an individual council member to initiate a directed referral on an application where action has been taken and is normally final at a lower level of authority, and to have the matter heard by the commission, design review committee, or council, as determined by the council.

B. Grounds for Directed Referral.

1. If the council refers an action to the design review committee or commission, the grounds for the directed referral shall be that the individual council member believes the matter should be determined by the design review committee or commission.

2. If the council refers an action to itself, the grounds for the directed referral shall be that the individual council member believes the matter should be determined by the council.

C. Procedure for Directed Referral. The individual council member shall prepare and sign a written directive that specifies:

1. Whether the action will be referred to the design review committee, the commission, or the council;

2. If the action will be referred to the design review committee or commission, whether the design review committee's or commission's decision shall automatically proceed to the council for review; and

3. Whether the directed referral is being initiated on the grounds specified in subsection (B)(1) or (B)(2) of this section. No other grounds or reasons for the directed referral shall be stated.

D. Time Limit. A directed referral shall be filed with the city manager within the time limit for appeals provided by Section 17.84.030(B) of this chapter or, in the case of a decision for which no time limit for appeal is specified, within ten calendar days of the action being referred.

E. Action by Review Authority. Any matter brought before the review authority designated by the council as a directed referral shall be considered at a noticed public hearing.

1. All alternatives available to the review authority which considered the original application are also available to the review authority for the directed referral, which may approve, modify, approve with conditions, or disapprove the item.

2. When considering a directed referral, the review authority may consider any issue associated with the decision being referred, in addition to the specific grounds for the referral.

F. Participation by Initiator of Directed Referral. The council member who initiated a directed referral process shall have full participation rights in the hearing, unless actual bias or prejudice is otherwise shown. (Ord. 766 §2 Exh. A (part), 2004).

<< previous | next >>